Cynthia Anderson Barker
NATIONAL LAWYERS GUILD
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
t.  213 381-3246
f. 213 252-0091
e. cablaw@hotmail.com

Paul Hoffman, SBN 71244
John Washington  SBN 315991
SCHONBRUN, SEPLOW, HARRIS &
HOFFMAN LLP
11543 W. Olympic Blvd. SBN 315991
Los Angeles, California 90064-1508
t.  310 396-0731; f.  310 399-7040
e.  hoffpaul@aol.com
e. jwashington@sshhlaw.com

Attorneys for Plaintiffs
Additional Counsel on Following Page

R. Brent Wisner, Esq. (SBN: 276023)
e. rbwisner@baumhedlundlaw.com
Pedram Esfandiary (SBN: 312569)
e. pesfandiary@baumhedlundlaw.com
Bijan Esfandiari (SBN:223216)
Monique Alarcon (SBN: 311650)
**BAUM, HEDLUND, ARISTEI &
GOLDMAN, P.C.**
10940 Wilshire Blvd., 17th Floor
Los Angeles, CA 90024
t.  310 207-3233
f.  310 820-7444

Barrett S. Litt, SBN 45527
Lindsay Battles  SBN 262862
KAYE, MCLANE, BEDNARSKI & LITT
975 E. Green Street
Pasadena, California 91106
t.  626 844-7660
f.  626 844-7670
e.  blitt@kmbllaw.com
e.  lbattles@kmbllaw.com

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| BLACK LIVES MATTER LOS ANGELES, CANGRESS (DBA LOS ANGELES COMMUNITY ACTION NETWORK), LINUS SHENTU, WESTON ROWLAND, individually and on behalf of a class of similarly situated persons, <br><br> PLAINTIFFS, <br><br> vs. <br><br> CITY OF LOS ANGELES, a municipal entity, CHIEF MICHEL MOORE , and DOES 1-10 inclusive, <br><br> DEFENDANTS. | Case No.: <br><br> **COMPLAINT: CLASS ACTION INJUNCTIVE RELIEF AND DAMAGES** <br><br> **42 U.S.C. § 1983: FIRST, FOURTH AND FOURTEENTH AMENDMENTS** <br><br> **DEMAND FOR JURY TRIAL** |

 Carol A. Sobel, SBN 84483
Katherine Robinson SBN 323470
LAW OFFICE OF CAROL A. SOBEL
725 Arizona Avenue, Suite 300
Santa Monica, CA 90401
t.  310 393-3055
e.  carolsobel@aol.com
e.  katherine.robinson@gmail.com

Colleen Flynn, SBN 234281
LAW OFFICE OF COLLEEN FLYNN
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
t.  213 252-9444
r.  213 252-0091
e. cflynn@yahoo.com

Matthew Strugar, SBN 232951
LAW OFFICE OF MATTHEW STRUGAR
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90039
t.  323 696-2299
e.  matthewstrugar@gmail.com

Jorge Gonzalez  SBN 100799
2485 Huntington Dr., Ste. 238
SAN MARINO, CA 91108-2622
t. 626 328-3081
e. jgonzalezlawoffice@gmail.com

Olu Orange SBN 213653
Orange Law Offices
3435 Wilshire BLvd., Ste. 2910
LOS ANGELES, CA. 90010-2015
T. 213 736-9900
f. 213 417-8800
e. o.orange@orangelawoffices.com

1.    This action arises out of the protests across the nation following the murder of George Floyd by officers with the Minneapolis Police Department.  The events in Minneapolis, in a very short time frame after the deaths of Breonna Taylor and Ahmaud Arbery, brought out hundreds of thousands of people around the country simultaneously to condemn the deaths of black and brown men and women at the hands of law enforcement and vigilantes condoned by local law enforcement. Some of the larger demonstrations in the country occurred in the Los Angeles area. Over the course of approximately a week, the Los Angeles Police Department arrested more than 2600 individuals engaged in peaceful protest.

**2.**    This was not the first time that the LAPD has engaged in these tactics. Over the course of the last several decades, the Defendant City has been sued repeatedly for many of the same tactics on display the past week, including kettling protestors before declaring an unlawful assembly, excessive force with batons and rubber bullets, and prolonged handcuffing and improper conditions of confinement for arrestees, only recently settling a lawsuit raising many of the same challenges in the protests that followed the decision of the Ferguson Grand Jury not to indict the officer who shot and killed Michael Brown.  *See Chua v. City of Los Angeles*, 16-cv-00237-JAK-GJS (C.D. Ca.). By kettling the demonstrators, detaining, keeping them tightly handcuffed on buses for hours, without access to bathroom facilities, water or food, Defendants violated Plaintiffs' rights under the U.S. and California constitution.

3.    This Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights jurisdiction). This Court has jurisdiction to issue declaratory or injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

4.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391, as all Defendants and events giving rise to the claims herein occurred in the Central District of California.

