Cynthia Anderson Barker SBN 75764
NATIONAL LAWYERS GUILD
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
t. 213 381-3246  f. 213 381-3246
e. cablaw@hotmail.com

Paul Hoffman, SBN 71244
Michael Seplow SBN 150183
Aidan McGlaze  SBN 277270
John Washington SBN 315991
SCHONBRUN, SEPLOW, HARRIS,
HOFFMAN & ZELDES LLP
11543 W. Olympic Blvd.
Los Angeles, California 90064-1508
t. 310 396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. jwashington@sshhlaw.com

Attorneys for Plaintiffs
Additional Counsel on Next Page

Barrett S. Litt, SBN 45527
Lindsay Battles SBN 262862
KAYE, MCLANE, BEDNARSKI & LITT
975 E. Green Street
Pasadena, California 91106
t. 626 844-7660 f. 626 844-7670
e. blitt@kmbllaw.com
e. lbattles@kmbllaw.com

Pedram Esfandiary SBN 312569
e. pesfandiary@baumhedlundlaw.com
Monique Alarcon SBN 311650
e. malarcon@baumhedlundlaw.com
Bijan Esfandiari SBN 223216
e. besfandiari@baumhedlundlaw.com
R. Brent Wisner SBN 276023
e. rbwisner@baumhedlundlaw.com
BAUM, HEDLUND, ARISTEI &
GOLDMAN, P.C.
10940 Wilshire Blvd., 17th Floor
Los Angeles, CA 90024
t. 310 207-3233 f. 310 820-7444

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| BLACK LIVES MATTER LOS ANGELES, CANGRESS (DBA LA CAN), STEVEN ROE, NELSON LOPEZ, TINA CRNKO, JONATHAN MAYORCA, ABIGAIL RODAS, KRYSTLE HARTFIELD, NADIA KHAN, CLARA ARANOVICH, ALEXANDER STAMM, MAIA KAZIM, ALICIA BARRERA-TRUJILO, SHANNON LEE MOORE, DEVON  YOUNG, LINUS SHENTU, individually and on behalf of a class of similarly situated persons, <br><br> PLAINTIFFS, <br> v. <br><br> CITY OF LOS ANGELES, a municipal entity, CHIEF MICHEL MOORE , and DOES 1-10 inclusive, <br><br> DEFENDANTS. | Case No.: 2:20-cv-05027 CBM-AS <br><br> **FIRST AMENDED COMPLAINT: CLASS ACTION; INJUNCTIVE RELIEF AND DAMAGES** <br><br> **42 U.S.C. § 1983: FIRST, FOURTH AND FOURTEENTH AMENDMENTS; CALIFORNIA CONSTITUTION, ARTICLE 1, §§ 2 (FREEDOM OF SPEECH), 3 (RIGHT OF PETITION AND ASSEMBLY), 7 (DUE PROCESS) 13 (SEARCH AND SEIZURE), 19 (CRUEL AND UNUSUAL PUNISHMENT; CIVIL CODE § 52.1; PENAL CODE §853.5; GOVT. CODE §815.** <br><br> **DEMAND FOR JURY TRIAL** |

1   Carol A. Sobel, SBN 84483            Jorge Gonzalez SBN 100799
2   Katherine Robinson SBN 323470        A PROFESSIONAL CORPORATION
    Weston Rowland  SBN 327599           2485 Huntington Dr., Ste. 238
3   LAW OFFICE OF CAROL A. SOBEL         SAN MARINO, CA 91108-2622
    725 Arizona Avenue, Suite 300        t. 626 328-3081
4   Santa Monica, CA 90401               e. jgonzalezlawoffice@gmail.com
    t. 310 393-3055
5   e. carolsobel@aol.com
    e. klrobinsonlaw@gmail.com
6   e. rowland.weston@gmail.com          Olu Orange SBN 213653
                                         Orange Law Offices
7                                        3435 Wilshire BLvd., Ste. 2910
    Colleen Flynn, SBN 234281            LOS ANGELES, CA. 90010-2015
8   LAW OFFICE OF COLLEEN FLYNN          T. 213 736-9900
    3435 Wilshire Blvd., Suite 2910      f. 213 417-8800
9   Los Angeles, CA 90010                e. o.orange@orangelawoffices.com
    t. 213 252-9444
10  r. 213 252-0091
    e. cflynn@yahoo.com
11
    Matthew Strugar, SBN 232951
12  LAW OFFICE OF MATTHEW STRUGAR
    3435 Wilshire Blvd., Suite 2910
13  Los Angeles, CA 90039
    t. 323 696-2299
14  e. matthewstrugar@gmail.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

## I.  INTRODUCTION

1.     This action arises out of protests across the nation following the murder of George Floyd by Minneapolis Police Department officers. The events in Minneapolis, soon after the deaths of Breonna Taylor and Ahmaud Arbery, brought out millions of people around the country at once to condemn the deaths of black and brown men and women by law enforcement and vigilantes condoned by local law enforcement. Some of the larger demonstrations in the country occurred in the Los Angeles area. Over the course of six days, the Los Angeles Police Department arrested approximately 3000 individuals. Defendant Chief Moore told the public that well more than 92 percent of those arrested were engaged in peaceful protest.[1] Nonetheless, the Los Angeles Police Department ended the protests through the use of force (batons and rubber bullets), and imposed unconstitutional conditions of confinement on arrestees by holding them on enclosed buses for up to six hours or longer, tightly handcuffed, without access to bathroom facilities, food or water.

2.     On the buses, arrestees were seated just inches apart, with windows closed and with no ventilation (significantly compounding the potential of exposure to Covid-19). In hundreds of cases, the LAPD made false arrests where the charges filed were solely infractions for which custodial authority does not exist.

3.     The LAPD also used unreasonable and unnecessary force directly against residents of Skid Row, both housed and unhoused, and caught them in the crossfire of attacks on protestors through indiscriminate and improper use of kinetic impact projectiles.  Perhaps no image embodies this more than the photograph of a homeless man in a wheelchair on Skid Row.  He was shot in the head at close range when police fired large projectiles while chasing a small group of protestors.

_____

[1] https://ktla.com/news/lapd-arrests-more-than-2700-people-amid-protests-chief/

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF



4.      The Plaintiffs' injuries caused by the use of so-called "rubber bullets" are strong evidence in this instance that the training of the LAPD in the use of these potentially lethal weapons was absent, seriously deficient, or intentionally indifferent to the known serious harm that can result from the use and misuse of kinetic impact projectiles (KIPs).  The force of KIPS can cause serious organ injuries and death, especially when the point of impact is the head, neck, and torso.[2]  The injuries of just the few plaintiffs identified by name in this class action demonstrate this finding.  Several required surgery for head wounds.

5.      All told, approximately 3000 LAPD arrests followed by the above described bus detentions occurred over six nights from May 29 to June 3. On May 29, the protests began at the LAPD headquarters at First and Main Streets. The police fired Kinetic Impact Projectiles ("KIPs") at the protestors, causing many in the group

---

[2]      Haar RJ, *et al*. *BMJ Open* 2017;7:e018154. doi:10.1136/bmjopen-2017-018154

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

to leave and march through downtown's jewelry district before circling back to the LAPD headquarters. At about 9:30 p.m., an unlawful assembly was declared, resulting in 533 arrests that night, mostly for failure to disperse, but only after first using chemical irritants against the protestors. *See* "Arrests During George Floyd Protests Swell to Near 3000 in L.A. County; Many are Locals," Los Angeles Times June 2, 2020: https://www.latimes.com/california/story/2020-06-02-george-floyd-protests-los-angeles-arrests-locals.

6.     On May 30, 2020, most of the arrests occurred in the Fairfax area, following a peaceful rally organized by BLM LA. When the rally ended in the early afternoon, many of the participants continued peaceful protests, marching throughout the Fairfax area, along Beverly and other streets. Throughout the area, heavily armed officers, several lines deep at times, used unwarranted and unlawful force to kettle and arrest the protestors. Most of the protestors followed orders yelled at them by the officers but each time they moved in the direction that they were told to move, they soon found no avenue to disperse. They were kettled, targeted with impact projectiles and struck with batons as they were ordered to move back. Surrounded by officers, there was nowhere for them to move. Defendant Chief **MOORE** was on site and spoke to the kettled protestors twice, although his words were inaudible to most of the trapped protestors. Chief Moore authorized, approved, and ratified the unwarranted assault on the protestors with projectiles and batons. Alternatively, he did nothing to stop the assault on the protestors as he witnessed it.

7.     On Sunday, May 31, nearly 700 individuals were arrested, with many subjected to unlawful force, primarily in downtown Los Angeles. *See* Los Angeles Times June 2, 2020, available at https://www.latimes.com/california/story/2020-06-02-george-floyd-protests-los-angeles-arrests-locals. Of that total, approximately 10 percent were for property crimes, primarily looting. Tens of thousands of demonstrators started a march from Pershing Square. While few arrests were made

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND
INJUNCTIVE RELIEF

during the day, at approximately 5:45 p.m., the LAPD advised the assembled protestors that a curfew would go into effect at 6 p.m. and they would be arrested.

8.      On June 1, nearly 600 individuals were arrested in Hollywood, with only 20 or so charged with property crimes, such as looting. Earlier in the day, the LAPD put out a news release "requesting" residents of the City not to come to Hollywood that evening. Shortly before 4 p.m., the City announced the curfew that night would begin at 5 p.m. instead of at 6 p.m. as on previous nights. Barely an hour later, a mobile alert was sent out, announcing the curfew would, in fact, start at 6 p.m. Despite the correction, the police began arrests at 5 p.m. In addition to Hollywood, about 100 individuals were arrested on June 1 in a protest in Van Nuys.

9.      Mass arrests occurred on the evening of June 2, when approximately 1000 protestors assembled outside Mayor Garcetti's Hancock Park home, demanding that the Mayor's budget defund the police.  After a few hours, participants in the protest outside the residence split up, with groups marching away peacefully to the north and south. They were followed and soon kettled by the police, then arrested. Approximately 120 individuals were arrested at about 8 p.m. in the vicinity of Crenshaw Avenue and 8th Street on curfew violation charges, only enforceable as an infraction under the Los Angeles Municipal Code.

10.      The chart at footnote 3 lists some central arrest events and rough estimates for each.[3]

---

[3]

| DATE | AREA | # ARRESTED |
|------|------|------------|
| May 29 | Downtown LA | 533 |
| May 30 | Downtown LA | 398 |
| May 31 | Pan Pacific Park/Fairfax | 700 |
| June 1 | Hollywood | 585 |

4

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND
INJUNCTIVE RELIEF

11.     On May 29, the third day of protests, protestors blocked the 101 freeway in downtown and engaged LAPD officers who responded. At 9:30 p.m. Defendants declared nearly all of downtown LA an "unlawful assembly" and imposed an immediate curfew for the area from the 10 freeway to the 101 freeway, and from the 110 freeway to Alameda. The curfew was announced on the LAPD and Mayor Garcetti Twitter accounts, and at Mayor Garcetti's press conference.[4]

12.     On Twitter, the LAPD wrote: "This [curfew order] is being made following repeated acts of violence and property damage. Residents should stay inside. Business should close. Those on the street are to leave the area." This was

| June 2 | Mayor's home | 200 |

4



**I.Mayor Eric Garcetti @MayorOfLA**
We will always protect free speech and Angelenos' right to live without fear of violence or vandalism. To increase safety for demonstrators, law enforcement and all citizens of Los Angeles, we are...
pscp.tv

https://www.pscp.tv/w/caGHiDExMTkzNjN8MWVhS2JRV21IcEJ4WLAxZ0Dzz2-iobDlWBufDWNeHPcCb-7O-UR_4tQbozv4 …

5

inadequate notice as it is unlikely that all, most or even many of the 10 million residents of the City follow the LAPD on Twitter.

13.     In a similar vein, the May 31 curfew, preemptively declaring all of downtown to be an "unlawful assembly," was announced in a news release posted on lapdonline.org.  *See* http://www.lapdonline.org/newsroom/news_view/66585. California Penal Code §407 defines an unlawful assembly as two or more people who come together to do "an unlawful act, or to do a lawful act in a "violent, boisterous or tumultuous" manner. To comply with the First Amendment, the California Supreme Court construed this statute narrowly to apply only to assemblies that are "violent or pose a clear and present danger of imminent violence." *In re Brown*, 9 Cal.3d 612, 623 (1973). Defendants could not preempt all public assemblies in downtown on the actions of a few at other locations and other times.

14.     On June 1, the LAPD posted a news release on the its website, issuing a "request" to the public to stay away from the Hollywood Area. *See* http://www.lapdonline.org/newsroom/news_view/66592.

15.     The curfew in place from the night of June 2 to the morning of June 3 was also announced in a press release posted on the LAPD website. *See* http://www.lapdonline.org/newsroom/news_view/66598.

16.     Although public outcry regarding the LAPD's/City's unlawful protest suppression tactics resulted in the cessation of such conduct, nothing guarantees that it will not resume. Resumption of this unlawful conduct is a serious risk confirmed by the fact that this was not the first time that the LAPD has engaged in these tactics, even after committing on prior occasions not to engage in such conduct. *See* Los Angeles Times, June 15, 2020 ("LAPD Violence Against George Floyd Protests Erodes Decades of Reform"). https://www.latimes.com/california/story/2020-06-14/lapd-protest-history-criticism-heavy-tactics.

17.     Over the course of the last several decades, the Defendant City has been sued repeatedly for many of the same tactics challenged herein, including

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND
INJUNCTIVE RELIEF

kettling (i.e., corralling) protestors before declaring an unlawful assembly and blocking all exit routes, excessive force with batons and rubber bullets, and prolonged handcuffing and improper conditions of confinement for arrestees. The day after George Floyd was killed in Minneapolis, the City of Los Angeles paid a settlement of $750,000 for a lawsuit raising many of the same violations in the protests after the Ferguson Grand Jury decision not to indict the officer who shot and killed Michael Brown. *See Chua v. City of Los Angeles*, 16-cv-00237-JAK-GJS (C.D. Ca.). By kettling the demonstrators, detaining them tightly handcuffed on buses for hours, without access to bathrooms, water or food, and through other conduct detailed below, Defendants violated Plaintiffs' federal and state constitutional rights.

18.    This Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights jurisdiction). This Court has jurisdiction to issue declaratory or injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

19.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391, as all Defendants and events giving rise to the claims herein occurred in the Central District of California.

## II. PARTIES - PLAINTIFFS

### A.    ORGANIZATIONAL PLAINTIFFS:

20.    Plaintiff BLACK LIVES MATTER LOS ANGELES ("BLMLA") is part of a nationwide organization with chapters in many major cities, including Los Angeles. The organization originated in Los Angeles with demonstrations on July 13, 2013, the date George Zimmerman was acquitted of killing teenager Trayvon Martin in Florida.

21.    BLMLA is one of the largest and most active chapters of the organization, with nearly 500 active members and organized ally groups, including

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

White People for Black Lives. In response to the death of George Floyd, BLMLA sponsored protests in Los Angeles and participated in demonstrations organized by other groups. On average, BLMLA sponsors four actions a week. Defendants' actions interfered with BLMLA's right to assembly and speech. BLMLA plans to assist, plan, participate in, hold similar events in the future, on its own or in conjunction with others, and is fearful that the same unlawful police actions in response to these and similar protests of institutional racism and police brutality will be repeated absent injunctive relief to prohibit the LAPD's practices, policies, and customs that caused the unlawful action in response to the recent protests.

22.    In response to the murder of George Floyd, BLMLA organized protests in Los Angeles. One such action was held at Pan Pacific Park in Los Angeles on Saturday, May 30, 2020. During the course of this protest and others over the past week, while BLMLA and its members were engaged in lawful First Amendment activity, the LAPD used force to terminate the protests, including the indiscriminate use of so-called "less lethal" weapons that caused injury to its members and instilled fear in them that, if they chose to assemble in public spaces to express their opposition to police violence across the nation against black men and women, they would be the subject of such violence and arrest.

23.    Plaintiff **CANGRESS**, dba Los Angeles Community Action Network (LA CAN), is a grassroots non-profit organization in Skid Row for approximately two decades. More than 800 low-income residents of Skid Row are involved with LA CAN, many of whom are unsheltered each night. In addition, individuals such as Plaintiff SHENTU are members and supporters of the organization. The primary purpose of the organization is to organize and empower community residents to work collectively to address systemic poverty and oppression in the community. Since its founding in 1999, LA CAN has been the only member-driven organization in Skid Row whose goal is to protect the rights and prevent the further disenfranchisement of homeless and poor people in Los Angeles. LA CAN brings

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

this action on behalf of its members and associates who have been arrested and/or subjected to the use of less-lethal weapons and other tactics aimed at shutting down public spaces over the past 10 days by City employees and agents pursuant to the enforcement policies, practices and customs of the City. As a result of Defendants' unlawful actions, LA CAN has expended personnel resources to try and prevent at-risk individuals from being subjected to these unlawful policies, assist those who have been physically injured by these unlawful policies, and assist their members and associates to be safe from police actions.

### B.   MAY 29 ARRESTS AND FORCE PLAINTIFFS

24.   Plaintiff **STEVEN ROE** participated in a peaceful protest in downtown Los Angeles at or about the intersection of Temple and Spring Streets, near City Hall. Around 9:00 that night, **ROE** observed the police form a line and begin pushing the protestors toward City Hall.  Approximately 100-200 people were assembled. The crowd moved in compliance with the police orders, but each time the demonstrators did so, they were met by other lines of police officers that blocked them.  The demonstrators realized that they were being herded by the police into a confined space as a group and completely surrounded by officers.  **ROE** and others asked to leave the demonstration but were refused by the officers at the scene.

25.   **ROE** observed a single bottle thrown at the police from behind him. The police made no effort to isolate that one individual.  Instead, the officers advanced more aggressively toward the demonstrators.  An officer took aim at **ROE** and shot him in the stomach with kinetic impact projectile.  **ROE** did not present a threat to and was walking backward facing the officers when he was struck.  The KIP struck with such force that it broke the skin and caused a deep and very painful injury.  Two weeks after being hit, **ROE** still has a welt under the skin.

26.   At approximately 9:45 p.m., the LAPD announced that everyone in the group should sit down on the ground.  Before this, **ROE** heard no announcement to disperse and all requests to the LAPD to leave were ignored or denied for 45 minutes.

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND
INJUNCTIVE RELIEF

**ROE** later learned that, at about 9:35 p.m., the LAPD tweeted a declaration of an unlawful assembly order. **ROE** does not follow the LAPD on Twitter, and besides, he and more than 100 others were already kettled when the "unlawful assembly" was declared on Twitter. **ROE** and the others were handcuffed behind their backs with plastic zip ties that were very tight and caused a lot of pain and discomfort. After waiting for buses to transport the group to a jail facility, they were loaded onto buses and held in close contact with each other. They were driven to a location just a few blocks away and could have walked there faster without extending the time that they were handcuffed or creating congregate conditions on the buses that increased the exposure to COVID-19. During the entire time they were in custody they were not provided with any water or given access to a bathroom. **ROE** and others asked for the zip ties to be removed because of the pain but their persistent requests were ignored or refused. In all, **ROE** spent 2 hours and 15 minutes handcuffed. His fingers were numb, and he had visible injuries from the zip ties.



27.     Plaintiff **NELSON LOPEZ** participated in a peaceful protest in front of Los Angeles City Hall at First and Spring Street in downtown Los Angeles on the evening of May 29, 2020. At approximately 7:30 p.m., he arrived at City Hall. The crowd was very peaceful, with some children holding signs. **LOPEZ** soon observed a line of officers form around the group on all sides, blocking anyone from leaving.

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

28.   **LOPEZ** never heard a dispersal order.  A helicopter flew over the crowd, making it hard to hear.   At some point, the group was told to sit on the ground because they were being arrested. After about 40 minutes, LAPD officers informed them that they would be issued a citation, like a traffic ticket. While  seated, **LOPEZ** called his mother, a nurse who worked nearby.  After ending her 12-hour shift, she came to get him on her way home.  She was trapped by the LAPD and arrested.

29.   It took about two to three hours for everyone in the group trapped at City Hall to be handcuffed.  Some homeless people were also swept up in these arrests.  Some detainees were screaming because of the tight handcuffs. Others were upset because, after the officers told the group that they would only be cited and release, they were now handcuffed and taken into custody.

30.   **LOPEZ** estimates that approximately several hundred people were in the group arrested with him.  Once handcuffed, they were loaded onto buses and held in close contact with each other.  They were taken to what appeared to be a police garage just a few blocks from City Hall.  However, **LOPEZ** sat on the bus for approximately 45 minutes, waiting for the bus to enter the garage.  When **LOPEZ** entered the garage, he observed approximately 1,000 people inside being processed.  He also observed more buses arriving at the location.

31.   **LOPEZ**'s handcuffs were very tight, bruising his wrists and injuring his shoulder (rotator cuff).  He asked an officer to loosen the handcuffs but was told they could not do so because they did not have sufficient replacement zip ties. **LOPEZ** heard multiple, if not most, of the arrestees complain about tight handcuffs. He did not see anyone's handcuffs loosened in response to these complaints.  He was not released until approximately 3:30 a.m.  He was held in handcuffs for several hours in the garage before being issued a citation for a violation of LAMC 80.02 ("obedience to an officer"), which is only punishable as an infraction.



### C.   MAY 30 ARRESTS AND FORCE PLAINTIFFS

32.   Plaintiff TINA ČRNKO attended the Black Lives Matter Los Angeles rally at Pan Pacific Park on May 30, 2020, arriving at approximately 12:30 p.m. At approximately 1 p.m., some of the participants began marching peacefully toward the Beverly Center. After another two hours without incident, the group split into three groups. One group was protesting near the intersection of 3rd Street and Edinburgh peacefully.  Plaintiff **ČRNKO** was part of that group.

33.   Sometime before 5:30 p.m., Defendant **MOORE** arrived and spoke to the group; however, he could not be heard over the protestors as he lacked adequate amplification equipment that would allow him to be heard.  At that time, additional officers, wearing riot gear and brandishing more weapons, arrived on the scene. Eventually, several lines of officers in riot gear kettled the group on all sides, preventing everyone from leaving.

34.   A short time after Moore spoke to the group, **ČRNKO** observed protestors running east on 3rd Street, followed by a swarm of LAPD officers.  About

30 minutes later, the demonstrators marched south and were able to leave the kettling when Chief **MOORE** directed the line of officers on the south end of the to allow some people to exit.

35.   **ČRNKO** then marched to the northeast corner of the intersection of 3rd and Fairfax.  She observed ever increasing number of LAPD officers arrive at the intersection attired in riot gear, heavily armed and forming what appeared to be an impenetrable wall of officers at least 10 deep stretching across a wide area.

36.   Once again, Chief Moore appeared, this time in riot gear, and addressed the crowd but, once again, he could not be heard because of the poor quality of the amplification equipment he used.

37.   At about 6:00 p.m., plaintiff observed what appeared to be some panicked protestors running east on 3rd Street, followed by a large number of LAPD officers moving behind them and coming toward the area where **ČRNKO** was assembled.  She began moving east, as well, but soon realized that was not an available option.  Soon after that, she observed a line of officers coming toward the group from the west.

38.   At approximately 6:25 p.m., she heard shots being fired. She was hit in the left bicep and ribcage by KIPs.  As the group she was with moved east, the officers fired KIPs at them, including small projectiles colloquially referred to as "rubber bullets." She was struck on the forehead above her right eye, causing a temporary hearing loss and extreme pain.  She was bleeding profusely.  With officers continuing to advance on the group, she could not get help from a medic on site. The resulting wound required seven stitches. She still suffers nerve damage in the area of impact.

39.   Plaintiff **JONATHAN MAYORCA** is a journalist for an independent media. On May 30, 2020, along with two crew members, he was filming a peaceful demonstration on Beverly Boulevard in the Fairfax area of Los Angeles. He observed LAPD officers begin to form a line and push back everyone in the area of

13

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

the protest. Mr. **MAYORCA** soon realized he was trapped by the officers, and they were kettling the group of protestors he was with toward an alley. His press badge was clearly visible, but the LAPD officers ignored his attempts to show his press credentials and continued pushing the entire group toward the alley, surrounding them and refusing all requests to leave. **MAYORCA** did not hear any dispersal order and was not given any opportunity to leave before being pushed in the alley and arrested.

40.     Once in the alley area, **MAYORCA** was ordered to stop filming and to sit on the ground. The LAPD forced him to the ground, breaking his camera. He was handcuffed tightly with zip ties, causing pain and discomfort. He was then stood up against a wall. After the entire group was handcuffed, they were moved into a van, sitting close together. Others in the same arrest group were protestors, whom **MAYORCA** had filmed engaging in a peaceful protest.

41.     After about thirty minutes, the group was driven to the Van Nuys station, a considerable distance away. At the station, Mr. **MAYORCA** was issued a citation for failing to obey lawful orders, LAMC 80.02, which is expressly and only chargeable as an infraction pursuant to the Los Angeles Municipal Code.

42.     **MAYORCA** was handcuffed tightly for approximately two hours and 15 minutes. His repeated requests to remove or loosen the handcuffs because of the pain were ignored. During the entire time that the group was handcuffed, they were denied access to a bathroom or water.

43.     Plaintiff **ABIGAIL RODAS** participated in a peaceful event organized by BLM LA in the Fairfax area on May 30, 2020 of Los Angeles to protest the murder of George Floyd.  She was walking on Beverly Boulevard near LaCienega Boulevard when the protestors were met by a line of LAPD officers, who began to push them back.

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND
INJUNCTIVE RELIEF

44.     Although there had been no dispersal order, RODAS and a friend decided to leave the protest at that point and began walking toward her car when an officer began shooting projectiles at them. She was struck in the face by a projectile and momentarily lost consciousness.  She fell to the ground, bleeding. Someone drove her to nearby Cedar Sinai Hospital, where she was quickly taken to surgery. When she arrived at the hospital, she was unable to talk. She was diagnosed with a



severe fracture to her right mandible and underwent surgery. Stitches were required on both the inside and outside of her mouth to close the lacerations, and a steel plate was used to repair the fractured jawbone. RODAS spent two days in the hospital on Monday afternoon and has been recuperating at home since. She was unable to talk for about 10 days. For one week, she could only drink liquids and is still on a soft food diet. Nearly three weeks after the injury, she has screws in her gums and rubber bands to immobilize her jaw while the bones rejoin.

45.     Plaintiff **KRYSTLE HARTSFIELD** participated in a peaceful protest in the Fairfax area of Los Angeles on the afternoon of May 30, 2020.  She is employed in the Artist Management department of a Los Angeles media company.

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

When the protestors were near the Trader Joe's on Third Street and Fairfax Avenue, **HARTSFIELD** observed officers begin to physically direct the movement of the group of protesters. A short time thereafter, at around 3:30 p.m., she heard a dispersal order made by the LAPD.   At the point the dispersal order was given, the group was directed to leave through the alleyway next to the Trader Joe's.   **HARTSFIELD** complied and began to leave the area and was walking way when she heard an officer say "don't let them leave."  An officer then grabbed her and pulled her from behind, and other officers surrounded her in front.  As they did this, one of the other female protesters grabbed her hand and repeatedly said, "don't round her up – don't round her up" but the officers pulled her away and pushed **HARTSFIELD** into the parking lot near the alley.

46.   **HARTSFIELD** and the others were handcuffed and lined up on Third Street where they remained, tightly handcuffed, for approximately two hours while they waited to be transported.   The group was then put in a van, seated closely together, and taken to Van Nuys.  Despite repeated requests to loosen their handcuffs, they remained very tightly handcuffed throughout, causing considerable pain.  In all, she was handcuffed for approximately six hours before her release.

47.   **HARTSFIELD** was not released until approximately 10:30 p.m.  She heard LAPD officers warn those released that if they remained in front of the station, they would be rearrested for violating the curfew, which went into effect at 8:30 that night.  She was fortunate that family members arrived at the station to take her home.

48.   Plaintiff **NADIA KHAN** participated in the rally organized by Black Lives Matter Los Angeles at Pan Pacific Park on May 30, 2020, in the Fairfax area. She arrived there at approximately 11 a.m.  At around noon, the rally concluded and the protesters left the park and began a march.

49.   When the march neared the intersection of 3rd and Fairfax, **KHAN** observed lines of police in riot gear.  **KHAN** observed the officers shoot projectiles at the group, although she not hit at this time.

50.     The march continued north on Fairfax to Beverly Boulevard where it met up with a large group of young people.  **KHAN** marched with them to the Beverly Center and back on Beverly Boulevard toward Fairfax.  When the marchers neared Beverly and Fairfax, the police deployed a chemical irritant that made **KHAN**'s eyes burn and tear up.  In addition, the gas got into her lungs, making her cough.  At or about the same time, the police were also shooting small pellet-like impact projectiles at the group. She was hit in the legs, but because she was not close to the police and was wearing jeans, she did not suffer serious injury.

51.     **KHAN** continued with the peaceful protestors north on Fairfax towards Melrose. The police kettled the group there at about 7:45 p.m.   There were approximately 100 people detained at this location.  All of the demonstrators were handcuffed behind their back with zip ties. KHAN's zip ties were very tight and caused pain.  She asked the officers to loosen the zip ties but was ignored.  The arrestees were loaded on to two crowded buses.  **KHAN** was wearing both a mask and goggles to protect against exposure to COVID-19 contagions but most of the officers and some of the detainees did not have masks.

52.     The group was taken to Wilshire Division on Venice Boulevard and cited for a violation of LAMC 80.02, an infraction. **KHAN** was released about midnight.  She was handcuffed for approximately four hours, leaving her wrists sore and painful for several days.

53.     Plaintiff **CLARA ARANOVICH** is a filmmaker in Los Angeles. On May 30, 2020, she participated in a peaceful demonstration in the Fairfax district following a rally in Pan Pacific Park organized by Black Lives Matter Los Angeles. ARONOVICH arrived in the vicinity between 4:00 p.m. and 5:00 p.m. and observed a group of protestors gathered at the intersection of Fairfax Avenue and 3rd Street. She also observed a line of police officers across the street from the protestors.

54.     Just before 6:00 p.m., **ARANOVICH** observed Defendant Moore addressed the protestors. Initially, he spoke to the protestors without amplification,

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND
INJUNCTIVE RELIEF

making it nearly impossible to hear what he was saying. He then used an amplification device that someone handed to him, but it was still difficult to hear him over the crowd noise.  **ARANOVICH** did not hear Chief **MOORE** or anyone else make an unlawful assembly announcement, or that the protestors were required to disperse.  About 30 minutes after Chief **MOORE** spoke, the line of police officers began to move the protestors back by using aggressive, physical force.  As the officers advanced, they used the ends of their batons to jab people with force in their chest and abdomen area.  Some of the officers hit protestors with their batons in an overhand swinging motion.  **ARANOVICH** was struck in her chest and abdomen multiple times, with sufficient force to cause a painful bruise on her breast.

55.     As **ARANOVICH** left the protest, she was struck with a kinetic impact projectile in the calf.  This resulted in a painful welt and a bruise that was still visible on her leg as of June 18, 2020, almost three weeks later.



### C.     MAY 31 ARRESTS AND FORCE PLAINTIFFS (SKID ROW)

56.     Plaintiff JEFFREY TROTTER is a 51-year-old African American man and a resident of the Rosslyn Hotel on Skid Row. On Sunday, May 31, at about

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

5 p.m., TROTTER walked two blocks from the Rosslyn, at 5th and Main Streets, to the RiteAid drug store at 5th and Broadway. The Rite Aid was closed, so he started to walk back to the Rosslyn.

57. When he neared 5th and Spring streets, he saw a line of LAPD officers in riot gear. One officer, a white male, stepped toward him and asked where he was going. Mr. TROTTER responded that he was walking home from the Rite Aid. Without further discussion, the officer took a few steps back and shot Plaintiff with hard rubber or foam projectiles at close range four times, once in the chest, twice in the stomach, and once on the left hand. The projectile that hit his chest struck with such force that it tore off skin in the shape of the projectile. The one that hit his hand also tore off a chunk of skin about an inch long and half and an inch across.

58. Mr. Trotter collapsed from the impact. As he lay on the ground, the officers stepped over him and walked away. After a period of time, he was able to walk the block back to the Rosslyn. When he arrived there, a friend called the paramedics, who treated him there. He was in intense pain for more than a week and two weeks later, his stomach, chest and hand are still swollen and bruised.




FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

59.     Plaintiff **ORLANDO HINKSTON**, also known as "Cincinnati," is disabled and uses a wheelchair for mobility. He is a participant in LA CAN. He was struck multiple in the head, shoulder and back by impact projectiles on Sunday, May 31, while sitting in his wheelchair near the Rosslyn Hotel on Skid Row. He was not engaged in any protest and pleaded with police not to use force on him before being shot multiple times. Two weeks after he was struck with projectiles, a red welt is still visible on his shoulder.



### D.     *June 1 Arrests And Force Plaintiffs*

60.     Plaintiff **ALEXANDER STAMM** participated in a peaceful demonstration in Hollywood on the afternoon of June 1, 2020.  He arrived at approximately 4 p.m. and was joined by his husband at around 5:30 p.m. While marching, he saw the police block off streets, forcing protestors down side streets. As the protestors moved down side streets in response to the lines of officers blocking their march.

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

61.   **STAMM** observed that the police kettled the protestors in these side streets so they could arrest them.

62.   Plaintiff **STAMM** smelled some chemical irritants in the air around the protestors.  He also observed someone hit with an impact projectile in the thigh. Terrified by what was happening, **STAMM** and his husband decided to leave and go home to their nearby apartment.  At around 8 p.m., they started down Schrader Boulevard because Wilcox was blocked by a police line.  As **STAMM** walked down Schrader, between Selma Avenue and Sunset Boulevard, the police blocked the streets and surrounded the group he was walking with. Although he was only a few blocks from his home, he was not permitted to leave.

63.   There were approximately 200 to 300 people in the group.  All were ordered by the police to get on their knees and put their hands behind their backs. There were all handcuffed then.  **STAMM** did not hear a dispersal order before being ordered to get down on his knees.

64.   All the arrestees were loaded onto LASD buses, seated two to a bench with no social distancing.  Some people's face masks had fallen down, but they could not reposition the masks because they were handcuffed.

65.   The arrestees were driven from Hollywood to Jackie Robinson Stadium, on the Veterans Administration property in West Los Angeles.  The drive from Hollywood took approximately 45 minutes.  Once they arrived at the VA, they were held on the buses for another two hours before their citations were processed and they were released.  They were taken off the closed bus only two at a time and then lined up be processed.  During all this time, he remained tightly handcuffed, causing bruising on his wrists, and in an unventilated bus without social distancing or masks.

66.   At about 1:00 a.m., **STAMM**'s handcuffs were finally removed and he was told he was free to leave.  To get home to Hollywood, **STAMM** had to take two

21
FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND
INJUNCTIVE RELIEF

buses then walk approximately four miles to his apartment.  He did not arrive home until 2:30 a.m., long after the curfew went into effect.

67.     On June 1, 2020, Plaintiff **MAIA KAZIM** participated in a peaceful demonstration on Spring St. near the intersection of 5th Street in downtown Los Angeles.  At about 6:30 p.m., LAPD officers blocked about 300 people from moving north or south on Spring Street, forming a blockade at both ends of Spring Street.  Some people tried to leave through a parking lot on Spring, but police blocked them.

68.     **KAZIM** was at the front of the protestor group. Prior to the blockade by the LAPD, she heard no dispersal order, or warning that the group was in violation of a curfew order, or that they would be arrested if they did not leave the area.

69.     **KAZIM** was handcuffed with zip ties.  About 15 minutes after that, she was given a citation for a curfew violation but not released.  Instead, the hundreds of people in the group were loaded on to buses. Eventually, the arrestees were taken from downtown Los Angeles to a UCLA parking lot.  Once there, they were kept on the buses from 7:30 until about 1:00 a.m., handcuffed behind their backs, with no access to food, water or bathrooms.  While on the bus, **KAZIM** observed a woman on the bus in physical distress from a dislocated shoulder. Someone on the bus was able to access their cell phone and called 911.  The woman next to **KAZIM** was panicking because she needed to take medication.  Someone on the bus was able to use their cell phone to call 911 for this woman, as well.  Requests to the officers to address these situations were ignored.

70.     When she was finally released, **KAZIM** asked an officer whether her boyfriend would be violating the curfew if he picked her up.  The officer responded that it would be a violation of the law, but he should be fine.  Uneasy with this response, **KAZIM** did not want to risk arrest of her boyfriend, so she got a ride from the friend of someone on the bus.  She was handcuffed behind her back with plastic zip-ties for more than seven hours until she was released at 1:00 a.m. The handcuffs were painful and caused minor tenderness on both wrists for 2-3 days.

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

71.     Plaintiff **ALICIA BARRERA-TRUJILLO** also participated in a peaceful protest in downtown Los Angeles on June 1, 2020.  She arrived with her younger sister and a friend at 5th and Grand, near the main public library, at approximately 2:00 pm with her younger sister and friend.  The crowd was very peaceful and diverse, including families with children holding signs.

72.     At around 4:00 p.m., she started making plans to leave the area.  Soon thereafter, we received a text that the curfew for Los Angeles that night was 5:00 p.m.  **BARRERA-TRUJILLO** was confused because she also received a text informing her that the curfew was at 6:00 p.m.

73.     She attempted to leave the area shortly before 5:00 p.m. and observed that the police had blocked off all exit streets.  Police surrounded them on all sides, making it impossible for anyone to exit the area.  **BARRERA-TRUJILLO** began to panic and observed that everyone around her also appeared to panic as officers surrounded them.  **BARRERA-TRUJILLO** never heard a dispersal order, providing notice and an opportunity to leave before the group was kettled.  A helicopter flew over the crowd, making it was very hard to hear.

74.     Once they were kettled, **BARRERA-TRUJILLO** saw some type of rubber bullets being fired into the protest group.  She also saw a police officer direct some type of aerosol spray at a woman with a young child.  The child was crying and both the woman and the child appeared to be in pain from the effects of the spray.

75.     Approximately 500 people were in the group before it was split in half to handcuff and process them.  **BARRERA-TRUJILLO** was searched, handcuffed and received her citation while detained on the street.  She was then placed on a bus and waited an hour for the bus to leave downtown.  Ultimately, the arrestees were driven to Westwood, near the National Cemetery.

76.     While on the bus, she saw several people who seemed to need medical aide.  There were no officers on the bus and no way to get their attention.  One of the arrestees was able to get out of her handcuffs and call for emergency assistance.

Only when the ambulances arrived did the police check on the arrestees on the bus. Near plaintiff, one woman asked to use the bathroom but was denied by the officers. When the woman was later taken off the bus, she urinated on herself.

77.   Once released, **BARRERA-TRUJILLO** and her sister had no way to get home.  Her cell phone was not charged.  Several volunteers with the National Lawyers Guild waited with them until they could arrange a ride home.  **BARRERA-TRUJILLO** was handcuffed from about 6:50 p.m. until 4:00 a.m.   The tight handcuffs cut into her wrists, stripping skin off and causing bleeding.

### *E.   JUNE 2 ARRESTS AND FORCE PLAINTIFFS*

78.   Protests took place in several areas of the City throughout the day on June 2, 2020.  At Hollywood and Vine, a peaceful protest occurred mid-day with approximately 30 people, most standing on Hollywood Boulevard and a smaller group of about 10 people on Vine Street.  Plaintiff **SHANNON MOORE** arrived with a friend at the protest shortly before 3 p.m.  Within about five minutes, she was shot in the back of the head by a KIP.  A tall male in the group threw a water bottle at the police as she arrived.  Rather than isolate and arrest him, the police shot her.

79.   Because **MOORE** saw the officer take aim at her head, she was able to turn away so that she was struck in the back of the head.  She was able to prevent the projectile(s) from hitting her directly in her face and suffered much more serious injury. She sought medical treatment and suffers intense headaches.



24

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

80.     Plaintiff **DEVON YOUNG** is a mental health therapist in Los Angeles. On June 2, 2020, she participated in a large, peaceful demonstration outside Mayor Eric Garcetti's house on the corner of South Irving Blvd. and 6th Street in Windsor Square. The protest was organized by Black Lives Matter Los Angeles to protest the killings of George Floyd, Breonna Taylor, Ahmaud Arbery, and the countless other victims of police brutality and racism.

81.     **YOUNG** arrived at the protest at approximately 5:00 p.m. and remained in the area until about 8:00 p.m. The group she was with then began marching away from the Mayor's home. While marching, the group was surrounded and kettled by LAPD officers. No one was able to exit the group of about 100 people. The officers pushed the group aggressively and silently toward Crenshaw and 8th Street. Officers ignored the protestors' pleas: "We want to leave. Let us go home!"

82.     Finally, at around 8:45 p.m., near the intersection of Crenshaw and 8th Street, the officers announced that they were all under arrest. There was no dispersal order. The officers did not inform them that they were going to be arrested for a curfew violation before the arrests took place. All were handcuffed with their hands behind their backs using zip-ties. YOUNG was handcuffed at about 9:45 p.m. The officers separated the group into two lines – one for men and one for women. The officers performed pat down searches that were intrusive and uncomfortable for many of the women.  In addition, most of the officers were not wearing masks and came in close proximity to the women during the pat down.

83.     During the pat down searches, a transgender woman in the group was separated from her female partner because she did not have female sex organs. **YOUNG** asked an officer what was happening to her and he replied that she was being placed in a holding area labeled "other" so she could be searched separately for her own safety. She and her partner were frightened and upset by the separation.

84.     While handcuffed, **YOUNG's** skirt was raised up such that her underwear was exposed to the group and she had no ability to pull her skirt down

25

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

because she was handcuffed. She asked the officers if she could pull her skirt down and they refused to let her do so. Only after she walked through the group with her underwear completely exposed was she allowed to adjust her skirt**.** She was very uncomfortable and felt humiliated.

85. Approximately two hours after they were first detained and handcuffed, the group was loaded onto a bus. The arrestees were forced to be close together, many without masks. The handcuffs were very tight and uncomfortable. When finally uncuffed, **YOUNG** had bruises and marks on her wrist from the handcuffs.

86. The group was taken to a parking lot in Van Nuys where they were processed and released with a citation for a violation of LAMC 80.02, a curfew violation. Throughout the time they were detained, the arrestees were denied access to bathrooms, water and food. For some of the women, this situation was compounded by the inability to change their tampon.

87. **YOUNG** was released in the middle of the night at 1:30 a.m. with no ability to call for a ride or instruction on how to get home safely. A police officer told them they would be rearrested if they did not go home immediately. Fortunately, some volunteers arrived to give people a ride home.

88. Plaintiff **LINUS SHENTU** is a long-time member of CANGRESS. On the evening of June 2, 2020, he was participating in a peaceful protest in Hollywood, near Sunset and Vine. When the protestors marched and reached Van Ness between Melrose and Santa Monica Boulevards, SHENTU observed police starting to block streets and kettle the protestors. The march was accompanied by a car caravan. From a half a block away, SHENTU observed the police dragging people out of cars. All around him, the marchers started running. SHENTU and his partner were able to locate his partner's sister, who had been in the car caravan, and jumped in her car. Because the police had blocked off all of the streets, they could not leave the area. To avoid arrest and be safe until they could safely drive home, they followed other cars to the parking lot of a nearby apartment building.

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

89.     As they remained in their car, they observed a few officers enter the parking lot and pull people out of their vehicles. The officers ordered SHENTU, his partner and her sister out of their car, opened the rear passenger door where his partner was seated and yanked her harshly by her arm. SHENTU voluntarily exited the rear passenger seat. They were lined up on the side of the building with their hands zip tied behind their backs. In all, approximately 30 individuals were arrested at this one location and held at Elmwood and Van Ness for approximately one hour while officers filled out Field Interview cards with their personal identifiers.

90.     After approximately one hour, Sheriff's buses arrived to transport the arrestees. They were driven to a makeshift processing center in Van Nuys at Roscoe and Woodman. There were multiple buses at the location with arrestees who appeared to SHENTU to be protestors. In all, SHENTU estimates that he was detained, handcuffed tightly behind his back, for about four hours. SHENTU, his partner and his partner's sister experienced numbness, bruising and soreness from the handcuffing and the force used to remove them from their vehicle. His partner was pulled from the vehicle with such force that it caused bruises on her forearm.

91.     Defendants' actions interfered with BLMLA's right to assembly and speech. BLMLA plans to assist, plan, participate in, hold similar events in the future, on its own or in conjunction with others, and is fearful that police actions in response to these and similar protests of sanctioned executions will be repeated absent injunctive relief to prohibit the practices, policies, and customs of the LAPD that resulted in the unlawful action in response to the recent protests throughout the City.

92.     Defendants' actions also interfered with the work of Plaintiff CANGRESS to advocate for racial and economic justice for the residents of Skid Row, both housed and unhoused. Because Defendants indiscriminately arrested individuals on Skid Row for violations of the curfew and assaulted them with less lethal weapons, Plaintiff CANGRESS has had to shift its resources to protecting its members and other residents of Skid Row from the unlawful conduct of the LAPD.

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND
INJUNCTIVE RELIEF

Plaintiff CANGRESS' time in recent months was heavily focused on advocating for and protecting a highly-vulnerable population for COVID-19 from the greater likelihood of contracting and dying from the virus based on their poverty, underlying medical conditions and race.

93.   The Plaintiff injunctive relief class includes all persons who participated, or intend to exercise their First Amendment rights by participating, in future demonstrations, in particular in protest against police violence and racism.

94.   The Plaintiff damages classes consist of: 1) approximately 3000 individuals who were arrested and subjected to excessively tight and prolonged handcuffing, held on buses and in garages for extended periods of time, without access to bathrooms, water or food when they engaged in the spontaneous protests against a number of recent widely publicized police killings of civilians, the most recent spark being the murder of George Floyd in Minneapolis, Minnesota; 2) several thousand individuals who were struck by so-called "rubber bullets" and/or baton strikes administered without lawful justification and in a manner contrary to proper use and inflicted maximum injury; 3) individuals charged solely with infractions who were arrested and taken into custody rather than being released in the field despite their right to field release.

## II.   PARTIES-DEFENDANTS

95.   Defendant **CITY OF LOS ANGELES** is a municipal corporation duly organized and existing under the Constitution and laws of the State of California. The Los Angeles Police Department ("LAPD") is a local government entity and an agency of Defendant City of Los Angeles, and all actions of the LAPD are the legal responsibility of the City of Los Angeles. The City of Los Angeles is sued in its own right on the basis of its policies, customs, and practices which gave rise to Plaintiffs' federal rights claims.

96.    Defendant **CHIEF MICHEL MOORE**, is and was, at all times relevant to this action, the LAPD police chief and a policymaker for his department. He is sued in both his individual and official capacities.

97.    Plaintiffs are informed, believe, and thereupon allege that Does 1 through 10 were the agents, servants, and employees of Defendants City of Los Angeles and/or the LAPD. Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10, inclusive, and therefore sue these Defendant by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. The individual Doe Defendants are sued in both their individual and official capacities.

98.    Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto Does 1 through 10, in addition to the named Defendants, are responsible in some manner for the damages and injuries alleged herein.

99.    Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto Defendants, and each of them, were the agents, servants and employees of the other Defendants and were acting at all times within the scope of their agency and employment and with the knowledge and consent of their principal and employer. At all times Defendants were acting under color of state law.

100.    Plaintiffs are informed, believe, and thereupon allege that the practices, policies, and customs of the City of Los Angeles and/or the LAPD caused the unlawful action taken against Plaintiffs.

## III.    FACTS

101.    On May 25, 2020, Minneapolis Police Officer Derek Chauvin murdered George Floyd, suspected of forgery for attempting to use a purported counterfeit $20 bill. Officer Chauvin, along with two other officers, held Mr. Floyd on the ground, handcuffed behind his back, and ignored pleas to get off his neck, back and legs and let him breathe. Mr. Floyd died on the street in Minneapolis.

29
FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

102.   Because of extensive video by onlookers, security cameras and police body cameras, both the Minneapolis law enforcement and prosecutors, as well as the public, concluded that George Floyd was just the latest person to die at the hands of police because of deliberate and unlawful tactics.

103.   The death of George Floyd sparked an extraordinary wave of protests across the country and the world. In Los Angeles, tens of thousands of people participated in lawful and peaceful protests.  Based on the alleged unlawful conduct of a few, Defendants responded to these mass protests with expansive curfews and mass arrests for curfew violation, failure to disperse, unlawful assembly, failure to follow a "lawful" order of an officer,  similar misdemeanors and infractions, all designed to punish protestors. The routine and undifferentiated use of such widespread arrest and dispersal tactics impinged the protestors' right to engage in protected expressive activity in public spaces without preemption and curtailment based on group guilt.

104.   California Penal Code § 409, which defines an unlawful assembly, has repeatedly been construed to require a showing of imminent violence that so permeates a lawful expressive activity that law enforcement may curtail the rights of all demonstrators.  Facts justifying the declaration of an unlawful assembly order anywhere, let alone throughout the City, or even all of downtown Los Angeles in advance of any expressive activity, did not exist. Instead, Chief **MOORE** and Mayor Garcetti applied a ham-handed approach, announcing an unlawful assembly without adequate notice and unlawfully employing indiscriminate, untargeted use of force, silencing everyone.

105.   Thousands of peaceful protestors, the arrest class of Plaintiffs (defined further on), were transported to LAPD jails and make-shift detention sites around the City. All those arrested were held on buses for extended periods of time before being off-loaded into garages and parking lots to be cited and released. Because there was no plan for processing mass arrests and despite the fact that the City has

repeatedly been sued for the same unlawful policy and practice, many arrestees were held on the buses and driven around the City for long periods of time in close contact in unventilated buses - handcuffed and without any bathroom access - in search of a location where they could be processed and released. As a result, arrestees for infractions and misdemeanors were driven to far distant locations in the City and, after processing, released in the middle of the night without their property and with no way to get home, all the while being out during a time of curfew and risking rearrest if detained again by the LAPD.

106.   Throughout the time they were arrested and held in LAPD custody, Plaintiffs were handcuffed tightly behind their backs and denied food, water and access to bathroom facilities, resulting in many arrestees urinating on themselves in the closed buses. All arrestees, regardless of the alleged crime, were unnecessarily and unreasonably confined in close, enclosed quarters without any ventilation, increasing the risk of COVID-19 exposure. It is well known and was, or should have been known to Defendants, that being in closed spaces without vigorous air movement significantly increases the risk of COVID-19 exposure. Moreover, both the City and the Defendant **MOORE** were well aware of the increased risk of COVID-19 exposure because 1) of the institution of $0 bail for low-level offenses and 2) the City and LAPD's involvement in mitigation efforts for COVID-19 for individuals in congregate spaces, including the temporary placement of unhoused individuals at the City's recreation centers.  All members of the arrest class (defined in ¶ 123a) were held in restraint for a minimum of three hours, with some held more than 12 hours in these excruciatingly painful conditions from the time they were first handcuffed. The class members experienced numbness in their hands and requests to loosen the zip ties or remove them went unanswered. Without access to bathrooms, arrestees were forced to urinate on themselves.

107.   The harm caused by this practice is well-established.  The Ninth Circuit has long recognized that tight handcuffs for even relatively short period of time less

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

than an hour can cause significant pain and damage.  For more than a quarter of a century, law enforcement in California have "been on notice that abusive handcuffing can amount to excessive force and no officer could reasonable believe it is proper to fail to assist arrestees who complain that their handcuffs are too tight". *See e.g., Alexander v. County of Los Angeles*, 64 F.3d 1315, 1323 (9th Cir. 1995).[5]

108.    Arrestees were uniformly held under these unlawful conditions of confinement despite the fact that, to address the COVID-19 pandemic, California currently has a $0 bail for any misdemeanor where the bail would be less than $50,000. The prolonged detention of the arrest class is even more unjustified in light of the California Penal Code § 853.6, which permits individuals suspected of a misdemeanor violation to be cited and released promptly, in the field or after booking, unless one of a limited number of restrictions apply.

109.    Applying § 853.6, in 2013 the Los Angeles Police Commission conducted a research project that demonstrated that it took an officer approximately 15 minutes to prepare a cite and release in the field with a Notice to Appear; 45 minutes to transport an individual to the station and prepare a "short-form" booking document, cite and release the individual with a Notice to Appear; and two and one-half hours to complete a "long-form" booking document. As a result of this review, a directive was issued to follow the cite-and-release option, while reserving individual discretion to book and release at the station. On information and belief, in this instance the LAPD elected to transport every arrestee, regardless of the offense, to a "station" for booking, even though many, if not nearly all, were

---

[5] JJ Payne-James, "Restraint Techniques, Injuries, and Death: Handcuffs" Encyclopedia of Forensic and Legal Medicine, Volume 4 (December 2016): Lists studies of neurology injuries caused by handcuffing.

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND
INJUNCTIVE RELIEF

processed outside of a building and simply cited and released at that location.  This was done to punish demonstrators for their protest activity.

110.   A large number of individuals in this instance, as many as 1,000 or more, were arrested on infractions.  They were handcuffed and many had their citations prepared on site and put in their pockets.  Instead of releasing them once the citation was completed, all were held on buses and booked, in violation of Cal. Penal Code § 853.5, which imposes a mandatory requirement to release infraction arrestees on their own recognizance in the field. (" In all cases, except as specified in Sections 40302, 40303, 40305, and 40305.5 of the Vehicle Code, in which a person is arrested for an infraction, a peace officer shall only require the arrestee to present his or her driver's license or other satisfactory evidence of his or her identity for examination and to sign a written promise to appear contained in a notice to appear…. Only if the arrestee refuses to sign a written promise, has no satisfactory identification, or refuses to provide a thumbprint or fingerprint may the arrestee be taken into custody"). All those arrested and charged with infractions were denied the citation release process guaranteed by § 853.5, which creates a liberty interest for such arrestees to be released in the field so long as they provide sufficient identification and agree to sign a written notice to appear. The infraction arrestees were denied the opportunity for a field release without any individualized determination of whether they met one of the three narrow exceptions allowing a custodial arrest pursuant to § 835.5.  Section 835.5 creates a liberty interest in a field arrest for those within the statute's ambit and adherence to it is a mandatory governmental duty within the meaning of Govt. Code § 815.6.

111.   The unlawful detention of thousands of arrestees pursuant to the City's unlawful policy beginning on or around November 17. 2011, of denying OR release to individuals arrested for engaging in civil disobedience is a policy applied to the Occupy LA protests. According to former LAPD Deputy Chief Perez, who first announced this policy during the 2011 Occupy protests, the decision was made to

deny OR release to those engaged in First Amendment activity to "teach people a lesson." Subsequently, small groups of individuals involved in acts of civil disobedience at the Bank of America headquarters on November 17, 2011, were arrested on non-violent misdemeanor offenses arising from protest activity and denied OR release. Again, on November 30, 2011, the City denied OR release to the nearly 300 people arrested in connection with the mass arrests at City Hall made in connection with the Occupy L.A. demonstration.

112.   The same unlawful actions occurred in the November 2014 mass arrest of persons protesting the decision of the grand jury in Ferguson Missouri not to indict the police officer who shot and killed Michael Brown. In public statements, then-Chief Beck and other command staff in the LAPD stated that protestors would be held and not granted OR, as required by law, for retaliatory reasons and without the requisite individualized suspicion.  In this instance, while the Defendants did not deny OR release for arrestees for minor misdemeanors, they nonetheless detained them for up to 14 hours in some instances rather than cite and release them in the field as mandated by California Penal Code § 853.6. On information and belief, Plaintiffs allege that, without any individual suspicion that the arrestees would violate the law if released, Defendants opted to arrest and detain all protestors to preempt even lawful expressive activity.

113.   Both the Occupy arrests in 2011 and the Ferguson arrests in 2014 demonstrate the crucial need for the Defendants to have a plan to respond to similar future protests employing the technology the LAPD regularly uses to run wants and warrants in the field, not seizing, handcuffing and detaining protestors for prolonged periods of time. The failure to implement such a plan indicates a deliberate decision to inflict punitive measures against protestors exercising their First Amendment rights to assemble and speak.

114.   In this instance, Defendants' failures were exacerbated because the obligation to release those arrested in the field and charged with infractions is

mandatory under § 853.5. LAPD's past history shows Defendants' intent to deny Plaintiffs' basic rights without justification in retaliation for the exercise of their First Amendment rights violated the First, Fourth, and Fourteenth Amendment rights of Plaintiffs and the class members, and with the specific and deliberate intent to interfere with the exercise of Plaintiffs' rights to assembly and due process.

115. Defendants had ready alternatives to the prolonged detention of the Arrest Class. The LAPD has the technological capability to cite and release in the field using modern technology. In the Ferguson protests in 2014, the LAPD detained a group of approximately 40-50 protestors at Beverly and Alvarado, kettled them, handcuffed them with twist-ties, brought in computers and video recording equipment, collected the same information as would be done in a booking at a station, then released them with orders to disperse and advised the detainees that they would be taken to jail and held if they were found again that night in violation of the dispersal order. In all, people were handcuffed in the Beverly and Alvarado detention no longer than approximately one hour. No one suffered injury as a result of the prolonged tight handcuffing, no one urinated on themselves in an enclosed bus after being denied bathroom access, and, significantly, no one was a repeat offender that night or any other night as the demonstrations protesting the death of Michael Brown continued. The officers patted down the demonstrators' clothing and searched their personal belongings, including backpacks, as they would do if they were taking them into custody for booking. LAPD officers ran wants and warrants on each detainee in the field, as they do for any traffic stop and as they do with unhoused individuals in the city routinely and released the detainees with a warning. There is no reason why the protestors in the Plaintiff Arrest Class could not have been processed, without injury or anguish, exactly the same way.

## IV.  MONELL ALLEGATIONS

116. The LAPD engaged in repeated, widespread violations of law, as outlined above, over the course of at least four nights, shutting down the exercise of

First Amendment activities through the use of indiscriminate and unreasonable force against thousands of protestors; imposing curfews without accommodating, or attempting to accommodate, the right to peaceable assembly and protest; at times declaring unlawful assemblies without adequate sound amplification and without providing both directions, means and opportunity to disperse before taking aggressive police action; hitting at least close to a thousand protestors with batons and/or "rubber bullets" through the use of unreasonable and excessive force; arresting and not releasing in the field at least hundreds of persons charged solely with infractions in violation of California law; and unlawfully imposing on arrestees unlawful conditions of confinement for many hours – including but not limited to tight handcuffing, no bathroom access, no access to food or water, and lack of ventilation in small congregate spaces  – while on buses as previously outlined. In conjunction with Defendants' long history of protest-related constitutional violations (outlined below in sub-sections A and B), Defendants' repeated widespread and unlawful acts over several nights and involving many locations constitute an unlawful custom and policy of violating protest participants' constitutional rights.

117.   LAPD chief **MOORE** was fully knowledgeable and apprised of these actions and was on site on several days and at several locations, including but not limited to the first two days of protest, observing this operation and directing protestors, without repudiating or stopping the actions of the LAPD officers, thereby ratifying them.  Moreover, in his reports to the Police Commission and in other public statements, **MOORE** stated that the actions of the LAPD were proper.

118.   As stated above, the City, through **CHIEF MOORE** and the LAPD, has failed to train its officers in the appropriate constitutional responses to peaceful demonstrations. The City is well aware of its constitutional duties in these circumstances in light of the settlement agreements and consent judgments discussed below in *National Lawyers Guild v. City of Los Angeles* and *MIWON v. City of Los*

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND
INJUNCTIVE RELIEF

*Angeles*, as well as other settlements entered into specifying these constitutional duties over the years. The need for training and discipline to preserve constitutional guarantees in these circumstances is obvious. The City has known of the deficiencies in its training since at least 2000 and entered into settlement agreements in June 2005 and June 2009, each time agreeing to revised policies and training, yet the City has failed to promulgate adequate policies effectuating the terms of the settlement agreement and/or to train its command staff and officers on the revised policies, if any exist. This constitutes a separate Monell violation from those outlined above.

### A. THE SETTLEMENT IN NATIONAL LAWYERS GUILD V. CITY OF LOS ANGELES:

119.   In June, 2005, the City of Los Angeles entered into a settlement agreement in *National Lawyers Guild, et al. v. City of Los Angeles, et al.*, CV 01-6877 FMC (CWx), an action arising from the disruption of lawful assemblies and use of unlawful force during the Democratic National Convention ("DNC") in Los Angeles in 2000 and a subsequent demonstration on October 22, 2000. The settlement provided for important changes in the policy and practices of the LAPD as applied to demonstrations.

120.   Significantly, the settlement provided that, prior to declaring an unlawful assembly, the LAPD Incident Commander should evaluate the feasibility of isolating and arresting those responsible for any unlawful conduct, and if feasible, take action only against those individuals. The settlement also addressed the use of less-lethal weapons and chemical irritants to disperse peaceful protestors.

### B. THE SETTLEMENT IN *MULTI-ETHNIC WORKER ORGANIZING NETWORK V. CITY OF LOS ANGELES*:

121.   On May 1, 2007 (May Day), the LAPD assaulted a peaceful, permitted immigration march in MacArthur Park. The attack on the demonstrators was without warning. No dispersal order was given until more than three minutes into the police action and, even then, the dispersal order was grossly inadequate, given from

helicopters in English to a largely Spanish-speaking assembly. During the course of litigating the *MIWON* action, the LAPD conceded that it had not fully implemented training and policy orders regarding the *NLG* settlement two years earlier. In fact, no policy changes were ever finalized.

122.    On June 24, 2009, the federal district court approved and entered a Structural Relief Order as part of the settlement of a class action lawsuit brought on behalf of all those subjected to the LAPD's May Day action. Through this settlement, the LAPD agreed that it would facilitate demonstrations that may temporarily block traffic. This latter provision is consistent with established law in the Ninth Circuit, recognizing the need for local agencies to accommodate "spontaneous" protests in the streets, particularly in response to allegations of police misconduct.

123.    The *MIWON* order also set out requirements to declare an unlawful assembly: an amplified loudspeaker system with an officer at the far side of the crowd to record the officer; if there is no serious violence occurring, the order <u>shall</u> be made repeatedly over a period of time, including an "objectively reasonable" period of time to disperse and identification of "a clear and safe route" to follow to disperse. The order should be given so that it is heard by the entire crowd. These requirements were not met in this instance in most locations.

124.    The terms of the *MIWON* structural relief agreement were to be included in the LAPD's Crowd Control and Use of Force Manuals and every officer at the rank of Sergeant I and above, as well as the entire Metropolitan Division, were to undergo training every two years. Chief Moore, as well as those members of his command staff to whom he has delegated his responsibility to enact and implement lawful policies for responding to demonstrations, are aware of the unlawful policies, practices, and customs of the City and the LAPD which resulted in the settlement in *National Lawyers Guild v. City of Los Angeles* in June, 2005. Moreover, Chief Moore and his delegated command staff are aware that the use of unlawful dispersal orders, baton strikes and "less-lethal" weapons to break up lawful protests, in

particular, is a custom so ingrained in the marrow of the LAPD that it was critical to take all steps necessary to ensure that official policy was implemented in a manner sufficient to address the deeply rooted custom to violate First Amendment rights in the specific ways identified in the *National Lawyers Guild* settlement agreement. The failure to take such steps directly lead to the injuries suffered by the Plaintiffs. This failure amounted to an "acquiescence in the constitutional deprivations of which [the] complaint is made" and deliberate indifference to the rights of persons with whom the police come into contact, and constituted a conscious choice by the City not to properly train its law enforcement personnel on these issues.

125.   The City, through Chief **MOORE** and command staff to whom he delegated decision-making, also knew from the litigation for the Occupy-protest arrests, *Aichele v. City of Los Angeles* (filed in 2012), and *Chua v. City of Los Angeles* (filed in 2016) that it was violating Plaintiffs' right to due process and depriving them of their liberty interest by unlawfully and unreasonably refusing to release arrestees in the field based not on individualized suspicion but, rather, on group guilt based on their perceived association with the George Floyd protests.

126.   On information and belief, to the extent he did not make the decision and approve the plan himself, Chief **MOORE** delegated responsibility and authority to persons within his command staff to act as the final policy maker in determining the response to assemblies at various locations where protests of the death of George Floyd occurred. The persons who made these decisions, acted as the delegated policy maker for the City of Los Angeles on these issues. There was no time, opportunity, or procedure for anyone to review or revise the decisions made by these delegated policy makers prior to their final implementation.

## V.   CLASS ACTION ALLEGATIONS

### A.   CLASS DEFINITION – 23(B)(2)) (INJUNCTIVE RELIEF CLASS)

127.   The injunctive relief class is defined as all persons who have in the past participated, presently are participating, or may in the future participate in, or be

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND
INJUNCTIVE RELIEF

present at, demonstrations within the City of Los Angeles in the exercise of their rights of free speech, assembly and petition in general, and particularly as it relates to protesting police violence and discrimination against people of color, especially African-Americans.

B.      **CLASS DEFINITIONS – 23(B)(3) (DAMAGES CLASSES)**

128.    One or more of the named Plaintiffs (which are indicated for each class or subclass) bring this action individually and on behalf of a proposed class of all other persons similarly situated pursuant to FRCivP Rule 23(b)(1), (b)(2) and (b)(3). The damages classes are defined as:

a.   **Arrest Class:** Beginning May 29, 2020, and continuing until judgment or other resolution of this case, all persons present at or during the aftermath of protests regarding the killing of George Floyd in the City of Los Angeles, who were arrested by the LAPD on misdemeanor charges of failure to obey a curfew, failure to disperse, failure to follow a lawful order of a police officer and/or unlawful assembly, and who were held on buses and subjected to prolonged tight hand-cuffing, denied access to bathrooms, water and food, and enclosed spaces without ventilation. The Class Representatives for this class are KRYSTLE HARTSFIELD, DEVON YOUNG, LINUS SHENTU, ALEXANDER STAMM, STEVEN ROE, MAIA KAZIM and JONATHAN MAYORCA.

b.   **Direct Force Class:** Beginning May 29, 2020, and continuing until judgment or other resolution of this case, all persons present at or during the aftermath of protests regarding the killing of George Floyd in the City of Los Angeles, who were shot with so-called "less-lethal weapons" and/or struck with batons.   The Class Representatives for this class are SHANNON LEE MOORE, TINA ČRNKO, CLARA ARANOVICH, STEVEN ROE, ABIGAIL RODAS.

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

c. **Infraction Class:** Beginning May 29, 2020, and continuing until judgment or other resolution of this case, all persons present at or during the aftermath of protests regarding the killing of George Floyd in the City of Los Angeles, who were charged with infractions, arrested and taken into custody and not released in the field, as required by Penal Code § 853.5. The Class Representatives for this class are JONATHAN MAYORCA, NADIA KHAN, NELSON LOPEZ, ALICIA BARRERA-TRUJILLO, MAIA KAZIM, DEVON YOUNG.

## C. RULE 23 PREREQUISITES

### i. Numerosity

124. Each class is inclusive of people present to protest and those otherwise present in the vicinity as bystanders. In accordance with F.R.Civ. P. Rule 23(a), the members of the class are so numerous that joinder of all members is impracticable. The Protest Class is composed of tens of thousands of people. The arrest Class exceeds 2500 people. The Direct Force Class consists of at least several hundred people, likely in excess of 1000. The Infraction Class consists of at least several hundred people. The Homeless Class consists of approximately 100 people.

### ii. Common Issues Of Fact Or Law

125. Although the actions complained of in this Complaint occurred at different times and locations, Defendants acted uniformly with respect to each class. For example, all arrestees were placed on buses and subjected to the described conditions of confinement; all those charged with infractions were taken into custody and placed on buses even though they were entitled to field release; and so forth.

126. Plaintiffs are informed and believe and thereon allege that the LAPD officers acted in accordance with orders given by supervisors from the

highest command positions, in accordance with policies and procedures instituted by the LAPD and the City of Los Angeles.

127. The common questions of fact include, but are not limited to:

    a. Did Defendants impose curfews without accommodating, or attempting to accommodate, the right to peaceable assembly and protest;

    b. Did Defendants declare unlawful assemblies without adequate sound amplification and without providing both directions, means and opportunity to disperse before taking aggressive and injurious – potentially deadly police action;

    c. Did Defendants routinely break up George Floyd protests through the use of force (batons and rubber bullets) without regard to whether the individuals against whom such force was used were engaged in conduct justifying such force;

    d. Did Defendants routinely, while breaking up George Floyd protests, hit people with batons and/or rubber bullets although those people were not engaging in conduct justifying such force;

    e. When arresting people at the George Floyd protests, did Defendants routinely subject arrestees to prolonged detention on buses, while tightly hand-cuffed, denied access to bathrooms, water and food, and where they were kept in enclosed spaces without ventilation;

    f. When arresting people at the George Floyd protests, did Defendants routinely subject arrestees charged solely with infractions to custodial arrest without regard to whether they were entitled to field release as provided in Cal. Penal Code § 853.5?

128. The common questions of law include, but are not limited to:

    a. Must Defendants, when imposing a curfew based on some present at a protest that is unlawful, accommodate, or attempt to accommodate, the right to peaceable assembly and protest?

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

b. Must Defendants when declaring unlawful assemblies, provide adequate sound amplification and provide both directions, means and opportunity to disperse before taking aggressive and injurious – potentially deadly - police action?

c. Did Defendants routine break up George Floyd protests through the use of force (batons and rubber bullets) without regard to whether the individuals against whom such force was used were engaged in conduct justifying such force violate the First, Fourth or Fourteenth Amendments and their state law analogues?

d. Did the LAPD, while breaking up George Floyd protests and routinely hitting people with batons and/or rubber bullets although those people were not engaging in conduct justifying such force violate the First, Fourth or Fourteenth Amendments and their state law analogues?

e. Did the LAPD, after arresting people at the George Floyd protests, and routinely subjecting arrestees to prolonged detention on buses, while tightly hand-cuffed, denied access to bathrooms, water and food, and where they were kept in enclosed spaces without ventilation violate the Fourth or Fourteenth Amendments and their state law analogues?

f. Did the LAPD's custodial arrest of people at the George Floyd protests who were charged solely with infractions, and who qualified under Penal Code § 853.5 for field release, violate their rights under 853.5 and/or Govt. Code § 815.6, and their rights under the Fourth and Fourteenth Amendments and their state law analogues.

g. Did some or all of the conduct described above constitute a policy or custom of Defendants?

h. Is any individual Defendant sued in his individual capacity entitled to qualified immunity on the federal claims?

i.  Did any of the conduct alleged herein violate Cal. Civil Code § 52.1 (the Bane Act)?

j.  Are general classwide damages available to the various classes?

k.  Are statutory damages under § 52.1 available to the various classes?

129.  Defendants detained and/or arrested the putative class and sub-classes as a group and treated all similarly, acting on ground applicable to the putative class. The named Plaintiffs' claims that the First, Fourth, and Fourteenth Amendment rights—and their analogous state Constitution, statutory, and common law rights—were violated raise common question of law and fact. the Defendants have acted, threaten to act, and will continue to act, on grounds generally applicable to the class, thereby making appropriate final injunctive relief or declaratory relief with respect to the class as a whole.

130.  The questions of law and fact common to the classes, which are outlined above, predominate over any questions affecting only individual members.

**iii.  Typicality**

131.  In accordance with F.R. Civ. P. Rule 23(a), the claims of the representative Plaintiffs are typical of the class. Plaintiffs were all present at Floyd protests in the City of Los Angeles; were subjected to one or more of the violations previously enumerated; and seek redress for the past violations of their rights and protection to bar the repeat of those violations in the future.

132.  Thus, Plaintiffs have the same interests and have suffered the same type of damages as the class members. Plaintiffs' claims are based upon the same or similar legal theories as the claims of the class members of each class. Each class member suffered actual damages as a result of being subjected to one or more of the violations enumerated above. The actual injuries suffered by Plaintiffs are similar in type to the actual damages

suffered by each class member although the severity of those injuries may vary among class members.

133.  In accordance with F.R. Civ. P. Rule 23(a), the representative Plaintiffs will fairly and adequately protect the interests of the class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the class.

### iv.  Adequate Representation

134.  The named Plaintiffs will fairly and adequately represent the common class interest. The named Plaintiffs have a strong interest in achieving the relief requested in this Complaint, they have no conflicts with members of the Plaintiff class, and they will fairly and adequately protect the interests of the class.

135.  The named Plaintiffs are represented by counsel who are well-experienced in civil rights and class action litigation and are familiar with the issues in this case. Attorneys Paul Hoffman, Barry Litt, and Carol Sobel have successfully litigated a number of class action cases on behalf of protesters in Los Angeles. They were appointed by the court as class counsel in *Aichele, et al. v. City of Los Angeles, et al.*, No. 2:12-CV-10863-DMG (C.D. Cal. August 26, 2012), challenging, *inter alia*, the LAPD's denial of OR release to those arrested during the Occupy action at Los Angeles City Hall. They were appointed by the court as class counsel in *Chua v. City of Los Angeles,* Case No. CV 2:16-cv-00237-JAK-GJS(x) (C.D. Cal. January 12, 2016), which involved protests over the police killing of Michael Brown in Ferguson Mo.). They were also appointed as class counsel in *Multi-Ethnic Immigrant Worker Network v. City of Los Angeles*, 24 F.R.D. 631 (C.D. Cal. 2007), challenging the LAPD's assault on a lawful immigrant-rights rally in MacArthur Park on May 1, 2007. That case resulted in a settle of $12,850,000 -- the largest amount ever paid

nationally in a protest case in which there were no arrests of the Plaintiffs. In addition to class action protest litigation, attorneys Hoffman, Litt, and Sobel have served as class counsel in a number of other class actions redressing civil rights violations.

136.   Counsel for the named Plaintiffs know of no conflicts among or between members of the class, the named Plaintiffs, or the attorneys in this action.

### v.   Maintenance and Superiority

137.   In accordance with Fed.R.Civ.P. Rule 23(b)(1)(A), prosecutions of separate actions by individual members of the classes would create a risk that inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class.

138.   In accordance with Fed.R.Civ.P. Rule 23(b)(1)(B), prosecutions of separate actions by individual members of the classes would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

139.   In accordance with Fed.R.Civ.P. Rule 23(b)(2), Defendants have acted on grounds generally applicable to the class.

140.   In accordance with Fed.R.Civ.P. Rule 23(b)(3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe, and thereon allege, that the interests of class members in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute any action at all. Plaintiffs are informed

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

and believe, and thereon allege, that the amounts at stake for individuals are such that separate suits would be impracticable in that most members of the class will not be able to find counsel to represent them. Plaintiffs are informed and believe, and thereon allege, that it is desirable to concentrate all litigation in one forum because all of the claims arise in the same location, *i.e.,* the County of Los Angeles. It will promote judicial efficiency to resolve the common questions of law and fact in one forum rather than in multiple courts.

141.   Plaintiffs do not know the identities of most class members. Plaintiffs are informed and believe, and thereon allege, that the identities of the class members are ascertainable in significant part from LAPD records, at least as it relates to those class members who were arrested. Plaintiffs are informed and believe, and thereon allege, that a significant number of class members may be reached by the use of outreach efforts by organizations that participated in organizing the affected protests.

142.   Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Leading members of Plaintiffs' counsel organized The class action is superior to any other available means to resolve the issues managed similar litigation with similarly disparate damages as a result of LAPD conduct in breaking up the May Day 2007 protests that resulted in the *MIWON* litigation described previously, as well as the *Aichele* and *Chua* litigation, all of which was against the City of Los Angeles and the LAPD. Liability can be determined on a class-wide basis. General damages can also be determined on a classwide.

143.   In accordance with Fed.R.Civ.P. Rule 23(b)(3), class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through

reasonable effort. Plaintiffs are informed and believe that LAPD computer records contain a last known address for class members who were arrested. Plaintiffs contemplate that individual notice be given to class members at such last known address by first class mail, email and cell phone outreach, social media and efforts of organizations that organized the protests. Plaintiffs contemplate that the notice inform class members of the following regarding their damages claims:

A.      The pendency of the class action, and the issues common to the class;

        B.      The nature of the action;

C.      Their right to 'opt out' of the action within a given time, in which event they will not be bound by a decision rendered in the class action;

D.      Their right, if they do not 'opt out,' to be represented by their own counsel and enter an appearance in the case; otherwise, they will be represented by the named Plaintiffs and their counsel; and

E.      Their right, if they do not 'opt out,' to share in any recovery in favor of the class, and conversely to be bound by any judgment on the common issues, adverse to the class.

144.      As a direct and proximate cause of the conduct described herein, the named individual Plaintiffs and the class members have been denied their constitutional, statutory, and legal rights as stated herein, and have suffered general and special damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety and other damages in an amount according to proof.

145.      Plaintiffs have not yet filed a Cal. Govt. Code § 910 class claim addressing their state law damages claims but intend to do so in the near

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

future.  Once that occurs, and the time permitted by California law to file a lawsuit on such claims has elapsed, Plaintiffs intend to amend this complaint to add state law damages claims.  Because injunctive relief under state law does not require the filing of a prior administrative claims, Plaintiffs' injunctive relief claims currently entail violation of Plaintiffs' rights under California as well as federal law, including but not limited to Cal. Const. Article 1, §§ 1, 2, 3, 7, 13, 17 and 26; Civil Code § 52.1; Penal Code § 835.5; and Govt. Code § 815.6.

146.     Defendants' acts were willful, wanton, malicious, and oppressive, and done with conscious or reckless disregard for, and deliberate indifference to, Plaintiffs' rights.

147.      All of the following claims for relief are asserted against all Defendants.

148.     Although Plaintiffs' legal theories significantly overlap, they apply differently to different classes. Accordingly, Plaintiffs state their claims by class.

149.      Plaintiffs restate and incorporate by reference each of the foregoing and ensuing paragraphs in each of the following causes of action as if each paragraph was fully set forth therein.

## VI.   FIRST CLAIM FOR RELIEF – INJUNCTIVE RELIEF
**(First, Fourth And Fourteenth Amendments To The U.S. Constitution, 42 U.S.C. § 1983; California Constitution Articles 1 §§ 2, 3, 7, 13, Penal Code § 835.5, Civil Code § 52.1, And Civil Code § 815.6 For Injunctive Relief)**

150.     Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

151.     The  Defendants engaged in repeated, widespread violations of law, as outlined above, over the course of at least several nights, shutting down the exercise of First Amendment activities through the use of indiscriminate and unreasonable force against thousands of protestors;

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

imposing curfews without accommodating, or 3fen attempting to accommodate, the right to peaceable assembly and protest; at times declaring unlawful assemblies without adequate sound amplification and without providing both directions, means and opportunity to disperse before taking aggressive police action; hitting at least hundreds of protestors with batons and/or rubber bullets through the use of unreasonable and excessive force; arresting and not releasing in the field at least hundreds of persons charged solely with infractions in violation of California law; unlawfully imposing on arrestees unlawful conditions of confinement for many hours – including but not limited to tight handcuffing, no bathroom access, no access to food or water, and lack of ventilation, placing detainees at great risk of exposure to COVID-19 – while on buses as previously outlined; and booking and collecting information on arrested individuals.

152.     The City, through Chief Moore and the LAPD, has failed to train its officers in the constitutional responses to peaceful demonstrations as revealed by the above allegations despite the long history of such violations in the past, and Defendants' commitment to correct them in the form of both court orders and settlement agreements. The recurrence of the same violations with respect to these arrests indicates an intentional refusal to preserve the constitutional rights of protestors.

153.     Without intervention by this Court, the Injunctive Relief  class members, who have participated and wish to participate in protest activities, particularly related to police violence, are at risk of having their rights violated in the future due to the Defendants' demonstrated pattern of constitutional violations and threatened future actions. The Injunctive Relief Class has no adequate remedy at law to protect the future lawful exercise of their constitutional rights, and, without action

by this court, will suffer irreparable injury, thereby entitling them to injunctive and declaratory relief. The injunctive relief class is represented by Black Lives Matter Los Angeles and CANGRESS, as well as each of the individual class representatives.

154.    The Defendants have acted and refused to act on grounds generally applicable to the putative class. Injunctive and declaratory relief for the putative class as a whole is appropriate.

155.    Defendants' polices practices, customs, conduct and acts alleged herein resulted in, and will continue to result in, irreparable injury to the Plaintiffs, including but not limited to violation of their constitutional and statutory rights. Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein. The Plaintiffs and class members intend in the future to exercise their constitutional rights of freedom of speech and association by engaging in expressive activities in the City of Los Angeles. Defendants' conduct described herein has created uncertainty among Plaintiffs with respect to their exercise now and in the future of these constitutional rights, and has chilled their exercise of these rights.

156.    Specifically, Plaintiffs are concerned that, if arrested, whether lawfully or unlawfully, they will again be denied the liberty interest codified at California Penal Code § 853.5, will be subjected to unlawful conditions of confinement exposing them to increased risk of COVID-19, and will be subjected to unreasonable and excessive force by LAPD.

157.    Plaintiffs are also concerned that, when engaged in protest activities, Defendants will impose curfews without accommodating or attempting to accommodate First Amendment rights; will not provide adequate notice in the event unlawful assemblies are declared; will not provide adequate means and opportunity to disperse; and will again

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

employ indiscriminate, unreasonable or excessive force, injuring and terrifying protestors.

158.    Plaintiffs therefore seek injunctive relief from this court to ensure that Plaintiffs and persons similarly situated will not suffer violations of their rights from Defendants' illegal and unconstitutional policies, customs, and practices described herein.

159.    Plaintiffs also seek injunctive relief in the form of an order requiring that Defendants seal and destroy and records derived from Plaintiffs' arrests, including fingerprints, photographs, and other identification and descriptive information, and all information, and biological samples and information obtained from such biological samples collected from the Plaintiff class, and identify to the Plaintiff class all entities and agencies to which such information has been disseminated; and that all such disseminated records be collected and destroyed.

## VII.   SECOND CLAIM FOR RELIEF – ARREST CLASS
### (Fourth and Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. § 1983 for damages)

160.    Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

161.    All Arrest Class members were arrested on misdemeanor charges of failure to obey a curfew, failure to disperse, failure to follow a lawful order of a police officer and/or unlawful assembly during Floyd protests and were placed on buses and driven to a variety of facilities where they were processed and released.  All those arrestees were on the buses for several hours – both to get to their destination and then held on the bus until they were processed.  The times the arrest class was held on the congregate space of the buses ranged from

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

and lasting for as long as twelve hours or more. While held on buses or otherwise detained prior to their release, Arrest Class members were subjected to prolonged tight hand-cuffing; denied access to bathrooms, water and food.; and held in enclosed spaces without ventilation, which significantly increased their risk of Covid-19 exposure because, even if they had previously been similarly distanced from others during outside protests, the risk of exposure is significantly greater in enclosed, unventilated spaces.

162.    Defendants' above-described conduct violated Arrest Class members' rights to be free from unreasonable seizures under the Fourth Amendment and under the Fourteenth Amendment's due process clause and the state constitutional analogues.

163.    As a result of Defendants' wrongful conduct, Arrest Class members suffered damages as alleged above.

164.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

## VIII.   THIRD CLAIM FOR RELIEF – DIRECT FORCE CLASS
### (Fourth and Fourteenth Amendment to the U.S. Constitution 42 U.S.C. § 1983 for damages)

165.    Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

166.    All Direct Force Class members were shot with so-called "less-lethal weapons" and/or struck with batons.

167.    Members of the Direct Force Class who were shot with "rubber bullets" and struck with batons were injured in a manner that evinced that Defendants applied force unlawfully. Many class members were

53
FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

struck with rubber bullets in the face, head, shoulder and neck areas. Video footage of various incidents shows officers shooting straight at peaceful protestors who posed no threat to the police or the public. *See* Instagram video May 30, 2020 in the Fairfax area, near Pan Pacific Park after the BLMLA rally https://www.instagram.com/p/CA3GPPYB7dz/ Similarly, individuals suffered baton strikes meant not to compel people to retreat, but to injure and punish them on site.

168.     Defendants used unreasonable and excessive force in indiscriminately engaging in baton strikes and shooting rubber bullets at protestors, not based on an individualized determination of individual conduct justifying such force, in violation of the Fourth Amendment and its state law analogues. Further, this conduct was deliberately indifferent to the Direct Force Class members' rights, shocks the conscience, and violates the decencies of civilized conduct, under the Fourteenth Amendment and its state law analogues.

169.     As a result of Defendants' wrongful conduct, Direct Force Class members suffered damages as alleged above.

170.     As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

## IX.   FOURTH CLAIM FOR RELIEF – INFRACTION CLASS
### (Fourth and Fourteenth Amendment to the U.S. Constitution 42 U.S.C. § 1983 for damages)

171.   Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

172.   All Infraction Class members were charged with infractions, arrested and taken into custody and not released in the field, as required by Penal Code § 853.5.  Section 835.5 created a liberty interest for Infraction Class

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

members to be cited and released in the field and not subjected to custodial arrests.

173.   The custodial arrests of Infraction Class members violated their rights to be free from unreasonable seizures under the Fourth Amendment and its state constitutional analogue, and their rights under the Fourteenth Amendment's due process clause and its state constitutional analogue not to be deprived of their liberty without due process of law, and violated their rights under Penal Code § 853.5 and Govt. Code § 815.6.

174.   As a result of Defendants' wrongful conduct, Direct Force Class members suffered damages as alleged above.

175.   As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

## X.   REQUEST FOR RELIEF

Wherefore, Plaintiffs seek judgment as follows:

1.   An order certifying the class and each sub-class defined herein pursuant to Federal Rules of Civil Procedure Rule 23(b)(2) and (3);

2.   A preliminary and permanent injunction restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above and retaining Court jurisdiction to enforce the terms of the injunction;

3.   A declaratory judgment that Defendants' conduct detailed herein was a violation of the rights under the Constitution and laws of the United States and of Plaintiffs and the class members;

4.   An order directing that all arrest records be removed from all criminal databases, whether operated by the City or County of Los Angeles, or the State of California, and that all arrests be reduced to a "detention" other than those cases in which the individual arrested is convicted of the charge;

55
FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

5.      General and compensatory damages for Plaintiffs and the class they represent for the violations of their federal constitutional and statutory rights, pain and suffering, all to be determined according to proof;

6.      An award of attorneys' fees pursuant to 42 U.S.C. § 1988 and Cal. Civil Code §§ 52(b) & 52.1(h) and Cal. Code of Civ. Proc. § 1021.5;

7.      Costs of suit;

8.      Pre- and post-judgment interest as permitted by law;

9.      Such other and further relief as the Court may deem just and proper.

Dated: June 21, 2020                    Respectfully submitted,

                                        Schonbrun, Seplow, Harris & Hoffman
                                         & Zeldes LLP
                                         s/ Paul L. Hoffman
                                        By: Paul L. Hoffman

                                        Law Office of Carol A. Sobel
                                        s/ Carol A. Sobel
                                        By: Carol Sobel

                                        Kaye, McLane, Bednarski & Litt
                                        s/ Barrett S. Litt
                                        By: Barrett S. Litt

                                        Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs hereby make a demand for a jury trial in this action.

                                     /s/   Paul L. Hoffman
                                    By: Paul L. Hoffman

FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF