Cynthia Anderson Barker, SBN 75764
NATIONAL LAWYERS GUILD
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
t. 213 381-3246  f. 213 381-3246
e. cablaw@hotmail.com

Paul Hoffman, SBN 71244
Michael D. Seplow, SBN 150183
Aidan McGlaze, SBN 277270
John C. Washington, SBN 315991
SCHONBRUN, SEPLOW, HARRIS,
HOFFMAN & ZELDES LLP
11543 W. Olympic Blvd.
Los Angeles, California 90064-1508
t. 310 396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. jwashington@sshhlaw.com

Attorneys for Plaintiffs
Additional Counsel on Next Page

Barrett S. Litt, SBN 45527
Lindsay Battles, SBN 262862
KAYE, MCLANE, BEDNARSKI & LITT
975 E. Green Street
Pasadena, California 91106
t. 626 844-7660 f. 626 844-7670
e. blitt@kmbllaw.com
e. lbattles@kmbllaw.com

Pedram Esfandiary, SBN 312569
e. pesfandiary@baumhedlundlaw.com
Monique Alarcon, SBN 311650
e. malarcon@baumhedlundlaw.com
Bijan Esfandiari, SBN 223216
e. besfandiari@baumhedlundlaw.com
R. Brent Wisner, SBN 276023
e. rbwisner@baumhedlundlaw.com
BAUM, HEDLUND, ARISTEI &
GOLDMAN, P.C.
10940 Wilshire Blvd., 17th Floor
Los Angeles, CA 90024
t. 310 207-3233 f. 310 820-7444

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| BLACK LIVES MATTER LOS ANGELES, CANGRESS (DBA LA CAN), STEVEN ROE, NELSON LOPEZ, TINA CRNKO, JONATHAN MAYORCA, ABIGAIL RODAS, KRYSTLE HARTFIELD, NADIA KHAN, CLARA ARANOVICH, ALEXANDER STAMM, MAIA KAZIM, ALICIA BARRERA-TRUJILO, SHANNON LEE MOORE, DEVON YOUNG, LINUS SHENTU, individually and on behalf of a class of similarly situated persons, <br><br> PLAINTIFFS, <br><br> v. <br><br> CITY OF LOS ANGELES, a municipal entity, CHIEF MICHEL MOORE, and DOES 1-10 inclusive, <br><br> DEFENDANTS. | Case No.: 2:20-cv-05027 CBM-AS <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** <br><br> Date and Time: TBA <br> Courtroom: 8B |

Carol A. Sobel, SBN 84483
Katherine Robinson, SBN 323470
Weston Rowland, SBN 327599
LAW OFFICE OF CAROL A. SOBEL
725 Arizona Avenue, Suite 300
Santa Monica, CA 90401
t. 310 393-3055
e. carolsobel@aol.com
e. klrobinsonlaw@gmail.com
e. rowland.weston@gmail.com

Colleen Flynn, SBN 234281
LAW OFFICE OF COLLEEN FLYNN
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
t. 213 252-9444
r. 213 252-0091
e. cflynn@yahoo.com

Matthew Strugar, SBN 232951
LAW OFFICE OF MATTHEW STRUGAR
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90039
t. 323 696-2299
e. matthewstrugar@gmail.com

Jorge Gonzalez, SBN 100799
A PROFESSIONAL CORPORATION
2485 Huntington Dr., Ste. 238
SAN MARINO, CA 91108-2622
t. 626 328-3081
e. jgonzalezlawoffice@gmail.com

Olu Orange, SBN 213653
Orange Law Offices
3435 Wilshire BLvd., Ste. 2910
LOS ANGELES, CA. 90010-2015
T. 213 736-9900
f. 213 417-8800
e. o.orange@orangelawoffices.com

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................1

I.   THE FACTS THAT NECESSITATE THIS APPLICATION .......................2

II.  ARGUMENT.................................................................................4

   A. The LAPD Is Using Kinetic Projectiles and Batons Against Protesters
      in Dangerous, Unconstitutional Ways that Violate Its Own Policies...........6

      1.  The Use of Serious, "Less-Lethal" Force Against Peaceful Protesters
          Constitutes a Seizure. ..................................................6

      2.  The Fourth Amendment Requires Objectively Reasonable Force.............7

      3.  The LAPD Is Using "Rubber Bullets" and Similar "Less-Lethal"
          Projectiles in an Objectively Unreasonable Manner...............................8

      4.  The LAPD Is Using Baton Strikes Against Peaceful Protesters in an
          Objectively Unreasonable Manner.............................................11

   B. Defendants' Unlawful Custodial Arrests Violate the Rights of
      Protestors........................................................................14

   C. The LAPD's Handcuffing Practices Violate are Unconstitutional. ............16

   D. Confining Detainees Together in Unventilated Spaces without Social
      Distancing During a Pandemic Is Unconstitutional....................................19

   E. A Temporary Restraining Order and Preliminary Injunctive Relief Are
      Urgently Needed and Well Justified to Put an End to These
      Unconstitutional and Life-Threatening Practices. .......................................23

III. REQUESTED RELIEF .................................................................25

CONCLUSION ...............................................................................25

i

1

2

## **TABLE OF AUTHORITIES**

3

Page(s)

4

*Cases*

5

*Abay v. City of Denver*,
   2020 WL 3034161 (D. Colo.  2020).......................................................... 11, 23, 24

*Ahlman v. Barnes*,
   2020 WL 2754938 (C.D. Cal. May 26, 2020).................................................... 22

*Alexander v. County of Los Angeles*,
   64 F.3d 1315 (9th Cir. 1995) ............................................................................ 18

*Andrews v. Cervante*s,
   493 F.3d 1047 (9th Cir. 2007) .......................................................................... 22

*Arc of California v. Douglas*,
   757 F.3d 975 (9th Cir. 2014) .............................................................................. 5

*Arce v. Douglas*,
   793 F.3d 968 (9th Cir. 2015) .............................................................................. 6

*Bell v. Wolfish*,
   441 U.S. 520 ............................................................................................... 19, 20

*Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't*,
   2020 WL 3128299 (W.D. Wash. June 12, 2020) ........................................... 23, 24

*Cameron v. Bouchard*,
   2020 WL 1929876 (E.D. Mich. Apr. 17, 2020) .................................................. 22

*Carnell v. Grimm*,
   74 F.3d 977 (9th Cir. 1996) .............................................................................. 20

*Castro v. Cty. of Los Angeles*,
   833 F.3d 1060 (9th Cir. 2016) ..................................................................... 16, 20

*Demery v. Arpaio*,
   378 F.3d 1020 (9th Cir. 2004) ..................................................................... 20, 21

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Deorle v. Rutherford*,
   272 F.3d 1272 (9th Cir. 2001) ................................................................ 10

**TABLE OF AUTHORITIES – CONT'D**

Page(s)

*Cases*

*Doggett v. United States*,
   875 F.2d 684  (9th Cir. 1988) ................................................................ 15

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) ......................................................... 5, 24

*Edgerly v. City & Cty. of San Francisco*,
   713 F.3d 976 (9th Cir. 2013) ................................................................ 15

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ................................................................................ 20

*Felarca v. Birgeneau*,
   891 F.3d 809 (9th Cir. 2018) .................................................................. 6

*Fisher v. City of San Jose*,
   2003 WL 27384298 (N.D. Cal. Sept. 18, 2003) .................................... 11

*Flynt Distrib. Co. v. Harvey*,
   734 F.2d 1389 (9th Cir. 1984) ............................................................... 6

*Gibson v. Cty. of Washoe, Nev.*,
   290 F.3d 1175 (9th Cir. 2002) ............................................................... 20

*Gordon v. Cty. of Orange*,
   888 F.3d 1118 (9th Cir. 2018) ............................................................... 20

*Graham v. Connor*,
   490 U.S. 386 (1989) .............................................................................. 7, 8

*Helling v. McKinney*,
   509 U.S. 25 (1993) ................................................................................. 22

*Hernandez v. Cty. Of Monterey*,
   110 F. Supp. 3d 929 (N.D. Cal. 2015) ................................................... 22

*Johnson v. Couturier*,
  572 F.3d 1067 (9th Cir. 2009) .......................................................... 6

## TABLE OF AUTHORITIES – CONT'D

Page(s)

*Cases*

*Kingsley v. Hendrickson*,
  576 U.S. 389 (2015).................................................................. 16, 20

*Kopec v. Tate*,
  361 F.3d 772 (3rd Cir. 2004) .......................................................... 19

*LaLonde v. County of Riverside*,
  204 F.3d 947 (9th Cir. 2000) .......................................................... 18

*Lemire v. Cal. Dep't of Corr. & Rehab.*,
  726 F.3d 1062 (9th Cir. 2013) ...................................................... 20, 21

*Lopez v. McGrath*,
  2007 WL 1577893 (N.D. Cal. May 31, 2007)........................................ 22

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) .......................................................... 24

*Meredith v. Erath*,
  342 F.3d 1057 (9th Cir. 2003) ........................................................ 18

*Nelson v. City of Davis*,
  685 F.3d 867 (9th Cir. 2012) ...................................................... 6, 9, 10

*Nken v. Holder*,
  556 U.S. 418 (2009)...................................................................... 24

*Norris v. District of Columbia*,
  737 F.2d 1148 (D.C. Cir. 1984)........................................................ 19

*Palmer v. Sanderson*,
  9 F.3d 1433 (9th Cir. 1993) ........................................................ 18, 19

*Robinson v. Via*,
  821 F.2d 913 (2d Cir. 1987) ........................................................... 19

*Sammartano v. First Judicial District Court*,
   303 F.3d 959 (9th Cir. 2002) ............................................................ 24

## TABLE OF AUTHORITIES – CONT'D

Page(s)

*Cases*

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
   709 F.3d 1281 (9th Cir. 2013) .................................................. 5

*Smith v. City of Hemet*,
   394 F.3d 689 (9th Cir. 2005) ................................................. 13

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) ..................................................... 5

*Tennessee v. Garner*,
   471 U.S. 1 (1985) ..................................................................... 16

*Thompson v. City of Chicago*,
   472 F.3d 444 .......................................................................... 12

*Trevizo v. Webster*,
   2018 WL 5917858 ................................................................. 22

*United States v. Mohr*,
   318 F.3d (4th Cir. 2003) ......................................................... 13

*United States v. Olson*,
   546 U.S. 43, 126 S. Ct. 510, 163 L. Ed. 2d 306 (2005) ...................... 15

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981) .................................................................. 5

*Wall v. County of Orange*,
   364 F.3d 1107 (9th Cir. 2004) ............................................... 18

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008) ..................................................................... 5

*Young v. Cty. of Los Angeles*,
   655 F.3d 1156 (9th Cir. 2011) ............................................ Passim

# <u>TABLE OF AUTHORITIES – CONT'D</u>

Page(s)

*State Statutes*

Cal. Civ. Code § 52.1(c) ........................................................................ 24

Cal. Const. Art. I § 13 ........................................................................... 16

California Civil Code 52.1 ....................................................................... 4

California Government Code §815.6 ...................................................... 15

California Penal Code §853.5 ................................................................. 14

California Gov't Code 810.6 ................................................................... 15

Sections 40302, 40303, 40305, and 40305.5 of the Vehicle Code ........ 14

*Federal Rules*

FRCP 65(b) ............................................................................................... 5

# **INTRODUCTION**

In the aftermath of George Floyd's murder by Minneapolis police officers, a wide range of voices have sought transformative social change with respect to policing and to institutional racism in every aspect of American life. These calls have come in the form of mass protest marches in cities across this country, in keeping with American tradition and constitutional values. This case seeks to ensure the constitutional rights of our community's marchers.

The LAPD has fallen short of its constitutional duties in several ways during the protest marches so far.[1] The LAPD has used so-called rubber bullets and batons indiscriminately to disrupt and disperse protesters with many serious injuries resulting. These images of baton wielding LAPD officers and protester injuries unacceptably increase the cost of public participation in these important exercises of First Amendment rights.

The LAPD also manipulated ever-changing curfews and improper declarations of unlawful assemblies without justification in order to suppress protestors' constitutional rights. Protestors were not given adequate orders with directives on a path out of the protests or adequate time to comply and were detained unlawfully rather than cited and released in the field, as required by law. The LAPD detained protestors arrested for infractions in plain violation of California law. Detainees were targeted for detention on unventilated buses for as long as 12 hours, without access to bathrooms or water. They were kept in overly tight handcuffs for these long periods in violation of the Fourth Amendment and despite repeated requests to loosen the tight handcuffs. These conditions on the busses also increased their risk of contracting COVID-19.

---

[1] Indeed, the LAPD has violated fundamental international human rights law applicable in the United States and globally. *See generally* Appendix Tab 21 ("App. 21"), Declaration of Professor William J. Aceves.

These demonstrations will continue and these threats to constitutional rights are immediate and substantial.  *E.g.* Appendix Tab 1 ("App. 1"), Abdullah Decl. ¶¶ 5–6; App. 18, White Decl. ¶¶ 3, 5.  This Court should ensure that the voices of so many of our community members can be heard with the protections guaranteed by our Constitution.  The need is urgent.

## I.  THE FACTS THAT NECESSITATE THIS APPLICATION[2]

The ability to demonstrate, march and petition the government for redress of grievances is part of the constitutional DNA of this country.  Defendants have a duty to protect and defend those fundamental rights especially in times of turmoil and mass demands for social and racial justice. Defendants failed to fulfill this duty and unless restrained will continue to threaten the rights of tens of thousands of people in our community who want to assemble and use their collective voices to call for an end to racial injustice and police brutality across this country and in Los Angeles.

As the First Amended Complaint ("FAC") documents, the LAPD's actions demonstrate the repeated failures over the last two decades to respect the rights of protestors in precisely these kinds of circumstances.  FAC ¶¶ 118–126. Whether it is because of indifferent training and policies or an intention to undermine the constitutional rights of demonstrators, the long pattern of abridging these rights underscores the need for the requested initial relief.

During the five days covered by the allegations in the FAC (May 29-June 2) thousands of peaceful demonstrators had their constitutional rights infringed. These violations are set forth in detail in the attached declarations of the individual and organizational plaintiffs.  All of these violations, taken together, demonstrate a colossal failure to preserve constitutional rights.

---

[2] Plaintiffs have documented these violations in voluminous declarations included in their Appendix.

Time and again, peaceful protestors were dispersed with the indiscriminate and potentially lethal use of projectiles and the improper use of police batons. There were dozens of serious injuries, including many head injuries.  Fortunately, no protestor has yet died, but anyone subjected to this warlike display of police weaponry would think twice about coming out to engage in First Amendment activity.  The threat of losing an eye or suffering painful injuries places the weight of the State against fundamental constitutional rights.

Time and again, in these days of constitutional deprivation, Defendants used ever-changing curfews to suppress constitutional rights.  Defendants declared unlawful assemblies in many places where there was patently no basis under law for doing so.  Defendants gave inadequate and ineffective notice when they did so and failed utterly to allow protestors to leave protest areas voluntarily.

Time and again, Defendants kettled demonstrators to prevent them from leaving protest areas so that they could be detained and prevented from exercising their rights.  Such conduct even swept up people who were not protesting, but who were simply going home or were homeless and had no home.

These actions were not intended as an efficient way of clearing the streets. Defendants intended to impose an additional cost on the protestors.  Thousands were detained on cramped, unventilated buses.  They were kept in tight plastic handcuffs that tore at their skin behind their back for no apparent reason other than to hurt them and communicate that the cost of protest in the future would be high. Detainees were kept in conditions that heightened their exposure to COVID-19 in the middle of a pandemic in violation of all safeguards issued by the U.S. Centers for Disease Control.  Detainees were subjected to the humiliation and pain of urinating on themselves because they were given no access to bathrooms or water or food.   After being booked in this mindless, unnecessary process, many detainees had to fend for themselves in the LAPD Catch-22 of having to get home under the threat of rearrest for curfew violations!

The imposition of these detention practices over this five-day period was entirely unnecessary and, in fact, unlawful. California law provides that for most of the infractions charged by Defendants alleged violators must be cited and released, in the field, because no custodial detention is authorized by law. This mandate was ignored, as it has been in the past, presumably to teach demonstrators a lesson: protest police brutality in Los Angeles and you will, at a minimum, suffer humiliating and painful detention just to be cited and released after the LAPD finished imposing this cost.

Even for other offenses charged on these nights, the LAPD has mobile field resources enabling them to check for warrants and book alleged violators in less than an hour. Had Defendants just followed the law and their own procedures, the suffering of thousands of protestors would have been almost entirely eliminated. Defendant Moore, the LAPD's Police Chief, and the LAPD know this and they have all the means they need to fulfill their duties to the public and to demonstrators without trampling on constitutional rights as they did and as they will continue to do unless restrained by this Court.

## II.   ARGUMENT

Injunctive relief is warranted and necessary under the First, Fourth and Fourteenth Amendments of the U.S. Constitution; and under Article 1, Sections, 3 7, and 13 of the California Constitution and California Civil Code 52.1, to protect Plaintiffs and the classes they represent from being prevented from protesting, from serious, potentially permanent and even lethal injuries, as well as to prevent them from being unnecessarily exposed to and potentially dying from COVID-19.[3] Plaintiffs meet all the requirements for injunctive relief because they are (1) likely to succeed on the merits, (2) will suffer irreparable harm in the absence of

---

[3] Plaintiffs have not yet moved for initial injunctive relief regarding Defendants' practices, or lack thereof, with respect to its declarations of unlawful assemblies and curfews, but reserve the right to do so.

preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1289 (9th Cir. 2013).

The same factors apply to an application for a temporary restraining order, but a court may grant a temporary restraining order when irreparable injury may occur before the hearing for a preliminary injunction can be held. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (explaining that the Ninth Circuit's "analysis is substantially identical for the injunction and the TRO"); *see also* FRCP 65(b) (allowing TRO to be granted without notice). Here, marches and demonstrations will continue and Plaintiffs' rights are in jeopardy absent this Court's intervention. Plaintiffs seek a temporary restraining order in order to protect their constitutional rights pending a full hearing on their motion for a preliminary injunction.

The Ninth Circuit "evaluate[s] these factors via a 'sliding scale approach,' such that 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Arc of California v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (citations omitted).

The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Since this case involves a government actor, the balance of equities factor merges with the fourth factor, public interest. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

"Given the haste that is often necessary" when moving for injunctive relief, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). For this reason, "[a] party is not

required to prove her case in full on preliminary injunction," *Arce v. Douglas*, 793 F.3d 968, 976 (9th Cir. 2015), and "[t]he trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (quoting *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)).

As shown herein, Plaintiffs have presented substantial evidence (See Plaintiffs' Appendix) that the challenged LAPD tactics violate the constitutional rights of peaceful protesters and therefore Plaintiffs are likely to prevail on the merits.

### A.    The LAPD Is Using Kinetic Projectiles and Batons Against Protesters in Dangerous, Unconstitutional Ways that Violate Its Own Policies.

#### 1.    The Use of Serious, "Less-Lethal" Force Against Peaceful Protesters Constitutes a Seizure.

The Fourth Amendment governs law enforcement's use of force against protesters, even when the officers' goal is simply to disperse the crowd. In *Nelson v. City of Davis*, 685 F.3d 867, 877-78 (9th Cir. 2012), the Ninth Circuit applied Fourth Amendment excessive force principles to assess the constitutionality of police firing non-lethal projectiles into a crowd of students at a University party striking one of them and causing serious injuries. *See id.* ("Regardless of [the officers'] motives, their application of force was a knowing and willful act that terminated Nelson's freedom of movement. It unquestionably constituted a seizure under the Fourth Amendment."); *see also Felarca v. Birgeneau*, 891 F.3d 809, 818 (9th Cir. 2018) (applying Fourth Amendment analysis to officers' use of batons against protesters with intent to disperse, rather than detain, protesters).

Indeed, even the LAPD's own policies indicate that use of force whether to arrest some or for crowd dispersal must be "reasonable." In particular LAPD Directive No. 11 from June 2011 entitled "Crowd Management, Intervention, and Control" states:

> During crowd control situations, police officers may be required to physically engage individuals who exhibit conduct ranging from uncooperative to violent behavior.  In these situations, officers may have to utilize force to move crowd members who do not respond to verbal directions, control violent individuals, or to effect an arrest. When the use of force is appropriate in a crowd control situation, **only that force reasonable to make an arrest or disperse a crowd should be used**.

App. 27.  Accordingly, the use of non-lethal projectiles against protesters—whether to arrest them or to disperse them or for any other purpose is subject to a Fourth Amendment "reasonableness" analysis.[4]

### 2.  The Fourth Amendment Requires Objectively Reasonable Force.

The Fourth Amendment guarantees the right to be free from excessive force. Excessive force claims are analyzed under an objective reasonableness standard.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989).  The reasonableness of an officer's conduct must be assessed "from the perspective of a reasonable officer on the scene," recognizing the fact that the officer may be "forced to make split-second judgments." *Id.* at 396–97.  The *Graham* standards consider the particular factual circumstance of each situation.  *See id.* at 396–97.  Relevant factors include the severity of the crime, the potential threat posed by the suspect to the officer's and others' safety,

---

[4] As the Supreme Court stated in *Graham v. Connor*, 490 U.S. 386, 395 (1989): "Today we make explicit what was implicit in *Garner*'s analysis, and hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the **course of an arrest, investigatory stop, or other 'seizure'** of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a 'substantive due process' approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against **this sort of physically intrusive governmental conduct,** that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." (bold emphasis added).

and the suspect's attempts to resist or evade arrest. *See id.*; *see also* Ninth Circuit Model Jury Instruction No. 9.25 (listing various factors including "the amount of time the officer had to determine the type and amount of force that reasonably appeared necessary, and any changing circumstances during that period; the type and amount of force used; and the availability of alternative methods [to take the plaintiff into custody].").

In this case, the LAPD used in these protests, and in prior protests, and threatens to use so called "less-lethal" force against the protesters including so-called "rubber bullets" or other impact projectiles as well as baton strikes. As shown herein, the use of such "less-lethal" weapons can cause serious and debilitating injuries thereby rendering the use this type of force against peaceful protesters excessive and unreasonable under the Fourth Amendment.

### 3. The LAPD Is Using "Rubber Bullets" and Similar "Less-Lethal" Projectiles in an Objectively Unreasonable Manner.

The LAPD continues to use "less lethal" projectiles on protesters indiscriminately. As Plaintiffs have shown, the LAPD engaged in undeserved and indiscriminate firing of projectiles on individuals and into crowds of protestors, which causes many serious injuries. App. 13, Rodas Decl. ¶¶ 3–6, 8–9 (peaceful protestor was shot in the face with a rubber bullet as she attempted to return to her car, lost consciousness and fractured her mandible, requiring her jaw to be reinforced with a steel plate); App. 14, Črnko Decl. ¶¶ 2, 9–10 (peaceful protestor was, without warning,  shot with rubber bullets on her arm, ribcage, and then, in the forehead causing temporarily deafness, profuse bleeding, and permanent nerve damage); App. 17, Trotter Decl. ¶¶ 4–6, 9 (LAPD officer needlessly shot 51-year-old man in the chest and hand from only a few feet away, tearing off his skin); App. 14, Roe Decl. ¶ 4 (LAPD aimed at and shot a non-violent protestor in the stomach as he was backing away); App. 2, Aranovich Decl. ¶11 (peaceful protestor shot with a rubber bullet from behind as she was trying to leave); App. 16, Stamm Decl. ¶¶ 2, 5

(protestor witnessed officers filing on peaceful protestors fired on with rubber bullets); App. 8, Lessac-Chenen Decl. ¶¶ 6, 8, 11–12, 14, 16 (officers fired projectiles into crowd, hitting some persons multiple times and tearing skin, with an officer laughing as he shot at protestors and asking "who else wants one?"); App. 11, Moore Decl. ¶¶4–6 (officer aimed directly at plaintiff and shot her in the head with pellets);  App. 20, Hinkston Decl. ¶¶ 4–5 (plaintiff and bystander who was trying to escape in his wheelchair from police firing on protestors was forcefully shot from behind in his shoulder blade); App. 23, Haar Decl. ¶¶ 8–13 (describing severe injuries such weapons cause).  There was no justification for this violence, and indeed, it was contrary to well-accepted police practices and training.  App. 22, Clark Decl. ¶¶ 12–19.

The Ninth Circuit has held that using so called "non-lethal" force against unarmed persons can constitute excessive force in violation of the Fourth Amendment. In *Nelson v. City of Davis*, the Ninth Circuit dealt with the use of such dangerous but "non-lethal" projectiles by police to disperse a crowd, holding that the officers' actions in shooting pepperballs at plaintiff "was an act of excessive force." 685 F.3d 867, 872.[5] More specifically, the officers in *Nelson* were trying to disperse a party near UC Davis.  Plaintiff and other students "were attempting to leave the party[,] but the police blocked their means of egress and did not provide any instructions for departing from the complex."  *Id.* at 874.  They waited for instructions and "repeatedly raised their hands to show their willingness to comply." *Id.*  While there were bottles thrown at the officers, "no one from [plaintiff's] group threw bottles at the police."  *Id.*  Officers then launched a pepperball which struck

---

[5] "Pepperball guns are, in essence, paintball guns that fire rounds containing . . . pepper spray. . . . They break open on impact . . . [producing] an effect similar to mace or pepper spray. Pepperballs therefore combine the kinetic impact of a projectile with the sensory discomfort of pepper spray." *Id.* at 873.

plaintiff's eye, resulting in "temporary blindness," multiple surgeries, and forced withdrawal from UC Davis "due to the loss of his athletic scholarship." *Id.*

The Circuit concluded that the use of force in this case "was unreasonable and resulted in a violation of the Fourth Amendment." *Id.* at 883.  First, the severity of the government's intrusion by use of a pepperball projectile which resulted in "serious and permanent injury to one or more individuals" was "substantially more than a minimal intrusion."   Second, the government's interest in clearing the apartment complex of party goers was not "sufficient to justify the use of force at issue." *Id.*  There was no evidence that plaintiff "posed a risk to the officers or any other persons; the officers had no interest in arresting them; and the group engaged in passive resistance, at most, by failing to immediately disperse if and when such an order was given." *Id.*  Third, even when considering "all the partygoers as a single entity," the force used "could not have been justified by the government's interest in stopping any and all disorderly behavior."  *Id.*; *see also Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001) ("Less than deadly force that may lead to serious injury may be used only when a strong governmental interest warrants its use, and in such circumstances should be preceded by a warning, when feasible."); *id.* at 1284 (so holding for a "cloth-cased shot, which is something akin to a rubber bullet.").

*Nelson* and *Deorle* are both controlling authority regarding the police use of rubber bullets or other similar so called "non-lethal" projectiles and require a serious governmental interest before such force can be deployed.  Rubber bullets and similar projectiles can cause serious harm to persons, including blindness and permanent debilitating injuries. *See supra*, pp. 8–9.  As in *Nelson*, indiscriminately using rubber bullets or other projectiles on non-violent protesters to effectuate the dispersal of a

crowd plainly constitutes excessive force in violation of the Fourth Amendment in these circumstances.[6]

### 4. The LAPD Is Using Baton Strikes Against Peaceful Protesters in an Objectively Unreasonable Manner.

As Plaintiffs have shown, the LAPD engaged in undeserved and indiscriminate use of baton jabs and strikes against peaceful protestors, which can cause serious injuries.  App. 2, Aranovich Decl. ¶¶ 7–9 (peaceful protestors jabbed with batons and beaten with overhead strikes); App. 8, Lessac-Chenen Decl. ¶¶ 9–10 (officers swung batons at protestors with overhand strikes, and officer would have struck a woman in her head if he was not stopped by another protestor);  App. 5, Grenier Decl. ¶¶ 5 7–8 (LAPD Officers swung batons at peaceful protestors, including swinging the baton like a baseball bat at a protestor's head); App. 23, Haar Decl. ¶ 14. There was no justification for this.  Indeed, it violated the trainings for and expectations of reasonable officers in these circumstances. App. 22, Clark Decl. ¶¶ 14, 16–19.

Applying the same *Graham* factors discussed above to the LAPD's documented, repeated use of baton strikes against peaceful protesters compels the conclusion that deployment of these tactics is also objectively unreasonable and therefore violates the Fourth Amendment.  As the Ninth Circuit recognized nearly a decade ago, baton blows present "a significant use of force that is capable of causing pain and bodily injury, and therefore, baton blows . . . are considered a form of "intermediate force." *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1162 (9th Cir. 2011).  Given the serious impacts of batons acknowledged by this Circuit and others,

---

[6] *See also, e.g.*, *Fisher v. City of San Jose*, No. C-01-21192 PVT, 2003 WL 27384298, at *9 (N.D. Cal. Sept. 18, 2003) (holding that shooting unarmed misdemeanor suspect who did not obey officer's commands in the leg with a rubber bullet constitutes excessive force); *Abay v. City of Denver*, No. 20-cv-01616-RBJ, 2020 WL 3034161 at *3 (D. Colo.  2020) (holding that plaintiffs showed likelihood of success on excessive force claim involving use of rubber bullets on protesters).

they should be used "only as a response to aggressive or combative acts," and indeed the LA County Sheriff's Department has instructed officers that "[h]ead strikes with an impact weapon are prohibited unless circumstances justify the use of deadly force." *Id.* (citing *Thompson v. City of Chicago*, 472 F.3d 444, 451 & nn. 18–19 (7th Cir. 2006); *see also* App. 22, Clark Decl. ¶¶ 13–14; App. 23, Haar Decl. ¶ 14.

The LAPD's own tactical guidance further confirms the serious level of force and potential for injury that a baton strike entails. In its 2018 Use of Force-Tactics Directive for batons (the "2018 Baton Directive"), LAPD instructs officers that the use of less-lethal force options, including batons, is "*only* permissible when: An officer reasonably believes that a suspect or subject is violently resisting arrest or poses an immediate threat of violence or physical harm." App. 28 at 1 (first emphasis added). In addition, "An officer may use the Baton as a reasonable force option to control a suspect when the suspect poses an immediate threat to the safety of the officer or others." *Id.* The Baton directive specifically states that "non-compliance" and even "verbal threats of violence," "**do not** alone justify the use of the baton." *Id.*

The 2018 Baton Directive also directly addresses the use of batons in crowd control, confirming that the ***only*** sanctioned use of batons against peaceful, non-threatening protesters is pushing – as opposed to striking – with the baton, when verbal commands prove ineffectual. *Id.* at p.2 (noting "There are no exceptions to the Department's Use of Force Policy for crowd control situations," that verbalization should be used throughout encounters, officers should take into account the seriousness of crimes and threats at issue before using batons, and that while batons may be used to push non-responsive and encroaching protestors, the baton can only be used as an impact device to address threats of violence). Furthermore, officers should attempt to avoid striking the head, neck, throat, spine, kidneys or groin areas to decrease the likelihood of causing serious injuries. *Id.* at p.4.

As detailed above, despite the LAPD's unequivocal guidance as to when and how a baton can be used, LAPD officers have used and continue to use baton strikes against non-threatening, peaceful protesters, including swinging at their heads. *E.g.* App. 2, Aranovich Decl. ¶¶ 7–9; App. 8, Lessac-Chenen Decl. ¶¶ 9–10; App. 5, Grenier Decl. ¶¶ 5, 7–8. Such baton strikes are objectively unreasonable and therefore violate the Fourth Amendment's prohibition against excessive force, as confirmed by relevant Ninth Circuit caselaw applying the *Graham* factors.

First, as the Ninth Circuit instructs in *Young*, baton strikes are a type of "intermediate force" that is "capable of inflicting significant pain and serious injury" and therefore constitute a "significant intrusion upon an individual's liberty interests." 655 F.3d at 1161 (9th Cir. 2011) (citing *Smith v. City of Hemet*, 394 F.3d 689, 701–02 (9th Cir. 2005); *Mohr*, 318 F.3d at 623 (4th Cir. 2003)).

Second, with regard to the governmental interest in the use of force, the single "most important" factor to examine is "whether the individual posed an immediate threat to officer or public safety." *Young*, 655 F.3d 1163. By definition, individuals engaging in peaceful protest pose no threat to officers or to public safety. Moreover, given the at-most minimal severity of the "crime" (i.e., curfew violations), and the lack of any attempt to evade or resist arrest, it is clear that this factor also compels the conclusion that using baton strikes against peaceful protesters is objectively unreasonable. *Cf. id.* at 1164–65 ("Young's failure to wear a seatbelt was a run-of-the-mill traffic violation that clearly provided little, if any, support for the use of force upon him. . . . And while disobeying a peace officer's order certainly provides more justification for force than does a minor traffic offense, such conduct still constitutes only a non-violent misdemeanor offense that will tend to justify force in far fewer circumstances than more serious offenses, such as violent felonies. . . . When, as here, a suspect's disobedience of a police officer takes the form of passive noncompliance that creates a minimal disturbance and indicates no threat, immediate

or otherwise, to the officer or others, it will not, without more, give rise to a governmental interest in the use of significant force.") (citations omitted).

Finally, balancing the level of the intrusion against the government interest in the use of force, *Young* compels the conclusion that these baton strikes are objectively unreasonable. *See id.* at 1166–67 ("Our conclusion comports with the logical notion that it is rarely necessary, if ever, for a police officer to employ substantial force without warning against an individual who is suspected only of minor offenses, is not resisting arrest, and, most important, does not pose any apparent threat to officer or public safety.").

## B. <u>Defendants' Unlawful Custodial Arrests Violate the Rights of Protestors.</u>

Hundreds of participants in the Floyd protests were arrested for violations classified or charged as infractions. Defendants violated the rights of those arrested for infractions by seizing them, holding them handcuffed on buses for hours at locations distant from the point of arrest, without access to bathrooms, water or food, booking them only after a lengthy and unnecessary detention, and then releasing them in the middle of the night with the curfew in place and no way for many to get home. *E.g.* App. 3, Barrera-Trujillo Decl. ¶¶ 9–13; App. 6, Hartsfield Decl. ¶¶ 8–11; App. 7, Kazin Decl. ¶¶ 6–11; App. 9, Lopez Decl. ¶ 10.

California Penal Code §853.5 sets out the narrow circumstances when an individual arrested for an infraction may be taken into custody, none of which apply here:

> In all cases, except as specified in Sections 40302, 40303, 40305, and 40305.5 of the Vehicle Code, in which a person is arrested for an infraction, a peace officer ***shall only*** require the arrestee to present his or her driver's license or other satisfactory evidence of his or her identity for examination and to sign a written promise to appear contained in a notice to appear. . . . ***Only if the arrestee refuses to sign***

14

> *a written promise, has no satisfactory identification, or refuses to*
> *provide a thumbprint or fingerprint may the arrestee be taken into*
> *custody*.

*Id.* (edits and emphasis supplied).   Those who were arrested and detained for violating Los Angeles Municipal Code 80.02, which is only punishable as an infraction had their rights violated by Defendants' failure to cite and release them.[7] It was also not difficult to do so; the LAPD has the capacity in the field to cite and release protestors, including equipment in virtually every patrol car to do so.  App. 22, Clark Decl. ¶ 23.

Under California Government Code §815.6 ("§815.6), public entities, including police departments, are liable for "injuries of the kind sought to be avoided by the enactment of a mandatory duty."  *Doggett v. United States*, 875 F.2d 684, 689–90  (9th Cir. 1988), *abrogated in other part by United States v. Olson*, 546 U.S. 43, 126 S. Ct. 510, 163 L. Ed. 2d 306 (2005) (citing Cal. Gov't Code § 815.6).  Such claims have three elements: "First there must be an *enactment* which imposes a mandatory, not discretionary, duty. Second, the enactment must be intended to protect against the kind of risk of injury suffered by the individual asserting liability under section 815.6. Finally, the breach of the mandatory duty must be a proximate cause of the injury suffered." *Id.* at 691.  Each is satisfied here.

 Section 835.5 is an enactment (a statute, *see* Cal. Gov't Code 810.6) that imposes a mandatory duty that unequivocally and specifically requires field release for the infraction arrests; and is enforceable here as a mandatory duty under Section 815.6 There is no question failure to abide by it is a false arrest under California law. *Edgerly v. City & Cty. of San Francisco,* 713 F.3d 976, 984 (9th Cir. 2013).  There

---

[7] "OBEDIENCE TO OFFICERS. No person shall willfully fail or refuse to comply with any lawful order, direction or signal of a Police Officer or Traffic Officer." Los Angeles Municipal Code §80.02 (Amended by Ord. No. 151,833, Eff. 2/10/79, Oper. 2/25/79).

is likewise no question that the statute was designed to protect persons like Plaintiffs against the act of taking them into custody which it forbids, or that Defendants' breach proximately causes Plaintiffs' injury of being unnecessarily taken into custody. Nor is there any indication that Defendants exercised "reasonable diligence to discharge the duty," given that the officers engaged in a coordinated and wholesale process or plan to detain Plaintiffs as they did. Furthermore, seizures that are expressly forbidden under California law are unreasonable under its constitution. Cal. Const. Art. I § 13. Plaintiffs are entitled to injunctive relief to compel Defendants to abide by this mandatory duty and the California Constitution.

### C.   The LAPD's Handcuffing Practices Violate are Unconstitutional.

The Fourth Amendment applies not only to a "seizure," but also "the manner in which a … seizure is conducted," which must be reasonable. *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). The treatment of detainees must be carried out with the same reasonableness. *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1085 (9th Cir. 2016) (holding that a pretrial detainee establishes a Fourteenth Amendment claim by showing "that a government official's deliberate action was objectively unreasonable . . . . A claim that an official used excessive force, rather than reasonable force necessary to maintain order, falls into this category.") (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015)). Unnecessarily tight handcuffs, as complained of by the class here, and the punishing and humiliating conditions of confinement are actionable as unreasonable uses of force.

Members of the Arrestee class were handcuffed for hours; and in some instances, as long as 12 hours. They were handcuffed painfully behind their backs with zip ties for excessive periods of time without justification. They were placed on buses, transported or kept on the buses for up to several hours, still in handcuffs even after they were off the buses until they were processed. Throughout that time, whether before, while they were detained on the buses, or when they were off-loaded to the processing location, the class members pleaded with LAPD officers to loosen

16

the handcuffs because of excruciating pain.  Their cries for help were ignored.  As a consequence, the Arrestee class suffered various injuries, including nerve damage, loss of circulation, and bruises to their wrists.  App. 3, Barrera-Trujillo Decl. ¶¶ 8–11 (plaintiff handcuffed for approximately 9 hours and her wrists were skinned off and bled); App. 16, Stamm Decl. ¶¶ 8, 16 (Plaintiff kept in painfully tight handcuffing which bruised his wrists); App. 10, Mayorca Decl. ¶¶ 4, 8–9  (Plaintiff was handcuffed very tightly in a manner that caused a lot of pain and discomfort, and asked officers to remove the zip ties to help with the pain, and the officers refused); App. 9, Lopez Decl. ¶¶ 7, 9–10  (Plaintiff was subjected to extremely uncomfortable handcuffing that caused bruising and a shoulder injury, others were screaming about the tightness of the handcuffs).  Officers refused to loosen the handcuffs for any of these persons. App. 6, Hartsfield Decl. ¶¶ 6, 9, 11 (Plaintiff was kept in tight handcuffs for more than 6 hours, observed protestors who were in pain from tight handcuffs, which the officers refused, and another protestor's wrists turning purple); App. 14, Roe Decl. ¶¶ 6–8 (Plaintiff and many others were very handcuffed painfully; and asked officers to loosen the zip ties because of the pain, but officers refused this of Plaintiff and others throughout his 2 hour and 15 minute detention); *id.* ¶ 9 (arrestee was screaming in pain and continually asking for medical attention as the zip ties had cut his fingers, and was ignored for over half an hour); App. 7, Kazin Decl. ¶¶ 8–10 (Plaintiff painfully handcuffed behind her back for five and a half hours); App. 15, Shentu Decl. ¶¶ 7–9 (Plaintiff handcuffed for several hours which left numbness, bruising, and soreness); App. 12, Khan Decl. ¶¶ 5–6 (officers applied zip ties too tightly causing pain and soreness).  Plaintiffs pled to be able to go to the bathroom and for water during their detention, which officers refused.  App. 3, Barrera-Trujillo Decl. ¶¶ 10–11; 11; App. 6, Hartsfield Decl. ¶¶ 9, 13; App. 7, Kazin Decl. ¶¶ 7–8; App. 10, Mayorca Decl. ¶ 8; App. 14, Roe Decl. ¶ 7; App. 19, Young Decl. ¶ 11 (same, and officers refused to allow woman to change her tampon as she became visibly nauseated and sick).  Such practices were

17

unreasonable, unrelated to any legitimate law enforcement objectives, and indeed violated uniform State training for such officers.  App. 22, Clark Decl. ¶¶ 24–29.

Repeatedly, in circumstances applying restraints for much shorter periods of time than are at issue here, the Ninth Circuit has held that the application of extremely tight handcuffs, and the refusal to loosen handcuffs after requests to do, is actionable excessive force.  For example, in *Wall v. County of Orange*, 364 F.3d 1107 (9th Cir. 2004), the plaintiff was detained in tight handcuffs for an extended period of time (a twenty-minute wait and a drive to the police station), and as a result suffered nerve damage.  *Id.* at 1109–10.  In *Wall*, the Ninth Circuit held that it is "well-established that overly tight handcuffing can constitute excessive force." *Id.* at 1122.

In *Meredith v. Erath*, 342 F.3d 1057 (9th Cir. 2003), the plaintiff was detained in handcuffs for several hours during the execution of a search warrant.  *Id.* at 1059. While the Court granted the officer qualified immunity for the fact that handcuffs were used to detain the individual, the Court denied qualified immunity for the claim of excessive force based on the allegation that the officer ignored complaints that the handcuffs were too tight for 30 minutes, causing pain and bruising to the plaintiff's writs.  *Id.*

Similarly, in *LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000), the failure to loosen handcuffs after the individual complained of pain was held to be excessive force.  *Id.* at 960. In *Alexander v. County of Los Angeles*, 64 F.3d 1315 (9th Cir. 1995), the Court held that the refusal to loosen the handcuffs of a robbery suspect for 30 to 40 minutes after complaint of tightness, and then only after his hands were swollen and blue, was excessive force.  *Id.* at 1323.  Even earlier, in *Palmer v. Sanderson*, 9 F.3d 1433 (9th Cir. 1993), the Circuit rejected the arguments that the officer was entitled to qualified immunity against allegations of an abusive application of handcuffs.  *Id.* at 1436. The claim was that the handcuffs were so tight

1    that they caused the plaintiff pain and bruises and the officer refused to loosen the
2    handcuffs after the plaintiff complained of pain.  *Id.*[8]

3         The conditions of Plaintiffs' condition, in particular Defendants' handcuffing
4    practices, are unreasonable and unconstitutional and should be enjoined.

**D.    Confining Detainees Together in Unventilated Spaces without
        Social Distancing During a Pandemic Is Unconstitutional.**

7         In the midst of a global pandemic – widely known to require a minimum
8    distance of six or more feet and ventilation to reduce the chance of transmission –
9    Defendants seized protestors for infractions or misdemeanor violations and held
10   them handcuffed for hours next to each other in cramped, unventilated spaces,
11   without social distancing, and without any effort to ensure social distancing, or to
12   ensure the use of masks by detainees or officers, sanitation or limiting exposure.
13   App. 19, Young Decl. ¶¶ 12; App. 6, Hartsfield Decl. ¶ 8; App. 7, Kazin Decl.  ¶ 7;
14   App. 9, Lopez Decl.  ¶ 8; App. 12, Khan Decl. ¶ 5; App. 14, Roe Decl. ¶ 7; App. 16,
15   Stamm Decl. ¶ 12.

16        A pre-trial detainee may show the government violated his Fourteenth
17   Amendment rights in two ways.  First, by showing that governmental action taken
18   against him was punishment, including by showing it is not rationally related to a
19   legitimate government interest.  *See, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 535
20   ("[U]nder the Due Process Clause, a detainee may not be punished prior to an
21   adjudication of guilt in accordance with due process of law."); *id.* at n.16 (people
22   detained pretrial retain greater protections than convicted counterparts).

---

[8] Similarly, other circuits have held that injury related to the deliberate application
of excessively tight handcuffs, together with the refusal to loosen them for even short
periods of time, is excessive force. *See Kopec v. Tate*, 361 F.3d 772, 777–78 (3rd
Cir. 2004); *Robinson v. Via*, 821 F.2d 913, 924 (2d Cir. 1987) ("If the force used
was unreasonable and excessive, the plaintiff may recover even if the injuries
inflicted were not permanent or severe"); *Norris v. District of Columbia*, 737 F.2d
1148, 1150-52 (D.C. Cir. 1984) (same).

Second, the Fourteenth Amendment "imposes, at a minimum, the same duty the Eighth Amendment imposes: persons in custody have the established right to not have officials remain deliberately indifferent to their serious medical needs." *Gibson v. Cty. of Washoe, Nev*., 290 F.3d 1175, 1187 (9th Cir. 2002) (citations omitted), *overruled in part by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016); *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996).   Officials act with deliberate indifference under the Eighth Amendment where they fail to take reasonable actions to abate serious harms where they were aware of such risks, or the risks were obvious. *Lemire v. Cal. Dep't of Corr. & Rehab*., 726 F.3d 1062, 1078 (9th Cir. 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). Deliberate indifference under the Fourteenth Amendment is a lesser standard, and requires that the decisions were objectively unreasonable, not that the official had any awareness of the unreasonableness. *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018); *see also Castro*, 833 F.3d at 1071–72 (holding that under the Fourteenth Amendment plaintiffs need only show that a reasonable officer "would have appreciated the high degree of risk involved.").

Here, Plaintiffs show Fourteenth Amendment violations in both ways.   First, Plaintiffs have shown a reasonable likelihood that the action results from an attempt to punish them, both from the abusive and punitive context of the officers' actions suggesting retaliation for the Plaintiffs' protesting them, including shooting projectiles at specific protesters to disperse them and subject them to unlawful and humiliating detention and conditions during these demonstrations.   Defendants' acts are punitive because they were divorced from a legitimate, nonpunitive government purpose, or excessive in relation to any legitimate purpose. *Bell*, 441 U.S. at 561; *Kingsley*, 135 S. Ct. at 2473–74; *Demery v. Arpaio*, 378 F.3d 1020, 1030–33 (9th Cir. 2004). Here, the risk of protestors' infection and death was particularly excessive relative to inflicting this on persons charged at most with infractions or misdemeanors.

Second, Defendants failed to take reasonable actions to abate serious risks to the Plaintiffs.  Defendants know that the coronavirus is deadly, particularly for certain demographics, and extremely contagious.  Parker Dec. ¶¶ 5, 19.  Symptoms of COVID-19 can vary widely, resulting in organ failure or death, and long-lasting health problems stemming from damage to the lungs, heart, kidney, and brain. Parker Dec. ¶ 6.  There is no known cure for the disease.  App. 24, Ex. C, Parker Decl. ¶ 8; App. 24, Ex. D, Goldenson Decl. ¶ 13.  As is almost universally known, the virus is transmitted by air (indeed, it is suspended there for several hours). App. 24, Ex. D, Goldenson Decl. ¶¶ 10, 19.  Essential U.S. Centers for Disease Control ("CDC") guidelines for protecting against transmission include spacing individuals six feet apart, and ensuring proper and substantial ventilation, given individuals are most at risk in closed ventilation systems, and giving masks to every person taken into custody.  App. 24, Ex. C, Parker Decl. ¶¶ 11–13; App. 24, Ex. D, Goldenson Decl. ¶ 19; App. 25, CDC, *FAQs for Law Enforcement Agencies and Personnel* at 2 ("All persons taken into custody should be given a facemask or cloth face covering to wear . . . ."); *id.* ("If a person taken into custody does not show any symptoms of COVID-19, he or she should still be isolated as much as feasible during intake processing."); *id.* (If a person taken into custody does have any COVID-19 symptoms, "the person should be assessed for transport to a healthcare facility for further evaluation and management."); App. 31, CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (noting individuals should be detained at least 6 feet apart); App. 29, CDC, *What Every American and Community can Do Now to Decrease the Spread of the Coronavirus* (repeatedly referring to the need to increase ventilation); *see also*  App. 26, CDC, *Protect Yourself While Using Transportation* (noting the need to keep at least 6 feet from people outside one's household during travel; also noting need to improve ventilation).  Defendants here detained numerous individuals and forced them to sit

21

in cramped buses, less than six feet apart, without any ventilation, and without distributing any masks, putting them at significant risk of contracting COVID-19.

Putting confined persons at risk of an "unsafe, life-threatening condition" is sufficiently cruel and unusual to violate the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (exposure to second-hand smoke).[9]  Failure to follow CDC guidance and other generally-accepted medical guidelines for disease prevention, particularly CDC guidance to prevent COVID-19 transmission, is evidence of deliberate indifference. *See Ahlman v. Barnes*, No. SACV20835JGBSHKX, 2020 WL 2754938, at *11 (C.D. Cal. May 26, 2020) ("An institution that is aware of the CDC Guidelines and able to implement them but fails to do so demonstrates that it is unwilling to do what it can to abate the risk of the spread of infection. In other words, failure to comply demonstrates deliberate indifference toward the health and safety of the inmates."); *id.* at *14 (granting TRO ordering prisoners to be placed at least six feet apart in light of COVID-19); *Cameron v. Bouchard*, No. CV 20-10949, 2020 WL 1929876, at *2 (E.D. Mich. Apr. 17, 2020) (granting TRO based on jail's failure to comply with COVID-19 guidance from CDC and other public health experts), *modified on reconsideration*, *Cameron v. Bouchard,* No. CV 20-10949, 2020 WL 1952836 (E.D. Mich. Apr. 23, 2020); *Hernandez v. Cty. Of Monterey*, 110 F. Supp. 3d 929, 942–45 (N.D. Cal. 2015) (finding that "known noncompliance" with CDC tuberculosis guidelines

---

[9] *See also Trevizo v. Webster*, No. 17-cv-5868-MWF-KS, 2018 WL 5917858, at *4; (C.D. Cal. Sept. 6, 2018) ("It is well accepted that such substantial risks of harm include exposure of inmates to a serious, communicable disease.") (internal citation marks omitted) (quoting *Helling*, 509 U.S. at 33); *Lopez v. McGrath*, No. 04-cv-4782 MHP, 2007 WL 1577893, at *5 (N.D. Cal. May 31, 2007) ("Courts have recognized a broad range of diseases which may form the basis for a claim of deliberate indifference.") (collecting cases); *cf. Andrews v. Cervante*s, 493 F.3d 1047, 1055–56 (9th Cir. 2007) (recognizing "imminent danger" posed to prisoners by contagious "diseases [that] quite obviously cause serious health problems, and can result in death.").

"strongly indicates deliberate indifference to a substantial risk of serious harm" and ordering officials to implement tuberculosis prevention policies).

Defendants should not detain demonstrators in this way.  However, if arrestees are detained, Defendants must protect them from unnecessary exposure to COVID-19.

### E.    A Temporary Restraining Order and Preliminary Injunctive Relief Are Urgently Needed and Well Justified to Put an End to These Unconstitutional and Life-Threatening Practices.

In light of the ongoing nature of the George Floyd protests, as well as the unfortunate likelihood that additional incidents of racially-charged police brutality will catch the attention of an already incensed and increasingly attentive public, the issuance of a temporary restraining order and preliminary injunctive relief with regard to LAPD's use of batons is well-warranted here.

First, as demonstrated above, Plaintiffs are highly likely to succeed on the merits of their claims.  The use of rubber bullets and other similar projectiles on non-violent protesters violates their constitutional rights and therefore the LAPD should be enjoyed from using such projectiles against peaceful protesters.  *See Abay*, 2020 WL 3034161 at *9 (granting preliminary injunction enjoining Denver police from using "less-lethal" projectiles to target the head, back or pelvis area and ordering that "non-lethal or less-lethal projectiles shall not be shot indiscriminately into a crowd."); *Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't*, No. 2:20-CV-00887-RAJ, 2020 WL 3128299, at *5 (W.D. Wash. June 12, 2020) (granting TRO to enjoin Seattle police from employing  "projectiles of any kind [including h-bang grenades, "pepper balls," "blast balls," rubber bullets, and foam-tip projectiles] against persons peacefully engaging in protests or demonstrations."); App. 30, *Anti Police-Terror Project, et al. v. City of Oakland, et al*., No. 3:20-cv-03866-JCS (N.D. Cal. June 18, 2020) (enjoining, *inter alia*, firing rubber bullets or similar projectiles at protestors).

Similarly, the practice of using baton strikes on peaceful protesters violates both clear guidance from the Ninth Circuit and LAPD's own guidance regarding the reasonable use of batons, as do the practices of excessively tight handcuffing, unnecessarily prolonged detention to effectuate unlawful, custodial arrests for an infraction, and confinement of protesters in unventilated areas during an unprecedented global pandemic in which Los Angeles County is an epicenter of infection.

Second, in light of the potential for serious or even lethal injuries resulting from these practices, there is a clear possibility of irreparable harm in the absence of injunctive relief.  *Cf., e.g.*, *Black Lives Matter Seattle-King Cty*, 2020 WL 3128299, at *4 ("Plaintiffs have established a threat of immediate, irreparable harm in the absence of a TRO. They have shown a likelihood of success on their First and Fourth Amendment claims, demonstrating that irreparable injury has already occurred."); *Abay*, 2020 WL 3034161, at *4 ("Indeed, irreparable harm has already occurred in the form of physical injury and the suppression of speech.").

Finally, the balance of hardships and the public interest weigh strongly in favor of injunctive relief.  Notably, "[w]hen the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Moreover, "'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002)); *see also Abay*, 2020 WL 3034161, at *4 (D. Colo. June 5, 2020) ("Here, it is clearly in the public interest to protect plaintiffs' right to demonstrate, the media's ability to document that demonstration, and third parties' ability to render aid to demonstrators without threat of excessive force by police.").[10]

---

[10] Injunctive relief is also appropriate under the Bane Act for violations thereof. Cal. Civ. Code § 52.1(c).

### III.   REQUESTED RELIEF

Plaintiffs request the following injunctive relief to preserve their constitutional rights, during future demonstrations:

1. Defendants should be forbidden from using projectiles, including rubber bullets, to disperse or otherwise control crowds of protestors.

2. Defendants should be forbidden from using baton strikes against protestors or for crowd control purposes unless attacked.  Batons should not be used in a manner that would cause bruising or physical injury to demonstrators.

3. Defendants should be required to cite and release anyone charged with an infraction within 15 minutes of apprehension in the field and not detain them in buses, in parking lots or garages, or any other facility used for the purpose of detaining them.

4. Defendants should be required to book and release demonstrators charged with misdemeanors in no more than one hour using mobile booking technology if necessary.

5. If arrested protestors are detained in buses or transported to a booking facility, they should not be held in such detention or in handcuffs for more than 30 minutes but released earlier if complaints are made of tight handcuffs, and they should be given access to water and bathrooms and medical care, if needed.

6. If protestors are kept in buses or otherwise in close custody for more than 10 minutes Defendants must ensure that they comply with basic CDC guidelines including social distancing, providing face masks to detainees, having police officers wear facemasks during such detention or transport, and the application of basic sanitation in buses or other places of detention necessary to reduce exposure to COVID-19 for protestors.

### CONCLUSION

For the foregoing reasons, this Court should grant this request for a temporary restraining order and a preliminary injunction.

Respectfully submitted,

DATED: June 24, 2020          **SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**

**LAW OFFICE OF CAROL A. SOBEL**

**KAYE, MCLANE, BEDNARSKI & LITT**


By:   */s/ Paul Hoffman*
            Paul Hoffman
            Michael Seplow
            Aidan McGlaze
            John Washington
            *Attorneys for Plaintiffs.*

26