Cynthia Anderson Barker, SBN 75764
LAW OFFICES OF CYNTHIA
ANDERSON-BARKER
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
t. 213 381-3246  f. 213 381-3246
e. cablaw@hotmail.com

Barrett S. Litt, SBN 45527
Lindsay Battles, SBN 262862
KAYE, MCLANE, BEDNARSKI & LITT
975 E. Green Street
Pasadena, California 91106
t. 626 844-7660 f. 626 844-7670
e. blitt@kmbllaw.com
e. lbattles@kmbllaw.com

Paul Hoffman, SBN 71244
Michael D. Seplow, SBN 150183
Aidan McGlaze, SBN 277270
John C. Washington, SBN 315991
SCHONBRUN, SEPLOW, HARRIS,
HOFFMAN & ZELDES LLP
200 Pier Avenue, Suite 226
Hermosa Beach, California 90254
t. 310 396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. jwashington@sshhlaw.com

Pedram Esfandiary, SBN 312569
e. pesfandiary@baumhedlundlaw.com
Monique Alarcon, SBN 311650
e. malarcon@baumhedlundlaw.com
Bijan Esfandiari, SBN 223216
e. besfandiari@baumhedlundlaw.com
R. Brent Wisner, SBN 276023
e. rbwisner@baumhedlundlaw.com
BAUM, HEDLUND, ARISTEI &
GOLDMAN, P.C.
10940 Wilshire Blvd., 17th Floor
Los Angeles, CA 90024
t. 310 207-3233 f. 310 820-7444

Attorneys for Plaintiffs
Additional Counsel on Next Page

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| BLACK LIVES MATTER LOS ANGELES, CANGRESS (DBA LA CAN), STEVEN ROE, NELSON LOPEZ, TINA CRNKO, JONATHAN MAYORCA, ABIGAIL RODAS, KRYSTLE HARTFIELD, NADIA KHAN, CLARA ARANOVICH, ALEXANDER STAMM, MAIA KAZIM, ALICIA BARRERA-TRUJILO, SHANNON LEE MOORE, DEVON YOUNG, LINUS SHENTU, individually and on behalf of a class of similarly situated persons, <br><br>                PLAINTIFFS, <br><br> v. <br><br> CITY OF LOS ANGELES, a municipal entity, CHIEF MICHEL MOORE, and DOES 1-10 inclusive, <br><br>                DEFENDANTS. | Case No.: 2:20-cv-05027 CBM-AS <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND FOR AN OSC RE: PRELIMINARY INJUNCTION** <br><br> Date and Time: TBA <br> Courtroom: 8B |

1   Carol A. Sobel, SBN 84483
2   Katherine Robinson, SBN 323470
    Weston Rowland, SBN 327599
3   LAW OFFICE OF CAROL A. SOBEL
    1158 26th Street, #552
4   Santa Monica, CA 90403
    t. 310 393-3055
5   e. carolsobel@aol.com
    e. klrobinsonlaw@gmail.com
6   e. rowland.weston@gmail.com

7

8   Colleen Flynn, SBN 234281
    LAW OFFICE OF COLLEEN FLYNN
9   3435 Wilshire Blvd., Suite 2910
    Los Angeles, CA 90010
10  t. 213 252-9444
    r. 213 252-0091
11  e. cflynn@yahoo.com

12  Matthew Strugar, SBN 232951
    LAW OFFICE OF MATTHEW STRUGAR
13  3435 Wilshire Blvd., Suite 2910
    Los Angeles, CA 90039
14  t. 323 696-2299
    e. matthewstrugar@gmail.com

    Jorge Gonzalez, SBN 100799
    A PROFESSIONAL CORPORATION
    2485 Huntington Dr., Ste. 238
    SAN MARINO, CA 91108-2622
    t. 626 328-3081
    e. jgonzalezlawoffice@gmail.com


    Olu Orange, SBN 213653
    Orange Law Offices
    3435 Wilshire BLvd., Ste. 2910
    LOS ANGELES, CA. 90010-2015
    T. 213 736-9900
    f. 213 417-8800
    e. o.orange@orangelawoffices.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION…………………………………………………..…………1

NEW DEVELOPMENTS………………………………………………………4

    I.     MARCH 2021 AND PRIOR PROTESTS………..…………………4

    II.    THE CHALEFF REPORT…………………….………………..5

ARGUMENT…………………………………..……………………...8

    I.     PLAINTIFFS MEET ALL THE REQUIRMENTS
          FOR INJUNCTIVE RELIEF…,…………………………………8

        A. Introduction…………………………………………………..8

        B. The LAPD Continues to Use Large 40mm
           and 37 mm Kinetic Projectiles in Dangerous,
           Potentially Lethal Ways That Violate Its Own
           Policies and the Fourth Amendment………………………....10

           1.  The Fourth Amendment Forbids Officers
              from Using Serious, "Less-Lethal" Force
              Unreasonably Against Peaceful Protestors…………………10

           2.  The LAPD is Engaging in Widespread Use
              of "Less-Lethal" 40 mm and 37 mm Projectiles
               in an Objectively Unreasonable Manner and Putting
              Peaceful Protestors Safety and Lives at Risk………………...12

        C. A TEMPORARY RESTRAINING ORDER AND
           PRELIMINARY INJUNCTIVE RELIEF ARE URGENTLY
           NEEDED AND WELL JUSTIFIED TO PREVENT THESE
           UNCONSTITUTIONAL AND LIFE-THREATENING
           PRACTICES………………………………………..………..…..16

           1.  Plaintiffs Will Likely Suffer Irreparable harm
              if the Injunction is Not Granted………………………………16

i

2.  Plaintiffs' Interests Weigh Heavily in Favor
of Enjoining Defendants' Use of 40 mm and
37 mm Weapons……………………………………...…………20

REQUESTED RELIEF……………………………………...………………21

CONCLUSION………………………………………………...……………21

# **TABLE OF AUTHORITIES**

## **CASES**

*Abay v. City of Denver*,
445 F. Supp. 3d 1286 (D. Colo. 2020)…………………………………16, 17, 20

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)……………………..………………………..8

*Anti Police-Terror Project, et al. v. City of Oakland, et al.*,
2020 U.S. Dist. LEXIS 135607, 2020 WL 4346828, No. 3:20-cv-03866-JCS
(N.D. Cal. June 18, 2020)…………………………………………………17

*Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't*,
No. 2:20-CV-00887-RAJ, 2020 U.S. Dist. LEXIS 135583, 2020 WL 3128299
(W.D. Wash. June 12, 2020) ……………………………..…….............17

*Breathe v. City of Detroit*,
484 F. Supp. 3d 511 (E.D. Mich. 2020)…………………………………..17

*Deorle v. Rutherford*,
272 F.3d 1272 (9th Cir. 2001)……………………………………………10

*Don't Shoot Portland v. City of Portland*,
465 F. Supp. 3d 1150 (D. Or. 2020)………………………………………17

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014)……………………………….……………20

*Graham v. Connor*,
490 U.S. 386 (1989)…………………………………………….…10, 11

*hiQ Labs, Inc. v. LinkedIn Corp.*,
938 F.3d 985 (9th Cir. 2019) ……………………………….……………..8

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012)………………………..…….…………..17, 20

iii

*Nelson v. City of Davis*,
685 F.3d 867 (9th Cir. 2012)…………………………………..………..…10-11, 16

*Nken v. Holder*,
556 U.S. 418 (2009)……………………………………..…………………..20

*Sammartano v. First Judicial District Court*,
303 F.3d 959 (9th Cir. 2002)……………………………...………….20

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
709 F.3d 1281 (9th Cir. 2013)…………………………………...………9, 16, 20

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001)………………………….………………………8

*Vos v. City of Newport Beach*,
892 F.3d 1024 (9th Cir. 2018)…………………………….……………11

## **<u>OTHER AUTHORITIES</u>**

Los Angeles Times, LAPD Projectiles Fired at Lakers
Crowd Causes Severe Injuries (Oct. 15, 2020), *available at*:
https://www.latimes.com/california/story/2020-10-15/lapd-projectiles-gruesome-injuries-lakers-celebration……………………………………………………………10

Physicians for Human Rights,
*Shot in the Head*, Sept. 14,  2020, *available at:*
https://phr.org/our-work/resources/shot-in-the-head/……………………………4, 12

# **INTRODUCTION**

This Court declined to issue injunctive relief last spring to enjoin the unconstitutional actions of the Los Angeles Police Department ("LAPD") against peaceful protestors seeking an end to systemic racism in policing after the murder of George Floyd in Minneapolis.  The LAPD made assurances to this Court in response to Plaintiffs' request at that time which they have not fulfilled.  In recent days the LAPD has engaged in the same unlawful use of force, causing serious injuries to peaceful protestors.  *See generally* Compendium of Evidence ("Comp.") Vol. III Declarations.[1]  Moreover, the LAPD's internal reports about the Department's response to the protests last spring reveal long-standing problems with the LAPD on these issues.  *See, e.g.*, Comp. Vol. I, Ex. 1, An Independent Examination of The Los Angeles Police Department 2020 Protest Response ("Chaleff Report") at 8, 51-53, 61-62, 68-70 and Request for Judicial Notice.

The LAPD responded to recent protests in Echo Park on March 25, 2021 with brutality. They fired on non-violent protestors with 40 mm and 37 mm weapons at extremely close range, and aimed at the upper bodies of their targets, where doing so risks killing and permanently injuring them and is wholly unjustifiable. *See, e.g.*, Vol. III, Kim Decl. (struck in rib cage) and Ex. 15; Vol. III, Monterrosa Decl. (press person shot in abdomen) and Exs. 16, 17; Vol. III, Kanegawa Dec. (struck in upper arm), Exs. 13,14; Vol. III,  Barbadillo Dec., Exs. 8, 9 (video showing LAPD officers aiming directly at protestors' upper bodies, and firing less-lethal projectiles at close range) (manually filed).

---

[1] Here and unless otherwise designated, citations to exhibits refer to those filed concurrently with this motion.  Plaintiffs continue to rely on their prior submissions. Where citations reference previously submitted declarations or other evidence, this is designated by a docket number.

The use of force at Echo Park against persons engaged in First Amendment activity and posed no imminent, specific threat of violence was not an isolated incident   For example, at the Breonna Taylor solidarity protest two weeks before the Echo Park events, the LAPD shot a member of the press in the back, striking him in the shoulder/neck area, as he walked on a sidewalk away from the skirmish line and filmed the scene.  When shot, he was about 50-feet from the LAPD skirmish line and posed no threat to officers at all.  The impact of the projectile knocked him to the ground, rendered him unconsciousness and caused a concussion. Vol. III, Baffa Decl. and Ex. 6 (video) and 7. Late last summer, the LAPD shot an anti-Trump protestor at a demonstration in Tujunga when she started filming an officer strike a nearby protestor with a baton.  The LAPD officer shot her point blank in the chest from a distance of approximately three feet, causing an injury requiring plastic surgery to repair.  Vol. III,  Astorga Decl. and Ex. 4, 5 (manually filed video).

These abuses reflect a longstanding problem in LAPD culture and training further documented by a recent report requested by the City Council on LAPD conduct concerning the demonstrations that gave rise to this case.  This report, the Chaleff Report, indicated a significant lack of training for officers on deploying these weapons – indeed, any for current officers over the last three years – which has contributed to LAPD officers injuring peaceful protestors. *See* Comp. Vol. I, Ex. 1 at 8.[2]  It is a certainty that such misconduct will continue unless this Court intervenes.

Plaintiffs, who intend to continue protesting on these crucial public issues, face a likelihood of being subjected to such violent actions again.  In this motion

---

[2] Many of the same conclusions about deficiencies in the LAPD response to protests were also made by the report commissioned by the Los Angeles Police Commission. *See* Vol. I, Ex. 2 ("A Crisis of Trust," prepared for the Los Angeles Police Commission), and Request for Judicial Notice.

2

Plaintiffs request an injunction to protect them and the exercise of their first amendment rights to protest without risk of serious injury.

This request is urgent.  The trial of Derek Chauvin for the murder of George Floyd is currently underway and expected to reach a verdict before the end of the month. The judgment will likely be taken as one on longstanding claims of racism and police brutality in the country.  Whether or not Mr. Chauvin is – and especially if he is – acquitted, convicted of a lesser charge, or there is a hung jury, Plaintiff BLM plans protests and demonstrations that will likely be widespread and substantial.  Vol. III, Abdullah Decl. ¶¶ 2-3.  They are fearful that large public assemblies aimed at police misconduct will subject them to the same brutality and indiscriminate force from the LAPD that similar protests concerning the same matter did in May and June – consistent with Defendants' recent responses to protestors. *Id.* ¶ 4. These recent events and the LAPD's internal reports demonstrate the imminence of the threats Plaintiffs face.

Plaintiffs bring this application to enjoin the LAPD's use of 40 mm and 37 mm weapons in public demonstrations. These weapons are target specific and likely to produce serious injury when used at close range as a crowd control mechanism. The 40 mm, in particular, is specifically intended to incapacitate an individual who poses an imminent threat, not disperse a largely peaceful assembly.[3] As past use demonstrates, the LAPD repeatedly deployed these weapons in a manner that caused serious injuries. The LAPD continues to use these weapons improperly and indiscriminately.  For reasons addressed above and in greater detail below, Plaintiffs are likely to prevail on the merits of their claims; absent injunctive relief, are likely to suffer irreparable harm, and the balance of equities and interests also tip in their favor.

---

[3] The After Action Report issued by the LAPD on April 9, 2021 recognized that most of the protestors were peaceful.  *See* Vol. II, Ex. 3 at 5-56.

3

## **NEW DEVELOPMENTS**

### I.    MARCH 2021 AND PRIOR PROTESTS.

On March 24 and 25, 2021, LAPD officers responded to persons gathered near Echo Park to protest the City's forced removal of unhoused persons from the area. Officers fired on peaceful protestors with 40 mm and 37 mm weapons at close range, aiming at the upper bodies of their targets, where doing so risks permanently disabling them or even killing them.  *See* Dkt. 15-1, Haar Decl. ¶¶ 9-13 (describing significant injuries caused by kinetic impact projectiles); *infra*, pp. 11–15. [4]

For example, Christian Monterrosa, a journalist with LAPD media credentials, was shot at close range below his pectoral muscle less than four feet from the muzzle.  Comp. Vol. III, Monterrosa Decl. ¶ 2.  The LAPD shot Nara Kim with a "less lethal" in the left side of her abdomen from less than three feet away, Vol. III, Kim Decl. ¶ 2, and then shot her partner from about three feet away as he tried to move them away from the line of fire.  Vol. III, Kanegawa Decl. ¶ 2.  Some of the instances of LAPD targeting and firing on non-violent protestors was also captured on video.  *See* Vol. III, Barbadillo Decl. ¶ 3 & Ex. 7.

These recent events are not isolated.  At the Breonna Taylor solidarity protest two weeks before the Echo Park events, the LAPD shot a member of the press in the back, inches from where his spine connects to his skull.  Vol. III, Baffa Decl.   When shot, he was about 50-feet from the LAPD skirmish line and posed no threat. *Id.*  The impact rendered him unconscious and caused a concussion, bruises and swelling at the site the munition struck.  *Id.* and Ex. 7.

---

[4] The uses of these weapons, including by the LAPD in the spring of 2020, and the injuries they cause were also recently documented by Physicians for Human Rights in a recent report.  *See* Physicians for Human Rights, *Shot in the Head*, Sept. 14, 2020,  *available   at:*   https://phr.org/our-work/resources/shot-in-the-head/.   Los Angeles was one of three cities discussed at length.

Last summer, the LAPD shot an anti-Trump protestor at a demonstration in Tujunga when she started filming an officer strike a nearby protestor with a baton. Vol. III, Astorga Decl.  Just moments after she did so, an LAPD officer shot her point blank in the chest, from a distance of approximately three feet, causing an injury requiring plastic surgery to repair.  *Id.* and Ex. 4, 5.

Additionally, on August 26, 2020, the LAPD blocked persons peacefully protesting the police shooting in Wisconsin of Jacob Blake seven times in the back, paralyzing him.  The protestors were marching through the 3rd Street tunnel when they were kettled by the police, provided no opportunity to disperse, and fired upon with large kinetic projectiles.  See. Vol. III, Guerrero Decl. ¶¶ 3,4 and Ex. 10, 11, 12.

As these events show, the LAPD's use of projectiles in demonstrations, and particularly 40 mm and 37 mm projectiles, poses an ongoing risk of serious injury to protestors such as Plaintiffs.

## II.    THE CHALEFF REPORT.

On March 10, 2021, a report was released concerning the LAPD's responses to the May 29 to June 2, 2020 protests, commissioned by the City and led by retired LAPD commander Gerald Chaleff and Assistant Chief Sandy Jo MacArthur.  *See* Comp. Vol. I, Ex. 1. The report revealed serious longstanding problems in the LAPD, as relevant here, in the misuses, inadequate supervision and lack of training concerning 40 mm and 37 mm projectiles.   As the Report underscored, these weapons are only to be used in circumstances where an individual is resisting arrest or presents an imminent threat to an officer, not to disperse peaceful protestors.[5]  *Id.* at 41. The Report also further documents how widespread the LAPD's abuses and

---

[5]  Less lethal force is only permissible when there is reasonable belief that a suspect is ***violently*** resisting arrest or presents an immediate threat of violence or physical harm. Ex. 1 at 41.

uses of the 40 mm and 37 mm projectiles have been; and, indeed, approximately 10,000 rounds of 40 mm and 37 mm rounds were not returned to the LAPD's armory following these protests. *Id.* at 43, 44.

As the Report also demonstrates, there has been no training for officers on the 40 mm, other than those going through basic training, since 2018. *Id.* at 45. Before 2018, outside of the Metropolitan Division, the LAPD's only training for the weapon – patrol training – consisted of a two-hour tutorial amounting to a demonstration of how the weapon is manipulated where an officer then fired at a stationary target. *Id.* at 8, 52. The previous training did not, when it did occur, even address using the 40 mm beyond this, or in crowd situations at all. *Id.*[6] Even the LAPD's directive authorizing the use of the 40 mm has no guidance for use in public order policing situations. *Id.* at 45. Nor are officers adequately supervised. *See, e.g.*, *Id.* at 61-62 (officers were "left to deploy less lethal tools, including the 40 mm, with no direction or coordination.")

There also appears to be no credible LAPD commitment to monitor the use of these projectiles. The LAPD's inability or refusal to account for approximately 10,000 rounds officers expended during the demonstrations in the spring of 2020 is further evidence of indiscriminate use. The LAPD was asked for and refused to

---

[6] As the Chaleff Report shows, the LAPD appears to have a longstanding institutional resistance to securing the rights of protestors. The LAPD has been repeatedly sued for violation of the rights of protestors. As a result of multiple settlements, LAPD was required to provide adequate training. It has ceased to, which the Chaleff Report also criticized the LAPD for. Ex. 1 at 11 ("The LAPD's training in public order policing has declined in the past several years and was identified as problem in 2007 after the MacArthur Park May Day demonstrations. As a result, the LAPD command staff were required to receive annual training on public order policing. This training had not occurred for several years prior to 2020. There had been minimal crowd control and mobile field force training in the past five years . . . . This lack of training caused problems in 2020. . . . The 2007 MacArthur Park lawsuits required every officer above the rank of sergeant to undergo training in crowd control and use of force policies at a minimum of every two years, and command staff to be trained annually. It is recommended that this requirement be followed.")

6

provide investigators the number of less lethal munitions it used. *Id.* at 43 ("The Department was asked for but did not provide the number of less lethal munitions used between May 27 and June 7. . . . As of this writing, no accounting of less lethal munitions has been received."). In the LAPD's own recently issued After Action Report, there is not a single recognition or recommendation that addresses these well documented violations of department policy and misuse of these potentially lethal munitions against individuals who posed no imminent threat and were not resisting arrest. *See generally* Vol. II, Ex. 3.

As the Chaleff Report emphasized, "[t]he use of the 40 mm weapon to fire at individuals who are in a crowd situation requires well-trained, experienced, and highly skilled individuals." Vol. I, Ex. 1 at 8. The LAPD lacks that training, as the report also concluded. *Id.* This causes injuries, sometimes significant, to non-violent protestors, and did in the May and June protests. *Id.* (acknowledging significant reports of injuries to protestors, including those not engaged in criminal behavior, and that this was due to "a lack of adequate training on the 40 mm system.").

The LAPD's violent use of projectiles against peaceful protestors reflects officers who behaved unreasonably and without proper training. Vol. III, Clark Decl. ¶ 15. The Chaleff Report findings underscore Clark's opinion that there is an absence of any adequate or reasonably specific LAPD training concerning the 40 mm and 37 mm projectiles. *Id.* ¶ 21. Absent such trainings and adequate supervision, LAPD officers confronted with similar protests are likely to misuse these weapons and cause protestors serious injuries.

7

**ARGUMENT**

**I. PLAINTIFFS MEET ALL THE REQUIREMENTS FOR INJUNCTIVE RELIEF.**

**A. Introduction.**

Injunctive relief is warranted and necessary to protect Plaintiffs and the classes they represent from being prevented from protesting, and from serious, potentially permanent or even lethal injuries just for exercising their First Amendment Rights. Plaintiffs meet all the requirements for injunctive relief because they are (1) likely to succeed on the merits, (2) are likely suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1289 (9th Cir. 2013).[7]   The same factors apply to an application for a temporary restraining order, but a court may grant a temporary restraining order when irreparable injury may occur before the hearing for a preliminary injunction can be held. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (explaining that the Ninth Circuit's "analysis is substantially identical for the injunction and the TRO"); *see also* FRCP 65(b) (allowing TRO to be granted without notice).   That is the case here because the Chauvin verdict may come down at any time in the next 10 days.

Plaintiffs are likely to succeed on the merits of their claims regarding the

---

[7]   The Ninth Circuit evaluates these factors on a "sliding scale" approach meaning that a stronger showing in one area may offset a weaker showing in another. *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019).   For example, even where there is not a likelihood of success on the merits, but only "serious questions" going to them a preliminary injunction is appropriate, provided that the balance of hardships favors the plaintiff. *Id.; All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1133 (9th Cir. 2011) ("[T]he more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief.")

misuse of 40 mm and 37 mm projectiles.  They are likely to suffer harm, and the balance is sharply in their favor based on the LAPD's continued misuse of 40 mm and 37 mm munitions, as the LAPD did recently at Echo Park. Each of the recent investigative reports of the LAPD's response to the Floyd protests last spring reveal the inadequacies of Defendants' training, supervision, and policies concerning the use of these munitions.  *E.g.* Vol. III, Clark Decl. ¶ 21; Vol. I, Ex. 1 at 8, 53; Vol. II, Ex. 3.

Plaintiffs amply meet the requirements for a temporary order restraining the Defendants' use of 40 mm and 37 mm projectiles. Plaintiffs show a strong likelihood of success on the merits, and of severe threatened harm. Defendants have responded to protests about police brutality by baselessly shooting peaceful protestors, including point blank and/or in their heads, faces, and torsos where doing so inflicted serious injury.  The LAPD continues to employ large munitions intended to incapacitate the target, rather than disperse an unlawful assembly. Defendants continue to fire on protestors this way, including as recently as three weeks ago at Echo Park.  While City officials just received reports of investigation into the LAPD's past actions, the police continue to employ 40 and 37 mm weapons at the front line of their deployments against individuals who pose no imminent threat in crowd control situations.

There are substantial grounds to find that the LAPD, if not restrained, will continue to misuse these potent and dangerous weapons.  The have continued to do so. In fact, the two most recent uses of force occurred *after* issuance of the Chaleff report, criticizing the LAPD for these uses of force.  The LAPD appears undeterred in their dangerous and unconstitutional use of these projectiles.  Indeed, the Chaleff report shows that the LAPD has a disturbing tendency to ignore past settlements restraining similar protest-related misconduct. *E.g.* Vol. I, Ex. 1 at 11, 16-17, 52-53. In the face of widespread protests expected with the impending Chauvin verdict,

9

coupled with the LAPD's failure to address the misuse of kinetic impact projectiles against individuals who posed no imminent threat, the need for immediate relief by the Court is strong.

In light of the nature of the risk to Plaintiffs, the balance of interests also tips strongly in their favor in restraining the LAPD's use of these projectiles.[8] Without this Court's intervention Plaintiffs and other protestors must risk serious injuries just to protest peacefully.

**B. The LAPD Continues to Use Large 40 mm and 37 mm Kinetic Projectiles in Dangerous, Potentially Lethal Ways that Violate Its Own Policies and the Fourth Amendment.**

**1. The Fourth Amendment Forbids Officers from Using Serious, "Less-Lethal" Force Unreasonably Against Peaceful Protestors.**

The Fourth Amendment governs law enforcement's use of force against protesters, even when the officers' broader goal is to disperse a crowd. *See, e.g.*, *Nelson v. City of Davis*, 685 F.3d 867, 877-78 (9th Cir. 2012) ("Regardless of [the officers'] motives, their application of force was a knowing and willful act that terminated Nelson's freedom of movement. It unquestionably constituted a seizure under the Fourth Amendment."). The Fourth Amendment guarantees the right to be free from excessive force, which is determined under an objective reasonableness standard, in which the nature of the force is balanced against countervailing governmental interests. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). Any government interest in using less lethal projectiles must be substantial. *Nelson*, 685 F.3d at 879; *see also Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001)

---

[8] The LAPD also used these projectiles to shoot indiscriminately in the general area of individuals celebrating championships by the Los Angeles Lakers and the Dodgers. The Los Angeles Times reported on some injuries of those struck by "less-lethal" projectiles at these two incidents, including a bystander who lost an eye. *See* Los Angeles Times, LAPD Projectiles Fired at Lakers Crowd Causes Severe Injuries (Oct. 15, 2020), *available at*: https://www.latimes.com/california/story/2020-10-15/lapd-projectiles-gruesome-injuries-lakers-celebration.

("Less than deadly force that may lead to serious injury may be used only when a strong governmental interest warrants its use, and in such circumstances should be preceded by a warning, when feasible."); *id.* at 1284 (so holding for a "cloth-cased shot, which is something akin to a rubber bullet.").

The reasonableness of an officer's conduct must be assessed "from the perspective of a reasonable officer on the scene," recognizing the fact that the officer may be "forced to make split-second judgments." *Id.* at 396–97. The *Graham* standards consider the particular factual circumstance of each use of force. *See id.* at 396–97. The analysis considers whether it was reasonable to fire on a specific person and a substantial government interest justified doing so, even when they were in a crowd the government had a right to disperse. *E.g. Nelson*, 685 F.3d at 880-81.[9]

The most important factor in this analysis is whether the person shot posed a threat to officers or others. *Nelson*, 685 F.3d at 880. Others include the severity of the target's crime, the suspect's attempts to resist or evade arrest, and the availability of less intrusive force. *See id.*; *see also, e.g.*, *Vos v. City of Newport Beach*, 892 F.3d 1024, 1033–34 (9th Cir. 2018); Ninth Circuit Model Jury Instruction No. 9.25 (listing various factors including "the amount of time the officer had to determine the type and amount of force that reasonably appeared necessary, and any changing circumstances during that period; the type and amount of force used; and the availability of alternative methods [to take the plaintiff into custody].").

The LAPD has used 40 mm and 37 projectiles to cause serious and potentially lethal injuries against peaceful protestors in the protests at issue in the complaint, and in subsequent ones as recent as March 25, targeting or indiscriminately firing on such protestors. This puts Plaintiffs at risk of significant injury or death and, as addressed below, the force is excessive.

---

[9] As the LAPD's own policies acknowledge, the use of force in crowd control must be limited to that which is reasonable. *See, e.g.*, Dkt. 15-1, Ex. 27, LAPD Directive No. 11 form June 2011, "Crowd Management, Intervention, and Control."

11

1
2

### 2. The LAPD Is Engaging in Widespread Use of "Less-Lethal" 40 mm and 37 mm Projectiles in an Objectively Unreasonable Manner and Putting Peaceful Protestors' Safety and Lives at Risk.

3
4
5
6

The LAPD uses "less lethal" projectiles to fire on peaceful protestors, including at point blank range, subjecting them to a risk of serious injuries and possibly even death. The LAPD has continued to do so, in protests following as recently as March 25, 2021. *See supra*, pp. 3-5.

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

The use of 40 mm and 37 mm projectiles is part of LAPD's arsenal of many weapons known as "less-lethals." The projectiles seriously injure protestors, and have the capacity even to kill them.   Recent studies show that of those injured by kinetic projectiles, 70% of the 1,925 injured suffered severe injuries, 295 were permanently disabled by the projectiles, and 53 were killed by them. Dkt. 15-1, Haar Decl. ¶ 11; *see also* Physicians for Human Rights, *Shot in the Head*, *supra* note 4 (describing injuries from kinetic impact projectiles including from the LAPD during the spring Floyd protests). These weapons can blind protestors; cause traumatic brain injuries, cause injuries to the spinal cord; deflate and injure lungs, and many other serious injuries. Dkt. 15-1, Haar Decl. ¶ 12.  Severe injuries are more common when fired at close range, though indiscriminate firing at longer distances still risks striking protestors in vulnerable locations and cause such severe injuries. *Id.* ¶ 13; *see also, e.g.*, *id.* ¶ 12(A) ("Direct trauma to the eye from KIPs nearly always causes . . .  total blindness in that eye, due to ruptured globe (eyeball).  KIPs have also entered the brain through the eye socket and caused extensive and irreversible damage.").

23
24
25

If such weapons are to be used at all,[10] they may only be used when subjected to significant limitations and only then after the officers who use them have necessary training and adequate supervision.  As the Chaleff Report emphasized,

26
27
28

---

[10] There are significant doubts as to whether these large kinetic impact projectiles–even used as directed, let alone as the LAPD has done here – can ever be used in a manner that is safe and effective.  Dkt. 15-1, Haar Decl. ¶ 13.

"[t]he officer operating the 40mm must be very precise to strike the intended target and minimize the risk to potential bystanders."  Vol. I, Ex. 1 at 44.  40 mm rounds "cannot be used to disperse a crowd." *Id.* at 42. The 40 mm should not, for example, be used to fire at the head, neck, face, eyes or spine, unless the intention is to kill the target.  *Id.* at 41.  They should also not be aimed at the chest. Comp. Vol. III, Clark Decl. ¶ 14.  When aimed at the chest, impact projectiles bruise the lungs and heart, causing serious or even fatal injuries.  Dkt. 15-1, Haar Decl. ¶ 12(D); Vol. III, Ex. 1 at 94.  The LAPD's own regulations show that the 40 mm should not be used on a subject, even when otherwise targeted appropriately, unless the person is violently resisting arrest or poses an immediate threat of violence or physical harm.  Vol. III, Ex. 1 at 94. The minimum safe range for firing the weapon is 5 feet. *Id.*  Officers deploying 37 mm foam baton rounds are limited to firing at the ground to absorb the kinetic energy and skip toward persons, rather than ever directly at a person.  *Id.* at 9, 94.  The evidence before this Court demonstrates that the LAPD does not abide by these restrictions.

The officers here engaged in widespread, indiscriminate and deliberate firing on peaceful protestors. Even the City's report acknowledged that officers were quickly firing 40 mm rounds at distant targets and that LAPD officers fired numerous less-lethal rounds during the protests, with approximately 10,000 such rounds not returned to the armory or otherwise accounted for after the protests. *Id.* at 43, 44.

The LAPD continues to indiscriminately fire on peaceful protestors and target specific non-violent demonstrators, contrary to the Chaleff Report's clear findings on the matter, contrary to longstanding recommendations from the manufacturer, and to even their own general guidelines. Vol. III, Clark Decl. ¶¶ 12-15, 18-20.  In August of last year for example, an LAPD officer aimed directly at and fired on Christina Astorga's chest from no more than three feet away, causing necrosis in her

breast, and requiring plastic surgery.  Vol. III, Astorga Decl.  ¶ 4, Ex. 4, 5.  This is just one of many examples; however, the Astorga incident illustrates the serious injuries inflicted by the misuse of the 37mm less-lethal munitions, the weapon used to injure Astorga.  According to an LAPD Directive noted in the Chaleff Report, the 37 mm "foam baton round consists of five foam rubber projectiles that are discharged at once. . . .   The LAPD only allows the foam baton rounds to be skip fired." Vol. I, Ex. 1 at 42 & n. 21.  As the video of Astorga being shot demonstrates, the officer's weapon is pointed directly at her torso, not at the ground for a skip shot, significantly increasing the force at which the projectiles struck her chest.  Moreover, it is highly unlikely that the munitions could be skip-fired in such close proximity in the manner intended by the manufacturer.  *Id.*

In the recent March 25 protests in Echo Park, officers fired 40 mm and 37 mm projectiles into the assembly, just a few feet from them.  Protestors and members of the press were struck in the upper body by these munitions shot at extremely close range. Vol. III, Kim Decl. ¶ 2 and Ex.15; Vol. III, Kanegawa Decl. ¶ 2  and Ex. 13-14; Vol. III, Monterossa Decl. ¶ 2 and Ex. 16 and 17.  As the video taken by Diana Barbadillo demonstrates, the LAPD officers in the front line were pointing weapons directly at the assembled persons, in some instances with just inches between the officers armed with these larger projectiles as the officers forced the group to move backwards. Vol. III, Ex. 8 and 9 (manually filed).  Just a few days earlier, at the Breonna Taylor protest, another press person was shot in the back, inches to the side of the base of where his skull and spine connect. Vol. III, Baffa Decl. ¶ 4-7 and Ex. 7.

Thus, it is highly likely that the LAPD will continue to use these munitions in a highly dangerous and unconstitutional manner, causing the same injuries that Plaintiffs and others sustained during the spring 2020 George Floyd Protests and in more recent protests.  *See, e.g.*, Dkt. 15, Ex. 13, Rodas Decl. ¶¶ 3–6, 8–9 (peaceful

protestor was shot in the face with a rubber bullet as she attempted to return to her car, lost consciousness and fractured her mandible, requiring her jaw to be reinforced with a steel plate); Dkt. 15, Ex. 14, Črnko Decl. ¶¶ 2, 9–10 (peaceful protestor was, without warning,  shot with rubber bullets on her arm, ribcage, and then, in the forehead causing temporary loss of hearing profuse bleeding, and permanent nerve damage); Dkt. 15, Ex. 17, Trotter Decl. ¶¶ 4–6, 9 (LAPD officer needlessly shot 51-year-old man in the chest and hand from only a few feet away, tearing off his skin); Dkt. 15, Ex. 14, Roe Decl. ¶ 4 (LAPD aimed at and shot a non-violent protestor in the stomach as he was backing away); Dkt. 15, Ex. 2, Aranovich Decl. ¶11 (peaceful protestor shot with a rubber bullet from behind as she was trying to leave); Dkt. 15, Ex. 16, Stamm Decl. ¶¶ 2, 5 (protestor witnessed officers firing on peaceful protestors fired on with rubber bullets); Dkt. 15, Ex. 8, Lessac-Chenen Decl. ¶¶ 6, 8, 11–12, 14, 16 (officers fired projectiles into crowd, hitting some persons multiple times and tearing skin, with an officer laughing as he shot at protestors and asking "who else wants one?"); Dkt. 15, Ex. 11, Moore Decl. ¶¶4–6 (officer aimed directly at plaintiff and shot her in the head with pellets); Dkt. 15, Ex. 20, Hinkston Decl. ¶¶ 4–5 (plaintiff and bystander who was trying to escape in his wheelchair from police firing on protestors was forcefully shot from behind in his shoulder blade); Dkt. 15-1, Haar Decl. ¶¶ 8–13 (describing severe injuries such weapons cause).

There is no legitimate justification for the way the LAPD misuses these munitions.  Indeed, it was and continues to be contrary to well-accepted general police practices and training, including the LAPD's own purported policies.  Vol. III, Clark Decl. ¶¶ 12-15, 18-20; Ex. 1 at 41-45.

As the parties previously addressed and Defendants effectively conceded, firing on non-violent protestors with targeted munitions that may seriously injure or kill them is excessive force. *See generally* Dkt. 14 at 6 –11; Dkt. 24 at 10 ("[C]ertain individual Plaintiffs may be entitled to damages [but] that doesn't mean they would

be entitled to any permanent equitable remedy . . . ."). In short, police use of projectiles that seriously injure peaceful protestors require a serious governmental interest before such force can be deployed, and there is no such interest in firing indiscriminately on or targeting non-violent protestors.[11] Dkt. 14 at 9-11 & n.5, *see also*, *e.g.*, *Nelson v. City of Davis*, 685 F.3d 867, 877-78 (9th Cir. 2012) (the firing of even a pepperball, significantly less dangerous than the munitions here, on protestors who do not pose a threat is unconstitutional, and indeed, this is clearly established). The shootings at issue here are patently unconstitutional.

## C. A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF ARE URGENTLY NEEDED AND WELL JUSTIFIED TO PREVENT THESE UNCONSTITUTIONAL AND LIFE-THREATENING PRACTICES.

### 1. Plaintiffs Will Likely Suffer Irreparable Harm if the Injunction is not Granted.

The second requirement for a temporary restraining order is a likelihood of irreparable harm. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1289 (9th Cir. 2013). Plaintiffs amply meet this here.

As demonstrated above, Plaintiffs are highly likely to succeed on the merits of their claims. The LAPD's use of 40 mm and 37 mm projectiles on non-violent protesters violates their constitutional rights. Throughout the country courts have ordered such relief to protect the constitutional rights and lives of citizens. *See, e.g.*, *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1294 (D. Colo. 2020) (granting preliminary injunction enjoining Denver police from using "less-lethal" projectiles to target the head, back or pelvis area and ordering that "non-lethal or less-lethal

---

[11] Indeed, as the LAPD's own policies confirm, there is no justification in firing on even violent protestors in the areas the LAPD has targeted them, including their face and backs, unless the LAPD has been intending to kill these protestors with these "less lethals." Ex. 1 at 41.

projectiles shall not be shot indiscriminately into a crowd."); *Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't*, No. 2:20-CV-00887-RAJ, 2020 U.S. Dist. LEXIS 135583, 2020 WL 3128299, at *5 (W.D. Wash. June 12, 2020) (granting TRO to enjoin Seattle police from employing  "projectiles of any kind [including h-bang grenades, "pepper balls," "blast balls," rubber bullets, and foam-tip projectiles] against persons peacefully engaging in protests or demonstrations."); *Anti Police-Terror Project, et al. v. City of Oakland, et al*., 2020 U.S. Dist. LEXIS 135607, 2020 WL 4346828, No. 3:20-cv-03866-JCS (N.D. Cal. June 18, 2020) (enjoining, *inter alia*, firing rubber bullets or similar projectiles at protestors); *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1157 (D. Or. 2020) (enjoining police from using tear gas unless in accordance with police practices and limiting the use of tear gas to situations where lives or safety were at risk); *Breathe v. City of Detroit*, 484 F. Supp. 3d 511, 520 (E.D. Mich. 2020), *order clarified*, No. 20-12363, 2020 U.S. Dist. LEXIS 250308, 2020 WL 8575150 (E.D. Mich. Sept. 16, 2020).

An injunction is particularly warranted here, in light of the potential for serious injuries the LAPD continues to cause, and the unnecessary and potentially lethal injuries they are likely to continue to cause.  Such harm is clearly irreparable. *Cf., e.g.*, *Black Lives Matter Seattle-King Cty*, 2020 U.S. Dist. LEXIS 135583, 2020 WL 3128299, at *4 ("Plaintiffs have established a threat of immediate, irreparable harm in the absence of a TRO. They have shown a likelihood of success on their First and Fourth Amendment claims, demonstrating that irreparable injury has already occurred."); *Abay*, 445 F. Supp. 3d at 1293 ("Indeed, irreparable harm has already occurred in the form of physical injury and the suppression of speech."); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.").

The Chaleff Report acknowledges these problems and puts them in the larger context of all the LAPD's deficiencies in responding to the spring 2020 protests. *See, e.g.*, Vol. I, Ex. 1 at 44 (noting the majority of reported injuries at the protests, including as to peaceful protestors, were the result of these munitions); *id.* at 8, 42, 55 (noting the lack of adequate and relevant training on the use of 40 mm and 37 mm projectiles, and any at all over the last three years, and that it has contributed to injuring protestors); *see also, e.g.*, *id* at 58 (describing deficiencies in planning, including failing to follow basic principles of the incident command system); *id.* at 58-60 (describing deficiencies in command and control, including a lack of a known or clear chain of command or training concerning command); *id.* at 60-61 (describing lack of training for commanding officers concerning managing large crowds); *id.* at 62-63 (describing the LAPD's errors in detaining people for excessive amounts of time, without being provided access to restrooms, water, or masks, and that the LAPD has not corrected the issues related to the Occupy LA or the Ferguson cases).

As the Chaleff Report acknowledged, the majority of reported injuries protesters, including non-violent ones, were the result of projectile munitions, Ex. 1 at 44, and the LAPD's absence of training on the weapons contributed to this. *Id.* at 8, 42, 5. The Report also itself emphasized that if LAPD officers were to use 40 mm and 37 mm weapons they would be limited to using them in the manners discussed above, including not using 40 mm to disperse crowds, not using them at short range, hitting protestors in potentially dangerous areas, or ever, unless they were an immediate threat of violence or physical harm. *See* § B(2), *supra*. There is no basis to believe that the LAPD will implement these limitations in any upcoming demonstrations.

The declarations, photos and videos show that LAPD officers have and continue to target and indiscriminately fire on non-violent protestors with these

potentially lethal weapons.  *See supra*, pp. 3–5, 14–15. Moreover as the Chaleff Report and Plaintiffs' declarations demonstrate the LAPD simply does not have the necessary training or supervision to use these weapons.  *E.g.* Comp. Vol. I, Ex. 1 at 8.

There has been no training for officers on the 40 mm, other than those going through basic training, since 2018.  *Id.* at 45. Before 2018, the LAPD's training for the weapon, for a patrol context, consisted of a two-hour tutorial which amounted to a demonstration of how the weapon is manipulated, with an officer permitted to fire it a few times at a stationary target.  *Id.* at 52, 8.  The previous training did not, when it occurred, even address using the 40 mm beyond this or in crowd situations at all. *Id.*

The LAPD's directive authorizing the use of the 50 mm also has no detailed guidance for use in public order policing situations.  Vol. I, Ex. 1 at 45. As the Chaleff Report found, "[t]he use of the 40 mm weapon to fire at individuals who are in a crowd situation requires well-trained, experienced, and highly skilled individuals." *Id.* at 8.  The LAPD lacks such training – indeed any, currently – and this caused injuries to protestors, including non-violent ones, as even the Chaleff Report found.  *Id.* at 8 (acknowledging significant reports of injuries to protestors, including those not engaged in criminal behavior, and that this was due to "a lack of adequate training on the 40 mm system."). The LAPD simply lacks the specific (or, really, any) training to otherwise properly wield these weapons in the context of demonstrations or crowd control. The Chaleff Report and the new evidence before the Court demonstrate the essential need for such training and the need for experienced and informed supervision over the use of these potentially lethal weapons.  Until that exists this Court should enjoin the LAPD's use of the weapons for crowd control purposes.

Since this action was started in June 2020, the LAPD has used 40 mm and 37 mm projectiles multiple times to directly fire on peaceful protestors, including intentionally at close range, or indiscriminately into crowds. *See supra*, pp. 3–5. Without the Court's intervention, future protesters exercising their First Amendment rights will only do so if they are willing to risk serious injury or even death.

In response to Plaintiffs' initial request for injunctive relief, Defendants assured that they were not authorizing kinetic projectiles following June 3, 2020, and Plaintiffs' concerns were unfounded. *E.g* Dkt. 24-3, Rimkunas Decl. ¶ 34. In fact, just days later, this was proven false. These assurances cannot be accepted any longer in light of subsequent and repeated events, with two incidents at protests in the last four weeks, and the Chaleff report.

### 2. Plaintiffs' Interests Weigh Heavily in Favor of Enjoining Defendants' Use of 40 mm and 37 mm Weapons.

The last necessary factors for a temporary restraining order and preliminary injunction are that the balance of equities tips in favor of an injunction, and an injunction is in the public interest. *Shell Offshore, Inc.*, 709 F.3d at 1289. Notably, "[w]hen the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Moreover, "'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002)); *see also Abay*, 445 F. Supp. 3d at 1293 ("Here, it is clearly in the public interest to protect plaintiffs' right to demonstrate, the media's ability to document that demonstration, and third parties' ability to render aid to demonstrators without threat of excessive force by police.").

To the extent Defendants claim the use of 40 mm and 37 mm projectiles is and has been necessary for self-defense, and this is purportedly why they need to deploy such weapons against protestors, this is refuted by the facts. Defendants have

20

not used these projectiles as a tool for self-defense purposes. Defendants instead fired on non-violent and distant protestors, as the videos and declarations show.  The use of these munitions in the way the LAPD has used them is unconstitutional, and not justified by any legitimate state interest.

Temporarily enjoining the use of the 40 and 37 mm weapons – which the LAPD's own commissioned report indicates officers are not reliably trained to accurately or appropriately use anyway – in this way is appropriate, as it has been in the numerous other cities where such weapons have been enjoined the waeapons more broadly or limited them for nearly a year. The LAPD also has numerous other and adequate options for crowd control if the requested order is issued.  *See, e.g.*, Vol. III, Clark Decl. ¶ 22; *Abay*, 445 F. Supp. at 1293 (assertion of officer safety "is a hypothetical harm, especially given the fact that officers have access to many other types of non-lethal weapons that they use on a daily basis, including tazers. The unlikelihood of such harm to officers is outweighed by the very real harm that has already been caused to plaintiffs.").

Moreover, the aggressive and improper use at issue here, established by the videos and declarations, particularly when employed by unskilled and untrained officers, risks escalating situations, rather than controlling them.   Vol. III, Clark Decl. ¶ 20.

## REQUESTED RELIEF

Plaintiffs seek the proposed order submitted herewith, which would prohibit the LAPD from firing 40mm and 37 mm projectiles, only, for the purposes of crowd control.

## CONCLUSION

The abuse of these munitions in the Spring of 2020 was not an aberration.  The Chaleff Report establishes a deep, longstanding problem in LAPD culture and actions in response to demonstrations.  The March 2021 events in Echo Park reveal

what would happen if protest over a Chauvin verdict occur.  This Court should grant this request for a temporary restraining order, and grant a preliminary injunction prohibiting the use of these dangerous munitions in public demonstrations.

Respectfully submitted,

DATED: April 13, 2021

By:   */s/ Paul Hoffman*
                Paul Hoffman
                John Washington
                Carol Sobel

                *Attorneys for Plaintiffs.*