Cynthia Anderson Barker, SBN 75764
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
t. 213 381-3246  f. 213 381-3246
e. cablaw@hotmail.com

Paul Hoffman, SBN 71244
Michael D. Seplow, SBN 150183
Aidan McGlaze, SBN 277270
John C. Washington, SBN 315991
SCHONBRUN, SEPLOW, HARRIS,
HOFFMAN & ZELDES LLP
200 Pier Avenue, Suite 226
Hermosa Beach, California 90254
t. 310 396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. jwashington@sshhlaw.com

Barrett S. Litt, SBN 45527
Lindsay Battles, SBN 262862
KAYE, MCLANE, BEDNARSKI & LITT
975 E. Green Street
Pasadena, California 91106
t. 626 844-7660 f. 626 844-7670
e. blitt@kmbllaw.com
e. lbattles@kmbllaw.com

Pedram Esfandiary, SBN 312569
e. pesfandiary@baumhedlundlaw.com
Monique Alarcon, SBN 311650
e. malarcon@baumhedlundlaw.com
Bijan Esfandiari, SBN 223216
e. besfandiari@baumhedlundlaw.com
R. Brent Wisner, SBN 276023
e. rbwisner@baumhedlundlaw.com
BAUM, HEDLUND, ARISTEI &
GOLDMAN, P.C.
10940 Wilshire Blvd., 17th Floor
Los Angeles, CA 90024
t. 310 207-3233 f. 310 820-7444

Attorneys for Plaintiffs
Additional Counsel on Next Page

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| BLACK LIVES MATTER LOS ANGELES, et al.,<br><br>PLAINTIFFS,<br><br>v.<br><br>CITY OF LOS ANGELES, et al.,<br><br>DEFENDANTS. | Case No.: 2:20-cv-05027 CBM-AS<br><br>**VOLUME I**<br><br>**EXHIBITS AND DECLARATIONS IN SUPPORT OF PLAINTIFFS' RENEWED APPLICATION FOR A TEMPORARY RESTRAINING ORDER**<br><br>Date and Time: TBA<br>Courtroom: 8B |

Carol A. Sobel, SBN 84483
Katherine Robinson, SBN 323470
Weston Rowland, SBN 327599
LAW OFFICE OF CAROL A. SOBEL
1158 26th Street, #552
Santa Monica, CA 90403
t. 310 393-3055
e. carolsobel@aol.com
e. klrobinsonlaw@gmail.com
e. rowland.weston@gmail.com

Colleen Flynn, SBN 234281
LAW OFFICE OF COLLEEN FLYNN
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
t. 213 252-9444
r. 213 252-0091
e. cflynn@yahoo.com

Matthew Strugar, SBN 232951
LAW OFFICE OF MATTHEW STRUGAR
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90039
t. 323 696-2299
e. matthewstrugar@gmail.com

Jorge Gonzalez, SBN 100799
A PROFESSIONAL CORPORATION
2485 Huntington Dr., Ste. 238
SAN MARINO, CA 91108-2622
t. 626 328-3081
e. jgonzalezlawoffice@gmail.com

Olu Orange, SBN 213653
Orange Law Offices
3435 Wilshire BLvd., Ste. 2910
LOS ANGELES, CA. 90010-2015
T. 213 736-9900
f. 213 417-8800
e. o.orange@orangelawoffices.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INDEX OF EXHIBITS AND DECLARATIONS

**Exhibit No.** **Cited**

**VOLUME I:**

1. An Independent Examination of the Los Angeles Police       *passim*
   Department 2020 Protest Response ("Chaleff Report")

2. A Crisis in Trust

**VOLUME II:**

3. Safe La 2020 Civil Unrest After Action Report              9

**VOLUME III;**

**Declarations**                                              **Page**

   Declaration of Abdullah                                    2
   Declaration of Astorga                                     1,4,13,18
   Declaration of Baffa                                       2,4,13,18
   Declaration of Barbadillo                                  4,13,18
   Declaration of Roger Clark                                 6,8,12-14,21
   Declaration of Guerrero                                    4
   Declaration of Kanegawa                                    1,4,13,18
   Declaration of Kim                                         1,4,13,18
   Declaration of Monterrossa                                 1,4,13,17

**Exhibits:**

4. Photographs of Astorga injury

5. Video of Astorga shooting (manually filed)

6. Video of Baffa shooting   (manually filed)

1

7. Photograph of Baffa injury

8. Video of Echo Park incident by Barbadillo (manually filed)

9. Video of Echo Park incident by Barbadillo (manually filed)

10. Photograph of Guerrero injury

11. Photograph of Guerrero injury

12. Photograph of Guerrero injury

13. Photograph of Kanegawa injury

14. Photograph of Kanegawa injury

15. Photograph of Kim injury

16. Photograph of Monterrosa injury

17. Photograph of Monterrosa injury

Respectfully submitted,

DATED: April 13, 2021                  **LAW OFFICE OF CAROL A. SOBEL**

By:   */s/ Carol A. Sobel*
          CAROL A. SOBEL
          *Attorneys for Plaintiffs.*

# EXHIBIT 1

FORMGEN. 160

## CITY OF LOS ANGELES
INTER-DEPARTMENTAL CORRESPONDENCE

C.F. No. 20-0729

Date:     March 10, 2021

To:       Honorable Members, Los Angeles City Council

From:     Sharon M. Tso, Chief Legislative Analyst

Subject:  **REPORT BY INDEPENDENT COUNSEL, GERALD CHALEFF, OF THE POLICE DEPARTMENT RESPONSE TO PROTESTS IN MAY/JUNE 2020**

**SUMMARY**

On June 30, 2020, the Council adopted a Motion (Harris-Dawson – Bonin – Rodriguez – Ryu, Council File No. 20-0729) which instructed the Police Department (LAPD) to include an analysis of LAPD's crowd control tactics and compliance with existing departmental policies and legal mandates during the civil unrest resulting from the death of George Floyd in May 2020, as part of the After-Action Report requested by Motion (Rodriguez – Harris-Dawson, Council File No. 20-0686). In addition, this Motion instructed the LAPD to request that Mr. Gerald Chaleff, author of the LAPD's review of the 2007 May Day incident, take the lead on this report. This review has been completed, and this office is now transmitting this report to Council on behalf of Mr. Chaleff.

This report has also been transmitted to the Board of Police Commissioners (BOPC), who will consider this and two additional After-Action Reports, one authored by LAPD staff and another by the National Police Foundation. Both of these reports are expected to be completed by the end of March 2021. For context, the Council may wish to consider the attached report when all three reports have been submitted to the BOPC.

Attachment: "An Independent Examination of the Los Angeles Police Department 2020 Protest Response"

SMT:jwd



# An Independent Examination
# Of The
# Los Angeles Police Department
# 2020 Protest Response

**Report by Independent Counsel, Gerald Chaleff**

1

# Table of Contents

I.   Executive Summary ................................................................................................ 4

II.  Introduction ......................................................................................................... 14

    Section 2.01   Background and Methodology ........................................................ 14

    Section 2.02   Civil Unrest in Los Angeles .......................................................... 15

    Section 2.03   Consent Decree .............................................................................. 16

    Section 2.04   Settlements in Los Angeles ........................................................... 16

    Section 2.05   Department Organization ............................................................... 18

    Section 2.06   Incident Command System Concept .............................................. 19

III. Timeline Summary of Major Events ................................................................... 21

IV.  Observations and Findings .................................................................................. 24

    Section 4.01   Planning ......................................................................................... 24

    (a)   Public Information and Messaging .......................................................... 26

    Section 4.02   Command and Control ................................................................... 26

    (a)   Command and Control ............................................................................. 27

    (b)   Intelligence .............................................................................................. 27

    (c)   Operations Central Bureau Command Post ............................................. 29

    (d)   Operations Central Bureau Staging Area ................................................. 30

    (e)   Operations West Bureau Command Post .................................................. 31

    (f)   Mutual Aid ............................................................................................... 32

    Section 4.03   Public Order Policing .................................................................... 34

    (a)   Mobile Field Force Configuration ........................................................... 38

    (b)   Shadow Teams .......................................................................................... 40

    Section 4.04   Less Lethal Tools .......................................................................... 41

    (a)   40mm Launcher Deploying the 40 mm eXact iMpact Sponge Round ...... 41

    (b)   37mm Launcher Deploying the 37 mm Foam Baton Black Powder Round .............. 42

    (c)   Beanbag Shotgun ...................................................................................... 42

    (d)   Hornets Nest Sting Grenade, .60 Caliber Rubber Balls ............................ 43

    (e)   Less Lethal Use ........................................................................................ 43

2

(f)      Handheld Baton ................................................................................... 45

Section 4.05   Planning for Mass Arrests and Citations ..................................... 46

(a)    Citations Related to Mass Arrests ............................................... 46

(b)    Transportation of Arrestees ....................................................... 48

(c)    Field Jails .................................................................................... 49

Section 4.06   Preparedness and Training ......................................................... 50

Section 4.07   Wellness ..................................................................................... 53

Section 4.08   Community Input ........................................................................ 56

V.   Conclusion ............................................................................................................ 57

VI.   List of Findings .................................................................................................... 58

VII.   Recommendations ............................................................................................... 65

VIII.   Appendix ............................................................................................................. 76

Appendix 1:   Review Team Members and Other Contributors .......................... 76

Appendix 2:   Methodology and Limitations ...................................................... 79

Appendix 3:   1992 After-Action Report Findings .............................................. 81

Appendix 4:   2001 Consent Decree Details ....................................................... 82

Appendix 5:   2000 DNC National Lawyers Guild Settlement Information ......... 83

Appendix 6:   2007 MacArthur Park Settlement ................................................ 84

Appendix 7:   2011 Occupy Los Angeles ............................................................. 85

Appendix 8:   2014 Ferguson .............................................................................. 86

Appendix 9:   Key Terms ..................................................................................... 87

Appendix 10:  Incident Command System Structures ......................................... 91

Appendix 11:  LAPD and FEMA National Concepts of Emergency Management ... 93

Appendix 12:  LAPD Less Lethal Tools ................................................................. 94

Appendix 13:  History of Training 1992-2020 ...................................................... 96

IX.   Bibliography ........................................................................................................ 99

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

## I.  Executive Summary

The death of George Floyd sparked protests across the United States. The protests in Los Angeles began on May 27, 2020 and continued for many weeks. In Los Angeles there were many peaceful protests, but some erupted in violence, arson, looting and vandalism. On June 30, the Los Angeles City Council approved a motion that the Los Angeles Police Department (LAPD) prepare an after action report, and that Gerald Chaleff lead the review of the Department's actions during the protests. This report has been prepared pursuant to that motion, although the Department ultimately decided to prepare its own report. Because of that decision, an independent review team was assembled to prepare this report.

In the protests in Los Angeles in May-June 2020, there were small groups that were primarily responsible for the violence and criminal activity, which resulted in the disruption of protestors' ability to exercise their First Amendment rights. Additionally, these disrupters were throwing dangerous objects at the police. The level of violence committed by these small groups had not been seen at demonstrations in years. The lack of adequate planning and preparation caused the Department to be reactive, rather than proactive, and inhibited the Department's ability to have better control over the violence being committed by small groups of individuals whose objectives were to create chaos and confrontation with the police.

Additionally, looting occurred that appeared to be well coordinated with "scouts" and convoys of up to ten cars targeting a given location. It was also believed that some of the organized looting was gang related while other looting seemed to be opportunistic. When the police responded to interdict or make arrests the looters would quickly disperse only to regroup elsewhere to attack another target. The Department initially did not have enough resources or strategies to contain the looting. Eventually using tactics developed by the air unit observers, officers were able to make arrests and reduce the amount of looting that occurred.

The Review Team found deficiencies in the following areas that impacted the Department's actions during the protests: (1) planning, (2) command and control, (3) public order policing, (4) less lethal tools, (5) mass arrests, (6) preparedness and training and (7) wellness.

PLANNING

It appears the Department believed that if protests arising out of George Floyd's death occurred in Los Angeles, they all would be peaceful. In interviews with the Review Team, interviewees said they were surprised at the violence that occurred in the afternoon and evening hours at some protests. They had believed that the good relationships which had been developed with various communities would cause any protests to be peaceful, as they had been in the past.

There had been widely publicized violence in Minneapolis on Tuesday, May 26, and protests were beginning across the country. However, the next day (Wednesday) the Department treated the weekly racial justice protest at the Office of the District Attorney, which had always been peaceful, as if it were business as usual. Even after some protestors left the District Attorney's Office on Wednesday and began to engage in violent or otherwise unlawful activity in downtown Los Angeles, necessitating the

4

declaration of a tactical alert, the Department still did not seem to believe that widespread or violent protests would occur in Los Angeles. For example, the Department did not establish a fully staffed command post until Saturday night, May 30.

On May 27 and 28, the protests in downtown Los Angeles were marred by an escalating level of violence and criminality. Initially, the Department treated these as isolated incidents, rather than as a manifestation of a larger expression of outrage that was spreading across the United States.

When the Department did begin to set up a command post, on Friday, May 29, the assigned personnel did not have the experience or training to execute what needed to be done to successfully run a command post. At that time, the Department designated the Central Bureau command post as the Department area command, giving it the authority to oversee police operations for the entire City. This required those running the Central Bureau command post to manage competing responsibilities, juggling the needs of the Central Bureau divisions (downtown Los Angeles and the surrounding area) with the Department's needs City-wide. If the Department had planned for protests across the City, it would have created an area command structure to oversee the whole City and would not have placed the burden on Central Bureau to manage both.

Another example of lack of planning was creating the staging area downtown, at Dodger Stadium, and requiring all personnel to report there before being assigned to protest locations. This was problematic because officers wasted valuable time driving from their areas of assignment to Dodger Stadium, and then back to their respective areas. This occurred because the Department did not seem to anticipate for protests in parts of Los Angeles other than downtown.

Even as some of the protests began to intensify, the Department failed to properly plan in a number of other areas. For example, the Department did not consult with the City Attorney for advice on the proper charge for arrests. This caused the Department to arrest people for violating Los Angeles Municipal Code (LAMC) Section 80.02 (failure to obey a lawful order of a police officer) which is an infraction. An infraction, pursuant to the California Penal Code (PC), only requires the arrestee to provide proof of identification and sign a promise to appear, in order to be released. It does not authorize the transportation of the person to another site or prolonged detention of the person, both of which occurred during the May-June protests.

The Department also failed to appropriately plan for field jails, in the event the need for mass arrests were to arise. This further impacted operations, because there was not a plan in place for buses to transport those arrested out of the protest areas to be processed. The need for buses for a mass arrest situation is not new for the Department. It has been a problem at large events over the past decade, as evidenced by prior litigation settlements.[1] Preparation and/or planning for large scale protests that

---

[1] The City and the Department settled lawsuits in 2011 involving arrests at the Occupy LA encampment, and in 2014 during protests about the death of Michael Brown in Ferguson, Missouri, where the detention of arrestees for hours while handcuffed, deprived of water and the use of bathroom facilities, were the main issue.

posed a likelihood of mass arrests was even more important during the time period reviewed because of the existence of a pandemic and the possibility of exposure to the Covid-19 virus.

COMMAND and CONTROL

When confronted by multiple large scale events, it is important that there be a clear chain of command, where everyone knows who is in charge, and those in charge provide clear direction. This did not consistently occur during the protests. There were times when command staff officers arrived on the scene of a protest and issued orders without coordination with the incident commander, who was supposed to be in charge of the entire police response to a protest. This created confusion. Multiple command staff officers gave orders, sometimes conflicting, regarding the same protest.

Members of the LAPD command staff confirmed that they did not always know who was in charge, which led to a chaos of command. In some instances, resources were allocated to a location or tasked by one command staff member, and those decisions were subsequently contradicted by another command staff member, who sent the same resources somewhere else.

For example, on at least two occasions, high-ranking officers self-deployed directly to the field, bypassing the command post, and made tactical decisions. In some instances, the directions given by these high-ranking officers conflicted with directions and actions being undertaken by personnel in the field, who were acting at the direction of the incident commander. As one command officer indicated, he was in the field working on a problem for an extended period when a higher-ranking officer arrived and tried to enact different tactical plans, creating confusion where disorder was already occurring. While it is understood that these situations were highly chaotic and volatile, the duty of high-ranking officers is to think strategically; their limited situational awareness in the field and conflicting tactical directions only exacerbated the confusion.

PUBLIC ORDER POLICING

Public order policing, also known as crowd management/crowd control, is complex in the 21st Century. Skills to manage public order are perishable and diminish over time if they are not maintained. The skills necessary to manage a complex and dynamic situation must be refreshed frequently. In interviews with command officers, many opined that they lacked expertise in public order policing. Many said they were not provided with meaningful or relevant command-level training to be able to effectively manage large scale, complex events that involve violence and criminal activities. The Department did not adequately prepare the Department command staff for events such as those faced in May-June.

Between 2018 and 2020, the Department experienced the departure of a number of high-ranking officers with expertise in public order policing. During that time period, two assistant chiefs, six deputy chiefs, and numerous commanders and captains left the Department, representing an attrition rate of nearly 50%. Some left as their time expired in the irrevocable Deferred Retirement Option Program (DROP); others chose to leave for early retirement; and some left to pursue other career opportunities. This has posed, and continues to pose, a significant leadership challenge.

Although there are still a few high-level personnel within the LAPD with expertise in public order policing, attempts to ensure that the expertise, lessons learned, and historical knowledge is not lost must be a Department priority. The Department should ensure that, as retirements occur and promotions and assignments are made, the necessary expertise and experience is retained in all areas, not just crowd management.

The expertise, skills, and experience necessary to manage a peaceful protest are different from the skills required to manage a protest that is violent and hostile. The lack of expertise and experience in this area impacted the Department's ability to control the protests and, in particular, to prevent the criminal element from creating the chaos and violence that ultimately occurred.

Actionable intelligence is necessary for the success of public order policing. The Department suffered from a lack of useable intelligence leading up to the protests, which dramatically impacted LAPD's operational effectiveness. There has been a degradation of LAPD's intelligence function because of cutbacks of numerous positions to better support patrol operations. During the period that is the subject of this report, there was a notable lack of specific actionable information available for incident commanders. Accordingly, the LAPD could not reliably plan where or how to dedicate resources to manage the demonstrations.

The Department faced small groups of disrupters within the larger group of protesters at several demonstrations. These groups of disrupters often intermingled throughout the crowd, throwing objects, while those standing in the front were shouting with their hands up in a non-threatening manner. It became exceedingly difficult to isolate and remove the problem individuals from those who were there to exercise their First Amendment rights.

Additionally, the traditional Department strategy used in crowd control incidents utilizes lines of officers (skirmish lines) as a blocking force and/or to move or push crowds and in some instances to protect property. Skirmish lines are often static but will move at a slow pace to direct crowd movement. At the protests in 2020, skirmish lines were effective during the peaceful demonstrations when used to control the direction of the movement of the protestors. When violence erupted at some of the protests, these static or slow-moving skirmish lines were ineffective because they were not able to isolate and arrest those who were committing the criminal acts. Some interviewed for this report stated that the "Napoleonic-style static skirmish line" was useless in controlling the small groups of violent agitators placing protestors and police at risk.

At times, the Department did not, or was not able to, isolate and arrest those criminal elements who were throwing objects, creating violence, or looting due in part to the use of antiquated tactics and lack of training on public order policing. On some occasions, when undercover officers were able to identify criminal activity, they were unable to directly communicate with supervisors on the front line because of their reporting protocols. This did not allow for instantaneous or even quick responses from uniformed personnel. Also, because of the hostility of some of those disrupters in the crowd the safety of undercover officers was threatened and at times officers had to be removed from the violence.

LESS LETHAL TOOLS

The LAPD used a variety of less lethal munitions and tools during the protests of 2020, including batons, bean bag shotguns, 37mm and 40mm munitions, and, on one occasion, a stinger grenade. Collectively, the LAPD used a significant amount of less lethal munitions during the protests.[2] As stated in the City Council resolution that formed the Review Team, there are reports that people were struck in the face and head, causing significant injuries, some of which required surgery. Not all people struck with less lethal munitions during the protests were engaging in criminal behavior. This appears to be in part due to the complex and rapid movement of the crowds and at times a lack of adequate training on the 40mm system. Multiple lawsuits have been filed regarding the protests in Los Angeles, in which allegations are made that the Department violated detention and arrest procedures; many of the plaintiffs claim to have been injured by police action. The plaintiffs who claim injuries state they were not engaged in the violent or criminal activity.

While this report cannot evaluate each use of force incident or instance of individual injury, it does attempt to examine the overall use of less lethal munitions during the evaluation period and to provide suggestions regarding their use. Whether any of the uses of the less lethal tools were inappropriate, or in violation of policy, is being investigated by the Department, with the Inspector General and the Board of Police Commissioners reviewing the Department's investigations and determinations.

Until 2017, only personnel from Metropolitan Division who were certified and trained frequently to deploy the 40mm less lethal weapon were allowed to do so in crowd control incidents. The use of the 40mm weapon was expanded to routine patrol operations in 2017 for any officer who received training in its use. The training that was provided, however, lasted only two hours and was embedded in a ten-hour integrated communications, de-escalation and crowd control course. The training consisted of learning how to manipulate the weapon and firing the weapon only a few times at a stationary target.

The 40mm training was problematic for several reasons, including that the dynamics dramatically change in a crowd control situation when the person engaging in the criminal behavior is not standing still. There also may be other people in front, behind or to the side of the intended target. In such cases, the officer operating the 40mm weapon must be very precise in its application to minimize the risk to bystanders. The use of the 40mm weapon to fire at individuals who are in a crowd situation requires well-trained, experienced, and highly skilled individuals. Unfortunately, because of dynamic movement of large, unruly crowds, individuals who are not involved in criminal activity can unintentionally be hit and injured, which is alleged to have occurred during these protests. To be precise takes practice. Of further concern is that the policy from 2017 is silent on the use of the 40mm weapon in crowd control situations.

---

[2] It was difficult to determine how many less lethal rounds in totality were fired as the Department did not provide the numbers to the Review Team.

Unlike the 40mm munitions, the 37mm foam baton round may be indirectly fired at crowds of people by firing or "skipping" the rounds along the ground in front of the group police intending to disperse. This less lethal tool requires less specialized training and practice to use properly.

The handheld baton is a less lethal tool approved to be used on skirmish lines during crowd control incidents, to push a crowd. The baton is not authorized to be used as an impact device unless the officer or another individual is being physically threatened. In the videos reviewed there is no evidence that the baton use during this evaluation period was inappropriate. However, in lawsuits filed following the events in 2020, plaintiffs have alleged that the baton was inappropriately used as an impact weapon. The Chief of Police reissued a Department directive on baton use in the fall of 2020 to reiterate the policy of baton use in crowd control situations.

One of the recommendations of this report is to analyze the use of the 40mm less lethal weapon in situations with large crowds, or ones where people are standing close together, and whether the use of such a weapon should be limited in such situations to individuals well-trained and experienced, as was the LAPD policy until 2017.

MASS ARRESTS

Thousands of people were arrested throughout the protests without a clearly articulated plan for detentions, transportation and processing. As a result, those arrested were detained at the scene of the arrests for hours, handcuffed on the pavement, detained in buses, and taken to remote locations, without water or the use of bathroom facilities. Additionally, because the protests occurred during the pandemic, officers and those arrested were in close proximity, not socially distancing, many without masks and thus at risk of being exposed to the Covid-19 virus.

These problems have occurred in the past; in 2011 with Occupy LA arrests, and again in 2014 during the arrests in the protests over the death of Michael Brown in Ferguson Missouri. Those earlier protestors were detained for hours in similar conditions as in 2020. Lawsuits were filed in connection with both the 2011 and 2014 mass arrests and were settled by the City for more than $3,000,000. It is unfortunate that the same issues have arisen again and again, with the Department being unable or unwilling to rectify the problem.

The use of LAMC Section 80.02, an infraction, does not allow those cited to be detained for hours and transported to another location for processing[3]. Even when the arrests were made pursuant to LAMC Section 8.78 (curfew violation), a misdemeanor, which does allow for arrest, detention and transportation to another location for processing, the unreasonable delays and failure to provide access to bathroom facilities and water remained a problem.

The failure to obtain buses needed to transport the large number of people arrested was one of the causes of the lengthy detention of those arrested. This failure required those detained to remain

---

[3] Edgerly v City and County of San Francisco, 713F3d976(2013).

handcuffed sitting on the pavement or standing against walls while buses were obtained to transport them. This failure also required officers to remain with those detained and removed them from being deployed to assist with controlling the protest and help prevent violence from occurring. It also subjected the officers to potential exposure to Covid-19.

The LAPD arrested more than 4,000 people between May 29 and June 2. The Department's failure to establish a field jail early to process the large number of people arrested was problematic.[4] The Department arrested a large number of people on both Saturday and Sunday, yet the first field jail was not set up until Monday, June 1, causing long delays and overwhelming the arrest processing system.

On June 1, a field jail was set up at the University of California, Los Angeles (UCLA), many miles from the location of the arrests. More than 1,000 people were processed there. The lack of experience and trained personnel contributed to the lengthy detention of many of the arrestees, causing them to be released in a location far from their arrest location and in violation of the curfew declaration. However, this field jail was shut down on June 2, when members of the UCLA community complained. That caused further delays in processing arrestees. A second field jail was set up in the parking lot of Grace Community Church in the San Fernando Valley on June 2 to help in the processing. The lack of planning for the field jail created several problems, including:

- An insufficient number of personnel to staff the field jails.
- A lack of properly trained or experienced personnel to adequately handle the large number of arrests; and

Declarations for unlawful assembly were made. However, there were few arrests for failure to disperse; the arrests were generally made for failure to obey a lawful order of a police officer and for curfew violations. The reasons for not arresting people for failure to disperse were not made clear.

PREPAREDNESS AND TRAINING

The Department has a history of legal settlements and agreements that it entered into after lawsuits were filed in connection with police conduct at large events: in 2000 (Democratic National Convention); 2007 (MacArthur Park incident); 2011 (Occupy LA); and 2014 (Ferguson demonstrations). In each settlement, there were mandates that the Department correct policy, procedures, and training regarding various components of the management of protests and demonstrations. The Department did not maintain some of the requirements from these prior settlement agreements, which in turn caused problems for the Department in 2020. Crowd control, mobile field force, mass arrest procedures and less lethal training were all insufficient.

Preparedness demands that an organization plan, organize, train, exercise, and evaluate performance before any event actually occurs. As such, training and exercising that at one time had been implemented should have been sustained within the Department over the years, but were not. If it had

---

[4] Field Jails are temporary facilities set up to process large numbers of arrests that would otherwise overwhelm the available jail facilities and personnel.

been, the LAPD command staff would have been better prepared for the events of May-June 2020 in Los Angeles.

The LAPD's training in public order policing has declined in the past several years and was identified as a problem in 2007 after the MacArthur Park May Day demonstrations. As a result, the LAPD command staff were required to receive annual training on public order policing. This training had not occurred for several years prior to 2020. There had been minimal crowd control and mobile field force training in the past five years and mass arrests procedures were not exercised at all. The lack of training caused problems in 2020. Indeed, command officers interviewed for this report raised the issue of the lack of training to prepare them for public order policing events.

Based on information gleaned during this examination, it is recommended that the LAPD develop a command-level public order policing curriculum and practice these leadership skills frequently. The settlement of the 2007 Macarthur Park lawsuits required every officer above the rank of sergeant to undergo training on crowd control and use of force policies at a minimum of every two years, and command staff to be trained annually. It is recommended that this requirement be followed.

WELLNESS

Many officers worked long hours during the protests without relief and were sleep deprived throughout the protests. It is imperative that when officers are subjected to dangerous conditions and provocations, --such as having objects thrown at them, having lasers pointed at their eyes, and being taunted and screamed at -- they be at their best, with the patience and judgement necessary to perform professionally.

Members of LAPD command staff also were subject to long hours and not afforded the opportunity to get sufficient rest or sleep. The lack of sleep is equally important for command officers, who must make critical decisions as events rapidly unfold. If they are sleep deprived, decision making could be impacted, which then has the potential to affect the success of the police strategy and the safety of the officers they command, as well as the safety of the community.

It is incumbent upon the leadership of the Department to ensure that officers and command staff members can get the necessary down time for rest/sleep. During the protests, there were situations where officers were in staging areas but were never assigned to relieve those working in the field. There were also command staff members who volunteered to work, but were never assigned to the field. The Department must develop schedules that will allow officers to obtain the relief that is necessary.

Almost every day during the protests there were small subgroups of people engaged in criminal activity; they used the protests to attack officers by throwing dangerous objects at them including bricks and concrete blocks, using firecrackers or explosive devices, and pointing lasers at officers' eyes. The Department reported that 106 officers were injured during these protests. The Department must do everything it can to provide for officer safety and at the same time protect the safety of those who are peacefully protesting.

11

The Department has ordered protective eye gear and shields for the officers to use during future events that might turn violent. The Department should continue to research what additional protective gear is available to ensure that personnel are protected in the future.

Another important aspect of officer wellness is officer morale and trust in Department leadership. The Los Angeles Police Protective League conducted a survey, after the protests, that clearly showed that the officers did not feel supported by their leadership, the Mayor, Board of Police Commissioners, or the City Council. This is a problem that all involved must consider and try to solve.

RECOMMENDATIONS

There are 67 findings included in this report. The Review Team has proposed 22 recommendations for the City, the Board of Police Commissioners, and the Department to consider. These recommendations address the deficiencies noted in planning, command and control, public order policing, use of less lethal tools, mass arrests, preparedness and training, and wellness.

It is recommended that the Department's public order policing strategies be enhanced to meet contemporary operational challenges and anticipate future ones. Crowd psychology is a necessary component of training police to better handle dynamic crowd behavior. The strategies used by some small groups causing violence during the protests in Los Angeles have dramatically changed from past disrupters; disrupters now have become more mobile and better organized likely due to the use of technology, and more violent. This shift has significantly impacted the ability of officers to facilitate peaceful protestors exercising their First Amendment rights. The challenge for police today is how to facilitate the exercising of a crowd's First Amendment rights while at the same time interdicting smaller groups who are attempting to disrupt the lawful demonstrations. A review of the LAPD Emergency Operations Guide, last updated in 2009, reveals that there are no plans/strategies for dealing with the type of highly mobile groups and/or looting convoys that were observed in Los Angeles at some of the May-June demonstrations. When police strategies and tactics are based on inaccurate assumptions about how crowds function, these approaches can stimulate more conflict than they prevent, endangering both crowds and the police.

The Review Team is urging the Department to research and adopt a variety of strategies and tactics that would minimize the extent to which protesters "transfer" their grievances toward the police. [5] The LAPD is in a unique position because it is fortunate enough to have a fulltime, large behavioral sciences section embedded within the Department. Psychologists within this section likely have crowd psychology experience and should be consulted as the Department moves forward. The Department should also contact other agencies, academics, and law enforcement experts to identify best practices and to develop strategies for policing in the 21st Century.

---

[5] Roger Smith, Ian Tomlinson Inquest Proves We Have Moved Forward, L. SOC'Y GAZETTE (May 19, 2011), http://www.lawgazette.co.uk/analysis/ian-tomlinson-inquest-proveswe-have-moved-forwards/60507.

It is recommended that the LAPD create a high-level executive position (sworn or civilian) with appropriate support staff within the Department to serve as a "Strategic Emergency Manager". That person should have expertise, or be able to develop the expertise, in all-hazards emergency management, public order policing, large scale incident management, intelligence/information gathering and dissemination, use of force, use of less lethal tools, and analysis of current events as they present a challenge to policing operations. That person should be responsible for examining current events and preparing the Department (and City) to manage large-scale emergency events that occur in Los Angeles. Though such events do not happen every day, the costs when the Department is not prepared are too great not to consider such a position. Additionally, the Strategic Emergency Manager would be responsible to the Department to ensure any recommendations adopted from this report, prior court settlement requirements pertaining to public order policing, and other Department policies/directives on the subject, are implemented and sustained.

## II.  Introduction

This report examines the LAPD's response to the protests beginning May 27, following the death of George Floyd. The report contains observations, an analysis of the events, 67 findings and 22 recommendations with a focus of the following:

1.  Planning
2.  Command and Control
3.  Public Order Policing
4.  Use of Less Lethal Tools
5.  Mass Arrests
6.  Preparedness and Training
7.  Wellness

The report also considers the history of the Department during prior protests and civil unrest to help understand the problems of the past and determine whether the Department learned from its experience in these events or repeated errors in tactics or mistakes of the past.

This report includes 22 recommendations (see Section VI), however, it will be the City's elected and appointed officials and the Department who must determine which, if any, should be adopted. The hope is that this report will provide the Department with findings and recommendations that will assist the leadership in enacting reforms that will improve the Department. Unlike the past, where crises were followed by long periods of time between major events that allowed police leaders to analyze, work with the community and political leadership, and learn from events, police leaders today are facing a precipitous growth in the number of major crises they face, leaving little time between events. This calls for a fundamentally different approach to crisis management that will allow the Department to be more agile, be forward thinking, and be more responsive to communities they serve.

Thus, it is recommended that the LAPD create a high-level executive position (sworn or civilian) within the Department known as a "Strategic Emergency Manager". That person should have expertise in all-hazards emergency management, public order policing, and large-scale incident management. This individual should work closely with the Department executive level officers and the commanding officer of the Risk Management and Legal Affairs Group to focus on the management of natural disasters, acts of terror, other large-scale or catastrophic events in which people and information needs to be managed. This individual should be responsible for examining current events, as well as preparing the Department (and City) for future crises in Los Angeles.

### Section 2.01          Background and Methodology

This report was prepared under the conditions of the Covid-19 stay-at-home orders. Therefore, all interviews were conducted by Zoom video conferencing or by telephone. The Review Team spoke with more than 50 members of the LAPD command staff (captains and above). Over 30 members of both sworn and civilian personnel below the rank of captain or police administrator were also interviewed. All interviews were voluntary. Additionally, the Los Angeles Police Protective League provided access to comments in response to an internal summer 2020 survey conducted by the union that represents all

sworn personnel at the rank of lieutenant and below. The survey discussed officers' perceptions of what occurred during the protests and unrest.

In addition to Department personnel, the Review Team talked to members of the community, representatives from the City Attorney's office, and attorneys representing plaintiffs in litigation arising out of the George Floyd protests. Finally, several individuals with expertise in the field of public order policing, and crisis management were also interviewed. The Review Team conducted an analysis of hundreds of pages of Department documents and conducted in-depth interviews of LAPD command staff resulting in findings throughout this report.

This report does not address the issue of discipline to be imposed, if any, on individual officers related to any use of force or use of less lethal tools or munitions (see Appendix 2 for Methodology and Limitations). The Review Team does not have the authority to conduct internal investigations. The investigations of use of force, use of less lethal munitions, and lawsuit allegations will be investigated by the Department and reviewed or monitored by the Inspector General and the Board of Police Commissioners.

There were thousands of hours of video contained in nearly 141,000 files from body worn video cameras and other sources. Although only a small portion of those were reviewed, this did not affect the understanding of what occurred, as this report is primarily concerned with institutional issues and not individual ones. The use of less lethal tools and the types of munitions used during crowd management and control situations will be addressed later in this report. The appropriateness of the individual uses will be left to the Department to assess.

## Section 2.02    Civil Unrest in Los Angeles

To better understand the dynamics of the issues the LAPD faces today, it is important to understand the history of civil unrest in Los Angeles. Historically, the topics of biased policing and police uses of force have been of concern in the United States and in Los Angeles. For several decades Los Angeles has been a rallying point for many demonstrations, including those specifically concerned with police abuse and the treatment of people of color. The LAPD's history is evidenced in the 1965 Watts Riots and in the civil unrest that erupted on April 29, 1992, in the aftermath of the acquittal of officers involved in the 1991 Rodney King beating.

The 1992 civil unrest lasted approximately seven days and is a stark reminder of how fragile police-community relationships are and how quickly volatile incidents can unfold. The Department was unable to contain and control the events for nearly a week. As sections of the City burned and livelihoods were destroyed, many officers on the front lines watched as the Department was slow, and at times unable to respond. It was noted in the Los Angeles Police Department After-Action Report 1992 April/May Riot that a high-level staff officer conducted a meeting with other Department staff and command personnel a month prior to the release of the jury's decision regarding the officers on trial and requested that plans be developed for the possibility of civil unrest if the officers were acquitted of charges. Commands were advised to train line personnel in civil disorder tactics, revitalize mobilization rosters, update

employee "call-up" and notification plans, develop a ratio of officers to available police vehicles for transportation to areas impacted by civil unrest, and develop platoon-size teams to respond to looters. Unfortunately, only a small number of staff officers within the Department believed there was a possibility of violence, and therefore the Department did not prepare. The after action report indicated that the first signs of planning did not begin until 37 days into the officer's trial even though a commander had asked for this to occur.

At that time, the LAPD after action report stated the Department experienced organizational complacency, as few problems with civil unrest had occurred within the City since the 1965 Watts Riots.

The after action report from the 1992 civil unrest contained lessons learned that, like all after action reports, were to be used to improve the Department's future response to such incidents (Appendix 3). Some of the areas include lack of preparation and planning, problems with command and control in the field, lack of discipline at the command post, organizational complacency, lack of intelligence, and lack of training for civil disorder tactics.[6]

### Section 2.03     Consent Decree

In 1999 the Department of Justice informed the City and the Department that it intended to sue the City for a pattern and practice of unconstitutional conduct by the LAPD. The Department of Justice's actions were prompted by complaints about police actions against people of color and a corruption scandal, which became known as the Rampart Scandal.

The result was a settlement agreement, in which the City and the Department consented to monitoring by the Department of Justice, under the jurisdiction of a federal court judge, to enact reforms of the LAPD's policies, procedures, and actions. The agreement, known as the Consent Decree, was enacted in June 2001.[7] It took the Department eight years to be relieved of court jurisdiction for most of the Consent Decree and an additional three years to be relieved of the remainder. Reforms included but were not limited to: investigations of complaints against officers; investigations of officer involved shootings and other uses of force; training; development of an officer early intervention system; control over the use of confidential informants; supervision and management of units responsible for investigating gangs, and the development of a program for responding to persons with mental illness (see Appendix 4 for an overview of the settlement).

### Section 2.04     Settlements in Los Angeles

Los Angeles has a history of lawsuits arising from police actions and responses to demonstrations and protests. The lawsuits have involved the Democratic National Convention (2000), MacArthur Park (2007), Occupy LA (2011) and the Ferguson protests (2014).  Collectively, the settlement agreements involved the use of less lethal munitions, timely processing of arrestees and declaration of unlawful

---

[6] http://documents.latimes.com/los-angeles-police-department-after-action-report-1992-aprilmay-riot/
[7] The Department of Justice Consent Decree, 2001.

assemblies. The settlement costs agreed to by the City (and Department) totaled over $21,000,000. (See Appendix 5, 6, 7, 8 for more information regarding the settlement agreements).

Results of the settlements are as follows:

**Democratic National Convention (2000).** The court ordered that less lethal munitions may only be used to control persons who are aggressive and/or combative or persons armed with weapons other than firearms or who are destroying property. Before declaring an unlawful assembly, the incident commander should consider isolating and arresting those responsible for unlawful conduct if feasible. Settled for over $5,000,000.

**MacArthur Park (2007).** The court ordered that warnings should generally be given prior to the use of less lethal munitions.  Less lethal munitions may only be deployed on aggressive and/or combative subjects in a crowd control situation and to prevent the destruction of property. Less lethal munitions are not to be used on lawfully dispersing crowds. Before declaring an unlawful assembly, the incident commander should consider isolating and arresting those responsible for unlawful conduct if feasible. Crowds shall be given a reasonable amount of time to disperse before being subjected to arrest. Training was mandated for Metropolitan Division personnel every year, patrol officers every two years, and command staff every year. Settled for over $13,000,000.

**Occupy LA (2011).** Plaintiff's alleged that they were arrested without being given the opportunity to leave. Plaintiffs also alleged they were placed on transportation buses with tight handcuffs for an extended period of time and denied access to bathroom facilities or water while held in police custody. Arrestees shall be released on their own recognizance if charged with only a misdemeanor, pursuant to PC Section 853.6. Settled for $2,450,000.

**Ferguson Protests (2014).** Plaintiff's alleged that they were handcuffed using "zip-ties" (plastic handcuffs) for extended periods of time, incarcerated for extended periods of time or denied release on their own recognizance pursuant to PC Section 853.6.  Settled for $750,000.

This evaluation determined that the Department had not corrected its historical problems in the treatment and timely processing of arrestees as agreed to in the Occupy LA and Ferguson Protests agreements. Despite having nearly a decade to revise and exercise custody procedures, the LAPD did not have an adequate arrestee processing procedure in place resulting in arrestees being in handcuffs for extended periods of time and arrestees allegedly not being allowed access to bathroom facilities or water. The lack of an efficient custody process also adversely impacted field operations as noted later in this report.

17

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

### Section 2.05     Department Organization

The Department is led by a Chief of Police. There are three assistant chiefs or Office Directors who report to the Chief. The Director of Office of Special Operations oversees specialized divisions such as Metropolitan, Emergency Services, Major Crimes and Air Support Divisions along with traffic enforcement and transit services. Another assistant chief, the Director of Office of Support Services, oversees administrative and support entities including Training, Recruitment, Personnel, Fiscal Support, Communications and Custody Services Divisions.



The Director of Office of Operations is responsible for the traditional day-to-day policing that takes place in the City, such as patrol and detective operations. The Office of Operations is divided into four large geographic sectors called bureaus, as depicted in Figure 1, and include: Operations Central Bureau, Operations South Bureau, Operations West Bureau, and Operations Valley Bureau. Each bureau is led by a deputy chief who reports to the Office of Operations assistant chief. The four bureaus are divided further into geographic "areas" also commonly referred to as divisions. Each area is staffed with a senior captain in charge of all Departmental activities for the area and a subordinate captain who oversees patrol functions.

Three Operations Bureaus have Special Events Units where staff are specifically assigned to planning for special events and unusual occurrences. Operations Valley Bureau utilizes their Training Unit personnel to do most event planning. Those persons have expertise in most aspects of event planning and create the majority of incident action plans for preplanned events. Operations Central Bureau command staff indicated that their Special Events Unit alone handles hundreds of special events each year. In nearly all instances, these events are peacefully facilitated by the LAPD.

A list of key terms is found in Appendix 9.

*Figure 1: Los Angeles Police Department Bureaus and Areas Map*

18

## Section 2.06   Incident Command System Concept

The incident command system is a standardized hierarchical structure that allows for a cooperative response by multiple entities, both within and outside of government, to organize and coordinate response activities without compromising the decision-making authority of local command (Appendix 10). The incident command system ensures that the most pressing needs are met and that precious resources are used without duplication or waste."[8]

The incident command system was created in the 1970s to allow fire agencies to meld their resources to control wildfires.[9] The system adopted standardized terminologies, position titles, etc. The system soon was adopted by law enforcement and other first responders as an organized structure to establish a command structure over an incident to manage that incident effectively. The incident command system is now the national standard for organizing and handling large-scale events.

Successful deployment of the incident command system requires individuals with expertise to be designated to administer or lead the various sections and subsections within the organizational structure. An incident command system structure is designed to be infinitely adaptable by allowing the incident commander to create an organization that supports the mission. Incident command system protocols advise that the structure should be effective by keeping the span of control from three to seven people with five being the ideal.

The incident command system table of organization that is created for the unique incident designates who is responsible for each function. According to the LAPD's Emergency Operations Guide, some of the essential features of the incident command system are:

- Common Terminology
- Modular Organization
- Management by Objectives
- Incident Action Planning
- Manageable Span of Control
- Incident Location and Facilities
- Comprehensive Resource Management

- Integrated Communications
- Establishment and Transfer of Command
- Chain of Command and Unity of Command
- Unified Command
- Accountability
- Dispatch Deployment
- Information and Intelligence Management[10]

---

[8] Overview: The Incident Command System, accessed December 15, 2020, https://www.nationalservice.gov/sites/default/files/olc/moodle/ds_online_orientation/viewf265.html?id=3139&chapterid=908.

[9] History of ICS, *EMSI* (blog), accessed December 19, 2020, http://www.emsics.com/history-of-ics/.

[10] Emergency Operations Guide (Los Angeles Police Department, 2009), vol. 4, page 5.

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE



*Figure 2[11]: A summary of the Incident Command Structure*

The area command is an important component of the incident command system. It is used in instances when there are several incidents occurring simultaneously in the same general area and often similar in nature (e.g., multiple structure fires, multiple wildland fires, collapsed buildings, medical events, civil disturbances, planned everts, earthquake, etc.). Typically, these kinds of incidents compete for the same resources."[12] In these instances, an area command is established. The area command places a hybrid of an incident command system organization over several incident command system organizations handling similar incidents (Appendix 10).



*Figure 3[13]: A summary of the Incident Command Structure*

[11]Managing Large Scale Incidents - Area Command, ICS 420-1.3,
January 2020, https://firescope.caloes.ca.gov/ICS%20Documents/ICS%20420-1.3.pdf.
[12] Managing Large Scale Incidents - Area Command, ICS 420-1.3, 1.
[13] Managing Large Scale Incidents - Area Command, ICS 420-1.3, January 2020,
https://firescope.caloes.ca.gov/ICS%20Documents/ICS%20420-1.3.pdf.

20

## III.  Timeline Summary of Major Events

This timeline was meant to capture the highlights of the events in Los Angeles and does not represent a complete list of all events that occurred during the time in review. It was compiled from documents obtained from the Department and timestamped media footage.

**On Monday, May 25, 2020,** George Floyd died in Minneapolis, Minnesota, and on May 26 protests began in response to his death throughout the country.

**On Wednesday, May 27,** protests occurred in cities across the country. At approximately 4:00pm, protestors converged on the Hall of Justice in downtown Los Angeles, in front of then District Attorney Jackie Lacey's office. Although protestors were loud, they were peaceful. At approximately 6:00pm the crowd had grown to several hundred and began to march towards Union Station four blocks from the Hall of Justice. The crowd took a turn and entered the Hollywood freeway causing a temporary closure. As protestors began to march off the freeway, some participants turned violent, breaking the windows of two California Highway Patrol (CHP) vehicles before heading towards City Hall and LAPD headquarters. By 6:30pm, groups were observed burning American flags, vandalizing City property and blocking streets in the downtown area. Central Bureau resources were overwhelmed, and the Department called for a City-wide tactical alert, the preliminary stage of the LAPD's mobilization plan for unusual occurrences, holding over on-duty resources. As the crowd became more destructive, the decision was made to declare the event an unlawful assembly. A sergeant delivered a dispersal order using a Department sound truck at the intersection of Temple and Los Angeles Streets. The Department later confirmed to news media that no demonstrators were arrested, despite police headquarters being vandalized with graffiti.

**On Thursday, May 28,** there were multiple peaceful protests during the day. At approximately 5:00pm hundreds of protestors in downtown began to walk towards the 110 freeway, vandalizing CHP vehicles and ultimately shutting down the freeway. An estimated 500 to 1000 people marched from City Hall and blocked multiple intersections in downtown. At 8:00pm a modified tactical alert was declared for Central Bureau. At about 8:30pm there was violence erupting at 7th Street and Grand Avenue, LAPD police vehicles were damaged, and an LAPD officer was dragged into a crowd. Objects were being thrown at the police and an unlawful assembly was declared. The group walked to 3rd Street and Grand Avenue and a second dispersal order was made. Three arrests for failure to disperse and four for burglary were made.

**On Friday, May 29**, multiple peaceful protests continued throughout the City. Simultaneously, a group blocked the 110 freeway, and looting was occurring at multiple businesses in downtown Los Angeles including jewelry stores, food markets, and coffee shops. The crowd pelted police cars, vandalized property, set fires and broke windows. LAPD records indicated that 265 people were arrested, and six police officers were injured. Officers recovered handguns, brass knuckles and bricks during sweeps of downtown. Less lethal munitions were used during the downtown protests.

**On Saturday, May 30**, multiple peaceful protests took place across the City. A Black Lives Matter demonstration was planned for noon at Pan Pacific Park located at 7600 Beverly, a public green space located just east of The Grove shopping area and adjacent to the historic Farmers Market. Information surfaced that there would also be a demonstration at Mariachi Plaza located at 1st Street and S. Boyle Avenue in the Hollenbeck Area police district and that a plan to take over the Hollenbeck police station might be attempted.

Thousands of people gathered for the peaceful protest at Pan Pacific Park. By early afternoon violence broke out when breakaway groups from the larger protest blocked the intersection of 3rd Street and Fairfax Avenue and surrounded a Department mobile field force which had been sent to the area to rescue a Los Angeles County Metropolitan Transit Authority (MTA) bus with passengers onboard. The bus had been overrun by a group of aggressive agitators. A Department-wide tactical alert was called due to the need for additional personnel demands throughout the City. A large, organized convoy of cars arrived in the area and individuals from those cars began to systematically loot local businesses at The Grove. Looting and vandalism continued there, and groups of criminals set fires, burned a kiosk, and vandalized stores into the evening hours. Several LAPD police cars were damaged, and some were burned.

The Mayor declared a state of emergency and implemented a curfew in Los Angeles effective from 8:00pm to 5:30am. As the curfew went into effect, an LAPD police car was set on fire in downtown. At 11:15pm police arrested dozens of people in vehicles in the vicinity of 8th Street and Broadway. Officers were being pelted with rocks, M-80s, frozen water bottles, bricks, bottle rockets and had lasers directed at their eyes. KNX 1070 news radio reported attacks on police and journalists, looting and vandalism. Weapons found on some individuals included knives, brass knuckles, bottles of urine and a pepper ball gun. The National Guard was requested by the Mayor. A total of 866 people were arrested for looting, curfew violations, failure to disperse, and failure to obey a lawful order of a police officer. Most individuals were processed at the Van Nuys or Wilshire Station. Less lethal munitions were used in both the Pan Pacific Park incident and during downtown protests.

**On Sunday, May 31,** multiple peaceful protests occurred throughout the day in Los Angeles. The National Guard arrived during the early morning hours and was deployed to protect buildings and critical infrastructure. The Mayor lowered the curfew hour to 6:00pm. The LAPD was finding it difficult to obtain buses to transport arrestees. Looting and vandalism occurred in downtown, and less lethal munitions were deployed at various locations. LAPD made 700 arrests for curfew violations and looting. Most arrestees were transported to the Van Nuys jail for processing.

**On Monday, June 1,** multiple peaceful protests occurred during the day. Violence and looting erupted in the late afternoon. A county-wide curfew was issued, beginning at 6:00pm. Looting occurred in Hollywood, Van Nuys and downtown Los Angeles. LAPD deployed less lethal munitions at various incidents to control the crowd. Caravans were seen bringing criminal activity into the City. LAPD arrested 1,242 individuals, most from those three communities for looting, curfew violations and failing to obey a

police order. The LAPD decided to create a field jail at the Jackie Robinson Stadium at UCLA to which the majority arrested were transported.

**On Tuesday, June 2,** multiple protests continued throughout the City. By 12:30pm violence and looting had erupted in Hollywood. Projectiles were thrown at police and less lethal munitions were used. Looting and vandalism were sporadic in various locations throughout the day and into the night including downtown, the Mayor's Getty House residence approximately five miles west of City Hall, Van Nuys, and Hollywood. Approximately 1,500 persons unexpectedly arrived to demonstrate in and around the Getty House. The demonstrators at Getty House reportedly were loud, but not violent. Olympic Area had one squad (approximately ten officers and one sergeant) at Getty House. Subgroups from the crowds in downtown pelted police cars, vandalized property and set fires. LAPD cited several people for LAMC violations. LAPD records indicate that 956 people were arrested, and six police officers were injured.

**Between the five-day period of Wednesday and Sunday, June 3-7**, a total of 80 arrests were made by the LAPD as peace was restored to the City. On June 4, at 5:21pm, the Mayor rescinded the curfew. On June 6, a peaceful protest occurred at Pan Pacific Park and on June 7, a peaceful protest attended by over 20,000 protesters occurred with no problems. In both cases there were no conflicts between the police and the protesters.

## IV.  Observations and Findings

There are seven thematic areas identified from the review providing opportunities for improvement: (1) planning, (2) command and control, (3) public order policing, (4) less lethal tools, (5) mass arrests, (6) preparedness and training, and (7) wellness.

The Review Team would like to acknowledge the sworn, including volunteer Reserve Officers, and civilian members of the Department who worked tirelessly under difficult conditions during the protests of 2020 in Los Angeles. It must be noted that although deficiencies have been identified in this examination, most officers involved in the events that are the focus of this report responded to exceedingly difficult circumstances with professionalism and courage.

### Section 4.01     Planning

The potential exists during any large-scale events for events or demonstrations to turn violent. Law enforcement executives should prepare for such instances by developing tactics and strategies to effectively maintain peace and public safety while protecting Constitutional rights and civil liberties.

**Observations**

In the days following May 25, 2020, the death of George Floyd in Minneapolis, a focus on issues of police abuse and discriminatory treatment of people of color fell upon all law enforcement. By the afternoon of May 26, peaceful protests began to develop spontaneously in Minneapolis, as well as in many large cities throughout the nation. As the day progressed in Minneapolis, the tone of the protests began to shift. Subgroups of individuals intent on engaging in criminal behavior started to clash with police. At nightfall acts of violence, vandalism, arson and looting were observed and broadcasted throughout the nation.

On Wednesday, May 27, the LAPD deployed for a protest in opposition to District Attorney Jackie Lacey at the downtown Hall of Justice. This recurring weekly protest had been taking place since late 2017. There is no indication that the LAPD did any additional planning as the result of the death of George Floyd for the May 27 event. Members of the command staff stated that no additional planning had been deemed necessary because there had been no violence at the Wednesday protest in the past and the Department had successfully facilitated hundreds of protests in the City in the last several years with no problems or violence. Additionally, there is no indication that LAPD had received any intelligence or information that the May 27 would become violent.

This protest began at approximately 4:00pm. By 6:00pm, it turned violent when hundreds of demonstrators marched onto the Hollywood freeway, stopped traffic and vandalized two CHP vehicles. By 6:40pm a tactical alert was called holding over all on-duty personnel. An unlawful assembly was declared, and the unlawful assembly order was repeated at 7:34pm at Los Angeles and Temple Streets. The Department had not planned for or deployed for this type of violent protest. The crowd dispersed after a final warning was given at 2nd and Hill Streets.

24

It appears limited planning was done for the 5:00pm protest in the downtown area on Thursday, May 28. The protest led to a modified tactical alert being declared for Central Bureau, and a declaration of an unlawful assembly. Police vehicles were damaged, an officer was dragged into the crowd, and there were acts of vandalism.

On May 29, Central Bureau set up a command post to run operations in Central Bureau. Central Bureau became the focal point of where the Department believed unrest would continue. This was largely because initial unrest occurred in downtown Los Angeles, and because of a very consistent historical pattern of demonstrations being limited to downtown municipal facility areas. Because of this focus, Department executives decided the Central Bureau would act as an area command (a command structure that oversees and coordinates City-wide events) and be responsible not just for any incidents in Central Bureau but also be responsible for tracking and allocating resources throughout the City. The command post did not become fully staffed until May 31.

No other geographic bureaus were directed to establish any kind of command structure or prepare for possible protests in communities under their command. However, two bureaus did so without direction. This included one bureau chief directing subordinate commands to contact off duty officers and request they respond voluntarily to provide extra deployment at critical sites within that bureau.

The pattern of past demonstrations being limited to downtown was disrupted when unrest spread to West Bureau (most notably Pan Pacific Park in Wilshire Area) and later into Valley Bureau. In addition to establishing the Central Bureau command post as the area command structure for the City, the Department had also placed many of its operational resources close to downtown causing delays in deployment. While the Central Bureau command post was managing Central Bureau events, executive level leadership should have been planning to set up an area command structure as events began to unfold across the City rather than placing the burden on Central Bureau.

The Department did not provide documentation indicating that any formal or informal high-level meetings or discussions took place within the Department or with City leadership to obtain thoughts or impressions of what the mood of the community was in various parts of the City.

**Findings**

1. The Department did not follow the basic principles of the incident command system and did not set up an appropriate area command post immediately when protests became widespread by designating the Central Bureau as the Department command post overseen by an assistant chief.

2. The Central Bureau command post did not become fully staffed until May 31. Some personnel assigned lacked experience and training in command post operations. (All of the issues with this command post are fully explained in Section 4.02 Command and Control (b) Operations Central Bureau Command post.)

25

3.  There was a lack of firm executive-level direction to the Department command officers to prepare and plan for potential widespread civil unrest and demonstrations which contributed to the problems cited throughout this report. It is unlikely that proper planning would have totally prevented the problems experienced in Los Angeles. However, preplanning and preparation could have mitigated the issues.

### (a)  Public Information and Messaging

In any crisis, best practice is to have a plan for messaging. Messaging must be transparent, allow access for the media, and occur on a consistent basis at set times with updates when necessary. The Department's messaging should be consistent with City leadership so that the City speaks with one voice. It is imperative that the messaging explains what is occurring, why actions are being taken and be accurate.

<u>**Observations**</u>

The Department's Public Information Officer was not given responsibility for messaging and was not asked to contribute to the creation of a Department message. There was no consistent messaging done by the Department during the multi-day events which allowed various factions to use social media and traditional media to fill the information void and drive their own messages. Instead of the public being made aware of the violent nature of some of the protestors, including shots fired at officers and physical attacks on officers, looting, vandalism and arson, social media sources displayed edited videos showing what appeared to be officers attacking peaceful protestors for no reason. In any case there was no response or explanation from the Department or City leaders indicating the full version of the video showed the officers were actually being attacked.

<u>**Findings**</u>

4.  It does not appear that either the Department or City leaders had a plan for messaging to the public, to the media or to Department personnel.

5.  There was a lack of a unified message from City leaders to de-escalate the violence so that peaceful protestors could exercise their First Amendment rights.

Note: The Review Team does not suggest that a slanted or biased version should have been presented by the Department or the City. Rather, messaging by the Department and the City should have been factual, consistent, and thoughtful, which might have helped in discouraging unlawful behavior.

## Section 4.02    Command and Control

It is imperative there be clear lines of command delineated and followed so that there can be unified and coordinated actions. The incident command system provides clear lines of authority and responsibility which are critical to follow in large scale events to ensure there is no confusion in the directions given by the incident commander and the operations chief in their plans to command and control the incident.

### (a)  Command and Control

**Observations**

In some instances during this review period high-ranking officers, ventured outside their lines of responsibilities causing command and control confusion. On more than one occasion during the multi-day events, command officers appeared at a location and issued orders without coordination with other command officers, the incident commander, or operations chief. Lower ranking personnel complained of operating with unclear missions and conflicting orders and at times minimal direction. In some cases, one commanding officer would intercept resources and redirect them without notifying the original commanding officer or the command post, creating confusion and incongruent direction to personnel regarding enforcement, about when, or if, to make arrests, and enforce curfew laws. This confusion of command inhibited the Department's ability to control what was occurring.

**Findings**

6.   A lack of clear command and control led to diverted resources and at times, an inability to accomplish basic policing tasks given by the incident commander or operations chief.

7.   The lack of a known and clear chain of command resonated in some incidents examined.

### (b)  Intelligence

Accurate and timely intelligence is vital to public order policing. Intelligence is seeking out information (knowledge about a particular fact or circumstance), analyzing it to determine what it means, and then using it in decision making. The more accurate the available intelligence/information to an incident commander, the better the decisions on deployment and tactics will be. There are three components of accurate and timely intelligence/information gathering: (1) intelligence and information must be gathered (2) analyzed; and (3) distributed. During this review period all three factors were problematic.

**Observations**

During the multi-day events, the Department received unanalyzed information from the internet and social media, information shared by the Los Angeles Sheriff's Department (LASD), as well as intelligence/ information from the Joint Regional Intelligence Center, the Federal Bureau of Investigation, and the National Operations Center. LAPD geographic bureaus were also attempting to identify relevant information and forward it to appropriate entities within the Department.

The Department established an intelligence control center on Friday, May 29, at the Central Bureau command post. However, it was not until May 31 that the intelligence control center was fully staffed with personnel from the Office of Special Operations and Major Crimes Division. The Department had taken individuals out of specialized units and reassigned them back to patrol operations before the events of May-June 2020 occurred. As a result of this managed attrition, the intelligence function of the Department had been scaled down to a minimal level. One person was assigned to this function at Major Crimes Division, and one was assigned at Robbery Homicide Division. The Robbery Homicide

27

Division employee focused on criminal investigations. Department personnel attempted to analyze information during the protests, but the amount of information was too great. The Department currently does not have access to software to assist in gathering and processing information.

Several Department personnel pointed out that there is software available that would assist the Department in gathering open-source information on the internet, analyzing it and making it useful intelligence. Requests to purchase software of this kind have not been approved.

Personnel assigned to the Central Bureau command post, those assigned to field duties, and other staff and command officers gave different statements about how information was received (if at all). This suggests that the distribution method was not consistent, thereby degrading its usefulness.

Some interviewees stated they sent out e-mail blasts to some command staff members, posted information on a white board in the Central Bureau command post and provided information at briefings done at the Central Bureau command post when possible. However, the consensus of those who were in the field in need of the intelligence was that they either did not receive analyzed information or intelligence or that when they did receive analyzed information, it was coming too rapidly to be useful.

**<u>Findings</u>**

8. The lack of a dedicated unit to analyze information, along with the fact that the Department does not have software to assist with the analysis, weakened the process and created a significant disadvantage.

9. Interviews and a lack of any documentation to the contrary support the conclusion that the Department has no specific or consistent direction on how individual commands are supposed to monitor the internet and social media.

10. There is no training within the City or Department to develop employees in the skills necessary to perform the intelligence function.

11. There is no current robust intelligence function to gather information, analyze it and then distribute it effectively and quickly during large, wide-spread events. While current budget deficits could prevent the Department from staffing dedicated intelligence positions, it would be beneficial for the Department to develop a plan on how it would monitor the internet and social media when staffing does become available.

12. Software and technology is available to analyze the flow of information, which would provide meaningful intelligence to those who need it during an event.

13. The Department does not have established protocols on how intelligence/information is going to be distributed during major events so that all personnel know how to obtain the information and that there is consistency throughout the Department.

### (c)  Operations Central Bureau Command Post

A bureau command post should be responsible for all events within the respective bureau. During instances in which events are occurring simultaneously at various locations throughout the City, the best practice is to set up what is called an area command post to be responsible for tracking and allocating resources throughout the City. Responsibilities for the City-wide command post include: intelligence/information control, logistics, mass arrest response, resource tracking, staging, and working with the National Guard to establish missions.

**Observations**

On Friday, May 29, the Department established a command post for Central Bureau at the Buddhist Temple on 1st Street near Vignes Street in downtown. The command post was an outdoor, temporary structure located next to the City Emergency Operations Center and the Department Operations Center. A decision was also made that the Central Bureau command post serve as the Department's area command, thus making it responsible not only for all events in Central Bureau but also responsible for tracking and allocating resources throughout the City. Such a structure went against both the basic principles of the incident command system, and against past practices of the Department. The span of control was far too great and placed an undue burden on the Central Bureau incident commander who was dealing with a complex and rapidly changing situation in downtown.

Interviews established that on Saturday, May 30, discussions were held at the executive-level of the Department about transitioning to a true area command. An area command would have required each geographic bureau to establish separate command posts with the responsibility of handling events in their commands while the area command post would have oversight over the four geographic bureaus. The area command post would then be responsible for City-wide tracking and allocation of resources responding to the needs of the four geographic bureaus. The decision was made not to do this as it was believed the Central Bureau command post was already operating effectively, was staffed, and had situational awareness. This was an error in judgement. As of late on May 31, personnel were still being called in to staff positions in the Central Bureau command post. In many cases these personnel did not have training or experience in the positions to which they were assigned.

Further, had the Department had a properly configured area command structure, each of the four geographic bureaus would have had a fully operational command post to support their subordinate commands.

**Findings**

14. The Department should have set up a separate area command under the direction of an assistant chief using the Department Operations Center. No information was provided to the Review Team that any assistant chief assumed formal operational command of Department operations at any time during the review period. Having Central Bureau act as the area command placed an unnecessary burden on the entire Central Bureau incident command

structure. In addition, it exceeded the span of control as recommended by incident management best practices.

Note: Given the extreme anger and violence exhibited by the demonstrators on Saturday, May 30, it is doubtful that establishing a true area command on Friday, May 29, would have prevented the criminal behavior that occurred. But it is legitimate to ask whether, if the appropriate area command structure had been in place and fully staffed with trained personnel, the Department might have been able to act more quickly and possibly have mitigated the criminal behavior. The Department did establish the appropriate area command for the November 2020 presidential election.

### (d)  Operations Central Bureau Staging Area

In the incident command system structure, the logistics chief is responsible for obtaining necessary personnel resources, who are then directed to report to a staging area that is under the direction of the operations chief. The operations chief directs a staging manager to supervise the staging area and the staging manager is responsible for receiving, organizing and tracking personnel resources prior to dispatching them to their respective assignments. It is important for the staging manager to be well trained in and have experience with major events. During such large-scale events dozens, if not hundreds, of personnel are responding and any delays in getting personnel in and out of the staging area can lead to further delays in gaining control of the incident.

**Observations**

Under an area command configuration, each operations bureau would have had its own staging area so as not to concentrate resources in one location. In conjunction with the Central Bureau command post, a Central Bureau staging area was established on Friday, May 29, at Dodger Stadium on the same property that the City of Los Angeles had set up a Covid-19 testing area. Through Sunday, May 31, this was designated as the Department staging area with all personnel resources being directed there for assignments throughout the City.

Several interviewees noted that there was confusion at the staging area with long delays for personnel arriving to their assignments. Several officers commented they spent many hours in staging when they knew they were needed in the field. In some cases, officers reported they were not assigned appropriate radio designations, which caused additional issues. According to a Department executive officer, the problems in the staging area were serious enough at one point that he had to respond to the location to try to fix the problems.

Currently, the Department does not have any technology or software that can be utilized for processing personnel coming into or leaving the staging area.

**Findings**

15. The initial designation of the Central Bureau staging area as the Department staging area was problematic. Personnel from throughout the City had to respond to this location and in some

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

instances were then sent back to their home bureaus or to locations in the City in other geographic bureaus, outside Central Bureau, causing response delays.

16. Personnel assigned to the staging area in many cases had never received training on how to run a staging area or command post. They had to devise staging procedures on the fly, at the very time that personnel demands were the greatest in the field.

17. Problems with the staging area included the location, long delays in processing personnel, a lack of restrooms and proper lighting and lack of protection from the extreme heat during the day (temperatures over 100 degrees Fahrenheit).

18. Personnel assigned to the staging area were forced to use paper forms and white boards to receive, organize, track, and then dispatch hundreds of officers, causing further delays.

NOTE: Personnel assigned to the Central Bureau staging area appear to have done the best they could under the circumstances. The delays were not because of lack of effort or because they did not try, but instead appeared to be a lack of preparation by the Department in developing personnel with the skill sets necessary and providing the support needed to ensure the deployment of a successful staging area. After several days, the Department moved staging to the four geographic bureaus which is more consistent with an area command.

### (e)  Operations West Bureau Command Post

**Observations**

On Thursday, May 28, the Department received information that there was going to be a Black Lives Matter demonstration at the Pan Pacific Park on Saturday May 30. At that time, West Bureau had not established a fully staffed command post at the bureau level to support major incident management, leaving that task to the individual areas within the bureau.

On Saturday, May 30, the incident commander for the planned Black Lives Matter demonstration in Pan Pacific Park set up a command post at the West Bureau community room at West Bureau Headquarters.

An event action plan was created for the Pan Pacific Park event and while the plan named specific personnel for some positions within the incident command system, it noted "TBD" (to be determined) for many positions. This included the logistics section chief, safety officer, public information officer, resource unit leader, situation unit leader, documentation unit leader and communication unit leader. These are key staffing positions to ensure the incident commander and operations chief have situational awareness and can respond effectively to problems that may occur during the event.

The incident commander responded to the designated staging area at the nearby CBS Television City studio complex to give a briefing for assigned personnel. It was at this time that problems began to occur in the field and the incident commander was not able to return to the command post. As the event became more violent, the command post was transitioned to the staging area. At some point later

in the afternoon the West Bureau commanding officer responded to the staging area and became the incident commander.

**Findings**

19. West Bureau's decision not to establish a fully staffed command post after two nights of violent protests resulted in no logistical support for the West Bureau divisions and adversely impacted their ability to manage the large-scale events.

20. There was a lack of personnel assigned to key event action plan positions for the Pan Pacific Park protest. This does not mean that some, if not all, positions were staffed; however, it does raise questions as to whether the command post staff was adequately staffed to handle this event.

21. The lack of fully staffed West Bureau and Pan Pacific Park event command posts hindered the ability of the incident commander to manage the extreme anger and violence exhibited by some of the protestors on Saturday, May 30.

NOTE: It is doubtful that the establishment of fully staffed command posts with well trained personnel would have prevented the criminal behavior. But it is legitimate to ask the question that if they had been in place, would the Department have been able to act more quickly and been able to mitigate the situation.

### (f)  Mutual Aid

Mutual aid is used by law enforcement agencies to call upon county, state, and federal resources to supplement their own resources to ensure the safety of the public under various emergency situations. Instances may include both natural and manmade disasters, terrorist events, and civil unrest. Mutual aid acts as a force multiplier for the requesting agency to return chaotic situations back to order.

As a general matter, differences between requesting and responding agencies' respective policies, policing strategies, and training can create the potential for conflicts between the expectations of the community and the expectations of the agency in need of mutual aid.

**Observations**

On May 30, the fourth day of the protests in Los Angeles, the Mayor determined that additional resources were needed as a force multiplier because the protests turned riotous and the Mayor requested mutual aid. The Department was assisted by the LASD, other regional law enforcement agencies and the National Guard.

The LAPD immediately began to prepare for the arrival of the National Guard. Despite the National Guard numbers rising from 50 to 2,800 in a period of 24 hours, LAPD did a remarkable job controlling this process. For more than nine days, the National Guard operated with clear missions and LAPD

escorts throughout the City. The National Guard deployment and LAPD's use of this resource was well documented, and the deployment was consistent with the Department's direction.

The Review Team did not receive information from the Department documenting the activities or uses of force by the various policing agencies, including the LASD, that responded to the City's mutual aid request. However, it is believed that the LASD deployed "pepperball" less lethal munitions. This munition is not approved for Department-wide use, nor was it used by the LAPD during this time. The LASD may also have other less lethal munitions that the LAPD does not use and may have deployed them during the protests in Los Angeles. However, making this determination was outside the scope of this evaluation. Photographs on the internet and social media posts depicting various expended less lethal munitions did reveal some of those munitions are not in the LAPD inventory.

The approval for the LAPD to deploy tear gas requires a commander or higher. The LAPD has not used tear gas in a public order policing environment for decades. The LASD is authorized to use tear gas and only requires the approval of the incident commander, a watch commander or sergeant. LAPD patrol personnel are not equipped for operating in a teargas environment and have no experience in doing so. Should teargas be deployed near officers without the proper equipment, it would cause eye and lung irritation and widespread confusion. The Department asked the LASD not to deploy teargas in the downtown protests. It does not appear that the LASD deployed tear gas within the City.

### Findings

22. The National Guard activation and the LAPD's use of this resource was well documented, and the deployment was consistent with the Department's direction.

23. The fact that the National Guard operated without becoming the story is a testament to both the conduct of the National Guard and to the Department's ability to quickly solve problems as they surfaced. LAPD's success in facilitating the National Guard's deployment appears to be in large part because LAPD personnel with both military and incident command system experience were selected to work this assignment throughout the duration of the National Guard's deployment to Los Angeles.

24. The LAPD has various settlement agreements (as described elsewhere in this report) that requires the approval of a commander (or higher) to use certain kinds of less lethal munitions. The LASD has a lower approval threshold for the deployment of less lethal munitions that allow an incident commander or watch commander to approve the use of the same munition.

25. Due to the operational differences between agencies, the LAPD should consider using mutual aid agencies for fixed position tasks, such as protecting locations freeing up LAPD officers to engage in more dynamic tactical action (skirmish lines and seeking out roving looters).

NOTE: It is incumbent on the Department to obtain or review/update mutual aid agreements with partner agencies, especially the LASD, ahead of time outlining the concepts of operation, use of force policies, approvals required, less lethal tools/munitions to be used and use of force reporting.

## Section 4.03    Public Order Policing

For purposes of this report, the term "public order policing" means the discipline of using strategies and tactics to manage and control crowds. LAPD's Emergency Operations Guide describes the Department's public order policing mission as follows:

> The Department's mission is to work in partnership with the public to ensure that the First Amendment rights of all who have gathered are protected and guaranteed by our personnel. We have the responsibility to the public to protect the lives and property of all people.  This will be accomplished through the fair and impartial enforcement of laws.  It is imperative that when faced with both crowd management and crowd control incidents, those Department personnel utilize planning, communication, openness, and leadership to accomplish our mission. [14]

Public order policing is a complex and challenging endeavor because it entails policing (protecting rights, enforcing laws, keeping the peace) large numbers of people, often in volatile, evolving, and uncertain circumstances.

Crowd management, as distinguished from crowd control, means policing crowd situations that do not involve "civil disorder or unlawful activities". [15] For preplanned events, representatives of the Department meet with the leaders or organizers of the demonstration in advance of the event to plan together to ensure that participants in the event are allowed to exercise their First Amendment rights, and that the event remains peaceful. In such instances, it is common for the police and organizers to share plans so that the event can be peacefully managed. Generally, the police are able to facilitate the crowd through such tactics as stopping traffic and helping plan routes.

Even when the police and organizers work together, there may be instances where individual actors or small groups in the crowd commit unlawful acts. When such instances occur, because a line of communication is open between the police and the organizers/leaders, the police can work with the organizers/leaders to de-escalate the situation by having them "self-monitor" to stop the unlawful acts, thereby eliminating the need for other policing actions, such as making arrests or declaring an unlawful assembly.

When the police are not included in the planning of the protests, they should attempt, when feasible, to identify and work with the formal or informal leaders in the crowd. They should encourage such leaders to assist with self-monitoring of the crowd, to prevent violence and maintain the safety of everyone involved. In most cases of ad hoc, unpermitted demonstrations or marches, police can manage the

---

[14] Emergency Operations Guide (Los Angeles Police Department, n.d.), vol. 5, page 1.
[15] Emergency Operations Guide, vol. 5, page 2.

demonstrations and marches to ensure they are conducted peacefully. When members of the crowd commit unlawful acts, the police then must transition from crowd management to crowd control.

Crowds are typically heterogeneous, made up of numerous smaller groups of people from many walks of life, and often with different norms and values. This creates a complex problem for those within the larger crowd and those who are expected to manage the crowd. Police who attempt to manage a large crowd must avoid the mistake of treating the entire crowd as though they were all part of a violent or criminal element. If officials view a crowd as homogeneous and impose a direction or an action such as declaring curfew or an unlawful assembly, conflict can escalate. As such, strategies used by police can either escalate or deescalate crowd behavior. Understanding the dynamic of crowd psychology should be a priority of Department leadership training.

The Department defines crowd control as:

> When a preplanned or spontaneous lawful assembly deteriorates to the point where there is a potential for unlawful activity or threat of violence, the Department has a duty to stop this behavior. The nature of these events has the potential to cause injury, death, damage to property, and infringement of the rights of other members of the public. The Department must react in a lawful, measured, and rapid manner to restore order. The objective will be achieved through the use of appropriate crowd control tactics and the adherence to the law, policies and procedures. If the situation results in a use of force, the force utilized to arrest violators and restore order shall be objectively reasonable.[16]

Basic crowd control tactics include placing officers on skirmish lines to move or block a crowd. The officers on the line are allowed to "push the crowd" with batons if the crowd encroaches on them or the crowd does not move. The Department also has authorized the use of less lethal munitions (described elsewhere in this report) for crowd control. If required, and safe to do so, a squad of officers may enter the crowd, in what is known as an "arrest circle" to detain an individual.  It is in these circumstances that the Department may disperse the crowd or make arrests for unlawful assembly or other crimes, such as curfew violations.

### Observations

Many command officers interviewed indicated they are used to successfully managing and facilitating the movement of crowds and demonstrations in Los Angeles. For example, prior to the protests that are the subject of this report, Central Bureau had experienced anti-gentrification marches in the Hollenbeck Area, several years of weekly demonstrations supporting the removal of District Attorney Jackie Lacey, and recent demonstrations about such matters as tenant's rights and Covid-19. Those demonstrations were peacefully managed by the Department.

---

[16] Emergency Operations Guide, vol. 5, page 3.

On many occasions during May-June of 2020, the police become aware of an unplanned or ad hoc demonstration taking place. In such instances the Department arrived on-scene and gauged the temperament and conduct of the crowd to determine whether the crowd was peaceful or engaged in criminal activity. It has long been a standard practice of the LAPD to facilitate unplanned public demonstrations just as they do with preplanned events. This took place on several occasions throughout May-June 2020. Notably, an example occurred in West Bureau, when a large crowd of frustrated protestors marched through an LAPD geographic area to several adjoining jurisdictions only to be prevented from entering those cities. The incident commander and field commander were able to successfully facilitate the crowd movement and exercising of their First Amendment right to protest without violence erupting.

In addition to the formal mission of the Department, one of its informal goals is to "not become the story". This means to avoid becoming involved in controversy by unnecessarily interrupting a march, by using force, or by otherwise diverting attention away from the cause of the organizers and unnecessarily focusing it onto the Department.

It is notable that most of the many demonstrations that occurred in Los Angeles in the wake of George Floyd's killing were peaceful. Community members interviewed said the police generally allowed the demonstrations to proceed without interference. For example, the Department peacefully facilitated the Black Lives Matter demonstration in Hollywood on June 7, which was attended by over 20,000 people.

A major challenge for the LAPD was to determine to which of the numerous protests held over several days to send resources, and then then to determine the mood of the crowd, and how to police it appropriately.

It appears that on occasion during the May-June protests command officers did not transition from crowd management to crowd control as quickly as was necessary. Some command officers expressed reluctance to act quickly out of concern over being unfairly second guessed in the aftermath. While it is understandable that decision-making can be difficult, there were times when more rapid interdiction of unlawful behavior would have been appropriate.

With few exceptions, nearly all commanding officers interviewed for this report said that their level of training and experience was limited prior to these events, and that they did not feel confident in handling these incidents. The few who felt confident in handling all aspects of public order situations indicated that their competence came from prior assignments such as Metropolitan Division or via mentoring from highly knowledgeable peers/superiors. The Review Team was not able to identify any formal training or mentoring programs in place to ensure that commanding officers are proficient in being able to provide command and control in crowd control situations.

The community focus of the protests and demonstrations of May-June was the police and the issue of police abuse, particularly of people of color. Thus, the Department could not always manage the crowd.

The mere presence of police officers was not necessarily going to quell problems as has been the recent experience of the LAPD, and in fact led to confrontations on occasion.

In addition, most crowds were leaderless. Some smaller groups in some of the crowds who appeared to be attempting to commit unlawful acts seemed to be well prepared, highly mobile and coordinated. Some police commanders, as well as Air Support Division officers, opined that some persons in the crowd may have been monitoring LAPD radio frequencies, as evidenced by their rapid and coordinated movements in response to police communications. Police commanders described the behavior of some groups involved in criminal behavior as similar to "water" where they would commit an unlawful act and quickly disperse, only to reappear at another location, extremely difficult to contain.

As reflected in media video, and according to LAPD accounts, it appeared that in some instances people at the front of the crowd directly facing police officers had their hands raised over their heads, while others stood behind this line and threw objects at police. Many command officers opined that this appeared to be a deliberate strategy, using the general protestors in front as a shield, possibly without their knowledge. Such behavior of small subgroups of people engaging in criminal acts and causing violence, and then hiding behind demonstrators, was a shift from past demonstrations. This behavior was observed at multiple demonstrations across the nation.

Looting often appeared to be well coordinated. Police commanders observed that it looked like there were "scouts" in certain areas observing the actions of police and selecting targets. The looters seemed to be opportunistic and some officers identified gang members in the groups engaged in looting and vandalism. Convoys of up to ten cars were observed driving together in a line to "attack" one location. If police responded to interdict or make arrests, those cars (and occupants) quickly dispersed in all directions, only to reconfigure together elsewhere to attack another target. The wide-spread nature of the looting simultaneously at various locations made it incredibly difficult to contain. At times, the Department did not seem to have enough resources to contain the looting that initially occurred.

**Findings**

26. There were many protests during the evaluation period which the LAPD facilitated peacefully.

27. There was a lack of training to properly prepare command officers for managing large crowds with the possibility of civil unrest and many command officers stated they did not feel confident in handling these incidents.

28. The Department culture inhibits those in in a position to make decisions as they are either afraid to use their best judgment or paralyzed by concerns that they will be second-guessed by their superiors or they fear "becoming the story".

29. The LAPD did not anticipate and was not prepared for the disruptive strategies of swift mobility and coordination of movement used by some criminal groups.

NOTE: Recommendation No.1 to establish a Strategic Emergency Manager would be key to effectively addressing all-hazards emergency management facing law enforcement today. It is envisioned that the Strategic Emergency Manager will keep abreast of emerging trends in all aspects of public order policing and introduce those concepts to the Department. Public order policing must be enhanced to meet contemporary operational challenges and anticipate future ones. Crowd psychology is a necessary component of training police to better handle dynamic crowd behavior. The civil unrest strategies now used by some groups intent on spreading chaos have allowed them to become more mobile and better planned than historically has been the case. The challenge for police is to facilitate First Amendment rights while at the same time interdicting groups who are attempting to disrupt lawful demonstrations. The Review Team contacted law enforcement professionals and emergency management experts and found that there are crowd psychology professionals independently looking at such issues. The LAPD should be doing the same (see Recommendations section for further). The LAPD is in a unique position, since it is fortunate enough to have a fulltime, large behavioral sciences section embedded within the Department. Psychologists within this section likely have some crowd psychology experience and should be consulted as the Department moves forward. The Department also should contact other law enforcement agencies, academics, and law enforcement experts to understand best practices and to develop strategies for the 21st Century.

### (a)   Mobile Field Force Configuration

In the aftermath of the 1992 civil unrest in Los Angeles, LAPD's Metropolitan Division conducted a best practices in training for crowd management search. Metropolitan Division then created the mobile field force concept, which is still in use today by law enforcement nationwide. The mobile field force concept was codified into the 1993 California Police Officers Standards in Training Crowd Management and Crowd Control Guidelines and incorporated into multiple documents within the LAPD. Mobile field forces use crowd control strategies, such as skirmish lines, but are also a more flexible way of rapidly responding to events. The mobile field force concept was developed to provide a fast and effective method to assemble and deploy a platoon-size, tactical force. It is adaptable to both planned events and spontaneous incidents which require the rapid assembly of large numbers of officers. An important strategy during crowd control events is the use of the mobile field force configuration. The effectiveness of the mobile field force is dependent upon its mobility. As such, the cars must be staged in a relatively safe location and the driver's duty is to stay with the cars to maintain security and be ready to move quickly if necessary.

A mobile field force is defined as:

- A platoon-sized tactical force of one lieutenant, four sergeants, and 45 officers who rapidly assemble specifically capable to respond to events as a unit;
- A standalone group that is capable of mobility, physical presence, supervision and command;
- Tactically trained and capable of mass arrest; and
- Utilized during pre-planned and spontaneous events; and

- Capable of deployment within 45 minutes.[17]

In addition to mobile field forces, Metropolitan Division deploys what are known as tactical support elements. Tactical support elements are used in coordination with mobile field forces or as a standalone strategy. A tactical support element is a reinforced Metropolitan Division squad of between eight and 22 officers with two sergeants and one lieutenant, with equipment and equipment operators selected based on the assigned mission.

The LAPD also often deploys helicopters (air units) over public policing situations and did so on many occasions during the protest that were triggered by George Floyd's death. Obviously, personnel in helicopters have the advantage of being able to have a far greater view of events as they unfold on the ground. A tactical flight officer's perspective in the air unit adds situational awareness from a unique position and thus provides tactical communications to officers on the ground. The tactical flight officer is often a key component of any crowd control situation, as was the case during the review period.

<u>Observations</u>

During the review period, at least six police vehicles from mobile field force configurations were destroyed by arson and others were damaged. This was in part because no officers were left with the cars to protect them from vandalism as the crowds were very mobile, overtaking the locations where police cars were parked. The Department has estimated the repair and replacement cost at nearly $1,000,000.

Numerous officers interviewed by the Review Team, and many of the LAPD officers who participated in the Los Angeles Police Protective League survey, stated that they frequently told supervisors on the ground that the police vehicles needed to be protected by a small group of officers from the mobile field force configuration. However, some supervisors did not take the advice of their subordinates, creating opportunity for small groups of problem people to commit crimes of arson and vandalism on police vehicles, without consequence.

Most command staff interviewed stated that the Metropolitan Division tactical support elements were used effectively and supported the mobile field forces as they were made up of smaller groups of officers, thus more mobile. The West Bureau commander who was present at the Pan Pacific Park protest on May 30 was able to start to control problem areas using the tactical support elements, which he stated were a "huge help". The tactical support elements developed a plan based on their situational awareness, gave a dispersal order, and then, when the crowd did not disperse, they moved the crowd in the direction of an alley where they could be surrounded and arrested for curfew. A review of dispatch audio, corroborated by command officer interviews, indicates that the air units from the LAPD Air

---

[17] Emergency Operations Guide, vol. 5.

Support Division was used effectively throughout the events, helping to coordinate officers on the ground.

Groups of individuals who engaged in criminal behavior were using new methods to cause disruption that the LAPD had never encountered before. Thus, it was difficult for officers to separate and isolate those who were committing unlawful acts. Command and line officers noted that the heavy reliance on traditional crowd control tactics of skirmish lines, described as "Napoleonic tactics" in which officers stand in static lines and attempt to push the crowds, were simply not effective during the protests. As such, the highly mobile groups within crowds, as well as roving looters, made the officers on the ground less effective.

The LAPD air units developed a tactic to deal with the looters during the Pan Pacific Park unrest which was then used in other problem locations throughout the City. On Monday, June 1, the air unit broke up mobile field forces and used other available officers to make small squads of one sergeant and ten officers. The tactical flight officers identified convoys of looters and then directed the officers on the ground to intercept and arrest the looters. In addition, once the LAPD was fully mobilized so as to provide additional personnel, and the National Guard was on-scene, police resources were freed up to interdict roving convoys of looters. This tactic proved to be effective. The traditional Mobile field force configuration of 45 officers was not effective in many instances during the unrest of 2020. The LAPD recognized that the mobile field force configuration needed more personnel to be operationally effective and keep the cars protected. Subsequently, the LAPD increased the number of officers in a mobile field force from 45 to 60.

**Findings**

30. The traditional mobile field force configuration of 45 officers was not effective in many instances during the protests of 2020 and additional personnel were needed to be able to protect the police vehicles and manage the crowds. The LAPD has since increased the size of the mobile field force from 45 to 60 personnel.

31. The LAPD adjusted tactics mid-way through the unrest when the air unit designed a tactic that broke up mobile field force units into smaller squads. This tactic proved effective.

32. Officers occasionally expressed concern to supervisors that the mobile field force police vehicles needed to be guarded, however, in some instances these warnings were ignored.

### (b)  Shadow Teams

Shadow teams are a strategy the Department has used frequently during past crowd management events. Shadow teams consist of undercover officers who are in the crowd to monitor the mood of the crowd and to provide operational information to the incident commander. Such a strategy can be extremely effective if information can be quickly communicated to the incident commander. For example, the immediate arrest of a few agitators can potentially deescalate an incident by removing the

trouble-maker intent on creating chaos or engaging in criminal behavior from the crowd with minimal disruption.

**Observations**

The Department deployed shadow teams in crowds at various points during the May-June 2020 protests. The use and assignment of shadow teams has been successful historically. During these protests, shadow teams were utilized by some incident commanders. Many of the crowds were violent and hostile, which raised concerns about the safety of the officers. There were also communications problems between shadow team members, and uncertainty about whom they should be communicating within the incident command system. This created a lack of information that could be acted upon in a timely manner.

**Findings**

33. There are no standard Department protocols or training documents on the use of shadow teams.

34. Communications and information from the shadow team's observations were not distributed in a timely manner. The Department now assigns shadow teams and a uniformed cover team to the mobile field force. This will allow for a more direct line of communication between shadow teams and mobile field force leaders while providing the shadow teams with a dedicated security team.

## Section 4.04      Less Lethal Tools

Trained LAPD officers were authorized to use four types of less lethal tools during the May-June 2020 events. Those tools were:

### (a)  40mm Launcher Deploying the 40 mm eXact iMpact Sponge Round

The 40mm fires a single foam projectile that weighs 0.96 oz and travels at 325 feet per second. The minimum range for the eXact iMpact round is five feet and the maximum effective range is 131 feet (Note: LAPD limits this range to 110 feet). The round is intended for direct impact (target specific) application.[18] The 40mm is a standard tool for patrol operations.

LAPD policy on the 40mm is documented in a directive which states that less lethal force options are only permissible when an officer reasonably believes that a suspect or subject is violently resisting arrest or poses an immediate threat of violence or physical harm.[19] The 40mm shall not be used to target the head, neck, face, eyes, or spine unless lethal force is authorized. The 40mm launcher may be used in

---

[18] 40mm eXact iMpact Sponge Round Spec Sheet (Defense Technologies, December 30, 2020), www.defense-technologies.com.
[19] USE OF FORCE - TACTICS DIRECTIVE:  40mm LESS-LETHAL LAUNCHER, 1.

crowd control situations against a single subject/suspect as a target-specific less lethal option. [20] Because the 40mm round is target specific, it cannot be used to disperse a crowd. The LAPD 40mm launchers are outfitted with an EOTech sight. The cost of the 40mm system with a sighting system is approximately $2,000. (A repurposed shotgun that uses a beanbag shotgun round can cost one fourth of that amount.) The 40mm rounds cost approximately $25 per round making it too expensive to certify (requalify) the entire Department on a regular basis.

### (b) 37mm Launcher Deploying the 37 mm Foam Baton Black Powder Round

The foam baton round consists of five foam rubber projectiles that are discharged at once. The LAPD uses the 37mm foam baton rounds as a non-target specific impact tool. The LAPD only allows the foam baton rounds to be skip fired. The range of the round is 15 to 30 feet.[21]

LAPD policy states in part, "the 37mm foam baton round is a non-target specific round used for crowd control. With the approval of the incident commander, the 37mm foam baton round may be used as a crowd control tool when a dispersal order has been issued and/or immediate action is necessary, to stop violence, to ensure public safety, and restore order."[22]

### (c) Beanbag Shotgun

The beanbag shotgun is a Remington 870 shotgun which has been configured with a green slide handle and stock, rifled barrel, and side saddle ammunition holder. The beanbag shotgun deploys a "super-sock round" which is a 12-gauge cartridge containing a shot-filled fabric bag. These rounds are designed to be non-penetrating, and upon striking a target distribute energy over a broad surface area. According to LAPD policy, the beanbag shotgun may be used in crowd control situations against a single subject/suspect as a target-specific less-lethal option.[23]

The beanbag shotgun is also a standard less lethal tool/munition used during patrol operations. Most officers in the Department have been certified during the academy in the use of the beanbag shotgun trained for use in patrol functions. Like the 40 mm round, the beanbag shotgun is not to be fired at the head, neck, face, eyes, or spine.

---

[20] USE OF FORCE - TACTICS DIRECTIVE:  40mm LESS-LETHAL LAUNCHER, 2.

[21] 37mm Foam Baton Black Powder Round Spec Sheet (Defense Technologies, December 30, 2020), www.defense-technologies.com.

[22] USE OF FORCE - TACTICS DIRECTIVE No. 11.1 CROWD MANAGEMENT, INTERVENTION, AND CONTROL (Los Angeles Police Department, October 2020), 5, http://lapd-lapd-lapd-assets.lapdonline.org/assets/pdf/tac-dir11-crowd-mgmt.pdf.

[23] USE OF FORCE - TACTICS DIRECTIVE No. 6.3 BEANBAG SHOTGUN (Los Angeles Police Department, July 2018).

### (d)  Hornets Nest Sting Grenade, .60 Caliber Rubber Balls

Hornets Nest Sting Grenade (sometimes referred to as a "stinger" round) is a "rubber ball diversionary device that produces approximately 130 decibels at five feet and emits 1-2 million candelas. In addition to the light and sound, the device disperses 25, .60 caliber, rubber balls in a 360-degree pattern."[24]

The Department did not provide documentation relative to the deployment approval of the Hornets Nest Sting Grenade round. However, the Department did provide information that states that only the Special Weapons and Tactics Team (SWAT) has this less lethal tool and is authorized to deploy it. There is some confusion among the Department command staff as to who may authorize the deployment of this tool in crowd control situations. The MacArthur Park 2007 settlement agreement as well as information in the Emergency Operations Guide and lesson plans indicate that only a person of the rank of commander or higher may authorize its usage in crowd control situations. However, there is a belief by command staff that only the Chief of Police may authorize its usage. Regardless, members of SWAT deployed rounds of this less lethal tool on May 30, during the Pan Pacific Park situation with the direct approval of the Chief of Police who was on-scene.

For detailed information on the above less lethal weapons see Appendix 12.

### (e)  Less Lethal Use

The goal of less lethal tools is to control or stop the actions of the subject while minimizing the potential for serious injury to the suspect. Less lethal tools may reduce the likelihood of using deadly force.[25]

The Department was asked for but did not provide the number of less lethal munitions used between May 27 and June 7. Less lethal munitions were not used after June 3. As of this writing, no accounting of less lethal munitions has been received. However, rough inventory records indicated that over 3,500 rounds of 40mm and over 6,200 rounds of 37mm munitions were not returned to the Department armory. Whatever the exact number was, it appears that the Department expended a great deal of less lethal rounds during the protests.

Of note, the Review Team received information from the Department that there are six serious use of force investigations (for a definition of categorical use of force incident see Appendix 9) that are related to the protests. Those cases will be investigated by a specialized LAPD investigative team assigned to Professional Standards Bureau and findings will be reviewed by the Board of Police Commissioners.

There are over 140,000 body worn camera videos associated with this review period and the LAPD technology makes it exceedingly difficult to separate out videos related to the various events throughout the City. Therefore, the Review Team was not able to view every video in which less lethal munitions were deployed. Thus, the Review Team did not attempt to investigate the appropriateness of

---

[24] Hornets Nest Sting Grenade, .60 Cal. Rubber Balls, Produce Code ALSG10160 (ALS, December 30, 2020), www.lesslethal.com.
[25] Sid Heal, *Concepts of Nonlethal Force: Understanding Force from Shouting to Shooting* (Brooklyn: Lantern Publishing & Media, 2020), chap. 6.

individual uses of less lethal munitions. Nor could a determination be made about the amount of less lethal munitions expended other than that a large amount was used.

It is believed that the majority of injuries reported occurred from the deployment of the 40mm rounds because of the reasons stated below.

The Department first approved use of the less lethal 40mm system in 2000. At that time, only personnel from Metropolitan Division were authorized to use the 40mm and trained frequently on its use.

The LAPD later undertook a pilot program to examine the deployment of the 40mm Department-wide. This was largely due to the increased safety of the 40mm round vs. the beanbag round and the increased effective range of the 40mm. The pilot program was successful. The 40mm system was authorized for Department-wide patrol operations use in 2017 upon approval of the Board of Police Commissioners after the Inspector General's evaluation.

In 2017, when the Department transitioned to the 40mm for patrol, officers were trained during the Integrated Communications, De-escalation, and Crowd Control (ICDC) ten-hour class. Two hours of this course was dedicated to the 40mm transition. At that time, the Department also integrated training on the 40mm in the Basic Recruit Training Course. To the best of the Review Team's knowledge, the Department determined that officers would only need to qualify one time during the class to be able to carry and use the weapon in the field.

A primary benefit of the 40mm system, its greater effective range, is also a factor that complicates the deployment in crowd control situations. The effective range of the round makes precise, target-specific shots at distance possible, but also magnifies issues such as marksmanship (or lack thereof) and movement of the intended target. The movement of others in the crowd creates the potential for other persons to be impacted by the round. The officer operating the 40mm must be very precise in its application to strike the intended target and minimize the risk potential to bystanders. Given the longer-range capabilities of the 40mm system and the environment in which the round is used in, a greater level of training, marksmanship and competency is necessary.

**Findings**

35. It appears the majority of reported injuries that were sustained by persons in crowds were the result of less lethal munitions from the 40mm. Many who reported being injured claim that they were not involved in any violent or hostile acts.

36. Injuries reported ranged from minor to significant, some in the head, the back, the neck, and the eye.

37. Limited viewing of video indicated that there were instances where officers quickly fired the 40mm rounds at distant targets which increases the likelihood of hitting an unintended target.

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

38. The deployment of less lethal munitions was not always done at the direction of a supervisor or officer. In some instances, officers were directed to be in front of a skirmish line and left to deploy less lethal tools, including the 40 mm, with no direction or coordination.

39. Over 7,800 personnel were trained (certified) to deploy the 40mm during a two-hour block of instruction at the ICDC course. However, the Review Team did not find the two hours of training to be sufficient given the skill level needed to deploy the 40mm in a chaotic public order policing environment.

40. Officers are required to be trained one time on the 40mm system. Deploying the 40mm in public order policing situations requires recurring certification and training.

41. The skill level required to deploy the 40mm in chaotic public order policing situations is high. Officers must be extremely competent and possess excellent marksmanship skills. It is unlikely that all officers trained possess the marksmanship skills necessary to competently deploy the 40mm system under those circumstances.

42. The last training for the 40mm for officers, other than those going through recruit training, was in 2018.

43. Most supervisors and officers who deploy less lethal munitions are outfitted with body worn video and could use the video audio capabilities to record information about their use of less lethal munitions. This should become a protocol during crowd control situations.

44. The Department's Use of Force Tactics directive authorizing the use of 40mm has no detailed guidance on use in public order policing situations.

45. The 40mm can be an effective tool in a crowd control situation when utilized by officers who are well trained and experienced in its use.

### (f)   Handheld Baton

During crowd control situations the use of the baton is authorized only to push a crowd and not as an impact weapon unless the officer or another person is physically threatened.

**Observations**

LAPD personnel used the handheld baton throughout the protests in 2020. The Review Team was not able to determine if the baton use was appropriate. Lawsuits filed indicated that some plaintiffs claimed they were hit with batons but were not engaged in any violent or threatening behavior. Any allegations of inappropriate use of batons will be investigated by the Department.

**Findings**

None

45

## Section 4.05     Planning for Mass Arrests and Citations

An agency must have a clearly articulated plan for how to handle the various issues related to mass arrests. For example, the plan must include appropriate transportation, provide access to water and restroom facilities and have an adequate number of personnel to process arrestees in a timely manner.

**Observations**

The type of large-scale mass arrests that occurred in Los Angeles in May-June 2020 requires significant planning. The LAPD arrested more than 4,000 people. Nearly all those arrests occurred during a five-day period from Friday, May 29 to Tuesday, June 2. The breakdown of the arrests over those five days was 265 on Friday, 866 on Saturday, 700 on Sunday, 1,242 on Monday, and 956 on Tuesday. There is no evidence, however, that the Department prepared for a situation where mass arrests might be in order. Even after Wednesday and Thursday nights - when protesters shut down the freeway and vandalized property, including police headquarters and police vehicles, threw objects at police officers and dragged one officer into a crowd - there is no indication that planning had begun for mass arrests.

The LAPD's field jail guide (Volume 6 of the Department's Emergency Operations Guide) lays out the planning process that should be used by a logistics chief assigned to an event in which mass arrests are a possibility. The field jail guide outlines how to set up a field jail unit, which is a temporary unit that must be stood up to identify and process arrestees, evidence and property in the field. A field jail unit set-up requires time, equipment and personnel. It requires preparation and planning, and it is essential that the logistics section within the incident command structure appoint someone with experience and knowledge to set up the field jail.

On Saturday, May 30, 866 arrests were made by the LAPD. At that time, the Department did not have a fully staffed, properly set up logistics branch within the area command configuration. This led to the Department being unprepared to handle the mass arrests.

**Findings**

46. The LAPD failed to plan ahead for mass arrests, which resulted in a last-minute, uncoordinated effort to manage the arrests of more than 4,000 individuals.

### (a)   Citations Related to Mass Arrests

A violation of PC Section 409 (failure to disperse) requires an announcement of unlawful assembly with a route to leave, and a reasonable amount of time to do so. PC Section 415 (disturbing the peace) and LAMC Section 8.78 (curfew violation) are sections individuals can be arrested for, while LAMC Section 80.02 (failure to obey a lawful order of a police officer) is an infraction. An infraction is like a traffic ticket, in that the person arrested is only required to show proof of identification and sign a promise to appear in order to be released at the location of the traffic stop.

## Observations

The first instance in which the LAPD consulted with the City Attorney as to what charges to use for those arrested during the protests was Friday night, May 29. At that time, LAPD only inquired about the use of PC Section 409 (failure to disperse at the scene of a riot or unlawful assembly) and PC Section 415 (disturbing the peace).

On the night of Friday, May 29, however, the Department arrested 265 people for violation of LAMC Section 80.02, failure to obey a lawful order of a police officer, which is an infraction under the law. In this instance, the Department arrested, detained, and transported individuals to a Department facility to be booked or cited, and then released. Many, if not all, of those arrested were detained for hours, while remaining handcuffed, and citations were ultimately issued at the police facility where the arrestees were taken. This treatment of the arrestees in 2020 is nearly identical to the treatment of those arrested in 2011 at Occupy LA, and then again in 2014 during the Ferguson protests, except that in 2020 it occurred in the middle of a public health crisis.

Over the course of several days of protests, prior to the declaration of a curfew, most of the arrests by LAPD were for disobeying a lawful order of a police officer. After the curfew declaration on Saturday night, LAMC Section 8.78, violation of curfew, was the primary arrest section used. Those arrested for curfew were detained and handcuffed for hours, without water or bathroom breaks, before being transported to the jail facility for booking. This occurred during the worst pandemic in 100 years and subjected those arrested, and officers providing security, to be in close proximity to one another for extended periods of time with the possibility of becoming infected with Covid-19. Ultimately, the looters were detained and the curfew violators were released. During the protests, very few arrests were made for violation of PC Section 409, failure to disperse. The reasons for not using this section are unknown, but it could be that the requirements of the section would have been difficult to meet due to excessively loud noise levels or not wanting to disperse people out of one area, just to have them relocate to another area where unrest was occurring.

## Findings

47. The arrests made on Thursday, Friday, and Saturday were made under a Municipal Code Section that is an infraction requiring a citation and release in the field.

48. On Thursday, Friday and Saturday, the LAPD arrested and detained individuals for exceedingly long periods of time, and transported individuals to a Department facility for processing.

49. Those arrested were detained for hours while handcuffed and were not provided with water or the use of bathroom facilities and were held in close conditions without masks during a pandemic environment.

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

50. The LAPD has not corrected the issues related to detention and arrests identified in the 2011 Occupy LA and the 2014 Ferguson protests. Those lawsuit settlements regarding arrest problems resulted in the City paying over $3,000,000.

### (b)  Transportation of Arrestees

Factors LAPD considers when setting up a field jail include the number of officers required to process arrestees. Typically, approximately 50-80 officers are required to handle the intake of 200-300 arrestees per hour.[26] To assist with the timely processing of arrestees, the field jail may activate the Automated Mass Arrest Booking System (AMABS) whenever the Department has exhausted, or anticipates to exhaust, its routine capabilities (reached at approximately 300-400 arrestees). The AMABS is a computer-based system operated by the LASD. When activated, Department personnel need only to complete the arresting officer's portion of an LASD mass arrest report and an arrest report narrative. At the time the incident commander activates the AMABS, it is recommended that they communicate the need for jail buses to the on-duty watch commander at LASD. This allows time for drivers to be notified and buses to be scheduled while the LAPD identifies a location for a field jail. LASD personnel and buses will ultimately transport the arrestees.

**Observations**

On May 30, 866 arrests were made by LAPD. A request was made to secure buses from LASD for arrestee transportation. The LAPD was not able to secure buses as the LASD buses were already dedicated to other functions. The LAPD had also requested buses from the MTA, but, per MTA policy, MTA will not assist the LAPD unless the LASD has officially refused to do so. After several hours of trying, the LAPD command post was finally able to secure MTA buses.

The delayed identification of a source of buses caused even longer delays in the field. Additionally, as the violence began to escalate throughout the City, it became increasingly difficult for the buses to reach their designated pick-up location, leaving officers in the field holding arrestees for hours while awaiting transportation. In some instances, officers resorted to obtaining vans from police stations to remove arrestees from the field.

The lack of buses or other vehicles for transportation also necessitated that field officers remain with the arrestees for hours. This prevented them from assisting with crowd control efforts.

It appears that minimal pre-planning was done by LAPD in regard to setting up the appropriate mass arrest organization, including a field jail and transportation plan, until after problems arose on Saturday, May 30. After three nights of demonstrations, some with significant violence including arson and looting, LAPD was not timely in establishing the field jail and obtaining the resources needed to operate it. In addition, on May 30, the Central Bureau command post did not have sufficient nor experienced

---

[26] Emergency Operations Guide, page 1.

staff to develop the organization needed to manage this growing incident, causing troublesome delays in getting buses to transport arrestees and processing of arrestees.

**Findings**

51.  The lack of planning and preparation for mass arrests resulted in an insufficient number of personnel assigned to process the arrestees and a lack of buses or vans to transport the arrestees to the field jails. Arrestees were seated on curbs while handcuffed for exceedingly long periods of time before buses were available for transportation.

52.  The lack of an efficient mass arrest procedure negatively impacted field operations. Officers in the field were often forced to maintain custody of arrestees for lengthy periods of time making it impossible for them to return to crime control or public order policing operations.

NOTE: The current Prisoner Transportation and Release Services Agreement between LAPD and LASD expires on June 30, 2021. It addresses service fees, contractual requirements and limitations for prisoner transportation from jail facilities to court locations. It does not include an emergency clause regarding the transportation of arrestees during a local emergency.

### (c)  Field Jails

The incident commander must consider several factors when determining the most appropriate location for a field jail unit. These factors as outlined in the field jail guide include accessibility to the involved area, proximity to the incident command post, number of arrestees, sufficient space for processing, detention, supplies, lighting, restrooms and other factors.

Further, the field jail guide notes that,

> "Arrestees should not be held at a Field Jail Unit long enough to require feeding. However, the formal booking facility (Jail Division, County jails) that ultimately receives the prisoners must be prepared to feed them. The facility should be alerted if a large volume of arrestees is foreseen. Liaison should be established with the prosecutor's office and the local courts to expedite arraignment of arrestees".

**Observations**

West Bureau selected the Jackie Robinson Stadium, at the University of California, Los Angeles (UCLA) located in West Los Angeles, as the location to setup a field jail. The location was freeway close, large, and secure, preventing protestors from wandering in while resources were staging, and arrestees were being processed. The selection of the UCLA venue was problematic as the optics of using the Jackie Robinson Stadium, a stadium named after an iconic civil rights movement symbol, to process arrestees protesting police abuse of people of color was insensitive. UCLA administrators complained because their students were arrested and objected to the use of the stadium. This resulted in the location being

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

used for one 24-hour period before the Department was required to move to a location in the San Fernando Valley.

The field jail locations were miles from the locations of arrest. People were released late in the evening and early morning hours during the curfew period, placing them again in violation of the curfew declaration. Further, there was no public transportation available, and people were not able to call for someone to pick them up without also placing that individual in jeopardy of being arrested for a curfew violation.

**Findings**

53. The lack of selection of an appropriate location for the field jail unit resulted in the Jackie Robinson Stadium location being used for one 24-hour period before the Department was asked to relocate, requiring personnel to move to a location in the San Fernando Valley and set up a new field jail.

54. The field jail locations were miles from arrest locations and when people were released, they were again in violation of the curfew.

55. Personnel assigned to the field jail had not received training on field jail procedures.

56. The use of the UCLA Jackie Robinson Stadium as a field jail was inappropriate during these protests.

## Section 4.06    Preparedness and Training

Federal Emergency Management Agency (FEMA) identifies four phases of disaster management as preparedness, response, recovery, and mitigation. The emergency preparedness phase is defined by the Department of Homeland Security (DHS) and FEMA as a "continuous cycle of planning, organizing, training, equipping, exercising, evaluating, and taking corrective action in an effort to ensure effective coordination during incident response." Preparedness guidelines "promote a common understanding of the fundamentals of risk-informed planning and decision making to help planners examine a hazard or threat and produce integrated, coordinated, and synchronized plans."[27] Preparedness is a constant cycle that allows an agency to prepare for all-risks, all-hazards incidents (see Appendix 11). The concept of preparedness refers to the ability of an organization to anticipate and plan for effective responses to current, imminent or potential events. The preparedness cycle specifically refers to the actions such as planning, organizing, training, etc., taken as a precautionary measure when the organization has the luxury of time.



Preparedness Cycle: Planning, Organizing, Training, Equipping, Exercising, Evaluating, Taking Corrective Action

---

[27] FEMA: Developing and Maintaining Emergency Operations Plans: Comprehensive Preparedness Guide (CPG) 1010, version 2.0 (November 2020)

Training should include an all-hazards approach to policing. An all-hazards approach is an integrated approach to emergency preparedness planning that focuses on developing capacities and capabilities for a full spectrum of emergencies or disasters.[28] Such a training philosophy prepares law enforcement for a multitude of incidents they may face and creates a more agile response to complex incidents when needed. Training must go beyond lecture-based teaching of the fundamentals. It is incumbent upon police agencies to provide training that will prepare and instill confidence in their membership. LAPD provides its personnel with an abundance of training, much of which is excellent, evidenced by agencies across the country participating in or seeking out LAPD's curriculum.

**Observations**

Post-1992 civil unrest, Metropolitan Division was directed to develop a 16-hour mobile field force and crowd management course to include lessons learned from the unrest and began delivery to LAPD personnel.[29] By 1993, 6,500 Department personnel had been trained. In 1993 the State of California adopted the mobile field force concept and the 16-hour training course. As other training demands increased overtime needs, the mobile field force refresher course was reconfigured in 1994 to be a four-hour, eight-hour, or twelve-hour version of the course to be delivered on an as needed basis. At that time, the mobile field force training was added to the Supervisory Development School.[30]

In July 1999, preparations for the 2000 Democratic National Convention began and Metropolitan Division trained approximately 500 patrol officers and 350 supervisors in the eight-hour mobile field force refresher course which included crowd control techniques. Sporadic training on crowd management and mobile field force occurred between 2000 and 2007.

In 2007, after the MacArthur Park incident, the Chief of Police directed Incident Management and Training Bureau (now Training Bureau) to conduct Department-wide training on command and control on a regular basis consistent with the California State Commission on Police Standards and Training two-year training cycle. The recommendation was that scenario-based, classroom and e-learning training would be viable methods of training. Additionally, command staff officers would continue training on an annual basis as recommended in the 2007 MacArthur Park report. Due to the Chief of Police's concerns regarding command staff's lack of experience in facilitation of demonstrations and crowd control incidents, an incident management team mentoring program was introduced. This mentoring program created teams of command officers who would be assigned newly appointed command staff as mentees. The incident management teams would then be assigned to pre-planned protests, demonstrations, celebrations, parades, etc. Those who were inexperienced would shadow the mentors, providing opportunity for learning and gaining of experience. This program assisted in preparing future leaders of the Department.

---

[28] The Department of Homeland Security, Federal Emergency Management Agency (FEMA) Continuity Guidance Circular 2(CGC 2) July 22, 2010 https://.fema.gov/pdf/about/org/ncp/coop/cont_guidance2.pdf
[29] LAPD Tactical Crowd Control Course, course number: SK 43.
[30] LAPD Tactical Crowd Control Course, course numbers: SK 43, 114 & 115.

During 2007-2009 all Department sworn personnel attended a ten-hour Crowd Management/Crowd Control course. Areas trained together with their commanding officers in which groups of over 150 personnel at a time would train thus being able to replicate actual field scenarios with large numbers of demonstrators. Over 9,500 personnel were trained. During this time, all command staff also completed incident command system training annually. The incident management team mentoring program continued during that time.

During 2009-2012, the Multiple Assault-Counter Terrorism Action Capabilities ten-hour course incorporated a brief overview of the mobile field force concept and was conducted Department-wide. This allowed large numbers of personnel to train at one time, allowing for replication of actual field scenarios. All officers, supervisors, and command staff were required to attend. Over 9,100 personnel were trained. Incident command system training also occurred at the quarterly command staff training each year. The incident management team mentoring program continued, on an informal level.

During 2013-2014, some crowd management training was conducted through e-learning for line personnel and hands on training in the basic recruit course for all new officers. Incident command system and crowd management training occurred in the command staff quarterly training each year. Additionally, a program was introduced to address concerns over succession planning for command staff called Conversations in 21st Century Policing. Seminars were offered to all command level personnel and lieutenants in which panels discussed topics such as crowd management/facilitations, building community relationships, etc.

Since 2015, there is no evidence of ongoing training and/or a mentoring plan for mid-level managers (lieutenants and captains) or executive-level managers (commanders and chief officers) as was developed and implemented in the aftermath of MacArthur Park 2007. Both the incident management team mentoring program and Conversations in 21st Century Policing were discontinued. Other than the command officer course for lieutenants and newly appointed captains, training on protests, crowd management, crowd psychology, mobile field force, etc., was sparse. The priority for training had shifted away from public order policing to other topics. The hands-on training of the past had given way to more classroom lecture training.

In 2017 the Department required mobile field force and crowd management training to be reduced to a four-hour block embedded in a ten-hour course, mostly classroom, with some practical exercise. At that time, the Department introduced the 40mm less lethal system into patrol operations. Two hours of the four-hour block introduced personnel to the less lethal weapon, demonstrated how it functions, and each officer fired the weapon. Upon completion of the course personnel were considered certified to carry and deploy the 40mm. The curriculum was reviewed and found to be silent on the subject of using the 40mm in crowd control situations.

In most instances during May-June 2020, officers performed as trained. They responded professionally to complex and dangerous incidents involving large crowds of demonstrators which included those who were peacefully and loudly attempting to exercise their First Amendment rights, and groups who came

52

to engage in criminal acts of violence, assaults, vandalism, arson, and looting. Line personnel responded as directed by supervisors and command staff.

LAPD commanding officers were not trained or regularly exercised on crowd dynamics and crowd psychology. Such training and exercising are necessary to manage and take command of public order policing incidents. This was also noted in the MacArthur Park 2007 report. Public order policing demands command level training extend beyond a one-day mobile field force/crowd management training.

**Findings**

57. A review of crowd management curriculum in place prior to 2017 revealed that the eight-hour and ten-hour courses adequately covered basic mobile field force and crowd management concepts and included crowd dynamics. The 2017 four-hour mobile field force training did not adequately cover the material.

58. In the aftermath of the May-June 2020 demonstrations, the Department conducted a ten-hour mobile field force and crowd management course. As of the close of 2020, over 4,000 personnel were trained. The training curriculum is adequate for the basic mobile field force and basic crowd management topics.

59. Annual, hands on training on public order policing for command staff diminished over time resulting in many command staff in 2020 not being prepared for the civil unrest.

60. Most LAPD command staff have completed the basic incident command system training. However, the events of the summer of 2020 make it clear that additional training and mentoring in crowd control tactics and specific incident command system positions, such as incident commander, operations chief, logistics, etc. is needed and should be conducted on an annual basis.

61. The incident management team mentor program was dismantled resulting in numerous command staff lacking experience with public order policing.

62. Training on the 40mm system use during crowd control situations was insufficient.

## Section 4.07        Wellness

It is imperative that those in decision making roles as well as the officers who are in skirmish lines, facing hostile crowds and people throwing dangerous objects at them, be clear headed, have proper protective gear, have patience, and not be sleep deprived. Any agency which has emergency medical team (EMT) programs must ensure personnel are properly equipped to handle incidents in the field for the safety of the officers and the individuals they encounter.

**Observations**

The Department mobilized on the night of May 30, going into the morning of May 31. The process of deployment of the A-B watch configuration (where A watch starts at 6:00am and B watch starts at 6:00pm) often took hours to accomplish. Most of the demonstrations during this timeframe occurred later in the day or mid-afternoon and the A-watch personnel were committed to incidents that stretched far beyond their scheduled end of watch time.

Many officers worked 16 to-20-hour days, some standing on skirmish lines for hours without relief. At the same time there were officers who were being held in reserve and for unknown reasons never were deployed. Some remained in holding for entire shifts. Command officers were subject to the same long hours without relief.

An overwhelming concern from all sworn and civilian personnel is the mental health aspect of the LAPD and morale. A Department psychologist interviewed said that there has been a significant increase in the number of officers and civilian employees experiencing mental health problems since the protests. From a review of the Los Angeles Police Protective League survey results it is clear that morale is impacted by the Department, the Board of Police Commissioners, and City leaders, with these results:

- 86.33% do not feel supported by Department leadership (executive leadership and the Board of Police Commissioners).
- 99.1% do not feel supported by the Mayor.
- 99.1% do not feel supported by the City Council.

While some will see this as an important problem that needs immediate attention, others may say that Department personnel are simply complaining. Nevertheless, the survey results should be taken seriously by the Department and City leadership.

During the protests, the Department personnel and the media observed that some subgroups within the crowd and people standing on apartment balconies at various locations used green laser pointers to attack officers by focusing on the officers' eyes. At least one officer sustained significant eye damage. News reports indicate that the officer lost sight in one eye and has balance difficulty and migraine headaches. The use of lasers in Los Angeles and in other places, such as Portland, was at times unrelenting.

Some officers were attacked with bricks, fireworks, containers filled with urine, frozen water bottles, and caustic chemicals such as bleach. One police captain noted that someone fired a firework/explosive narrowly missing his head; the blast concussion caused the captain to lose vision and hearing for approximately a minute. Other personnel also noted they were struck with chemicals and/or fireworks. A review of the injuries sustained by police personnel during the review period noted several officers injured from projectile strikes, many suffering injuries to their hands.

There were several people (protestors and officers) injured during the May-June protests. Many of the seriously injured were provided medical care by the Los Angeles Fire Department. However, there were

instances where the Fire Department was not able to reach the injured individual due to crowd size and activity. There was at least one incident were police officers provided care to a person during a protest and other instances where they rendered aid to a fellow officer. It is likely police personnel provided medical care to other persons during the protest. These incidents are not captured by the Department in a consistent manner.

In 2014 officers were provided with updated training and first aid kits. As a result, there are several instances over the years in which officers rendered first aid and, in some cases, saved lives. The Department identifies expectations that employees "should provide basic and emergency assistance to all members of the community, including victims, witnesses, subjects, suspects, persons in custody, subject of use of force, and fellow officers" within their training and experience.[31]

The LAPD Emergency Medical Technician (EMT) program (officers voluntarily undergo additional training and maintain EMT certification) is also of significance. The first aid kits and accompanying training and the EMT program are important to support safety and wellness during general police operations. These valuable resources could potentially play a significant role in addressing injuries occurring during civil unrest when it may be difficult for the Fire Department to reach the injured due to crowd behavior as occurred on occasion during the 2020 protests in Los Angeles.

**Findings**

63. The Department did not appear to have plans in place to relieve personnel in the middle of a tactical operation. This resulted in personnel at all ranks experiencing sleep deprivation.

64. The Department mobilized using the traditional A and B watch configuration. This caused numerous personnel to be sleep deprived during the events due to the rigidity of the A/B configuration.

65. The LAPD ordered special eye protection for every officer to prevent the damaging effects of lasers. (The City of Los Angeles passed legislation making lasers a prohibited item at a demonstration, LAMC Section 55.07, which should be strictly enforced during future events.)

66. The LAPD ordered shields after the unrest to better protect the officers from the crowds and they are being trained in how to effectively use them.

67. The LAPD has a "rendering aid" philosophy and EMT program. There is not a consistent process to document when officers render first aid during crowd management and crowd control instances. The EMT program is voluntary and takes effort by the officers to keep their State certification current.

---

[31] LAPD Training Bulletin: Rendering Medical Aid, July 2019.

It is incumbent upon the Department that the safety and wellness of officers be of paramount importance as it is directly correlated to the safety and wellness of the communities it serves. Emphasis on this critical concern should be a priority as the Department moves forward.

## Section 4.08     Community Input

The Review Team had discussions with a number of community members who participated in many of the demonstrations between May 27 and June 7. Access to these community members was provided to the Review Team by City Council members who identified them with the belief they would be forthright in discussing their experiences. These discussions revealed that most of the interviewees did not have personal apprehension or concern about attending the organized demonstrations. Most of the participants attended more than one event during this time period and saw people of all ages and races, young families with children, and older folks watching out for one another during peaceful protests, enjoying a sense of camaraderie. Some said they wore masks and tried to practice social distancing.

Most of them expected or accepted a police presence but they are not police supporters. They believe that the current policing system in general is not working and they want a reallocation of community resources. Most stated that the police need to have more empathy toward demonstrators and not be so eager to anticipate violence from them. They stated that there is a disconnect between officers and the community, that police "need to listen to what is said at a protest," and that to have police watching them "incites us to say more things and exercise our right to free speech more loudly." However, they also believe that when things did escalate during May and June, it was because of "outside agitators" and "Trump supporters" who came with the intent to cause trouble. It was noted by most that when it started to get dark, it seemed like a new group of people would appear who were more "rowdy" than the daytime group. One of the interviewed community members stated that there were intoxicated individuals and some with mental health issues who caused a lot of disruption at a downtown protest, and that person gave the police credit, saying, "even then, the police let the crowd get their message out." One person left a demonstration at the Hall of Justice after the group started marching later in the day and she saw a "younger crowd coming in . . . it gave me a bad vibe."

None of the community members interviewed personally witnessed any violence, and none had complaints about officer misconduct. Nearly all agreed that the police, while appearing intimidating, were restrained. "The police gave us a chance to protest and give our planned speeches."

## V. Conclusion

Looking to the future, public order policing is going to become even more relevant and complex. Evolving crowd tactics, rising public expectations of police and the increase in civil discord are but a few of the challenges. This report recommends that the LAPD create an executive-level position of Strategic Emergency Manager to be responsible for preparing, planning, researching, and exercising the Department to meet those all-hazards policing needs facing the 21st Century.

It is incumbent that the Department prepare now for events that have a reasonable likelihood of occurring in the future. As identified in this examination, the LAPD did not prepare for handling mass arrests, staging of resources, and training in incident command systems. Nor did the Department provide meaningful strategic public order policing to command officers, mobile field force training for officers, and 40mm training for patrol officers during public order policing incidents, and otherwise did not give public order policing the focus that it deserves.

This report does not ignore the fact that 106 police officers suffered injuries from dangerous objects being thrown at them, lasers used to injure their eyes, and other methods used to injure the officers and incite the crowd of protestors. Nor does this report ignore the reporting of 141 LAPD patrol cars severely damaged and six destroyed by fire and other forms of vandalism. It does not excuse the behavior of those who used the protests as an opportunity to commit criminal acts or those protesting who got caught up in the violence or hostility. But it does recognize that, despite the provocations, the police must be able to effectively address those who are committing criminal acts and causing disruption. One of the fundamental duties of policing is to protect the First Amendment right to free speech, assembly and the right to petition the government for redress of grievances. The shift in protest dynamics seen in many cities including Los Angeles in 2020, makes protecting First Amendment rights more complex. Traditional crowd management techniques and tactics seem ill equipped to handle this new trend.

There were three key decisions that worked as a force multiplier and supported the Department in restoring order in June 2020: (1) the mobilization of the Department personnel; (2) the curfew implementation; and (3) the support of the National Guard. Although the Department was operating in a difficult and complex environment there were several notable deficiencies in seven areas:  planning, command and control, public order policing, use of less lethal tools, mass arrests, preparedness and training, and wellness.

This report encourages the Department to review and evaluate the Department's public order policing operational doctrine and training as well as less lethal tools training, certification, and less lethal use related to crowd control situations. There are 67 findings identified in this report that resulted in a total of 22 specific recommendations. The recommendations are designed to integrate policies, procedures, and protocols into the Department culture, so reforms are sustainable going forward. By establishing an executive-level person with appropriate support staff (Recommendation No.1) who is responsible for preparing the Department to meet future strategic challenges, it is hoped that the LAPD will seriously engage in a continuous cycle of improvement.

## VI. List of Findings

**Planning Findings**

1. The Department did not follow the basic principles of the incident command system and did not set up an appropriate area command post immediately when protests became widespread by designating the Central Bureau as the Department command post overseen by an assistant chief. Related Recommendation Nos. 1, 2, 12.

2. The Central Bureau command post did not become fully staffed until May 31. Some personnel assigned lacked experience and training in command post operations. (All of the issues with this command post are fully explained in Section 4.02 Command and Control (b) Operations Central Bureau Command post.) Related Recommendation Nos. 1, 12.

3. There was a lack of firm executive-level direction to the Department command officers to prepare and plan for potential widespread civil unrest and demonstrations which contributed to the problems cited throughout this report. It is unlikely that proper planning would have totally prevented the problems experienced in Los Angeles. However, preplanning and preparation could have mitigated the issues. Related Recommendation Nos. 1, 12, 16.

4. It does not appear that either the Department or City leaders had a plan for messaging to the public, to the media, or to Department personnel. Related Recommendation No. 13.

5. There was a lack of a unified message from City leaders to de-escalate the violence so that peaceful protestors could exercise their First Amendment rights. Related Recommendation No. 13.

**Command and Control Findings**

6. A lack of clear command and control led to diverted resources and at times, an inability to accomplish basic policing tasks given by the incident commander or operations chief. Related Recommendation Nos. 12, 16.

7. The lack of a known and clear chain of command resonated in some incidents examined. Related Recommendation No. 12.

8. The lack of a dedicated unit to analyze information, along with the fact that the Department does not have software to assist with the analysis, weakened the process and created a significant disadvantage. Related Recommendation No. 19.

9. Interviews and a lack of any documentation to the contrary support the conclusion that the Department has no specific or consistent direction on how individual commands are supposed to monitor the internet and social media. Related Recommendation No. 19.

10. There is no training within the City or Department to develop employees in the skills necessary to perform the intelligence function. Related Recommendation No. 19.

11. There is no current robust intelligence function to gather information, analyze it and then distribute it effectively and quickly during large, wide-spread events. While current budget deficits could prevent the Department from staffing dedicated intelligence positions, it would be beneficial for the Department to develop a plan on how it would monitor the internet and social media when staffing does become available. Related Recommendation No. 19.

12. Software and technology is available to analyze the flow of information, which would provide meaningful intelligence to those who need it during an event. Related Recommendation No. 19.

13. The Department does not have established protocols on how intelligence/information is going to be distributed during major events so that all personnel know how to obtain the information and that there is consistency throughout the Department. Related Recommendation No. 19.

14. The Department should have set up a separate area command under the direction of an assistant chief using the Department Operations Center. No information was provided to the Review Team that any assistant chief assumed formal operational command of Department operations at any time during the review period. Having Central Bureau act as the area command placed an unnecessary burden on the entire Central Bureau incident command structure. In addition, it exceeded the span of control as recommended by incident management best practices. Related Recommendation Nos. 1, 2.

15. The initial designation of the Central Bureau staging area as the Department staging area was problematic. Personnel from throughout the City had to respond to this location and in some instances were then sent back to their home bureaus or to locations in the City in other geographic bureaus outside of Central Bureau, causing delays in response Related Recommendation No. 2.

16. Personnel assigned to the staging area in many cases had never received training on how to run a staging area or command post. They had to devise staging procedures on the fly, at the very time that personnel demands were the greatest in the field. Related Recommendation No. 2.

17. Problems with the staging area included the location, long delays in processing personnel, a lack of restrooms and proper lighting, and lack of protection from the extreme heat during the day (temperatures over 100 degrees Fahrenheit). Related Recommendation Nos. 2, 19, 20.

18. Personnel assigned to the staging area were forced to use paper forms and white boards to receive, organize, track, and then dispatch hundreds of officers, causing further delays. Related Recommendation No. 20.

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

19. West Bureau's decision not to establish a fully staffed command post after two nights of violent protests resulted in no logistical support for the West Bureau divisions and adversely impacted their ability to manage the large-scale events. Related Recommendation No. 2.

20. There was a lack of personnel assigned to key event action plan positions for the Pan Pacific Park protest. This does not mean that some, if not all, positions were staffed, however, it does raise questions as to whether the command post staff was adequately staffed to handle this event. Related Recommendation Nos. 1, 2.

21. The lack of fully staffed West Bureau and Pan Pacific Park event command posts hindered the ability of the incident commander to manage the extreme anger and violence exhibited by some of the protestors on Saturday, May 30. Related Recommendation Nos. 1, 2.

22. The National Guard deployment and the LAPD's use of this resource was well documented, and the activation was consistent with the Department's direction. No recommendation.

23. The fact that the National Guard operated without becoming the story is a testament to both the conduct of the National Guard and to the Department's ability to quickly solve problems as they surfaced. LAPD's success in facilitating the National Guard's deployment appears to be in large part because LAPD personnel with both military and incident command system experience were selected to work this assignment throughout the duration of the National Guard's deployment to Los Angeles. No recommendation.

24. The LAPD has various settlement agreements (as described elsewhere in this report) that requires the approval of a commander (or higher) to use certain kinds of less lethal munitions. The LASD has a lower approval threshold for the deployment of less lethal munitions that allow an incident commander or watch commander to approve the use of the same munition. Related Recommendation No. 1.

25. Due to the operational differences between agencies, the LAPD should consider using mutual aid agencies for fixed position tasks, such as protecting locations freeing up LAPD officers to engage in more dynamic tactical action (skirmish lines and seeking out roving looters). Related Recommendation No. 1.

**Public Order Policing Findings**

26. There were many protests during the evaluation period which the LAPD facilitated peacefully. No recommendation.

27. There was a lack of training to properly prepare command officers for managing large crowds with the possibility of civil unrest and many command officers stated they did not feel confident in handling these incidents. Related Recommendation Nos. 1, 11, 12, 14, 15, 16, 21.

28. The Department culture inhibits those in in a position to make decisions as they are either afraid to use their best judgment or paralyzed by concerns that they will be second-guessed by their superiors or they fear "becoming the story". Related Recommendation No. 21.

29. The LAPD did not anticipate and was not prepared for the disruptive strategies of swift mobility and coordination of movement used by some criminal groups. Related Recommendation Nos. 1, 9, 11, 12, 13, 14, 15, 16, 19, 21.

30. The traditional mobile field force configuration of 45 officers was not effective in many instances during the protests of 2020 and additional personnel were needed to be able to protect the police vehicles and manage the crowds. The LAPD has since increased the size of the mobile field force from 45 to 60 personnel. Related Recommendation Nos. 13, 14.

31. The LAPD adjusted tactics mid-way through the unrest when the air unit designed a tactic that broke up mobile field force units into smaller squads. This tactic proved effective. No recommendation.

32. Officers occasionally expressed concern to supervisors that the mobile field force police vehicles needed to be guarded, however, in some instances these warnings were ignored. Related Recommendation Nos. 11, 13, 14, 16.

33. There are no standard Department protocols or training documents on the use of shadow teams. Related Recommendation No. 15.

**Less Lethal Tools Findings**

34. Communications and information from the shadow team's observations were not distributed in a timely manner. The Department now assigns shadow teams and a uniformed cover team to the mobile field force. This will allow for a more direct line of communication between shadow teams and mobile field force leaders while providing the shadow teams with a dedicated security team. Related Recommendation No. 15.

35. It appears the majority of reported injuries that were sustained by persons in crowds were the result of less lethal munitions from the 40mm. Many who reported being injured claim that they were not involved in any violent or hostile acts. Related Recommendation Nos.1, 7, 9, 10.

36. Injuries reported ranged from minor to significant, some in the head, the back, the neck, and the eye. Related Recommendation Nos. 1, 7, 9. 10.

37. Limited viewing of video indicated that there were instances where officers quickly fired the 40mm rounds at distant targets which increases the likelihood of hitting the wrong target. Related Recommendation Nos. 1, 7, 9, 10.

38. The deployment of less lethal munitions was not always done at the direction of a supervisor or officer. In some instances, officers were directed to be in front of a skirmish line and left to

deploy less lethal tools, including the 40 mm, with no direction or coordination. Related Recommendation Nos. 1, 7, 9, 10.

39.  Over 7,800 personnel were trained (certified) to deploy the 40mm during a two-hour block of instruction at the ICDC course. However, the Review Team did not find the two hours of training to be sufficient given the skill level needed to deploy the 40mm in a chaotic public order policing environment. Related Recommendation Nos. 7, 9, 10.

40. Officers are required to be trained one time on the 40mm system. Deploying the 40mm in public order policing situations requires recurring certification and training. Related Recommendation Nos. 7, 9, 10.

41. The skill level required to deploy the 40mm in chaotic public order policing situations is high. Officers must be extremely competent and possess excellent marksmanship skills. It is unlikely that all officers trained possess the marksmanship skills necessary to competently deploy the 40mm system under those circumstances. Related Recommendation Nos. 7, 9, 10.

42. The last training for the 40mm for officers, other than those going through recruit training, was in 2018. Related Recommendation Nos. 7, 8, 10.

43. Most supervisors and officers who deploy less lethal munitions are outfitted with body worn video and could use the video audio capabilities to record information about their use of less lethal munitions. This should become a protocol during crowd control situations. Related Recommendation No. 10.

44. The Department's Use of Force Tactics directive authorizing the use of 40mm has no detailed guidance on use in public order policing situations. Related Recommendation Nos. 1, 9.

45.  The 40mm can be an effective tool in a crowd control situation when utilized by officers who are well trained and experienced in its use. Related Recommendation Nos. 7, 8, 10.

**Planning for Mass Arrests Findings**

46. The LAPD failed to plan ahead for mass arrests, which resulted in a last-minute, uncoordinated effort to manage the arrests of more than 4,000 individuals. Related Recommendation Nos. 1, 2, 3, 5, 6.

47. The arrests made on Thursday, Friday, and Saturday were made under a Municipal Code Section that is an infraction requiring a citation and release in the field. No recommendation.

48. On Thursday, Friday and Saturday, the LAPD arrested and detained individuals for exceedingly long periods of time, and transported individuals to a Department facility for processing. Related Recommendation Nos. 2, 3, 5, 6.

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

49. Those arrested were detained for hours while handcuffed and were not provided with water or the use of bathroom facilities and were help in close conditions without masks during a pandemic environment. Related Recommendation Nos.2, 3, 5, 6.

50. The LAPD has not corrected the issues related to detention and arrests identified in the 2011 Occupy LA and the 2014 Ferguson protests. Those lawsuit settlements regarding arrest problems resulted in the City paying over $3,000,000. Related Recommendation Nos. 1, 2, 3, 4, 5, 12, 21.

51. The lack of planning and preparation for mass arrests resulted in an insufficient number of personnel assigned to process the arrestees and a lack of buses or vans to transport the arrestees to the field jails. Arrestees were seated on curbs while handcuffed for exceedingly long periods of time before buses were available for transportation. Related Recommendation Nos. 1, 2, 3, 4, 12, 21.

52. The Lack of an efficient mass arrest procedure negatively impacted field operations. Officers in the field were often forced to maintain custody of arrestees for lengthy periods of time making it impossible for them to return to crime control or public order policing operations. Related Recommendation Nos. 2, 3, 5.

53. The lack of selection of an appropriate location for the field jail unit resulted in the Jackie Robinson Stadium location being used for one 24-hour period before the Department was asked to relocate, requiring personnel to move to a location in the San Fernando Valley and set up a new field jail. Related Recommendation Nos. 2.

54. The field jail locations were miles from arrest locations and when people were released, they were again in violation of the curfew. Related Recommendation Nos. 2, 3.

55. Personnel assigned to the field jail had not received training on field jail procedures. Related Recommendation No. 3.

56. The use of the UCLA Jackie Robinson Stadium as a field jail was inappropriate during these protests. Related Recommendation Nos. 2, 3.

**Preparedness and Training Findings**

57. A review of crowd management curriculum in place prior to 2017 revealed that the eight-hour and ten-hour courses adequately covered basic mobile field force and crowd management concepts and included crowd dynamics. The 2017 four-hour mobile field force training did not adequately cover the material. Related Recommendation Nos. 1, 12, 14, 15, 17.

58. In the aftermath of the May-June 2020 demonstrations, the Department conducted a ten-hour mobile field force and crowd management course. As of the close of 2020, over 4,000 personnel were trained. The training curriculum is adequate for the basic mobile field force and basic crowd management topics. No recommendation.

63

59. Annual, hands on training on public order policing for command staff diminished over time resulting in many command staff in 2020 not being prepared for the civil unrest. Related Recommendation Nos. 1, 12, 14, 15, 16, 22.

60. Most LAPD command staff have completed the basic incident command system training. However, the events of the summer of 2020 make it clear that additional training and mentoring in crowd control tactics and specific incident command system positions, such as incident commander, operations chief, logistics, etc. are needed and should be conducted on an annual basis. Related Recommendation Nos. 12, 14, 15, 16.

61. The Incident Management Team mentor program was dismantled resulting in numerous command staff lacking experience with public order policing. Related Recommendation No. 21.

62. Training on the 40mm system use during crowd control situations was insufficient. Related Recommendation Nos. 9, 10.

**Wellness Findings**

63. The Department did not appear to have plans in place to relieve personnel in the middle of a tactical operation. This resulted in personnel at all ranks experiencing sleep deprivation. Related Recommendation No. 18.

64. The Department mobilized using the traditional A and B watch configuration. This caused numerous personnel to be sleep deprived during the events due to the rigidity of the A/B configuration. Related Recommendation No. 18.

65. The LAPD ordered special eye protection for every officer to prevent the damaging effects of lasers. (The City of Los Angeles passed legislation making lasers a prohibited item at a demonstration, LAMC Section 55.07, which should be strictly enforced during future events.) Related Recommendation No. 1.

66. The LAPD ordered shields after the unrest to better protect the officers from the crowds and they are being trained in how to effectively use them. Related Recommendation No. 1.

67. The LAPD has a rendering aid philosophy and EMT program. There is not consistent process to document when officers render first aid during crowd management and crowd control instances. The EMT program is voluntary and takes effort by the officers to keep their State certification current. The City plays a role in supporting this effort. Related Recommendation No. 19.

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

## VII.  Recommendations

| Recommendations | |
|---|---|
| 1 | *Recommendation*<br>Establish a Department Strategic Emergency Bureau to be commanded by a deputy chief or civilian equivalent who has expertise in public order policing, incident command systems, liaising with outside agencies, etc. This position should report directly to the Chief of Police.<br>*Rationale*<br>The Strategic Emergency Manager should be responsible for ensuring that the Department:<br>(a) Is on the cutting edge of organization, strategy, tactics, safety equipment and technology in dealing with all-hazard events by establishing contacts with personnel within the Department, throughout the Nation and in the world on this subject,<br>(b) Is responsible for working with Training Group and the existing committee (Tactics Training Review Committee) on developing and implementing procedures and training on this subject,<br>(c) Is responsible for advising the Chief of Police on what needs to be done to ensure the Department is always trained and prepared for any all-hazard events,<br>(d) Is responsible for periodic and thorough review of the Emergency Operations Guide. The position should chair the Unusual Occurrence Evaluation Board as outlined in the Emergency Operations Guide, Volume 1,<br>(e) Is responsible for review of all settlements, litigation, and after action reports and ensuring that items related to incident command system, emergency management, operations and respective training are fulfilled,<br>(f) Identifies and reviews safety equipment to better protect officers from anticipated assaults against them during public order policing operations, and<br>(g) Is responsible for obtaining or reviewing mutual aid agreements with partner agencies, especially the LASD, ahead of time outlining the concepts of operation, use of force policies, approvals required, less lethal tools/munitions to be used and use of force reporting.<br>*Funding*<br>Budget for this position and support staff.  This position will in fact minimize liability and save costs to the Department and the City by helping to reduce lawsuits and judgement awards that will occur if nothing is done.<br>*Responsibility*<br>City Council, Board of Police Commissioners, Chief of Police |

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

| | **Recommendations** |
|---|---|
| 2 | *Recommendation*<br>Under the direction of the Strategic Emergency Management Bureau, thoroughly review and update the Emergency Operations Guide. Include:<br>(a) Emphasis on the field jail guide, Volume 6 of the Emergency Operations Guide,<br>(b) Inclusion and emphasis on when to establish a Department area command structure,<br>(c) Identification of how the Department is to be organized when an area command is implemented under the directions of an assistant chief,<br>(d) Evaluation and updating of the establishment of staging and command post locations, mass arrest instructions, and the need to activate the field jail unit and transportation detail when mass arrests are planned, and<br>(e) Implement periodic training on how to run an area command, command posts (including forward operating platforms) and key positions such as staging.<br>*Rationale*<br>This report identified that the Emergency Operations Guide is outdated in numerous areas and it was not used during the review period to streamline processes.<br>*Funding*<br>No budgetary impact<br>*Responsibility*<br>Chief of Police |
| 3 | *Recommendations*<br>Emphasize the following upon updating the field jail guide:<br>(a) Training of all detective personnel on field jail duties during mass arrests, and<br>(b) Inclusion of field jail duties and staffing duties related to mass arrest in command officer training, and,<br>(c) Inclusion of Custody Services Division jail personnel in training on how to process arrestees during mass arrests.<br>*Rationale*<br>This report identified that the field jail guide within the Emergency Operations Guide is outdated in numerous areas and on several occasions, it was not used during the review period to streamline processes.<br>*Funding*<br>No budgetary impact<br>*Responsibility*<br>Chief of Police |

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

| | Recommendations |
|---|---|
| 4 | *Recommendation*<br>The Office of the Inspector General must periodically audit the requirements, and Department compliance with, all settlement agreements.<br>*Rationale*<br>A search of Board of Police Commissioner public documents on settlements involving protests and/or civil unrest revealed no current settlement agreement audit or inspection reports. Ongoing audits or inspections of the requirements of Department and City settlements should have identified some of the deficiencies identified in this report.<br>*Funding*<br>No budgetary impact<br>*Responsibility*<br>Board of Police Commissioners |
| 5 | *Recommendation*<br>Conduct a periodic review of the number of buses and vans available to transport arrestees during a mass arrest situation and the number of personnel certified to drive them. Include:<br>(a) An assessment that the total available is sufficient,<br>(b) Plans to increase the transportation fleet if needed, and<br>(c) Whether the Department Operations Center, Communications Division, shall retain a current list of all certified drivers.<br> *Rationale*<br>Currently there are few LAPD personnel properly licensed (Class B with appropriate endorsements) and the Department should identify an appropriate number of drivers needed for this function.<br>*Funding*<br>Cost to certify and license personnel: unknown budgetary impact until the Department identifies the number of personnel needed and the cost of licensing. The cost of buses and vans.<br>*Responsibility*<br>City Council, Board of Police Commissioners, Chief of Police |
| 6 | *Recommendation*<br>Work with both the LASD and MTA to include clauses in their Prisoner Transportation and Release Services Agreement contracts to assist with arrestee transportation during local emergencies.<br>*Rationale*<br>To prevent arrestee transportation delays and employee relations conflicts between agencies as noted in the events of 2020.<br>*Funding*<br>Unknown budgetary impact.<br>*Responsibility*<br>City Council, Board of Police Commissioners, Chief of Police |

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

| | **Recommendations** |
|---|---|
| 7 | *Recommendation*<br>Undertake an extensive study of all less lethal munitions, including the 40 mm round, to examine performance, consistent velocity, potential for ricochets, influence of the plastic wrapping or banding around the sponge projectile and other aspects of the round. Included in that study should be any potential new technology for use in public order policing operations.<br>*Rationale*<br>While manufacturers conduct research on the various less lethal rounds, the LAPD should conduct its own studies and look for emerging technologies.<br>*Funding*<br>Minor budgetary impact-cost of munitions.<br>*Responsibility*<br>Board of Police Commissioners, Chief of Police |
| 8 | *Recommendation*<br>Design and implement an inventory system to audit and track the amount of less lethal munitions, including the 37mm and 40mm rounds, expended during any public order policing incidents.<br>*Rationale*<br>The Department was unable to provide an accurate accounting of these munitions used during the 2020 protests.<br>*Funding*<br>No budgetary impact.<br>*Responsibility*<br>Board of Police Commissioners, Chief of Police |
| 9 | *Recommendation*<br>Update the use of force tactical directives to include more detailed instruction regarding the use of less lethal tools in crowds and the approval level required for the deployment of each the less lethal tools.<br>*Rationale*<br>Currently there is no use of force tactical directive relative to the 37mm less lethal tool.  The information contained in the use of force tactical directive for the 40mm system does not contain adequate instruction on the use of the round in crowd control situations.<br>*Funding*<br>No budgetary impact.<br>*Responsibility*<br>Chief of Police |

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

| Recommendations | |
|---|---|
| 10 | *Recommendation*<br>Establish protocols that:<br>(a) Only trained (certified) members of Metropolitan Division or officers who receive consistent and periodic instruction and certification in the 40mm system should be allowed to deploy the 40mm during crowd control situations,<br>(b) Retain the use of the 40mm system for all other officers during patrol duties and ensure annual retraining of weapon manipulations during shotgun qualification, and<br>(c) Mandate the use of body worn video (when feasible) to record problem behavior of individuals in the crowd when officers decide to use the target specific 40mm in a crowd control situation.<br>*Rationale*<br>The Department certified nearly 8,000 officers to deploy the 40mm munitions in patrol functions and deployment of that system in crowd control situations. Limiting the deployment of the 40mm munitions during crowd control situations to officers with enhanced and on-going training may enhance effectiveness and reduced unintended strikes during use under such conditions. Manipulations of the 40mm system could easily be retrained/tested during the annual shotgun qualification cycle after the shotgun qualification with minimal impact to deployment concerns. This would guarantee that the perishable skill involving weapon manipulation is addressed annually.<br>*Funding*<br>No budgetary impact.<br>*Responsibility*<br>Chief of Police |

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

| | **Recommendations** |
|---|---|
| 11 | *Recommendation*<br>Create an LAPD two-year training plan that is aligned with the State training cycle that is reviewed and updated every year to include:<br>(a) All required training mandates by various entities including the State, City, Police Commission,<br>(b) All litigation settlement items, or previous applicable reports,<br>(c) The topics and methods for training and delivery,<br>(d) Who is mandated to attend,<br>(e) Frequency, number of hours required,<br>(f) A cost analysis of time, dollar amount, and what training is not going to be able to occur,<br>(g) Identification of where the training should be integrated to replicate real life experiences, and,<br>(h) Formal plan approval by the Chief of Police with any modifications documented.<br>*Rationale*<br>It was evident that many executive-level officers throughout the Department's history, including the Board of Police Commissioners, and the City placed numerous well-intentioned training requirements on the Department with little understanding of the overall impact on deployment, training mandates, costs, and/or the organization. Likewise, these same executive officers frequently cut training without understanding the overall impact on the Department and training mandates put in place by litigation, legal mandates, etc. This will allow those recommending or mandating additional training to address the impact the proposed training would have on Departmental operations and the current training plan, and the cost to the Department. This process would document when and why training modifications occurred and ensure lessons learned from the past and training advances such as those of the Consent Decree are not lost.<br>*Funding*<br>No budgetary impact.<br>*Responsibility*<br>Chief of Police |

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

| | **Recommendations** |
|---|---|
| 12 | *Recommendation*<br>Train command staff annually on the incident command system, including:<br>(a) Exercising all-hazards events (fires, earthquakes, pandemics, demonstrations, etc.) through hands-on, scenario-based training, and<br>(b) Activating the incident management teams concept as outlined in the Emergency Operations Guide as part of the training plan.<br>*Rationale*<br>This will reinforce in all command officers what their designations mean in the incident command system configurations and provide for certainty and uniformity in the chain of command from the incident commander and improve situational awareness to direct field operations.<br>*Funding*<br>No budgetary impact at this time.<br>This training could be included in the current rotation of quarterly command staff training session.<br>*Responsibility*<br>Chief of Police |
| 13 | *Recommendation*<br>Staff the public information officer position in the incident command system during any major event(s). This position should be responsible to coordinate periodic updates from the Department for the media and the public to keep them informed on the status of the event(s). The personnel assigned should also coordinate with other City leaders to ensure there is a coordinated and consistent message being provided throughout the duration of the event(s).<br>*Rationale*<br>The importance of keeping the media and the public informed on the status of any event is critical to ensure that there is transparency, rumors are managed, misinformation can be corrected, and/or information clarified. The lack of providing these periodic updates can provide people with agendas that do not serve the public, to fill the gap with information that is inaccurate and at times can endanger lives. The need to include the City leadership in this process is also critical so that there are no mixed messages which can lead to the public questioning the credibility of the information being provided.<br>*Funding*<br>No budgetary impact at this time.<br>*Responsibility*<br>Chief of Police |

| | **Recommendations** |
|---|---|
| 14 | *Recommendation*<br>Conduct a thorough review of, and update on, the configuration and deployment of a mobile field force to include consideration of:<br>(a) The number of officers and supervisors deployed in a mobile field force,<br>(b) The configuration of the preplanned mobile field force,<br>(c) Examination of the form of transportation of the mobile field force (police car vs vans, etc.), and<br>(d) Assessment of whether preplanned mobile field configurations should include resources such as shadow seams.<br>The review should use Department expertise and subject matter experts.<br>*Rationale*<br>Under the current mobile field force configuration, a driver must remain with each police car, which only carries four officers.  This change could allow for less vehicles and less personnel needed to be assigned to vehicle protection upon arrival.<br>*Funding*<br>No budgetary impact at this time.<br>*Responsibility*<br>Chief of Police |
| 15 | *Recommendation*<br>Conduct a thorough review of mobile field force training:<br>(a) Adjust accordingly to any updated, contemporary tactics for crowd control as identified during the mobile field force review by the Department experts as stated in recommendation No.1, and any updated California State guidelines,<br>(b) Training Bureau should conduct this review in coordination with personnel with appropriate expertise. If the Department adopts the Strategic Emergency Manager recommendation, Training Bureau and the Director of Police Training and Education should coordinate the update with this executive-level officer, and,<br>(c) Require that hands on mobile field force training be conducted every two years for lieutenants and below and annually for command officers.<br>*Rationale*<br>Mobile field force skills are perishable and need to be trained on a consistent basis to ensure competency. Currently no Department representative is specifically designated to reach out to other agencies, experts or scholars for best practices to learn what tactics are being used by protestors around the nation or the world. A consensus of the people interviewed for this review stated that many of the tactics used by protestors during this event had not been seen before by the LAPD.<br>*Funding*<br>No budgetary impact.<br>*Responsibility*<br>Chief of Police |

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

| | **Recommendations** |
|---|---|
| 16 | *Recommendation*<br>Establish Department-wide, consistent shadow team protocols and training to manage the risk that shadow teams endure, including establishing a clear line of communication so information is received and acted upon rapidly by the incident commander to enable quick arrests when necessary or to potentially retrieve the shadow team officers if needed.<br>*Rationale*<br>Shadow teams are for the safety of the crowd and the officers facilitating crowd movement. Well-coordinated teams with clear missions can coordinate the quick removal of individuals committing crimes and/or prevent a potential "blue on blue" situation in which undercover police officers may not be recognized by uniformed personnel.<br>*Funding*<br>No budgetary impact.<br>*Responsibility*<br>Chief of Police |
| 17 | *Recommendation*<br>Explore the possibility of adding public order policing scenarios to the Department's force-on-force training (training simulators/systems) library. Include scenario training for command staff, supervisors and officers.<br>*Rationale*<br>The Department does not currently use public order policing scenarios in its force-on-force training simulators/systems. Force option simulation training will enhance decision making and competency in using the less lethal tools.<br>*Funding*<br>Unknown cost of new force options simulator or other technology.<br>*Responsibility*<br>Chief of Police |
| 18 | *Recommendation*<br>Review and assess the current mobilization period start times to determine if an additional start of watch time would be appropriate to prevent the fatigue that occurred during this event.  Develop several unusual occurrence deployment schemes to fit a variety of occurrences (A/B, A/B/C etc.) to provide for safety and flexibility. A possibility would be to add a 10:00am start time for personnel who would most likely be assigned to missions that would go end of watch after 6:00pm.<br>*Rationale*<br>The Department currently uses two start of watch times, 6:00am-6:00pm, for most all personnel. During these events it was common for personnel who began watch at 6:00am to be assigned to missions that caused them to work 18 or 20-hour shifts, severely limiting the time they had to rest and recover. This can cause levels of fatigue that can lead to flawed decision making.<br>*Funding*<br>This recommendation may save funds as overtime should be reduced.<br>*Responsibility*<br>Chief of Police |

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

| | **Recommendations** |
|---|---|
| 19 | *Recommendation*<br>Establish a more robust Department basic first aid and EMT program.<br>(a) Develop a consistent reporting process to document all instances of rendering general first aid using the first aid kits provided to all officers,<br>(b) Develop a consistent reporting process to document all incidents when a trained EMT renders aid,<br>(c) Support the EMT program in terms of the cost of the equipment and on-duty time needed to retain State certification, and<br>(d) Consider providing a bonus pay incentive for those employees who are EMT certified.<br>*Rationale*<br>The Department currently does not document these instances in a consistent manner. Establishing a more formal and expanded EMT program to include patrol officers will provide potentially lifesaving care.<br>*Funding*<br>Cost of a bonus based on the number of employees EMT certified, the cost of replacing used equipment and keeping equipment updated.<br>*Responsibility*<br>City Council, Board of Police Commissioners, Chief of Police |
| 20 | *Recommendations*<br>Purchase software that can be used to analyze open-source internet and social media content to provide field operations with vetted and useable intelligence/information and add appropriate staffing.<br>*Rationale*<br>To provide real-time analysis of information.<br>*Funding*<br>Council to consider approving funding or Department could potentially use federal Urban Areas Security Initiative (UASI) grant funds.<br>*Responsibility*<br>City Council, Board of Police Commissioners, Chief of Police |
| 21 | *Recommendation*<br>Explore Department personnel tracking technology to be used for large scale events to be able to track personnel during staging and deployment, skill sets, certification and timekeeping for better planning and deployment.<br>*Rationale*<br>The current process is to conduct Department personnel check-in and check-out using pencil/paper and can take hours to accomplish.  Technology could improve efficiencies, effectiveness, minimize errors, improve personnel safety, and assist with administration of mutual aid and assistance reimbursement agreements.<br>*Funding*<br>Council to approve funding. Budgetary impact is the cost of technology.<br>*Responsibility*<br>Board of Police Commissioners, Chief of Police |

| Recommendations | |
|---|---|
| 22 | *Recommendations*<br>Establish a five-year succession plan.<br>*Rationale*<br>The LAPD has been experiencing an unusually large number of retirements in all ranks over the past ten years taking with them leadership experience and expertise and leaving a gap in experience. This was identified as a problem throughout this report and if the Department does not have the resources to develop a formal succession plan, an outside consultant may be of assistance.<br>*Funding*<br>No budgetary impact unless an outside consultant is determined to be useful. |

*This was intentionally left blank*

# VIII.  Appendix

## Appendix 1:   Review Team Members and Other Contributors

**Review Team Members**

**Gerald Chaleff**

Mr. Chaleff joined LAPD in 2003 under Chief William J. Bratton as the civilian Commanding Officer of the Consent Decree Bureau, tasked with overseeing the implementation of the reform provisions of the 2001 Consent Decree which the Department and the City of Los Angeles entered into with the United States Department of Justice. In 2009, Mr. Chaleff became the Special Assistant for Constitutional Policing to Chief Charlie Beck. During his tenure with the Department, Mr. Chaleff also oversaw the operations of the Department Risk Manager, as well as the Civil Rights Integrity, Planning and Research, Legal Affairs, Internal Audits, and Fiscal Operations Divisions.

Before joining LAPD, Mr. Chaleff was appointed to the Los Angeles Board of Police Commissioners, serving as President from 1999 to 2001. During this time he was selected by the City to be part of the team negotiating with the United States Department of Justice the terms of the 2001 Consent Decree. He is also a former President of the Los Angeles County Bar Association and served as a Deputy General Counsel to the Webster Commission.

After receiving his Bachelor of Science degree from UCLA and his law degree from Harvard Law School, Mr. Chaleff worked for the office of the Los Angeles County District Attorney and the office of the Los Angeles County Public Defender. He then entered private practice, first at his own law firm, and later as a partner at a large, multinational firm. He is a nationally recognized expert in criminal defense, with extensive experience in both state and federal courts and is a member of the prestigious American College of Trial Lawyers.

Mr. Chaleff has served as a consultant on constitutional policing issues to the New York Police Department and assisted the City of New Orleans in their negotiations with the Department of Justice, which resulted in a Consent Decree. Mr. Chaleff is presently a member of the National Research Advisory Board of the Data Collaborative for Justice, at John Jay College and the National Advisory Committee for the Early Intervention System of the University of Chicago Crime lab. He recently assisted in the evaluation of the Community Safety Partnership by UCLA as a member of the Advisory Committee. He has previously served as a member of the Board of Advisory of the Luskin School of Public Affairs, at UCLA.

**Gloria Grube**

Gloria Grube is a retired LAPD Police Administrator III, a Deputy Chief equivalent and the highest ranking civilian position in the Police Department. She spent the last five of her 35 years with the LAPD as the Bureau Chief of the Administrative Services Bureau, a command of 1600 employees. She has overseen or managed most of LAPD's support entities including Personnel, Recruitment, Communications (dispatch center), Records and Identification, Information and Technology, Motor Transport (fleet services), Facilities Management, Evidence and Property Management, and Custody Services Divisions.

76

She also had oversight over the military liaison unit and was responsible for Department-wide personnel deployment.

**Stephen R. Jacobs**

Stephen Jacobs is a retired LAPD Deputy Chief who spent the last five years of his career as the Chief of Staff for Chief of Police Charlie Beck. As the prior Commanding Officer of Metropolitan Division and one of the original incident management team leaders he has extensive experience in crowd management, crowd control and the incident command system.

**Sandy Jo MacArthur**

Sandy Jo MacArthur is a law enforcement consultant (e.g., Chicago, Detroit, New York, Cincinnati) an associate professor at Pepperdine University, and a retired LAPD Assistant Chief. She has extensive experience in policing training, LAPD consent decree and settlement agreements and implementation, use of force, and employee wellness. In 2007 she was the Commanding Officer of Incident Management and Training Bureau and has experience in designing and implementing public order policing training programs. Sandy Jo has her Masters Degree in Negotiations and Conflict Management and for over ten years was a member of the City of Los Angeles City Attorney's Officer Community Dispute Resolution program. She currently a member of the University of Chicago Crime Lab National Advisory Committee on Police Early Intervention Systems and a member of an Advisory Committee for the UCLA evaluation of the Community Safety Partnership program.

**Rosa Moreno**

Rosa Moreno is a retired LAPD Captain III who spent 32 years with the LAPD. She has more than nine years of patrol experience, more than ten years of detective experience and over 12 years of administrative experience. At the time of her retirement, she was the Commanding Officer of Legal Affairs Division. She was an incident management team member, has experience with the Department Operations Center and extensive knowledge of the Department consent decrees, settlements, and lawsuits, including those that pertain to crowd control, mass arrest, and field jail procedures.

**Rick Webb**

Rick Webb is a retired LAPD Commander with over 35 years of service. He currently provides consultation and expert testimony for law enforcement firms and police agencies in police practices, police management, use of force, police tactics, internal discipline and biased policing. While with the LAPD he spearheaded key projects including collaborating with various law enforcement agencies across the country to design new police strategies and tactics to manage large scale active shooter incidents and acts of terrorism.

**Appreciation for professionalism in representing their constituents and clients.**
Rachel Brashier, Deputy Chief of Staff, Office of Councilmember Harris-Dawson, Council District 8
Muna Busailah, Law Firm of Stone Busailah, LLP, Command Officer's Association

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

Krista Kline, Deputy Chief of Staff, Office of Councilmember Bonin, Council District 11
The Los Angeles Police Protective League Board of Directors, representing LAPD Officers to Lieutenants

**Appreciation to the professionals who were interviewed and contributed to this report.**
All those who agreed to be interviewed and made this report possible.
Special thanks to Dr. Ian Mitroff, PhD, Professor Emeritus from the Marshall School of Business and the Annenberg School for Communication, University of Southern California. He is currently a Senior Research Affiliate in the Center for Catastrophic Risk Management at the University of California, Berkeley

Bret Burton, Sergeant Portland Police Department
Craig Dobson, Commander Portland Police Department
Phil Fontanetta, Retired Commander LAPD
Robert Green, Retired Deputy Chief LAPD
Leland Klauzer, Sergeant Portland Police Department
Jeffery McDaniel, Sergeant Portland Police Department
Mark Pazin, Chief of California Office of Emergency Services
Eric Rose, LAPD Reserve Officer and Partner and Crisis/Media Strategist with Englander, Knabe & Allen

### Appendix 2:    Methodology and Limitations

**Methodology:**  The Review Team reviewed documents, policies, directives and tactics of the LAPD and conducted in-depth interviews with over 100 members of the LAPD (more than 50 of whom were members of the leadership team), and City and plaintiff attorneys.

Although most after action reports rely on open discussion participation with those involved in the incident, this report is a hybrid. While the Review Team was not given access to a true after action review meeting with key individuals involved in the protests and civil unrest, the Chief of Police provided an opportunity to obtain voluntary interviews from command staff to officers on the ground. The team was able to obtain over 50 interviews of sworn and civilian command officers. In addition, the team was able to interview over 30 sworn members of the rank of lieutenant and below and reviewed the responses to the LAPPL membership survey regarding the events of May and June 2020, from over 3,000 sworn members. After conducting a thorough review and analysis, recommendations for improvement were identified. A full list of recommendations is found in Section VIII of this report.

City Council members provided the Review Team with a list of community members and advocates who participated in the various protests. The Review Team obtained interviews from ten individuals who were able to provide invaluable information regarding their perspective of the Los Angeles events during May and June of 2020.

**Limitations:**  It is not possible to review and evaluate every incident and interaction between members of the public and the police that occurred during the review period. There are logical, logistical, and legal limitations in the Review Team's ability to evaluate individual actions. Those limitations include:

Each incident and parts of an incident is unique. Police use of force must be evaluated based on the facts and circumstances facing the officer at the time of the force incident. To accurately assess reasonableness, the articulation expressed by the officer and a thorough examination of the facts and evidence surrounding the use of force is required for each incident. Given the thousands of interactions between officers and members of the public during May-June 2020, it was not feasible to examine each incident.

According to LAPD policy, reporting of force used by officers in crowd control situations, such as baton strikes or pushes and deployment of less lethal munitions, is summarized on incident command system forms. This is unlike use of force incidents occurring during normal policing operations where there is an on-scene supervisory investigation, canvassing for witnesses and thorough documentation of all aspects of the incident. Reporting force procedures used in crowd control incidents must consider the fact that the scenes are often dynamic and there may be multiple instances of force used by officers in often unsafe and rapidly unfolding conditions. For these reasons, such uses of force are reported after the incident has calmed or subsided.

In crowd control situations, police supervisors are required to document as much information as they can (the name of the officer(s) using force, the type of force tool used, and the approximate time). Usually, the identification of the subject of the use of force is not known or available and the reporting is

done after the incident has concluded or at the end of the shift. Generally, given the numbers of incidents, the chaotic and on-going nature of crowd control situations, and the delay in reporting, the information documented is typically very general in nature.

All allegations of serious misconduct, including allegations of excessive force are investigated by Internal Affairs Group, Professional Standards Bureau. Officers under investigation, and witness officers, have certain rights afforded to them by the Peace Officers Bill of Rights, California Government Code Section 3300-3311. The Bill of Rights guides the way the investigation is conducted. The Review Team does not have the authority to investigate allegations of misconduct, compel officers to cooperate with an investigation, interview witnesses, canvass for evidence, evaluate the report for consideration of criminal referral, or otherwise make recommendations about individual cases. Further, any effort by the Review Team to investigate or question officers about an occurrence under investigation by the Department could unreasonably interfere with an on-going Department investigation.

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

### Appendix 3:   1992 After-Action Report Findings

| Table of 1992 LAPD After Action Report Findings |
|---|
| After the video recording of an LAPD use of force incident against a Black man (Rodney King) that was viewed by most of the nation, four Los Angeles police offices were tried for excessive force and acquitted. The trial of the officers was broadcast live on television for several weeks. All four officers were acquitted. Soon after the acquittal, violence erupted. Over the following six days, 63 people were killed. The National Guard and other mutual aid law enforcement agencies were deployed into the City. The property damage from arson and looting was estimated at over $1 billion. Below are findings from the LAPD After Action Report. |
| **Problems with call up rosters:** Individual commands were directed to revitalize mobilization rosters, update employee "call-up" and notification plans, develop a ratio of officers to available police vehicles for transportation to areas impacted by civil unrest, and develop platoon size teams to respond to looters. |
| **Preparedness:**  Only a small number of staff officers within the Department believed there was a possibility of violence, while the majority did not and did not follow through on making plans for potential unrest. |
| **Preparedness/Training:**  Although commands were advised to train line personnel in civil disorder tactics, there was no evidence that any training occurred. |
| **Planning:**   A high-level staff officer conducted a meeting with other Department staff and command personnel a month prior to the release of the jury's decision and requested that plans be developed for the possibility of civil unrest in the event that the officers were acquitted of charges. However, planning did not begin until 37 days into the trial. |
| **Planning:**  There was no centralized Department-wide effort to develop plans should there be unrest. Instead, commands were left to devise their own plans, resulting in 18 separate Area plans, four Traffic Division plans, and one Metropolitan Division plan to respond to possible civil unrest. |
| **Area Command:**  There was no centralized direction to conduct outreach to community leadership which may have afforded the Department valuable intelligence that an acquittal most likely would spark community outcry and possible violence. |
| **Preparedness:**  The LAPD experienced organizational complacency, as few problems with civil unrest had occurred within the City since the 1965 Watts Riots. |
| **Incident Command System:** Command post and staging discipline and deployment of resources was poorly executed. |
| **Communication:**  Communications and interoperability difficulties. |
| **Intelligence:** Lack of intelligence gathering capabilities. |
| **Command and Control:**  Command and control deficiencies noted throughout the report. |
| **Planning and Preparedness:**  Department incident action plans for pre-planned events, emergency action plans for unplanned events, and after-action reports created by the LAPD did not include specific areas in planning, command and control, and accurate and timely information.[32] |

---

[32] July 8, 1992, Los Angeles Police Department After-Action Report 1992 April/May Riot.

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

### Appendix 4:   2001 Consent Decree Details

| Federal Department of Justice Civil Rights Consent Decree<br>June 2001 Agreement |
| --- |
| The Consent Decree was intended to promote police integrity within the Department and prevent conduct that deprives individuals of their rights, privileges, or immunities protected by the Constitution of the United States.  The Consent Decree placed emphasis on the following nine areas. |
| 1.   Management and supervisory measures to promote civil rights integrity |
| 2.   Critical incident procedures, documentation, investigation and review |
| 3.   Management of gang units |
| 4.   Management of confidential informants |
| 5.   Program development for response to persons with mental illness |
| 6.   Training |
| 7.   Integrity audits |
| 8.   Operations of the Police Commission and Inspector General |
| 9.   Community outreach and public information |
| In May 2013, U.S. District Judge Gary Feess formally lifted the binding agreement the U.S. Department of Justice imposed on the Department. Judge Feess said that the Department had sufficiently complied with reforming itself and no longer required the oversight of a monitor. |

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

### Appendix 5:   2000 DNC National Lawyers Guild Settlement Information

| National Lawyers Guild V. City of Los Angeles June 2005 Settlement | |
| --- | --- |
| Helicopters | Must operate at reasonable altitudes and not be used with the intent to deny response to emergency. |
| Marches | Crowds can use the public sidewalk adjacent to the street but may not disrupt businesses. |
| Motorcycles/Bicycles | Not allowed to strike lawfully assembling demonstrators as a crowd control strategy. |
| Use of Less Lethal Tools | May be deployed on aggressive and/or combative suspects in crowd control situations on subjects armed with weapons other than firearms, and on subjects who are destroying property.  Not allowed to be used on lawfully dispersing individuals or crowds, individuals or crowds who are retreating. Department must publish a notice that require stinger weapons to be used ONLY with the approval of a staff officer and only in riotous situations. |
| Public Assemblies | Prior to declaring an assembly unlawful, Department personnel shall refer to the LAPD guidelines for crowd management and control, Volume 5 of the Emergency Operations Guide. All incident commanders shall be trained in crowd management strategies and tactics. Before declaring an unlawful assembly, the incident commander should evaluate the feasibility of isolating and arresting those responsible for the unlawful conduct. |

## Appendix 6:   2007 MacArthur Park Settlement

| Multi-Ethnic Immigrant Workers Organizing Network V. City of Los Angeles<br>June 2009 Settlement<br>May Day 2007 | |
|---|---|
| Basic Principles | All persons have a right to demonstrate/protest.<br>Government may impose reasonable and narrowly tailored restrictions on the demonstrations. Restrictions must be justified based on public safety and public health. |
| Helicopters | Must fly at reasonable altitudes and used for emergencies. |
| Marches | Demonstrators/protestors can use sidewalks. LAPD will consider the practicality of facilitating demonstrations that may temporarily block traffic and include these procedures in the manual. |
| Motorcycles/Bicycles/<br>Motor Vehicles | Such vehicles may be used for observation and traffic control. They may not be used to strike demonstrators as a method or strategy to control or disperse crowds. |
| Horses | Ensure that during crowd control training the curriculum addresses the subject of the impact of the use of horses on crowd behavior. |
| Less Lethal Weapons | Less lethal weapons may be deployed on aggressive or combative subjects in crowd control situation, against a physical threat or aggressive or combative behavior and to prevent the destruction of property. Less lethal weapons may not be used on lawfully dispersing or retreating persons or crowds. When feasible, notice should be given before deploying less lethal in a crowd control incident or for dispersal.  Where feasible, the warning should be given in language(s) spoken by participants.<br>If LAPD resumes the use of Stinger rounds, LAPD must publish a notice that Stinger round use requires the approval of a staff officer and only in riotous situations. |
| Batons | Batons are not to be used against dispersing individuals or crowds who are unable to move or pose no imminent threat. Batons can be used in a pushing motion against individuals who intentionally refuse to move or when behavior is threatening or violent. Batons may be used as an impact weapon in accordance with LAPD policy. |
| Assemblies | The incident commander and supervisors shall make every effort to ensure the police missions are created and communicated with the highest regard for dignity and liberty. Prior to declaring an assembly unlawful, the Department shall refer to Volume 5 of the Emergency Operations Guide and the incident commander shall evaluate the feasibility of isolating the problem individuals. |
| Declaration of<br>Unlawful Assembly | Announce the unlawful assembly under the requirements of CA Penal Code 409, follow procedures in Volume 5 of the Emergency Operations Guide and use an amplified loudspeaker system to warn. If feasible, send personnel to the far side of the crowd to record the unlawful assembly order, and the order shall be made repeatedly and reasonably calculated to be heard by the entire crowd in English and other languages. The unlawful assembly order shall include: an objectively reasonable period of time to disperse and provide a safe route(s) to disperse and a warning that police action may include the use of less lethal munitions. |
| Crowd management<br>Training | Training shall include the understanding of the impact that a Department show of force has on crowd behavior. Metropolitan Division shall undergo training annually. Every officer above the rank of Sergeant I shall undergo training at a minimum interval of two years on crowd control and use of fore policy developed as the result of this settlement. Training may be live or by e-module or both. |
| Policy | All policies shall be included in the Emergency Operations Guide by July 1, 2009. (Plaintiffs were given opportunity to provide input prior to the approval.) |

### Appendix 7:   2011 Occupy Los Angeles

| | Occupy of Los Angeles<br>2011 Settlement |
|---|---|
| 1 | Demonstrators shall not be "kettled" by officers when they are attempting to comply with a dispersal order. |
| 2 | Arrestees shall not be placed on transportation buses with tight handcuffs for an extended period of time. |
| 3 | Arrestees shall not be denied access to bathroom facilities or water while held in police custody. |
| 4 | Arrestees shall be released on their own recognizance if charged only with a misdemeanor, pursuant to California Penal Code 853.6 |

### Appendix 8:   2014 Ferguson

| Ferguson Demonstration<br>2014<br>Settlement | |
|---|---|
| 1 | Demonstrators shall be given a dispersal order prior to arrest and given the opportunity to leave. |
| 2 | Demonstrators shall not be "kettled" after being given a dispersal order. |
| 3 | Arrestees shall not be zip-tied for extended periods of time. |
| 4 | Arrestees shall not be incarcerated for extended periods of time. |
| 5 | Arrestees shall not be denied "OR" (released on their own recognizance) for misdemeanor charges pursuant to California Penal Code 853.5pc |

## Appendix 9:   Key Terms

***Categorical Use of Force:***  LAPD Manual Section 3/795 defines categorical uses of force (CUOF) as:

- An incident involving the use of deadly force (e.g., discharge of a firearm) by a Department employee;
- All uses of an upper body control hold by a Department employee, including the use of a modified carotid, full carotid or locked carotid hold;
- All deaths while the arrestee or detainee is in the custodial care of the Department (also known as an In-Custody Death or ICD);
- A use of force incident resulting in death;
- A use of force incident resulting in an injury requiring hospitalization, commonly referred to as a law enforcement related injury or LERI;
- All intentional head strikes with an impact weapon or device (e.g., baton, flashlight, etc.) and all unintentional (inadvertent or accidental) head strikes that results in serious bodily injury, hospitalization or death;

**Note**:  Serious bodily injury, as defined in California Penal Code Section 243(f)(4), includes, but is not limited to, the following:

- o Loss of consciousness;
- o  Concussion;
- o Bone fracture;
- o Protracted loss or impairment of function of any bodily member or organ;
- o A wound requiring extensive suturing; and,
- o Serious disfigurement.

(All other unintentional head strikes shall be investigated as Level I Non-Categorical Use of Force incidents;)

- Officer-involved animal shootings and non-tactical unintentional discharges;
- An incident in which a member of the public has contact with a Department canine and hospitalization is required. Under Department policy, a canine contact is not a use of force but has been included in this category to satisfy the provisions of the Consent Decree; and,
- Incidents where the Department has agreed to conduct similar critical incident investigations for a non-Department entity, such as a Los Angeles Fire Department Arson Unit.[33]

***Civil Disturbance:***  A gathering that constitutes a breach of the peace or any assembly of persons where there is a threat of collective violence, destruction of property, or other unlawful acts. Such a gathering may also be referred to as a riot or unlawful assembly.[34]

***Crowd Control:***  Techniques used to address civil disturbances, to include a show of force, crowd containment, disperse equipment and tactics, and preparation for multiple arrests.[35] LAPD doctrine states that the Mission and Objectives of crowd control during a civil disorder is to restore conditions to normal as rapidly and efficiently as possible.[36]

***Crowd Management:***  Techniques used to manage lawful assemblies before, during, and after the event for the purpose of maintaining lawful status though event planning, pre-event contact with event organizers, issuance of permits where applicable, information gathering, personnel training and other means.[37] LAPD doctrine states that

---

[33] Manual of the Los Angeles Police Department, Vol 3/795.

[34] Crowd Management (Alexandria, Va: International Association of Chiefs of Police, April 2019), https://www.theiacp.org/sites/default/files/2020-08/Crowd%20Management%20FULL%20-%2008062020.pdf.

[35] Crowd Management

[36] Supervisor's Field Operations Guide (Los Angeles Police Department, n.d.), vol. 2 page 16.

[37] Crowd Management.

the Mission and Objectives of crowd management situation is to "preserve public order while at the same time protecting the constitutional rights of the individuals involved.[38]

***Command and Control:*** The use of active leadership to direct others while using available resources to coordinate a response, accomplish tasks and minimize risk. *Command* uses active leadership to establish order, provide stability and structure, set objectives, and create conditions under which the function of control can be achieved with minimal risk. *Control* implements the plan of action while continuously assessing the situation, making necessary adjustments, managing resources, managing the scope of the incident (containment), and evaluating whether existing Department protocols apply to the incident.[39]

***Demonstration:*** A lawful assembly of persons organized primarily to engage in free speech activity. These may be scheduled events that allow for law enforcement planning. They include, but are not limited to, marches, protests, and other assemblies intended to attract attention. Lawful demonstrations can devolve into civil disturbances that necessitate enforcement action.[40]

***Department Operations Center:*** The Department Operations Center (DOC) is part of Communications Division and serves as the Department command post during serious or major unusual occurrences. It is staffed to coordinate and provide police services, personnel, equipment, and supplies to incidents. It is located in the City's Emergency Operations Center and is capable of communicating with all City Departments and selected outside agencies.[41]

***Emergency Operations Center:*** The Emergency Operations Center (EOC) is the facility established by the City to coordinate the City's overall response and support to an emergency. Representatives from various City Departments and agencies, including the Police Department, staff the EOC.

***Review Period:*** The time frame from May 27 through June 7, 2020.

***Failure to Disperse:*** California Penal Code Section 409 states: Every person remaining present at the place of any riot, rout, or unlawful assembly, after the same has been lawfully warned to disperse, except public officers and persons assisting them in attempting to disperse the same, is guilty of a misdemeanor.[42]

***Impact Projectiles:*** Projectiles designed and intended to deliver non-penetrating impact energy from safer range. These may include direct fire or non-direct skip-fired rounds. The latter are projectiles that are discharged toward the ground in front of a target, theoretically delivering the energy to the subject following contact with the ground.[43]

***Mobilization:*** The principal Department plan to marshal personnel resources for control of a major unusual occurrence. The preliminary stage of a mobilization is a tactical alert. A mobilization includes the immediate implementation of 12-hour A and B watches, the deferment of days off, and the recalling of off-duty officers.

***Objective Reasonableness:*** Police use of force is judged pursuant to a "reasonable objective standard" per the United States Supreme Court Decision known as Graham v. Connor. "Graham" specifically states, and is repeated, in part, in the Los Angeles Police Department use of force policy: "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody the allowance for the fact that police officers are often forced to make split-second judgements – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. The test of reasonableness is not capable of precise

---

[38] Supervisor's Field Operations Guide, vol. 2, page 16.

[39] TRAINING BULLETIN:  COMMAND AND CONTROL (Los Angeles Police Department, July 2018), 1, http://lapd-lapd-lapd-assets.lapdonline.org/assets/pdf/tac-dir11-crowd-mgmt.pdf.

[40] Crowd Management.

[41] LAPD Media Relations Guide

[42] California Penal Code Section 409.5 - California Attorney Resources - California Laws, accessed October 1, 2020, https://law.onecle.com/california/penal/407.html.

[43]Crowd Management

definition or mechanical application. The force must be reasonable under the circumstances known to the officer at the time the force was used."[44]

*Public Order Policing:* A term that is widely used in Canada and Europe. For purposes of this report, public order policing is crowd control AND crowd management.

*Riot:* California Penal Code Section 404 defines a riot as: Any use of force or violence, disturbing the public peace, or any threat to use force or violence, if accompanied by immediate power of execution, by two or more persons acting together, and without authority of law, is a riot. (Amended by Stats. 1995, Ch. 132, Sec. 1. Effective January 1, 1996.)[45]

*Staging Area:* A location approved by the incident commander and used for the collection, storage, maintenance, disbursement, and accounting of personnel, vehicles, supplies, and equipment used or available. The staging area may also be used for the temporary storage of booked property and impounded vehicles.

*Unlawful Assembly:* California Penal Code Section 407 defines an unlawful assembly as: Whenever two or more persons assemble together to do an unlawful act, or do a lawful act in a violent, boisterous, or tumultuous manner, such assembly is an unlawful assembly.[46]

*Non-Categorical Use of Force:* LAPD Manual Section 4/245.02 defines Non-Categorial Use of Force (NCUOF) as: an incident in which any on-duty or off-duty Department employee whose occupation as a Department employee is a factor, uses physical force or a control device to:

- Compel a person to comply with the employee's direction;
- Defend themselves;
- Defend others;
- Effect an arrest or detention;
- Prevent escape; or,
- Overcome resistance.

The following incidents are **not** reportable NCUOF incidents:

- Any incident investigated by Force Investigations Division (Department Manual Section 3/794.10);
- The use of a C-grip, firm grip, or joint lock which does not result in an injury or complained of injury to the subject;
- The use of a joint lock walk-down or body weight to overcome a subject's passive resistance which does not result in an injury or complained of injury to the subject;
- In a crowd control situation, a use of force report is not required when officer(s) become involved in an incident where force is used to push, move, or strike individuals who exhibit unlawful or hostile behavior and who do not respond to verbal directions by the police. This applies only to officers working in organized squad and platoon sized units directly involved in a crowd control mission. Additionally, should force be utilized under these circumstances, officers shall notify their immediate supervisor of the use of force once the tactical situation has been resolved. The supervisor shall report the action on the incident command system (ICS), Form 214(Activity Log), or as directed by the incident commander. When a suspect has been taken into custody, the booking number, or Division of Records (DR) number of the related report shall be cross-referenced on the incident command system form; and,

---

[44] Los Angeles Police Department Use of Force Policy - Revised (Los Angeles Police Department, March 2017).

[45] California Penal Code Section 404 (2016) - California Codes, accessed December 19, 2020, https://california.public.law/codes/ca_penal_code_section_407.

[46] California Penal Code Section 409 (2016) - California Codes, accessed December 19, 2020, https://california.public.law/codes/ca_penal_code_section_407.

- The discharge, including tactical discharge, of a projectile weapon (e.g., beanbag shotgun, 37mm or 40mm projectile launcher or compressor air projectile system), electronic control device (Taser), or any chemical dispenser that does not make contact with an individual or their clothing is not a reportable use of force.[47]

---

[47] Manual of the Los Angeles Police Department, Section 4/245.02.

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

## Appendix 10:  Incident Command System Structures

**Single Incident**



**Multiple Incidents**



**Description of incident command system positions:**

**Area Command:**  In some instances, there are several incidents occurring simultaneously in the same general area and often of the same general kind (e.g., multiple structure fires, multiple wildland fires, collapsed buildings, medical events, civil disturbances, planned everts, earthquake, etc.). Typically, these kinds of incidents compete for the same resources."[48] In these instances, an area command is

_____

[48] Managing Large Scale Incidents - Area Command, ICS 420-1.3, 1.

established. The area command places a hybrid of an incident command system organization over several incident command system organizations handling similar incidents.

**Incident Commander:** The person who has overall responsibility and authority over the incident. The incident commander is supposed to provide a "commander's intent" with missions and directives to achieve an overall mission to bring an incident to a conclusion.

**Logistics Section**: (Logs Chief) provides personnel, equipment and support for the command center. They handle the coordination of all services involved in the response, from locating rescue equipment to coordinating the response for volunteer organizations.[49]

**Finance Section:** Responsible for accounting for funds used during the response and recovery aspect of the disaster. They monitor costs related to the incident and provide accounting analyses.[50]

**Operations Section:** (Ops Chief) handles tactical operations, coordinates the command objectives, and organizes and directs all resources to the disaster site.

**Planning Section:** (Planning Chief) provides the necessary information to the command center to develop the action plan that will accomplish the objectives. They also collect and evaluate information as it is made available.

**Sectoring (Divisions):** In disbursed incidents, (such as wide-spread civil unrest) the geographic territory around the incident may be divided into smaller areas that are then place under control of subordinate leadership with resources. This ensures that resources are maintained and not over-deployed to other areas or taken away from those divisions.

**Staging:** Key components of comprehensive resource management are logistics and staging. The logistics chief is supposed to arrange for resources, including personnel to respond to the event. staging is typically under the command of the operations section chief. At staging, resources, such as police officers, respond to an area with the intention of being re-deployed to the incident. The "staging manager" is supposed to receive, organize, track and account for those resources while in the staging area. In law enforcement, the staging manager is responsible for reconfiguring those resources into pre-determined tactical packages such as mobile field force platoons (if not already done) and then dispatch the resources per the directions of the incident commander.

---

[49] Overview: The Incident Command System.
[50] Overview: The Incident Command System.

### Appendix 11:  LAPD and FEMA National Concepts of Emergency Management

The LAPD Emergency Operations Guide states the following: "The 21st Century emergency-preparedness strategies, i.e., all-hazards, special events and criminal terrorist incidents include regional response, mutual aid, and specialized command expertise. No longer can the planning and command of high consequence events be limited to rank or position within the organization. Today's complex events need to be managed by highly trained specialists.  An incident management team is a team of specialists familiar with all aspects of emergency management. They are experienced leaders, decision makers and strategic thinkers, self-actualized and willing to develop themselves into a cohesive team focused on managing large, complex, high consequence incidents. Incident management teams are intended to address all-hazards incidents, i.e., earthquakes, fires, evacuations and other man-made or natural disasters; special events including marches, rallies, and public assemblages; crowd management strategies, mobile field force resources, and sophisticated crime scenes. Furthermore, incident management teams must be agile enough to integrate into regional, allied agencies."[51]

The LAPD emergency management doctrine follows that of the federal government.  The Federal Emergency Management Agency (FEMA) identifies the four phases of disaster management as preparedness, response, recovery, and mitigation. The preparedness phase is defined by the Department of Homeland Security (DHS) and FEMA: Emergency Management Preparedness is the continuous cycle of planning, organizing, training, equipping, exercising, evaluating, and taking corrective action in an effort to ensure effective coordination during incident response." Preparedness guidelines "promotes a common understanding of the fundamentals of risk-informed planning and decision making to help p lanners examine a hazard or threat and produce integrated, coordinated, and synchronized plans."[52]



*Figure 4: Phases of Disaster Management*

---

[51] LAPD Emergency Operations Guide.

[52] FEMA: Developing and Maintaining Emergency Operations Plans: Comprehensive Preparedness Guide (CPG) 1010, version 2.0 (November 2020).

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

### Appendix 12:  LAPD Less Lethal Tools

---

#### 40mm Launcher, Deploying the 40mm eXact iMpact Sponge Round

The 40mm launcher has a rifled barrel and is equipped with a holographical sighting system that uses a single foam projectile.  According to the manufacturer, the projectile weighs 0.96 oz (27 g) and travels at 325 feet per second (99mps). The round is 1.6 in (40mm) in diameter and 2.60 inches (6.6 cm) long. The minimum safe range for the eXact iMpact round is five feet (1.5m) and the maximum effective range is 131 feet (40 m). The round is intended for direct impact (target specific) application.[53]  LAPD policy on the 40mm is documented in a directive which states that less-lethal force options are only permissible when an officer reasonably believes that a suspect or subject is violently resisting arrest or poses an immediate threat of violence or physical harm.[54] The 40mm shall not be used to target the head, neck, face, eyes, or spine unless lethal force is authorized. The 40mm launcher may be used in crowd control situations against a single subject/suspect as a target-specific less-lethal option. [55]  Because the 40 mm round is target specific, it cannot be used to disperse a crowd.



---

#### 37 mm Launcher, Deploying the 37mm Foam Baton Round

The foam baton round consists of five foam rubber projectiles that are discharged at once. The 37 mm launcher has a smooth bore barrel with standard iron sights. According to the manufacturer, "…each foam rubber projectile should be used as a pain compliance round for crowd control.  It is most suitable in close to medium ranges of fire, approximately 15 to 30 feet.  Beyond 30 feet, the lightweight foam batons may move off target and lose most of their impact energy. The round is intended to be fired at a target, however, may be skip fired at the direction of the operator. [56]  The LAPD uses the 37mm weapon as a non-target impact weapon. LAPD policy states in part, "the 37mm foam rubber baton round is a non-target specific round used for crowd control. With the approval of the incident commander, the 37 mm foam rubber baton may be used as a crowd control tool when a dispersal order has been issued and/or immediate action is necessary, to stop violence, to ensure public safety, and restore order.[57]

Officers deploying the 37 mm launcher are limited to firing a "foam baton" round by skipping the round off of the ground in front of the intended targets to disperse the crowds.

---

[53] 40mm EXact IMpact Sponge Round Spec Shee" (Defense Technologies, December 30, 2020), www.defense-technologies.com.

[54] USE OF FORCE - TACTICS DIRECTIVE:  40mm LESS-LETHAL LAUNCHER, 1.

[55] USE OF FORCE - TACTICS DIRECTIVE:  40mm LESS-LETHAL LAUNCHER, 2.

[56] 37mm Foam Baton Black Powder Round Spec Sheet (Defense Technologies, December 30, 2020), www.defense-technologies.com.

[57] USE OF FORCE - TACTICS DIRECTIVE No. 11.1 CROWD MANAGEMENT, INTERVENTION, AND CONTROL (Los Angeles Police Department, October 2020), 5, http://lapd-lapd-lapd-assets.lapdonline.org/assets/pdf/tac-dir11-crowd-mgmt.pdf.

### Beanbag Shotgun, Deploying the Beanbag Super-Sock Round

The beanbag shotgun is a Remington 870 shotgun which has been configured with a green slide handle and stock, rifled barrel, and side saddle ammunition holder. The color green is used to signify that the shotgun is for the beanbag super-sock round which is a 12-gauge cartridge containing a shot-filled fabric bag.  These rounds are designed to be non-penetrating, and upon striking a target distribute energy over a broad surface area."  According to LAPD policy the beanbag shotgun may be used in crowd control situations against a single subject/suspect as a target-specific less-lethal option. [58]

The beanbag shotgun is also a standard less lethal tool used during patrol operations.  Most officers on the Department have been certified during the academy in the use of the beanbag shotgun trained for use in patrol functions.

 

### Hornets Nest Sting Grenades, Deploying .60 Caliber Rubber Balls

The Hornets Nest Sting Grenade (sometimes referred to as a "stinger" round) is a "rubber ball diversionary device that produces approximately 130 decibels at five feet and emits 1-2 million candelas.  In addition to the light and sound, the Hornets Nest Sting Grenade is designed to disperse approximately 25, .60 caliber, rubber balls in a 360-degree pattern."[59]

The Department did not provide documentation relative to the deployment approval of the Hornets Nest Sting Grenade Round.  However, the Department did provide information that stated that only the Special Weapons and Tactics Team possesses this less lethal tool and is authorized to deploy it. There appears to be some confusion in the Department as to who may authorize the deployment of this less lethal tool in crowd control situations. The Review Team located lesson plans which indicated a person of the rank of commander or higher may authorize its usage.

---

[58] USE OF FORCE - TACTICS DIRECTIVE No. 6.3 BEANBAG SHOTGU" (Los Angeles Police Department, July 2018).
[59] Hornets Nest Sting Grenade, .60 Cal. Rubber Balls, Produce Code ALSG10160 (ALS, December 30, 2020), www.lesslethal.com.

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

### Appendix 13:  History of Training 1992-2020

| History of Development and Training[60]<br>Mobile Field Force and Crowd Control/Management<br>Prepared by Training Group July 2007 for the May Day 2007 Examination Report. | |
|---|---|
| 1992 | Metropolitan Division developed a 16-hour mobile field force course and began delivery to LAPD personnel after working with the Miami Police Department who were responding to Miami riots from both 1988 and 1989. The training consisted of conventional crowd control tactics; counter ambush tactics; lessons learned from 1992; mass arrest procedures; mobile field force concept; personnel and vehicle assignment; use of force; and exercises in arrest and control, chemical agents, citizen rescue, gang convoy stops, mobile tactics, patrolling hostile areas, and squad formations. |
| 1993 | 6,500 Department personnel and 1,000 personnel from outside agencies (California Highway Patrol, Los Angeles County Sheriff's Department) had completed the course. |
| 1993 | The State of California adopted the mobile field force concept and codified it into the 1993 California Police Officer's Standards in Training (POST) Crowd Management and Crowd Control Guidelines. |
| 1995 | The Department introduced a new situational use of force continuum to officers that labeled categories of individual behaviors as the following: *cooperative, no response to commands, uncooperative, aggressive/combative and life threatening* and established it as LAPD policy. Various force options available to officers to control a situation were listed and correlate to behavioral categories.  At that time, the Department published a Use of Force Handbook and trained all sworn employees to the use of force continuum. It was immediately added to the Recruit Basic Course, Supervisor, Watch Commander, and Command Development schools. The subject of use of force was added to roll call training and provided on a regular basis. |
| 1996 | The Department issued a training bulletin entitled "Use of Force-Baton Part II Crowd Management and Control". This bulletin became the document cited in training to describe the amount of force an officer is able to use during crowd control incidents. |
| 1998 | The mobile field force and crowd control course was added to the Recruit Basic Academy Course. |
| 2001 | The in-service mobile field force lesson plan was updated during a routine review and at that time the use of force section in the mobile field force lesson plan included a very brief section on use of force that stated that " there is no exception to the use of force policy during crowd control situations other than the reporting requirements." There was no further information documented in the lesson plan regarding details of the use of force policy or the appropriate application of baton strikes during crowd control events. There is no ability to now prove if any additional information was provided in the course regarding use of force, except through discussions with individuals who were students or instructors of the course. Additionally, the section of the course that pertained to the use of the baton during crowd control situations focused totally on technical skills. Therefore, from 2001 forward, the class discussion surrounding use of force at crowd control situations and the behaviors that allow for the use of the baton during crowd control incidents is complicated. In 2001, the settlement requirement in the *Crespo* v *City of Los Angeles* lawsuit *to* train officers on issues involving the media was added |

---

[60] LAPD Report to the Board of Police Commissioners: An Examination of May Day 2007, Appendix 2, pgs.87-89.

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

| | |
|---|---|
| | to the lesson plans. However, the detail in the lesson plans is insufficient to clarify what specifically, was taught to the students in these areas. |
| 2003 | Use of force was one of several topics covered in the in-service training program that all in-service sworn employees attended. In 2003 Metropolitan Division updated the mobile field force course and created a four, eight and ten-hour version for delivery on an "as needed" basis. At the request of the Office of Operations, Metropolitan Division modified the mobile field force training into a five-hour course that was combined with a five-hour course on immediate action and rapid deployment for a ten-hour training day. Combining the two courses was done to help with the growing concern over crime suppression and deployment demands. At this time, the focus of the training continued to be technical skill development due to the reduction in time allotted. When the lesson plan was modified to five hours, the use of force section and the media section were removed from the lesson plan. Metropolitan Division instructors voiced concerns about the inadequate time now allotted for the two vastly different subject matters. However, the training proceeded. It was also incorporated into the Supervisory Development School in 2003. The lesson plan did not cover three critical areas: use of force, when the use of the baton is warranted during crowd control situations, and, policy related to the media at crowd management incidents. The lesson plans clearly focus on techniques rather than policy. |
| 2004 | Amid rising concern over crime suppression and field deployment needs, much of the "non-required" training was scaled back at the request of Office of Operations. The chief of police supported the reduction of "non-required" training to allow for a strong focus on Consent Decree compliance and crime suppression. Mobile field force training for in-service officers was not mandated by the Department or State and, therefore, was not a priority and was among the many training courses that were scaled back. |
| 2005 | The Office of Operations director halted the Basic Metro Course and scaled back Metropolitan Division's regularly scheduled monthly training from two days per month to one due to a growing concern over crime suppression. The cut back of training allowed for Metropolitan Division to be deployed in crime suppression details and assist other commands throughout the City. The Chief of Police approved the recommendation to scale back training with the understanding that the subject should be revisited periodically. By 2005, the information regarding the media policy was added back into the lesson plan during the annual update.  Few officers or supervisors attended training conducted with this lesson plan. |
| 2006 | As the Department continued to struggle with more officers retiring than new hires coming into the Academy, mobile field force training was sidelined altogether. The Metropolitan Division Basic course remained shut down. |

**Miscellaneous Training Information MacArthur Park After Action Report 2007**

- To date (July 2007) every sworn employee in the Department had received training on the use of force policy on more than one occasion and had been trained on the techniques and appropriate use of the baton as it pertains to use of force policy.
- Traditionally, Metropolitan Division platoons were allowed two training days every four weeks - one firearms and one tactics. Since 2004, Metropolitan Division platoons were generally allowed to conduct one tactics training day and one firearms training day every four weeks, January through May, and only one training day, June through December. On several occasions the training day(s) were cancelled as a result of special assignments and/or pre-planned events. A review of the tactics training day topics generally focused on dignitary protection duties and other tactics not related to crowd control events.

| History of Training Post 2007 May Day Report<br>Information based on documents provided by the LAPD for purposes of this report.<br>January 2021 | |
| --- | --- |
| 2007-2009 | Crowd Management/Crowd Control, 10-hours. Department-wide in which areas trained together with their commanding officers. Groups of over 150 personnel at a time would train thus being able to replicate actual field scenarios with large numbers of demonstrators. Over 9,500 personnel were trained. Incident command system and crowd management training occurred in the command staff quarterly training. |
| 2009-2012 | Multiple Assault-Counter Terrorism Action Capabilities, 10-hours. Department-wide in which large numbers of bureau personnel would train at one time thus being able to replicate actual field scenarios. All supervisors and command staff were required to attend. Over 9,100 personnel were trained. Incident command system and crowd management training occurred in the command staff quarterly training each year. |
| 2013-2014 | Some crowd management training was conducted through e-learning for line personnel. Incident command system and crowd management training occurred in the command staff quarterly training each year. Additionally, a program was introduced to address concerns over succession planning for command staff called Conversations in 21st Century Policing. These were seminars offered to all command level personnel and lieutenants in which panels discussed topics such as crowd management/facilitations, building community relationships, etc. This program appears to have been discontinued in 2015 without any documentation as to why. |
| 2015-2016 | Training Bureau planned a Department-wide rollout of mobile field force/crowd management training. However, when this plan discussed with executive staff the training was tabled per the Office of Operations assistant chief and the Chief of Police to address deployment needs and the rising concern over issues surrounding use of force, de-escalation, and crime trends. |
| 2017-2018 | Training Bureau again raised the issue of conducting Department-wide mobile field force/crowd control training with executive staff. At that time, a decision was made to take the eight-hour and 10-hour courses approved by the State and the Department and condense it into a four-hour block to accommodate other training needs. Over 9,200 personnel were trained. |
| 2019-2020 | Training Bureau again raised the issue of conducting Department-wide mobile field force/crowd control training with executive staff with no decision to plan for a Department-wide rollout in 2019. In 2020 the Covid-19 pandemic had engulfed the deployment needs of the Department and created restrictions on training. Therefore, most training was tabled. |

## IX. Bibliography

37mm Foam Baton Black Powder Round Spec Sheet. Defense Technologies, December 30, 2020. www.defense-technologies.com.

40mm EXact IMpact Sponge Round Spec Sheet. Defense Technologies, December 30, 2020. www.defense-technologies.com.

Acohido, Byron. "Microsoft Engages Cybergang That Stole $500 Million, June 6, 2013. http://www.usatoday.com/story/cybertruth/2013/06/06/hackers-microsoft-fbi-citadel-botnet-500-million-robbery/2396693/.

Ahluwalia, Muninder K, and Laura Pellettiere. Sikh Men Post-9/11: Misidentification, Discrimination, and Coping. *Asian American Journal of Psychology* 1, no. 4 (2010): 303–14. https://doi.org/10.1037/a0022156.

Active Shooter Incident and Resulting Airport Disruption. Los Angeles World Airports, March 18, 2014.

CA Codes (Pen:830-832.17), 2014. http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=00001-01000&file=830-832.17.

CA Codes (Pen:833-851.90), 2014. http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=00001-01000&file=830-832.17.

California Penal Code Section 404 (2016) - California Codes. Accessed December 19, 2020. https://california.public.law/codes/ca_penal_code_section_407.

California Penal Code Section 409 (2016) - California Codes. Accessed December 19, 2020. https://california.public.law/codes/ca_penal_code_section_407.

California Penal Code Section 409.5 - California Attorney Resources - California Laws. Accessed October 1, 2020. https://law.onecle.com/california/penal/407.html.

Core Values of the LAPD - Los Angeles Police Department. Accessed December 21, 2020. http://www.lapdonline.org/inside_the_lapd/content_basic_view/845.

Crowd Management. Alexandria, Va: International Association of Chiefs of Police, April 2019. https://www.theiacp.org/sites/default/files/2020-08/Crowd%20Management%20FULL%20-%2008062020.pdf.

Deorle v. Rutherford, No. 99–17188 (United States Court of Appeals, Ninth Circuit March 26, 2001).

Emergency Operations Guide. Los Angeles Police Department, 2009.

Employment and History of the Bay Area Rapid Transit District Police Department, 2014. http://www.bart.gov/about/police/employment.

EMSI. History of ICS. Accessed December 19, 2020. http://www.emsics.com/history-of-ics/.

Hornets Nest Sting Grenade, .60 Cal. Rubber Balls, Produce Code ALSG10160. ALS, December 30, 2020. www.lesslethal.com.

Heal, Sid. *Concepts of Nonlethal Force: Understanding Force from Shouting to Shooting*. Brooklyn: Lantern Publishing & Media, 2020.

Hornets Nest Sting Grenade, .60 Cal. Rubber Balls, Produce Code ALSG10160. ALS, December 30, 2020. www.lesslethal.com.

ICS Organizational Structure and Elements. Federal Emergency Management Administration, March
2018.
https://training.fema.gov/emiweb/is/icsresource/assets/ics%20organizational%20structure%20
and%20elements.pdf.

Lesson Plan:  Integrated Communications, De-Escalation and Crowd Control Expanded Course Outline.
Los Angeles Police Department, October 16, 2018.

Los Angeles Police Department Use of Force Policy - Revised. Los Angeles Police Department, March
2017.

Managing Large Scale Incidents - Area Command, ICS 420-1.3, January 2020.
https://firescope.caloes.ca.gov/ICS%20Documents/ICS%20420-1.3.pdf.

Manual of the Los Angeles Police Department. Los Angeles Police Department, Fall 2020.
http://lapdonline.org/lapd_manual/volume_3.htm#794.10.

Mitroff, Ian I, and Ralph H. Kilmann. The Psychodynamics of Enlightened Leadership:  Cping with Chaos,
2020.

OVERVIEW OF LESS-LETHAL FORCE TOOLS AND DEPLOYMENT. Inspector General, Los Angeles Board of
Police Commissioners, February 22, 2017.

Overview: The Incident Command System. Accessed December 15, 2020.
https://www.nationalservice.gov/sites/default/files/olc/moodle/ds_online_orientation/viewf26
5.html?id=3139&chapterid=908.

American Legal Publishing Corporation. SEC. 103.111. PARADES AND ASSEMBLIES. Accessed December
22, 2020. https://codelibrary.amlegal.com/codes/los_angeles/latest/lamc/0-0-0-192090.

Supervisor's Field Operations Guide. Los Angeles Police Department, n.d.

The Mission Statement of the LAPD - Los Angeles Police Department. Accessed December 21, 2020.
http://www.lapdonline.org/inside_the_lapd/content_basic_view/844.

TRAINING BULLETIN:  COMMAND AND CONTROL. Los Angeles Police Department, July 2018. http://lapd-
lapd-lapd-assets.lapdonline.org/assets/pdf/tac-dir11-crowd-mgmt.pdf.

USE OF FORCE - TACTICS DIRECTIVE:  40mm LESS-LETHAL LAUNCHER. Los Angeles Police Department,
July 2018. http://lapd-lapd-lapd-assets.lapdonline.org/assets/pdf/tac-dir11-crowd-mgmt.pdf.

USE OF FORCE - TACTICS DIRECTIVE:  BEANBAG SHOTGUN. Los Angeles Police Department, July 2018.
http://lapd-lapd-lapd-assets.lapdonline.org/assets/pdf/tac-dir11-crowd-mgmt.pdf.

USE OF FORCE - TACTICS DIRECTIVE No. 6.3 BEANBAG SHOTGUN. Los Angeles Police Department, July
2018.

USE OF FORCE - TACTICS DIRECTIVE No. 11.1 CROWD MANAGEMENT, INTERVENTION, AND CONTROL.
Los Angeles Police Department, October 2020. http://lapd-lapd-lapd-
assets.lapdonline.org/assets/pdf/tac-dir11-crowd-mgmt.pdf.

**EXHIBIT 2**



NATIONAL POLICE FOUNDATION
*Advancing Policing Through Innovation and Science*

# A CRISIS OF TRUST

A National Police Foundation Report
to the Los Angeles Board of Police Commissioners on
the Los Angeles Police Department Response to
First Amendment Assemblies and Protests Occurring
**May 27 – June 7, 2020**



# Disclaimer

The analyses, findings, and recommendations contained herein are those of the National Police Foundation (NPF) assessment team and do not necessarily represent the official position or policies of the Los Angeles Police Foundation (LAPF), the Los Angeles Police Department (LAPD), or the Los Angeles Board of Police Commissioners (LABOPC). References to specific agencies, companies, products, or services should not be considered an endorsement by the authors, contributors, or the LAPF, LAPD, or LABOPC. Rather, the references are illustrations to supplement discussion of the issues.

The Internet references cited in this publication are valid as of the date of publication. Given that URLs and websites are in constant flux, neither the authors, the NPF, the LAPF, LAPD, or LABOPC can vouch for their current validity.

# Statement of Independence

As a nonpartisan and non-member organization, the NPF strives to remain independent in all of its after-action reviews. The NPF has maintained independence throughout this review and assessment of the LAPD's response to the SAFE LA First Amendment assemblies and protests in the summer of 2020. As stated in its agreement with the Los Angeles Police Foundation and the LAPD:



*As the report is independent (and not funded by the Commission), the findings and conclusions of the report shall be those of the NPF. The NPF is not aware of any actual, potential or perceived conflicts of interests related to this agreement or the project. Should we become aware of such an actual, potential or perceived conflict of interest, we will notify the Commission of such as well as the project's funder, the Los Angeles Police Foundation.*

*The NPF, to the fullest extent possible, will base its findings and conclusions on the data and records provided by the LAPD or other reliable information. Our purpose is not to find fault or place blame or to investigate any allegation or claim of wrongdoing, but to identify lessons learned and best practices that may be used to improve future responses of the LAPD or other law enforcement agencies across the U.S.*

*The NPF team will independently assess LAPD's response to mass demonstrations, protests, and First Amendment assemblies that occurred between May 27, 2020 and June 7, 2020, from a variety of perspectives that includes LAPD personnel, community-based organizations, elected officials, the local business community, LAPD staff involved in command and control operations, as well as additional stakeholders."[1]*

While the NPF assessment team has engaged with the LABOPC and LAPD throughout the review, at no point did either body influence the outcomes or findings of the report. Additionally, the NPF assessment team did not discuss any of the specific findings or recommendations or otherwise collaborate with any NPF contributors or partners.

# Suggested Citation

National Police Foundation. (2021). *A Crisis of Trust: A National Police Foundation Report to the Los Angeles Board of Police Commissioners on the Los Angeles Police Department Response to First Amendment Assemblies and Protests Occurring May 27 – June 7, 2020.* National Police Foundation.

[1] National Police Foundation. (2020, August 11). Award Letter to Los Angeles Board of Police Commissioners.

National Police Foundation - A Crisis of Truth

# Acknowledgements

Having conducted a critical review of LAPD's response to the unrest following the Rodney King use of force incident, the National Police Foundation was asked by the Los Angeles Board of Police Commissioners (LABOPC) to conduct an independent after-action review of the Los Angeles Police Department's response to First Amendment assemblies and protests in Los Angeles during the period May 27– June 7, 2020. The Los Angeles Police Foundation provided funding to support the review.

Los Angeles Police Department (LAPD) Chief Moore, his command staff, and the LAPD Office of Constitutional Policing and Policy (OCPP) provided access to LAPD materials and resources, contact information for LAPD personnel and community stakeholders, and information related to the department's response to the SAFE LA First Amendment assemblies and protests.

LAPD personnel, family members of LAPD personnel, City elected officials, and community members participated in interviews, focus groups, and open listening sessions. Their experiences, feedback, and recommendations were invaluable.

This review demonstrates the commitment of the LABOPC and the LAPD to reimagining policing in the City of Los Angeles, to addressing challenges in community-police interactions, and protecting First Amendment assemblies and protests. In requesting this review, the LABOPC and the LAPD recognize that to advance and improve policing in the City of Los Angeles, they must engage in rigorous internal and external processes to identify areas of strength and areas for improvement in their response to First Amendment assemblies and protests.



# About the National Police Foundation

Established in 1970 through a grant from the Ford Foundation, the National Police Foundation (NPF) is the oldest nationally known 501(c)(3) nonprofit, nonpartisan, and non-membership-driven organization dedicated to improving American policing. Born out of widespread tensions that had reached their peak following the Civil Rights Movement that resulted in public protests, riots, and other civil disruptions nationwide, NPF was a mechanism for a reasoned approach through application of scientific principles and understanding of police procedure to examine and improve policing nationwide. Independent of political encumbrances, NPF operated with independence and objectivity in a time when political influences continued to be strong and gripping.

Through time, NPF's growing portfolio of scientific research and experiments remains the catalyst for significant changes in policing, informing scholars and practitioners alike, and serves as a model for the systematic examination of real-world challenges. Over the course of the last 50 years, NPF has conducted seminal research in police behavior, policy, and procedure, and continues leading efforts in new evidence-based practices and innovations to law enforcement.

To accomplish its mission—Advancing Policing Through Innovation and Science—NPF works closely with public safety and criminal justice agencies across the country and around the world. One area of focus has been to increase institutional and community learning through independent, comprehensive after-action reviews of critical incidents such as mass violence, officer involved shootings, and mass demonstrations. Over the last decade, the NPF has completed dozens of these reviews, committing to an honest, balanced, informed approached to evaluation, and to providing this information to stakeholders nationwide in its library of after-action reviews. The NPF continues to add to this library in an effort to share lessons that contribute to the advancement of policing nationwide.

## NPF Staff [2]

- Frank Straub, PhD, Director, Center for Mass Violence Response Studies, NPF
- Jennifer Zeunik, Director, Local Programs, NPF
- Travis Taniguchi, PhD, Director, Research, NPF
- Ben Gorban, Senior Project Associate, NPF
- Katherine Hoogesteyn, PhD, Research Associate, NPF

- Christine Johnson, Project Associate, NPF
- Yukun Yang, Research Data Scientist, NPF

[2] NPF staff biographies and headshots can be found in Appendix D.

National Police Foundation - A Crisis of Truth

# National Police Foundation Assessment Team Members

## Subject Matter Experts







### Reverend Jeffrey Brown

### Chief (retired) Robert C. White

### Commissioner (retired) Charles H. "Chuck" Ramsey

Reverend Brown is a nationally recognized leader and expert in coalition-building, gangs, youth, and urban violence reduction. He has over 20 years of experience of gang mediation and intervention and developing dialogues in police/community relations in the United States and around the world. His work builds on the idea that while community policing is an effective policing tool, in many urban areas, the relations between the urban, often minority community and law enforcement is poor, which inhibits effective policing and prevents the community from getting the quality of life it deserves. Rev. Brown's experience has led to his successful work nationally in cities like Boston, Massachusetts; Camden, New Jersey; and Salinas, California to help build a strong community component into any public safety crime reduction strategy. He is one of the co-founders of the Boston Ten Point Coalition, a faith-based group that was an integral part of the "Boston Miracle"— a process where the city experienced a 79% decline in violent crime in the 90s—and spawned countless urban collaborative efforts in subsequent years that followed the Boston Ceasefire model.

With almost 50 years of experience, Chief White has experience in almost every area of policing. He has led both the Denver Police Department and the Louisville Metropolitan Police Departments over his career. He began his career with the Metropolitan Washington DC Police Department in 1972.

Commissioner Ramsey has been at the forefront of developing innovative policing strategies and leading organizational change for the past 35 years. He brings over 50 years of knowledge, experience and service in advancing the law enforcement field. He has led three major police departments, including the Chicago Police Department ( -1997), the Metropolitan Washington DC Police Department (1998-2007), and the Philadelphia Police Department (2008 – 2016). Following this tenure, Ramsey was tapped by President Obama to lead the *President's Task Force on 21st Century Policing*. His work in police organizational change and reform continues under his company, 21CP.

# TABLE OF
# CONTENTS

**ACKNOWLEDGEMENTS**                                                      i

**ABOUT THE NATIONAL POLICE FOUNDATION**                                 ii
    NATIONAL POLICE FOUNDATION ASSESSMENT TEAM MEMBERS   iii

**EXECUTIVE SUMMARY**                                                    5
    THE NATIONAL CONTEXT                                    5
    PROTESTS IN LOS ANGELES                                5
    COMMUNITY PERCEPTIONS OF THE LAPD RESPONSE             6
    SUMMARY STATEMENT OF FINDINGS                          7

**AFTER ACTION REVIEW PURPOSE AND SCOPE**                                9
    PURPOSE, SCOPE, AND APPROACH                           9
    ACCESS TO DATA, INFORMATION AND PERSPECTIVES           9
    CHALLENGES AND LIMITATIONS OF THIS REVIEW              10

**NATIONAL AND LOCAL CONTEXT**                                           14
    NATIONAL CONTEXT                                       14
    THE "NEW" PROTEST ENVIRONMENT                          15
    LOCAL CONTEXT                                          17

**GENERAL SUMMARY OF EVENTS**                                            22

**CHAPTER ONE: LAPD PROVISIONS AND TRAINING RELEVANT TO
FIRST AMENDMENT ASSEMBLIES AND PROTESTS**                                24
    USE OF FORCE                                          24
    LESS-LETHAL WEAPONS                                    25
    CROWD CONTROL INCIDENT DOCUMENTATION AND REVIEW        27
    BODY-WORN CAMERAS                                      28
    CROWD DISPERSAL AND DISPERSAL ORDERS                   29
    MASS ARRESTS                                          29
    TRAINING                                              31
    CHAPTER ONE FINDINGS AND RECOMMENDATIONS               33

**CHAPTER TWO: LEADERSHIP AND INCIDENT COMMAND**                         36
    CITY LEADERSHIP AND INCIDENT COMMAND                   36
    LAPD INCIDENT COMMAND                                  38
    STAFFING AND RESOURCE ALLOCATION                       41
    MUTUAL AID                                            45
    CHAPTER TWO FINDINGS AND RECOMMENDATIONS               47

**CHAPTER THREE: PUBLIC COMMUNICATION AND SOCIAL MEDIA**   51
PUBLIC COMMUNICATION   51
SOCIAL MEDIA DURING CRITICAL INCIDENTS   53
TRANSPARENCY   54
SOCIAL MEDIA FOR INFORMATION-GATHERING   57
CHAPTER THREE FINDINGS AND RECOMMENDATIONS   59

**CHAPTER FOUR: OFFICER WELLNESS AND MORALE**   60
POLICING CIVIL UNREST AND TRAUMA DURING COVID-19   60
OUTCOMES OF TRAUMA   61
IMPACT OF TRAUMATIZED OFFICERS   62
THE LAPD RESPONSE TO EMPLOYEE HEALTH AND WELLNESS   63
CHAPTER FOUR FINDINGS AND RECOMMENDATIONS   65

**CHAPTER FIVE: COMMUNITY ENGAGEMENT AND PERSPECTIVE**   67
PUBLIC SAFETY IN COMMUNITIES OF COLOR   67
LAPD RELATIONSHIP WITH THE COMMUNITY   68
RELATIONSHIPS DURING THE SAFE LA FIRST AMENDMENT
ASSEMBLIES AND PROTESTS   69
CHAPTER FIVE FINDINGS AND RECOMMENDATIONS   71

**CONCLUSION: MOVING FORWARD**   72

**APPENDIX A: ALL FINDINGS AND RECOMMENDATIONS**   73

**APPENDIX B: DETAILED METHODOLOGY**   84
INTERVIEWS AND FOCUS GROUPS   84
LAPD AND CITY OF LA RESOURCES MATERIAL REVIEW AND
DATA ANALYSES   85
OPEN SOURCE NEWS AND SOCIAL MEDIA REVIEW   93
NATIONAL RESOURCE REVIEW   93

**APPENDIX C: TIMELINE OF EVENTS**   94
THE FIRST THREE DAYS: WEDNESDAY, MAY 27 - FRIDAY,
MAY 29, 2020   94
SATURDAY, MAY 30 - MONDAY, JUNE 1, 2020   97
TUESDAY, JUNE 2 - SUNDAY, JUNE 7, 2020   102

**APPENDIX D: NPF STAFF MEMBERS**   108

National Police Foundation - A Crisis of Truth

# Executive Summary

## The National Context

The past year, 2020, was by many measures an unprecedented year. The COVID-19 pandemic, political discourse and rising tensions amid ideological divisions, public frustration and anxiety, and a growing intensity and spotlight on racial justice took center stage in communities across the United States. Then, the May 25, 2020, death of George Floyd[3] ignited protests and civil unrest. The protests spanned across communities large and small and engaged a broad spectrum of people across racial and ethnic divides[4]. Similar protests in cities and communities – large and small, urban and suburban, East and West—across the United States voiced mistrust and frustration regarding police interactions within communities of color as well as the growing tension, not just within those communities, but in all communities. Protests were amplified and tensions heightened as the issues became a part of the national political debate.



## Protests in Los Angeles

The City of Los Angeles (LA) and the Los Angeles Police Department (LAPD) has had experience with First Amendment events, protests and riots over several decades. In 1992, the Rodney King riots in the LAPD's South Bureau provided lessons regarding the importance of police-community relations, training, crowd control, and the need for de-escalation in tense crowd situations[5]. To some extent, because of the work LAPD has done to engage the community since 1992, and because the death of Mr. Floyd did not happen in LA, members of the LAPD command staff and City elected officials indicated to the NPF assessment team that they didn't expect the protests to erupt in violence.

In fact, the LAPD and elected officials believed that they had developed and implemented an effective strategy to facilitate and protect First Amendment assemblies and protests, often in collaboration with activists in the LA community. Therefore, officials were surprised by the intensity and scope of the unrest, and while they were prepared for large First Amendment assemblies, they did not anticipate—or prepare for—the violence that erupted.

[3] The Hennepin County Medical Examiner's Office Autopsy Report diagnosed the death as a homicide caused by "cardiopulmonary arrest complicating law enforcement subdual, restraint, and neck compression." See: Hennepin County. (2020, May 26). https://www.scribd.com/document/464472105/Autopsy-2020-3700-Floyd#fullscreen&from_embed. Derek Michael Chauvin has been charged with Second Degree Murder – Unintentional – While Committing A Felony, Third Degree Murder – Perpetrating Eminently Dangerous Act and Evincing Depraved Mind, and Second Degree Manslaughter – Culpable Negligence Creating Unreasonable Risk. See: State of Minnesota v. Derek Michael Chauvin. (2020, June 3). US District Court, Fourth Judicial District. https://mncourts.gov/mncourtsgov/media/High-Profile-Cases/27-CR-20-12646/AmendedComplaint06032020.pdf
[4] Fisher, Dana R. (2020, July 8). "The diversity of the recent Black Lives Matter protests is a good sign for racial equity." The Brookings Institution. https://www.brookings.edu/blog/how-we-rise/2020/07/08/the-diversity-of-the-recent-black-lives-matter-protests-is-a-good-sign-for-racial-equity/
[5] Webster, William H. and Hubert Williams. (1992, October 21). The City in Crisis: A Report by the Special Advisor to the Board of Police Commissioners on the Civil Disorder in Los Angeles. https://www.policefoundation.org/publication/the-city-in-crisis/

National Police Foundation - A Crisis of Truth

# Community Perceptions of the LAPD Response

Some community members detailed accounts of police aggression during the SAFE LA First Amendment assemblies and protests, including using "chemicals" and rubber bullets **(see Less-Lethal Weapons beginning on page 25 of this report)**, hitting protesters with batons, and kettling **(see Mass Arrests beginning on page 29 of this report)** to effect mass arrests as a method of crowd control. One community member suggested that the LAPD response, "was no surprise to me although it was shocking and I will never forget this incredibly scarring event in my life."[6] Others, however, perceived that while the department is generally proactive in responding to crime and safety issues particularly in the downtown area, LAPD did not do enough to stop the looting and destruction of local businesses during some of the events–which may have suggested to some that a higher level of tolerance may exist and that violence and destruction of property would be tolerated. Finally, the National Police Foundation (NPF) assessment team heard from some community members who referenced positive interactions with the LAPD during the protests. These community members reported that LAPD personnel responded and "did the best that they could" given chaotic and fluid situations[7]. They acknowledged the violence being directed at officers that worked the line and described officers being yelled at and having frozen water bottles, rocks, and other items thrown at them[8]. These community members believed that the aggressive tactics used by LAPD were in reaction to aggressive tactics used by protesters that may have been trying to incite a violent response[9].

LAPD members involved in the response described to the NPF assessment team a department with some of the most highly-skilled, highly-trained members in the country. At the same time, they noted that at the beginning of the protests—specifically on May 28, 29, and 30—the department was unable to coordinate, mobilize and disperse the crowds, or effectively stop the destruction. After the third day, LAPD members described being better resourced and deployed within a strategy that allowed community members to exercise their First Amendment rights safely and peacefully.

Families of LAPD members expressed that these events have taken a significant toll on LAPD members and their families. LAPD members and their families are exhausted; they and their families feel isolated; they are demoralized by the lack of support from public, City, and department leadership; and, are frustrated by their perceived inability to do the job they are trained to do. They described missed or ignored opportunities that the City and the department had to counter destructive narratives, and to tell the department's story about the work they do every day to protect the city.

---

[6] NPF assessment team Community Listening session. February 4, 2021. By policy, LAPD does not deploy projectile chemical munitions, but officers are issued individual OC spray canisters.
[7] Ibid.
[8] NPF assessment team interview with Business Improvement District representative. January 25, 2021.
[9] See footnote 6.

## Summary Statement of Findings

Through its review of the LAPD response to the SAFE LA First Amendment assemblies and protests that occurred between May 27 and June 7, 2020, the NPF assessment team makes 22 findings, each of which are discussed in greater detail within the report:

### LAPD Provisions and Training Relevant to First Amendment Assemblies and Protests

**Finding 1.1:** Following the violent Rodney King protests in South LA in 1992, the LAPD made significant changes to their protocols in response to civil unrest, setting a national model for law enforcement policy and training.

**Finding 1.2:** LAPD, like many police departments across the country had well-developed crowd management policies and practices that had proven successful during previous events. Those policies and practices were inadequate to handle the disparate groups, or to identify leaders amongst the protesters and address the level of violence.

**Finding 1.3:** Although it aligned with LAPD's use of force provisions and procedures, documentation of uses of force during protests and demonstrations—including the deployment of less lethal munitions—was inconsistent by LAPD members.

**Finding 1.4:** Some LAPD personnel had not been provided contemporary training on crowd management, mobile field force, supervision, de-escalation, or the use of less-lethal instruments prior to the First Amendment assemblies and demonstrations from May 27 through June 7, 2020.

**Finding 1.5:** During the initial days of the protest, the number of disparate groups, the pace at which the protests accelerated, and the level of violence precluded the highly trained and experienced LAPD bike unit from successfully completing its mission.

**Finding 1.6:** The National Guard was mobilized, responded to the City, and were used to protect critical infrastructure and major intersections and thoroughfares.

**Finding 1.7:** While LAPD has clear policies around use of force, crowd management, and other relevant pieces of responding to First Amendment assemblies and protests, they do not have one policy directing response specifically to large-scale, fluid, city-wide civil unrest that turns violent or contains violence.

### Leadership and Incident Command

**Finding 2.1:** The nature of the SAFE LA First Amendment assemblies and protests that occurred in Los Angeles between May 27 and June 7, 2020 were ones that neither LAPD, nor other jurisdictions across the nation, have previously experienced nor expected.

**Finding 2.2:** The City of Los Angeles lacked a well-coordinated city-wide political, policy, communications, and law enforcement response mission to the SAFE LA First Amendment assemblies and protests that occurred between May 27 and June 7, 2020.

**Finding 2.3:** Communication within LAPD—particularly in the first few days—was inconsistent between the Chief, his command staff, bureau commanders and field supervisors, and line officers. This created significant challenges regarding: (a) identifying a cogent operating philosophy; (b) determining operations during individual shifts, including when shifts started and ended; and, (c) establishing coordination and consistency between shifts.

**Finding 2.4:** The issuing and cancellation of Tactical Alerts contributed to confusion and frustration amongst supervisors and officers.

Finding 2.5: LAPD did not effectively leverage intelligence and information city-wide—including publicly-available social media—that may have enhanced situational awareness of officers and their ability to rapidly assess multiple venues and deploy resources.

Finding 2.6: LAPD should develop, implement, and review MOUs with the LASD and other law enforcement agencies to support and clearly define roles, responsibilities, and protocols to First Amendment assemblies and protests.

## Public Communication and Social Media

Finding 3.1: Although a virtual JIC was established, the review process impacted the ability of LAPD to post timely messages to its social media accounts.

Finding 3.2: The LAPD decision to not fully leverage social media to share information and respond to false accusations allowed demonstrators to control the narrative and overwhelm LAPD on the information front.

## Officer Wellness and Morale

Finding 4.1: For more than 50 years, LAPD has endeavored to assist its personnel through Behavioral Science Services and aligned groups. In many ways, LAPD should be recognized for its innovative programs and leadership in the law enforcement profession regarding physical and mental wellness.

Finding 4.2: The research is clear that law enforcement personnel are exposed to significant traumatic events during the course of their careers. This exposure increases the likelihood of negative physical and mental health impacts that extend beyond an officer's law enforcement career.

Finding 4.3: LAPD, elected officials and the LA community should recognize that research indicates that crowd management and other critical incidents have a significant negative impact on law enforcement personnel, their significant others, and children.

Finding 4.4: COVID-19, the deaths of nine members of the Department, deaths and serious illness among loved ones, and the fear of infecting family members placed untold stress on the LAPD, and exacerbated the stress and trauma associated with crowd management during the SAFE LA First Amendment assemblies and protests.

Finding 4.5: Officer morale has been described almost universally as 'at an all-time low'. In addition to being the "target" of the protests, frustration with LAPD leadership and inconsistent messaging, and statements and decisions made by elected officials during and after the protests have been perceived as a lack of support for the department.

## Community Engagement and Perspective

Finding 5.1: LAPD has a history of professional policing, positive engagement, and strong relationships with business owners and Business Improvement District (BID) organizations, faith- and community-based institutions and organizations, and the Los Angeles community, including activists. They were able to leverage those relationships during responses to the SAFE LA First Amendment assemblies and protests.

Finding 5.2: Despite ongoing efforts to improve relationships, the history of LAPD is also punctuated with tensions between the community and the department (as well as

# After Action Review Purpose and Scope

## Purpose, Scope, and Approach

In August 2020, at the request of the Los Angeles Board of Police Commissioners (LABOPC)—and with funding provided by the Los Angeles Police Foundation—the National Police Foundation (NPF) was engaged to conduct an independent after-action review (AAR), assessment, and analysis of the actions of the Los Angeles Police Department (LAPD) in response to First Amendment assemblies and protests in the City of Los Angeles (LA) from May 27 through June 7, 2020.

The purpose of this NPF AAR is to assist the LABOPC and the LAPD to improve the Department's preparation and response to future similar events. Putting resources toward this type of review while only occasionally undertaken by Cities or city stakeholders demonstrates the willingness of the LABOPC and the LAPD to consider reimagining policing in the City of Los Angeles, to addressing challenges in community-police interactions, and to protecting First Amendment assemblies and protests. In requesting this review, the LABOPC and the LAPD recognize that to advance and improve policing in the City of Los Angeles, they must engage in rigorous internal and external processes to identify areas of strength and areas for improvement in their response to First Amendment assemblies and protests. The LA community also deserves City and LAPD leadership who will commit to follow through on necessary changes to improve future responses to First Amendment assemblies and protests, as well as the delivery of police services in LA.

It should be noted that this AAR is not part of or associated with any other investigation–criminal, civil, internal, or other. The sole purpose of this review is to provide an independent assessment of the LAPD response to the SAFE LA First Amendment assemblies and protests to promote LAPD's study and improvement of the systems, processes, and strategies executed by their members.

In order to conduct this AAR, the NPF assessment team—comprised of subject matter experts in law enforcement, police-community relations, response to First Amendment assemblies and protests, policy analysis, police data analysis, and research—developed and implemented a process that involved multiple methods of information gathering, collection, and analysis. The NPF assessment team gathered feedback, information, and data through:

1. **interviews, focus groups, and anonymous feedback;**
2. **LAPD and City of LA resources and data;**
3. **open-source news and social media review; and,**
4. **national academic and public safety resources.**[10]

The NPF assessment team used the totality of the information gathered to identify the findings and recommendations included herein.

## Access to Data, Information and Perspectives

LAPD provided access to materials and data requested by the NPF assessment team for this review. LAPD provided directives, operational manuals, internal memoranda and special orders, and notices; academy and in-service training curricula/expanded course outlines and lesson plans, guides, training records, and

---

[10]For more information, see Appendix B: Detailed Methodology.

training bulletins; Incident Action Plans, Event Action Plans, and chronology logs; Incident Command System forms; communications logs; arrest, crime, calls for service, booking, property damage, and socio-economic data; officer wellness plans and injury data; and, more as requested by the NPF assessment team. Additionally, LAPD provided the NPF assessment team with approximately two terabytes of videos, images, and radio channel recordings. LAPD also provided access to 147,921 body-worn camera videos and images.

The NPF assessment team also received data, information, and multimedia directly from business representatives and community members.

## Challenges and Limitations of this Review

### COVID-19

Due to the COVID-19 pandemic, the NPF assessment team was unable to conduct in-person site visits in LA—historically, an important part of the NPF AAR process. The NPF assessment team normally conducts several site visits throughout the review period in an effort to host in-person interviews and focus groups; to gain situational awareness and perspective of the local community; to understand distances/proximities; to get a better feel for department and city culture; and, to better envision potential challenges related to crowd control and responding officers establishing on-scene command.

The site visits are integral to NPF's approach to conducting AARs, especially in engaging with community members. The NPF assessment team conducted virtual interviews, focus groups, and community listening sessions, but was unable to visit local coffee shops, eateries, and community gathering locations to conduct spontaneous field interviews and establish the comradery and environmental awareness necessary for the team to be able to ask important questions, hear honest answers, and have tough conversations. The NPF assessment team was able to hold four, 60-minute virtual open listening sessions for community members: two on February 4, 2021 and two on February 17, 2021. A total of 128 community members attended these sessions. In an effort to expand the options for those who wanted to provide input, the team created a webpage—www.policefoundation.org/lapdreview—with an anonymous comment box and an email address to schedule individual interviews or focus groups, provided a phone number for LAPD personnel and LA community members to provide feedback, and disseminated information about the listening sessions and ways to provide feedback through the LABOPC and on the NPF social media accounts.[11]

COVID-19, which has also been implicated as one of the reasons for the number, and visceral nature, of the protests in the first place, also prevented the NPF assessment team from traveling to LA during the review. It prevented the team from being on-site and generally presented a hurdle to the expansive collection of information through both scheduled formal methodologies and organic approaches that are inherent in the NPF AAR data collection and analysis process.

### Coinciding Investigations, Reviews, Inquiries & Assessments, and Limited Participation

Due to simultaneous ongoing litigation, internal affairs investigations, and other AARs regarding the same assemblies and protests, some information was not provided to the NPF assessment team. The NPF

[11]For more information, see Appendix B: Detailed Methodology.

National Police Foundation - A Crisis of Truth

litigation or internal affairs investigations, in an effort to protect the legitimacy and integrity of those investigations. At the same time as this AAR was underway at least two other similar reviews were also underway. First, a team of former LAPD members led by Gerald Chaleff was commissioned by the City Council to review LAPD's response to SAFE LA First Amendment assemblies and protests[12].  Also, through interviews and focus groups, the NPF assessment team was told that the LAPD OCPP was also conducting an internal AAR.  The NPF assessment team was not provided access to either AAR[13] before its final draft was written.

Despite efforts to work with LAPD and the Los Angeles Police Protective League (LAPPL)—the union that represents LAPD officers below the rank of lieutenant—to encourage participation in this review, many LAPD personnel who responded to SAFE LA First Amendment assemblies and protests did not speak with the NPF assessment team. The NPF assessment team scheduled four 90-minute virtual focus groups/listening sessions for LAPD officers; four 90-minute virtual listening sessions for LAPD sergeants; and, one with the Los Angeles Police Protective League Board (LAPPL) to provide opportunities for them to provide input on their experiences during the response to the SAFE LA First Amendment assemblies and protests. The NPF assessment team also provided several means through which LAPD members could reach out to schedule interviews or focus groups or to provide written input anonymously. Four LAPPL Board members, four sergeants and one officer participated. In addition, a number of high-ranking LAPD personnel who played important roles in the agency's response have since retired, and were not interviewed by the NPF assessment team because the LAPD determined that it was not able to provide contact information for these individuals. The NPF assessment team also conducted a series of focus groups and individual interviews with family members of LAPD personnel.

City of Los Angeles elected officials, while having engaged their own review of the LAPD response to the protests and demonstrations, were invited to participate in this review as well. However, less than half of those invited, participated in interviews with the NPF assessment team.

The NPF assessment team engaged, to the best of their ability, Los Angeles business owners and representatives, community and faith leaders, and individual community members by providing opportunities for them to participate in interviews and voice their concerns. The NPF assessment team scheduled virtual interviews, focus groups, and open listening sessions with LA community members throughout the process. The input and feedback of those who participated is referenced in this report.

While those LAPD personnel, elected officials, and community members who did participate provided a variety of insights and perspectives into areas for the NPF assessment team to focus on, made recommendations, and offered suggestions to enhance police-community relations and the response to First Amendment assemblies and protests, the NPF assessment team was surprised at the unusually low number of individuals willing to participate.

---

[12] Chaleff, Gerald. (2021, March 10). An Independent Examination Of The Los Angeles Police Department 2020 Protest Response.
https://clkrep.lacity.org/onlinedocs/2020/20-0729_rpt_CLA_03-11-21.pdf
[13] Los Angeles Police Department. (2021). SAFE LA After Action Report DRAFT. Provided to the NPF assessment team by LAPD electronically on March 17, 2021.

However, a number of factors may have contributed to this.

1. **A general lack of trust exists around policing in LA. Many community members don't trust the police and there are politics both within the City of LA and within LAPD that preclude some in the City and LAPD from participating.**
2. **Due to COVID-19, the NPF assessment team was not able to be on-site in LA and at LAPD to conduct informal interviews and discussions, to better publicize scheduled ones or to encourage individuals to participate. The team had limited reach working remotely.**
3. **Having three different reviews of the same incident(s) going on at the same time can cause fatigue from community members, LAPD members, and other stakeholders in answering similar questions repeatedly. This 'multiple review' approach can also detract from one focused and thorough investigation that provides access to all the information and a robust variety of perspectives while also contributing to the 'us against them' politics that continues to plague public safety.**

## Multiple Stakeholders

While the scope of this assessment was limited to LAPD's response to the SAFE LA First Amendment assemblies and protests, multiple stakeholder groups have a role to play in understanding the responses and improvement going forward.

Under the City Charter, the LABOPC serves as the head of the LAPD, setting overall policy or policy direction and goals, while the Chief of Police manages and implements the LABOPC's directives. In 1992, the LABOPC commissioned _The City in Crisis: A Report by the Special Advisor to the Board of Police Commissioners on the Civil Disorder in Los Angeles,_ in response to the LAPD handling of the riots instigated by the "not guilty" verdict in the trial involving four LAPD officers for their involvement in the arrest and beating of Rodney King.[14]

Chief Moore, his command staff, and the LAPD Office of Constitutional Policing and Policy (OCPP) were in the midst of an ongoing process of reviewing LAPD policies, procedures, and training relative to the ways in which the department engages in crowd control and crowd management during First Amendment assemblies, mass demonstrations, protests, and civil unrest when the AAR request was made[15].  Chief Moore, his command staff, and the leadership of the OCPP are interested in receiving recommendations that would assist them in those ongoing efforts to enhance the programs and operations of the department, as well as police-community relations.

Elected officials also play a key role in the response to First Amendment assemblies and protests. Regardless of their involvement in tactical and operational decisions, their leadership, coordination, and public messaging, have both explicit and implicit impacts on the overall response. It is increasingly important that the mayor, city councilmembers, and other city officials understand their roles and responsibilities and the impacts their actions and statements have.

---

[14] See footnote 5.
[15] Los Angeles Police Department. (2020, August 30). Memorandum of Agreement Between the Los Angeles Police Department and the Police Foundation.

National Police Foundation - A Crisis of Truth

Communities across the country, including LA, are working to address complex issues of race in the United States, including disparities in the criminal justice system, reimagining policing, reducing use of force, and other long-standing and unaddressed socio-economic and political challenges that have impacts on policing and police-community relations. Community organizations and members with a variety of perspectives can play an integral role in helping to identify opportunities to make meaningful enhancements and in working with police and elected officials to create holistic strategies regarding First Amendment assemblies and protests.

Likewise, each of these stakeholders—LABOPC, LAPD, elected officials, and the community—has a role in identifying steps necessary to engage in dialogue, healing, and moving LA forward. City government, LABOPC, LAPD, and the community must commit to rebuilding and restoring trust together through honesty, transparency, accountability, engagement, and a shared definition of public safety. It is also critical that the City of LA, LAPD, and community members join in developing and training for a city-wide response that supports the expression of individual First Amendment rights and prevents disorder from persisting and intensifying.

LA and the LAPD have served as innovative city and police agency models in many ways. LA, LAPD, and Angelenos now have a unique opportunity develop a new model for law enforcement agencies and communities nationwide to resolve the crisis of trust and enhance police and community response to First Amendment assemblies and protests.



# National and Local Context
## National Context

On May 25, 2020, George Floyd, a 46-year-old African American man, died after being handcuffed and pinned to the ground by Derek Chauvin, a Minneapolis Police Department (MPD) officer who knelt on Mr. Floyd's neck for more than seven minutes.[16] Three other MPD officers were also charged in the incident. The death of Mr. Floyd was recorded on video by witnesses, and subsequently shared extensively on social and news media. His death galvanized nationwide outrage spurring First Amendment assemblies and protests for racial justice across cities in the US, and across the globe. The public reaction to the death of Mr. Floyd was fueled by a history of high-profile cases involving the deaths of African Americans at the hands of police officers—including Oscar Grant in 2010, Michael Brown and Eric Garner in 2014, Keith Lamont Scott in 2016, and Breonna Taylor and Tony McDade in 2020—and against the backdrop of ongoing distrust between the African American community in particular, and minority groups in general, and the police.

The death of Mr. Floyd also intensified demands for police reform across the nation. As thousands took to the streets to protest, they called for renewed attention to long-standing criticisms and concerns regarding police practice—including complaints about racism and disparate use of force against communities of color, the militarization of police forces, and the lack of accountability for abuses of police power. Perhaps the most controversial demand has been the call to "defund the police." Proponents of defunding the

police attest that police reform must be radical, as conventional methods of reform have been insufficient to bring about needed changes to policing.

At the same time, the percent of positive COVID-19 tests and the number of fatalities were continuing to increase across the nation.[17] Specifically in Los Angeles (LA), Mayor Eric Garcetti had issued a series of local public health emergencies and guidelines that limited or cancelled public and private gatherings, business operations, and established penalties for failure to comply.[18][19][20] As a result, industries that are particularly important to the Los Angeles economy—including entertainment, travel, shopping, and dining—began unprecedented levels of furloughs and layoffs.[21] People were feeling restricted, angry, fearful, anxious, and frustrated, which created the impetus and opportunity for many people to express those feelings through First Amendment assemblies and protests that went on for days and nights.

Anger regarding the death of Mr. Floyd, ongoing calls for police reform, erosion of police legitimacy, and the uncertainties surrounding the COVID-19 pandemic fueled the flames of an already-divisive political environment. Increasingly, traditional and social media was used to make and spread accusations, question opposing views, and pit groups against one another. Across the nation, communities were challenged to reconsider issues that burned below the surface as First Amendment assemblies became protests and riots.

[16] State of Minnesota v. Derek Michael Chauvin. (2020, June 3). US District Court, Fourth Judicial District. https://mncourts.gov/media/High-Profile-Cases/27-CR-20-12646/AmendedComplaint06032020.pdf
[17] US Centers for Disease Control and Prevention. (2020, June). COVIDView Week 22, ending May 30, 2020. https://www.cdc.gov/coronavirus/2019-ncov/covid-data/pdf/covidview-06-05-2020.pdf
[18] Eric Garcetti. (2020, March 4). Declaration of Local Emergency. City of Los Angeles. http://clkrep.lacity.org/onlinedocs/2020/20-0291_reso_03-04-2020.pdf
[19] Eric Garcetti. (2020, March 12). COVID-19 City Guidelines. City of Los Angeles. https://www.lamayor.org/sites/g/files/wph446/f/article/files/Mayor%20Memo%20-COVID-19%20LA%20City%20Guidelines.pdf
[20] Eric Garcetti. (2020, March 19). Public Order Under City of Los Angeles Emergency Authority. City of Los Angeles. https://www.lamayor.org/sites/g/files/wph446/f/page/file/20200527%20Mayor%20Public%20Order%20SAFER%20AT%20HOME%20ORDER%202020.03.19%20(REV)%202020.05.27).pdf
[21] Borden, Taylor, A. Akhtar, J. Hadden, & D. Bose. (2020, October 8). "The coronavirus outbreak has triggered unprecedented mass layoffs and furloughs. Here are the major companies that have announced they are downsizing their workforces." Business Insider. https://www.businessinsider.com/coronavirus-layoffs-furloughs-hospitality-service-travel-unemployment-2020#on-october-1-united-airlines-furloughed-13000-people-the-company-had-previously-said-16370-jobs-would-be-impacted-by-cuts-7

# The "New" Protest Environment

As First Amendment assemblies and protests have evolved, so has the police response to them. Historically, protests were met by escalated force that focused on crowd control. Clear examples of the escalated force style come from the response to civil rights protests in the 1960s.[22] During the 1980s, however, a shift toward a negotiated management approach was adopted. This approach prioritized the First Amendment right of the community to peaceably assemble and encouraged the police to work with protesters before demonstrations to limit conflict. [23]

Protesters began to adjust tactics again in the late 1990s, by overwhelming law enforcement with large numbers and spontaneous and violent demonstrations, exemplified by the 1999 World Trade Organization (WTO) protests in Seattle.[24] The Seattle Police Department (SPD) did not anticipate the size of the demonstration or the level of violence perpetrated by agitators. Therefore, the SPD responded by reverting back to escalated force tactics. Following the SPD response to the WTO, some police departments sought to adopt protest and crowd management approaches that were flexible and would account for the changing nature of protests. Some police officials felt that pure negotiation management was too "soft," but wanted options that were less coercive than previous escalated force tactics.[25] This led to the approach that is most-often employed today—which is the identification and strategic extraction of individuals inciting or engaging in acts of violence[26]

and increasing proactivity toward negotiation objectives.[27]

More recently, protesters have again altered tactics with another key factor: the extensive use of social media platforms such as Twitter, Facebook, Snapchat, and Instagram. Protesters increasingly leverage social media to gain support for their movement, to share logistics information, distribute mobilization plans, and track police movements. The use of social media has added a significant challenge to crowd management strategies utilized by police, as crowds have become more organized, more versatile, more nimble and fluid, and more strategic–with movements[28] planned around countering police tactics, instead of the other way around.[29]

Another recent tactical evolution by protesters has been to disregard applying for and receiving permits. Many jurisdictions require organizers to complete a permit application for marches or parades that require blocking traffic or street closures, large rallies requiring the use of sound amplifying devices, or events with a planned attendance above a certain number.[30] While the intent of the permit process is to provide police and public officials sufficient notice to plan and prepare accordingly, recent protest groups have chosen to leverage the element of surprise. When the Occupy movement spread across the nation in 2011, local groups organized entirely on social media and staged demonstrations, protests,

[22] McPhail, Clark, David Schweingruber, and John McCarthy. (1998). "Policing protest in the United States: 1960-1995." Policing protest: The control of mass demonstrations in western democracies 6: 49-69.
[23] Ibid.
[24] Bryant, Kenneth. "Policing communities of color: An historical examination of social control and protest management strategies." In Political Authority, Social Control and Public Policy. Emerald Publishing Limited, 2019.
[25] Ibid.
[26] Noakes, John, and Patrick F. Gillham. "Aspects of the 'New Penology'in the police response to major political protests in the United States, 1999–2000." The policing of transnational protest (2006): 97-116.
[27] Wahlström, Mattias. (2011). The making of protest and protest policing: Negotiation, knowledge, space, and narrative. Department of Sociology; Sociologiska institutionen.
[28] Earl, Jennifer, Heather McKee Hurwitz, Analicia Mejia Mesinas, Margaret Tolan, and Ashley Arlotti. (2013). "This protest will be tweeted: Twitter and protest policing during the Pittsburgh G20." Information, communication & society 16, no. 4. 459-478.
[29] Jost, John T., Pablo Barbera, Richard Bonneau, Melanie Langer, Megan Metzger, Jonathan Nagler, Joanna Sterling, and Joshua A. Tucker. (2018, February 13). "How Social Media Facilitates Political Protest: Information, Motivation, and Social Networks." Political Psychology 39, no. S1. 85-118. https://onlinelibrary.wiley.com/doi/full/10.1111/pops.12478
[30] American Civil Liberties Union. (2021). Know Your Rights: Protesters' Rights. https://www.aclu.org/know-your-rights/protesters-rights/

National Police Foundation - A Crisis of Truth

and occupations of government buildings with no prior warning.[31] Similarly, protests in Portland, Oregon, in 2017 and 2018 were impacted by the long-standing practice by the city of overlooking the need for permits to protest. The community described the permitting process—run by Parks and Recreation Department—as complicated and cumbersome, but understood that it provided Portland Police Bureau with valuable preparation information if used. [32]

It must be noted that while shifts in protest strategies have occurred, there is considerable heterogeneity in the manner by which police agencies respond.[33] The trend toward the militarization of the police response to protests has implications for how the police balance the use of escalated force and negotiation management.[34] Police generally perceive and respond to First Amendment assemblies and protests from the vantage points of regulation, management, and control as a means to avoid violence and maintain public order. From the police perspective, their primary role and responsibility is to ensure safety and security of persons and property. Particularly in terms of protecting persons—protesters, media, bystanders, and officers—police also have to be prepared for scenarios in which counter-demonstrators or others intent on causing harm use the large crowd to blend in before perpetrating their attacks.[35] As is exemplified by violent—

and in some cases fatal—incidents between demonstrators and counter-demonstrators in Charlottesville, Virginia; Kalamazoo, Michigan; and, Washington, DC, police departments must be prepared for the worst, and in doing so, use strategies and tactics that support public safety by quickly responding to acts of violence.

Without community dialogue and explanation regarding the strategies, tactics, and equipment used by law enforcement to respond to violence and to disperse crowds, police actions are often interpreted as unnecessary, overly-aggressive, and demonstrating a predisposition to the "warrior" mentality.[36] In chaotic situations, the police can perceive the entire group as a single entity, rather than as individual persons.[37] In instances when individuals in a large group attempt to instigate police officers into using force against them, the response more often than not, is directed at the entire group who are seen as aiding and abetting the violent individuals. Without adequate time to plan, prepare, and deploy the most well-trained personnel and appropriate resources to facilitate spontaneous events, officers tend to rely on the tactics they are most-regularly trained in to quickly regain and maintain control.[38]

[31] Maguire, Edward R. and Megan Oakley. (2020, January). Policing Protests: Lessons from the Occupy Movement, Ferguson & Beyond: A Guide for Police. Harry Frank Guggenheim Foundation. https://static1.squarespace.com/static/5b293370ec4eb7e463c960e6/t/601d60d2a7f98e73c3dbee05/1612538076086/Policing+Protests.pdf
[32] National Police Foundation. (2020). Preparing for and Responding to Mass Demonstrations and Counter- Demonstrations in Portland, Oregon: A Review of the Portland Police Bureau's Response to Demonstrations on June 4, 2017, August 4, 2018, and August 17, 2019. Arlington, VA: National Police Foundation. https://www.portland.gov/sites/default/files/2021/portland-police-independent-review-final-report.pdf
[33] See footnote 31.
[34] Ibid.
[35] Ibid.
[36] Ibid.
[37] Ibid.
[38] Ibid.

# Local Context

## Rodney King – 1992

On April 29, 1992 the City of Los Angeles began to experience one of its most disruptive civil unrest episodes in history. On that day, four Los Angeles Police Department (LAPD) officers were acquitted for the beating of Rodney King, an African American man who was brutally beaten by officers after leading them on a high-speed chase a year before. Once the non-guilty verdicts of the involved police officers were made public, residents of South LA erupted in protests that turned into five days of violent riots, massive looting, destruction of property, and arson, that culminated with 6,000 arrests and the death of more than 60 individuals.[39]

In 1992, an AAR assessed the City's and the LAPD's response to the unrest and highlighted the overall lack of preparedness of both parties. Given the insufficient communication between government and police leaders and inadequate training for such situations, the disorganization that ensued in response to the unrest was determined to be unsurprising. The LAPD also suffered from a lack of leadership, with the Chief of Police at that time being unable to provide officers with meaningful direction and failure to mobilize and deploy resources quickly.[40] The LAPD acted on the findings and recommendations found in the AAR and implemented changes to its culture, training, provisions, and community relationships.

Adding to the urgency for change was the 1991 Christopher Commission report on the department's use of force practices.[41] The Commission found that there was a significant number of officers who persistently ignored departmental guidelines on use of force, frequently employing excessive force against the community. The report also highlighted pervasive improper attitudes and practices of misconduct and overt racism among some officers.[42]

## May Day – 2007

Another significant clash between LA protesters and the LAPD occurred on May 1, 2007, when approximately 6,000-7,000 protesters marched to MacArthur Park in support of immigration rights. The protests were peaceful for most of the day, however, as a group of between 200-300 protesters took a side route on their way to the park, a team of LAPD motorcycle officers attempted to re-direct the crowd. At this point, tension started to escalate as a sergeant was grabbed by three individuals who attempted to pull him off his motorcycle.[43] Later, a group of approximately 30 individuals began to throw projectiles at the police, including wooden sticks, ice, gravel, and pieces of cement. In response, officers formed a skirmish line and, without a dispersal order, began moving the crowd. As they moved the crowd, officers struck some protesters with batons and struck some media crew members as well. The department deployed a total of 146 less-lethal munitions and struck persons with batons more than 100 times. As a result, 246 individuals claimed injury, and 18 officers were treated for various abrasions and contusions. The LAPD also faced multiple lawsuits for excessive use of force which they settled with nearly $13 million in 2009.[44]

The LAPD, under the command of Chief William "Bill" Bratton, later published an assessment of the

[39] See footnote 5.
[40] Ibid.
[41] Christopher, Warren, ed. (1991). Report of the independent commission on the Los Angeles Police Department. Diane Publishing.
[42] Ibid.
[43] Los Angeles Police Department. (2007) "An Examination of May Day 2007: Report to the Board of Commissioners." https://www.policefoundation.org/wp-content/uploads/2021/01/An-Examination-of-May-Day-2007-Los-Angeles-Police-Department-Report-to-the-Board-of-Police-Commissioners.pdf
[44] Ibid.

department's response to the protests.[45] In their report, LAPD described several problems related to planning, tactics, command and control, situational awareness, training, and individual responsibility. However, as the report noted, the larger issue was the lack of intervention from command staff members. The report noted "the failing leadership, breakdown in supervision, and breakdown in personal discipline, caused those without full situational awareness to take action without understanding how their decisions might affect the final outcome."[46]

Following the report's release, the LAPD put forth a plan of improvement, including annual revisions of their crowd management and control and use of less-lethal force policies. They instituted regular Mobile Field Force trainings and engaged in the re-assessment of protocols for planned and unplanned events.[47]

## Crowd Management Reforms and Community Policing in LAPD

When Chief Bratton took over as Chief of Police in 2002, the LAPD was facing the challenge of reforming its practices and culture. The year prior, the department entered a consent decree to settle a lawsuit brought by the US Department of Justice due to a pattern of police misconduct. According to a report published by the Harvard Kennedy School of Government, Chief Bratton was instrumental in the implementation of the consent decree measures.[48] Chief Bratton was widely praised for his ability to introduce community-policing to the LAPD's philosophy, and strengthening the ties between the department and LA residents. One way he achieved this was by showing transparency–for example, after the 2007 May Day incident, Bratton publicly denounced the LAPD's behavior, demoting one commander and forcing another into retirement. He later commissioned the report that outlined the failures of the department's response.[49] Bratton believed that community policing had to be developed by field captains to fit their specific divisions and neighborhoods' needs.

When Bratton retired in 2009, Charlie Beck was appointed the new Chief of Police. Chief Beck had worked alongside Chief Bratton for years, sharing Bratton's views on the importance of community

policing. In a post he wrote reflecting on his first year as Chief, Beck wrote: "I believe one of the keys to a successful police organization is making myself easily accessible to the public in a way that genuinely opens honest communications, particularly with people who have disagreements with the LAPD."[50] Among Chief Beck's community policing initiatives was the Community Safety Partnership (CSP). The CSP's officers were not judged by "arrest numbers but by how effectively they strengthened and stabilized each of the housing projects; kept crime and violence low through gaining the community's trust, partnership, and support; and worked with the projects' kids and families to keep the kids out of jail."[51]

Following Chief Beck's retirement in 2018, Michel R. Moore was appointed Chief of Police. Chief Moore had risen through the ranks and assignments of LAPD, serving as an officer, detective, sergeant, lieutenant, commander, deputy chief, and assistant chief, prior to being Chief. During his LAPD tenure, Chief Moore has overseen training, the department's command center, and operations; was Chair of the Use of Force Review Board; and, directed the LAPD CompStat process, among other notable accomplishments. Throughout his career, Chief Moore has promoted community policing, partnership-oriented strategies involving

[45] Ibid.
[46] Ibid.
[47] Ibid.
[48] Stone, Christopher, Todd S. Foglesong, and Christine M. Cole. (2009). Policing Los Angeles under a consent degree: The dynamics of change at the LAPD. Cambridge, MA: Program in Criminal Justice Policy and Management, Harvard Kennedy School.
[49] Domanick, Joe. (2015, September) "What Bill Bratton Has Taught American Police" Time Magazine.
[50] Beck, Charlie. "Reflections on My First Year as Chief of Police" Official Site of the Los Angeles Police Department. https://www.lapdonline.org/home/content_basic_view/46571
[51] Domanick, Joe. (2015). Blue: The LAPD and the Battle to Redeem American Policing. New York: Simon and Schuster.

community stakeholders and various members of the criminal justice system, and professionalism and diversity.[52] Nowhere is the commitment to community partnerships more apparent than in the formalization of the Community Safety Bureau.

Some notable efforts to strengthen the fragile relationship between the communities in South LA and LAPD have emerged, particularly in Watts, a neighborhood that has a long history of dealing with gang violence. In 2006, the LAPD developed the Watts Gang Task Force, in an attempt to reduce the rates of violence through a community-based policing philosophy. Since 2011, Watts has also been part of the Community Safety Partnership, a program developed by the LAPD, the Housing Authority and the city's office of Gang Reduction and Youth Development. Through the program, 30 specially assigned officers invest efforts in community relationships and building trust. Officers play basketball with residents, coach

the Watts Bear football team, and generally engage with the community on and off duty.[53] The results of such community policing efforts have been compelling. A University of California, Los Angeles (UCLA) study found that the CSP program was responsible for approximately 221 fewer violent crimes over a six-year period (2012-2017). These include approximately seven fewer homicides, 93 fewer aggravated assaults and 122 fewer robberies.[54] Moreover, there is open dialogue between the community and the police, something that seemed impossible a decade ago in Watts.[55] The program has now expanded to 10 sites across LA. Watts is just one neighborhood of South LA, which does not necessarily represent all the communities of color across the City of LA. Nonetheless, the efforts that the LAPD has invested in Watts is an example of how historically contentious relationships can become amicable and productive.

## Community Safety Partnership

In 2020, the Community Safety Partnership (CSP) was formalized as the Community Safety Bureau, headed by Deputy Chief Emada Tingirides.

CSP's goal is to reduce the amount of violence and gang influence across LA through developing strong partnerships with the community. The new bureau works on institutionalizing the CSP model across all aspects of the LAPD.

CSP officers dedicate at least five years to a single neighborhood where they invest partner with the community to co-create strategies and programs that address the specific needs of the community. The CPS emphasizes that officer's productivity is no longer defined by stops, citations, and arrests. Rather through the community's engagement and feelings of overall safety and security.

[52] Los Angeles Police Department. Michel R. Moore. https://www.lapdonline.org/lapd_command_staff/comm_bio_view/7646
[53] Siegler, Kirk. (2013, July 25). "After Years of Violence, L.A.'s Watts Sees Crime Subside" NPR.
https://www.npr.org/sections/codeswitch/2013/07/25/205198028/Once-Crime-Ridden-South-L-A-s-Watts-Sees-Violence-Drop
[54] Leap, Jorja, Brantingham, Jeffrey, and Bonis Susana. (2020, March). "Evaluation Of The LAPD Community Safety Partnership" Final report.
http://lapdpolicecom.lacity.org/051220/CSP%20Evaluation%20Report_2020_FINAL.pdf
[55] Rice, Constance, and Susan K. Lee. (2015). "Relationship-based policing achieving safety in Watts." Washington, DC: Advancement Project.

It is worth noting that the CSP program, now developed into the Community Safety Bureau, has been commended by civil rights advocates and City councilmembers.[56] However, some community members remain hesitant and skeptical, particularly those proponents of defunding the police, who believe that investing additional funds into police-driven programs is not the right approach.[57] As the Community Safety Bureau gains its footing in LA's post George Floyd landscape, it remains to be seen how their efforts progress city-wide community-police relationships.

## LAPD Relationships with Communities of Color

The relationship between the LAPD and the communities of color they serve has been tumultuous, particularly in South LA where tension between the African American community and the police has been pervasive throughout the neighborhood's history. Most exemplary is that South LA, previously known as South Central, was the epicenter of the 1965 Watts Uprising and the 1992 Rodney King riots.

In 2019, the University of Southern California (USC) Price Center for Social Innovation released a report detailing findings from public safety data (including calls for service, stops by police, arrests) and community listening sessions that showed over-policing taking place in communities of color. People in communities of color across all LA County were stopped at higher rates by the police than other groups, and Black community members were stopped and arrested three times as often as their white and Latino counterparts. Moreover, participants in listening sessions voiced the damaging psychological effects of racial profiling, and their disappointment at the lack of investments in community programs, education and health services, particularly in South LA. [58]

## Public Perception of LAPD

The LAPD underwent significant changes at the turn of the century when, in 2000, the US Department of Justice announced that it had collected enough evidence to pursue litigation against the City of LA over a pattern of police misconduct. Consequently, the city government entered a consent decree committing to reform under the supervision of the Federal Court.

According to a report produced by the Harvard Kennedy School of Government, from 2005 to 2009, the LAPD was successful in garnering substantially greater ratings of approval, which were consistent across ethnic and racial groups. LA community members reported on their personal experiences with LAPD officers as well. The general pattern of responses was positive, with majorities of every racial and ethnic group reporting that most of the LAPD officers they encountered treated them, as well as their friends and family, with respect. However, it must be noted that among Black and African American respondents, 10% reported that almost no LAPD officers treat them with respect, and the figure was even higher for the small number of residents who identify as something other than Hispanic, White, Black, or Asian. As the authors of the report stated, this 10% figure might not cause too much concern, but it is twice the rate for Hispanics and it fits a general pattern, suggesting that in a portion of African American communities, relations with the LAPD remained tense.[59]

[56] Denkmann, Libby. (2020, July 28). "The LAPD Is Doubling Down on A Community Policing Program. Why Some Activists Are Opposed." LAist. https://laist.com/2020/07/28/lapd-communication-safety-partnership-expands-reaction.php
[57] Ibid.
[58] USC Price. "NDSC Criminal Justice Data Initiative Year 1 Wrap Report." https://socialinnovation.usc.edu/wp-content/uploads/2020/10/Price-Criminal-Justice_Final_October-6-1.pdf
[59] Stone, Christopher, Todd S. Foglesong, and Christine M. Cole. (2009). Policing Los Angeles under a consent decree: The dynamics of change at the LAPD. Cambridge, MA: Program in Criminal Justice Policy and Management, Harvard Kennedy School.

National Police Foundation - A Crisis of Truth

report on bias police training, which also included results from a community survey.[60] They found that across the city, nearly three-quarters of residents strongly or somewhat approved of the job the LAPD was doing. The confidence ratings were considerably lower among the African American and Black community, of which just 48% reported viewing LAPD officers as honest and trustworthy. This is compared to 74% of white residents, 71% of Latinos and 68% of Asians. Moreover, community members of various backgrounds expressed concern about whether the LAPD treats people equally. Only about half of all respondents agreed that officers treat people of all races and ethnicities fairly. [61]

In the wake of the SAFE LA First Amendment assemblies and protests, StudyLA and Loyola Marymount University conducted a survey of attitudes and opinions of city residents towards the LAPD. According to the survey results, approximately 88.2% of residents support community policing; more than 60% of residents believe LAPD is "serving and protecting my neighborhood" and "serving and protecting people like me;" and, more than 50% of residents believe they can trust LAPD to do what is right. The survey results also demonstrated that approximately 47.5% of residents believed LAPD use too much force in their treatment of protesters, while 40.5% believed it was an appropriate amount.[62]



[60] Los Angeles Police Department. (2016, November 15). Report of the Los Angeles Police Department on the Prevention and Elimination of Biased Policing. http://www.lapdpolicecom.lacity.org/111516/BPC_16-0391.pdf
[61] Ibid.
[62] Guerra, Fernando J. and Brianne Gilbert. (2020) Police and Community Relations Survey. Thomas and Dorothy Leavey Center for the Study of Los Angeles.

National Police Foundation - A Crisis of Truth

# General Summary of Events

The SAFE LA First Amendment assemblies and protests following the death of George Floyd began in Los Angeles on May 27, 2020 and continued for almost two weeks. Through interviews, focus groups, and listening sessions, the NPF assessment team identified three distinct phases of the time period from May 27 through June 7, 2020:

- **Wednesday, May 27 through Friday, May 29—which were primarily characterized by various small groups of protesters outmaneuvering LAPD members and causing destruction mostly downtown;**
- **Saturday, May 30 through Monday, June 1—which involved large-scale gatherings that devolved into destruction and violence, increased tensions, and clashes between LAPD and protesters; and,**
- **Tuesday, June 2 through Sunday, June 7—which centered on peacefully engaging in First Amendment assemblies and LAPD and the community coming together.[63]**

From May 27 through June 7, 2020, LAPD arrested thousands of people (see Table 1 below) and impounded hundreds of vehicles. Documented damage was recorded for 142 police vehicles—at a total cost of approximately $836,589.00 for labor and parts—and additional damage to LAPD facilities brought the total cost to approximately one million dollars.[64] Additionally, more than 100 businesses were vandalized and looted, city buses and property were sprayed with graffiti and lit on fire, and other destruction totaled millions of dollars, leading at least one business representative who attended an NPF assessment team community listening session to question whether downtown LA would ever truly recover. [65]

### Table 1: SAFE LA First Amendment Assemblies and Protests Arrests and Total Arrests

| Date | SAFE LA Arrests[66] | Total Arrests in LA[67] |
|------|---------------------|-------------------------|
| May 27, 2020 | No available data | 193 |
| May 28, 2020 | 3 | 194 |
| May 29, 2020 | 264 | 493 |
| May 30, 2020 | 855 | 1,002 |
| May 31, 2020 | 719 | 932 |
| June 1, 2020 | 1,378 | 1,743 |
| June 2, 2020 | 969 | 1,130 |
| June 3, 2020 | 55 | 175 |
| June 4, 2020 | 20 | 124 |
| June 5, 2020 | 3 | 94 |
| June 6, 2020 | 8 | 107 |
| June 7, 2020 | 1 | 107 |

[63] See Appendix C: Timeline of Events for a timeline of daily occurrences.
[64] Los Angeles Police Department. (2020, August 11). Project 20-064, After-Action Expenditures. Provided to NPF assessment team by LAPD electronically on March 19, 2021.
[65] NPF assessment team Community Listening session. February 4, 2021.
[66] Los Angeles Police Department. (2021). SAFE LA After Action Report DRAFT. Provided to the NPF assessment team by LAPD electronically on March 17, 2021.
[67] Total Arrests equals the number of SAFE LA Arrests plus the number of arrests according to the City of Los Angeles Open Data website. City of Los Angeles. (2021). Los Angeles Open Data. https://data.lacity.org/

National Police Foundation - A Crisis of Truth

Following the SAFE LA First Amendment assemblies and protests, at least seven LAPD officers were reassigned to "non-field duties" and more than 50 complaints alleging misconduct, violations of LAPD policies, and excessive force were filed.[68] The National Lawyers Guild—on behalf of Black Lives Matter of Los Angeles and the Los Angeles Community Action Network Civil—also filed a class action lawsuit against the City, LAPD, and Chief Moore alleging excessive use of force and violations of First, Fourth, and 14th Amendment rights. Individual protesters have also filed their own civil suits against LAPD.[69]



[68] Wamsley, Laurel. (2020, June 11). "LA Police Reassigns 7 Officers As It Investigates Complaints Of Excessive Force." KPBS. https://www.kpbs.org/news/2020/jun/11/los-angeles-pd-reassigns-7-officers-as-it/
[69] National Lawyers Guild. (2020, June 21). First Amended Complaint: Class Action; Injunctive Relief and Damages. US District Court Central District of California–Western Division. https://nlg-la.org/wp-content/uploads/sites/5/2020/06/AMENDED-COMPLAINT-ECF.pdf

National Police Foundation - A Crisis of Truth

# Chapter One: LAPD Provisions and Training Relevant to First Amendment Assemblies and Protests

The US Constitution, the California Constitution, and the Los Angeles Police Department (LAPD) all provide for the rights of free speech and assembly. While providing the right to free speech (Article I, Section 2) and the right to assemble (Article I, Section 3), the California Penal Code and the LAPD also acknowledge that there are instances in which certain assemblies are not protected by the First Amendment.

According to California Penal Code Section 407, "Whenever two or more persons assemble together to do an unlawful act, or to do a lawful act in a violent, boisterous or tumultuous manner, such assembly is an unlawful assembly."[70] Likewise, according to LAPD, "When a preplanned or spontaneous lawful assembly deteriorates to the point where there is a potential for unlawful activity or threat of violence, the Department has a duty to stop this behavior."[71] Law enforcement is provided the authority to take necessary actions to mitigate unlawful activity, as long as the actions follow department provisions, procedures, and training.

## Use of Force

In multiple locations throughout its Manual, LAPD addresses use of force. In providing for officers to use force, LAPD Provision 1/115 Management Principles, reminds that "The police should use physical force to the extent necessary to secure observance of the law or to restore order…and police should use only the reasonable amount of physical force which is necessary on any particular occasion for achieving a police objective."[72] The Preamble to Use of Force also establishes that the guiding principle in using force is "reverence for human life," and acknowledges that "the use of force by members of law enforcement is a matter of critical concern both to the public and the law enforcement community."[73] Additionally, according to Provision 1/556.10 Policy on the Use of Force, "It is the policy of this Department that, whenever practicable, officers shall use techniques and tools consistent with department de-escalation training to reduce the intensity of any encounter with a suspect and enable an officer to have additional options to mitigate the need to use a higher level of force while maintaining control of the situation."[74] The Provision continues to identify factors used to determine "objective reasonableness," which include, "the feasibility of using de-escalation tactics," "the potential for injury to citizens, officers or subjects," and, "the environmental factors and/or other exigent circumstances" amongst other things.[75]

Provision 4/245.05 differentiates the uses of force between Categorical Use of Force (CUOF) and Non-Categorical Use of Force (NCUOF) and explains the reporting requirements of each. An NCUOF is defined as, "an incident in which any on-duty or off-duty Department employee whose occupation as a Department employee is a factor, uses physical force or a control device to: compel a person to comply with the employee's direction; defend themselves; defend others; effect an arrest or detention; prevent escape; or, overcome resistance." Under traditional circumstances, the only NCUOF incidents that are not required to be reported are those already

70 State of California. (1969). State of California Penal Code, Section 407. https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=PEN&sectionNum=407#:~:text=Whenever%20two%20or%20more%20persons,(Amended%20by%20Stats
71 City of Los Angeles. (2009). Los Angeles Police Department Emergency Operations Guide, Volume 5: Guidelines for Crowd Management and Crowd Control. Provided to NPF assessment team by LAPD electronically on August 31, 2020.
72 Los Angeles Police Department. (2020). 2020 3rd Quarter Manual: Los Angeles Police Department. https://www.lapdonline.org/lapd_manual/
73 Ibid.
74 Ibid.
75 Ibid.

being investigated by the LAPD Force Investigation Division (FID); the use of certain grips that do not result in injury or complaints of injury to the subject; and, uses of body weight that do not result in injury or complaints of injury to the subject.[76]

As it relates to crowd control situations, LAPD acknowledges that officers "may have to utilize force to move crowd members who do not respond to verbal directions, control violent individuals, or to effect an arrest." However, all use of force policies, including prioritizing de-escalation and using only the objectively reasonable level of force and only as a last resort if verbalization is unsuccessful in gaining compliance, pertain regardless of the situation.[77]

Regardless of the situation, LAPD recommends that when feasible, officers provide verbal warning prior to using any level of force to control an individual. The verbal warning should include a command and warning of potential consequences of the use of force if compliance is not achieved.

## Less-Lethal Weapons

**Batons:** All sworn LAPD personnel are issued a baton. When necessary, if verbalization appears to be ineffective or an officer has a reasonable belief that a particular situation may escalate to a physical confrontation, they may draw their baton as a show of force. Officers are also allowed to use their baton when a suspect poses an immediate threat to their safety.[78] Specifically during crowd control situations, officers are authorized to use their batons to push individuals, "who do not respond to verbal commands and encroach upon officers on a skirmish line or who intentionally delay departure while officers attempt to disperse the crowd, whether or not a lawful dispersal order has been issued."[79] Officers may also use their batons as an impact device in a crowd control situation when the crowd, or an individual in the crowd, is threatening or violent in nature.[80]

Under traditional circumstances, the use of a baton is a reportable NCUOF when it is used to strike a suspect, and photographs of all visible and noted injuries are required to be taken by a supervisor.[81]

Additionally, the provision or non-provision of a use of force warning must be documented on the NCUOF report. The Use of Force Summary heading must include the name of the officer that gave the warning and, where appropriate, an explanation and appropriate justification for not using the warning.[82]

As it relates to crowd control, though, LAPD Provision 4/245.05 states that, "a use of force report is not required when officer(s) become involved in an incident where force is used to push, move, or strike individuals who exhibit unlawful or hostile behavior and who do not respond to verbal directions by the police."[83] This Provision applies to officers working in organized squad and platoon sized units directly involved in crowd control situations, but does not cover situations when an officer "becomes involved in an isolated incident with an individual during a crowd control situation, which goes beyond the mission of the skirmish line," in which case an NCUOF report is required.[84]

[76] Ibid.
[77] Los Angeles Police Department. (2011, June). Directive No. 11: Use of Force – Tactics Directive, Crowd Management, Intervention, and Control. Provided to NPF assessment team by LAPD electronically on August 31, 2020.
[78] Los Angeles Police Department. (2018, August). Directive No. 8.2: Use of Force – Tactics Directive Baton. Provided to NPF assessment team by LAPD electronically on August 31, 2020.
[79] See footnote 77.
[80] See footnote 78.
[81] Ibid.
[82] Ibid.
[83] See footnote 72.
[84] See footnote 78.

**OC Spray and Chemical Agents**[85]: All sworn LAPD personnel are issued an oleoresin capsaicin (OC) spray canister.[86] OC spray may only be considered as a use of force option when a suspect poses an immediate threat to the safety of an officer or others. Unlike a baton, an OC spray canister may not be drawn merely as a show of force, because its deployment is considered an "Intermediate Force Option." OC spray may be deployed in crowd control situations to control a specific suspect or when approved by a commander or above on a larger crowd.[87] Similar to using a baton, when feasible, officers should issue a verbal warning that includes a command and warning of potential consequences of the use of force prior to deploying OC spray. In individual circumstances, the deployment of OC spray is a reportable NCUOF when the spray makes contact with the suspect's clothing or skin. When it is deployed but does not make such contact, officers are still required to document the circumstances on an Employee Report.[88] Additionally, the provision or non-provision of a use of force warning must be documented on the NCUOF report. The Use of Force Summary heading must include the name of the officer that gave the warning and, where appropriate, an explanation and appropriate justification for not using the warning.[89]

As it relates to crowd control situations, there is an added note in Provision 4/245.05 that the use of chemical agents must be approved by a commander or above.[90] It is important to note that projectile chemical agents were not approved during the SAFE LA First Amendment assemblies and protests, and the NPF assessment team found no official records that chemical munitions or agents were deployed by LAPD personnel.

**Non-Chemical Munitions:** LAPD Metropolitan Division personnel and other personnel who complete specific trainings may deploy 37mm non-target specific dispersal rounds, and the Super-Sock round from a beanbag shotgun as a target-specific munition. The beanbag shotgun should be deployed at a range of approximately five to 45 feet and must only be used with sock round ammunition. The sock round is a 12-gauge cartridge that contained a shot-filled fabric bag designed to be non-penetrating and distribute energy over a broad surface area upon strike. The round should be primarily aimed at the navel area or belt line, but may also target an individual's arms, hands, or legs.[91]

Additionally, only  personnel who have completed specialized training and are 40mm Launcher Certified may check out or deploy the 40mm sponge round and may only do so as a target-specific munition.[92] The 40mm may only be used in crowd control situations against a single suspect, also known as a target-specific less-lethal option. The 40mm round is a "point-of-aim, point-of-impact, direct fire round…designed to be non-penetrating, and upon striking a target, distribute energy over a broad surface area." The round should be primarily aimed at the navel area or belt line, but may also target an individual's

---

[85] It is possible that community members who witnessed the deployment of OC spray may be referring to that when discussing "chemical munitions" or "chemical agents" being used by LAPD. It is important to note that projectile chemical agents were not approved during the SAFE LA First Amendment assemblies and protests, and the NPF assessment team found no official records that chemical munitions or agents were deployed by LAPD personnel.
[86] Los Angeles Police Department. (2018, July). Directive No. 5.2: Use of Force – Tactics Directive Oleoresin Capsicum. Provided to NPF assessment team by LAPD electronically on August 31, 2020.
[87] Ibid.
[88] Ibid.
[89] Ibid.
[90] See footnote 72.
[91] Los Angeles Police Department. (2018, July). Directive No. 6.3: Use of Force – Tactics Directive, 40mm Less-Lethal Launcher. Provided to NPF assessment team by LAPD electronically on August 31, 2020.
[92] Los Angeles Police Department. (2018, October 16). Los Angeles Police Department Integrating Communications, De-Escalation and Crowd Control Expanded Course Outline. Provided to NPF assessment team by LAPD electronically

arms, hands, or legs.[93] Similar to the other less-lethal weapons, when feasible, officers should issue a verbal warning that includes a command and warning of potential consequences of the use of force prior to deploying a projectile launcher. The 40mm should be deployed at a range of approximately five to 110 feet.[94]

Under routine circumstances, the use of a beanbag shotgun for any reason other than an approved training exercise is considered a reportable NCUOF, unless the round does not strike a person, in which case the Employee's Report must be completed to document the incident.[95] Additionally, the provision or non-provision of a use of force warning must be documented on the NCUOF report. The Use of Force Summary heading must include the name of the officer that gave the warning and, where appropriate, an explanation and appropriate justification for not using the warning.[96] However, as it relates to crowd control situations, Provision 4/245.05 notes, "The discharge, including tactical discharge, of a projectile weapon (e.g., beanbag shotgun, 37 mm or 40mm projectile launcher or Compressor Air Projectile System), electronic control devise (Taser), or any chemical dispenser that does not make contact with an individual or their clothing is not a reportable use of force."[97]

## Crowd Control Incident Documentation and Review

While Provision 4/245.05 provides leniency regarding individual documentation of NCUOF incidents in response to crowd control situations, it does state that "officers shall notify their immediate supervisor of the use of force once the tactical situation has been resolved." The Provision further requires that the supervisor, "shall report the action on the Incident Command System (ICS), Form 214 (Activity Log), or as directed by the incident commander."[98] The Provision does not provide requirements regarding the specificity of the information that must be documented in each NCUOF under their supervision.

Likewise, Provision 3/579.15 provides significant leniency regarding the level of information required to accompany use of body-worn cameras (BWCs).[99] LAPD does not require the geographic location of each BWC to be enabled or for clips or markers to be used to document specific incidents. Additionally, there is no process to ensure or check that individual videos correspond to applicable names, badge numbers, and locations when they are uploaded to the BWC storage site. While each BWC is assigned a serial number, the NPF assessment team did not find that the LAPD has a way to easily search for all videos associated with a particular BWC serial number, and there is no way to ensure that a particular BWC serial number was associated with a particular officer during a particular time period. LAPD personnel acknowledged the difficulties in identifying all video evidence related to a single incident caused by officers "using incident numbers, Division of Records numbers, and other qualitative descriptors to identify incidents" and established the requirement to, "only use the full 12-digit incident number in the 'ID' field" and the event type to

---

[93] See footnote 91.
[94] Ibid.
[95] Ibid.
[96] Ibid.
[97] See footnote 72.
[98] Ibid.
[99] Ibid.
[100] Los Angeles Police Department. (2018, March 12). NOTICE – Requirement to Identify Body Worn Video Recordings – Reminder and Clarification. Provided to NPF assessment team by LAPD electronically on February 16, 2021.

# Body-Worn Cameras

On April 28, 2015, the LA Board of Police Commissioners approved LAPD use of BWCs, in part, to promote accountability and provide additional information regarding certain contacts with members of the public. At the beginning of 2020, LAPD reiterated the importance of building community trust through transparency and made more cameras available to officers working uniformed, public-facing assignments.[101]

Provision 3/579.15 identifies the policies related to BWCs and identifies a number of situations when officers are required to activate their BWCs, which includes uses of force and crowd management and control involving enforcement or investigative contacts. To the extent possible, officers are required to activate their BWC prior to initiating the activity that necessitates recording and are required to continue recording until the activity has ended. Provision 3/579.15 also requires officers to upload all of their recordings to the department's secure storage site and identify the event type and other information that best describes the content of each video they record. Officers are also required to document any portion of an incident on all administrative and investigative reports.[102]

As it relates to uses of force, Provision 3/579.15 includes separate procedures for officers reviewing BWC footage in CUOF incidents, while NCUOF incidents follow the standard procedure detailed above. In CUOF incidents, officers are prohibited from reviewing their BWC footage until authorized by the assigned FID investigator. Once authorized, the officer may view their recording, as well as relevant recordings from other potential BWCs, prior to being interviewed by investigators.[103]

Provision 3/579.15 also identifies responsibilities for supervisors assigned to units with BWC-equipped officers and Watch Commanders. Immediately following a CUOF situation, supervisors are required to take possession of the officer's BWC, ensure the recording has stopped, power off the device, and maintain custody of the device until it is transferred to FID. Supervisors are also responsible for reviewing relevant recordings prior to submitting any administrative reports, including NCUOF investigations. Supervisors and Watch Commanders are also responsible for ensuring that officers are following all BWC policies, procedures, and trainings.[104]

In addition to Provision 3/579.15, a notice disseminated from the LAPD Office of Constitutional Policing and Policy directs all officers to have their cameras, "powered on (in buffer mode) and ready to activate at all times when deployed to the field." [105]

[101] Los Angeles Police Department. (2020, January 30). NOTICE – Body Worn Video Kit Accountability and Availability. Provided to NPF assessment team by LAPD electronically on February 16, 2021.
[102] See footnote 72.
[103] Ibid.
[104] Ibid.
[105] Los Angeles Police Department. (2018, December 20). NOTICE – Powering Off Body-Worn Camera Devices While in Department Facilities. Provided to NPF assessment team by LAPD electronically on February 16, 2021.

## Crowd Dispersal and Dispersal Orders

Provision 1/548 acknowledges, "When the City is confronted with a situation which may escalate into a riot, the Department must establish control of the situation by reacting quickly and committing sufficient resources to control the situation."[106] Similarly, LAPD Directive No. 11 explains that, "when group behavior appears to be unlawful, aggressive, or otherwise uncontrollable, it is reasonable for the assembly to be declared unlawful."[107] The Directive suggests that the dispersal order make clear that the crowd is expected to leave the area immediately and include a warning that force, which could result in serious injury, and/or arrest. It continues that the dispersal order, "must be given in a manner reasonably believed to be heard and understood by the intended audience," and recommends repeating the dispersal order multiple times from various locations.[108]

While there is no specific Provision regarding documentation of dispersal orders, Directive 11 does include, "Regardless of the delivery method, the name of the individual giving the dispersal order and the date and time each order was given should be documented."[109] Likewise, although an example dispersal order is provided in the Directive, and was provided in some of the Event Action Plans developed during the SAFE LA First Amendment assemblies and protests, there is no requirement to communicate the exact language in the sample. LAPD also recommends that when dispersal orders are issued: they should be given using an amplified loudspeaker system; if feasible, an officer should be sent to the far side of the crowd to record the dispersal order; and, if possible, provide a reasonable amount of time to disperse and a clear route to do so.[110]

## Mass Arrests

California Penal Code includes multiple sections related to individuals who choose to disregard dispersal orders. Section 409 establishes, "Every person remaining present at the place of any riot, rout, or unlawful assembly, after the same has been lawfully warned to disperse, except public officers and persons assisting them in attempting to disperse the same, is guilty of a misdemeanor."[111] Similarly, Section 416(a) establishes, "If two or more persons assemble for the purpose of disturbing the public peace, or committing any unlawful act, and do not disperse on being desired or commanded so to do by a public officer, the persons so offending are severally guilty of a misdemeanor."[112] These two sections provide the foundation for LAPD to effect arrests to regain control in situations where First Amendment assemblies and protests have devolved into criminal events.

---

[106] See footnote 72.
[107] See footnote 77.
[108] Ibid.
[109] Ibid.
[110] See footnote 71.
[111] State of California. (1872). State of California Penal Code, Section 409.
https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=PEN&sectionNum=409.
[112] State of California. (1989). State of California Penal Code, Section 416.
https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=PEN&sectionNum=416.

LAPD does not have a provision that clearly defines the use of mass arrests. In fact, in its Unlawful Assembly Checklist, LAPD provides a list of recommended penal, vehicle, and municipal codes that can be cited as possible charges—and evidentiary recommendations—when effecting mass arrests.[113] Some LAPD personnel indicated to the NPF assessment team that mass arrests were an effective strategy in regaining control of riotous situations during the SAFE LA First Amendment assemblies and protests.[114]

## Limiting Mass Arrests during First Amendment Assemblies

The Metropolitan (DC) Police Department's standard operating procedure (SOP), Handling First Amendment Assemblies and Mass Demonstrations, states "the Department will make reasonable efforts to employ non-arrest methods of crowd management as the primary means of maintaining order." The SOP also establishes, "If the issuing official recommends that high volume arrests be commenced, the incident commander shall satisfy himself or herself that probable cause exists for the arrest of each person to be arrested."

Source: Metropolitan Police Department. (2016, December 13). SOP-16-01 (Handling First Amendment Assemblies and Mass Demonstrations). https://go.mpdconline.com/GO/SOP_16_01.pdf

National policing best practices assert that when possible, law enforcement organizations should avoid mass detentions and arrests in favor of more differentiated, targeted responses.[115] Conducting differentiated responses by focusing arrests on individuals who are engaging in violence allows police to continue to facilitate the peaceful and lawful activities of other protesters exercising their First Amendment rights.[116] However, to enter into an uncooperative and violent crowd to engage and arrest agitators requires sufficient personnel and targeted strategy to form arrest teams that can move through a crowd, make an arrest(s) and extract arrestees; this is far easier said than done. If the number of properly trained and equipped officers available is insufficient to accomplish such a tactical objective, the officers risk being trapped in the crowd which could lead to a much more serious crisis and to higher uses of force, injuries, and arrests.

---

[113] Los Angeles Police Department (2017, October 27). Unlawful Assembly Checklist – Updated. Provided to NPF assessment team by LAPD electronically on August 31, 2020.
[114] NPF assessment team interviews with LAPD personnel. January 11, 2021 through February 10, 2021.
[115] Policing Project at NYU School of Law. (2020, October). Policing Protests to Protect Constitutional Rights and Public Safety. https://static1.squarespace.com/static/58a33e881b631bc60d4f8b31/t/5f9af5fe6b0e0f0c265ffdb8/1603991043508/POLICING+PROTESTS+TO+PROTECT+CONSTITUTIONAL+RIGHTS+AND+PUBLIC+SAFETY+10-29.pdf
[116] Maguire, E.R. (2016, July). New directions in protest policing. St. Louis University public law review, 35: 67-108.

# Training

**Basic Training:** The California Commission on Peace Officer Standards and Training (POST) mandates all officers in the state to complete a minimum mandatory curriculum of 664 hours and includes scenario demonstrations and tests. The 664 hours are divided into 41 topics, including communication, skills for law enforcement, and patrol techniques. Topics pertinent to responding to First Amendment assemblies and protests, include Handling Disputes/Crowd Control.[117] However, it was not until October 2020 that a POST course specifically included the National Incident Management System (NIMS)/Incident Command System (ICS).[118]

**Training Specific to Protests and Demonstrations:** In addition to the California POST requirements and the traditional LAPD academy and in-service requirements, LAPD provides multiple training courses specifically related to various components of First Amendment assemblies and protests. Each year since 2007, all LAPD recruits have been provided crowd control training in the academy.[119] This Crowd Management and Control for Patrol training course, provides, "the policy, procedures, and laws related to public assemblies, crowd management and control and practice the 'Mobile Field Force concept.'"[120] In 2010, a basic Multiple Assault Counter-Terrorism Action Capabilities (MACTAC) course was added to the academy to teach recruits about immediate deployment of teams or squads and how to rescue innocent civilians.[121] In addition to these two specific courses, multiple courses in the academy integrate the concepts of de-escalation, communication, and appropriate levels of use of force.

**In Service Training:** In terms of in-service training, LAPD began providing approximately 10 hours of training on 21st Century Crowd management in 2007. The following year, LAPD also conducted a separate eight-hour day on 21st Century Crowd Management in-service training for command staff. In-service Incident Management Training was also delivered beginning in 2008, including eight hours for command staff. In 2009, the MACTAC Basic course was also introduced in in-service training and provided to the entire department. In 2010 and 2011, an in-service e-learning Crowd Management Update course was required of all sworn LAPD personnel. In 2012 and 2013, the in-service training was adjusted and in addition to the MACTAC Basic, a four-hour CMD Staff Crowd Management course and a four-hour Occupy LA Overview were added.

Beginning in 2014, the in-service training was adjusted again due to deployment issues and a mandatory department-wide focus on "Preservation of Life." Command staff were provided two additional sessions on crowd management and control with department experts and community advocates in a "Conversations in 21st Century Policing" training and a four-hour "Ferguson Overview & Lessons Learned in Crowd Management & Control Debrief." In 2016 and 2017, LAPD priorities and in-service

---

[117] California Commission on Peace Officer Standards and Training. (2020, October 30). Regular Basic Course. State of California. https://post.ca.gov/regular-basic-course
[118] Ibid.
[119] Los Angeles Police Department. (2020). LAPD Training Overview, Tactics Related to Mobile Field Force Crowd Management & Control. Provided to NPF assessment team by LAPD electronically on August 31, 2020.
[120] Los Angeles Police Department. (2011, April 12). Crowd Management and Control for Patrol Expanded Course Outline. Provided to NPF assessment team by LAPD electronically on August 31, 2020.
[121] Los Angeles Police Department. (2019, November). Session 2–Multi-Assault Counter Terrorism Action Capabilities.

were redirected to support mandatory training on the new Use of Force policy, less lethal overview, and introduction of the 40mm less-lethal launcher. In each year since 2018, in-service training has included a course entitled "Integrating Communication, De-Escalation, and Crowd Control."[122]

Additionally, LAPD offers a 40-hour Watch Commander School to ensure that potential watch commanders understand the purpose of their roles and functions in the notification process, identify functions of the process, and identify common errors to avoid. Furthermore, LAPD provides specialized units opportunities to train and to select the topics they train on. The Metropolitan Division is provided one day per month to train on tactical responses to different scenarios, including First Amendment assemblies and protests.



[122] Los Angeles Police Department. (2020). LAPD Training Overview, Tactics Related to Mobile Field Force Crowd Management & Control. Provided to NPF assessment team by LAPD electronically on August 31, 2020.

## Chapter One Findings and Recommendations

**Finding 1.1:** **Following the violent Rodney King protests in South LA in 1992, the LAPD made significant changes to their protocols in response to civil unrest, setting a national model for law enforcement policy and training.**

**Finding 1.2:** **LAPD, like many police departments across the country had well-developed crowd management policies and practices that had proven successful during previous events. Those policies and practices were inadequate to handle the disparate groups, or to identify leaders amongst the protesters and address the level of violence.**

**Recommendation 1.2.1:** **LAPD should synthesize the relevant provisions spread throughout the current Department and clearly establish guidelines for the coordination, facilitation, and management of First Amendment assemblies and protests.** This single provision should include relevant components of responding to planned and spontaneous events, managing such events, identifying and quickly obtaining additional staffing and resources, determining and declaring an unlawful assembly, crowd management and control, public information and communications, and use of force and less lethal documentation. Other large agencies, including the San Diego Police Department, have recently published similar synthesized policies.[123]

**Recommendation 1.2.2:** **LAPD should review national and international best practices regarding the impact of police actions on First Amendment assembly and protest participants.[124]**

**Recommendation 1.2.3:** **LAPD should consider developing special unit(s) to establish contact with activists and demonstrators before, during, and after protests.** As a consequence of the failure of the police to control riots during the EU Summit in Gothenburg, Sweden (2001), the police developed a new special tactic for crowd management.  The aim of the tactic is to achieve de-escalation. "Dialogue officers" were trained and deployed to establish contact with demonstrators before, during and after protests and to link the organizers of the events and police commanders.  Similar units have been developed and deployed in response to civil unrest in England.[125] Similar units were deployed in Portland during protests and counter-protests in 2019. Following the 2016, civil unrest in Charlotte, North Carolina, the Charlotte-Mecklenburg Police Department and community created the Community Conversation Team to deescalate and engage protesters.

---

[123] San Diego Police Department. (2021, February 17). First Amendment Activity Facilitation and Management. https://ca-times.brightspotcdn.com/04/ac/754ed3ba44529a8b7b9cf47368a8/sdpd-protest-policy.pdf
[124] See footnote 115.
[125] Holgersson, S. and Knutsson, J., (2011). Dialogue policing – a means for less  crowd violence? Crime Prevention Studies, 26, 191-216. Gorringe, Hugo, Clifford Scott, and Michael Rosie. (2012). Dialogue Police, Decision Making, and the Management of Public Order During Protest Crowd Events. Journal of Investigative Psychology and Offender Profiling. 9.10.1002/jip.1359. Waddington, D. (2017). Police Liaison Approaches to Managing Political Protest: A Critical Analysis of a Prominent UK Example. In: Bayer, P., Karlovic, R., Akhgar, B., Marakaria, G. (eds) Community Policing – A European Perspective. Advanced Sciences and Technologies for Security Applications. Springer, Cham. https://doi.org/10.1007/978-3-319-53396-4_7.

**Finding 1.3:** Although it aligned with LAPD's use of force provisions and procedures, documentation of uses of force during protests and demonstrations—including the deployment of less lethal munitions—was inconsistent by LAPD members.

> **Recommendation 1.3.1:** LAPD should establish a clear policy, process, and documentation requirement for requesting and receiving less lethal munitions, particularly during the response to First Amendment assemblies and protests. Senior level command staff and first-line supervisors made similar observations to the NPF assessment team that nobody was responsible for maintaining awareness of less lethal munitions.[126] Multiple LAPD personnel relayed to the NPF assessment team that officers would "fill their trunks" with less lethal munitions without any documentation of where they were being used, in what scenarios, and who deployed them.[127] This was exacerbated by breakdowns in command and communication but has a significant impact on transparency and accountability.

**Finding 1.4:** Some LAPD personnel had not been provided contemporary training on crowd management, mobile field force, supervision, de-escalation, or the use of less-lethal instruments prior to the First Amendment assemblies and demonstrations from May 27 through June 7, 2020. Many of the LAPD training bulletins, courses, and directives related to crowd management and control were outdated. For example, the Mobile Field Force Training Bulletin was last updated in August 2006[128]; the Use of Force – Tactics Directive on Crowd Management, Intervention, and Control was last updated in June 2011[129]; the Use of Force – Tactics Directive on Tactical De-Escalation Techniques was last updated in October 2016[130]; the Crowd Management and Control for Management was last updated in June 2007[131]; and, the similar course for patrol was last updated in November 2012.[132]

> **Recommendation 1.4.1:** LAPD should continue to serve as a national model for law enforcement by developing strategies, tactics, and Mobile Field Force teams to more effectively respond to these types of First Amendment assemblies and protests, which are becoming more frequent in the City and nationwide.

**Finding 1.5:** During the initial days of the protest, the number of disparate groups, the pace at which the protests accelerated, and the level of violence precluded the highly trained and experienced LAPD bike unit from successfully completing its mission. As the SAFE LA First Amendment assemblies and protests continued, the bike units were used to facilitate organized movements and rolling traffic stops.

---

[126] NPF assessment team interviews with LAPD personnel. December 7, 2020 through March 3, 2021.
[127] Ibid.
[128] Los Angeles Police Department. "Training Bulletin: Mobile Field Force Concept – Part II Mobile Tactics." August 2006. Provided to NPF assessment team electronically on August 31, 2020.
[129] Los Angeles Police Department. "Los Angeles Police Department Use of Force – Tactics Directive No. 16 Tactical De-Escalation Techniques." October 2016. Provided to NPF assessment team electronically on August 31, 2020.
[130] See footnote 77.
[131] Los Angeles Police Department. (2007, June 15). "Los Angeles Police Department Crowd Management and Control for Management Expanded Course Outline." Provided to NPF assessment team electronically on August 31, 2020.
[132] Ibid.

**Finding 1.6:** **The National Guard was mobilized, responded to the City, and were used to protect critical infrastructure and major intersections and thoroughfares.** The presence of the National Guard freed LAPD personnel for assignments related to crowd management and control.

> **Recommendation 1.6.1:** **Elected officials and LAPD leadership should weigh the risk and benefits of requesting National Guard assets sooner in future First Amendment assemblies and protests to support police operations, protect critical infrastructure, and provide a neutral presence.**

> **Recommendation 1.6.2:** **The City should develop and widely distribute a well-coordinated message about the deployment of the National Guard, prior to, during and following their deployment in an effort to avoid them being seen as an occupying force.** Messaging should include why the decision was made to request them, where they may be seen in the city, what their assignments may be and when they will be able to leave.

**Finding 1.7:** **While LAPD has clear policies around use of force, crowd management, and other relevant pieces of responding to First Amendment assemblies and protests, they do not have one policy directing response specifically to large-scale, fluid, city-wide civil unrest that turns violent or contains violence.**

> **Recommendation 1.7.1:** **LAPD should consider developing an overarching 'response to fluid dynamic protests and civil unrest' policy that provides for the nuances of this type of event, incorporates critical thinking skills and offers decision making models to guide at what points uses of force and relevant tools are permitted to be used by LAPD officers.[133]**

[133] See footnote 115.

National Police Foundation - A Crisis of Truth

# Chapter Two: Leadership and Incident Command

The City of Los Angeles (LA) and the Los Angeles Police Department (LAPD) are recognized as leaders in managing First Amendment assemblies, protests, and demonstrations and have provided training and guidance to police departments nationally and internationally.

However, following the death of George Floyd, LA and the nation saw unprecedented protests, violence, and destruction. City and law enforcement leaders in LA failed to recognize the extent to which members of the LA community shared the concerns, anger, and pain of communities across the nation. They also failed to recognize the extent to which those participating in the protests in the LA community would participate in acts of violence directed at private property, government facilities, members of the public, and law enforcement– which was also true of elected officials and law enforcement leaders across the country.

## City Leadership and Incident Command

LA is a Mayor-Council-Commission form of government in which the Mayor, City Attorney, and Controller are elected by the residents of the city at large every four years and the City Council consists of 15 members who are elected by the residents of their geographic districts.[134] The city government type is considered a "strong mayor," in which the mayor is the chief executive officer and centralizes executive power; appoints and removes the heads of city agencies, chief administrative officers of certain departments, and members of the boards of commissioners identified in the city charter; prepares and submits an annual budget to the council; establishes procedures, policies, and executive orders necessary to effectively manage and supervise all responsibilities to which they are entrusted; prepares an annual budget for the City Council; and, represents the City.[135] Meanwhile, the City Council is solely responsible for passing ordinances of municipal concern and legislation.[136] As a "strong mayor" form of government, the mayor is the primary official leading the city government's response. Therefore, the Mayor's Office has a considerable amount of influence in the overall tenor and mission of the response to emergencies in the city, including those managed by LAPD.

In LA, the response to large scale security events are coordinated from the City of Los Angeles Emergency Operations Center (EOC). The EOC is, "the focal point for coordination of the City's emergency planning, training, response, and recovery efforts" for all hazards and disasters that require involvement by multiple City departments.[137] The operational department that manages the EOC and conducts the day-to-day tasks is the Emergency Operations Organization (EOO), which was created by ordinance in 1980, at the time making Los Angeles the only local government to have an EOO.  The EOO is supervised by the Emergency Operations Board (EOB), "during all periods of emergency preparation, response and recovery," and is comprised of, "the general managers of the Police, Fire, Airports, Building and Safety, the City Administrative Officer (CAO), Emergency Management, General Services, Harbor, Information Technology Agency, Personnel, Recreation and Parks, Transportation and Water and Power Department, a Public Works Commissioner and the Chief Legislative Analyst (CLA)."[139]

---

[134] City of Los Angeles. (2021). Form of Government. https://www.lacity.org/government/popular-information/form-government
[135] City of Los Angeles. https://codelibrary.amlegal.com/codes/los_angeles/latest/laac/0-0-0-568
[136] City of Los Angeles. https://codelibrary.amlegal.com/codes/los_angeles/latest/laac/0-0-0-630
[127] City of Los Angeles. (2021). Emergency Operations Center. https://emergency.lacity.org/eoc.
[138] City of Los Angeles. (2021). Emergency Operations Organization. https://emergency.lacity.org/eoo.
[139] City of Los Angeles. (2021). Emergency Operations Board. https://emergency.lacity.org/emergency-operations-board

National Police Foundation - A Crisis of Truth

The EOB is permanently chaired by the LAPD Chief of Police and the Fire Department chief is the vice-chair.[140] There is also an Emergency Management Committee, which includes different representatives from the same agencies as well as other relevant City stakeholders.[141]

## Figure 1: Los Angeles Emergency Incident Command Structure

| EOC | • Emergency Operations Center (EOC)<br>• Location of citywide coordination for all hazards<br>• Arranged according to NIMS/ICS (Management, Operations, Planning, Logistics, and Finance and Administration section) |
|---|---|
| EOO | • Emergency Operations Organization (EOO)<br>• Operational department that manages day-to-day tasks of EOC |
| EOB | • Emergency Operations Board (EOB)<br>• Supervises EOO during ememergencies<br>• Permanently chaired by LAPD chief and vice-chaired by LAFD chief |

Within this multi-level structure, personnel and representatives from the relevant City agencies are required to complete the Incident Command System (ICS) courses associated with their roles and responsibilities. At the highest level, the representatives of City agencies and City elected officials that are in the EOC for major events, complete regular ICS trainings and have worked together to coordinate the citywide response to regular incidents.[142] In addition to the ICS requirements for public safety personnel, the Mayor's public safety staff are required to complete ICS IS 100—Introduction to the ICS, IS 200 – ICS for Single Resources and Initial Action Incidents, IS 700 – An Introduction to [the National Incident Management System] NIMS, IS 800 – National Response Framework an Introduction, and IS 907 – Active Shooter: What You Can Do, as well as a City Emergency Operations Center 101 and 201 course administered by the City Emergency Management Division.[143]

The City-wide EOC was initially activated on March 16, 2020 at Level 1—the highest level of activation—to support the coordination of information and resources related to the COVID-19 pandemic, and remained active throughout 2020 and into 2021.[144] Personnel from multiple City agencies—including elected City officials and

---

[140] Ibid.
[141] City of Los Angeles. (2021). Emergency Management Committee. https://emergency.lacity.org/emc
[142] NPF assessment team interview with City of Los Angeles elected official. February 11, 2021.
[143] Ibid.
[144] City of Los Angeles. (2020, July 7). Emergency Operations Board. Minutes. https://ens.lacity.org/epd/eobminutes/epdeobminutes211143507_07072020.pdf.

National Police Foundation - A Crisis of Truth

LAPD command staff—were present in the EOC and were effectively leveraging the NIMS structure to address the COVID-19 pandemic. City officials had also established a virtual joint information center (JIC) and were well-rehearsed in coordinating public messaging related to the COVID-19 pandemic.[145]

When the SAFE LA First Amendment assemblies and protests began on the evening of May 27, 2020, personnel from City agencies—including elected City officials and LAPD command staff—were already in the EOC and operating under the NIMS/ICS framework.

As the protests intensified, a separate incident command post was established by the LAPD and many of the agencies represented in the EOC provided additional representatives to staff this new command post. Within the new command post, a representative from Mayor Garcetti's office was regularly present and the Office of the CAO was in regular contact with LAPD to ensure proper documentation and management of budget allocations related to their response.

## LAPD Incident Command

The LAPD Manual establishes the department's command structure, particularly during emergency situations. Provision 3/108.20 identifies the Office of the Chief of Police as the primary Department Command Post, except when the Office of the Chief of Police is closed, in which case the Department Command Post is the Department Operations Center (DOC).

Provision 3/108.60 further describes that the DOC is activated as a temporary division during major or serious unusual occurrences to: coordinate the Department's emergency control activities; collect and disseminate information from the Field Command Post(s); determine the needs for, and provide, personnel, equipment, and supplies to the Field Commander; maintain chronological logs, situation maps, and situation reports; and, complete necessary reports regarding the incident and a final report for submission to the Chief."[146]

In addition to the primary command post, Provision 3/108.40 Field Command Post allows for the establishment of a Field Command Post by a field commander, for the purposes of: direction operations in the field during emergency incidents; collecting information pertinent to the incident and relaying it to the DOC; requesting personnel, equipment and supplies from the DOC; and, requesting assistance from other agencies through the DOC.[147]

---

[145] NPF assessment team interview with City of Los Angeles elected official. February 11, 2021.
[146] See footnote 72.
[147] Ibid.

National Police Foundation - A Crisis of Truth

## Figure 2: LAPD Incident Command Structure



On May 27, the LAPD established a separate incident command post from the City's EOC, in its Operations Central Bureau (OCB) at Los Angeles Fire Department Station 4, approximately four blocks southeast of City Hall, to monitor the SAFE LA First Amendment assemblies and protests and designated an incident commander (IC). This command post was established by the DOC, as identified in Provision 3/108.60. The following night, the command post moved to the courtyard of LAPD Headquarters, across the street from City Hall. On May 29, the DOC re-established the primary command post in a large parking lot approximately two blocks away from the original location. This parking lot is a common location used by the City and LAPD to station command posts for planned events that occur downtown because of its spaciousness and proximity to City Hall and LAPD Headquarters.[148] The command post remained in the large parking lot for the duration of the SAFE LA First Amendment assemblies and protests.[149]

---

[148] NPF assessment team interview with LAPD Commander, January 11, 2021 and City of Los Angeles elected official, February 11, 2021.
[149] Los Angeles Police Department. (2020). AAR Chrono Time Log. Provided to NPF assessment team by LAPD electronically on October 28, 2020.

Although the command post was established with an IC, the rest of the traditional NIMS support structure was not immediately established as the number of protesters quickly swelled in the early hours of the SAFE LA First Amendment assemblies and protests on May 27.[150] The lack of a fully staffed command post with the technology to facilitate complicated information sharing, analysis, mobilization and communication between various components within LAPD, including between the IC and Deputy IC, negatively impacted the LAPD response.

Additionally, without clearly identified leaders of the Planning, Logistics, and Finance Administration Sections, internal coordination and communication were challenged. Without these sections, the IC and Deputy IC did not have access to the full breadth of LAPD resources, which hampered the department's ability to deploy mobile field forces (MFFs) with recent training and high levels of tactical understanding, and to gain control in certain instances. The extent of the protests and the level of violence associated with them overwhelmed the LAPD and led to resources being deployed without clear missions or assignments.[151]

Likewise, members of the LAPD command staff and City elected officials were in and out of the OCB command post at various times, which added to the confusion regarding decision-making authorities, roles, and responsibilities. Some LAPD personnel suggested that when members of the LAPD executive staff engaged in field operations, it caused a level of confusion.[152] However, the NPF assessment team did not hear during interviews that members of the command staff directly influenced decisions made by the IC and Deputy IC in the command post or in the field.

In addition to the command post in OCB, on May 28, the Forward Operating Platforms (FOPs) that had been established in Operations West Bureau (OWB) and Operations Valley Bureau (OVB) to coordinate local responses to the COVID-19 pandemic transitioned their focus to the SAFE LA First Amendment assemblies and demonstrations. Operations South Bureau (OSB) established its FOP on May 28.[153] Each FOP served as the single area for resources to be assigned and tactics to be coordinated for events occurring in that bureau and were staffed with bureau command personnel.[154]

The LAPD response to the SAFE LA First Amendment assemblies and protests was primarily coordinated out of the OCB command post, including having all LAPD personnel and resources in a single staging area, with the assistance of the OWB, OVB, and OSB FOPs until May 30—as opposed to a fully-functional EOC with field-based command posts. By May 30, it became apparent that the challenges of the SAFE LA First Amendment assemblies and protests—including the number of geographic areas within the City that were involved; the number of simultaneous events and the number of protesters at each; the fluid movements of the crowds; the impacts and influence of social media; and the level of violence, property destruction, and looting—posed challenges to the LAPD's well-practiced standard operating procedures and crowd management and control strategies. As some LAPD personnel indicated to the NPF assessment team, initiating citywide operations from a single command post and a single staging area

---

[150] Ibid.
[151] Ibid.
[152] NPF assessment team focus group with LAPD personnel. February 26, 2021.
[153] See footnote 149.
[154] Ibid.

created logistical problems as LAPD personnel were required to drive from their bureau across the city, to form a mobile field force (MFF), which was then deployed to the bureau from which they had just come.[155]

Recognizing the challenges associated with responding to the citywide and constantly evolving nature of the SAFE LA First Amendment assemblies and protests from a single command center, LAPD's leadership shifted to a more decentralized system in which the FOPs were afforded additional autonomy. Bureau commanders and their staff were given greater latitude in determining the breadth of, and managing, their response consistent with geographic opportunities and challenges. Some bureau commanders understood and more-fully adhered to the NIMS structure, also inviting relevant stakeholders from their area into the command post. One of the bureau command posts leveraged security personnel from the local Business Improvement Districts (BIDs) in the Logistics Section, to gather and share real-time information.[156] In other cases, bureau commanders further decentralized the decision-making, passing it to captains and those personnel in direct contact with protesters. Additionally, some bureaus, Operations West and Operations South, were able to optimize community relationships to reduce levels of violence as well as to facilitate peaceful First Amendment assemblies and protests.

While the decision to decentralize alleviated the majority of the command challenges, some logistical challenges remained. Although the DOC remained the primary command post, communication between the FOPs and the DOC (and vice versa), clearly understanding who was in charge and the overall mission of the response, and logistical challenges continued regarding LAPD's citywide response to the SAFE LA First Amendment assemblies and protests.

## Staffing and Resource Allocation

Despite having internal information and intelligence personnel, participating in local and regional fusion centers, and collecting information from local BIDs and other police-community partnerships, the City of LA and LAPD command staff were slow to recognize and effectively react to the large and varied SAFE LA First Amendment assemblies and protests.

---

[155] NPF assessment team interview with LAPD Commander. February 4, 2021.
[156] NPF assessment team interview with Business Improvement District members. January 25, 2021.

National Police Foundation - A Crisis of Truth

## Lost Opportunities: Initiating the Tactical Alert

**LAPD Terms Defined**

**Tactical Alert:** The preliminary stage of the Department Mobilization Plan. A Tactical Alert is an announcement of the anticipated redistribution of on-duty officers to achieve personnel levels necessary for controlling an emergency.

**Tactical Alert, Modified:** Provides the Director of Emergency Operations, Incident Commander or Communications Division watch commander a method of holding over watches without the disruption of "routine" police duties.

**Mobilization:** The principal Department plan to marshal personnel resources for control of a Major Unusual Occurrence. The preliminary stage of a Mobilization is a Tactical Alert. A Mobilization includes the immediate implementation of 12-hour A and B watches, the deferment of days off, and the recalling of off-duty officers.

Source: Email from LAPD sergeant to NPF assessment team. March 24, 2021.

### May 27, 2020

Beginning at approximately 3:00pm on May 27, nearly 100 protesters started to march downtown in the area around City Hall. As the group of protesters began to grow, the IC requested five supervisors and 50 officers to respond to the staging area. Shortly after, however, a new request was broadcast to send an MFF of 42 LAPD personnel instead. As the number of protesters continued to grow, protesters separated into different groups and marched in different directions. An LAPD Aerial Unit was launched to provide situational awareness, but the number of LAPD personnel assigned downtown were quickly outnumbered. In an attempt to get more officers on scene, a modified tactical alert was declared for OCB only. The alert was canceled later that evening.[157] California Highway Patrol (CHP) officers responded when a group of demonstrators marched towards, and onto, the 110 Freeway. The LAPD officers and CHP officers were outnumbered and the decision was made to address problematic locations individually and then transition resources to the next area of concern. This continued into the early morning hours of May 28.

[157] See footnote 149.

## May 28, 2020

Again, in the early evening on May 28, small groups of protesters began to march in the downtown area. The number of OCB personnel available in the area was consistent with regular operational staffing levels. As vandalism started to occur and a group of demonstrators again marched in the direction of the 110 Freeway, it became apparent that the Bicycle Unit and plainclothes officers that had been deployed to monitor the crowd were not enough. Officers also witnessed individuals gathering rocks and bottles and vandalizing businesses as they marched downtown.

At approximately 8:00pm, a tactical alert was declared for OCB only, but was modified by a declaration of a Citywide Tactical Alert approximately 55 minutes later.[158]  The Citywide Tactical Alert was intended to fully mobilize LAPD personnel and resources to help respond to the various groups of demonstrators in the downtown area, including one large group that was marching towards the 110 Freeway. Once again, an LAPD Air Unit was launched to provide situational awareness as a large group of demonstrators congregated downtown, outnumbering available LAPD personnel. The group eventually dispersed and less than three hours after the Citywide Tactical Alert was declared, it was cancelled.[159]

## May 29, 2020

Based on the occurrences of the previous two days, early in the afternoon on May 29, OCB and OWB requested additional resources to help manage potential crowd movement, but the request was denied by the command post. Shortly thereafter, another Citywide Tactical Alert was declared, this time by an LAPD Assistant Chief. While waiting for the additional resources and personnel, the Air Unit was once again deployed to provide overhead situational awareness. The Air Unit advised that demonstrators were moving too fast to set blocking forces to contain them in some cases, and in others, bicycle officers continued to attempt to follow groups of approximately 100 protesters. After the protesters attempted to surround motorcycle officers assisting with traffic control and plainclothes officers in the crowd advised that protesters were spray-painting a bus stop, tensions escalated. Additional requests were made for multiple MFFs, and LAPD and CHP personnel made attempts to establish blocking forces to prevent protesters from getting onto the 110 Freeway again.

Despite the Citywide Tactical Alert being declared hours earlier, by the early evening, LAPD personnel downtown were once again severely outnumbered, and requests for additional MFF units were denied because there were none available. The MFF units attempting to respond were delayed from arriving downtown because of gridlocked traffic and ended up responding to requests for additional units to control the group of protesters that had gathered on the 110 Freeway. Large groups of protesters also formed in other areas across the City, breaking windows and destroying police vehicles they passed and further overwhelming LAPD personnel. Despite the widespread looting, rioting, and chaos, the Citywide Tactical Alert was canceled in the morning hours of May 30.

[158] Ibid.
[159] Ibid.

## May 30 – June 5, 2020

Another Citywide Tactical Alert was declared just before noon on May 30. This Citywide Tactical Alert remained in place until June 5 for all A- and B-watch units who were not actively assigned to SAFE LA First Amendment assemblies and protests.[160] This Citywide Tactical Alert resulted in a full mobilization of LAPD personnel and resources. All sworn personnel were reassigned to 12-hour shifts (A and B-watch), an IC was assigned to each of the two watches, and the Communications Division was instructed to encourage all callers for non-emergency situations to file reports online or at their local station. While the Citywide Tactical Alert provided consistency across the LAPD in terms of shifts and staff availability, a lack of consistent communication between the ICs of A and B Watch continued, which contributed to inconsistencies in mission, resource availability, and deployment.

## Resource Deployment and Mobilization

Even when the Citywide Tactical Alert was implemented and LAPD was fully mobilized, the agency faced challenges in the deployment of resources and personnel. According to LAPD, the MFF concept was developed to supplement conventional resources for restoring conditions to normal as soon as possible during any unusual occurrence or civil disturbance. The MFFs are designed to combine elements of flexibility, rapid deployment, and mobility to effectively control and disperse disorderly groups. The minimum operating component for an MFF is 12 LAPD personnel, a squad leader and 11 officers, along with three vehicles; however, the ideal deployment is 15 personnel, a squad leader and 14 officers, along with four vehicles.[161] During the response to the SAFE LA First Amendment assemblies and protests, MFFs were organized based on who was available and did not always include the same team members from one day to the next, and some officers were sent to bureaus in which they had not worked before, did not know their supervisors or local community members.

Coordination regarding which of the geographic FOPs would receive additional staff and resources was primarily informed by the command staff of the FOPs. Decisions at the incident command post were largely made based on information gathered by officers and captains from divisions within each of the four FOPs. Within the FOPs, personnel and resource requests were made based on different sources of information, in some cases including social media. Some division personnel were able to independently search social media or leverage relationships with local business security personnel and private companies to stay abreast of First Amendment assemblies and protests that were being planned in their geographical area of operation. Other divisions and bureaus, though, were outmaneuvered and underprepared at least in part because of the lack of coordinated information gathering from social media and other intelligence sources at either the FOP or the command post.

The challenges associated with individual officer, MFF, and specialized assignments; clear definitions of allowable tactics and strategies; agency-wide alerts; and, a clearly communicated overall mission of the response negatively impacted the ability of LAPD to effectively and efficiently respond to the more chaotic situations that occurred during the SAFE LA First Amendment assemblies and protests.

[160] Ibid.
[161] Los Angeles Police Department. (2006, August). Training Bulletin: Mobile Field Force Concept – Part II Mobile Tactics.

# Mutual Aid

## Local Agencies

As the nature and primary locations of the SAFE LA First Amendment assemblies and protests ebbed and flowed, LAPD both received and provided mutual aid. For the entirety of the May 27 through June 7 timeframe, LAPD received mutual aid from LASD. While LASD did not participate in any tactical formations or frontline engagements with LAPD, they did effect a number of arrests, primarily for persons violating nightly county curfews. LASD also provided regular aid in processing the hundreds of persons arrested by LAPD. The two agencies frequently work together, respond to similar events, and have had a mutual aid operational plan agreement since 2013.[162] Although there are no formalized memoranda of understanding or agreements between LAPD and LASD specifically regarding operations during First Amendment assemblies and protests, the mutual aid operational plan agreement does state, "The responsible local official in whose jurisdiction an incident has occurred requiring mutual aid, unless otherwise provided, shall remain in charge at such incident including the direction of such personnel and equipment provided him through the operation of such mutual aid operations plan."[163]

Additionally, on the night of May 30, 43 officers from Santa Barbara and 62 from Ventura County arrived in Los Angeles to provide additional assistance to OWB.[164] The following afternoon, two LAPD MFFs were deployed to Santa Monica to provide mutual aid to the Santa Monica Police Department.[165]

## National Guard

Ultimately, after initial concern about the impact the presence of the National Guard would have, during the late night hours of May 30, the LAPD agreed that the Mayor should contact the governor to officially request National Guard personnel. The decision was made to request 2,000 personnel for the City of Los Angeles and an additional 2,000 National Guard personnel for the County of Los Angeles.[166] A retired member of LAPD's command staff with previous experience in coordinating with the National Guard regarding natural disasters was engaged to serve as a liaison between the National Guard and the LAPD during their deployment.

The National Guard personnel arrived early in the morning on May 31. As they drove through the City, National Guard units heard active security sirens from buildings and observed people looting stores. The National Guard contacted LAPD personnel to respond to those locations. From there, the National Guard units deployed in the Central and West Bureaus were directed to report to the staging location for LAPD personnel.[167] Later on May 31, approximately 100 National Guard troops were deployed to Santa Monica to assist with First Amendment assemblies and protests there. Throughout the City of Los Angeles, National Guard personnel were assigned to conduct high-visibility security to deter looting and protect critical infrastructure and locations. For example, National Guard personnel were deployed to shopping centers including Sherman Oaks Galleria, Fashion Center, and malls in Topanga and Northridge.[168] Using National Guard personnel in these capacities freed up LAPD personnel to respond to the frontline needs of the SAFE LA First Amendment assemblies and demonstrations.

---

[162] Los Angeles Police Department. (2013). Mutual Aid Operational Plan Agreement 2013. Provided to NPF assessment team by LAPD electronically on March 19, 2021.
[163] Ibid.
[164] See footnote 149. LAPD also explained that after Mayor Garcetti declared a state of local emergency and requested mutual aid, the California Office of Emergency Services (CalOES) tracked all mutual aid resources provided to the LAPD. CalOES tracked a total of 144 law enforcement personnel that were requested and responded.
[165] Ibid.
[166] NPF assessment team interview with City elected official. February 11, 2021.
[167] See footnote 149.
[168] Ibid.

Early in the morning on June 2, the decision was made in the DOC to demobilize the National Guard. However, a few minutes later, 30 National Guard personnel were directed to deploy to a shopping mall, and later the same day other National Guard personnel were deployed to Pershing Square, City Hall, and popular street corners in the Hollywood area. National Guard personnel maintained their presence in Los Angeles and staged at the Los Angeles Convention Center until June 5, when an LAPD Captain advised that the National Guard would not be deployed.[169] After two more days of peaceful First Amendment assemblies, the National Guard fully demobilized and left the City on June 7.[170]



[169] Ibid.
[170] Email from City of Los Angeles Executive Officer to NPF assessment team. February 17, 2021.

## Chapter Two Findings and Recommendations

**Finding 2.1:** **The nature of the SAFE LA First Amendment assemblies and protests that occurred in Los Angeles between May 27 and June 7, 2020 were ones that neither LAPD, nor other jurisdictions across the nation, have previously experienced nor expected.** While LAPD has years of experience with responding to large First Amendment assemblies, mass demonstrations, and civil disturbances in the past—some of which have involved violence and destruction—the SAFE LA First Amendment assemblies and protests occurred during a unique and unprecedented time in the nation. Local and national political tensions, frustrations and uncertainty caused by COVID-19, and the continued national narrative decrying police, contributed to a visceral response by many demonstrators locally and nationwide—including some intent on violence.

Particularly in LA, the SAFE LA First Amendment assemblies and protests were unique in that multiple assemblies occurred at the same time in locations across the city (locations not previously impacted by civil disturbances). They involved both spontaneous and planned events, demonstrators used both social media and messaging applications and were planned and coordinated. Demonstrators used more advanced logistics and tactics to counteract known police response strategies, and they required more police and city resources than protests in the past. The simultaneous needs for specialized personnel and resources across the City to address these more contemporary tactics caused confusion and strained an LAPD system that was accustomed to responding to First Amendment assemblies and protests that occur at a single time and location. In some cases, people intent on causing violence and destruction took advantage of the spanned geographic space and time SAFE LA First Amendment assemblies and protests to wreak havoc.

**Recommendation 2.1.1:** **City and LAPD leaders should continue to build strong working relationships and prioritize planning, preparation, management, and training for First Amendment assembly and protest response.** First Amendment assemblies and protests have occurred in Los Angeles since the Rodney King protests in 1992 and—given that LA is the second most populous city in the United States—will likely continue to take place. The LAPD and the City of Los Angeles should continue to review the totality of the 2020 protests and demonstrations and the impact on the city and the department in an effort learn from, plan and prepare for future incidents and to identify strategies and systems that worked in allowing freedom of expression while also protecting the public.

**Recommendation 2.1.2:** **The City of Los Angeles and the LAPD should continue to review lessons learned from other large-scale First Amendment assemblies, mass demonstrations, and civil disturbances across the country and abroad to improve citywide and police department planning, preparedness, and response to similar events so as to incorporate best and promising practices.** The City of Los Angeles and LAPD have been leaders in the field in responding to First Amendment assemblies and protests. However, when the peaceful assemblies devolved into chaotic and riotous events, LA and LAPD were not able to quickly adapt and respond. LA and LAPD should collect and analyze data available around civil disturbances, including damage incurred, injuries, use of force, arrest and impound, economic impact and other data collected during civil disturbances to identify systems, situations and variables that can assist in preventing and/or mitigating violence and destruction.

**Recommendation 2.1.3:** **The LAPD should have commanders who were directly involved in responding to the SAFE LA First Amendment assemblies and protests write an after-action report (AAR) that includes input from line level officers and up.** These AARs—particularly the recommendations—should be synthesized and presented to the LAPD operations and training command staff.[171]  Where possible, promising practices and lessons learned should be incorporated into policy, training, and protocol.

**Finding 2.2:** **The City of Los Angeles lacked a well-coordinated city-wide political, policy, communications, and law enforcement response mission to the SAFE LA First Amendment assemblies and protests that occurred between May 27 and June 7, 2020.** The City of Los Angeles' Emergency Operations Center (EOC) was activated and staffed prior to May 27, 2020, to coordinate the City's COVID-19 response. The EOC was under-utilized for decision-making and strategy implementation in response to the SAFE LA First Amendment assemblies and protests.

**Recommendation 2.2.1:** **City officials, councilmembers, relevant City agencies, and LAPD leadership should ensure that a city-wide plan, consistent with the National Incident Management System (NIMS), is used to manage First Amendment assemblies and protests, and that all City agencies understand, and participate in, the development and implementation of the plan.** While the City of Los Angeles has used NIMS effectively to respond to natural disasters, the response to the SAFE LA First Amendment assemblies and protests did not effectively leverage all components of NIMS—including establishing a single incident command system (ICS), fully utilizing the EOC, communicating and coordinating messaging through a Joint Information Center, and sharing information and resources across agencies. Planning and training for responses to pre-planned and spontaneous First Amendment assemblies and protests should include elected and appointed officials, law enforcement, other public safety agencies, other relevant government agencies, and relevant non-government and private sector organizations as appropriate.

**Recommendation 2.2.2:** **The City of Los Angeles should establish one citywide incident management team (IMT)[172] to lead its response to future large-scale First Amendment assemblies and incidents that involve a multi-agency, multi-jurisdiction response.** Beginning in 2009, LAPD established three internal IMTs—defined as, "a team of specialists familiar with all aspects of emergency management. They are experienced leaders, decision makers and strategic thinkers, self-actualized and willing to develop themselves into a cohesive team focused on managing large, complex, high consequence incidents."  The Citywide IMT should include operational public safety personnel (particularly from the LAPD IMTs), as well as representatives from the mayor's staff—and other elected and City officials—to ensure collaboration, coordination, and unity of command. The Citywide IMT should also train regularly through tabletop and full-scale exercises.

---

[171] National Police Foundation. 2020. How to Conduct an After Action Review. Washington, DC: Office of Community Oriented Policing Services. https://www.policefoundation.org/wp-content/uploads/2020/02/How-to-Conduct-an-AAR.pdf
[172] Also referred to as the Multi-agency Coordination Group (MAC). Online at: training.fema.gov – "Unit 5:  NIMS Coordination: MAC and Joint Information System.

**Recommendation 2.2.3:** **All City of Los Angeles elected officials, and personnel from each of the relevant City offices and agencies, should complete the appropriate level of ICS training if they have not already done so, and take regular refresher courses.** A US Department of Justice report advises, "Incident management organizations and personnel at all levels of government and within the private sector and nongovernmental organizations must be appropriately trained to improve all-hazards incident management capability...Training involves standard courses on incident command and management, incident management structure, operational coordination processes and systems—together with courses focused on discipline and agency-specific subject matter expertise—helps ensure that personnel at all jurisdictional levels and across disciplines can function effectively together during an incident."[173]

**Recommendation 2.2.4:** **The City of Los Angeles and LAPD should conduct joint regularly-scheduled First Amendment assemblies, protest, mass violence, and other critical incident tabletop and full-scale exercises.** While some LA elected officials and LAPD personnel identified the frequency with which they coordinate in response to natural disasters including earthquakes and fires, they also indicated that there are not enough exercises on other events.

**Finding 2.3:** **Communication within LAPD—particularly in the first few days—was inconsistent between the Chief, his command staff, bureau commanders and field supervisors, and line officers. This created significant challenges regarding: (a) identifying a cogent operating philosophy; (b) determining operations during individual shifts, including when shifts started and ended; and, (c) establishing coordination and consistency between shifts.** Senior level command staff and first-line supervisors made similar observations that there was confusion regarding who the Incident Commander was at times, which command post was responsible for final decisions, and what the overall LAPD strategy and mission was. This impacted every component of the LAPD response to the SAFE LA First Amendment assemblies and protests.

**Recommendation 2.3.1:** **LAPD should establish a planning team that includes command staff, training, equipment, communications, logistics, and intelligence to ensure plans receive the necessary attention to detail in these areas.** Identifying personnel to focus on specific areas of the plan is valuable to ensure that there is full understanding of the resources, systems, and needs and to ensure the viability of the plan.

**Recommendation 2.3.2:** **LAPD should update and enhance its Emergency Operations Guide: Volume 5 to address all components of First Amendment Assemblies and Mass Demonstrations, as opposed to focusing on crowd management and crowd control.[174]** The updated Guide should include: scalable strategies for, and immediate steps to take when, responding to spontaneous First Amendment assemblies and mass demonstrations; roles, responsibilities, and specific assignments for all ranks and positions as they relate to NIMS; processes for establishing and staffing a Joint Information Center (JIC) that includes relevant City stakeholders and agency representatives; and, coordinating with

---

[173] Bureau of Justice Assistance. "Mutual Aid: Multijurisdictional Partnerships for Meeting Regional Threats." NCJ160113. 2005. Washington, D.C.: U.S. Department of Justice. https://www.ncjrs.gov/pdffiles1/bja/210679.pdf (accessed December 11, 2017).
[174] See footnote 71.

National Police Foundation - A Crisis of Truth

geographic command centers. The LAPD should consult with community members and organizers, civil rights attorneys, internal experts, national-level experts, and academic experts in policing.

**Recommendation 2.3.3: LAPD should practice establishment of ICS in different scenarios and should develop lists of personnel with the appropriate training and capacities to fill the necessary leadership positions in each section.** One of the challenges LAPD faced initially was the incomplete establishment of a command system that fully implemented NIMS/ICS. The lack of some of these positions—including Planning, Intelligence/Investigations, and Logistics—contributed to the initial lack of coordination in the response to the SAFE LA First Amendment assemblies and protests.

**Finding 2.4:** The issuing and cancellation of Tactical Alerts contributed to confusion and frustration amongst supervisors and officers.

**Recommendation 2.4.1: LAPD should establish clear processes for identifying and deploying appropriate personnel to planned and spontaneous critical incidents, including First Amendment assemblies and protests.**

**Finding 2.5: LAPD did not effectively leverage intelligence and information city-wide—including publicly-available social media—that may have enhanced situational awareness of officers and their ability to rapidly assess multiple venues and deploy resources.** LAPD did not fully leverage and communicate throughout the department open sources of intelligence and social media to account for the size, evolution, and adaptability of the SAFE LA First Amendment assemblies and protests. While the LAPD Special Events Permit Unit (SEPU), received permit requests for some of the SAFE LA First Amendment assemblies and protests, many more spontaneous demonstrations did not allow for the development of Event Action Plans (EAPs) or Incident Command System (ICS) plans. While many LAPD commands gathered intelligence on significant First Amendment assemblies and protests—including possibly disruptive groups—it was not compiled, deconflicted, or leveraged across the LAPD to strategically deploy resources.

**Recommendation 2.5.1: LAPD should work with the community to consider collaborative approaches and technology solutions and strategies that will enhance situational awareness and improve community and officer safety.**

**Recommendation 2.5.2: LAPD should develop a process to ensure that intelligence and information gathered to improve public safety is appropriately incorporated in the command structure.** This information should be shared promptly and consistently with the Incident Commander as well as relevant department and bureau command posts and should be factored into planning and preparedness.

**Finding 2.6: LAPD should develop, implement, and review MOUs with the LASD and other law enforcement agencies to support and clearly define roles, responsibilities, and protocols to First Amendment assemblies and protests.**

# Chapter Three: Public Communication and Social Media

Traditional media and social media communication played significant roles and provided multiple strategic advantages to the protesters throughout the SAFE LA First Amendment assemblies and protests.

From the early stages, protesters used social media to voice their frustrations, to garner support and to control the narrative around First Amendment assemblies. They mired the Los Angeles Police Department (LAPD) Public Communications Group (PCG) and command staff in a cycle of constant response, placing them in a reactive position versus proactively disseminating accurate and timely information, dispelling rumors, and correcting false statements. Social media drove the perception that the death of George Floyd was just the latest case of an officer-involved fatality of an unarmed African American in LA and around the world. Protesters quickly called for justice by posting and sharing videos and images of the death of Mr. Floyd and planning protests throughout the city. As the SAFE LA First Amendment assemblies and protests continued, protesters continued to leverage social media to frame their actions as entirely peaceful, while depicting the LAPD response to the crowds as heavy-handed and unnecessarily violent, particularly after LAPD officers deployed less-lethal weapons or used force.

Many of the First Amendment assemblies and protests in LA and across the country, were organized, coordinated, and communicated entirely through social media. Looters intent on causing destruction and intentionally overwhelming and "outmaneuvering" the traditional responses of the LAPD also effectively leveraged social media to arrange meeting locations and strategic posts throughout the city and to coordinate next steps. Most importantly, the strategic use of social media by protesters afforded them the opportunity to control the narrative, and therefore the protests from the beginning.

## Public Communication

A fundamental principle of crisis and civil disturbance management is that an effective response requires communication, collaboration, and partnerships among elected officials, public safety leaders, other government agencies, and at times private sector and community organizations. By its nature, the SAFE LA First Amendment assemblies and protests were a series of rapidly evolving and dynamic events, often co-occurring in various locations throughout the city. As is often the case in the response to dynamic events, consistent and coordinated communication from the City of Los Angeles to the public was difficult.

## Public Messaging during First Amendment Assemblies and Protests

Public communication and social media messaging during First Amendment assemblies and protests is imperative. Oftentimes, however, agencies can be unsure of what to communicate and how to message. Helpful questions to answer include:

- What is protected First Amendment conduct?
- What is a peaceful protest versus an unlawful protest?
- When does a peaceful protest become a threat to public safety personnel and the public and when does it become a riot?
- What protest behavior, even when unlawful, warrant use of force to generate compliance?
- What is the balance between lawful First Amendment expression and the rights of others (motorists, residents, business owners and patrons, etc.)?

Despite dealing with the COVID-19 pandemic, the City of Los Angeles coordinated public messaging through a virtual joint information center (JIC). The virtual JIC included representatives from the Mayor's Office, LAPD and other public safety agencies, and other relevant city agencies.

The LAPD PCG includes sworn and civilian personnel, and at the time of the SAFE LA First Amendment assemblies and protests, was led by a former member of the media. The PCG serves as the liaison between the LAPD and all major media outlets; facilitates the dissemination of news releases; staffs the City Emergency Operations Center Public Information Officer position and the similar position at LAPD incident command posts; and conducts internal media relations trainings for sergeants, detectives, and watch commanders. The PCG also oversees the LAPD website and manages the overall social media strategy—including the Headquarters accounts and the accounts of 21 field divisions. The overall goal of the PCG is "to ensure that open lines of communication are maintained at all times with all segments of the greater Los Angeles community."[175]

In addition to coordinating public messaging, it is important that city elected and appointed officials understand the communications principles described in the National Incident Management System (NIMS) and Incident Command System (ICS). As the Federal Emergency Management Agency's guidance on NIMS affirms, "Elected and appointed officials are key players in incident management...Effective communication between...incident personnel and policy-level officials fosters trust and helps ensure that all leaders have the information they need to make informed decisions."[176]

NIMS and ICS should guide city officials in predetermining and coordinating roles and responsibilities and statements so that, in the event of an incident, all stakeholders—including elected officials— are prepared to help resolve critical incidents.

[175] Los Angeles Police Department. (2020). Public Communications Group. https://www.lapdonline.org/inside_the_lapd/content_basic_view/2022.
[176] Federal Emergency Management Agency. (2017, October). National Incident Management System. United States Department of Homeland Security. Washington, DC. https://www.fema.gov/media-library/data/1508151197225-ced8c60378c3936adb92c1a3ee6f6564/FINAL_NIMS_2017.pdf

National Police Foundation - A Crisis of Truth

# Social Media During Critical Incidents

In critical incidents, law enforcement and government officials face a delicate balance between informing the public about what has occurred and ensuring the integrity of the response and any potential investigations. Frequently in these situations, they are more risk-averse, focused on accuracy of information and protecting potential evidence–even if that means "no comment"–than on quickly posting and sharing the most updated information.

While social media was ubiquitous for the demonstrators, and afforded them the opportunity to firmly grasp the attention and the narrative of the news media, and social media audience, the LAPD was almost entirely silent until it was too late. A PCG member advised that LAPD was not quick enough to use social media and share more than basic information and traditional messaging.[177] Others were hesitant to post anything on the LAPD Headquarters social media accounts unless it was approved up the internal chain-of-command all the way to the Chief; shared and approved by a representative from the Mayor's Office; and, then sent back down with any edits or revisions–a process that, in a fast moving and dynamic protest environment, can take more time to complete than it does for the next protest to begin.[178]

Despite the looting and general chaos, on May 27, LAPD posted a single message on Facebook, Twitter, and Instagram. The message acknowledged the anger and pain of protesters, asked that protests be held in a safe and legal manner, and that the department would always facilitate freedom of speech.[179] The following day, LAPD posted a YouTube video of Chief Moore recognizing the frustration of community members, the fragile nature of police-community relations, and concerns regarding excessive use of force.[180] The LAPD Twitter account was only used to share the video of Chief Moore and to retweet a message from Mayor Garcetti. Again though, as looting and chaos occurred in the downtown area, LAPD social media was not used to communicate with the community.

As the SAFE LA First Amendment assemblies and protests continued on May 29, the first social media post related to the events was not posted until approximately 11:00pm. At that point, LAPD used its Facebook, Twitter, and Instagram accounts to encourage people to avoid the downtown area because of the ongoing protests. LAPD also used its primary Twitter account to retweet a message from Chief Moore's Twitter account, stating that the department would facilitate spontaneous and planned protests, but would take enforcement actions on anyone who endangers protesters, officers, or the public.[181]

In the early morning on May 30, the primary LAPD social media accounts were used to disseminate the message that an unlawful assembly had been declared throughout the downtown area, due to repeated acts of violence and property damage. Later in the afternoon, the department also posted information about the numbers of arrests and officer injuries, as well as a general statement that several police vehicles and numerous downtown businesses were vandalized, looted, and damaged on its primary social media accounts.[182]

---

[177] NPF assessment team focus group with LAPD sergeants. February 11, 2021.
[178] NPF assessment team focus group with LAPD sergeants. February 11, 2021.
[179] Los Angeles Police Department. (2020, May 27). https://www.instagram.com/p/CAtxyBHhHQv/
[180] Los Angeles Police Department. (2020, May 28). https://www.youtube.com/watch?v=_0MUGF5xw48&t=2s
[181] Los Angeles Police Department. (2020, May 29). https://twitter.com/LAPDChiefMoore/status/1266476381547819008
[182] Los Angeles Police Department. (2020, May 30). https://twitter.com/LAPDHQ/status/1266804085245661185

As the protests in the area of Pan Pacific Regional Park devolved into chaos and large-scale destruction, LAPD leveraged its primary social media accounts to encourage people to stay away from the area because of the large amount of protesters and police presence.[183] Approximately eight minutes later, LAPD disseminated that a curfew had been applied to the downtown area between 8:00pm and 5:30am, noting that violators would be subject to arrest.[184] LAPD also used only its Twitter account to disseminate the declaration of an unlawful assembly in the mid-Wilshire area later that night.[185] When the decision was made to apply the original curfew to the entire city, LAPD used its three primary social media accounts to disseminate the update.[186]

On May 31, LAPD only used its three primary social media accounts to inform followers about the hours of the curfew. Otherwise, the department leveraged Twitter as its primary social media channel to share information. LAPD tweeted information about the deployment of the National Guard and a series of messages regarding the numbers of arrests and officer injuries, as well as a general statement that several police vehicles and numerous businesses were vandalized, looted, and damaged.[187] The Twitter account was also used to retweet a joint press conference of Mayor Garcetti, Chief Moore, and the chief of the Los Angeles Fire Department.[188]

As the SAFE LA First Amendment assemblies and demonstrations continued, LAPD continued to leverage social media to post reminders regarding the curfews, images and videos of peaceful assemblies and interactions between officers and protesters, and statements encouraging interaction between LAPD and community members.

## Transparency

During the SAFE LA First Amendment assemblies and protests, the only time LAPD used social media to acknowledge an individual incident involving an officer was on June 1. On May 31, protesters captured video of an incident which appeared to show an altercation between an LAPD vehicle and a group of protesters. In a single tweet, LAPD stated, "We are aware of video circulating on social media of an LAPD patrol vehicle involved in a traffic collision with a pedestrian, during one of several spontaneous protests occurring throughout the city. A traffic report was taken, and the incident is under investigation."[189]  By that time, the videos had been widely shared on social media and became the focus of numerous media articles.

[182] Los Angeles Police Department. (2020, May 30). https://twitter.com/LAPDHQ/status/1268040852456611185
[183] Los Angeles Police Department. (2020, May 30). https://twitter.com/LAPDHQ/status/1268686430751805440
[184] Los Angeles Police Department. (2020, May 30). https://twitter.com/LAPDHQ/status/1268688463030530051
[185] Los Angeles Police Department. (2020, May 30). https://twitter.com/LAPDHQ/status/1266911752349863936
[186] Los Angeles Police Department. (2020, May 30). https://twitter.com/LAPDHQ/status/1266922943965089792
[187] Los Angeles Police Department. (2020, May 30). https://twitter.com/lapdhq
[188] Los Angeles Police Department. (2020, May 30). https://twitter.com/lapdhq
[189] Los Angeles Police Department. (2020, June 1). https://twitter.com/LAPDHQ/status/1267309149504720896

In addition to social media, LAPD only used its website once during the May 27 through June 7, 2020 time period to issue a news release regarding a categorical use of force from the SAFE LA First Amendment assemblies and protests. The news release from June 2, provides a summary of the incident that occurred on May 30.[190] A link to a YouTube video of a Critical Incident Community Briefing, in which the department provides video footage from several angles and a more-detailed explanation of the May 30 incident, was posted on July 14, 2020.[191] LAPD posted a similar Critical Incident Community Briefing video recapping a police-protestor encounter on May 30 on July 31, 2020.[192] The only other news release and Critical Incident Community briefing related to the SAFE LA First Amendment assemblies and protests was posted on the LAPD website in early December 2020.[193]

The time period between the incidents and when the information was posted allowed protesters to shape the narrative about LAPD uses of force and question LAPD's transparency about the nature of many of the incidents. On June 5, 2020, the National Lawyers Guild filed a federal class action lawsuit documenting multiple instances of alleged LAPD uses of force.[194]  The complaint was amended on June 21, 2020, to include additional descriptions and images of alleged LAPD uses of forces against protesters.[195] Media articles also documented the number of complaints filed alleging excessive force and LAPD officers assigned to other roles.[196] While LAPD provided general information about the number of overall complaint investigations and those specifically related to allegations of excessive use of force,[197]  no additional information was provided publicly and the use of force page on the LAPD website only covers officer-involved shootings and critical incidents.[198]



[190] Los Angeles Police Department. (2020, June 2). Officer-Involved-Shooting in Central Division NRF022-20bm. https://lapdonline.org/newsroom/news_view/66595
[191] Los Angeles Police Department. (2020, July 14). Central Area OIS 5/30/2020 (NRF022-20). https://www.youtube.com/watch?v=xY7J-g_izn8&feature=youtu.be
[192] Los Angeles Police Department. (2020, July 31). Wilshire Area CUOF 5/30/2020 (NRF028-20). https://www.youtube.com/watch?v=7fLSS0Po4rA&feature=youtu.be
[193] Los Angeles Police Department. (2020, December 4). Law Enforcement Related Injury (LERI) NRF029-20dm. https://www.lapdonline.org/newsroom/news_view/67078
[194] National Lawyers Guild. (2020, June 21). First Amended Complaint: Class Action; Injunctive Relief and Damages. US District Court Central District of California–Western Division. https://nlg-la.org/wp-content/uploads/sites/5/2020/06/BLACK-LIVES-MATTER-COMPLAINT-ECF-FILED.pdf
[195] Ibid.
[196] Leonard, Eric. (2020, June 18). "LAPD Officers Removed From Field While Protest Complaints Are Investigated." NBC Los Angeles. https://www.nbclosangeles.com/investigations/lapd-protest-arrests-police-officers-george-floyd/2382322/
[197] Ibid.
[198] Los Angeles Police Department. (2021). "2021 Officer Involved Shooting (O.I.S.) and Critical Incidents." https://www.lapdonline.org/use_of_force

National Police Foundation - A Crisis of Truth

## Promising Use of Social Media During First Amendment Assemblies

The Kansas City Police Department (KCPD) in Missouri, leveraged traditional and social media and the department's website to share information about the First Amendment assemblies and demonstrations that were occurring, beginning on May 27, 2020. KCPD posted the department's policy on First Amendment assemblies and protests and shared messages of KCPD officers expressing their commitment to supporting community members' First Amendment rights. A new webpage was also created to answer questions from the public and linked to the KCPD's Response to Resistance policy—which explains department training in relevant areas including de-escalation, mental health awareness, bias, stress management, and tactical communication—and the department's full list of policies. KCPD also used its Media Unit as the central repository for feedback regarding the protest response and to coordinate messaging. KCPD public information officers (PIOs) also responded to protest areas to create designated media staging areas and provided hourly updates to the media. At the same time as PIOs were on scene, other KCPD public relations staff posted similar information on social media remotely, and a public relations specialist went to the city's Emergency Operations Center to monitor and post to social media. As the First Amendment assemblies and protests evolved, so too did the messaging from the KCPD Media Unit, and the unit and department continue to monitor the perceptions of the community and adapt their messages accordingly.

Source: Boyd, Sarah and Jake Becchina. (20201, March 3). "No More Rocks and Bottles: Lessons Learned in Crisis Communication." Police Chief Online. https://www.policechiefmagazine.org/no-more-rocks-and-bottles/

## Social Media for Information-Gathering

In addition to the benefits of leveraging social media to share information and updates, law enforcement and government officials can use social media platforms to observe—or listen to—social media posts and multimedia to gather additional situational awareness or intelligence from scenes of civil disturbances. Beginning on May 30, the LAPD Major Crimes Division began monitoring open source information to provide situational awareness of similar projected planned and unplanned gatherings that may devolve into looting and riots.[199] Each day, relevant information about potential local events—including flyers posted on social media, tweets of locations to meet, and posts of march route—and similar First Amendment assemblies and protests in other cities was shared with the appropriate bureau command posts. Where possible, additional information that could be gleaned from the social media posts was also included.[200] By that point, the veracity and fluidity of the protests had diminished significantly and many of the posts did not account for the looting and rioting that occurred each night.



[199] Los Angeles Police Department. (2020, May 30). Contact Information for MCD ICC. Provided to the NPF team by LAPD electronically on March 19, 2021.
[200] Los Angeles Police Department. (2020). ICC Updates Multimedia. Provided to the NPF team by LAPD electronically on November 10, 2020.

National Police Foundation - A Crisis of Truth

## Using Social Media During Critical Incidents

During the 2011 Stanley Cup finals, the Vancouver Police Department (VPD) used a social media dashboard to create streams and searches that could be followed to respond to questions being asked by people who had gathered outside of the arena in Vancouver to watch the games being played in Boston and to gain situational awareness. As riots ensued in Vancouver, the ability to observe the social media posts being generated was useful in determining how to respond. In addition, the department could see hundreds of supportive tweets and emails, which they ultimately used to help generate tips and identifications of some of the rioters and looters.

Likewise, public information officers at the University of North Carolina–Charlotte, Orlando Police Department, and San Bernardino County Sheriff's Department all reported that monitoring social media during and immediately following an incident was a major lesson learned from their experiences responding to mass violence incidents. Although different scenarios, monitoring social media can ensure that false narratives and information are identified, dispelled, and countered with factual information quickly. Additionally, social media can be used to gain situational awareness about spontaneous gatherings or group movements that may require a public safety response.  These tasks can be assigned internally to personnel with appropriate technical skills to conduct social media analysis and intelligence gathering or potentially delegated out to mutual aid agencies with similar expertise.

Source: Centers for Disease Control and Prevention. (2014, August). Crisis Emergency Risk Communication. Atlanta, GA: US Department of Health and Human Services. https://emergency.cdc.gov/cerc/resources/pdf/cerc_2014edition.pdf

## Chapter Three Findings and Recommendations

**Finding 3.1:** Although a virtual JIC was established, the review process impacted the ability of LAPD to post timely messages to its social media accounts.

> **Recommendation 3.1.1:** The City of Los Angeles should establish a unified narrative and public messaging strategy around first amendment assemblies (before, during, and after) that informs the public about City leadership's position on supporting free speech during First Amendment assemblies, but clearly defines consequences for those responsible for committing violence or destruction during such assemblies.

> **Recommendation 3.1.2:** The City of LA and LAPD should develop policies and procedures that use social media to "push" information to the community and quickly disseminate accurate information in response to rumors, misinformation, and false accusations.

**Finding 3.2:** The LAPD decision to not fully leverage social media to share information and respond to false accusations allowed demonstrators to control the narrative and overwhelm LAPD on the information front.

> **Recommendation 3.2.1:** LAPD should create a clear and detailed media strategy to guide the department's use of traditional news media and social media, particularly during critical incidents.

> **Recommendation 3.2.2:** LAPD should consider leveraging new and emerging technologies including reverse-text alert systems—and continue leveraging social media—to disseminate dispersal warnings and curfew notices.

# Chapter Four: Officer Wellness and Morale

As the City of Los Angeles and the Los Angeles Police Department (LAPD) move forward from the public protests that followed the death of George Floyd, the LAPD and police departments across the country must define a new "normal" for policing. In doing so, the LAPD should acknowledge the grief and pain experienced by individual officers assigned to the First Amendment assemblies and protests, their families, the department, and the community. With the focus on reform and moving forward, the City and the LAPD should take the time to acknowledge individual, group trauma and community trauma.

To implement and sustain the changes the community is demanding, the City of LA and the LAPD must address community trauma as well as the trauma experienced by its members. Unresolved trauma becomes the mechanism by which "history repeats itself."[201]

## Policing Civil Unrest and Trauma during COVID-19

Perhaps the most unique feature of police work is the experience of critical incidents, which are distinguished from more common routine emergencies (that can also be very severe) by significant elements of novelty. The novelty may result from threats that have never been encountered before; from a more familiar event occurring at an unprecedented level; or from a confluence of forces, which, although not new, in combination pose unique challenges.[202]

In Los Angeles, the First Amendment assemblies and protests that followed the death of George Floyd were marked by novelty—intense levels of violence, divisive politics, multiple voices amongst the protesters, and calls for defunding or eliminating the LAPD. Even more troubling, and unique to the current wave of civil unrest, have been the tactics employed by extremists and violent actors targeting law enforcement. These tactics have included physical targeting of officers, patrol vehicles, personal residences, and property, as well as virtual targeting through posting personal information online and cyber threats.[203]

The challenges of policing First Amendment assemblies and protests, have been further exacerbated by the COVID-19 pandemic—which, in itself, is an ongoing pervasive stressor and traumatic event. LAPD officers have continued to work and respond to calls for service increasing the risk of exposure and concerns that their family members could be exposed to the virus. Social distancing policies have resulted in numerous changes and alterations in protocols including requirements to wear personal protective equipment (PPE), altered patrol routines, changed shift schedules, and work hours. In some cases, the protests in LA have led to outbreaks or rapid escalation of COVID-19 infections in the LAPD.

---

[201] Fromm, M. Gerard (ed). (2012). Lost in Transmission: Studies of Trauma Across Generations. New York: Routledge. p. 183.
[202] Howitt, Arnold M. and Herman B. Leonard. (2009). Managing Crises: Responses to Large-Scale Emergencies. Washington, D.C.: CQ Press. pgs. 5-6.
[203] See footnote 115.

## Outcomes of Trauma

Heightened exposure to threat and trauma places first responders at increased risk for a wide range of negative outcomes, including post-traumatic stress disorder (PTSD).[204]  For example, following the September 11th terrorist attack, the prevalence of PTSD ranged from 6.3% to 22% in firefighters, from 6.5% to 14.1% in EMT's, and from 2.5% to 9.8% in police officers.[205] While many LAPD officers experience symptoms and behavior problems that fall short of full diagnostic criteria for PTSD, they may have subthreshold PTSD along with many debilitating symptoms. Such post-trauma adjustment problems include (but are not limited to) acute stress reactions, domestic and other forms of violence, depression, suicidal ideation, and death by suicide.[206]

A study regarding the effects of the 1992 Los Angeles civil unrest among members of the Los Angeles Police Department found that of the 141 police officers who participated in the research, 17% of the officers were experiencing stress symptomatology. Findings further indicated that the officers were twice as likely to use avoidance coping strategies than their counterparts without symptomatology. Furthermore, the officers used a broader variety of coping strategies than their counterparts. Overall, the results indicated the presence of PTSD symptomatology among the police officers assigned to the riot areas in Los Angeles. The majority of the police officers either directly or indirectly expressed difficulty performing the job because of associated stressful conditions.[207]

In a study of police officers assigned to the VI Reparto Mobile, an Italian specialized police unit exclusively deployed for riot and crowd control during the 2001 G8-Summit in Genoa, the research team found that although the officers had a good capability to withstand operational stress and to keep balance, a considerable number of officers suffered from excessive levels of stress due to a disparity between work demands and control capability, as well as disparity between effort and reward. Some officers suffered from excessive levels of stress leading to higher short-term absence.[208]

A study of the mental health effects for law enforcement and community members exposed to violence during the Ferguson protests found that 14.3% of law enforcement officers exceeded the clinical cutoffs for a likely PTSD diagnosis. The researchers opined that the high incidence of law enforcement personnel exceeding the PTSD cutoff and the depression cutoff (32.6%) as well as high rates of clinically significant anger (22.7%) had implications for healing in a similarly traumatized community—"It is difficult to imagine how a community can heal, live, and work together harmoniously when one out of four members (in both community and police) is suffering from PTSD symptoms and/or clinically elevated levels of anger and one out of three is suffering from clinical levels of depression."[209]

An area that has received minimal research attention is the impact of the socio-political environment on the level of stress experienced by police officers. Police officers indicated that socio-political stress was attributed to the following: (a) national news makes it appear that all communities distrust their local departments, despite the fact that their departments maintained good relationships with the communities they serve;

[204] Violanti, J. M., Charles, L. E., McCanlies, E., Hartley, T. A., Baughman, P, Andrew, M. E., Fekedulegn, D., Ma, C. C., Mnatsakanova, A., & Burchfiel, C. M. (2017). Police stressors and health: a state-of-the-art review. Policing (Bradford, England), 40(4), 642–656. https://doi.org/10.1108/PIJPSM-06-2016-0097
[205] Wilson, L.C. (2015). "A systematic review of probable post-traumatic stress disorder in forst responders following man-made mass violence." Psychiatry Research.
[206] Arble, Eamonn Patrick and Arntez, Bengt B. (2020). "Evidence-Based Practices to Enhance First Responder Well-Being and Performance" in Bowers, Clint A.; Deborah C. Beidel and Madeline R. Marks (2020). Mental Health Intervention and Treatment of First Responders and Emergency Workers.  Hershey, PA: IGI Global, p. 206.
[207] Harvey-Lintz, Terri and Romeria Tidwell. (1997). "Effects of the 1992 Los Angeles Civil Unrest: Post Traumatic Stress Disorder Symptomatology among Law Enforcement Officers." The Social Science Journal, Volume 34, Number 2, pgs. 171-183.
[208] Garbarino, S.; N. Magnavita; C. Chiorri; D. Brisinda; G. Cuomo; A. Venuti; and, R. Fenici, (2012, May 12). "Evaluation of Operational Stress in Riot and Crowd Control Police Units: A Global Challenge for Prevention and Management of Police Task-Related Stress." Journal of Police Criminal Psychology.
[209] Galovski, Tara E., Zoe D. Peterson, Marin C. Beagley, David R. Stasshofer, Philp Held, and Thomas D. Fletcher. (2016, August). "Exposure to Violence During Ferguson Protests: Mental Health Effects for Law Enforcement and Community Members." Journal of Traumatic Stress, 29, 283-292. https://onlinelibrary.wiley.com/doi/full/10.1002/

(b) "over scrutiny" by the media set up impossibly high standards, leading officers to second guess their enforcement actions—causing hesitation and reluctance to follow use of force guidelines that may expose them to injury; (c) the 24-hour news cycle and cable news channels exacerbate the negative perception of officers leading them to feel defensive and unappreciated; and, (d) community members recording interactions and sharing them creates a heightened stressful atmosphere causing officers to be concerned about how they will appear on film that can be edited unfavorably.[210] Additionally, social media provides a troubling opportunity for persons to post unverified, hateful, and derogatory messaging in a growing milieu of chat rooms, search engines, and other venues that can be damaging to individual officers and their departments in both the short- and long-term.

## Impact of Traumatized Officers

Although police officers are generally thought to be more resilient and are exposed to threatening and potentially traumatic events at a higher frequency than other professions, police officers who maintain negative or traumatic information in long-term memory are vulnerable to mental illness, unstable emotional and behavioral responses, interpersonal problems, and impaired social relationships.

According to the National Alliance on Mental Illness (NAMI), many police officers struggle with alcohol abuse, depression, suicidal thoughts, posttraumatic stress disorder and other challenges over the course of their careers. Here are some concerning facts from NAMI's website:

- **The suicide rate for police officers is four times higher than the rate for firefighters.**
- **In the smallest departments, the suicide rate for officers increases to almost four times the national average.**
- **More police officers die by suicide then in the line of duty.  In 2017, there were an estimated 140 law enforcement suicides.**
- **Compared to the general population, law enforcement reports much higher rates of depression, PTSD, burnout and other anxiety related mental health conditions.[211]**

According to Blue H.E.L.P.,[212]  a non-profit organization that tracks police officer suicide data, at least 228 police officers died by suicide in 2019. In the aftermath of the Capitol attack, two police officers, one a Capitol Police officer and the other a Metropolitan Police Department officer, took their own lives.[213] Researchers have found that police officers tend to either not seek mental health treatment, try to fix their own mental health problem, or will not be forthcoming in treatment regarding internalized thoughts of psychological distress.[214]

[210] Saunders, Jessica, Virginia Kotzias, and Rajeev Ramchand. (2018, December 12). "Contemporary Police Stress: The Impact of the Evolving Socio-Political Context." Criminology, Criminal Justice, Law & Society. https://scholasticahq.com/criminology-criminal-justice-law-society/
[211] National Alliance on Mental Illness. https://nami.org/
[212] Shannon, Joel. (2020, January 2). "At least 228 police officers died by suicide in 2019, Blue H.E.L.P. says.  That's more than were killed in the line of duty." USA Today. https://www.usatoday.com/story/news/nation/2020/01/02/blue-help-228-police-suicides-2019-highest-total/2799876001/
[213] Emma, Caitlin and Sarah Ferris. (2021, January 27). "Second officer died by suicide following Capitol attack." Politico. https://www.politico.com/news/2021/01/27/second-officer-suicide-following-capitol-riot-463123
[214] Mahbubani, Rhea and Kelly Mclaughlin. (2020, June 14). "Police officers stigmatize seeking help for mental-health issues. It could be damaging for the communities they're supposed to serve and protect." Insider. https://www.insider.com/police-officers-stress-mental-health-stigma-impacting-public-2020-6

National Police Foundation - A Crisis of Truth

## The LAPD Response to Employee Health and Wellness

Fifty-two years ago, the LAPD established Behavioral Science Services (BSS) which is responsible for planning, developing, implementing and administering the Department's psychological services program. BSS, originally staffed by one psychologist has grown to 15-full-time professional and trained psychologists who specialize in law enforcement-related situations and crises.

Psychologists are assigned to one or more of LAPD's divisions, and pre-COVID 19, attended roll calls, participated in ride-a-longs, and provided training and health education. Since COVID-19, psychological services are provided via telehealth, with limited in-person visits. Telehealth has increased participation overall, by reducing the need for personnel to commute downtown for services and increasing anonymity.  Services are provided at no cost and there is no cap on the length of participation for employees or their significant other.

BSS provides individual and couples counseling to all Department personnel and their spouses.  In addition to counseling, BSS psychologists also provide training for Department personnel on topics such as stress management, suicide prevention, and anger management. BSS conducts debriefings and defusings for Department personnel involved in traumatic incidents. Additionally, a psychologist responds with the Special Weapons and Tactics Team to assist in hostage negotiation and barricaded subject situations.[215]

LAPD personnel are connected to BSS psychologists through self-referrals, as a result of their involvement in a critical incident (e.g. an officer involved shooting) or a direct referral by a supervisor for an assignment most often related to a workplace conflict or suicidal ideology.

BSS supports the efforts of the Department's 320-person peer support team, which was established in 1986, and is composed of members from all ranks and assignments. Approximately 75% of the peer support team are drawn from the sworn ranks and 25% from civilian personnel, primarily 911 operators. There are five specialized cadres within the peer support program–officer-involved shooting, caregivers, retirees, substance abuse, and veteran-to-veteran.

The BSS works closely with the LAPD Wives Association providing counseling, education and support to the wives of LAPD officers. Additionally, BSS assists other support groups within the department.

In addition to BSS, the League entered into a contract with the Holman Group to provide counseling services to officers who seek assistance outside of BSS. Officers, their significant other and children can participate in up to ten (10) free sessions and additional sessions at a reduced rate. The service is paid through officer membership dues.

During the protests, BSS provided services to officers through telehealth and saw a significant increases in self-referrals (approximately 50%).[216] In the aftermath of the protests, psychologists attended roll calls and meetings and asked attendees to share thoughts and feelings regarding the protests, City and department leadership,

[215] Los Angeles Police Department. (2021). Behavioral Science Services. https://www.lapdonline.org/inside_the_lapd/content_basic_view/6497
[216] NPF assessment team interview with LAPD BSS employee. March 8, 2021
[217] Los Angeles Police Department. (2020, June 19). "Heard From the Field Post-2020 Protests." Submitted by BSS to the LAPD Chief of Police. Provided to NPF assessment team by LAPD electronically on March 8, 2021.

community perception, individual physical and mental health, and the future of policing in LA. The statements were summarized in "Heard from the Field Post-2020 Protests," a document prepared by Behavioral Science Services and submitted to the Chief of Police.[217]

"Heard from the Field," documents the level of trauma, exhaustion, isolation, disappointment, anger, hopelessness and frustration experienced by LAPD personnel regarding their assignments during the protests, and regarding community perception, political and department leadership. Similar observations were made by the LAPD Wives Association during interviews conducted by the National Police Foundation (NPF) assessment team and in a survey taken by the Los Angeles Police Protective League and published in the Thin Blue Line (2020).[218] The "Heard from the Field" document provided nine (9) recommendations to the Chief and the Department's command staff on "immediate response options" and nine (9) recommendations regarding opportunities to "tap into and rebuild the resiliency of the workforce."



[218] Los Angeles Police Protective League. (2020, November). "Your Voice Matters." Provided to NPF assessment team by LAPPL electronically on February 3, 2021.

## Chapter Four Findings and Recommendations

**Finding 4.1:** **For more than 50 years, LAPD has endeavored to assist its personnel through Behavioral Science Services and aligned groups. In many ways, LAPD should be recognized for its innovative programs and leadership in the law enforcement profession regarding physical and mental wellness.**

**Finding 4.2:** **The research is clear that law enforcement personnel are exposed to significant traumatic events during the course of their careers. This exposure increases the likelihood of negative physical and mental health impacts that extend beyond an officer's law enforcement career.**

> **Recommendation 4.2.1: LAPD should continue to support the capacity of Behavioral Science Services, the Peer Support Team, and other aligned groups to assist Department personnel and their families address trauma, build resiliency and support physical and mental health.**

**Finding 4.3:** **LAPD, elected officials and the LA community should recognize that research indicates that crowd management and other critical incidents have a significant negative impact on law enforcement personnel, their significant others, and children.** This not only impacts officers' ability to positively engage with the community, a cornerstone of community policing, but also contributes to the cycle of community trauma.

> **Recommendation 4.3.1: LAPD should consider deploying BSS psychologists to the DOC, and COVID-19 permitting, to divisions to conduct defusings and debriefings during extended crowd management periods as well as continue employee and family outreach and engagement activities to mitigate trauma and to connect officers to services in real time.** This and other wellness resources for officers on extended deployment should be coordinated by a Mental Health Incident Commander that reports to the Safety Officer within the Incident Command Structure. The MHIC should manage all mental health-related tasks, especially during First Amendment assemblies and protests, while the Safety Officer focuses on traditional components of physical safety.

**Finding 4.4:** **COVID-19, the deaths of nine members of the Department, deaths and serious illness among loved ones, and the fear of infecting family members placed untold stress on the LAPD, and exacerbated the stress and trauma associated with crowd management during the SAFE LA First Amendment assemblies and protests.**

> **Recommendation 4.4.1: Recognizing the impact of COVID-19; extended shifts and cancelled days; violence directed at officers; threats to their families; highly charged rhetoric; and loss of public trust and confidence–LAPD leadership, in particular, as well as elected officials and the LA community should recognize the importance of supporting officers and their families during this challenging period.**

National Police Foundation - A Crisis of Truth

**Finding 4.5:** Officer morale has been described almost universally as 'at an all-time low'. In addition to being the "target" of the protests, frustration with LAPD leadership and inconsistent messaging, and statements and decisions made by elected officials during and after the protests have been perceived as a lack of support for the department. There were significant resignations and retirements in 2020 and early 2021, with some of the individuals citing the combination of the SAFE LA First Amendment assemblies and protests, the COVID-19 pandemic, and anti-police rhetoric as their reasons.

In May 2015, the President's Task Force on 21st Century Policing (2015) observed:



*The wellness and safety of law enforcement officers is critical not only to themselves, their colleagues, and their agencies but also to public safety. An officer whose capabilities, judgement, and behaviors are adversely affected by poor physical or psychological health not only may be of little use to the community he or she serves but also may be a danger to the community and to other officers."[219]*

*Hurt people can hurt people."[220]*

As the City of Los Angeles, elected officials, and the LAPD work to reimagine policing, strengthen the Department's community policing programs, and repair fractured community relations, there must be collective action and a concerted effort to address trauma in the Department and the community it serves.

---

[219] President's Task Force on 21st Century Policing. 2015. Final Report of the President's Task Force on 21st Century Policing. Washington, DC: Office of Community Oriented Policing Services. https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf
[220] Ibid.

National Police Foundation - A Crisis of Truth

# Chapter Five: Community Engagement and Perspective

The City of Los Angeles (LA) is comprised of a demographically and socioeconomically diverse composition of persons. According to US Census estimates, there are almost 4 million people in the City of Los Angeles: approximately 52.1% "White alone," 48.5% "Hispanic or Latino," 28.5% "White alone, not Hispanic or Latino," 11.6% "Asian alone," 8.9% "Black or African American alone," 3.8% "Two or More Races," 0.7% "American Indian and Alaska Native alone," and 0.2% "Native Hawaiian and Other Pacific Islander alone."[221] This mix of cultures and people makes LA a vibrant and diverse city, and it provides a diverse mix of perspectives regarding the SAFE LA First Amendment assemblies and protests.

## Public Safety in Communities of Color

For many people who live in socially and economically disadvantaged neighborhoods, poverty, a lack of opportunity, disrupted families, violence, and feelings of hopelessness define the narrative of everyday life.[222]

Over the past 40 years, some police departments, challenged by surges in violent crime and calls for quick and decisive actions by the public and elected officials, relied on aggressive enforcement narratives and strategies to fight the "wars" on crime and drugs. The strong emphasis on fighting crime and the dramatic increases in incarceration tore a hole in the social fabric of many neighborhoods. Communities of color in particular, suffered from aggressive and indiscriminate tactics that failed to bring peace and stability to neighborhoods. Although the tactics were intended to reduce crime and keep residents safe, their use disenfranchised many of the residents they were meant to protect. Those residents viewed the tactics as intrusive, oppressive, misguided, and race-based. Amongst many community members, particularly in those neighborhoods that needed police services the most, the heavy-handed tactics have reduced police credibility and legitimacy.[223]

Wesley Lowery, author of "They Can't Kill Us All" wrote:



*In hundreds of interviews, residents of the North Country [Ferguson] suburbs told me heartbreaking stories of arbitrary traffic stops and aggressive street stops and pat downs, emergency calls ignored by the police, and the enduring perception that the deaths of black and brown men are neither fully investigated nor solved – especially at the hands of police officers."[224]*

In 2017, former Los Angeles Police Department (LAPD) Chief Charlie Beck echoed these concerns in an opinion piece that appeared in the Los Angeles Times: "unfortunately, when we declare war, several things happen. We cause collateral damage, which erodes whatever moral high ground led to the declaration.

---

[221] US Census Bureau. (2021). "Quick Facts: Los Angeles city, California" https://www.census.gov/quickfacts/fact/table/losangelescitycalifornia,losangelescountycalifornia,CA/PST045219#qf-headnote-a
[222] Straub, Frank. (2021). "Rewriting the Narrative: A Path Forward for Policing." In: Dangerous Narratives: Warfare, Strategy, Statecraft. Maan, Ajit (ed) Washington, D.C.: Narrative Strategies Ink, p.138-139.
[223] Ibid.
[224] Lowery, Wesley. (2016). They Can't Kill Us All: Ferguson, Baltimore, and a New Era in America's Racial Justice Movement. New York: Little, Brown and Company.

Our 'opponents'–now unified–possess their own moral mandate for counterattacks. This is what we [LAPD] did when we declared war on our own communities during the 1980s and 1990s."

The "war narratives" that were advanced during the past forty years have proven remarkably durable. In fact, few observers of American policing would disagree with the statement that police-minority relations remain stressed, nor would they disagree that they represent the embers that burned just below the surface in LA and many American communities that accelerated protests following the death of George Floyd.

## LAPD Relationships with the Community

The relationship between the LAPD and the LA community has substantially improved because of the work of LAPD leadership who have sought to change the "warrior" culture, in which many officers saw themselves as soldiers and minority communities as war zones.[226] In its place, these chiefs morphed the culture to one that prioritized a community policing approach that focused on fostering and maintaining positive relationships with community members and local business owners, assigning the same officers to the same communities, and working collaboratively with Community-Police Advisory Boards (CPABs) and Business Improvement Districts (BIDs) to address hyperlocal issues. Many of the community members interviewed by the NPF assessment team discussed their relationships with LAPD in a positive way, describing efforts to engage with the community through programs like the Senior Lead Officer Program as helpful, and in some cases, "a lifeline."[227]

In conjunction with changing the culture, LAPD also recognized the importance of enhancing diversity and increasing transparency to improving police-community relations. During the 1992 civil unrest, more than 60% of the department was White; however, today LAPD is significantly more diverse and is only approximately 30% White.[228] Additionally, LAPD emphasized developing and promoting an array of internal personnel, resulting in a command staff that is demographically diverse and predominately from the southern California region.

LAPD has focused on improving relationships with the community by enhancing transparency. LAPD posts its entire Department Manual, news updates and press releases, and reports from during and after its consent decree on its website. LAPD was also one of the first large agencies to deploy body-worn cameras and use the footage from these cameras as part of the Critical Incident Community Briefing videos that provide context and preliminary investigation findings around specific use of force incidents.[229] LAPD also posts details and summaries of certain use of force and all officer-involved-shooting cases on its website.[230]

This commitment to culture, diversity, and transparency has led some in the community, while skeptical of the LAPD, to meet and work with "good officers"–ones they identify as having helped make their communities safer. Some community members—particularly those in high-crime neighborhoods—even indicated that they would like to see more police in their neighborhoods, more foot patrols, more presence, and generally more engagement by

[226] (2017, April 28). "Twenty five years later, how did the riots transform L.A.? And has the city changed enough." Los Angeles Times. https://www.latimes.com/opinion/la-oe-los-angeles-riots-voices-updates-20170428-htmlstory.html
[228] Lovett, I. (2020). 1992 Los Angeles Riots: How the George Floyd Protests Are Different. The Wall Street Journal. https://www.wsj.com/articles/how-george-floyd-protests-in-los-angeles-differ-from-1992-riots-11591263005
[227] NPF assessment team interview with business representative. January 22, 2021.
[228] Ibid.
[229] Ibid.
[230] See footnote 197.

National Police Foundation - A Crisis of Truth

the LAPD.[331] These community members, while supportive of movements that call for police accountability and reduction in uses of force, also believe that the police are necessary to keeping the city safe.

Nonetheless, some community members talked about longstanding racial tension between the LAPD and segments of the community, particularly people of color. These community members described years of police misconduct, particularly against diverse communities, and suggested that these issues continue today and fear that the LAPD is reverting back to heavy-handed methods.[232]

Regardless of the views expressed, the overwhelming majority of community members the NPF assessment team talked to and heard comments from discussed the fact that they want equitable and fair policing from LAPD, abhor police misconduct, and do not want to see it tolerated—in LA or elsewhere.[234] At the same time, they do not want violence and destruction in their city, but want to see their city thrive and believe the police are necessary to keep it safe.[233]

## Relationships During the SAFE LA First Amendment Assemblies and Protests

Some community members though, detailed accounts of police aggression during the SAFE LA First Amendment assemblies and protests, including using "chemicals" and rubber bullets, hitting protesters with batons, and 'kettling'—encircling and confining large groups of protesters, without distinguishing between those who were peaceful and those who were inciting violence, to effect mass arrests as a method of crowd control.[235] Some community members voiced concern that the recent trend of LAPD responses to First Amendment assemblies and protests–dating back to the Democratic National Convention in Los Angeles in 2000 and a subsequent demonstration on October 22, 2000—demonstrate a "pattern of constitutional violations and threatened future actions."[236] Other community members

made allegations of racism within LAPD, even highlighting articles about gangs within LA law enforcement.[237]

During the SAFE LA First Amendment assemblies and protests, LAPD was able to leverage some community relationships to assist in communication, monitoring, and providing a visible security presence. During interviews with the NPF assessment team, BID representatives reported seeing a heavy LAPD presence in the downtown area, were included in some of the bureau command posts, and appreciated the ongoing direct contact with district commanders. CPAB members interviewed by the NPF assessment team also referenced the positive interactions with the LAPD and noted

[231] NPF assessment team interview with community member. February 5, 2021.
[232] Ibid.
[233] NPF assessment team Community Listening session. February 4, 2021.
[234] NPF assessment team interview with community member. January 21, 2021.
[235] NPF assessment team Community Listening session. February 4, 2021. By policy, LAPD does not deploy projectile chemical munitions, but officers are issued individual OC spray canisters.
[236] National Lawyers Guild. (2020, June 21). First Amended Complaint: Class Action; Injunctive Relief and Damages. US District Court Central District of California–Western Division. https://nlg-la.org/wp-content/uploads/sites/5/2020/06/AMENDED-COMPLAINT-ECF.pdf
[237] NPF assessment team interview with community member. February 2, 2021. Community member followed up with an email to NPF assessment team on February 6, 2021 including links to the following articles: CBSLA Staff. (2021, January 13). "LA Sheriff's Department Has Several Secret Deputy Gangs, Report Finds." CBS Los Angeles. https://losangeles.cbslocal.com/2021/01/13/la-sheriffs-department-has-several-secret-deputy-gangs-report-finds/ and Rector, Kevin. (2021, February 13). "LAPD investigating report of George Floyd photo circulating with caption 'You take my breath away'." Los Angeles Times. https://www.latimes.com/california/story/2021-02-13/lapd-employee-posts-photo-of-george-floyd-with-caption-you-take-my-breath-away

that district commanders and captains regularly reached out to provide community and business representatives with information to help them prepare for possible activities in their areas. BID and CPAB representatives said that their LAPD personnel respond every time they called and "did the best that they could" given the chaotic and fluid situations. These representatives also acknowledged the violence being directed at LAPD officers that worked the line and described officers being yelled at and having items thrown at them. These community members believed that oftentimes, aggressive tactics used by LAPD were in reaction to aggressive tactics used by protesters trying to incite a violent response.

At the same time, BID representatives perceived that while the department is generally proactive in responding to crime and safety issues particularly in the downtown area, they LAPD did not do enough to stop the looting and destruction of local businesses during some of the events. The BID representative also suggested that LAPD is "afraid to mess up—due to pressure generally around policing and in particular around enforcement action of the homeless in LA—so instead they do nothing to intervene in crime, even crimes in progress."[238] The sentiment that LAPD was hesitant to take actions that could be misperceived as heavy-handed or violent was echoed by other BID representatives and community members along with the perception that the message that ended up being sent was that crime will be tolerated in the city and LAPD will do nothing.[239]

## Constructive Conversation Team (CCT) Training

In 2016, following demonstrations instigated by an officer-involved shooting in Charlotte, North Carolina, community members and the Charlotte-Mecklenburg Police Department (CMPD) collaborated to develop the Constructive Conversation Team (CCT) training. CCT training combines classroom instruction and scenario-based exercises and focuses on enhancing interactions between CMPD personnel and community members. Scenarios include bringing in members of the Charlotte advocacy community to engage in the same behaviors they are likely to use during a First Amendment assembly or protest and CMPD trainees are required to de-escalate the situation using only communication. The program has been so successful that some media reports in the Charlotte area highlighted the positives during the First Amendment assemblies and protests following the death of George Floyd.

Source: Hicks, Caroline. (2020, June 1). "A look at CMPD policing from 2016 to 2020 protests." WBTV. https://www.wbtv.com/2020/06/01/look-cmpd-policing-protests/

---

[238] NPF assessment team interview with business representative. January 25, 2021.
[239] Ibid.

National Police Foundation - A Crisis of Truth

## Chapter Five: Findings and Recommendations

**Finding 5.1:** **LAPD has a history of professional policing, positive engagement, and strong relationships with business owners and Business Improvement District (BID) organizations, faith- and community-based institutions and organizations, and the Los Angeles community, including activists. They were able to leverage those relationships during responses to the SAFE LA First Amendment assemblies and protests.**

**Recommendation 5.1.1:** **LAPD should continue to identify opportunities to engage community members—particularly those community members and leaders likely to organize and participate in First Amendment assemblies and mass demonstrations—in the preparation and training process.**[240]

**Recommendation 5.1.2:** **LAPD should continue to invest in community policing efforts including engaging one-on-one or in small groups to build relations and obtain feedback from communities in each bureau.** Community members interviewed told the NPF assessment team that the Community-Police Advisory Boards (C-PABs) and BID meetings are important opportunities for them to meet and engage with their local police officers and supervisors, as well as identify and discuss local issues, concerns, and strategies. Particularly around the SAFE LA First Amendment assemblies and protests, these meetings were helpful in sharing information about potential demonstrations and routes.

**Recommendation 5.1.3:** **LAPD should continue to engage C-PABs, BID meetings, and other community engagement opportunities to provide the community a voice and meaningful involvement in how its police department operates—including strategic hiring and promotions, training, policy development, and other activities to improve community-police relations.**

**Finding 5.2:** **Despite ongoing efforts to improve relationships, the history of LAPD is also punctuated with tensions between the community and the department (as well as narratives highlighting tensions between various communities and the police around the nation).** These tensions and narratives continue to inform perceptions of the police in Los Angeles.

**Recommendation 5.2.1:** **LAPD training programs on community-police interactions, implicit bias, and building and maintaining trust should continue and build on lessons learned during recent First Amendment assemblies and protests.**

**Recommendation 5.2.2:** **Each LAPD bureau should continue to identify opportunities to engage community members—particularly those community members and leaders likely to organize and participate in First Amendment assemblies and protests in their area—in the preparation and training process.** These opportunities have helped officers and community members in other jurisdictions develop mutual understanding and conduct full-scale training exercises with those likely to demonstrate.

---

[240] See footnote 115.

National Police Foundation - A Crisis of Truth

# Conclusion: Moving Forward

Traumatic events are defined as a single incident or series of incidents that cause high levels of stress and are marked by a sense of horror, serious injury, or the threat of serious injury and affect survivors, first responders, and friends and relatives of those who were involved.[241] Accounts from Los Angeles Police Department (LAPD) personnel at all levels, City of Los Angeles (LA) elected officials, and community and business representatives of the SAFE LA First Amendment assemblies and protests that occurred between May 27 and June 7, 2020 expressed these elements.

LAPD has worked hard to build and maintain relationships with all segments of the Los Angeles community and personnel at all ranks continue to work to ease tensions, rebuild and repair relationships, and identify opportunities to enhance transparency and accountability. This work should continue. Likewise, community members must continue to be empowered through Community-Police Advisory Boards, Business Improvement Districts, and other formal and informal opportunities to develop and implement meaningful opportunities to work collaboratively with LAPD and elected officials toward public safety. It is also incumbent upon elected officials to facilitate meaningful opportunities to host and facilitate open, honest, and productive conversations to work toward understanding and addressing issues and to support LAPD and the community as they come together and implement some of the recommendations provided in this AAR.

The City of LA and the LAPD's commitment to the continual advancement of fair and just policing should continue. During peaceful SAFE LA protests and demonstrations, strong and motivated partnerships between law enforcement, community members, and elected officials were instrumental in ensuring that violence, destruction and chaos did not occur in the aftermath of the death of George Floyd.

No individual stakeholder has the ability to solve all the past and present challenges around racial justice and policing in LA or elsewhere. However, the participation of representatives from all parties in this exemplifies their commitment to wanting to ensure the City remains the "Creative Capital of the World," by creating a city-wide strategy that balances First Amendment assemblies and protests with community safety.[242]



[241] US Centers for Disease Control and Prevention. Coping with a Traumatic Event. https://www.cdc.gov/masstrauma/factsheets/public/coping.pdf
[242] Nusca, Andrew. (2009, November 19). "Is Los Angeles really the creative capital of the world? Report says yes." ZDNet. https://www.zdnet.com/article/is-los-angeles-really-the-creative-capital-of-the-world-report-says-yes/

# Appendix A: All Findings and Recommendations

**Finding 1.1:** Following the violent Rodney King protests in South LA in 1992, the LAPD made significant changes to their protocols in response to civil unrest, setting a national model for law enforcement policy and training.

**Finding 1.2:** LAPD, like many police departments across the country had well-developed crowd management policies and practices that had proven successful during previous events. Those policies and practices were inadequate to handle the disparate groups, or to identify leaders amongst the protesters and address the level of violence.

> **Recommendation 1.2.1:** LAPD should synthesize the relevant provisions spread throughout the current Department and clearly establish guidelines for the coordination, facilitation, and management of First Amendment assemblies and protests. This single provision should include relevant components of responding to planned and spontaneous events, managing such events, identifying and quickly obtaining additional staffing and resources, determining and declaring an unlawful assembly, crowd management and control, public information and communications, and use of force and less lethal documentation. Other large agencies, including the San Diego Police Department, have recently published similar synthesized policies.[243]

> **Recommendation 1.2.2:** LAPD should review national and international best practices regarding the impact of police actions on First Amendment assembly and protest participants.[244]

> **Recommendation 1.2.3:** LAPD should consider developing special unit(s) to establish contact with activists and demonstrators before, during, and after protests. As a consequence of the failure of the police to control riots during the EU Summit in Gothenburg, Sweden (2001), the police developed a new special tactic for crowd management. The aim of the tactic is to achieve de-escalation. "Dialogue officers" were trained and deployed to establish contact with demonstrators before, during and after protests and to link the organizers of the events and police commanders. Similar units have been developed and deployed in response to civil unrest in England.[245] Similar units were deployed in Portland during protests and counter-protests in 2019. Following the 2016, civil unrest in Charlotte, North Carolina, the Charlotte-Mecklenburg Police Department and community created the Community Conversation Team to deescalate and engage protesters.

[243] San Diego Police Department. (2021, February 17). First Amendment Activity Facilitation and Management. https://ca-times.brightspotcdn.com/04/ac/754ed3ba44529a8b7b9cf47368a8/sdpd-protest-policy.pdf
[244] Policing Project at NYU School of Law. (2020, October). Policing Protests to Protect Constitutional Rights and Public Safety. https://static1.squarespace.com/static/58a33e881b631bc60d4f8b31/t/5f9af5fe6b0e0f0c265ffdb8/1603991043508/POLICING+PROTESTS+TO+PROTECT+CONSTITUTIONAL+RIGHTS+AND+PUBLIC+SAFETY+10-29.pdf
[245] Holgersson, S. and Knutsson, J., (2011). Dialogue policing – a means for less crowd violence? Crime Prevention Studies, 26, 191-216. Gorringe, Hugo, Clifford Scott, and Michael Rosie. (2012). Dialogue Police, Decision Making, and the Management of Public Order During Protest Crowd Events. Journal of Investigative Psychology and Offender Profiling. 9.10.1002/jip.1359. Waddington, D. (2017). Police Liaison Approaches to Managing Political Protest: A Critical Analysis of a Prominent UK Example. In: Bayer, P., Karlovic, R., Akhgar, B., Marakaria, G. (eds) Community Policing – A European Perspective. Advanced Sciences and Technologies for Security Applications. Springer, Cham. https://doi.org/10.1007/978-3-319-53396-4_7.

**Finding 1.3:** Although it aligned with LAPD's use of force provisions and procedures, documentation of uses of force during protests and demonstrations—including the deployment of less lethal munitions—was inconsistent by LAPD members.

> **Recommendation 1.3.1:** LAPD should establish a clear policy, process, and documentation requirement for requesting and receiving less lethal munitions, particularly during the response to First Amendment assemblies and protests. Senior level command staff and first-line supervisors made similar observations to the NPF assessment team that nobody was responsible for maintaining awareness of less lethal munitions.[246] Multiple LAPD personnel relayed to the NPF assessment team that officers would "fill their trunks" with less lethal munitions without any documentation of where they were being used, in what scenarios, and who deployed them.[247] This was exacerbated by breakdowns in command and communication but has a significant impact on transparency and accountability.

**Finding 1.4:** Some LAPD personnel had not been provided contemporary training on crowd management, mobile field force, supervision, de-escalation, or the use of less-lethal instruments prior to the First Amendment assemblies and demonstrations from May 27 through June 7, 2020. Many of the LAPD training bulletins, courses, and directives related to crowd management and control were outdated. For example, the Mobile Field Force Training Bulletin was last updated in August 2006[248]; the Use of Force – Tactics Directive on Crowd Management, Intervention, and Control was last updated in June 2011[249]; the Use of Force – Tactics Directive on Tactical De-Escalation Techniques was last updated in October 2016[250]; the Crowd Management and Control for Management was last updated in June 2007[251]; and, the similar course for patrol was last updated in November 2012.[252]

> **Recommendation 1.4.1:** LAPD should continue to serve as a national model for law enforcement by developing strategies, tactics, and Mobile Field Force teams to more effectively respond to these types of First Amendment assemblies and protests, which are becoming more frequent in the City and nationwide.

**Finding 1.5:** During the initial days of the protest, the number of disparate groups, the pace at which the protests accelerated, and the level of violence precluded the highly trained and experienced LAPD bike unit from successfully completing its mission. As the SAFE LA First Amendment assemblies and protests continued, the bike units were used to facilitate organized movements and rolling traffic stops.

---

[246] NPF assessment team interviews with LAPD personnel. December 7, 2020 through March 3, 2021.
[247] Ibid.
[248] Los Angeles Police Department. "Training Bulletin: Mobile Field Force Concept – Part II Mobile Tactics." August 2006. Provided to NPF assessment team electronically on August 31, 2020.
[249] Los Angeles Police Department. "Los Angeles Police Department Use of Force – Tactics Directive No. 16 Tactical De-Escalation Techniques." October 2016. Provided to NPF assessment team electronically on August 31, 2020.
[250] See footnote 77.
[251] Los Angeles Police Department. (2007, June 15). "Los Angeles Police Department Crowd Management and Control for Management Expanded Course Outline." Provided to NPF assessment team electronically on August 31, 2020.
[252] Ibid.

**Finding 1.6:** **The National Guard was mobilized, responded to the City, and were used to protect critical infrastructure and major intersections and thoroughfares.** The presence of the National Guard freed LAPD personnel for assignments related to crowd management and control.

> **Recommendation 1.6.1:** **Elected officials and LAPD leadership should weigh the risk and benefits of requesting National Guard assets sooner in future First Amendment assemblies and protests to support police operations, protect critical infrastructure, and provide a neutral presence.**

> **Recommendation 1.6.2:** **The City should develop and widely distribute a well-coordinated message about the deployment of the National Guard, prior to, during and following their deployment in an effort to avoid them being seen as an occupying force.** Messaging should include why the decision was made to request them, where they may be seen in the city, what their assignments may be and when they will be able to leave.

**Finding 1.7:** **While LAPD has clear policies around use of force, crowd management, and other relevant pieces of responding to First Amendment assemblies and protests, they do not have one policy directing response specifically to large-scale, fluid, city-wide civil unrest that turns violent or contains violence.**

> **Recommendation 1.7.1:** **LAPD should consider developing an overarching 'response to fluid dynamic protests and civil unrest' policy that provides for the nuances of this type of event, incorporates critical thinking skills and offers decision making models to guide at what points uses of force and relevant tools are permitted to be used by LAPD officers.**[253]



---

[253] See footnote 115.

National Police Foundation - A Crisis of Truth

**Finding 2.1:** **The nature of the SAFE LA First Amendment assemblies and protests that occurred in Los Angeles between May 27 and June 7, 2020 were ones that neither LAPD, nor other jurisdictions across the nation, have previously experienced nor expected.** While LAPD has years of experience with responding to large First Amendment assemblies, mass demonstrations, and civil disturbances in the past— some of which have involved violence and destruction—the SAFE LA First Amendment assemblies and protests occurred during a unique and unprecedented time in the nation. Local and national political tensions, frustrations and uncertainty caused by COVID-19, and the continued national narrative decrying police, contributed to a visceral response by many demonstrators locally and nationwide—including some intent on violence.

Particularly in LA, the SAFE LA First Amendment assemblies and protests were unique in that multiple assemblies occurred at the same time in locations across the city (locations not previously impacted by civil disturbances). They involved both spontaneous and planned events, demonstrators used both social media and messaging applications and were planned and coordinated. Demonstrators used more advanced logistics and tactics to counteract known police response strategies, and they required more police and city resources than protests in the past. The simultaneous needs for specialized personnel and resources across the City to address these more contemporary tactics caused confusion and strained an LAPD system that was accustomed to responding to First Amendment assemblies and protests that occur at a single time and location. In some cases, people intent on causing violence and destruction took advantage of the spanned geographic space and time SAFE LA First Amendment assemblies and protests to wreak havoc.

> **Recommendation 2.1.1:** **City and LAPD leaders should continue to build strong working relationships and prioritize planning, preparation, management, and training for First Amendment assembly and protest response.** First Amendment assemblies and protests have occurred in Los Angeles since the Rodney King protests in 1992 and—given that LA is the second most populous city in the United States—will likely continue to take place. The LAPD and the City of Los Angeles should continue to review the totality of the 2020 protests and demonstrations and the impact on the city and the department in an effort learn from, plan and prepare for future incidents and to identify strategies and systems that worked in allowing freedom of expression while also protecting the public.
>
> **Recommendation 2.1.2:** **The City of Los Angeles and the LAPD should continue to review lessons learned from other large-scale First Amendment assemblies, mass demonstrations, and civil disturbances across the country and abroad to improve citywide and police department planning, preparedness, and response to similar events so as to incorporate best and promising practices.** The City of Los Angeles and LAPD have been leaders in the field in responding to First Amendment assemblies and protests. However, when the peaceful assemblies devolved into chaotic and riotous events, LA and LAPD were not able to quickly adapt and respond. LA and LAPD should collect and analyze data available around civil disturbances, including damage incurred, injuries, use of force, arrest and impound, economic impact and other data collected during civil disturbances to identify systems, situations and variables that can assist in preventing and/or mitigating violence and destruction.

**Recommendation 2.1.3:** **The LAPD should have commanders who were directly involved in responding to the SAFE LA First Amendment assemblies and protests write an after-action report (AAR) that includes input from line level officers and up.** These AARs—particularly the recommendations—should be synthesized and presented to the LAPD operations and training command staff.[254]  Where possible, promising practices and lessons learned should be incorporated into policy, training, and protocol.

**Finding 2.2:** **The City of Los Angeles lacked a well-coordinated city-wide political, policy, communications, and law enforcement response mission to the SAFE LA First Amendment assemblies and protests that occurred between May 27 and June 7, 2020.** The City of Los Angeles' Emergency Operations Center (EOC) was activated and staffed prior to May 27, 2020, to coordinate the City's COVID-19 response. The EOC was under-utilized for decision-making and strategy implementation in response to the SAFE LA First Amendment assemblies and protests.

**Recommendation 2.2.1:** **City officials, councilmembers, relevant City agencies, and LAPD leadership should ensure that a city-wide plan, consistent with the National Incident Management System (NIMS), is used to manage First Amendment assemblies and protests, and that all City agencies understand, and participate in, the development and implementation of the plan.** While the City of Los Angeles has used NIMS effectively to respond to natural disasters, the response to the SAFE LA First Amendment assemblies and protests did not effectively leverage all components of NIMS—including establishing a single incident command system (ICS), fully utilizing the EOC, communicating and coordinating messaging through a Joint Information Center, and sharing information and resources across agencies. Planning and training for responses to pre-planned and spontaneous First Amendment assemblies and protests should include elected and appointed officials, law enforcement, other public safety agencies, other relevant government agencies, and relevant non-government and private sector organizations as appropriate.

**Recommendation 2.2.2:** **The City of Los Angeles should establish one citywide incident management team (IMT)[255] to lead its response to future large-scale First Amendment assemblies and incidents that involve a multi-agency, multi-jurisdiction response.**  Beginning in 2009, LAPD established three internal IMTs—defined as, "a team of specialists familiar with all aspects of emergency management. They are experienced leaders, decision makers and strategic thinkers, self-actualized and willing to develop themselves into a cohesive team focused on managing large, complex, high consequence incidents."  The Citywide IMT should include operational public safety personnel (particularly from the LAPD IMTs), as well as representatives from the mayor's staff—and other elected and City officials—to ensure collaboration, coordination, and unity of command. The Citywide IMT should also train regularly through tabletop and full-scale exercises.

---

[254] National Police Foundation. 2020. How to Conduct an After Action Review. Washington, DC: Office of Community Oriented Policing Services. https://www.policefoundation.org/wp-content/uploads/2020/02/How-to-Conduct-an-AAR.pdf
[255] Also referred to as the Multi-agency Coordination Group (MAC). Online at: training.fema.gov – "Unit 5:  NIMS Coordination: MAC and Joint Information System.

**Recommendation 2.2.3:** **All City of Los Angeles elected officials, and personnel from each of the relevant City offices and agencies, should complete the appropriate level of ICS training if they have not already done so, and take regular refresher courses.** A US Department of Justice report advises, "Incident management organizations and personnel at all levels of government and within the private sector and nongovernmental organizations must be appropriately trained to improve all-hazards incident management capability...Training involves standard courses on incident command and management, incident management structure, operational coordination processes and systems—together with courses focused on discipline and agency-specific subject matter expertise—helps ensure that personnel at all jurisdictional levels and across disciplines can function effectively together during an incident."[256]

**Recommendation 2.2.4:** **The City of Los Angeles and LAPD should conduct joint regularly-scheduled First Amendment assemblies, protest, mass violence, and other critical incident tabletop and full-scale exercises.** While some LA elected officials and LAPD personnel identified the frequency with which they coordinate in response to natural disasters including earthquakes and fires, they also indicated that there are not enough exercises on other events.

**Finding 2.3:** **Communication within LAPD—particularly in the first few days—was inconsistent between the Chief, his command staff, bureau commanders and field supervisors, and line officers. This created significant challenges regarding: (a) identifying a cogent operating philosophy; (b) determining operations during individual shifts, including when shifts started and ended; and, (c) establishing coordination and consistency between shifts.** Senior level command staff and first-line supervisors made similar observations that there was confusion regarding who the Incident Commander was at times, which command post was responsible for final decisions, and what the overall LAPD strategy and mission was. This impacted every component of the LAPD response to the SAFE LA First Amendment assemblies and protests.

**Recommendation 2.3.1:** **LAPD should establish a planning team that includes command staff, training, equipment, communications, logistics, and intelligence to ensure plans receive the necessary attention to detail in these areas.** Identifying personnel to focus on specific areas of the plan is valuable to ensure that there is full understanding of the resources, systems, and needs and to ensure the viability of the plan.

**Recommendation 2.3.2:** **LAPD should update and enhance its Emergency Operations Guide: Volume 5 to address all components of First Amendment Assemblies and Mass Demonstrations, as opposed to focusing on crowd management and crowd control.[257]** The updated Guide should include: scalable strategies for, and immediate steps to take when, responding to spontaneous First Amendment assemblies and mass demonstrations; roles, responsibilities, and specific assignments for all ranks and positions as they relate to NIMS; processes for establishing and staffing a Joint Information Center (JIC) that includes relevant City stakeholders and agency representatives; and, coordinating with

---

[256] Bureau of Justice Assistance. "Mutual Aid: Multijurisdictional Partnerships for Meeting Regional Threats." NCJ160113. 2005. Washington, D.C.: U.S. Department of Justice. https://www.ncjrs.gov/pdffiles1/bja/210679.pdf (accessed December 11, 2017).
[257] See footnote 71.

National Police Foundation - A Crisis of Truth

geographic command centers. The LAPD should consult with community members and organizers, civil rights attorneys, internal experts, national-level experts, and academic experts in policing.

**Recommendation 2.3.3: LAPD should practice establishment of ICS in different scenarios and should develop lists of personnel with the appropriate training and capacities to fill the necessary leadership positions in each section.** One of the challenges LAPD faced initially was the incomplete establishment of a command system that fully implemented NIMS/ICS. The lack of some of these positions—including Planning, Intelligence/Investigations, and Logistics—contributed to the initial lack of coordination in the response to the SAFE LA First Amendment assemblies and protests.

**Finding 2.4: The issuing and cancellation of Tactical Alerts contributed to confusion and frustration amongst supervisors and officers.**

**Recommendation 2.4.1: LAPD should establish clear processes for identifying and deploying appropriate personnel to planned and spontaneous critical incidents, including First Amendment assemblies and protests.**

**Finding 2.5: LAPD did not effectively leverage intelligence and information city-wide—including publicly-available social media—that may have enhanced situational awareness of officers and their ability to rapidly assess multiple venues and deploy resources.** LAPD did not fully leverage and communicate throughout the department open sources of intelligence and social media to account for the size, evolution, and adaptability of the SAFE LA First Amendment assemblies and protests. While the LAPD Special Events Permit Unit (SEPU), received permit requests for some of the SAFE LA First Amendment assemblies and protests, many more spontaneous demonstrations did not allow for the development of Event Action Plans (EAPs) or Incident Command System (ICS) plans. While many LAPD commands gathered intelligence on significant First Amendment assemblies and protests—including possibly disruptive groups—it was not compiled, deconflicted, or leveraged across the LAPD to strategically deploy resources.

**Recommendation 2.5.1: LAPD should work with the community to consider collaborative approaches and technology solutions and strategies that will enhance situational awareness and improve community and officer safety.**

**Recommendation 2.5.2: LAPD should develop a process to ensure that intelligence and information gathered to improve public safety is appropriately incorporated in the command structure.** This information should be shared promptly and consistently with the Incident Commander as well as relevant department and bureau command posts and should be factored into planning and preparedness.

**Finding 2.6: LAPD should develop, implement, and review MOUs with the LASD and other law enforcement agencies to support and clearly define roles, responsibilities, and protocols to First Amendment assemblies and protests.**

**Finding 3.1:** Although a virtual JIC was established, the review process impacted the ability of LAPD to post timely messages to its social media accounts.

> **Recommendation 3.1.1:** The City of Los Angeles should establish a unified narrative and public messaging strategy around first amendment assemblies (before, during, and after) that informs the public about City leadership's position on supporting free speech during First Amendment assemblies, but clearly defines consequences for those responsible for committing violence or destruction during such assemblies.

> **Recommendation 3.1.2:** The City of LA and LAPD should develop policies and procedures that use social media to "push" information to the community and quickly disseminate accurate information in response to rumors, misinformation, and false accusations.

**Finding 3.2:** The LAPD decision to not fully leverage social media to share information and respond to false accusations allowed demonstrators to control the narrative and overwhelm LAPD on the information front.

> **Recommendation 3.2.1:** LAPD should create a clear and detailed media strategy to guide the department's use of traditional news media and social media, particularly during critical incidents.

> **Recommendation 3.2.2:** LAPD should consider leveraging new and emerging technologies including reverse-text alert systems—and continue leveraging social media—to disseminate dispersal warnings and curfew notices.

**Finding 4.1:** For more than 50 years, LAPD has endeavored to assist its personnel through Behavioral Science Services and aligned groups. In many ways, LAPD should be recognized for its innovative programs and leadership in the law enforcement profession regarding physical and mental wellness.

**Finding 4.2:** The research is clear that law enforcement personnel are exposed to significant traumatic events during the course of their careers. This exposure increases the likelihood of negative physical and mental health impacts that extend beyond an officer's law enforcement career.

> **Recommendation 4.2.1:** LAPD should continue to support the capacity of Behavioral Science Services, the Peer Support Team, and other aligned groups to assist Department personnel and their families address trauma, build resiliency and support physical and mental health.

**Finding 4.3:** LAPD, elected officials and the LA community should recognize that research indicates that crowd management and other critical incidents have a significant negative impact on law enforcement personnel, their significant others, and children. This not only impacts officers' ability to positively engage with the community, a cornerstone of community policing, but also contributes to the cycle of community trauma.

> **Recommendation 4.3.1:** LAPD should consider deploying BSS psychologists to the DOC, and COVID-19 permitting, to divisions to conduct defusings and debriefings during extended crowd management periods as well as continue employee and family outreach and engagement activities to mitigate trauma and to connect officers to services in real time. This and other wellness resources for officers on extended deployment should be coordinated by a Mental Health Incident Commander that reports to the Safety Officer within the Incident Command Structure. The MHIC should manage all mental health-related tasks, especially during First Amendment assemblies and protests, while the Safety Officer focuses on traditional components of physical safety.

**Finding 4.4:** COVID-19, the deaths of nine members of the Department, deaths and serious illness among loved ones, and the fear of infecting family members placed untold stress on the LAPD, and exacerbated the stress and trauma associated with crowd management during the SAFE LA First Amendment assemblies and protests.

> **Recommendation 4.4.1:** Recognizing the impact of COVID-19; extended shifts and cancelled days; violence directed at officers; threats to their families; highly charged rhetoric; and loss of public trust and confidence–LAPD leadership, in particular, as well as elected officials and the LA community should recognize the importance of supporting officers and their families during this challenging period.

**Finding 4.5:** Officer morale has been described almost universally as 'at an all-time low'. In addition to being the "target" of the protests, frustration with LAPD leadership and inconsistent messaging, and statements and decisions made by elected officials during and after the protests have been perceived as a lack of support for the department. There were significant resignations and retirements in 2020 and early 2021, with some of the individuals citing the combination of the SAFE LA First Amendment assemblies and protests, the COVID-19 pandemic, and anti-police rhetoric as their reasons.

In May 2015, the President's Task Force on 21st Century Policing (2015) observed:



*The wellness and safety of law enforcement officers is critical not only to themselves, their colleagues, and their agencies but also to public safety. An officer whose capabilities, judgement, and behaviors are adversely affected by poor physical or psychological health not only may be of little use to the community he or she serves but also may be a danger to the community and to other officers."[258]*

*Hurt people can hurt people."[259]*

As the City of Los Angeles, elected officials, and the LAPD work to reimagine policing, strengthen the Department's community policing programs, and repair fractured community relations, there must be collective action and a concerted effort to address trauma in the Department and the community it serves.

[258] President's Task Force on 21st Century Policing. 2015. Final Report of the President's Task Force on 21st Century Policing. Washington, DC: Office of Community Oriented Policing Services. https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf
[259] Ibid.

**Finding 5.1:** **LAPD has a history of professional policing, positive engagement, and strong relationships with business owners and Business Improvement District (BID) organizations, faith- and community-based institutions and organizations, and the Los Angeles community, including activists. They were able to leverage those relationships during responses to the SAFE LA First Amendment assemblies and protests.**

> **Recommendation 5.1.1:** **LAPD should continue to identify opportunities to engage community members—particularly those community members and leaders likely to organize and participate in First Amendment assemblies and mass demonstrations— in the preparation and training process.**[260]
>
> **Recommendation 5.1.2:** **LAPD should continue to invest in community policing efforts including engaging one-on-one or in small groups to build relations and obtain feedback from communities in each bureau.** Community members interviewed told the NPF assessment team that the Community-Police Advisory Boards (C-PABs) and BID meetings are important opportunities for them to meet and engage with their local police officers and supervisors, as well as identify and discuss local issues, concerns, and strategies. Particularly around the SAFE LA First Amendment assemblies and protests, these meetings were helpful in sharing information about potential demonstrations and routes.
>
> **Recommendation 5.1.3:** **LAPD should continue to engage C-PABs, BID meetings, and other community engagement opportunities to provide the community a voice and meaningful involvement in how its police department operates—including strategic hiring and promotions, training, policy development, and other activities to improve community-police relations.**

**Finding 5.2:** **Despite ongoing efforts to improve relationships, the history of LAPD is also punctuated with tensions between the community and the department (as well as narratives highlighting tensions between various communities and the police around the nation).** These tensions and narratives continue to inform perceptions of the police in Los Angeles.

> **Recommendation 5.2.1:** **LAPD training programs on community-police interactions, implicit bias, and building and maintaining trust should continue and build on lessons learned during recent First Amendment assemblies and protests.**
>
> **Recommendation 5.2.2:** **Each LAPD bureau should continue to identify opportunities to engage community members—particularly those community members and leaders likely to organize and participate in First Amendment assemblies and protests in their area—in the preparation and training process.** These opportunities have helped officers and community members in other jurisdictions develop mutual understanding and conduct full-scale training exercises with those likely to demonstrate.

[260] See footnote 115.

# Appendix B: Detailed Methodology

At the request of the Los Angeles Board of Police Commissioners, the National Police Foundation (NPF) created an assessment team to conduct an independent after-action review (AAR) of the Los Angeles Police Department (LAPD) response to the SAFE LA First Amendment assemblies and protests that occurred from May 27 through June 7, 2020. The NPF assessment team, comprising subject matter experts in law enforcement, police-community relations, response to First Amendment assemblies and protests, policy analysis, police data analysis, and research, developed a comprehensive mixed methodology to thoroughly review and assess the LAPD and City of Los Angeles (LA) response to the First Amendment assemblies and protests that followed the death of George Floyd on May 25, 2020.

The AAR involved multiple means of information gathering, collection, and analysis: (1) interviews, focus groups, listening sessions, and anonymous feedback; (2) LAPD and City of LA resource material review and data analyses; (3) open source news and social media review; and, (4) national resource review. The NPF assessment team used the totality of the information gathered to identify key areas to develop a series of findings and recommendations for LA, LAPD, and the community.

## Interviews and Focus Groups

While the NPF assessment team normally conducts site visits to be able to host in-person interviews and focus groups; to gain situational awareness and perspective of the locales, distances/proximities, and potential challenges related to crowd control and responding officers establishing on-scene command; and, to engage community members individually and through community listening sessions, due to the COVID-19 pandemic, the NPF assessment team was unable to conduct any site visits. However, virtual interviews were conducted with more than 45 individuals, including the following:

- **Representatives from the Mayor's Office and Executive Staff;**
- **City Councilmembers;**
- **LAPD Chief of Police and command staff;**
- **LAPD Public Information personnel;**
- **Los Angeles Police Protective League (LAPPL) board members;**
- **Los Angeles business representatives;**
- **Los Angeles religious and community leaders; and,**
- **Los Angeles community members.**

In addition to individual interviews, the NPF assessment team scheduled four 90-minute virtual focus groups/ listening sessions for LAPD officers; four 90-minute virtual listening sessions for LAPD sergeants; and, one with the LAPPL board to provide opportunities for them to provide input on their experiences during the response to the SAFE LA First Amendment assemblies and protests. The NPF assessment team also provided several means through which LAPD members could reach out to schedule interviews or focus groups or to provide written input anonymously. Four LAPPL Board members, four sergeants, and one officer participated. The NPF assessment team also conducted a series of focus groups and individual interviews with family members of LAPD personnel.

The NPF assessment team also held four 60-minute virtual open listening sessions for community members: two on February 4, 2021 and two on February 17, 2021. A total of 128 community members attended these sessions.

National Police Foundation - A Crisis of Truth

# LAPD and City of LA Resources Material Review and Data Analyses

The NPF assessment team collected and reviewed relevant LAPD policies, procedures, training curricula, chronology logs, data, and other materials provided by LAPD. Each resource was reviewed to better understand LAPD's response to First Amendment assemblies and protests. Materials reviewed included the following:

- **LAPD Directives, operational manuals, internal memoranda and special orders, and notices;**
- **LAPD academy and in-service training curricula/expanded course outlines and lesson plans, guides, training records, and Training Bulletins;**
- **Incident Action Plans, Event Action Plans, and chronology logs;**
- **Incident Command System (ICS) forms;**
- **LAPD social media content;**
- **Communications logs;**
- **Arrest, crime, calls for service, booking, property damage, and socio-economic data; and,**
- **Officer wellness plans and injury data.**

Additionally, LAPD provided the NPF assessment team with approximately two terabytes of videos, images, and radio channel recordings. LAPD also provided access to 147,921 videos and images from body-worn cameras.

## Data Sources and Analyses

The NPF assessment team also analyzed a series of data to identify hotspots of First Amendment assembly and protest activity from May 27 through June 7, 2020. Five datasets were used to identify these hotspots. Table 1 summarizes the volume, date range, and source of each dataset used in the identification process.

## Table 1 Summary of the Datasets

| Dataset | Description | Source |
|---|---|---|
| Arrest Data | This dataset reflects 2,298 arrest incidents in Los Angeles from May 27, 2020 through June 10, 2020. | Los Angeles City Open Data Portal[261] |
| Crime Data | This dataset reflects 8,324 reported incidents of crime in Los Angeles from May 27, 2020 through June 10, 2020. | |
| Calls for Service Data | This dataset reflects 47,236 calls for service incidents in Los Angeles from May 27, 2020 through June 10, 2020. | Los Angeles Police Department |
| Vehicle Impound Data | This dataset reflects 1,562 incidents of vehicle impound in Los Angeles from May 27, 2020 through June 5, 2020. | |
| Property Damage Data | This dataset reflects 124 reported incidents of property damage in Los Angeles from May 31, 2020 through June 18, 2020. | |

[261] City of Los Angeles. (2021). Los Angeles Open Data. https://data.lacity.org/

National Police Foundation - A Crisis of Truth

The identification of protest hotspot activity was done through visual and spatial analytics that identified temporal and spatial clusters within the five datasets. The NPF assessment team spatially referenced all datasets and created tools to combine the data for both spatial, temporal, and spatio-temporal analyses.

## Data Preprocessing
The five datasets were preprocessed to ensure the quality and completeness of the data. The first step was to spatially reference events via geocoding. Arrest and crime datasets were received with spatial coordinates provided by the LAPD; the vehicle impound and property damage datasets were not provided with spatial information necessitating geocoding by project staff. To address this issue, the geocoder Nominatim[262] was used to match address information with spatial data found in OpenStreetMap. Ultimately, the NPF assessment team was able to geocode 1,024 vehicle impounds and 98 reports of property damage.

In the calls for service dataset, the NPF assessment team dropped records where "Code" was equal to 6 as these calls for service were outside the LAPD service area. In the end, 29,674 records were retained in the calls for service dataset.

## Data Visualization
After data cleaning, a secure Internet application was developed to allow the NPF assessment team to view mapping incidents and interactive visualizations.[263] This application supports the following functions that assist the team to identify hotspots.

## Visualizing Density Heatmaps
Density heat maps are a simple and effective way to find the spatial concentration of incidents. To create density heat maps, the NPF assessment team first aggregated all incidents by the geographical coordinates and counted incidents per location. The longitude and latitude were used as the input for x- and y-axis, and the count determined the magnitude of each data point. Six density heatmaps were created in the Internet application. Each of the five data sources was used to create separate density heatmaps; the sixth map was a composite of all datasets. Each map supported user interaction. Users could zoom in on the map to see the street names. Also, hovering the datapoints would show the tooltips containing the geographical coordinates and the number of reported incidents.

---

[262] Github. Nominatim API. https://nominatim.org/release-docs/develop/api/Overview/
[263] Plotly. (2021). Dash. https://plotly.com/dash/

National Police Foundation - A Crisis of Truth

## Figure 1 Density Heatmap of All Data Points



Figure 1 (above) shows an example of the density heatmap the NPF assessment team rendered in the Internet application. It shows the density of all incidents in Los Angeles on May 27, 2020. It is intuitive to observe the incidents were clustered in the downtown area, southern LA, and the northwestern area.

### Hierarchical Density-Based Spatial Clustering of Applications with Noise

Hierarchical Density-Based Spatial Clustering of Applications with Noise (HDBSCAN) is a robust and efficient clustering algorithm that was implemented to automate the process of finding clusters.[264] It estimates the density of a region that has data input, finds regions with high density, and combines the data in selected regions to form a hierarchy.

[264] Campello, R. J. G. B., Moulavi, D., & Sander, J. (2013). Density-Based Clustering Based on Hierarchical Density Estimates. In J. Pei, V. S. Tseng, L. Cao, H. Motoda, & G. Xu (Eds.), Advances in Knowledge Discovery and Data Mining (pp. 160–172). Springer. https://doi.org/10.1007/978-3-642-37456-2_14

Two important parameters were configured to identify clusters: (1) the minimum cluster size and (2) the minimum sample size. The larger the values of these parameters, the more conservative and generic the clustering results. To get more granular clusters, the NPF assessment team set the minimum cluster size as 10 and the minimum sample size as 1. After obtaining the cluster assignments of each data point, the NPF assessment team calculated the convex hull of each cluster, which is the smallest convex polygon enclosing all of the data points in that specific cluster.

In the end, the clustering results of HDBSCAN were color-coded and each was overlaid with its convex hull. Figure 2 (below) shows an example of HDBSCAN visualization. Using this approach, the spatial clusters of incidents were foregrounded. The interactivity of the visualization supported users to filter specific clusters on the map for scrutiny. Overall, this section supplemented the heatmap created above, translating the density into concrete polygons for cluster identification.

## Figure 2 Example of HDBSCAN Results



## Human-intelligence based map annotations

Despite automating the clustering procedure using HDBSCAN, the NPF assessment team also incorporated cross-platform human annotations. The annotations were later exported into a shapefile that loaded into the map and overlaid with the density heatmap.

## Temporal Filtering

The NPF assessment team designed time filters to add temporal constraints to the datasets. Instead of grouping the dataset by date, the NPF assessment team provided a more flexible way to filter out the time that recognizes the temporal pattern of the incidents: filtering datasets by date and hours with a fixed length of time windows. Three kinds of time filters were presented to the users for customization:

- **Date select box (Datte, May 27, 2020 through June 18, 2020)**
- **Hour select slider (Numeric, 0 to 23)**
- **Time window check box (Numeric, 4 or 8 or 12)**

The input value of time window X was added and subtracted to the selected date and time, creating the time range that encompasses X hours before and after the selected date and time. Using this filter, the data across different dates were aggregated together for analysis and automatically updated the abovementioned maps.

## Filtering datasets by Arrest and Crime Type

The NPF assessment team was also allowed to filter the type of arrest and crime information. This filter was used as a way to dismiss some records that were unlikely to be associated with the SAFE LA First Amendment assemblies and protests.

## Social Media Data Integration

The NPF assessment team harvested social media posts on Twitter as an additional source of information for the hotspot identification. Social media, especially Twitter, has been regarded as the most prominent platform for posting information about protests and activism.[265][266] Incorporating social media data expanded the NPF assessment team's data sources and helped to verify hotspots identified in the previous datasets. The NPF assessment team started with developing a comprehensive query to search for relevant tweets. The search query has four parts:

- **(Protest) AND**
- **(Police brutality OR Police OR Force OR Assault) AND**
- **(LAPD) OR**
- **(BLM OR George Floyd OR Racism)**

[265] Bonilla, Y., & Rosa, J. (2015). #Ferguson: Digital protest, hashtag ethnography, and the racial politics of social media in the United States. American Ethnologist, 42(1), 4–17. https://doi.org/10.1111/amet.12112
[266] Trottier, D., & Fuchs, C. (2014). Social media, politics and the state: Protests, revolutions, riots, crime and policing in the age of Facebook, Twitter and YouTube. Routledge.

A total of 71,048 tweets were retrieved using Twitter's official with a selected time range of May 17, 2020 through June 20, 2020. The NPF assessment team approach to analyzing social media mainly focused on text and pictures, which are the most common communication methods on social media about the protests.[267 268 269] The analyses results were rendered in two Internet applications compiled using the Streamlit framework.[270]

## LAPD Tweet Text Explorer

This application supported exploratory text analysis of the collection of tweet data. In this application, users were able to customize the dataset and review specific groups of tweets to gather information about the SAFE LA First Amendment assemblies and protests. This application had a number of components. First, it allowed the NPF assessment team to visualize daily trends such as the number of tweets by day and time. Second, the Explorer assisted the NPF assessment team with understanding keywords through the creation of word clouds. Two metrics were calculated to determine important keywords among the tweets, namely the term frequency and the term frequency-inversed document frequency. Users can choose one of the ranking metrics to generate word clouds. Additionally, the NPF assessment team provided customizations that allowed filtering out selected words and selecting the number of terms to show in the word cloud. Figure 3 (below) is an example of the word cloud generated in the Internet application. It shows the important words that were central to the online discussion around the SAFE LA First Amendment assemblies and protests.

### Figure 3 Important Terms Word Cloud



[267] Bosch, T., & Mutsvairo, B. (2017). Pictures, protests and politics: Mapping Twitter images during South Africa's fees must fall campaign. African Journalism Studies, 38(2), 71–89.
[268] Grossman, L. (2009). Iran protests: Twitter, the medium of the movement. Time Magazine, 17.
Gupta, A., Dollár, P., & Girshick, R. (2019). LVIS: A Dataset for Large Vocabulary Instance Segmentation. ArXiv:1908.03195 [Cs].
http://arxiv.org/abs/1908.03195
[269] Wetzstein, I. (2017). The visual discourse of protest movements on Twitter: The case of Hong Kong 2014. Media and Communication, 5(4), 26–36.
[270] Streamlit Inc. (2021). Streamlit. https://www.streamlit.io/

Third, the Explorer assisted the NPF assessment team with visualizing important hashtags in a word cloud. Hashtags are quintessential to online communication on Twitter. They are especially important to protests and activism as a way of building online community.[271] [272] Tracking important hashtags helps find key individuals and groups and identifies key protest places. The Explorer application rendered the word cloud with the most important hashtags using all the tweets or using tweets from a specific date. This function helped the NPF assessment team understand trends of hashtag usage and aided in finding any emerging protests and their relevant information.

Beyond aggregating information about tweets, the Explorer also supported the filtering of specific tweets by hashtags and time. This manual process allowed NPF assessment team members to scrutinize specific tweets' texts for further investigation.

## LAPD Tweet Image Explorer

The image explorer was designed to analyze images embedded in tweets using Facebook's AI Research's computer vision framework, Detectron.[273] Two mask computer neural network (CNN) image segmentation models were applied to 10,133 images derived from 71,048 tweets.[274] The first model was the Common Objects in Context (COCO) dataset[275] while the second was the Large Vocabulary Instance Segmentation (LVIS) dataset.[276] The results of object detection were then visualized in the Internet application.

Similar to the LAPD Tweet Text Explorer, the NPF assessment team visualized the daily trends of the number of images in the tweets as a bar chart to help users understand volume in trends of posting pictures. Going a step further, the Image Explorer allowed for visualizing objects detected in the images and the changes in object presence over time. Three versions of every image could be presented in the application: the original one in the tweet and the image highlighted with detected objects with both COCO and LVIS-trained models.

Figure 4 (below) demonstrates how identified objects are depicted in Image Explorer. In this example, the detected objects include people and a backpack. Every detected object is shadowed and masked by a box indicating the type of object and the confidence of the detection. Also, the aggregated value showing the general trends of objects with time were visualized in a line chart. These functions provided an automatic way to analyze and summarize the key information from the tweets.

[271]Cumberbatch, P., & Trujillo-Pagán, N. (2016). Hashtag activism and why# BlackLivesMatter in (and to) the classroom. Radical Teacher, 106.
[272] Segerberg, A., & Bennett, W. L. (2011). Social media and the organization of collective action: Using Twitter to explore the ecologies of two climate change protests. The Communication Review, 14(3), 197–215.
[273] https://github.com/facebookresearch/detectron
[274] He, K., Gkioxari, G., Dollár, P., & Girshick, R. (2018). Mask R-CNN. ArXiv:1703.06870 [Cs]. http://arxiv.org/abs/1703.06870
[275] Lin, T.-Y., Maire, M., Belongie, S., Bourdev, L., Girshick, R., Hays, J., Perona, P., Ramanan, D., Zitnick, C. L., & Dollár, P. (2015). Microsoft COCO: Common Objects in Context. ArXiv:1405.0312 [Cs]. http://arxiv.org/abs/1405.0312
[276] Gupta, A., Dollár, P., & Girshick, R. (2019). LVIS: A Dataset for Large Vocabulary Instance Segmentation. ArXiv:1908.03195 [Cs]. http://arxiv.org/abs/1908.03195

National Police Foundation - A Crisis of Truth

## Figure 4 Example of Object Detection Result



Image Explorer ranked images by their influence (retweet count and favorite count) relative to other tweets. The most viral and influential images were shown first to enumerate the pool of images for examination by the NPF assessment team. A scatter plot with retweet count (as x-axis) and favorite count (as y-axis) was plotted in the application. A slider bar was designed for users to view the images in the order based on the influence.

Further filtering of the dataset by keywords, objects, and time was also possible in Image Explorer. The NPF assessment team designed several functions that allowed for filtering out only the most important images. A text input box was also implemented that allowed the NPF assessment team to only display tweets that contained desired keywords. Also, users could select the images to explore based on the detected objects. Since the images about protests usually are of similar elements, (e.g., helmet, backpack, banner, flag, and street sign) filters reduce the pool of images to help identify the most relevant content.

National Police Foundation - A Crisis of Truth

## Open Source News and Social Media Review

The NPF assessment team reviewed hundreds of news media articles and videos, as well as social media posts and footage from the SAFE LA First Amendment assemblies and protests. In addition to using social media posts to assist in the identification of hotspots of activity, as described above, social media posts were used to provide additional perspective on the LAPD response to protesters and to identify potential areas of policy review for the NPF assessment team.

## National Resource Review

In addition to the information collected from the City of LA and LAPD, and to ground the AAR in national standards, model policies, and promising practices, the NPF assessment team researched and reviewed scholarship on First Amendment assemblies and protests with an emphasis on de-escalation procedures. The NPF assessment team also reviewed and analyzed relevant AARs from national incidents including other First Amendment assemblies and protests that occurred during the same time period. The NPF assessment team also reviewed information such as the National Incident Management System, Incident Command System, and other relevant topics published by researchers from academia and from organizations including the following:

- **US Department of Justice;**
- **US Department of Homeland Security;**
- **Federal Emergency Management Agency;**
- **International Association of Chiefs of Police;**
- **Police Executive Research Forum; and,**
- **National Police Foundation.**

National Police Foundation - A Crisis of Truth

# Appendix C: Timeline of Events

## The First Three Days: Wednesday, May 27 – Friday, May 29, 2020

### Wednesday, May 27, 2020

Approximately 100 individuals gathered and began to march in the streets around City Hall at around 4:00pm.[277] After a largely peaceful protest, at approximately 6:00pm, a group broke off and hundreds of protesters marched through the streets downtown, towards, and onto, the 101 Freeway, temporarily blocking motorists.[278] The protesters spent approximately 30 minutes on the Freeway, before they were ushered back into the downtown area and continued to march near North Alameda Street and East Aliso Street.[279] At one point, protesters burned an upside-down American flag and used graffiti to vandalize LAPD Headquarters.[280]



---

[277] See footnote 149.
[278] Ormseth, Matthew, et al. (2020, May 27). "Protesters, Law Enforcement Clash in Downtown L.A. during Protest over George Floyd's Death." Los Angeles Times. www.latimes.com/california/story/2020-05-27/protesters-block-the-101-freeway.
[279] City News Service. (2020, May 27). "Black Lives Matter Protest in LA Temporarily Closes 101 Freeway, 1 Injured." Los Angeles Daily News. www.dailynews.com/2020/05/27/black-lives-matter-protest-in-la-temporarily-closes-101-freeway-1-injured/
[280] See footnote 149.

National Police Foundation - A Crisis of Truth

## Thursday, May 28, 2020

At approximately 5:00pm, a group of close to 70 protesters once again gathered downtown, this time in front of LAPD headquarters. At approximately 7:20pm, several protesters clashed with officers as they attempted to move their police cruisers; during these skirmishes, protesters vandalized several cruisers.[281] Meanwhile, another group of protesters gathered and started to march away from LAPD Headquarters and moved downtown. Along the way, plainclothes LAPD officers reported several instances of vandalism.[282] Based on those reports, when the group of protesters reached the intersection of South Grand Avenue and West Second Street, LAPD issued a dispersal order.[283]



[281] See footnote 149.
[282] Ibid.
[283] Valdez, Jonah, and Elizabeth Chou. (2020, May 28). "Protesters Return to Streets Thursday Night in Los Angeles over Killing of George Floyd." Los Angeles Daily News. www.dailynews.com/2020/05/28/protesters-return-to-streets-thursday-night-in-los-angeles-over-killing-of-george-floyd/

Protesters separated and headed in several different directions.[284] More LAPD resources arrived and dispersal orders continued.[285] Despite more LAPD resources arriving downtown, the groups of protesters continued to evade officers and sprung up in several areas of the downtown area of the city, including another attempt to access the Freeway.[286] There were also multiple reports of attempted, and successful, break-ins and looting at businesses across the downtown area, as well as vandalism or police vehicles.[287]

## Friday, May 29, 2020

On Friday, May 29, community members reported several small groups of protesters blocking intersections throughout the city. By approximately 5:00pm, a group of protesters which had gathered in front of City Hall and began to march peacefully, with LAPD facilitating the group's movements by blocking traffic along the way.[288] LAPD officers were also assigned as protection for the Los Angeles Fire Department (LAFD), as they responded to fire and medical incidents within the crowd.[289] It was reported that as LAFD responded to extinguish a fire, a bystander seized the fire hose and threw it into the nearby flames.[290]

By approximately 7:00pm, the main crowd spanned approximately 2.5 city blocks, before dividing into three groups: one moved toward the 110 Freeway again, one group moved to South Hope and West Seventh Streets, and the last moved toward South Grand Avenue and West Seventh Street.[291] At approximately 8:00pm, the group was able to gain access to the 110 Freeway again.[292] While LAPD attempted to clear the Freeway, other protesters threw projectiles such as "eggs, rocks, glass bottles, road stanchions, broken concrete, and electric scooters" at the officers from an overpass.[293] Other reports indicate protesters threw bottles of urine and fecal matter.[294] Others state that officers were hit with projectiles such as rocks, bottles, and trash cans.[295] Even after LAPD declared an unlawful assembly, at approximately 9:30pm,[296] the tone of the evening only seemed to devolve further, as individuals looted and burglarized businesses, set trash cans and debris on fire, vandalized police vehicles, continued to block intersections throughout the city, and engaged with officers.[297] Later in the evening, there were reports of demonstrators shining green lasers at LAPD's air unit.[298]

---

[284] NPF assessment team interview with business representative. January 25, 2021
[285] See footnote 149.
[286] Ibid
[287] Ibid.
[288] Ibid.
[289] Ibid.
[290] Valdez, Jonah, and Hunter Lee. (2020, May 29). "Stores Looted, Dozens Arrested in Aftermath of Los Angeles Protest." Los Angeles Daily News. www.dailynews.com/2020/05/29/protesters-march-again-friday-night-in-los-angeles-amid-growing-anger-nationwide-over-george-floyds-death/#:~:tex t=Businesses%20were%20looted%2C%20police%20vehicles,George%20Floyd%20in%20Minneapolis%20Monday
[291] CBS Los Angeles. (2020, May 29). "LAPD Declares Unlawful Assembly As Protesters, Police Clash Downtown; Looting Reported." CBS Los Angeles. https://losangeles.cbslocal.com/2020/05/29/los-angeles-george-floyd-protests-day-3/
[292] Ibid.
[293] See footnote 149.
[294] See footnote 291.
[295] See footnote 149.
[296] See footnote 291.
[297] Vives, Ruben, et al. (2020, May 29). "Looting, Vandalism across Downtown L.A. as Protesters, Police Clash." Los Angeles Times. www.latimes.com/california/story/2020-05-29/protesters-outraged-over-george-floyd-death-shut-down-101-freeway-in-san-jose
[298] See footnote 149.



## Saturday, May 30 – Monday, June 1, 2020

### Saturday, May 30, 2020

Within the first hour of May 30, LAPD officers in two separate locations reported shots fired by protesters.[299] Looting and burglaries continued to be an issue, specifically in the jewelry district.[300] Demonstrators continued to throw various projectiles at officers, set off fireworks in the streets, and set trash cans on fire.[301]

Another demonstration—whose organizers had received a permit—was scheduled to meet at noon and march to the jail facilities and LAPD Headquarters downtown.[302] Yet another demonstration, hosted by the Coalition for Community Control Over the Police, was scheduled for 1:00pm to begin at LAPD's Southeast Station.[303] Finally, May 30 would be a "National Day of Protest" in the City of Los Angeles, calling for protesters to arrive at Mariachi Plaza at 3:00pm.[304]

---

[299] See footnote 149.
[300] Ibid.
[301] Ibid.
[302] City News Service. (2020, May 30). "Officers Attacked, Businesses Looted in Downtown Demonstrations." Spectrum News. https://spectrumnews1.com/ca/la-west/public-safety/2020/05/30/officers-attacked--businesses-looted-in-downtown-demonstrations
[303] Ibid.
[304] Ibid.

National Police Foundation - A Crisis of Truth

## Pan Pacific Regional Park

There were several protests scheduled for the afternoon of May 30. One protest—for which a permit was received—was scheduled by Black Lives Matter Los Angeles and BLD PWR, to be held at Pan Pacific Regional Park, beginning at noon. At noon, approximately 500 people were in attendance in Pan Pacific Regional Park. LAPD's air unit estimated the group to number 1,500, and by approximately 1:00pm, an estimated 2,500 were in attendance.

At approximately 2:00pm, protesters started to move toward Beverly Hills. At that point, the tone of demonstration, which had begun peacefully, shifted as protesters began to clash with officers. There were also reports of projectiles being thrown at officers. At approximately 6:00pm the Los Angeles County Sheriff's Department (LASD) arrived on the scene at Pan Pacific Park to provide additional resources and assistance. At 7:00pm, LAPD declared unlawful assembly for the Mid-Wilshire area, and all persons on the street were ordered to disperse. At approximately 8:00pm, LAPD Rescue Task Forces and LAFD responded to four "major fires" in LAPD's West Bureau.



Sources: City News Service. (2020, May 30). "Officers Attacked, Businesses Looted in Downtown Demonstrations." Spectrum News. https://spectrumnews1.com/ca/la-west/public-safety/2020/05/30/officers-attacked--businesses-looted-in-downtown-demonstrations
LAist Staff. (2020, May 30). "Anger Over Historic Police Brutality Boils Over In Los Angeles In Saturday's George Floyd Protests." LAist. https://laist.com/2020/05/30/los-angeles-george-floyd-protests-day-four.php
Los Angeles Police Department. (2020). AAR Chrono Time Log. Provided to NPF assessment team by LAPD electronically on October 28, 2020.

Simultaneously, in Mariachi Plaza, about 100 protesters had gathered. This group soon grew to approximately 200 people and began their march to the LAPD's Southeast Station.[305] As the march continued, protesters blocked traffic, police cars were set on fire and vandalized, and officers deployed less lethal munitions to attempt to gain control of the crowd.[306] By approximately 5:50pm, the group of protesters from Mariachi Plaza had grown to approximately 500 people, and again gained access to the 101 Freeway, where they began vandalizing police vehicles.[307]

At approximately 3:45pm, Mayor Eric Garcetti announced that a curfew would be in place for downtown Los Angeles on Saturday night, from 8:00pm to 5:30am, to allow for the clean-up of the remaining damage from the previous night's events.[308] Shortly thereafter, West Hollywood and Beverly Hills followed suit, instituting curfews of their own.[309] By 6:30pm, Mayor Garcetti extended the curfew to the entire city of Los Angeles.  By 8:45pm, the following cities instituted curfews as well: Culver City, Pasadena, and Santa Monica.[310]

Despite the curfew, at approximately 9:45pm, there were reports of protesters setting off explosive devices in downtown Los Angeles. Additionally, more than 100 mutual aid officers were deployed from Santa Barbara and Ventura County to provide assistance to LAPD.[311] Later in the evening, the looting and assaults on officers that had plagued the previous night resumed, prompting Governor Gavin Newsom to declare a state of emergency and Mayor Garcetti to request assistance from the California National Guard.[312]

## Sunday, May 31, 2020

The California National Guard arrived early on Sunday morning to provide assistance to the resources who were already present at the protests.[313] In the early morning hours, LAPD's Central Bureau requested multiple jail transports, as well as bomb squad assistance.[314] From approximately 12:30am to 6:30am, several reports of looting occurred at various locations throughout the Central Bureau area.[315] Later in the morning, LAPD reported multiple pallets of rocks and cinderblocks appeared to be staged in different sites by individuals intent on continuing the looting and break-ins.[316]

At approximately noon, LAPD's West Bureau reported that a group of roughly 300 protesters was on its way to a Councilmember's place of residence and several officers were deployed to provide security services.[317] By 2:30pm a group of 200 protesters was moving into the West Bureau from the neighboring City of Santa Monica.[318]

---

[305] See footnote 149.
[306] LAist Staff. (2020, May 30). "Anger Over Historic Police Brutality Boils Over In Los Angeles In Saturday's George Floyd Protests." LAist. https://laist.com/2020/05/30/los-angeles-george-floyd-protests-day-four.php.
[307] See footnote 149.
[308] See footnote 302.
[309] Ibid.
[310] Ibid.
[311] See footnote 149.
[312] See footnote 306.
[313] See footnote 149.
[314] Ibid.
[315] Ibid.
[316] Ibid.
[317] Ibid.
[318] Ibid.

At 2:00pm, LAPD was aware of and monitoring a group of approximately 50 protesters at Pershing Square.[319] At approximately 5:00pm, protesters made their way from Pershing Square to City Hall, where a number of National Guardsmen and LAPD officers were stationed.[320] During the protest, several police vehicles were vandalized and set on fire.[321] By approximately 6:30pm, protesters were said to have grown more aggressive, decreasing the distance between themselves and the Guardsmen.[322] At approximately 7:30pm, LAPD began its attempts to disperse the demonstrators at City Hall.

On May 31, a countywide curfew was instituted from 6:00pm to 5:30am; but, within the city, the curfew did not begin until 8:00pm.[323] Again, despite the curfew, the evening unfolded in a manner similar to those before it; there were reports of demonstrators wielding baseball bats, breaking windows, attempting to gain access to shops, looting, fires, groups vandalizing vehicles, and general unrest.[324]

## Monday, June 1, 2020

The early morning hours of June 1 were marred with more burglaries, looting, and unrest.[325]

Multiple protests were scheduled to occur on June 1 in various locations throughout Los Angeles, including Beverly Hills, Brentwood, Santa Monica, Hollywood, and West Hollywood.[326] The announcements of these protests caused concern amongst residents and business owners, due to the damage incurred in previous protests in other areas in the city.[327] In the early afternoon, several marches were held in Hollywood. There were also demonstrations in downtown Los Angeles and Westwood.[328] In the Westwood section of the city, a peaceful protest involving approximately 1,000 people occurred outside the Federal Building.[329] At approximately 4:00pm, a faction of this group gained access to the 405 Freeway and blocked motorists from passing through. Officers issued dispersal orders for this crowd.[330]

---

[319] City News Service. (2020, May 31). "Another Day and Night of Unrest Mars SoCal Protests." NBC Los Angeles, NBC Southern California. https://www.nbclosangeles.com/news/local/demonstrations-continue-across-socal-as-curfews-expanded/2371795/
[320] Ibid.
[321] Ibid.
[322] Ibid.
[323] Ibid.
[324] See footnote 149.
[325] Ibid.
[326] Scott, Henry (Hank) E. (2020, June 24). "One Demonstration Cancelled, Others Scheduled In and Near West Hollywood." WEHOville. https://www.wehoville.com/2020/06/01/one-demonstration-cancelled-others-scheduled-in-and-near-west-hollywood/
[327] Ibid.
[328] Singgih, Pierce. (2020, June 2). "George Floyd Protest Begins Anew Monday Afternoon in Downtown LA." Daily News. https://www.dailynews.com/2020/06/01/george-floyd-protest-begins-anew-monday-afternoon-in-downtown-la/
[329] LAist Staff. (2020, June 1). "Protests In LA Day 6: Floyd's Memory 'Deserves A Better Los Angeles... A Better World'." LAist. https://laist.com/2020/06/01/protests_in_los_angeles_latest_monday_june_1_2020.php
[330] Ibid.

## Van Nuys Boulevard

At approximately 3:00pm in Van Nuys, LAPD declared unlawful assembly and ordered the crowds to disperse. At that time, the group was made up of several hundred protesters. Looting commenced once more in Van Nuys at approximately 4:00pm. As these and other protests were underway in Hollywood and Van Nuys, officers concentrated their efforts to uphold the 6:00pm Los Angeles County curfew. LAPD reportedly deployed less lethal munitions into the crowds of looters. There were also reports of fires being set at a strip mall.



Sources: LAist Staff. (2020, June 1). "Protests In LA Day 6: Floyd's Memory 'Deserves A Better Los Angeles... A Better World'." LAist. https://laist.com/2020/06/01/protests_in_los_angeles_latest_monday_june_1_2020.php Singgih, Pierce. (2020, June 2). "George Floyd Protest Begins Anew Monday Afternoon in Downtown LA." Daily News. https://www.dailynews.com/2020/06/01/george-floyd-protest-begins-anew-monday-afternoon-in-downtown-la/

Also, in the afternoon, an LAPD commander took a knee with demonstrators after pleading with them to peacefully protest and to spare businesses from any looting activity.[331] A similar scene occurred in front of LAPD Headquarters, where several officers knelt with protesters in a display of solidarity.[332]

---

[331] Singgih, Pierce. (2020, June 2). "George Floyd Protest Begins Anew Monday Afternoon in Downtown LA." Daily News. https://www.dailynews.com/2020/06/01/george-floyd-protest-begins-anew-monday-afternoon-in-downtown-la/
[332] Lloyd, Jonathan. (2020, June 2). "LAPD Officers Join Protesters in Taking a Knee Outside Police Headquarters." NBC Los Angeles. https://www.nbclosangeles.com/news/local/los-angeles-police-protest-knee-lapd-george-floyd/2373032/

National Police Foundation - A Crisis of Truth

## Tuesday, June 2 – Sunday, June 7, 2020

### Tuesday, June 2, 2020

Following the preceding 72 hours, which would prove to be the most tumultuous period during the SAFE LA First Amendment assemblies and protests, June 2 began with a series of peaceful events.[333] At approximately 6:00am, roughly 150 demonstrators began their march in the Venice area of Los Angeles.[334] This march remained peaceful as no related disturbances were reported by local residents or business owners.[335] Downtown LA was also the site of two more demonstrations, one of which was held in front of LAPD Headquarters, in the mid-morning hours.[336] LAPD's air unit estimated one group to be roughly 2,000 people.[337] A group of approximately 200 people moved through Beverly Hills close to noon; at roughly the same time, two separate marches were held in Hollywood, one of which made its way into West Hollywood.[338] All of these protests and marches remained peaceful.[339]

The tenor of peacefulness continued to permeate through the day. In a display of solidarity similar to those witnessed on Monday, officers took a knee with protesters outside of LAPD Headquarters at approximately 10:30am at a rally in honor of Mr. Floyd.[340] Additionally, protesters were seen interacting with National Guardsmen in Hollywood, and Mayor Garcetti was seen taking a knee with protesters in Windsor Square.[341]



[333] CNS News. (2020, June 2). "Close to 600 People Arrested in Hollywood During George Floyd Protests." KNX 1070 News Radio. https://www.radio.com/knx1070/articles/cns-news/single-day-record-arrests-in-hollywood-during-protests
[334] Ibid.
[335] Ibid.
[336] Ibid.
[337] See footnote 149.
[338] Staff Report. (2020, June 3). "Live Updates (June 2, 2020): LA County Declares Curfew for Third Straight Night." NBC Los Angeles. https://www.nbclosangeles.com/news/local/protests-george-floyd-los-angeles-curfew-downtown-la-venice/2373095/
[339] Ibid.
[340] Ibid.
[341] Alpert Reyes, Emily, et al. (2020, June 3). "As 'Defund LAPD' Becomes a Rallying Cry, Garcetti Will Seek Cuts up to $150 Million." Los Angeles Times. https://www.latimes.com/california/story/2020-06-03/lapd-budget-unrest-garcetti

Mayor Garcetti also indicated that it was his direction to minimize LAPD's officers' use of less lethal munitions. In a press conference, Mayor Garcetti stated "I think that we've seen less of any of those tactics and I hope that we can see the most minimal if not zero of those tactics… Those tactics will sometimes be out there, but it is my direction to minimize those and if we can to not use those [tactics] at all especially if there's peaceful protesters."[342]

Despite the peace, another countywide curfew was issued, scheduled to run from 6:00pm to 6:00am.[343]

## Wednesday, June 3, 2020

Although the majority of the previous day had been peaceful, throughout the early morning hours of June 3, calls for service related to looting and vandalism were made by community members and business owners at several locations in each of the four bureaus.[344]

Throughout the day, peaceful protests occurred in West Hollywood,[345] Hollywood, and downtown Los Angeles.[346] At approximately 3:00pm, a group of protesters began marching toward Mayor Garcetti's residence in Windsor Square. Another group of demonstrators outside City Hall and the Hall of Justice grew from approximately 3,000 to 8,000 people by 4:00pm, according to LAPD's air unit.[347]

Cognizant that the peacefulness during the daytime hours would likely change again once it got dark, Los Angeles County issued another curfew, which would be instituted from 9:00pm to 5:00am.[348] The City of Los Angeles announced its own curfew, this time matching the hours of the county.[349]

At approximately 8:00pm, LAPD reported that the crowd near City Hall grew hostile and had begun throwing projectiles at officers.[350] Over the next couple of hours, LAPD officers attempted to contain and detain the protesters, who were now in violation of curfew.[351] However, each time LAPD tried to encircle the crowd, protesters would separate into smaller groups, change locations, and join with new groups, repeatedly evading LAPD's attempts at containment.[352] By the end of the evening, roughly 100 peaceful protesters were arrested in Grand Park by LASD for violating the county curfew.[353]

Additionally, on June 3, the Los Angeles Board of Police Commissioners posted a news release on the LAPD website entitled "Demands for Law Enforcement Reform," which detailed plans for "greater accountability, increased transparency, and a strengthening of public trust," to demonstrate that residents' concerns had been heard.[354]

---

[342] Winton, Richard, et al. (2020, June 3). "LAPD Chief Michel Moore's Comments on Looters Create Political Firestorm." Los Angeles Times. https://www.latimes.com/california/story/2020-06-03/lapd-chief-moores-comments-on-looters-create-political-firestorm-even-after-he-apologized
[343] See footnote 341.
[344] See footnote 149.
[345] NBC Southern California. (2020, June 3). "Live Updates (June 3, 2020): Protesters March in Downtown LA, West Hollywood, Orange County." NBC Los Angeles. https://www.nbclosangeles.com/news/local/southern-california-protests-marches-george-floyd-racism-justice-los-angeles-orange-county/2373840/
[346] Ibid.
[347] Ibid.
[348] Ibid.
[349] Ibid.
[350] See footnote 149.
[351] Ibid.
[352] Ibid.
[353] See footnote 345.
[354] Los Angeles Board of Police Commissioners. (2020, June 3). "Demands for Law Enforcement Reform." https://www.lapdonline.org/police_commission/news_view/66600

## Thursday, June 4, 2020

Although there were still some reports of looting in the early morning hours, June 4 saw a marked decrease in protests, looting, and criminal activity.[355] Even though a number of protests and marches occurred in each of the four bureaus, June 4 unfolded without incident. Two separate protests, involving as many as 400 people occurred in the Valley area; a series of five protests ranging from approximately 100 to 700 people[356] took place in the downtown area, including one at City Hall[357] and one in Grand Park;[358] a Peace March that began at approximately noon and lasted about four hours concluded with no issues in South LA;[359] and, two separate peaceful protests—one involving a group of approximately 300 people at the Getty house and the other involving approximately 500 people at the University of California, Los Angeles—took place in West LA.[360]

In only one instance, a protest of approximately 100 people grew contentious as business owners in the area banded together to protect their businesses and had a heated exchange with protesters to which police responded, but no further issues were reported.[361]

Based on the overarching peacefulness of the previous two days, Mayor Garcetti announced that there was no further need for a citywide curfew to remain in effect.[362]

At approximately 7:00pm, in front of a group of protesters that had grown to approximately 800 people[363] outside of LAPD Headquarters and City Hall, LAPD Chief Moore took a knee in solidarity with protesters.[364] Chief Moore also used the time to address the crowd,[365] which by approximately 8:00pm, had grown to approximately 4,000 protesters and some vehicles. After Chief Moore's comments, the number of protesters slowly diminished.[366] Although there were some reports of protesters throwing water bottles at officers, the crowds remained mostly peaceful, and the night was largely uneventful.[367]

[355] See footnote 149.
[356] Ibid.
[357] Ibid.
[358] Ibid.
[359] Ibid.
[360] Ibid.
[361] Ibid.
[362] Ibid.
[363] Ibid.
[364] NBC Southern California. (2020, June 4). "Live Protest Updates (June 4, 2020): Several Communities Cancel Curfews." NBC Los Angeles. https://www.nbclosangeles.com/news/local/george-floyd-protests-memorial-los-angeles-california-curfew/2374713/
[365] Ibid.
[366] Ibid.
[367] See footnote 149.

National Police Foundation - A Crisis of Truth

## Friday, June 5, 2020

Although there were some reports of criminal activity in the early morning hours, the trend from the previous day largely continued as violence, looting, and vandalism declined.[368] Throughout the city, thousands of protesters gathered at locations such as Los Angeles City Hall, LAPD Headquarters, West Hollywood, Beverly Hills, and Hollywood. All these assemblies were peaceful.[369] Three additional protests of approximately 300 people each proceeded without incident occurred also occurred in the Valley.[370] A small protest formed in the South Bureau where no issues were reported, and the West Bureau reported on six separate protests throughout the bureau, to which no resources were assigned, as they had all remained peaceful.[371]

There were two incidents which caused some tumult, but were handled quickly.[372] At approximately 3:24pm, a protester sent a threatening text to 911, reportedly stating, "we are the peace rally we are going to kill you."[373] An individual in another protest sought out officers to say that someone in the crowd was in possession of knives or a similar type weapon.[374] Officers detained the individual in question at approximately 4:00pm.[375]

At approximately 4:00pm, a crowd of approximately 1,500 people gathered outside the Hall of Justice and began peacefully marching around the downtown area.[376]

### Community Solidarity Vigil

At approximately the same time, in anticipation of a candlelight vigil being hosted by LAPD in honor of Mr. Floyd outside of LAPD Headquarters, a crowd of approximately 2,000 people had gathered. The vigil was held "in support of community solidarity," and in that spirit, the groups in attendance remained peaceful. During the vigil, Chief Moore addressed the community, stating, "in the days after that event, after that murder, after that tragedy, after watching the horrific scene and hearing his pleas, and the lack of compassion and humanity of just simply recognizing another individual, tore at the very heart of what policing stands for…Tore at the very essence of our duty to protect, to serve, to treat each individual as just that." Chief Moore spoke with some of the vigil's attendees following his remarks to the crowd.

Sources: KTLA Digital Staff and Mary Beth McDade. (2020, June 5). "LAPD Holds Vigil with Religious Leaders amid Unrest over Death of George Floyd." KTLA. https://ktla.com/news/local-news/lapd-to-hold-vigil-amid-unrest-over-death-of-george-floyd/
Los Angeles Police Department. (2020). AAR Chrono Time Log. Provided to NPF team by LAPD electronically on October 28, 2020.

---

[368] Ibid.
[369] City News Service, and Staff Report. (2020, June 6). "More than Three Dozen George Floyd-Inspired Protests Planned around Region Today." Daily News. https://www.dailynews.com/2020/06/06/more-than-three-dozen-george-floyd-inspired-protests-planned-around-region-today/
[370] See footnote 149.
[371] Ibid.
[372] Ibid.
[373] Ibid.
[374] Ibid.
[375] Ibid.
[376] Ibid.

## Saturday, June 6, 2020

At least 17 protests were scheduled to take place throughout the city of Los Angeles on June 6.[377] The protests began as early as 8:00am and were scheduled to continue throughout the afternoon in various locations.[378] The groups ranged in size from approximately 100 in Hollywood,[379] to as many as 8,000 in front of City Hall.[380] As the different groups marched, LAPD facilitated their movements, blocking traffic and temporarily closing roads as necessary.[381] More importantly, the protests occurred without any reports of violence, aggression, property damage, or other incidents.[382]

## Sunday, June 7, 2020

Downtown Los Angeles and Beverly Hills saw demonstrations of their own,[383] and thousands of people gathered in Compton to march as well.[384] Likewise, at approximately 1:30pm, LAPD's South Bureau reported a caravan of vehicles moving through the area, towards City Hall.[385] LAPD's Central Bureau later reported the caravan of vehicles moving past Union Station, and toward LAPD Headquarters and City Hall.[386] The group of vehicles numbered roughly 300-400 and made its way through the Central Bureau without incident and obeying traffic laws.[387] LAPD's West Bureau reported on a crowd of around 4,000 people that had gathered in Hollywood; by approximately 5:45pm, this crowd had more than tripled, and was now estimated to be 15,000 protesters.[388] By 7:45pm, another large gathering of up to 15,000 people had formed in West Hollywood.[389] Later in the evening, demonstrators gathered for a candlelight vigil of their own on Hollywood Boulevard, and peacefully dispersed afterward.[390]

In contrast to just one week prior, there were no reports of conflicts, vandalism and looting, rioting, or aggression. Based on the increasing peacefulness and the decreasing conflicts, the California National Guard was also entirely demobilized.[391]

[377] City News Service and Staff Report. (2020, June 6). "More than Three Dozen George Floyd-Inspired Protests Planned around Region Today." Daily News. https://www.dailynews.com/2020/06/06/more-than-three-dozen-george-floyd-inspired-protests-planned-around-region-today/
[378] Ibid.
[379] LAist Staff. (2020, June 6). "Saturday's LA Protests: Here's What Happened." LAist. https://laist.com/2020/06/06/live_updates_day_11_of_protests_in_la.php
[380] See footnote 149.
[381] Ibid.
[382] Ibid.
[383] Braslow, Samuel. (2020, June 8). "Black Lives Matter Estimates That as Many as 100,000 Protesters Gathered in Hollywood on Sunday." Los Angeles Magazine. https://www.lamag.com/citythinkblog/hollywood-protest-sunday/
[384] Pierce, Tony. (2020, June 6). "A Timeline of Events: How L.A. Protests for George Floyd Played Out." Los Angeleno. https://losangeleno.com/features/la-protests-timeline-george-floyd/
[385] See footnote 149.
[386] Ibid.
[387] Ibid.
[388] Ibid.
[389] Ibid.
[390] Ibid.
[391] Email from City of Los Angeles Executive Officer to NPF assessment team. February 17, 2021.

National Police Foundation - A Crisis of Truth

## Hollywood Demonstration

On June 7, the city saw its largest protest related to the death of Mr. Floyd. Estimates range from 20,000 people, to 50,000, to as many as 100,000 people gathered in Hollywood to rally. The gathering was entirely peaceful.



Sources: Pierce, Tony. (2020, June 6). "A Timeline of Events: How L.A. Protests for George Floyd Played Out." Los Angeleno. https://losangeleno.com/features/la-protests-timeline-george-floyd/

Braslow, Samuel. (2020, June 8). "Black Lives Matter Estimates That as Many as 100,000 Protesters Gathered in Hollywood on Sunday." Los Angeles Magazine. https://www.lamag.com/citythinkblog/hollywood-protest-sunday/

National Police Foundation - A Crisis of Truth

# Appendix D: NPF Staff Members



**Frank Straub PhD**
**Director Center for Mass**
**Violence Response Studies**
**NPF**

Is the Director of the National Police Foundation's Center for Mass Violence Response Studies (CMVRS). Under his leadership, the NPF has conducted in-depth studies of targeted mass violence events in San Bernardino, Kalamazoo, Orlando, Parkland, and the University of North Carolina-Charlotte. He has also led reviews of the police response to civil unrest in several cities. It was under his leadership, that the NPF began including mental health practitioners on its review teams to ensure counseling services or referrals were available to responders, survivors and witnesses. Dr. Straub is the project manager for the national Averted School Violence project, a national database, funded by the US Department of Justice, Office of Community Oriented Policing Services. He has also led a DHS funded Countering Violent Extremism project in Boston, MA. Prior to joining the National Police Foundation, Dr. Straub served for more than 30-years in federal, state and local law enforcement. He led law enforcement/public safety agencies in New York, Indiana and the State of Washington. During his tenure in White Plains, New York he established the first police-mental health co-responder team in the state. In Spokane, he established the first cross system mental health steering committee and ensured that all officers received a minimum of 40-hours crisis intervention training. The SPD peer support team provided assistance to law enforcement agencies in eastern Washington and western Idaho. Dr. Straub is a Non-Resident Fellow at West Point's Center for Combatting Terrorism, an Adjunct Professor in Michigan State University's Department of Psychiatry; a Graduate Faculty Scholar, University of Central Florida's Department of Psychology; and, a member of Yale University's Department of Psychiatry and Law's Working Group on Social Isolation and Extremism. Dr. Straub is a licensed masters-level psychologist in Michigan. He is serves as a clinician on the Calhoun County Sheriff's Department's Peer Support Team. In collaboration with UCF RESTORES research and treatment clinic he advises law enforcement agencies across the country on crisis intervention and peer support. Dr. Straub holds a B.A. in Psychology, a M.A. in Forensic Psychology, and a Ph.D. in Criminal Justice. He has authored articles and reports on school violence, critical incident response, community policing, and youth violence prevention. He speaks regularly at national and international conferences, has participated in numerous Congressional and White House briefings, and is a frequently invited commentator and analyst for national and international media outlets.



**Jennifer Zeunik**
**Director Local Programs**
**NPF**

Is the Director of Local Programs for the National Police Foundation, where she provides leadership and oversight for the organization, as well as project, financial and staff management. She has extensive experience in public administration, law enforcement organizations and practices, non-profit management, government grants and contracts and organizational leadership. She is responsible for PF's portfolio of state and local programs, including critical incident and after-action reviews, organizational assessments and studies, strategic planning, management studies, training and technical assistance and other organizational change services. Throughout her career, Ms. Zeunik has worked closely with a variety of stakeholder organizations in policing program and policy areas. She works with federal, state and local executives, law enforcement and public safety command staff to leverage evidence-based strategies to address critical contemporary policing issues. Her goal is to advance the health, safety and performance of law enforcement officers and organizations and the communities they serve by providing evidence-based, data-supported resources and solutions.

National Police Foundation - A Crisis of Truth



Is Director of Research at the National Police Foundation. His research interests include program and policy evaluation, crime and place, and the spatial distribution of crime. Dr. Taniguchi has extensive experience conducting field-based experiments of police practices and has worked with many law enforcement agencies (LEAs) across the United States. He has led numerous large-scale surveys of law enforcement agencies including the 2016 Law Enforcement Management and Administrative Statistics (LEMAS) Body-Worn Camera Supplement, 2016 LEMAS, 2018 Census of State and Local Law Enforcement Agencies, and 2018 Census of Law Enforcement Training Academies. Before joining the National Police Foundation, Dr. Taniguchi worked as a research criminologist in the Policing Research Program in the Division for Applied Justice Research at RTI International. He has a bachelor's degree in Criminology and Criminal Justice from Chaminade University of Honolulu and a master's and PhD in Criminal Justice from Temple University.

**Travis Taniguchi PhD**
**Director Research NPF**



Is a Senior Project Associate who works on incident reviews of public safety responses to mass violence/terrorism attacks and mass demonstrations, school security issues, operational assessments, and other law-enforcement related projects. He has over nine years of experience supporting national-scope law-enforcement related projects including the provision of technical assistance and policy analysis support on projects related to community policing and the role of social media in law enforcement, countering violent extremism, cyber crime, school security, and traffic safety. He has worked on projects with the U.S. Department of Homeland Security (DHS), the U.S. Department of Justice (DOJ), and the U.S. Department of Transportation (DOT), as well as state and local governments and law enforcement agencies.

**Ben Gorban**
**Senior Project Associate**
**NPF**



Joined the National Police Foundation as a Research Associate in January 2021. She holds a Ph.D. in Legal Psychology from Maastricht University (the Netherlands) and Portsmouth University (U.K) and a B.A in Psychology from Florida International University. Katherine has over seven years of research experience in areas related to investigative interviewing practices, including tactics for information elicitation and rapport-building. Her primary interest is on science-based policing and working alongside police practitioners on how to most effectively translate scientific findings into practice.

**Katherine Hoogesteyn PhD**
**Research Associate NPF**



Is a Project Associate at the National Police Foundation, supporting the U.S. Department of Justice Bureau of Justice Assistance's (BJA) Preventing Violence Against Law Enforcement and Ensuring Officer Resilience and Survivability (VALOR) Officer Safety and Wellness project, working on incident reviews of public safety responses to civil unrest, among other law enforcement-related areas. Christine has over five years of experience working in the criminal justice field, specifically related to implementing FISMA (Federal Information Security Modernization Act) compliant systems for information sharing purposes, project management for grant funded programs through BJS's NCHIP (National Criminal History Improvement Program), enterprises, and privacy. Prior to joining the National Police Foundation, Christine served as the Strategic Analysis Specialist for the DC Criminal Justice Coordinating Council (CJCC), and as a Special Investigator for Keypoint Government Solutions.

**Christine Johnson**
**Project Associate NPF**



Is a Research Data Scientist at the National Police Foundation. He has comprehensive knowledge in data science and extensive experience in computational social science, especially the research with social media data.  He works closely with other staff within the NPF and helps identify data needs and opportunities, adopt the best practices for data collection and data wrangling, conduct rigid data analysis and render visually appealing data visualizations. His work tackles complex problems with innovative data approaches, enabling the NPF to undertake more sophisticated research and generate new learning and insights with new datasets and advanced analytical tools. Before his work at the NPF, he earned his M.S. in Information Science at UNC-Chapel Hill and worked as a social media data analyst at the Digital Innovation Lab.

**Yukun Yang**
**Research Data Scientist**
**NPF**