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

PARTIES

5.     Plaintiff BLACK LIVES MATTER LOS ANGELES ("BLMLA") is part of a nationwide organization with chapters in many major cities, including Los Angeles.  The organization originated in Los Angeles with demonstrations on July 13, 2013, the date George Zimmerman was acquitted of killing teen-ager Trayvon Martin in Florida.

6.     BLMLA is one of the largest and most active chapters of the organization, with nearly 500 active members and organized ally groups, including White People for Black Lives.    On average, BLM sponsors four actions a week. Defendants' actions interfered with BLMLA's right to assembly and speech. The BLMLA plans to assist, plan, participate in, hold similar events in the future, on its own or in conjunction with others, and is fearful that the police actions in response to these and similar protests of sanctioned executions will be repeated absent injunctive relief to prohibit the practices, policies, and customs of the LAPD that resulted in the unlawful action in response to the recent protests throughout the City.

7.     In response to the murder of George Floyd, BLM organized protests in Los Angeles.  One such action was held at Pan Pacific Park in Los Angeles on Saturday, May 30, 2020.  During the course of this protest and others over the past week, while BLMLA and its members were engaged in lawful First Amendment activity, the LAPD used force to terminate the protests, including the indiscriminate use of so-called "less lethal" weapons that caused injury to its members and instilled fear in them that, if they chose to assemble in public spaces to express their opposition to police violence across the nation against black men and women, they would be the subject of such violence and arrest.

8.     Plaintiff CANGRESS, dba Los Angeles Community Action Network (LA CAN), is a grassroots non-profit organization operating in Skid Row for approximately two decades.  More than 800 low-income residents of Skid Row are involved with LA CAN, many of whom are unsheltered each night. In addition,

individuals such as Plaintiff SHENTU are members and supporters of the organization. The primary purpose of the organization is to organize and empower community residents to work collectively to address systemic poverty and oppression in the community. Since its founding in 1999, LACAN has been the only member-driven organization in Skid Row whose goal is to protect the rights and prevent the further disenfranchisement of homeless and poor people in Los Angeles. LA CAN brings this action on behalf of its members and associates who have been arrested, subjected to the use of less-lethal weapons and other tactics aimed at shutting down public spaces over the past 10 days by employees and agents of the City pursuant to the enforcement policies, practices and customs of the City. As a result of Defendants' unlawful actions, LA CAN has expended personnel resources to try and prevent at-risk individuals from being subjected to these unlawful policies and assist their members and associates to be safe from police actions.

9.      Plaintiff LINUS SHENTU is a long-time member of CANGRESS. On June 2, 2020, he was participating in a peaceful protest in Hollywood, near Sunset and Vine. When the march was on Van Ness between Melrose and Santa Monica Boulevard, SHENTU observed police started blocking streets and kittling the protestors. The march was accompanied by a car caravan. From a half a block away, SHENTU observed the police dragging people out of cars. All around him, the marchers started running. SHENTU and his partner were able to locate the sister of his partner and jumped in her car. Because the police had blocked off all of the streets, they could not leave the area. To avoid arrest and be safe, they followed other cars to a parking lot ofa nearby apartment building.

10.      As they remained in their car, they observed a few officers enter the back yard and begin to pull people out of their vehicles. The officers ordered SHENTU, his partner and her sister out of their cars, opened the rear passenger door where his partner was seated and began to yank her harshly by her arm. SHENTU voluntarily exited the rear passenger seat. They were lined up on the side of the

building with their hands zip tied behind their backs.  In all, approximately 30 individuals were arrested and held at Elmwood and Van Ness for approximately one hour while officers filled out Field Interview cards with their personal identifiers.

11.     After approximately one hour, Sheriff's buses arrived to transport the arrestees.  They were driven to a makeshift processing center in Van Nuys.  In all, SHENTU estimates that he was detained, handcuffed tightly behind his back, for about four hours.   SHENTU, his partner and his partner's sister experienced numbness, bruising and soreness from the handcuffing and the forced removal from their vehicle.

12.     The injuries and violations of rights experienced by Plaintiff SHENTU are typical of, and consistent with, the violations of rights and injuries suffered by the arrestee class. `

13.     In addition to the experience of Plaintiff SHENTU, other members of organizational plaintiff CANGRESS were subjected to excessive force.  Most, if not all of these individuals, are unhoused and had no place they could go to avoid violating the curfew.  Some were arrested and taken to Jackie Robinson stadium on the VA property in West Los Angeles.  They were all tightly handcuffed from the time they were arrested, transported across town to Brentwood, held for processing and then released, homeless on the streets of Los Angeles during a city-wide curfew.

14.     Still other low-income residents of Skid Row were subjected to excessive force through the indiscriminate use of "rubber bullets" by the LAPD.  For example, a participant in LA CAN, "Cincinatti," was struck in the face by so-called less lethal weapons.  Cincinatti is disabled and in a wheelchair.  He pleaded with police not to use force on him before being shot in the face.  But he was not the only disabled person in a wheelchair to be struck in the face by a rubber bullet as the LAPD enforced curfew laws and other misdemeanors in the last week.



15.    Plaintiff Weston Rowland is a resident of Los Angeles County.  After going to the BLMLA rally in Pan Pacific Park on Saturday, Rowland marched with the protestors to the Fairfax area. As he left the Park, the police was struck with a baton in the ribs and his friend was repeatedly struck with a baton.  The police had formed a line blocking the march.   Rowland heard no orders from the officers other than "back up."  In a very short time, the officers opened fire with less lethal weapons, aiming directly at the demonstrators and striking many in the upper body.  As Weston tried to help a woman on the ground, without notice or warning, he was struck with a rubber bullet in his shoulder and sustained extensive bruising and pain. He sues as an individual and on behalf of a class of similarly situated individuals.

16.     Defendants' actions interfered with BLMLA's right to assembly and speech. BLMLA plans to assist, plan, participate in, hold similar events in the future, on its own or in conjunction with others, and is fearful that the police actions in response to these and similar protests of sanctioned executions will be repeated absent injunctive relief to prohibit the practices, policies, and customs of the LAPD

that resulted in the unlawful action in response to the recent protests throughout the City.

17.  Defendants' actions also interfered with the work of Plaintiff CANGRESS to advocate for racial and economic justice for the residents of Skid Row, both housed and unhoused. Because Defendants indiscriminately arrested individuals on Skid Row for violations of the curfew and assaulted them with less lethal weapons, Plaintiff CANGRESS has had to shift its resources to protecting its members and other residents of Skid Row from the unlawful conduct of the LAPD. Plaintiff CANGRESS' time in recent months was heavily focused on advocating for and protecting a highly-vulnerable population for COVID-19 from the greater likelihood of contracting and dying from the virus based on their poverty, underlying medical conditions and race.

18.  The Plaintiff classes consist of: 1) approximately 2600 individuals who were subjected to excessively tight and prolonged handcuffing, held on buses and in garages for extended periods of time, without access to bathrooms or water when they engaged in the spontaneous protests against a number of recent widely publicized police killings of civilians, the most recent spark being the murder of George Floyd in Minneapolis, Minnesota; and 2) approximately 10,000 individuals, if not more, who were struck by so-called "rubber bullets" and/or baton strikes administered without lawful justification and in a manner contrary that was contrary to proper use and inflicted maximum injury.

19.  Defendant City of Los Angeles is a municipal corporation duly organized and existing under the Constitution and laws of the State of California. The Los Angeles Police Department ("LAPD") is a local government entity and an agency of Defendant City of Los Angeles, and all actions of the LAPD are the legal responsibility of the City of Los Angeles. The City of Los Angeles is sued in its own right on the basis of its policies, customs, and practices which gave rise to Plaintiffs' federal rights claims.

20.     Defendant Chief Michel Moore, is and was, at all times relevant to this action, the LAPD police chief and a policymaker for his department. He is sued in both his individual and official capacities. .

21.     Plaintiffs are informed, believe, and thereupon allege that Does 1 through 10 were the agents, servants, and employees of Defendants City of Los Angeles and/or the LAPD. Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10, inclusive, and therefore sue these Defendant by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. The individual Doe Defendants are sued in both their individual and official capacities.

22.     Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto Does 1 through 10, in addition to the named Defendants, are responsible in some manner for the damages and injuries alleged herein.

23.     Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto Defendants, and each of them, were the agents, servants and employees of the other Defendants and were acting at all times within the scope of their agency and employment and with the knowledge and consent of their principal and employer. At all times Defendants were acting under color of state law.

24.     Plaintiffs are informed, believe, and thereupon allege that the practices, policies, and customs of the City of Los Angeles and/or the LAPD caused the unlawful action taken against Plaintiffs.

## FACTS

25.     On May 25, 2020, Minneapolis Police Officer Derek Chauvin murdered George Floyd, suspected of forgery for attempting to use a purported counterfeit $20 bill.  Officer Chauvin, along with two other officers, held Mr. Floyd on the ground, handcuffed behind his back, and ignored pleas to get off his neck, back and legs and let him breathe.  Mr. Floyd died on the street in Minneapolis.

26.     Because of extensive video by onlookers, security cameras and, ultimately police body cameras, both the Minneapolis law enforcement and prosecutors, as well as the public, concluded that George Floyd was just the latest person to die at the hands of police because of deliberate and unlawful tactics of law enforcement.

27.     The death of George Floyd  sparked an extraordinary reaction of protests across the country and the world.  In Los Angeles, tens of thousands of people participated in lawful and peaceful protests.  While some individuals applied different tactics, the Defendants treated all those who came out to express their opposition to a police state to an unlawful police state with expansive curfews and arrests for failing to comply with the curfews, failing to disperse, unlawful assembly, failure to follow a "lawful" order of an officer and similar misdemeanors undercutting the right to engage in protected expressive activity in public spaces.

28.     California Penal Code § 409, defining an unlawful assembly, has repeatedly been construed to require a showing of imminent violence that so permeates a lawful expressive activity that law enforcement may curtail the rights of all.  Those facts did not exist in this instance.  Instead, the LAPD and Mayor Garcetti applied a ham-handed approach, silencing everyone.  Nearly 3,000 people were arrested as a result.

29.     The arrest class of Plaintiffs were transported to LAPD jails around the City.  All were held on buses or off-loaded into garages and similar facilities, where they were held handcuffed behind their backs.  All members of the arrest class were held in this manner for a minimum of several hours, with some held more than 12 hours in these excruciatingly painful conditions.  The class members experienced numbness in their hands and requests to loosen the zip ties or remove them went unanswered.  Without access to bathrooms, arrestees were compelled to urinate on themselves.

30.    The arrest class was held under these unlawful conditions of confinement despite the fact that, to address the COVID-19 pandemic, California currently has a $0 bail for any misdemeanor where the bail would be less than $50,000.  The prolonged detention of the arrest class is even more unjustified in light of the mandatory instruction of California  California Penal Code § 853.6, requiring that individuals suspected of a misdemeanor violation be cited and released in the field unless one of a limited number of restrictions apply.

31.    Penal Code § 853.6 imposes a mandatory requirement to release misdemeanor violators on their own recognizance in the field or immediately after booking unless individualized probable cause exists to believe that one or more exceptions to the statute exists as a basis to deny OR release.  In this instance, there was no reason why Defendants could not process individuals in the field and release them without the prolonged handcuffing.  Both § 853.6 by statute and the First Amendment by constitutional principle require individualized suspicion before fundamental rights may be denied.  All but approximately three percent of the nearly 2700 individuals arrested by the LAPD over the course of the Floyd protests were charged with misdemeanors for curfew violations, failure to disperse and failure to file a "lawful" order of a law enforcement officer.  There was no reasonable basis to believe that each and every one of the arrestee Plaintiffs, or even any of the Plaintiffs, would engage in a similar purported misdemeanor violation if they had been cited and released in the field. The Defendant LAPD had the capacity to process arrestees in the field.  On a daily basis, LAPD officers run individuals they stop on suspected misdemeanor violations for wants and warrants before writing a misdemeanor citation with a notice to appear.    The entire Plaintiff class was denied the individualized assessment of criminal liability that is the hallmark of due process and each had their liberty unlawfully restricted as a result of a deliberate decision by Defendant City to ignore the explicit command of Penal Code § 853.6.

32.     This action was in keeping with the City's unlawful policy, beginning on or around November 17. 2011, of denying OR release to individuals arrested for engaging in civil disobedience. According to former LAPD Deputy Chief Perez, who first announced this policy during the Occupy protests in Los Angeles in 2011, the decision was made to deny OR release to those engaged in First Amendment activity to "teach people a lesson." Subsequently, small groups of individuals involved in acts of civil disobedience at the Bank of America headquarters on November 17, 2011, were arrested on non-violent misdemeanor offenses arising from protest activity and denied OR release. Again, on November 30, 2011, the City denied OR release to the nearly 300 people arrested in connection with the mass arrests at City Hall made in connection with the Occupy L.A. demonstration.

33.     The same unlawful action occurred in the November 2014 mass arrest of persons protesting the decision of the grand jury in Ferguson Missouri not to indict the police officer who shot and killed Michael Brown.  In public statements, then-Chief Beck and other command staff in the LAPD stated that protestors would be held and not released OR for retaliatory reasons and without the requisite individualized suspicion.  In this instance, while the Defendants did not deny OR release for arrestees for minor misdemeanors, they nonetheless detained them for up to 14 hours in some instances rather than cite and release them in the field as directed by California Penal Code 853.6.

34.     Both the Occupy arrests in 2011 and the Ferguson arrests in 2014 evince the obvious need for the Defendants to plan to respond to similar protests with the technology the LAPD regularly uses on a daily basis to run wants and warrants in the field, without seizing, handcuffing and detaining individuals for prolonged periods of time.  The failure to develop and implement such a plan reflects a gross deficiency in law enforcement operations and/or a deliberate decision to inflict punitive measures against individuals coming together to exercise their First

Amendment rights and express their collective outrage and opposition to police abuse.

35.     Such a basis for a blanket decision to deny Plaintiffs' liberty and detain them without justification for prolonged times violates the First, Fourth, and Fourteenth Amendment rights of Plaintiffs and the class members, and was done with the specific and deliberate intent to interfere with the exercise of Plaintiffs' rights to assembly and due process.

36.     Defendants had ready alternatives to the prolonged detention of the arrest class in tight handcuffs, without access to bathrooms, food or water.  In the Ferguson protests in 2014, the LAPD detained a group of approximately 40-50 protestors at Beverly and Alvarado, kettled them, handcuffed them with twist-ties, brought in computers and video recording equipment, collected the same information as would be done in an a booking, then released them with orders to disperse and advised the detainees that they would be taken to jail and held if they were found again that night in violation of the dispersal order.  In all, people were handcuffed no longer than approximately one hour.  No one suffered injury as a result of the prolonged tight handcuffing and, significantly, no one was a repeat offender that night or any other night as the demonstrations protesting the death of Michael Brown continued.  The officers patted down the demonstrators' clothing and searched their personal belongings, including backpacks, as they would do if they were taking them into custody for booking.    LAPD officers ran wants and warrants on each detainee in the field, as they do for any traffic stop and as they do with unhoused individuals in the city routinely.

37.     Indeed, the Ninth Circuit held that a detention of a motorist in handcuffs for more than 20 minutes to issue a citation and release the person was a violation of the driver's constitutional rights and raised issues of retaliation for "contempt of cop."  This is significant because the length of time held excessive by the Ninth Circuit is similarly to the results of a study conducted by the Los Angeles

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

Board of Police Commissioners in or about 2013, showing the time required to cite and release in the field compared to the time to book and release at the station.

## MONELL ALLEGATIONS

38.     The City, through Chief Moore and the LAPD, has failed to train its officers in the constitutional responses to peaceful demonstrations as revealed by the above allegations.   The City has a custom and police of using excessive force against peaceful protestors, kettling lawful assemblies and arresting the participants, and applying policies that result in prolonged detentions in restraints, causing injury and denying liberty based on some unfounded group "suspicion." The City is well aware of its constitutional duties in light of the settlement agreements and consent judgments discussed below in *National Lawyers Guild v. City of Los Angeles* and *MIWON v. City of Los Angeles*, as well as other agreements entered into on these issues over the years.  The need for training and discipline to enforce constitutional guarantees in such circumstances is obvious and necessary. The City has known of the deficiencies in its training since at least 2000 and entered into settlement agreements in June 2005 and June 2009, each time agreeing to revised policies and training, yet failing to promulgate policies effectuating the settlement agreements and/or to train its command staff and officers on revised policies, if any exist.  The current unlawful crowd control and use-of-force policies and the long-standing customs and practices of the Defendants do not meet constitutional requirements.

## THE SETTLEMENT IN NATIONAL LAWYERS GUILD V. CITY OF LOS ANGELES:

39.     In June, 2005, the City of Los Angeles entered into a settlement agreement in *National Lawyers Guild, et al. v. City of Los Angeles, et al.*, CV 01-6877 FMC (CWx), an action arising from the disruption of lawful assemblies and use of unlawful force during the Democratic National Convention ("DNC") in Los

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

Angeles in 2000 and a subsequent demonstration on October 22, 2000. The settlement provided for important changes in the policy and practices of the LAPD as applied to demonstrations.

40.     Significantly, the settlement provided that, prior to declaring an unlawful assembly, the LAPD Incident Commander should evaluate the feasibility of isolating and arresting those responsible for any unlawful conduct, and if feasible, take action only against those individuals.  The settlement also addressed the use of less-lethal weapons and chemical irritants to disperse peaceful protestors.

**THE SETTLEMENT IN *MULTI-ETHNIC WORKER ORGANIZING NETWORK V. CITY OF LOS ANGELES*:**

41.     On May 1, 2007, the LAPD assaulted a peaceful, permitted immigration march in MacArthur Park.  The attack on the demonstrators was without warning.  No dispersal order was given until more than three minutes into the police action and, even then, the dispersal order was grossly inadequate, given from helicopters in English to a largely Spanish-speaking assembly.  During the course of litigating the *MIWON* action, the LAPD conceded that it had not fully implemented training and policy orders regarding the *NLG* settlement two years earlier.  In fact, no policy changes were ever finalized.

42.     On June 24, 2009, the federal district court approved and entered a Structural Relief Order as part of the settlement of a class action lawsuit brought on behalf of all those subjected to the LAPD's May Day action.  Through this settlement, the LAPD agreed that it would facilitate demonstrations that may temporarily block traffic. This latter provision is consistent with established law in the Ninth Circuit, recognizing the need for local agencies to accommodate "spontaneous" protests in the streets, particularly in response to allegations of police misconduct.

43.     The *MIWON* order also set out requirements to declare an unlawful assembly: an amplified loudspeaker system with an officer at the far side of the

crowd to record the officer; if there is no serious violence occurring, the order shall be made repeatedly over a period of time, including an "objectively reasonable" period of time to disperse and identification of "a clear and safe route" to follow to disperse.  The order should be given so that it is heard by the entire crowd.  These requirements were not met in this instance in most locations.

44.    The terms of the *MIWON* structural relief agreement were to be included in the LAPD's Crowd Control and Use of Force Manuals and every officer at the rank of Sergeant I and above, as well as the entire Metropolitan Division, were to undergo training every two years.  Chief Moore, as well as those members of his command staff officers to whom he has delegated his responsibility to enact and implement lawful policies for responding to demonstrations are aware of the unlawful policies, practices, and customs of the City and the LAPD which resulted in the settlement in *National Lawyers Guild v. City of Los Angeles* in June, 2005. Moreover, Chief Moore and his delegated command staff are aware that the use of unlawful dispersal orders, baton strikes and "less-lethal" weapons to break up lawful protests, in particular, is a custom so ingrained in the marrow of the LAPD that it was critical to take all steps necessary to ensure that official policy was implemented in a manner sufficient to address the deeply rooted custom to violate First Amendment rights in the specific ways identified in the *National Lawyers Guild* settlement agreement. The failure to take such steps directly lead to the injuries suffered by the Plaintiffs.

45.    Chief Moore, as well as those members of his command staff officers to whom he has delegated his responsibility to enact and implement lawful policies on the declaration of an unlawful assembly, are aware of the unlawful policies, practices, and customs of the City and the LAPD which resulted in the settlements in *NLG* and *MIWON*.  Moreover, Chief Moore and his delegated command staff are aware that the use of unlawful dispersal orders to break up lawful protests and the use of excessive force is a custom so ingrained in the marrow of the LAPD that it

was critical to take all steps necessary to ensure that official policy was implemented in a manner sufficient to address the deeply rooted custom to violate First Amendment rights in the specific ways identified in the settlement agreements. The failure to take such steps directly lead to the injuries suffered by the Plaintiffs. This failure amounted to an "acquiescence in the constitutional deprivations of which [the] complaint is made" and deliberate indifference to the rights of persons with whom the police come into contact, and constituted a conscious choice by the City not to properly train its law enforcement personnel on these issues.

46.    The City, through Chief Moore and his command staff to whom he delegated decision-making, also knew from the recent litigation involving the Occupy-protest arrests, *Aichele v. City of Los Angeles*, and *Chua v. City of Los Angeles* that it violated Plaintiffs' right to due process and deprived them of their liberty interest in violation of Penal Code § 853.6 based on their perceived association with the protest.

47.    On information and belief, Chief Moore delegated responsibility and authority to persons within his command staff to act as the final policy maker in determining the response to assemblies at various locations where protests of the death of George Floyd occurred.    The persons who made these decisions, acted as the delegated policy maker for the City of Los Angeles on these issues.  There was no time, opportunity, or procedure for anyone to review or revise the decisions made by these delegated policy makers prior to their final implementation.

## CLASS ACTION ALLEGATIONS

48.    The named Plaintiffs bring this action individually and on behalf of a proposed class of all other persons similarly situated pursuant to FRCivP Rule 23(b)(1), (b)(2) and (b)(3). The damages classes are defined as:

1. all persons who were arrested by the LAPD on misdemeanor charges of failure to obey a curfew, failure to disperse, failure to follow a lawful order

of a police officer and/or unlawful assembly, all in association with the protests against the killing of George Floyd in Minneapolis, Minnesota and who were subjected to prolonged tight hand-cuffing, denied access to bathrooms, water and food;

2. all persons who were shot with so-called "less-lethal weapons" and/or struck with batons.

49.     Each class is inclusive of people present to protest and those otherwise present in the vicinity as bystanders. The first class consists of approximately 2600 individuals and the second class consists of a presently unknown number but is estimated as in excess of 1,000 individuals.

50.     The injunctive relief class is defined as all persons who have in the past, or may in the future, participate in, or be present at, demonstrations within the City of Los Angeles in the exercise of their rights of free speech and petition. Without intervention by this Court, those class members are at risk of having their rights violated in the future due to the City's past and threatened future actions. The injunctive relief Plaintiffs have no adequate remedy at law to protect the future lawful exercise of their constitutional rights, and, without action by this court, will suffer irreparable injury, thereby entitling them to injunctive and declaratory relief. The injunctive relief class is represented by the National Lawyers Guild, as well as the individual class representatives.

51.     Because the issues in the two classes are substantially the same and arise from the same events, the Rule 23 criteria for the classes are discussed jointly without differentiating between the different classes.

52.     Questions of law or fact common to putative class members predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating this lawsuit. Alternatively, Defendants have acted on grounds generally applicable to the class, thereby making class-wide declaratory and injunctive relief appropriate.

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

53.     The claims of the putative class satisfy the requirements of Federal Rule of Civil Procedure 23(b)(3) and, alternatively, Rule 23(b)(2).

54.     The putative class consists of approximately 170 individuals – 130 individuals in the 6th and Hope Sub-Class and 40 in the Beverly and Alvarado Sub-Class -- and is so numerous as to render joinder impractical.

55.     Defendants detained and/or arrested the putative class and sub-classes as a group and treated all similarly, acting on ground applicable to the putative class. The named Plaintiffs' claims that the First, Fourth, and Fourteenth Amendment rights—and their analogous state Constitution, statutory, and common law rights— were violated raise common question of law and fact.  the Defendants have acted, threaten to act, and will continue to act, on grounds generally applicable to the class, thereby making appropriate final injunctive relief or declaratory relief with respect to the class as a whole.

56.     Questions of law and fact are common to the class and sub-classes, including whether the putative class and sub-classes were detained and/or arrested without probable cause and based on unlawful or non-existent dispersal orders and whether the 6th and Hope sub-class members were denied the liberty interest in OR release as codified in California Penal Code § 853.6.

57.     The legal theories and factual predicates upon which the damages classes and sub-classes seek relief predominate over any questions affecting only individual members. The legal harms suffered by the named Plaintiffs and the class Plaintiffs are identical.

58.     The named Plaintiffs' claims are typical of those of the putative class and sub-class each represents, as each was engaged in or associated with peaceable and lawful free speech and assembly activity when each was subjected to excessive force and/or arrested

59.     The named Plaintiffs will fairly and adequately represent the common class interest. The named Plaintiffs have a strong interest in achieving the relief

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

requested in this Complaint, they have no conflicts with members of the Plaintiff class, and they will fairly and adequately protect the interests of the class.

60. The named Plaintiffs are represented by counsel who are well-experienced in civil rights and class action litigation and are familiar with the issues in this case. Attorneys Paul Hoffman, Barry Litt, and Carol Sobel have successfully litigated a number of class action cases on behalf of protesters in Los Angeles. Most recently, they were appointed by the court as class counsel in *Aichele, et al. v. City of Los Angeles, et al.*, No. 2:12-CV-10863-DMG (C.D. Cal. August 26, 2012), challenging, *inter alia*, the LAPD's denial of OR release to those arrested during the Occupy action at Los Angeles City Hall. They were also appointed as class counsel in *Multi-Ethnic Immigrant Worker Network v. City of Los Angeles*, 24 F.R.D. 631 (C.D. Cal. 2007), challenging the LAPD's assault on a lawful immigrant-rights rally in MacArthur Park on May 1, 2007. That case resulted in a settle of $12,850,000 -- the largest amount ever paid nationally in a protest case in which there were no arrests of the Plaintiffs. In addition to class action protest litigation, attorneys Hoffman, Litt, and Sobel have served as class counsel in a number of other class actions redressing civil rights violations, including most recently *Chua v. City of Los Angeles*, arising from the Ferguson protests in 2014.

61. Counsel for the named Plaintiffs know of no conflicts among or between members of the class, the named Plaintiffs, or the attorneys in this action.

62. The Defendants have acted and refused to act on grounds generally applicable to the putative class. Injunctive and declaratory relief for the putative class as a whole is appropriate.

63. The prosecution of separate actions by individual members of the class would create a risk of inconsistent standards of conduct for the Defendants, thereby making a class action a superior method of adjudicating this lawsuit.

64. Plaintiffs do not know the identities of all of the class members. Plaintiffs are informed and believe and thereon allege that the identities of class

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

members in the arrestee class may be obtained from the personal information compelled by Defendants through arrest records.

65.     Plaintiffs are informed and believe and thereon allege that the LAPD officers acted in accordance with orders given by supervisors from the highest command positions, in accordance with policies and procedures instituted by the LAPD and the City of Los Angeles.

66.     As a direct and proximate cause of the conduct described herein, the named individual Plaintiffs have been denied their constitutional statutory, and legal rights as stated herein, and have suffered general and special damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety and other damages in an amount according to proof.

67.     Defendants' acts were willful, wanton, malicious, and oppressive, and done with conscious or reckless disregard for, and deliberate indifference to, Plaintiffs' rights.

68.     Defendants' polices practices, customs, conduct and acts alleged herein resulted in, and will continue to result in, irreparable injury the Plaintiffs, including but not limited to violation of their constitutional and statutory rights. Plaintiffs have no plain, adequate, or complete remedy at law to address the wrong described herein. The Plaintiffs and class members intend in the future to exercise their constitutional rights of freedom of speech and association by engaging in expressive activities in the City of Los Angeles. Defendants' conduct described herein has created uncertainty among Plaintiffs with respect to their exercise now and in the future of these constitutional rights. Specifically, Plaintiffs are concerned that, if arrested, whether lawfully or unlawfully, they will again be denied the liberty interest codified at California Penal Code § 853.6  Plaintiffs therefore seek injunctive relief from this court to ensure that Plaintiffs and persons similarly situated will not suffer violations

of their rights from Defendants' illegal and unconstitutional policies, customs, and practices described herein.

69.     Plaintiffs also seek injunctive relief in the form of an order requiring that Defendants seal and destroy and records derived from Plaintiffs' arrests, including fingerprints, photographs, and other identification and descriptive information, and all information, and biological samples and information obtained from such biological samples collected from the Plaintiff class, and identify to the Plaintiff class all entities and agencies to which such information has been disseminated; and that all such disseminated records be collected and destroyed.

70.     An actual controversy exists between Plaintiffs and Defendants in that Plaintiffs contend that the policies, practices, and conduct of Defendants alleged herein are unlawful and unconstitutional, whereas Plaintiffs are informed and believe that Defendants contend that said policies, practices, and conduct are lawful and constitution. Plaintiffs seek a declaration of rights with respect to this controversy.

71.     All of the following claims for relief are asserted against all Defendants

### FIRST CLAIM FOR RELIEF
### First Amendment to the U.S. Constitution (42 U.S.C. § 1983)

72.     Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

73.     Defendants' above-described conduct violated Plaintiffs' rights to freedom of speech, assembly, and association under the First Amendment to the United States Constitution.  Lawful protests that posed no threat were interrupted by police declaring unlawful assemblies without justification.  For example, when plaintiff BLMLA sponsored a large and peaceful protest in Pan Pacific Park, LAPD officers ordered Plaintiffs' supporters to disband and then used widespread force against BLMLA.

74.     These tactics were repeated throughout the City based on nothing more than baseless speculation of some potential unlawful activity by some unknown individual(s).

75.     Plaintiffs suffered harm as a direct and proximate result of Defendants' actions, including but not limited to physical injury and pain and suffering.

## SECOND CLAIM FOR RELIEF
### Fourth Amendment to the U.S. Constitution (42 U.S.C. § 1983)

76.     Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

77.     Defendants' above-described conduct violated Plaintiffs' rights to be free from unreasonable seizures, excessive or arbitrary force, and arrest or detention without reasonable or probable cause under the Fourth Amendment to the United States Constitution. Defendants detained, seized, handcuffed, searched their persons and their personnel property.

78.     Defendants used excessive force against peaceful protestors.   In particular, Defendants engaged in the indiscriminate use of less lethal weapons and baton strikes contrary to law.  Members of the Plaintiff class who were shot with "rubber bullets" and struck with batons were injured in a manner that evinced that Defendants applied force unlawfully. Many individuals were struck with rubber bullets in the face, head, shoulder and neck areas.  Video footage of various incidents shows officers shooting straight at peaceful protestors who posed no threat to the police or the public.  *See* the Instagram video May 30, 2020 at Fairfax at https://www.instagram.com/p/CA3GPPYB7dz/   Similarly,   individuals   suffered baton strikes meant not to compel people to retreat, but to injure and punish them on site. *See*  In the case of Plaintiff Rowland, he was shot in the shoulder with sufficient force to cause bruising down his entire upper arm and struck with a baton when he

attempted to help a woman who had been hit with a bator with sufficient force to knock her down.

79.     Defendants detained the arrest class of Plaintiffs for prolonged periods of time, handcuffed tightly behind their back and held on buses and in garages without access to bathrooms, water or food.

## THIRD CLAIM FOR RELIEF
### Fourteenth Amendment to the U.S. Constitution (42 U.S.C. § 1983);

80.     Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

81.     Plaintiffs had a liberty interest created by California Penal Code § 853.6 to be cited and released for a misdemeanor absent specific information and individualized suspicion that they would immediately repeat the allegedly unlawful conduct if promptly released and not subjected to a prolonged detention. Defendants' conduct deprived Plaintiffs of liberty without due process of law under the Fourteenth Amendment to the United States Constitution. Based on their perceived association with the protests against the continued government-sanctioned killings of Black and Brown men and women at the hands of law enforcement, Plaintiffs were uniformly denied the mandatory "liberty" interested codified at California Penal Code § 853.6 when they were denied individualized assessment and held in custody for approximately fourteen hours.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs seek judgment as follows:

1.     An order certifying the class and each sub-class defined herein pursuant to Federal Rules of Civil Procedure Rule 23(b)(2) and (3);

2.     A preliminary and permanent injunction restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above;

3.  A declaratory judgment that Defendants' conduct detailed herein was a violation of the rights under the Constitution and laws of the United States and of Plaintiffs and the class members;

4.  General and compensatory damages for Plaintiffs and the class they represent for the violations of their federal constitutional and statutory rights, pain and suffering, all to be determined according to proof;

5.  An award of attorneys' fees pursuant to 42 U.S.C. § 1988;

6.  Costs of suit;

7.  Pre- and post-judgment interest as permitted by law;

8.  Such other and further relief as the Court may deem just and proper.

Dated:  June 5, 2020        Respectfully submitted,


Schonbrun, Seplow, Harris & Hoffman


/s/ Paul L. Hoffman
By: PAUL L. HOFFMAN
Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF