Cynthia Anderson Barker, SBN 75764
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
t. 213 381-3246  f. 213 381-3246
e. cablaw@hotmail.com

Paul Hoffman, SBN 71244
Michael D. Seplow, SBN 150183
Aidan McGlaze, SBN 277270
John C. Washington, SBN 315991
SCHONBRUN, SEPLOW, HARRIS,
HOFFMAN & ZELDES LLP
200 Pier Avenue, Suite 226
Hermosa Beach, California 90254
t. 310 396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. jwashington@sshhlaw.com

Attorneys for Plaintiffs
Additional Counsel on Next Page

Barrett S. Litt, SBN 45527
Lindsay Battles, SBN 262862
KAYE, MCLANE, BEDNARSKI & LITT
975 E. Green Street
Pasadena, California 91106
t. 626 844-7660 f. 626 844-7670
e. blitt@kmbllaw.com
e. lbattles@kmbllaw.com

Pedram Esfandiary, SBN 312569
e. pesfandiary@baumhedlundlaw.com
Monique Alarcon, SBN 311650
e. malarcon@baumhedlundlaw.com
Bijan Esfandiari, SBN 223216
e. besfandiari@baumhedlundlaw.com
R. Brent Wisner, SBN 276023
e. rbwisner@baumhedlundlaw.com
BAUM, HEDLUND, ARISTEI &
GOLDMAN, P.C.
10940 Wilshire Blvd., 17th Floor
Los Angeles, CA 90024
t. 310 207-3233 f. 310 820-7444

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| BLACK LIVES MATTER LOS ANGELES, et al.,<br><br>PLAINTIFFS,<br><br>v.<br><br>CITY OF LOS ANGELES, et al.,<br><br>DEFENDANTS. | Case No.: 2:20-cv-05027 CBM-AS<br><br>**VOLUME II**<br><br>**EXHIBITS AND DECLARATIONS IN SUPPORT OF PLAINTIFFS' RENEWED APPLICATION FOR A TEMPORARY RESTRAINING ORDER**<br><br>Date and Time: TBA<br>Courtroom: 8B |

Carol A. Sobel, SBN 84483
Katherine Robinson, SBN 323470
Weston Rowland, SBN 327599
LAW OFFICE OF CAROL A. SOBEL
1158 26th Street, #552
Santa Monica, CA 90403
t. 310 393-3055
e. carolsobel@aol.com
e. klrobinsonlaw@gmail.com
e. rowland.weston@gmail.com

Colleen Flynn, SBN 234281
LAW OFFICE OF COLLEEN FLYNN
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
t. 213 252-9444
r. 213 252-0091
e. cflynn@yahoo.com

Matthew Strugar, SBN 232951
LAW OFFICE OF MATTHEW STRUGAR
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90039
t. 323 696-2299
e. matthewstrugar@gmail.com

Jorge Gonzalez, SBN 100799
A PROFESSIONAL CORPORATION
2485 Huntington Dr., Ste. 238
SAN MARINO, CA 91108-2622
t. 626 328-3081
e. jgonzalezlawoffice@gmail.com

Olu Orange, SBN 213653
Orange Law Offices
3435 Wilshire BLvd., Ste. 2910
LOS ANGELES, CA. 90010-2015
T. 213 736-9900
f. 213 417-8800
e. o.orange@orangelawoffices.com

## INDEX OF EXHIBITS AND DECLARATIONS

**Exhibit No.**                                                    **Cited**

**VOLUME I:**

  1.  An Independent Examination of the Los Angeles Police          *passim*
       Department 2020 Protest Response ("Chaleff Report")

  2.  A Crisis in Trust

**VOLUME II:**

  3.  Safe La 2020 Civil Unrest After Action Report                9

**VOLUME III;**

**Declarations**                                                   **Page**

    Declaration of Abdullah                                     2
    Declaration of Astorga                                      1,4,13,18
    Declaration of Baffa                                        2,4,13,18
    Declaration of Barbadillo                                   4,13,18
    Declaration of Roger Clark                                  6,8,12-14,21
    Declaration of Guerrero                                     4
    Declaration of Kanegawa                                     1,4,13,18
    Declaration of Kim                                          1,4,13,18
    Declaration of Monterrossa                                  1,4,13,17

**Exhibits:**

  4.  Photographs of Astorga injury

  5.  Video of Astorga shooting (manually filed)

  6.  Video of Baffa shooting   (manually filed)

7.  Photograph of Baffa injury

8.  Video of Echo Park incident by Barbadillo (manually filed)

9.  Video of Echo Park incident by Barbadillo (manually filed)

10. Photograph of Guerrero injury

11. Photograph of Guerrero injury

12. Photograph of Guerrero injury

13. Photograph of Kanegawa injury

14. Photograph of Kanegawa injury

15. Photograph of Kim injury

16. Photograph of Monterrosa injury

17. Photograph of Monterrosa injury

Respectfully submitted,

DATED: April 13, 2021                **LAW OFFICE OF CAROL A. SOBEL**

By:  _/s/ Carol A. Sobel_
CAROL A. SOBEL
*Attorneys for Plaintiffs.*

**EXHIBIT 3**

## INTRADEPARTMENTAL CORRESPONDENCE

April 13, 2020
1.14

**TO:**        The Honorable Board of Police Commissioners

**FROM:**     Chief of Police

**SUBJECT:**   SAFE LA CIVIL UNREST 2020 AFTER ACTION REPORT

## RECOMMENDED ACTION

That the Board of Police Commissioners REVIEW and APPROVE the Department's Safe LA Civil Unrest 2020 After Action Report.

## DISCUSSION

The death of George Floyd, in Minneapolis, Minnesota, served as a spark for demonstrations against police brutality and racial inequality everywhere. The sentiment behind those demonstrations echoed across the nation and the world. This sentiment took hold in Los Angeles beginning on May 27, 2020 and continuing for a 10-day period. During that time there was large-scale civil unrest in the City.

There is no doubt of the challenge and significance of those 10 days for the Department, the City and its various communities. This Report is meant to not only provide an accurate account of the Department's actions and response to those spontaneous protests, but to also assess the strengths and, more importantly, the deficiencies of that response. It is also meant to provide an understanding of how these events fit within the larger context, and to provide a realistic path forward for how the Department can address the identified deficiencies.

This Report is an extensive review of the Department's actions during the period of intensive protests and Civil Unrest. While authored by a few, its findings and recommendations represent the input of a broad cross-section of the Department and includes dozens of interviews and thousands of hours of review of documents and audio and video recordings. While there were missteps and shortfalls in communication and command and control, especially from senior staff in the field, the vast majority of personnel performed admirably with their ongoing efforts to tirelessly serve the City, even in the face of antagonistic and violent crowds. Officers endured many sleepless nights and violent assaults. Some were seriously injured. Nonetheless, they adapted to constantly changing situations and circumstances and demonstrated professionalism and restraint. Our people are our most important resource.

Even in the midst of the Civil Unrest, the Department identified steps that could be taken to facilitate lawful protests, while working with protest organizers to identify and isolate those within the crowd intent on committing crime. As a result, large-scale, peaceful demonstrations occurred just days after other demonstrations descended into violence, arson and looting.

Honorable Board of Police Commissioners
Page 2
1.14

The Department's commitment to law enforcement leadership in 21st Century policing did not stop when the period of Civil Unrest ended. Rather, the Department immediately began to evaluate its performance. It took the lessons learned from the Civil Unrest and applied them to updated and modernized training, and obtained additional equipment to keep personnel safe. By September of last year, the Department had revised and began teaching updated tactics for crowd control. By October, over 4,000 sworn personnel had attended this hands-on training and more had viewed the roll call video. The Department also strengthened command resources and began re-vamping mass arrest and field jail protocols. These innovations bore fruit during recent demonstrations and protests such as the Presidential Election and Inauguration.

The Department remains committed to implementing recommendations based on input from the community, experts in the field both inside and outside of the Department as well as the latest academic research. The Department intends to form a diverse task-force dedicated to improvement and innovation in First Amendment facilitation, command and control, and crowd management. The Department understands the need to be open to suggestions from multiple sources and viewpoints. As part of this task-force, the Department will continue to pursue new tactics and, when appropriate, new technology or tools, to more effectively respond to the emerging protest tactics seen this past year, while continuing to invest in community outreach. The Department also remains committed to investing in long-term training for the Department so that appropriate responses to these events become further ingrained into the culture of the Department and we can continue to serve the diverse communities across Los Angeles.

Through this Report and other critical reviews, the Department seeks to improve on both its strengths and shortcomings and to continue to be an innovative leader in redefining policing. It will prioritize these innovations and resource intensive endeavors so that the Department can live up to its own and the City's expectations. The Department has worked extensively in the past to implement positive change by building relationships with the communities it serves and developing leading initiatives and training within the law enforcement profession. It will continue to do so by embracing the lessons learned in this Report.

If you have any questions regarding this report, please contact Director Lizabeth Rhodes, Office of Constitutional Policing and Policy, at (213) 486-8730.

Respectfully,

MICHEL R. MOORE
Chief of Police

Attachment

# Safe LA | 2020
## Civil Unrest | After Action Report



## Michel R. Moore
### CHIEF OF POLICE
### LOS ANGELES POLICE DEPARTMENT

SAFE LA AFTER ACTION REPORT

# ACKNOWLEDGMENTS

The Los Angeles Police Department would like to thank the many contributors to this Report. Sworn and civilian personnel from all ranks of the Department contributed through interviews and research. They provided candid input regarding their experiences and recommendations for improvements. Specifically, the Department would like to thank Sergeant Eric Lee, Sergeant Rachel Rodriguez, Detective Nicholas Sinclair, Police Officer Arrin Harty, and Police Officer Michael Putrah, the authors of this Report. The Department believes that the recommendations for reform developed as a result of this process will help the LAPD to implement meaningful and lasting change, and the Department is in debt to the contributors and authors of this Report.

**SAFE LA AFTER ACTION REPORT**

# TABLE OF CONTENTS

**INTRODUCTION**………………………………………………………………**2**

**CHAPTER 1: NARRATIVE**…………………………………………………**...4**

January 20, 2020 – May 24, 2020 ................................................................5

Monday, May 25, 2020 – Tuesday, May 26, 2020...................................7

Wednesday, May 27, 2020 ..........................................................................9

Thursday, May 28, 2020..............................................................................15

Friday, May 29, 2020 ...................................................................................18

Saturday, May 30, 2020................................................................................26

Sunday, May 31, 2020 ..................................................................................37

Monday, June 1, 2020...................................................................................41

Tuesday, June 2, 2020 ..................................................................................45

Wednesday, June 3, 2020 .............................................................................48

Thursday, June 4, 2020.................................................................................50

Friday June 5, 2020 – Sunday June 7, 2020 ...............................................52

**CHAPTER 2: COSTS-INJURIES, PROPERTY DAMAGE & OTHER COSTS**…………**56**

Injuries ..........................................................................................................57

Property Damage ..........................................................................................58

Private Property ............................................................................................58

City Property.................................................................................................59

Clean Up and Removal of Debris.................................................................61

Vehicle Impounds.........................................................................................61

**CHAPTER 3: CRIMES, ARRESTS AND FIELD JAILS** ........................**62**

Crimes...........................................................................................................63

Arrests...........................................................................................................64

Felony Arrests...............................................................................................65

Misdemeanor/Infraction Arrests..................................................................67

Field Jails ......................................................................................................**68**

**CHAPTER 4: USE OF FORCE AND LESS-LETHAL OPTIONS FOR CROWD CONTROL** ........................................................................**70**

**SAFE LA AFTER ACTION REPORT**

Use of Force ................................................................................................................71

    Deadly Force ........................................................................................................71

    Non-Deadly Force ...............................................................................................72

Less-Lethal Munitions ................................................................................................72

Types of Less-Lethal Munitions Used ........................................................................72

Distribution and Use of Less-Lethal Rounds During the Civil Unrest ........................74

**CHAPTER 5: LAPD REFORMS** ..........................................................................**76**

**CHAPTER 6: DEPARTMENT PERSONNEL & MUTUAL AID** ..........................**90**

Personnel ...................................................................................................................91

Mutual Aid Received ...................................................................................................95

**CHAPTER 7: LOGISITICS** ...................................................................................**98**

Incident Command Post Information ...........................................................................99

Logistics ...................................................................................................................100

**CHAPTER 8: CRITIQUE & RECOMMENDATIONS** ........................................**102**

**CHAPTER 9: DETAILED CHRONOLOGY** ........................................................**122**

Wednesday, May 27, 2020..........................................................................................123

Thursday, May 28, 2020 ............................................................................................125

Friday, May 29, 2020 .................................................................................................127

    Department Operations Center (DOC) .................................................................127

    Operations-Central Bureau (OCB) ......................................................................127

    Operations-South Bureau (OSB) .........................................................................133

    Operations-West Bureau (OWB) .........................................................................133

Saturday, May 30, 2020 .............................................................................................133

    Department Operations Center (DOC) .................................................................133

    Operations-Central Bureau (OCB) ......................................................................133

    Operations-South Bureau (OSB) .........................................................................137

    Operations-West Bureau (OWB) .........................................................................137

Sunday, May 31, 2020 ...............................................................................................152

    Operations-Central Bureau (OCB) ......................................................................152

    Operations-South Bureau (OSB) .........................................................................155

    Operations-West Bureau (OWB) .........................................................................155

Operations-Valley Bureau (OVB) ...................................................................................157

Monday, June 1, 2020 ...................................................................................................158

    Department Operations Center (DOC) ...........................................................................158

    Operations-Central Bureau (OCB) .................................................................................159

    Operations-South Bureau (OSB) ....................................................................................162

    Operations-West Bureau (OWB) ....................................................................................163

    Operations-Valley Bureau (OVB) ..................................................................................165

Tuesday, June 2, 2020 ..................................................................................................166

    Department Operations Center (DOC) ...........................................................................166

    Operations-Central Bureau (OCB) .................................................................................168

    Operations-South Bureau (OSB) ....................................................................................172

    Operations-West Bureau (OWB) ....................................................................................172

    Operations-Valley Bureau (OVB) ..................................................................................178

Wednesday, June 3, 2020 .............................................................................................180

    Department Operations Center (DOC) ...........................................................................180

    Operations-Central Bureau (OCB) .................................................................................181

    Operations-South Bureau (OSB) ....................................................................................186

    Operations-West Bureau (OWB) ....................................................................................186

    Operations-Valley Bureau (OVB) ..................................................................................188

Thursday, June 4, 2020 ................................................................................................188

    Department Operations Center (DOC) ...........................................................................188

    Operations-Central Bureau (OCB) .................................................................................189

    Operations-South Bureau (OSB) ....................................................................................192

    Operations-West Bureau (OWB) ....................................................................................193

    Operations-Valley Bureau (OVB) ..................................................................................194

Friday, June 5, 2020 .....................................................................................................195

    Department Operations Center (DOC) ...........................................................................195

    Operations-Central Bureau (OCB) .................................................................................195

    Operations-South Bureau (OSB) ....................................................................................198

    Operations-West Bureau (OWB) ....................................................................................198

    Operations-Valley Bureau (OVB) ..................................................................................199

**SAFE LA AFTER ACTION REPORT**

Saturday, June 6, 2020 ...................................................................................200

    Department Operations Center (DOC) ..................................................200

    Operations-Central Bureau (OCB) ......................................................200

    Operations-South Bureau (OSB) .........................................................202

    Operations-West Bureau (OWB).........................................................203

    Operations-Valley Bureau (OVB) .......................................................204

Sunday, June 7, 2020 ....................................................................................206

    Department Operations Center (DOC) ..................................................206

    Operations-Central Bureau (OCB) ......................................................206

    Operations-South Bureau (OSB) .........................................................206

    Operations-West Bureau (OWB).........................................................207

    Operations-Valley Bureau (OVB) .......................................................207

**CHAPTER 10: APPENDICES** .....................................................................**208**

    Appendix A: Resources Used..............................................................209

    Appendix B: Proclamation of a State of Emergency...............................211

    Appendix C: Declaration of Local Emergency ......................................213

    Appendix D: Order and Revised Orders Setting Curfews.........................215

    Appendix E: Board of Commissions News Release ...............................229

    Appendix F: LAPD Organization Chart During Civil Unrest....................231

    Appendix G: Incident Command System Organization Chart ...................232

    Appendix F: Acronyms .....................................................................233

    Appendix G: Glossary Terms..............................................................235

# INTRODUCTION

The death of George Floyd in Minneapolis, Minnesota served as a catalyst for demonstrations against police brutality and racial inequality everywhere.  The sentiment behind those demonstrations reverberated across the nation and the world.  Law enforcement's responsibility in contributing to that sentiment and response to these demonstrations needs to be scrutinized.

This Report is one prong in that examination.  It is meant to provide context to those reading it today and in the future.  It is also meant to assess the strengths, and more importantly, the weaknesses in the response of the Los Angeles Police Department (LAPD or Department) to those protests.  Finally, this Report is written to provide the Department with a realistic path forward, recognizing the unique confluence of events during which the Civil Unrest arose and the finite resources and other limitations of the Department and the City.

On May 27, 2020, people gathered for their regularly scheduled protest of the County's failure to prosecute law enforcement officers.  While this protest had been occurring every Wednesday for years, May 27, 2020 was the beginning of a 10-day period of large-scale civil unrest in the City.  Many people exercised their constitutional rights to decry inequality, police brutality, and a loss of connection to their community.  Some individuals, however, used the protesting crowd as "cover" to conduct criminal acts, destroy property, loot stores, and assault law enforcement officers.

Previously unseen tactics and communication methods were used by protesters and criminal opportunists to organize themselves, and in some cases, thwart law enforcement's efforts to facilitate the protest or enforce the law.  Some of the individuals within the crowd also used social media platforms which later formed the sole or predominate narrative picked up by the traditional press.  These narratives often created the impression that the violent and destructive elements could have been easily identified, isolated, and extracted from the otherwise peaceful crowd.  The truth is not nearly so simple.

Given its status as the police department in the second biggest city in the United States, the LAPD was well-versed in handling large-scale demonstrations, that were organized, single-purpose, pre-planned, and aimed at entities other than local law enforcement.  The City's recent history of peaceful protests had allowed the Department to form relationships with protest organizations such as the National Lawyers' Guild and others and to contact protest organizers to facilitate peaceful demonstrations.  But training related to static, short-term, pre-planned, single location demonstrations was not helpful when spontaneous and leaderless groups emerged throughout the City and violence broke out from within the crowd.

It had been 28 years since a similar protest had erupted in Los Angeles and since the Department had been fully mobilized.  At that time, however, the Department was not asked to respond to an anti-police protest during a pandemic.  The Department had not specifically prepared for this confluence of events, and its resources were strained to respond to it.  The pandemic and economic aftermath of it are ongoing.  Reimagining the way law enforcement responds to this and future events, both anticipated and unanticipated, needs to be done with an analysis of costs and benefits.

Despite the uniqueness of the time, throughout the 10-day period of civil unrest, the Department learned to adjust and obtain a level of agility to deal with the new tactics.  The Department engaged in diverse policing strategies, from press conferences, to towing the vehicles of looting caravans, to carrying small fire extinguishers to put out fires set to obstruct their path.  The Department used the Air Unit to deploy a squad of officers to find looted locations.  This provided a nimble response to curb criminal behavior while allowing lawful protests to continue.  As the violence de-escalated, the Department deftly moved to a largely unseen protective and speech-facilitating force.  The ingenuity and inventiveness of Departmental personnel remains its greatest resource.

Although there was some disorder in the first few days, by the morning of May 29, 2020, as the country began to see large demonstrations in major cities, Chief Michel Moore conducted a debrief with senior staff to clearly form the commander's intent and review the situational status from the previous two nights.  Overarching objectives and strategies were identified.  The Department would concentrate on facilitating demonstrations, targeting response efforts towards preventing violence and property damage and, if necessary, declaring unlawful assemblies.  Chief Moore encouraged community outreach.

Still, this Report is necessary as it gives the Department an opportunity to examine its own actions and engage in meaningful reform.  This Report highlights and concentrates on deficiencies while providing factual framework that brought those shortfalls to light. Although some reform began even before the period of Civil Unrest finished, it is and should be continuing.  This Report memorializes what happened during the Civil Unrest and the current reforms.  It also provides a path forward, including the recognition that we cannot rely solely on improving old techniques – we must find new ones.

Of specific concern addressed in the critique and best practices section of this Report are inadequacies in command and control training especially within the Incident Command System; communication deficiencies; responding to new tactics and the need to learn from and train to these new tactics; mass arrests, transportation and field jails; and poor or antiquated recordkeeping.

Moreover, just as crowds and individuals within them develop new ways to express themselves and sometimes take opportunistic measures, the Department must be open to new ways of thinking about crowds.  The Department must consider whether control is the best option, and what new technologies can be used in times of civil unrest.  This Report highlights known techniques the Department could have used during the period of Civil Unrest, and what it should use in the future.  The Department, however, will not stop there, but will continue to seek and create new ideas for policing and what it means in this century.  While this Report may not have identified what those new ideas are, it understands the need to find them and to be open to them.

The readers of this Report, including the City Council, Board of Police Commissioners (BOPC), the community, and the Department itself will need to prioritize and fund these innovations and resource intensive endeavors so that the Department can live up to its own and the City's expectations.  Through this Report and other critical reviews, the Department seeks to improve on both its strengths and shortcomings and to continue to be an innovative leader in redefining policing.  The Department has worked extensively in the past to implement positive change by building relationships with the communities it serves and developing leading initiatives and training within the law enforcement profession.  It will continue to do so by embracing the lessons learned in this Report.





# Chapter 1:

## Narrative

# NARRATIVE

*This narrative is an overview of what led up to and transpired during the period of Civil Unrest from May 25 through June 7, 2020. It gives the reader context for the critique and recommendations that follow and allows the reader to assess and evaluate those recommendations based on the realities of the event and the finite resources of the City. It is supplemented by a detailed chronology of events that occurred in Los Angeles.*

### January 20, 2020 – May 24, 2020

*The Beginning of a Pandemic Meant Department Resources Were Being Pulled in Many Directions*

On January 20, 2020, when the first case of COVID-19 was diagnosed in the United States, the LAPD had 10,049 sworn personnel on its roster, or 2.5 officers per 1,000 Los Angeles City residents. This was substantially less than its counterparts in other large cities such as the 4.2 officers per 1,000



residents in New York and 4.5 per 1,000 residents in Chicago.[1]

On March 4, 2020, Mayor Eric Garcetti proclaimed a local state of emergency and the City's Emergency Operations Center (EOC) was activated to a Level 1.[2] Representatives from many City Departments started coordinating efforts from one location to minimize redundancy and increase efficiency. The City EOC also began coordinating with County agencies such as the Los Angeles County Department of Public Health and the Los Angeles County Sheriff's Department (LASD). Additionally, an LAPD Staff Officer assumed the position of Deputy Director of the EOC. One of the chief functions of the EOC was to prioritize the distribution of personal protective equipment (PPE) as there were insufficient supplies to fill City needs. The Department also continued to acquire PPE for officers and others.

---

[1] The New York Police Department has a total of 35,010 sworn officers with a population of 8,336,816 residents and Chicago Police Department has a total of 12,138 officers with a population of 2,693,976 city residents. See Federal Bureau of Investigation Crime in United States Reports 2019.

[2] The City's EOC has three levels of readiness and is activated depending on the scope, size, and complexity of an incident. Level 1 is the highest level and is considered a full activation usually reserved for major disasters. The EOC team includes personnel from all assisting agencies who support the response to the major incident.

In addition to their regular duties, LAPD personnel were also assigned to the EOC to fill management, operations, and liaison positions.  Personnel were also assigned to the Department's Operations Center (DOC) to serve the City by answering questions and providing advice related to COVID-19 exposures as well as logistical support.



City officials asked the Department to deploy to various locations throughout the City for COVID-19 related functions.  The Department became responsible for transporting people experiencing homelessness to and from what grew to be 23 shelter locations and 15 hotels. Additionally, Department personnel were tasked with providing round-the-clock security for shelter/hotel locations, testing sites, and medical staff.  The Department also transported test kits from the testing sites to laboratories and provided extra patrol at schools where lunches were being distributed.  To accommodate these additional pandemic-related demands and maintain public safety, the Department created a COVID-19 command post (CP) at each geographic Bureau.  Approximately 422 total sworn personnel were reassigned daily to support COVID-19 functions.  Finally, LAPD employees tracked COVID-19 exposures for each Area and Bureau and reported numbers to City officials daily.

By March 12, 2020, Mayor Garcetti and the Department of Public Health approved and encouraged working from home for various professions within the City.  The requirements of police work however, meant that few Department personnel could work from home.

Following the Mayor's directives for the pandemic, the Department de-centralized briefings and canceled non-essential training and gatherings.  The senior staff of the Department gathered telephonically each morning and evening to exchange information.  At those briefings, staff reported any new or unusual occurrences so that the Department could react quickly and nimbly to an unfolding public health crisis.  While LAPD officers and other first responders, made attempts to keep themselves socially distanced when possible, they had no choice but to come into contact with the community they served.  Thus, as Department employees were exposed to COVID-19 and had to quarantine, the LAPD's deployment numbers shrank further.  As of May 25, 2020, approximately 22 LAPD personnel were unable to work due to COVID-19 symptoms.

While the nation was coming to terms with COVID-19, on March 13, 2020, Breonna Taylor, a 26-year-old Black emergency medical technician, was fatally shot by Louisville Metropolitan Police Department officers serving a search warrant at her residence.  When officers entered the front doorway, gunfire was exchanged between Taylor's boyfriend and several officers.  The officers fired over 20 shots, some potentially from outside.  Taylor was shot eight times and died shortly thereafter. There was little initial response from government officials and all three officers involved in the

shooting were placed on administrative reassignment pending the outcome of an investigation by their department.[3]

> ## Monday, May 25, 2020 – Tuesday, May 26, 2020

*Outside of Los Angeles – George Floyd was Killed in Minneapolis, Minnesota*

On Monday, May 25, 2020, at 5:27 p.m. Pacific Time (PT)[4], George Floyd, a 46-year-old Black man, was killed in Minneapolis, Minnesota for allegedly using a counterfeit bill.  Derek Chauvin, a White Minneapolis Police Department (MPD) officer, knelt on Floyd's neck for over eight minutes while Floyd was handcuffed and lying face down.  Floyd repeatedly said, "I can't breathe" while two other MPD officers further restrained Floyd, and a fourth prevented bystanders from intervening.



Later that evening at 7:25 p.m., Floyd was pronounced dead at the Hennepin County Medical Center.  At 10:41 p.m., the MPD issued a statement that "Floyd had died during a medical incident involving police interaction.  During the incident, Floyd physically resisted officers and was placed into handcuffs."[5]

*Source: Hennepin County Medical Examiner's Office*

By 4:45 a.m. the following day, cellphone videos from witnesses and security camera footage became public.  At 8:30 a.m., a makeshift memorial was created where Floyd's arrest occurred.  By noon, all four officers were fired, and by 3:00 p.m. Minneapolis began experiencing large-scale protests.  At 3:55 p.m., the Hennepin County Medical Examiner released its first report stating Floyd died at 7:25 p.m., the previous day, and the cause of death had not been determined.  By 4:30 p.m. the protests in



---

[3] In September 2020, one officer was indicted for Breonna Taylor's death.
[4] Unless otherwise indicated, all times are approximate and converted to Pacific Time to reflect when things happened in Los Angeles.
[5] https://www.insidempd.com/2020/05/26/man-dies-after-medical-incident-during-police-interaction

Minneapolis had turned violent.  Protesters marched to the MPD's Third Precinct and began damaging police vehicles.

*In Los Angeles – the LAPD Monitored the Events in Minneapolis for Relevant Information*

On May 25 and 26, 2020, members of the LAPD Major Crimes Division (MCD) reviewed the footage of the police actions taken against George Floyd as well as the response in Minneapolis.  As early as May 26, 2020, MCD anticipated public demonstrations regarding the death of George Floyd could start appearing in Los Angeles.  The size and tenor of any possible protests in Los Angeles, a City almost 2,000 miles away and with different policies was unclear.[6]  The MCD analysts shared information related to protests and community response they were seeing with command staff in the Department.

In Los Angeles, there were no scheduled events on May 25 or 26, 2020, regarding George Floyd's death in Minneapolis.

No spontaneous protests erupted in Los Angeles on those days.



---

[6]  The Department's policies and training ensure officers understand inherent dangers related to restraining individuals for longer periods of time as well as applying pressure to the back and neck area and requiring officers to place individuals in a lateral recumbent position and limiting the use of the carotid, modified carotid, and locked carotid holds to only deadly force situations.  See Memorandum No. 6 dated August 13, 1982.  See also, Use of Force Tactics Directive No. 2.2 dated November 2017 (addressing the positioning of an arrestee who is on the ground and the acceptable location of an officer's knee in relation to the suspect, seated position or on his or her left side (left lateral recumbent position) after handcuffing and searching the individual).  See also Training Bulletin, Volume L, Issue 1 revised January 2021.

**Wednesday, May 27, 2020**

*Outside of Los Angeles – Events in Minneapolis Intensify*

In Minneapolis, protesters gathered around the MPD Station chanting "No justice! No peace!" and "I can't breathe." The MPD used tear gas, plastic bullets, and concussion grenades – meant to disorient protesters with deafening blasts – to keep crowds at bay.

*Inside Los Angeles – The Regularly-Scheduled Anti-Jackie Lacey Protest Turned Violent*

On May 27, 2020, there was one scheduled protest in Los Angeles – a recurring Anti-Jackie Lacey (the then-District Attorney) rally by Black Lives Matter (BLM). Anti-Jackie Lacey rallies began in November 2017 and occurred in front of the Los Angeles County Hall of Justice every Wednesday thereafter. Protesters claimed that Lacey refused to prosecute law enforcement personnel involved in lethal force incidents within Los Angeles County.



Both MCD and DOC analysts assessed the rally considering the significant events happening in Minneapolis. Analysts reviewed several media platforms and found no information to suggest large crowds would be coming to the Downtown Area. As of 2:00 p.m., an hour before the anti-Lacey protest was scheduled to begin, there had been no sizeable protests outside of Minneapolis.

As it had done every week since November 2017, the Department prepared for the Anti-Jackie Lacey protest. Generally, the protest involved about 30 individuals and lasted from 3:00 p.m. to 5:00 p.m., during which time the protesters stayed on the steps of the Los Angeles County Hall of Justice. One bicycle sergeant and three bicycle officers were usually scheduled to monitor the protest without directly engaging the protestors. Bicycle officers have been used by the LAPD for crowd management and control with great success for years. Bicycles officers have the unique capability of navigating around the City avoiding obstacles and other potential hazards that would stop a patrol vehicle. Additionally, bicycle officers can easily approach community members to build rapport while helping defuse situations before they escalate.



**SAFE LA AFTER ACTION REPORT**

In addition, due to the violence and events occurring in Minneapolis, a foot-beat sergeant and three officers were added to the event deployment.  The Captain told all assigned officers that the objectives for this event were to facilitate free speech and provide traffic control to ensure the safety of both protesters and uninvolved persons.

At 2:30 p.m., the expected crowd of 30 assembled at the Hall of Justice.  The crowd began marching around the Civic Center.  As the march progressed, more people began to join the crowd.  By 5:30 p.m., the crowd of 100 individuals marched eastbound on East Aliso Street and attempted to enter the southbound 101 Freeway at Los Angeles Street.  Officers were successful in blocking that freeway entrance at that time.  The Civic Center, however, sits at the convergence of the 60, 5, and 101 Freeways where multiple on-ramps and off-ramps exist.  The crowd blocked traffic at the intersection of North Alameda and East Aliso Streets and held a brief and peaceful rally.  The rally, while larger and in a different place than it had been in the preceding months, was of the type of demonstration LAPD had come to expect from this protest.

At the end of the rally, the group (which had grown to 200 individuals) marched north on Alameda Street and began entering the off-ramp to the northbound 101 Freeway.  While this tactic was not expected at this protest, it was not new in Los Angeles and LAPD officers are trained in freeway incursions.  Consistent with that training, the officers began blocking protesters from entering the freeway.  Commander 1B requested additional LAPD units and California Highway Patrol (CHP) units to provide support for traffic control.[7]  The demonstrators blocked both the north and southbound lanes of traffic.  Two CHP units arrived in the southbound lanes of the 101 Freeway to clear a lane of traffic for the vehicles that were trapped by the sudden demonstration on the freeway.  This maneuver was supposed to protect pedestrians on the freeway as well as the occupants of vehicles.  Upon the CHP's arrival, however, a demonstrator immediately used a skateboard to smash the back window of one of the CHP vehicles.  Another demonstrator, who had jumped on the front of the vandalized CHP vehicle, was injured when he fell off as the CHP officers attempted to drive away.



---

[7] All LAPD divisions have a number.  Divisions with two Command Staff Officers are differentiated by "A" or "B" with the senior officer designated as "A" and the junior officer as "B".  No designation of "A" or "B" is an indication of no designation or the Command Staff officer failed to provide his/her entire call sign.

At 6:00 p.m., Chief Moore issued a statement reacting to the circumstances and death of George Floyd:

> *"The actions I watched in the video were incredibly disturbing and go against the basic law enforcement principle of preservation of life. The lack of compassion, use of excessive force, or going beyond the scope of the law, doesn't just tarnish our badge-it tears at the very fabric of race relations in this country. Knowing that we have experienced our own high-profile incidents here in Los Angeles, I can assure you the LAPD strives each day to build trust and these events are sobering reminders of how quickly that can be lost."*
>
> *-Michel R. Moore, Chief of Police, LAPD*

Recognizing that the protesters' actions moved from peaceful to lawless, and that additional resources were needed, Commander 1B assumed the role of Incident Commander (IC) and established a Staging Area on Judge John Aiso Street between Temple and 1st Streets. At about 6:15 p.m., the Operations Central Bureau (OCB) Deputy Chief (DC) arrived at Alameda and the 101 Freeway. The DC of OCB assumed the role of IC and directed Commander 1B to establish a check-in location. By 7:00 p.m., both a CP and a Staging Area were established.[8]

The demonstrators eventually left the freeway. Most gathered on Aliso Street where they burned a United States Flag in the middle of the intersection at Los Angeles and Aliso Streets. From there, the group spread out and occupied numerous intersections around the Civic Center. The LAPD's initial tactic was to attempt to address each crowd at various locations simultaneously. However, due to the spontaneous nature of the event, the lack of available resources and communication issues, the IC decided to address one problematic location at a time and then transition resources to the next location of concern. This tactic aided in the command and control of resources but allowed some groups to block intersections while officers were dealing with separate groups elsewhere.



[8] Appendix N includes a glossary of terms such as Incident Commander, Deputy Chief, Staging Area, and Command Post.

By 8:15 p.m., there were at least two large groups of protesters.  One group, at the corner of East Temple and Los Angeles Streets blocked a LASD jail bus from traversing the intersection.  Bicycle and foot-beat officers were dispatched to clear the intersection for the bus.

Officers assigned to protect the Police Administration Building (PAB) reported that a protester had vandalized it with graffiti.  The graffiti was spray-painted on the building stating "1312" and "ACAB" both of which stand for "All Cops Are Bastards."  Several protesters threw objects at officers who were assigned to protect PAB.  Other buildings were vandalized as well.



While responding to the demonstrations, personnel received multiple and conflicting directions from supervisors and command personnel.  Officers were directed by one supervisor to deploy as a skirmish line and hold a specific location and then moments later were directed by another supervisor at scene to conduct another mission.  The directions came in the form of in-person communications, cellular telephone calls, and radio broadcasts.  The various methods in which directions were communicated caused further confusion.

By 10:20 p.m., the protesters had marched throughout Downtown for over seven hours.  The Air Unit and IC coordinated a containment of protesters at the intersection at 2nd and Hill Streets.  The IC then directed officers on the scene to give a dispersal order.  The order directed the crowd to disperse west on 2nd Street away from Hill Street within five minutes, or they would be subject to arrest.  The crowd complied with the dispersal order.

As the night ended, the Department assessed whether the events 2,000 miles away might have further impacts on the City of Los Angeles.  On the one hand, outside of Minneapolis, no other major cities were experiencing mass protests and there was no hard intelligence indicating additional or violent protests.  For example, cities such as New York and Chicago showed minimal protests evolving into violence.  On the other hand, the City had been quarantined for over two months and the photos and videos from Minneapolis had gone viral in known but unquantifiable ways.  This made it difficult to assess what impact of the events in Minneapolis would have on Los Angeles.



Chief Moore issued a statement regarding excessive force in Minneapolis.
6:05 PM

Dispersal order given at Temple and Los Angeles.
8:15 PM

7:00 PM
OCB Command Post established.



Based on the protest on May 27, 2020, the Department started preparing for additional protests centered on police brutality and racial inequity.  Because PAB, City Hall, the County Hall of Justice, the Federal Building and Courthouses, and a major state criminal court building were all within blocks of each other in the Downtown Area, the Department believed that most of the events would occur in the Downtown Area.  The OCB IC requested an increase of resources and coordinated an operational plan for the Downtown Area to prepare for what the next day might bring.

*Analysis*

The LAPD followed the evolving situation locally and nationally and planned accordingly.  With the benefit of 20/20 hindsight, the Department may be criticized for not having more personnel on hand for this first protest.  However, numerous indicators at the time called for the lower-profile and progressive tactics used by the LAPD to address the weekly Anti-Jackie Lacey event.

On May 27, 2020, most of the crowds were peaceful and managed effectively.  The IC recognized when the event became lawless and hostile.  Despite this recognition, the IC did not take the most appropriate action for the situation.  Specifically, the IC did not respond to the CP but remained deployed in the field coordinating and directing resources, communicating with the Air Unit, and requesting additional personnel.



An established CP aids an IC with the necessary oversight to manage an event effectively.  A CP also provides a central location to coordinate resources with assisting agencies; operationally track and



deploy resources assigned to the incident; monitor the location of protest groups; improve situational awareness; and make decisions. The IC can then continually evaluate the effectiveness of the objectives for the incident and update or modify them as necessary. Because the IC remained in the field and had communications problems, he lost situational awareness and was unable to track and deploy resources in an effective manner. (*See Chapter 8 – Critique Nos. 1, 2, and 6*.)

There were several conflicting communications and direction issues. As stated earlier, multiple informal communication systems were used.  It was not clear to officers where the directions were coming from or which ones to follow.  Primary formal communication via radio would have provided direction to the officers and allowed other assigned personnel monitoring the frequency to hear the plan. However, as was seen in subsequent days of the event, the protesters also tuned into LAPD's unencrypted radio transmissions thereby learning of and effectively thwarting officers' movements. Moreover, only one tactical frequency was used for this incident although there were multiple protest groups spread throughout the Downtown Area.  This proved to be problematic, as too many officers tried to use it simultaneously.  Thus, given the new tactics used by the demonstrators, the LAPD did not have the ideal equipment for law enforcement communication, such as encrypted radios.  (*See Chapter 8 – Critique No. 3*.)

In addition, the Department's two trained videographers from the Office of Operations film unit were assigned to administrative duties at the DOC and station security.  As a result, Technical Investigation Division (TID) dispatched their civilian photographers to film the demonstrations.  Officers from various assignments were also tasked with filming the demonstrations.  The personnel tasked to film the incident had not received any training in proper video documentation or procedures.  Many of the pictures and videos that were filmed did not depict street signs or have narrations as to the significance of the information.  Briefings, commander's intent, narration of crowd size and behavior, officer response, uses of force, and dispersal orders were not captured.  Department personnel did not follow the proper procedures for video retention.  (*See Chapter 8 – Critique Nos. 7 and 10*.)

After the Los Angeles demonstrations of May 27, 2020, the OCB DC made plans at the Bureau level should a spontaneous event occur again in the Downtown Area.  The Department did not fully mobilize as, outside of Minneapolis, no other major city in the United States was experiencing wide-



Crowd disperses.
10:25 PM

10:20 PM
Dispersal order given at 2nd and Hill.

11:45 PM
OCB CP demobilized.

scale civil unrest, and the pandemic was still raging and taxing Department resources.  Thus, while some may argue that the Department's assessment not to mobilize resources for the Citywide civil unrest that subsequently unfolded was an error.  This Report identifies no systemic failure in planning at this stage.  While hindsight supplies us with additional knowledge, there was extensive and continual planning that took place at the time.

**Thursday, May 28, 2020**

*Outside of Los Angeles – The National Guard was Activated in Minnesota*

On the second full day of protests in Minneapolis, the Minnesota Governor activated the National Guard.

*Inside Los Angeles – A Day of Protests Turned into A Night of Violence*

The morning and afternoon hours of May 28, 2020 saw minimal protest activity.  Nonetheless, based on the events that occurred the previous evening, the DOC transitioned the emphasis of each Bureau's CP from COVID-19 to the Civil Unrest (SAFE LA).  The OCB created a CP in front of PAB and established the Staging Area once again on Judge John Aiso Street between Temple and 1st Streets. [9]

Based on intelligence reports about protests that were supposed to happen on Saturday, Operations-West Bureau (OWB) and OCB began to prepare for those upcoming protests.

At 6:00 p.m., resources began to arrive at OCB Staging to prepare for what might be ahead.

At 7:30 p.m., a crowd of 50 protesters began to march from City Hall towards 3rd Street and the 110 Freeway on-ramp.  The bicycle unit facilitated the protesters' safety by blocking vehicle traffic so that marchers could demonstrate peacefully.  Plain clothes officers were positioned near the crowd and relayed their observations to the CP.  As the crowd marched south on Spring towards 5th Street,



---

[9]  Initially, OCB requested that the OCB CP be set up at Fire Station #4.  Two hours after this initial order, the OCB Operations Section Chief re-directed resources to set up the OCB CP in the front of PAB to obtain better situational awareness.

officers reported that individuals inside the crowd started vandalizing businesses along their route. The bicycle supervisor requested additional units to assist with crowd management and to protect the businesses and apartment buildings that were being damaged.

A unit reported that some of the protesters were gathering rocks and bottles as they walked in the direction of Central Community Police Station (251 East 6th Street). The group then changed direction and walked to 6th Street and Broadway. The plain clothes officers reported that individuals within the group were vandalizing businesses as they walked westbound on 6th Street.



At 8:00 p.m., based on the destructive actions of the crowd, the OCB IC declared a Modified Citywide Tactical Alert for Central Bureau. A Mobile Field Force (MFF) was deployed to the intersection of 2nd Street and Grand Avenue. Skirmish lines were set up and a sound truck was deployed. At 8:30 p.m., the IC ordered the sound truck to give a dispersal order at Grand Avenue and 2nd Street. The group was ordered to disperse south on Grand Avenue from 2nd Street and told that if they did not disperse in five minutes, they would be arrested. At the time of the dispersal order, however, the jail transportation vehicles and additional resources needed to make arrests were not at that location. While some demonstrators left the location, others remained in the intersection, defying the officers' commands. Five minutes after the dispersal order was announced, additional resources had still not arrived on scene. Thus, the IC decided to give another dispersal order before making arrests. This caused confusion between the officers and command staff at scene. The crowds began to use this confusion to their advantage. The remaining protesters began to completely disregard officers' orders to disperse. By the time additional resources arrived, a significant amount of time had elapsed.

At 8:55 p.m., a Citywide Tactical Alert was declared.

Several protesters from within the crowd confronted officers and the incident escalated from property damage to violence against people – specifically police officers. People began throwing a variety of objects at officers. Someone threw a bottle of bleach from an upper window of a building, splashing bleach on an officer. Officers discovered holes burned in their uniforms from chemicals that were thrown at them.



The Department attempted to stem the tide of destruction by deploying more personnel, but the additional resources seemed to attract additional protesters.  The crowd grew to approximately 100 protesters.  Based on information it was receiving, the Department was concerned that some of the destructive groups would move to the Staples Center and LA Live.  Officers were deployed to that area and found 30 to 40 protesters congregated there.

At 11:25 p.m. another dispersal order was given at 5th and Figueroa Streets.  Most of the crowd dispersed.

At 11:45 p.m., the Citywide Tactical Alert was canceled.

### Crimes and Arrests

On the second day of the Civil Unrest there was a small increase in crime and arrests.  By the end of the night (11:59 on May 28, 2020) the City had three misdemeanor arrests related to the Civil Unrest. Many of the illegal activities that began during the night of May 28, 2020, continued into the early morning hours of May 29, 2020 and arrests were made that day.  *(See Chapter 3).*

### Analysis

By the second night of protests, the main challenge was obtaining resources in a timely manner.  The IC communicated his intent and ensured that the CP was being properly staffed so that situational awareness could be obtained and maintained to manage the incident effectively.  The Operations Chief remained at the OCB CP while the IC deployed to PAB to monitor the protest in person.

Although the IC wanted to gain better situational awareness of the event, his deployment to City Hall negatively impacted his ability to oversee the entire operation, limited his access to intelligence, led to a lack of communication between the IC and the Operations Chief, and hindered the ability of the IC to effectively track and deploy resources.  For example, the IC directed deployed personnel without advising the Operations Chief of the movement.  This separation of command had a cascading impact as the coordination of resources to establish blocking forces, provide dispersal orders, capture video evidence, and effect arrests for criminal activity were all delayed.  (*See Chapter 8 – Critique No. 1 and 3*.)

Additionally, the delay in arrests following the dispersal order appeared to embolden protesters as threats of arrest were not taken seriously.  Protestors saw that their actions had little to no



consequences and they defied orders to disperse which would continue into the following days. (*See* Chapter 8 – Critique Nos. 7, 10, and 11.)

---

**Friday, May 29, 2020**

---

*Outside of Los Angeles – Demonstrations Occurred Across the Country*

The United States began to see large demonstrations in major cities, including New York, Dallas, Atlanta, Seattle, Oakland, and Washington D.C.

*In Los Angeles – Demonstrations Increased in Violence*

On the morning of May 29, 2020, Chief Moore conducted a debrief with senior staff.  He conveyed the commander's intent and reviewed the situational status for the previous two nights.  The group identified the overarching objectives and strategies as facilitating demonstrations; targeting response



efforts towards preventing violence and property damage; and, if necessary, declaring an unlawful assembly.  Chief Moore encouraged those in the meeting to conduct outreach to community groups and ask them to petition for peace but not tolerate violence and property damage.  He directed those in charge of Metropolitan Division to shift its platoons to Tactical Support Element (TSE) configurations to support operations.  He also directed that the Department use sectors to secure areas and establish a sustainable span of control and encouraged use of a tactical Air Unit.  A list of prohibited items at a protest was supplied to personnel.  Chief Moore directed everyone to review station security plans and to post officers as needed to maintain security.  The DOC advised that a command officer would be assigned to the DOC on B-Watch and Custody Services Division (CSD) would augment staffing.  If anyone they needed supplies, they were told to ask immediately and not wait.

Operations-West Bureau (OWB) and OCB continued to prepare for upcoming protests.

On May 29, 2020, there were multiple planned protests scheduled for the late afternoon.  Intelligence from MCD estimated that these pre-planned protests would draw hundreds of protesters into the Downtown Area.  In preparation, the Department organized additional personnel and positioned them



near critical sites.  Additional MFFs were identified and prepared to respond should the need arise.  The LAPD's initial tactic was to attempt to address any problematic crowds and have officers coordinate traffic to facilitate peaceful protests and protester safety.  The DOC emailed the *Al Crespo v. City of Los Angeles* decision to Department personnel and reminded officers of journalists' right to cover public protests even if an unlawful assembly is declared and an order to disperse is issued.  A plain clothes detail was assigned to monitor the crowd's demeanor and to gather intelligence for the IC.

To maximize the number of units available, at 2:20 p.m., the Director of the Office of Operations, declared a Citywide Tactical Alert.  Starting at 2:55 p.m., the Department began receiving reports from the community members that small crowds of protesters were temporarily blocking various intersections in the Downtown Area.  Just before 5:00 p.m. crowds began to form and march around the Downtown Area.  Bicycle officers coordinated traffic for protester safety as the group marched and occupied the streets.  Based on the plan, the OCB CP inserted plain clothes officers into the crowd.  The Air Unit provided an elevated perspective of the crowd's movement to support units on the ground.  As officers blocked vehicle traffic to facilitate the protests, the crowd's hostility increased.  When protesters approached intersections that officers were holding open for them, the protesters began yelling expletives at officers.



As the crowd continued marching in the Downtown Area, plain clothes officers within the crowd reported that the crowd changed from one of solely peaceful protesters to a crowd where individuals who wished to engage in hostile actions against property and the police mixed in with the peaceful protesters.  A single crowd therefore became one with mixed motives and different agendas making the Department's dual tasks of facilitating peaceful protests and deterring lawlessness more difficult.

Some protesters also ignited rubbish fires in the Downtown Area, requiring the Los Angeles Fire Department (LAFD) to respond.  Officers began providing the LAFD with force protection when fires were reported in areas of violence and criminal activity.  This further depleted available Department resources.  In the days following, officers provided security for the LAFD.

At 5:30 p.m., when a crowd of protesters formed near the 110 Freeway, Commander 1A coordinated with the CHP to block the on-ramp at Olympic Boulevard.  Plain clothes officers reported that



Officers assigned to force
protection for LAFD.
5:30 PM

4:54 PM
Protesters arrived a City Hall.

individuals within the crowd were arming themselves with bottles.  The OCB CP directed additional units to establish blocking forces to prevent the group from spreading into numerous intersections.

Protesters continued to move throughout the Downtown Area and grew more agitated.  By 6:15 p.m., the crowd had grown to 250 protesters and attempted to surround officers who were setting up blocking forces to minimize traffic congestion and protect pedestrian protesters.  The Air Unit saw the protesters' intent and alerted units in the area.  Some protesters armed themselves with bottles and other objects that they threw at officers.  The OCB CP contacted the DOC and requested a videographer to document what was occurring.  Commander 11A requested additional resources, but the OCB CP advised there were no additional resources to provide to them at that time.  This was true even though day watch units were held past their end of watch to bolster the number of personnel available.



Throughout the evening, large crowds began separating into smaller groups before merging into larger crowds and then splitting again into smaller groups.  This tactic was used throughout the night and caused officers to be spread thinly throughout the Downtown Area (approximately 5.84 square miles).  The crowds' level of violence continued to increase.  Although command staff declared unlawful assemblies and dispersal orders were given, due to continual merging and separating of the crowd, it was difficult to determine which groups had been given lawful dispersal orders.

At 6:43 p.m., the Department sound truck arrived at Pershing Square and gave amplified dispersal orders in English and Spanish to the protesters.  Although the crowd left the area, many of the protesters joined other groups scattered throughout the Downtown Area.  Thus, while officers again stopped the violence at that moment and location, their efforts to gain control of the crowd in general were unsuccessful.

By 7:04 p.m., the main crowd stretched for two and a half City blocks on 8th Street – from Hope Street to Figueroa Street.  The crowd overtook the intersection of 8th and Figueroa Streets while vehicle traffic was present.  While marching, protesters came across a CHP officer in his marked vehicle.  Some surrounded the vehicle, broke its windows, and attempted to assault the officer.  The Air Unit saw the incident and requested that officers respond to help the CHP officer.  The IC permitted the



Protesters loot a Target store
Downtown.
5:30 PM

7:24 PM
Protesters enter the 101 Freeway.

7:24 PM
Protesters assault officers with
bottles & fireworks at 7th & Figueroa.

MFF units' use the 37mm launcher.[10]  As additional officers arrived, the crowd fled.  Part of the crowd rushed north on Georgia Street through 9th Street toward the 110 Freeway on-ramp where they were blocked by CHP units.

Multiple groups then tried to gain access to the 110 Freeway from various locations.  A crowd of 150 entered the vehicle-laden freeway via the 8th Street on-ramp and marched between vehicles in the northbound lanes.  This caused gridlock and an unsafe environment for pedestrians and motorists alike. Staff 2A directed the Air Unit and MFF units to coordinate containment of the crowd and to arrest



protesters on the freeway.  The MFF and the CHP worked together to remove the protesters from the freeway.  The CHP held the northbound freeway traffic just south of the crowd near Olympic Boulevard and set a skirmish line near 7th Street on the 110 Freeway in northbound lanes.  The LAPD Air Unit coordinated the response of additional LAPD skirmish lines at both the 7th Street and Wilshire Boulevard overpasses to support the CHP and contain the area on and off the freeway. Holding these skirmish lines became difficult because smaller groups of protesters broke from the larger crowd and circled around behind the skirmish lines.  This meant that officers were surrounded and could not provide appropriate security to the officers below.  For example, while officers set skirmish lines around 7th Street and the 110 Freeway, protesters gathered on the elevated 7th Street and the Wilshire Boulevard overpasses.  From those elevated positions, individuals within the crowd threw rocks, glass bottles, road stanchions, broken concrete, and electric scooters at the officers below.

By 8:00 p.m., most of the crowd had moved off the freeway and back onto City streets.  Some of the protesters who did not leave the freeway were taken into custody so that traffic flow could be reestablished.  Throughout the night, based on their training and experience with other protests, LAPD personnel attempted to find a crowd leader or organizer to facilitate a peaceful protest.  As this event progressed, it became clear that the protesters had no defined leadership or organizer.  Without an organizer, the Department found it difficult to coordinate a peaceful protest.  In fact, in some circumstances, Department personnel's attempt to find someone to talk to was met with extreme



---

[10] The 37mm is designed to be deployed and skip fired at non-specific targets. The user must be thoroughly trained and qualified and maintain the Department standard.

hostility.  Officers were yelled at and had objects thrown at them.  This made it difficult for officers to communicate with perceived organizers.

At approximately the same time, 8:00 p.m., a request for additional MFF units was made to help contain the protesters at 7th and Figueroa Streets.  Some protesters used electric scooters to block and delay the MFF response.  To respond more quickly, officers parked their vehicles on 7th Street and responded on foot.  They left five officers to protect approximately 100 vehicles.  As the officers were responding, the crowd at Figueroa Street and 7th Street broke through a chain-link fence and entered the multi-level Target store parking structure near 945 West 8th Street.  They looted and vandalized the store.

The violence towards officers continued.  The use of fireworks, rocks, and bottles as weapons against the officers increased in frequency.  Individuals within the crowds also continued to vandalize businesses in the area.  Calls for service were generated in parking lots where protesters were damaging vehicles.  The CP asked the Air Unit to assist with the coordination of resources to keep the large crowds away from parking structures and vulnerable locations in order to minimize the destruction and not create more havoc.

As the crowds continued to march, hostility and violence grew.  Police vehicles were vandalized, and private property was destroyed.  When the protesters reached Pershing Square, at the corner of 5th and Olive Streets, some of them surrounded and assaulted bicycle officers who were positioned at the location to facilitate the protest by blocking traffic for the pedestrian protesters.  At approximately 8:39 p.m., one of those officers broadcasted "officer needs help" due to the hostile crowd.[11] Individuals from within the crowd responded by throwing projectiles at the officers and pushing one officer to the ground.  Members of the crowd then repeatedly struck the officer.  They also took some of the officer's emergency equipment from his duty belt.  When other officers arrived to assist, some protesters threw rocks, bottles, trash cans, and other projectiles at them.

Throughout the night officers generated at least two "officer needs help" broadcasts due to the level of violence directed at them.  For example, a crowd near Grand Avenue and 6th Street threw rocks and bottles at motor units who were setting up blocking forces to facilitate protests in the streets.  One motor officer had his baton stolen and advised officers of the safety hazard.  When motor officers approached the intersection of 6th and Hill Streets, people within the crowd threw rocks, bottles, and other objects at them.



Protesters arrive at PAB.
9:25 PM

9:21 PM
Officers at City Hall advise the crowd they were under arrest.

---

[11] An "officer needs help" broadcast is the highest level of need that officers can broadcast and is only used when imminent danger to officers exists.



As the night wore on, the Department received multiple calls for service (injured people, fires, property damage, etc.).  In responding to these calls, the Department found it difficult to find unobstructed avenues of travel.  Protesters obstructed the streets by placing trash cans in the roadway and igniting them.  They also ignited other items, throwing them into the street, and abandoning them to obstruct traffic.

Street obstruction would become a common tactic that individuals used to delay or prevent responses to areas that were being looted or otherwise vandalized.  Protesters also started launching fireworks at officers.  In the area impacted by the Civil Unrest, several officers were assigned to escort each LAFD fire truck or ambulance that responded to each fire or medical emergency.

By approximately 9:25 p.m., a different group of protesters converged on PAB.  Command Staff organized their resources to arrest any unlawful protesters.  Although everyone was eager to assist, this led to many people giving orders, including some contradicting orders.  The result was that officers in the field did not have clear direction.



Simultaneously, a group of protesters on Spring Street north of 1st Street, adjacent to City Hall, started throwing objects at officers.  Two officers received extensive injuries requiring them to be transported to the hospital via ambulance.  At 9:30 p.m., officers moved to surround the violent crowd adjacent to City Hall to start making arrests.

Some individuals within the crowd of demonstrators began using green lasers against officers and the Department's Air Unit.  While lasers have been used in isolated incidents, this was the first time green lasers were used during demonstrations.  The pointing of green lasers at officers by individuals within the crowd would become a common tactic used in the next several days.



Protesters vandalized police vehicles at 1st & Spring.
9:27 PM

9:25 PM
A green laser is aimed at Air Unit.

Green lasers are known to cause temporary blindness, and in some instances, permanent visual impairment when pointed directly into a person's eye.  Lasers directed at aircraft in flight bring additional safety concerns as they can brightly illuminate the cockpit of the aircraft, potentially blinding the pilot.  This leads to the visual loss of the pilot's aircraft controls and flight path, causing significant public safety concerns.  At least one officer sustained a serious injury due to lasers during the unrest.  Moreover, the use of the lasers made it difficult for air support to operate safely and adversely impacted their assistance to officers on the ground.



Members of the crowd continued with violent actions throughout the night, including assaulting officers with rocks, glass bottles, broken concrete, and other projectiles.  Some items were thrown at officers from rooftops and open windows.  Based on the violent actions from individuals within the crowd, officers deployed less-lethal munitions.  Officers quickly depleted the small number of less-lethal munitions they had "on hand" and had to request more.[12]  The DOC collected any available rounds of less-lethal rounds and delivered to the OCB CP where they were distributed to the field.

As the night wore on, the violence continued.  Officers consistently attempted to contain groups to apprehend the criminal element inside the crowds and enforce dispersal orders to stop the criminal activity.  Protesters and those who sought to use the demonstrations for nefarious activities, however, continued to elude detention and arrest using alleyways and small streets.  Moreover, officers were significantly outnumbered.  As officers detained some protesters who engaged in criminal behavior during the protest, others looted and vandalized businesses, including several in the Jewelry District near Olive Street and 6th Street.  Officers continued to face significant obstacles to travel between incidents, including dumpster fires in the middle of the street.  At approximately 11:45 p.m., protesters near 6th Street and Broadway threw bricks at officers in a vehicle responding to an emergency call.  The Department's years of training and emphasis regarding the peaceful facilitation of protests was of little use against the level of violence, destruction, and mayhem that the officers experienced that night.



Protesters loot a Starbucks at 6th and Spring.
10:25 PM

9:30 PM
Officers surround a violent crowd near City Hall
& made arrests.

---

[12] The 40mm requires an officer to unload and load an individual 40mm round after ever use.  The ammunition for the 40mm is not within the launcher and requires officers to carry extra 40mm ammunition on their person.  See Chapter 4 – Use of Force and Less-Lethal Munitions for Crowd Control.

*Crimes and Arrests*

The Department saw an increase in crimes and arrests.  A total of 264 felony and misdemeanor arrests were made because of the Civil Unrest on the night of May 29, 2020.  Most arrests were for Failure to Disperse.  The City of Los Angeles had yet to implement a curfew order.

*Analysis*

All supervisors and Command Staff in the field are given specific unit designations to use when deployed in the field such as Commander 1A for the Captain of Central Area.[13]  This is done so that supervisors and Command Staff know who the direction is coming from or who requested help at a particular location.  Although the supervisors and Command Staff were taking initiatives and coordinating blocking forces and traffic control, not all of them used their complete unit designations.  Not using proper or complete designations caused confusion when trying to track which units were deployed to specific protest groups in the Downtown Area.  (*See Chapter 8 – Critique No. 3.*)

There was also lack of unity of command between operations, supervisors, and officers in the field regarding who was directing units and managing the incident.  In their eagerness to assist, many people gave orders, some of them conflicting.  As a result, officers in the field did not know which direction to follow.  It is important that during the briefings or in the commander's intent, deployed personnel are reminded to use unity of command.  (*See Chapter 8 – Critique No. 3.*)

The Department did not provide adequate training for photographers and videographers.  Many of the photographs and videos taken by the Department photographers and videographers did not portray the actions of the crowd, actions taken by officers, or help document what was transpiring.  Videographers should narrate what they are observing and capture the demeanor of the crowd when it is peaceful and continue to document if the crowd demeanor escalates and becomes unlawful.  All aggressive and violent actions taken by demonstrators towards officers need to be captured as well as actions taken by officers, including arrests.  (*See Chapter 8 – Critique No. 7.*)

New tactics, such as projectiles coming from both within a crowd and above, as well as the use of green lasers has required the Department to adjust and obtain new equipment for the safety of its officers.  (*See Chapter 8 – Critique Nos. 18 and 19.*)



---

[13] The designation of "A" or "B" is used to identify of the Commanding Officers of a given Area.  "A" identifies the Commanding Officer and "B" identifies the Patrol Commanding Officer of the Area.

**SAFE LA AFTER ACTION REPORT**

Because the Department had arranged to have a CHP liaison in the CP, communication between the two agencies was fluid and tasks were able to be completed efficiently and effectively.  (*See Chapter 8 – Best Practice No. 2*)

**Saturday, May 30, 2020**

*Outside Los Angeles -- Many Cities Experienced Mass and Violent Demonstrations and Enacted Curfews.*

Several cities across the United States began to experience massive demonstrations and large-scale looting.  Atlanta and Portland implemented a curfew for their cities based on demonstrations that occurred on May 29, 2020 in both cities.  New York and Denver began experiencing large protests on May 29, 2020 while Cleveland, Dallas, and Philadelphia saw large-scale demonstrations beginning May 30, 2020.

Police departments in other cities used different tactics to address the unlawfulness that was occurring – including the use of tear gas.[14]  The LAPD has not used tear gas in decades.  (*See Chapter 4 – Use of Force and Less-Lethal Options for Crowd Control.)*

*Inside Los Angeles –   Both Violence and Community Engagement Continued.  The City Experienced a Devastation at 3rd & Fairfax, on Melrose and at the Grove.  The Mayor Declared a Curfew and the National Guard arrived.*

The violence, destruction, and looting from May 29, 2020, continued until early the next morning – May 30, 2020.  For example, just after midnight, a motor officer requested personnel to respond to 7th Street and Broadway where protesters were vandalizing police vehicles that had been left there the night before so that officers could respond to a Target store that was being looted.

Many of the day watch personnel were not released from the incident until just before their next shift was to begin (24 hours after they had first responded to work).



---

[14]   The LAPD did not use tear gas or any other irritants during the Safe LA Civil Unrest.

In the Downtown Area, at around 1:30 a.m., there were reports of looting in the Jewelry District and of officers being assaulted at Pershing Square.



At approximately 1:50 a.m., officers set up a blocking force at the intersection of 6th Street and Broadway. A suspect drove his vehicle towards officers. As the vehicle approached, officers ordered the vehicle to stop. The driver disregarded the officers' orders and continued to drive toward them. An officer fired a less-lethal 40mm round, which penetrated the passenger window, but did not strike anyone. As the driver continued towards officers, another officer fired his duty weapon at the suspect but did not strike him. The driver stopped the vehicle shortly thereafter and was arrested.

At 4:00 a.m., watch commanders began contacting off-duty day watch personnel and encouraging them to come into work on their regularly scheduled day off (the Department had not yet mobilized) in preparation for possible protests and violence. At approximately 6:00 a.m., the Citywide Tactical Alert was canceled to allow officers who worked that evening to go home for appropriate rest. The Department coordinated with the Department of Public Works to remove debris from the area. This aided in the removal of potential projectiles and assisted in securing area businesses. Los Angeles Sanitation estimated that it had cleared approximately 1,150 tons of debris from City property during the Civil Unrest period. See Chapter 2 for additional information.

*Planning for Saturday, May 30, 2020*

While violent protests continued from the previous night, the Department had information that there were several additional protests planned for later in the day. The Department had made and continued to make plans for these Saturday demonstrations. As dawn approached, the Department began to put those plans into effect.

For example, on Thursday, May 28, 2020, the Department received intelligence that there would be an unpermitted protest sponsored by the BLM movement and Students for George Floyd in the Pan Pacific Park area on May 30, 2020. There was no verified estimate of the crowd size, but an unverified source indicated about 100 people would be attending. Based on the intelligence they had and the events in OCB on the days prior, the Operations-West Bureau (OWB) created a written Event Action Plan (EAP) and requested resources including an Air Unit Downlink and a sound truck be deployed to the Pan Pacific Park area on May 30, 2020.





Meanwhile, on May 28, 2020, the Department also obtained intelligence about a march scheduled in OCB on Saturday, May 30, 2020.  The OCB march was slated to begin at Mariachi Plaza in Downtown and end at Hollenbeck Station in east Los Angeles.  The intelligence provided, coupled with vandalism to PAB, caused the Department to prepare for potential damage to and violence at Hollenbeck Station.  The information also noted that pallets of rocks and cinderblocks had been located in the Downtown Area, possibly staged by protesters or those who wanted to blend in with protesters and engage in violence.  Because of its concern over potentially staged weapons to be used during protests, the Department contacted both the Department of Public Works and the Bureau of Street Services to have these items removed before the protest was scheduled to begin.

When evaluating OWB's request for resources, the OCB CP considered the intelligence it had at the time.  This intelligence included: the history of large protests staying in Downtown Area; the fact that the previous three days of protests had been localized in the Downtown Area; the knowledge that people were protesting police brutality; and the understanding that critical City infrastructure, including PAB, the Sheriff's office, the District Attorney's Office, the Mayor's Office and City Council were all concentrated in a small Downtown Area.  The possibility of violence in the Downtown Area was also corroborated by the discovery of pallets of rocks and the intelligence regarding a protest that was supposed to begin at Mariachi Plaza in Downtown.  With these considerations in mind, the OCB CP denied resource requests from OWB because it believed that OCB would require more significant resources that day.

Due to the anticipated personnel needs in OCB, the Operations-Valley Bureau (OVB) DC, responded to OCB to assist the OCB IC.  In addition, Operation-South Bureau (OSB) reassigned one of its Commanders to the role of Operations Section Chief for B-Watch at the OCB CP and reassigned additional OSB personnel to OCB.

*The Downtown Area -- OCB*

Upon receiving intelligence of the Mariachi Plaza march on May 28, 2020, OCB prepared an EAP and coordinated resources through the DOC.  On May 30, 2020, at approximately 2:00 p.m., MFFs were configured and staged in preparation for the march.




*Source: Ariella Plachta*

At 2:00 p.m., on May 30, 2020, approximately 100 protesters gathered at Mariachi Plaza (1831 East 1st Street). A small group of protesters also gathered at PAB. Additionally, approximately 150 protestor vehicles gathered in Chinatown and were expected to drive to PAB. Before 2:30 p.m., multiple groups of protesters were marching in the Downtown Area.

By 3:30 p.m., approximately 200 protesters gathered at the Mariachi Plaza event. They marched in the area and entered the 101 Freeway near Temple Street. After the CHP moved the crowd off the freeway, the crowd marched towards Downtown instead of the anticipated destination of Hollenbeck Station. The crowd grew to approximately 600 individuals and factions within it became violent. Individuals within the crowd began destroying public and private property, looting businesses, vandalizing police vehicles, and assaulting Department and CHP officers with harmful objects such as rocks and bottles.

At 5:30 p.m., protesters continued marching throughout the Downtown Area causing destruction and harm to businesses. This required the Department to maintain significant resources in Downtown, while also supplying OWB with needed additional resources. (See below). Multiple attempts were made to contain the crowds, but protesters evaded containment as they had on previous nights. Vehicle caravans were also used to loot businesses throughout Downtown. Significant looting occurred in the Jewelry District.

*Third and Fairfax, Melrose, and the Grove -- OWB*

The OWB Command Staff arrived around 7:00 a.m. to set up and prepare for the anticipated Pan Pacific Park event. At that time, OWB Staging noticed discrepancies with the resources that were arriving. Specifically, OWB had difficulty forming complete MFFs because many of the officers scheduled to work the Pan Pacific Park event were assigned to MFF duties in Downtown the previous evening. As stated above, that event lasted into the morning hours of May 30, 2020. As such, those officers were unable to respond to the Pan Pacific Park event. In addition to personnel issues, officers reported that they did not have adequate less-lethal munitions. Significant amounts of less-lethal munitions had been used the previous night causing less to be available for areas across the City, including OWB. Furthermore, additional less-lethal rounds had been sent to the OCB CP. This caused a lack of available resources for the OWB area.





When planning for the Pan Pacific Park event, the OWB IC originally wanted to establish the CP at the OWB Conference Room and use OWB personnel to staff the CP.  However, at the last minute, the OWB IC was notified that the OWB conference room was not available as it was being used as the OWB Safe LA CP charged with monitoring all events throughout OWB.  In addition, the OWB personnel that were originally going to staff the OWB CP and operate the equipment to provide situational awareness, were no longer available due to the fact that they had worked in OCB the prior day and into the early morning.  The OWB IC decided to use the OWB community room, but it lacked the equipment necessary to obtain and maintain situational awareness.  In addition, the DOC advised the OWB IC that both Department sound trucks were loaned to OCB at the direction of the OCB IC.

At 9:00 a.m., a small group arrived at Pan Pacific Park and peacefully demonstrated.  By about 11:30 a.m., the group had grown to 150 protestors.  By 12:30 p.m., the Air Unit estimated the crowd was 1,500 protestors.  Additionally, at this time, an additional 300 protestors gathered at Beverly Boulevard and Gardner Street.  At 1:00 p.m., officers on scene reported the Pan Pacific Park protest grew to over 2,500 protesters and was increasing.

Like the protests in the Downtown Area the night before, the crowd divided into multiple groups.  The largest group of protesters began to march toward 3rd Street and Fairfax Avenue.  Smaller groups started demonstrating at various intersections, blocking or delaying Department personnel from responding to calls of looting or other violence.

At about 1:00 p.m. the OWB IC contacted the OWB CP and advised them to immediately move the CP to the OWB Staging Area at CBS studios (7800 Beverly Boulevard) due to operational necessity and the inability of the IC to leave the location to return to the community room.  The move also maximized the efficiency of CP duties, especially given the lack of resources.  The OWB IC directed the Wilshire Community Police Station to be shut down and all available units be sent to CBS Studios for redeployment.  Despite the IC's order, an unidentified captain, directed some of those resources to deploy to fixed post locations instead.  This caused an issue with the ability to accurately track resources and deploy them to critical sites.



Declaration of Local Emergency by Mayor.
4:45 PM

4:20 PM
Protesters enter 101 Freeway at Temple.

4:45 PM
Order setting Curfew by Mayor
8pm-5:30am.

**SAFE LA AFTER ACTION REPORT**

At approximately 1:15 p.m., protesters surrounded a Metropolitan Transportation Authority (MTA) bus at 3rd Street and Fairfax Avenue. The bus had an LAPD recruitment advertisement on its side.



Protesters slashed the bus's tires, spray-painted exterior panels, and threw hard objects at the bus which had a driver and community members inside. The IC deployed a squad of officers to protect the passengers and bus driver. Within minutes, the crowd surrounded the officers and began throwing hard objects at them. The OWB IC immediately deployed a TSE to respond and assist the surrounded officers. Still, several officers were injured. In addition, officers left their vehicles to assist bus passengers in distress and, while they were doing so, individuals burned and vandalized those vehicles.

The OWB CP realized quickly that even though more resources were being deployed, it was a challenge to facilitate, protect, and contain (depending on their actions) the numerous small crowds of protesters. Several times, officers attempted to contact someone in a group of protesters to discuss and facilitate peaceful protests. This technique had worked in past demonstrations, but on May 30, 2020, they were rebuffed by the group they approached and immediately flanked by a second group. The



hostility towards responding officers continued to increase as individuals within the various crowds threw objects such as bottles and rocks at the officers.

At approximately, 3:30 p.m., the OWB DC arrived at the OWB CP and took over as IC. The OWB IC mapped the area into four sectors and then assigned a captain to oversee each sector. That allowed for a better span of control. Due to the inability of the Air Unit to provide a downlink, Command Staff at the OWB CP used personal electronic devices to stream news casts to obtain aerial views of crowd size and demeanor.

*PICTURED ABOVE: BOUNDARIES OF CLOSED AREA WITHIN OWB*

At 4:45 p.m., the Mayor declared a local emergency within the City resulting from the civil unrest following the death of George Floyd in Minneapolis, Minnesota. Thereafter, at 6:30 p.m., the Mayor ordered a curfew between 8:00 p.m. on May 30, 2020 and 5:30 a.m. on May 31, 2020 within the City



limits exempting specific persons and informing individuals that failure to comply was in violation of Los Angeles Administrative Code Section 8.78.[15]

At 5:18 p.m., due to large-scale protests and the increase in violence Citywide, Chief Moore mobilized the Department and ordered the cancellation of days off and vacations for sworn personnel until further notice. Mobilization required the Department to move into two 12-hour shifts, A-watch (starting at 6:00 a.m.) and B-watch (starting at 6:00 p.m.) beginning May 31, 2020.[16]

Towards the evening hours, protesters escalated their criminal activity and began mass looting on and around Melrose Avenue and The Grove Drive. All resources not assigned to OCB were directed to respond to OWB Staging for deployment.

At approximately 5:30 p.m., dispersal orders were given, and individuals were advised that the area was closed. The boundaries of the closed area were La Cienega Boulevard to the west, Melrose Avenue to the north, 6th Street to the south, and La Brea Avenue to the east. After the dispersal order, anyone who failed to disperse was then arrested. This resulted in large scale arrests.

At 6:24 p.m., resources from the LASD, Manhattan Beach Police Department, CHP, and others began to arrive at the OWB Staging Area or other CPs to assist the Department.

At 6:46 p.m., as a crowd of protesters moved towards the OWB CP, the Air Unit assisted officers in redeploying and making arrests for failure to disperse.

Due to the escalation in violence from the crowds of protesters and their refusal to obey any dispersal orders, at approximately 7:30 p.m., Chief Moore determined that Special Weapons and Tactics (SWAT) should deploy less-than-lethal stinger grenades and authorized them to do so.[17] The LAPD SWAT deployed the stinger grenade seven times on Melrose Boulevard between Fairfax Avenue and La Brea Avenue. The stinger grenade was again deployed twice by SWAT on Fairfax Avenue and Rosewood Street. The crowds dispersed from the areas during every use. There have been no reported injuries as a result of the stinger grenade deployment.



---

[15] See "Declaration of Local Emergency," dated May 30, 2020 and "Order Setting Curfew During Existence of a Local Emergency," May 30, 2020.
[16] Emergency Operations Guide, Volume 1 – Emergency Operations Policies and Procedures, p. 43.
[17] The Stinger used by SWAT is a Sting Grenade .60 cal. rubber ball diversionary device that produces approximately 130 decibels at five feet. In addition to the light and sound, the stinger grenade is designed to disperse approximately 25 .60 caliber rubber balls in a 360-degree pattern.

In OWB, officers encountered yet another new tactic.  Protesters used vehicle caravans to conduct mass looting.  These caravans consisted of numerous vehicles with several looters inside each vehicle.  The caravans selected strategic locations, including areas where large crowds were blocking City streets.  They positioned and ignited dumpster fires at those locations, making it difficult for officers to maneuver around the crowd and fires to apprehend the looters.  Although each caravan spent minimal time at any one location, the technique allowed multiple looters to execute their crimes in a short period of time creating substantial property loss to many businesses.

The CP soon realized the tactic of the protesters and issued fire extinguishers to officers so they could extinguish small fires without having to dispatch LAFD.  With the help of the fire extinguishers, officers could respond to calls of looting more effectively.  Still, without the Air Unit (due to the limited number of Air Units available and multiple requests for their assistance) or additional personnel, it was difficult to apprehend people committing these acts.



By 8:00 p.m., the curfew was in place.  The curfew provided the Department with a means to detain and arrest protesters without having to verify that they had heard a dispersal order and prior to any violent or destructive actions being committed under the cover of darkness.  Nonetheless, the protests and looting continued throughout the night and into the early morning hours, predominately within West and Central Bureaus.



The jail vans could not accommodate all the requests to transport those taken into custody. This left several officers and arrestees waiting for significant periods of time for transport. To alleviate the response time for the jail transport vans, the Department used MTA buses to transport arrestees.

In the late evening hours, the City received mutual aid from various agencies to assist in restoring order. Those agencies included the Orange County, Santa Barbara County and Ventura County Sheriffs. All mutual aid responders were quickly deployed to the incident.

### *The Valley – OVB*

The OVB IC identified the need to appropriately deploy resources so that they could quickly respond to any identified issues in the Valley. Upon MFFs checking into the OVB CP and Staging Area, the OVB IC deployed MFFs on both the east side of the Valley (North Hollywood Area) and on the west side of the Valley (Topanga Area). This accomplished two strategic goals. First, it reduced response times of MFF units. Second, it deterred any criminal behavior throughout the entire Valley. The OVB IC also detailed a small group of officers at the OVB CP to begin monitoring social media. This provided updated intelligence on protests and any groups that were planning criminal activity in the


*Source: Trevor Stamp*

Valley, including the Topanga Mall where the National Guard was later deployed. Officers were directed to immediately make arrests if any criminal activity was seen and to immediately give a dispersal order if large groups of protesters became unruly. Additionally, OVB made it a priority to engage community leaders throughout the Valley and officers encouraged peaceful demonstrations.

The Valley experienced significantly less criminal activity than OCB or OWB during the Civil Unrest.

### *South Los Angeles – OSB*

The OSB reassigned one of its Commanders to the OCB CP, but the OSB DC was fortunate enough to have another Commander to split shifts with and help oversee OSB.

As the Civil Unrest began in other parts of the City, OSB identified potential locations that might be impacted/targeted by criminal activity. Although staffing levels were low, due to redeployment to the Downtown Area, the OSB DC appropriately managed the personnel within the Bureau. Warnings and board-up procedures were sent to potential locations that could be impacted by the Civil Unrest. The



OSB personnel conducted frequent checks on the potential impacted locations.  The OSB DC coordinated police vehicles to be clearly visible in the streets of OSB by turning on their amber lights while driving and by frequenting the main corridors of OSB.

There was minimal criminal activity related to the Civil Unrest within OSB.  In fact, the community responded with support of the Department.  For example, in Southeast Area, the Patrol Commanding Officer received a phone call from a well-known and long-term resident of that area asking what the LAPD needed, and informing him that the community had "the cops' back."  The caller went so far as to indicate that people were ready to drive down and protect the station.  The Captain informed the resident that such action, although appreciated, would not be necessary.  The protests that were held in OSB were mostly peaceful and the officers recognized the demonstrators as being members of their community.

### Crimes and Arrests

May 30, 2020, was a turning point in the City.  There was a stark increase in the number of individuals committing violence and destruction of property.  This resulted in 72 felony arrests including looting, weapons violations, assaults with deadly weapons, and an attempt murder.  With the increase in violence and Mayor-ordered curfew in effect, many protestors who refused to disperse were arrested for curfew violations.  In total 855 people were arrested on May 30, 2020.

### Analysis

Civil Unrest in Los Angeles first occurred in the OCB area.  Hence, OCB established an OCB CP.  Since OCB established its CP first, it assumed the role of also coordinating resources throughout the City.  This had adverse consequences as in that the OCB CP made the determination on whether resources were going to remain at OCB or be allocated to other Bureaus in the City.  The OCB retained the resources thinking that most of the events and violence would take place in the Downtown Area.  This proved to be an error in judgement.  It would have been wiser to have an independent arbiter of resources for multi-day, multi-location events to ensure an efficient and equitable distribution of resources.  (*See Chapter 8 – Critique No. 4*.)

The OWB was negatively impacted in its attempt to obtain and maintain situational awareness and resources by relocating to a different venue during the event.  While some of this movement was inevitable given the crowd and the impracticability of getting through it, each time the OWB CP moved it had to regain information on resources and awareness to document properly within the CP.



Moving from venue to venue delayed information coming to the CP until the CP was established.  (*See* *Chapter 8 – Critique No. 2.*)

Additionally, in OWB, (and in OCB the previous night) police vehicles were left unattended while officers were involved in dynamic situations including safeguarding people on a bus.  Violent individuals in the crowd took advantage of the situation by destroying 52 police vehicles and the officers' equipment inside of the vehicles.  (*See* *Chapter 8 – Critique No. 18 and 25*.)

Unity of command issues arose in OWB, as they had previously in OCB, when staff officers arrived on the scene and gave direction to officers and supervisors that conflicted with the missions already given by the IC and Operations Section Chief.  This caused confusion during an already chaotic situation.  (*See* *Chapter 8 – Critique No. 3*.)

An officer safety issue occurred when an MTA bus became surrounded by protesters and OWB made the decision to deploy one squad of officers to aid bus passengers.  This decision caused cascading issues, as this squad had too few personnel to assist the passengers and provide protection from the violent protestors.  Upon arrival to the bus, the squad of officers were immediately enveloped by the protesters who began throwing hard objects at the officers.  A TSE was deployed to rescue the passengers and assist the squad of officers in distress.  Several officers were injured during this incident.  Deployment of additional squads to assist the bus passengers from the onset could have safely extracted passengers while reducing the likelihood of injuries to officers.

The Air Unit downlink is an instrumental tool in obtaining situational awareness, specifically crowd size and demeanor, direction of travel, and location where resources are needed.  The downlink was unavailable during most of the Safe LA protests causing Command Staff to stream mainstream and social media from their personal devices.  (*See* *Chapter 8 – Critique No. 17.*)

Some protestors ignited garbage cans and other debris and then pushed them into the street causing delays in officer response to demonstrations and calls for service.  Deploying fire extinguishers inside each police vehicle would have allowed officers to immediately extinguish small fires without additional LAFD resources.  *(See Chapter 8 – Best Practice No. 1.)*

Separating OWB into sectors had both positive and negative effects.  The sectors provided better span of control as captains were given specific missions with dedicated personnel.  However, by using captains in each sector, the Department was limited in relief for sector oversight and performance of other designated duties in OWB and the City in general.  (*See* *Chapter 8 – Critique No. 5 and 25.*)



**Sunday, May 31, 2020**

*Outside Los Angeles- Massive Demonstrations Continued and the National Guard was Deployed*

During this time across the United States, several cities continued to experience massive demonstrations and large-scale looting in their metropolitan areas.  In numerous states, the National Guard was called in to assist law enforcement.  In Minneapolis, a man drove his truck into a crowd of protesters.

*Inside Los Angeles – As Protests Continued the Department Mobilized to Restore Public Order.  The National Guard Arrived.  The LAPD Assisted in Santa Monica.*

Because of the mobilization order from the previous evening, beginning at 6:00 a.m., all sworn A-watch personnel reported for duty.  With the additional personnel and a curfew in place, the Department was also able to better and more efficiently address unlawful crowds of protesters.

On May 31, 2020, the National Guard arrived and was assigned to protect critical infrastructures and probable targets including City Hall, the Staples Center, Fairfax District, Hollywood Boulevard, and the Topanga Mall.  This allowed Department personnel to focus on the disruptive demonstrators as well as protect other businesses and property from criminal activity in the area.



While the National Guard provided assistance at critical infrastructures, allowing officers to facilitate demonstrations, it was not universally welcomed.  Astutely aware of her command and the community she served, the OSB DC requested that there not be a military presence within OSB, as such a presence might elevate tensions and lead to Civil Unrest.  Many council members and the NAACP Urban League agreed with this decision.  The National Guard did not deploy to OSB.

On numerous occasions, officers and community members saw protesters being supplied with fireworks and other items that could cause property destruction and/or personal injury.  Throughout the City and in cities throughout the nation, large pallets of bricks were found on streets and sidewalks for



no apparent reason.  It appeared that unknown persons were supplying protesters with objects to use against officers and create destruction.

At 12:00 p.m. the Mayor issued a revised Curfew Order exempting credentialed media representatives from the curfew.

The Department saw an increase in violence in surrounding cities, including Beverly Hills and Santa Monica.  At 2:00 p.m., Santa Monica requested mutual aid from the LAPD.  The Department deployed personnel and the National Guard also assisted the Santa Monica Police Department (SMPD) in restoring order by helping to clear the looters from the Santa Monica Mall and the Pier.[18]  While at the Pier, the SMPD deployed C.S. gas (tear gas).  This was a safety concern for LAPD officers.  Because LAPD does not use tear gas, only a limited number of officers had gas masks.

While Santa Monica experienced violence, most of the protest groups that gathered in the City of Los Angeles on May 31, 2020 were vocal, but peaceful.  There were, however, sporadic instances of individuals within the crowds of protesters throwing items at officers.  For example, at 3:10 p.m. near 5th and Hill Streets, protestors threw rocks and bottles at officers.

Once the City reached the evening hours, violence increased including calls for lootings, "officer needs help," and crowds throwing fireworks and other objects.

At 8:00 p.m., the curfew took effect, the Department began making mass arrests for curfew violations.  This meant that crowds could not inadvertently or purposefully block officers from responding to criminal acts that were occurring after 8:00 p.m.  The curfew and corresponding arrests limited the amount of criminal activity that was occurring.  Property damage and looting significantly decreased.

Enforcement of the curfew created its own problem.  The mass arrests stopped the criminal activity but created a burden on the already overworked jail vans and lead to a significant wait-time for the transportation of arrestees.  This delay meant that officers were unable to respond to looting calls or be released to go end of watch until the arrestees in their custody were picked up.

At 11:05 p.m., OVB began to receive multiple reports of looting occurring in the Topanga and Encino communities.  At 11:20 p.m., A small and relatively peaceful group of protesters took over the area of Ventura Boulevard between Louise and Reseda Streets, in OVB.  An MFF was quickly deployed to



Santa Monica requests Mutual Aid.
2:00 PM

12:00 PM
Curfew revised to have media and homeless exempt.

---

[18] Based on information obtained from the City of Santa Monica, looting resulted in almost five million dollars in property damage and theft.

monitor the crowd and deter any violent behavior.  The crowd dispersed upon the arrival of the MFF but only after it had vandalized four businesses and looted one jewelry store.

### Crimes and Arrests

On May 31, 2020, there were 719 arrests associated with the Civil Unrest.  The common trends in arrests were Looting and Curfew Violations.

### Analysis

By May 31, 2020, the pattern for the protests had been set.  There was little criminal activity in the morning.  Peaceful marches, facilitated by the LAPD, would take place in the afternoon.  Then, as the day progressed, and the sun began to set, criminal elements would join the marches and protests would devolve into demonstrations mixed with violence and disorder until the early hours of the next day.

Communication between the ICs and field units improved.  The ICs used unity of command to convey information throughout the incident's organizational structure.  The overall management of the incident became streamlined and there was a clear chain of command among the different CPs.  The organizational structure developed for each of the Bureau's CP providing a clear understanding of the roles and responsibilities of those assigned to key positions.  This allowed those in command positions to know who to give direction to and the officers and supervisors knew from whom to elicit information and direction.  In addition, the commander's intent given by Chief Moore on May 29, 2020 was clearly relayed to all personnel.  The intent clarified that officers should facilitate protests and not allow the criminal action by select individuals to color their view of the entire group.  If, however, the protest group started to cause damage, loot, or infringe on the rights of others, arrests should be made.  The overall goal was to create a safe environment for the lawful expression of Constitutional Rights.  Although overall communication improved, many Command Staff were unable to identify their role within the ICS structure, causing some confusion.  Intermittently, officers and supervisors in the field received direction from Command Staff Officers that varied from the direction they received from the CP.

> *"There are quite a few command staff officers who lack experience in handling large dynamic incidents. They need a mentor.  Captains need more training, not in the description of what they are responsible for but how to functionally do the job."*
>
> *-Command Staff Officer*



Command Staff were eager to correct the issues that they had experienced over the past few days. These issues ranged from officers receiving conflicting directions to critical Command Staff leaving their CPs and losing situational awareness. Command Staff assigned to the ICS structure remained at their designated CPs. Once the proper ICS procedures were implemented, the Command Staff were able to step back and look at the overall picture of what was occurring, prioritize missions, and focus on economy of force by deploying officers more efficiently. Clear direction was provided to officers, which allowed for the Department's objectives to be met in a more effective manner. (*See* Chapter 8 – *Critique Nos. 1, and 3.*)

Not only did multiple agencies provide mutual aid to the Department, but the Department also sent resources to nearby agencies. Although the various departments were able to work together during this tenuous time, different protocols and less-lethal options for crowd control among the agencies proved challenging. For example, other agencies use tear gas. The LAPD consciously chose not to use tear gas on protesters and has not deployed tear gas in crowd control situations in decades. For example, the LAPD did not deploy tear gas during the 1992 Los Angeles Civil Unrest. In addition to its historical aversion to tear gas, the Department was concerned about using tear gas which impacts a person's respiratory system, during COVID-19. The Department chose alternative methods to address unlawful behavior. The use of tear gas by other agencies meant that the LAPD could not effectively assist without compromising their own safety. The region must continue to work together to develop coordinated responses to manage significant incidents. (*See* Chapter 8 – *Critique Nos. 8 and 18.*)

The National Guard assisted in many ways, including protecting fixed posts at City Hall, the Topanga Mall, and the Civic Center, allowing officers to be redeployed. However, there were several challenges that occurred with the arrival of the National Guard. The most difficult of these challenges was communication. On May 31, 2020, the OWB IC was notified by the Director of the Officer of Operations (OO) that a contingent of National Guard would be arriving at the OWB CP. The Director of OO believed that, because the Department had a liaison to the Guard, the National Guard had already been briefed on the rules of engagement and law of arrests. The Director of OO stressed the importance to immediately deploy the National Guard to designated critical sites. Upon arrival to OWB, the National Guard Commanding Officer, advised that he and his soldiers had not received any briefs on either the rules of engagement or laws of arrest causing a delay in their deployment. The Department needs to have procedures in place for working with the National Guard. (*See* Chapter 8 – *Critique No. 9.*)

During this day, Metropolitan Detention Center (MDC) became overwhelmed with the large number of arrestees that were being transported to the jail. As a result, several jail buses were rerouted to the other jail facilities in the City. This led to delays in processing arrestees and extended time in custody. Maintaining CSD's operating standards with the limited personnel was challenging. The CSD



personnel were not included in the Department-wide mobilization and therefore were limited in their ability to support the incident.  (*See* Chapter 8 – *Critique Nos. 13, 14, 15, and 16*.)

*Outside Los Angeles- The Protests Extended Beyond the United States.*

**Monday, June 1, 2020**

Protests over racial injustice began to emerge outside of the United States in several countries including, the Netherlands, Spain, and Nairobi.

*Inside Los Angeles –Hollywood Protest Occurred and the Crime Wave Peaked.*

Officers within MCD continued intelligence gathering related to the Civil Unrest and put out safety bulletins advising that protesters were arming themselves with bottles of acid, so officers should be to be diligent and aware of their surroundings.  Detectives from RHD were assigned to investigative response teams to assist the geographic Bureaus with major investigations including assaults and looting.

As numerous marches continued throughout the City, the Department maintained the same dual mission of protest facilitation and crime prevention.

At approximately 9:00 a.m., a small group of protesters formed in front of the Van Nuys Courthouse.  The OVB deployed an MFF and a Motor Strike Team to the Courthouse to monitor the protest.  The crowd grew to 100 protestors and remained peaceful.

Personnel were tasked with opening a field jail at University of California, Los Angeles (UCLA) at approximately 1:00 p.m.  Due to a lack of booking supplies, personnel, and equipment, the jail did not open until 3:00 p.m.  (See Chapter 3 for additional information).

At approximately 1:30 p.m. in OSB, the Watts community held a press conference.  At that press conference, community members spoke about not wanting any unlawful behavior occurring within their communities and stood in unity with the LAPD.  The community made it clear that they did not want any outside groups coming to their community and creating havoc over the bonds they fought so hard to forge.



**SAFE LA AFTER ACTION REPORT**

During the afternoon, OVB began experiencing sporadic looting incidents throughout the Valley.  In addition, OVB received broadcasts of vigilantes driving around and assaulting the individuals who were looting.

At approximately 2:45 p.m., the Los Angeles County Board of Supervisors issued a curfew order.  The County curfew would begin at 6:00 p.m. instead of 8:00 p.m.  The Mayor then revised the City's Curfew Order to mirror the County Order.  Thus, at 6:00 p.m. on June 1, 2020, curfew began in the City and County.

> *"...Watts isn't going back to its ashes, its rising...Don't let history repeat itself."*
> *-Pastor in Watts at Press Conference*

As in previous days, peaceful protests escalated to criminal acts in the evening hours and further escalating after nightfall.  By 5:00 p.m., the Department began receiving calls for looting and vandalism.



In OCB and OWB, many of the calls described caravans of vehicles committing criminal acts.  The vehicles in these caravans covered their license plates with trash bags so that no one could identify them.  Officers began towing all vehicles that were parked illegally or used in the caravans.  This strategy proved to be effective at immediately decreasing the looting and deterring future caravans of looters.



42

Towards the evening hours, Van Nuys Area, within OVB, began receiving reports of mass looting occurring on Van Nuys Boulevard between Victory Boulevard and Sherman Way. Additionally, officers received information that individuals within a crowd of protesters looted a pawn shop and armed themselves with firearms stolen from that business. Several MFFs were immediately deployed to the area to contain the protesters and to make arrests. Two jail vans were dispatched from Downtown to Van Nuys Area to transport any arrestees.

While these events were occurring in the Valley, the Hollywood Area received an influx of radio calls indicating mass looting was occurring at multiple locations along the Sunset Strip. With so many locations being looted and so few personnel, a Hollywood Area lieutenant deployed officers in a squad formation rather than an entire MFF. The Air Unit notified the officers about a looted location, and a squad responded to the location. Once the resources arrived and made arrests, the Air Unit searched for another location where criminal activity was occurring and directed a squad to that location. This



proved to be extraordinarily effective. Numerous looting arrests were made, and looting stopped because of this plan. This plan would then be used in the days to come.

In addition, a vehicle pursuit occurred in Hollywood after the driver of a white sports utility vehicle attempted to run over an officer. Officers stopped the vehicle at Nadeau Street and Antwerp Street where four individuals fled from the vehicle. Three vehicle occupants were taken into custody without incident.

That evening Southwest Narcotics Enforcement Detail (NED) was assigned to the Civil Unrest conducting crime suppression for looting. The Southwest NED officers arrived at a Chevron gas station when they heard a firearm racked and saw a firearm pointed at them by a suspect parked at the Chevron. The NED officers requested a back-up response, and as additional Southwest NED officers arrived, two suspects immediately fired their weapons at the NED officers. The Southwest NED officers responded with gunfire. The suspects then dropped their weapons, surrendered, and were taken into custody without further incident. One officer sustained a minor graze wound and was treated at the hospital for his injury. He was later released. During a search as a result of arrest, officers found several looted items in the suspects' truck. The suspects were later charged with attempted murder.



*Crimes and Arrests*

On June 1, 2020, looting and vandalism continued to occur throughout the City. This day saw the largest number of arrests made related to the Civil Unrest. Several mass arrests were made in the Downtown Area, Hollywood, and Van Nuys. The Hollywood Area experienced a massive amount of looting and vandalism at multiple locations along the Sunset Strip. The looting was so widespread that MFFs were broken up into squads to better respond to the large number of locations being looted.

In total, the Department made approximately 1,378 arrests related to the Civil Unrest. Most of the arrests were for Looting, Violations of Curfew, and Disobeying Orders.

*Analysis*

The City experienced a large amount of looting and vandalism calls for service in Hollywood and Van Nuys Areas. With the Department's full mobilization from the prior day, many resources were available to respond to the operational needs of the CPs. This brought a new challenge of coordinating the deployment of thousands of Department personnel, mutual aid resources, and the National Guard. Robust Staging Areas had to be maintained as well as a multitude of personnel at the CPs to track resources assigned to the incident. (*See Chapter 8 – Critique Nos. 6, 8, 9, 12, 21, 22, and 25.*)



When the Department is met with new tactics from demonstrators (such as splitting into small groups and moving in different directions, looting caravans, and building barricades), the Department must use unconventional tactics to accomplish its mission. Command Staff were hesitant about using new tactics that had not been previously established as "best practices." Ultimately, however, the Department decided to make changes including splitting up MFFs. The splitting of MFFs helped in apprehending many looters, making arrests, and using resources more effectively throughout the City. Despite the success in this event, these tactics should be used with caution as it is exponentially more challenging to track personnel effectively. (*See Chapter 8 – Critique No. 18*.)

In the evening hours there was an increase in looting and vandalism calls. Protesters marching in the streets caused gridlock and significant delays for buses arriving to transport those arrested. In some situations, buses were diverted when responding to a location causing further delays. This



significantly impacted the Department's transportation plan and left officers with arrestees for extended periods of time.  To help alleviate the transportation issues the Department received assistance from LASD in the form of jail buses.  The Department also used MTA buses.  (*See Chapter 8 – Critique No. 14.*)

At the field jails, officers became overwhelmed with the massive influx of arrestees arriving.  These locations had limited personnel, as pre-assigned personnel were reassigned to MFFs to help quell the massive demonstrations happening throughout the day.  Most of issues with the field jails were seen at the UCLA field jail location.  Although command staff ordered the location to be established at approximately 1:00 p.m., the designated UCLA Field Jail Leader recognized several major challenges upon her arrival.  There was no equipment or supplies at the location.  The UCLA Field Jail Leader made the request for the needed supplies to the DOC; however, numerous demonstrations blocked the roadways and delayed supplies getting to the location.

The UCLA Field Jail Leader overcame numerous challenges by taking supplies from the WLA CP and West Los Angeles Station that were located nearby.  These supplies included writing implements, water, portable toilets, tables, chairs, two police vehicles with working mobile data computers, and necessary paperwork such as Adult and Juvenile detention logs.  Central Detectives personnel, who were assigned to the field jail operations for the day, had cuff cutters available and provided them for field jail operations.  Eventually the DOC, was able to provide additional supplies such as Release from Custody (RFC) and Citation books as well as generators and lighting to continue operations during B Watch hours.  While the UCLA Field Jail Leader was able to overcome the majority of these challenges with ingenuity, the Department should consider having a pre-loaded trailer with the needed supplies and a trained cadre of detention personnel to establish field jails in future mobilizations or unusual occurrences.  (*See Chapter 8 – Critique No. 16.*)

**Tuesday, June 2, 2020**

*Outside Los Angeles – Minnesota Initiated a Civil Rights Investigation*

The Governor of Minnesota announced that a civil rights investigation would be conducted against the Minneapolis Police Department.



*Inside Los Angeles – Protests Continued.  Daytime Violence Decreased but Nighttime Violence Increased.*



At 7:00 a.m., the Department closed the UCLA field jail due to growing community concerns and the inability to staff an efficient field jail with personnel, medical supplies, and additional equipment.

At 12:40 p.m., the Mayor revised the Curfew Order to make individuals travelling to and from and participating in voting exempt from the Order.

Based on the reduction of violence by the daytime crowd, and the lack of violent agitators within in the crowd, the Department was able to recalibrate to facilitate protests with passive crowd management strategies.  This included directing officers to the rear of protest groups and having other officers parallel the crowds.  This way officers remained largely out of sight but available to assist if necessary. The officers would only become visible if the Air Unit indicated any escalation of criminal activity. This tactic produced positive results and created fewer negative interactions between protesters and police officers.

Although the City saw a substantial decrease in criminal activity during the afternoon, as the evening hours approached, rioting, looting, and property damage again replicated what it had been in previous nights.  The Department provided officers with intelligence on a continual basis to help them with safety and awareness.  For example, OVB received intelligence that pallets of bricks were left along Ventura Boulevard.

The RHD and Commercial Crimes Division assumed the investigative role for major cases intended for state and federal filings.  They worked closely with state and federal partners on cases such as major assaults on community members and officers, as well as looting and arson.

The Investigative Branch Director for OCB B-watch was briefed daily regarding the number of personnel he would have assigned to him to handle investigations.  Consistently over the next few days, the Branch Director would arrive at staging to find that his dedicated resources had been placed in an MFF and deployed to the field.  This caused the Investigative Branch to lack the necessary personnel to staff the field jails appropriately.

While most of the criminal activity occurred in the Downtown and Wilshire Area, there were flashes of criminal activity all over the City causing resources to be spread very thin.  For instance, while



resources were in the Valley addressing several looting occurrences, other officers were engaged in a pursuit. The pursuit was initially for a possible stolen U-Haul Truck and then shifted to an Assault with a Deadly Weapon on a Police Officer after the suspect intentionally collided his vehicle with the officer's vehicle. Ultimately the pursuit ended, and the suspect was taken into custody. However, this and other events showed that the City was under duress and had to attempt to complete each task that arose with scattered resources. It was difficult to maintain situational awareness and manage resources.

As the night progressed, there was a decline in radio traffic and calls for service. Although the curfew continued, many individuals still marched in the streets. The  Department continued to make arrests, predominately in the Hollywood and Central Areas. There were still isolated incidents of violence directed towards officers.

While the Civil Unrest was the main focus of the Department in late May and early June, there were other functions requiring the Department's attention. For example, during the period of Civil Unrest, there were several scheduled "Days of Gathering" within OSB including the 62 Brims' day on the second of June and the 64 Brims' day of gathering on the fourth of June. [19] The gatherings for these days all occur in OSB. Usually, OSB devotes a significant amount of resources to focus on gang enforcement due to the high criminal activity that can surround these days. Typically, OSB divisions are on a heavy deployment status to limit any criminal activity. In 2020, however, due to the Civil Unrest, the OSB DC shifted resources around to manage these significant events within OSB during a period of civil unrest in the middle of a pandemic. To the community's and OSB's credit, there was no criminal activity at either event. Both proceeded without incident.

   *Crimes and Arrests*

The Department made a total of 969 arrests on June 2, 2020 related to the Civil Unrest.



---

[19]A Day of Gathering is defined in slang terms as a "hood day" where members of local gangs celebrate their individual gang affiliations.

**SAFE LA AFTER ACTION REPORT**

<u>*Analysis*</u>

Although daytime violence decreased, criminal behavior in the evening continued as it had on previous nights.  During the day the Department was able to decrease its enforcement role and largely facilitate peaceful protests and gatherings.  *(See Chapter 8 – Critique Nos. 12 and 24.)*

During the evening hours, the Department had to focus on arresting anyone engaged in criminal behavior.  The Department continued to maintain its elevated level of deployment in case any incident escalated.

The Department closed the UCLA field jail which had been unable to staff an efficient field jail with personnel, medical supplies, and additional equipment.  *(See Chapter 8 – Critique No. 16.)*

<u>**Wednesday, June 3, 2020**</u>

*Outside Los Angeles – Minneapolis Charged Officers Implicated in Floyd's Death.*

Three former MPD officers were implicated in George Floyd's death and charged with aiding and abetting murder.

*Inside Los Angeles – Criminal Behavior and Violence Declined as the Day Progressed.*

The City of Los Angeles continued to experience Civil Unrest.  Several radio calls were generated in the early morning hours for looting and vandalism.  For example, in the Downtown Area, there were reports of looting and vandalism at the Carl's Jr. and Fallas Parades.  In addition to the Downtown Area being hit with looting and vandalism, OWB experienced continued looting and vandalism.  West Los Angeles and Hollywood Areas received numerous calls for looting and vandalism including multiple Walgreens in both Areas.  Moreover, a corner market in Olympic Area was being looted during the early morning hours.  As chaos and destruction was occurring, officers continued making several arrests in the early morning hours and activity began to significantly dwindle as the morning continued.

The Department maintained its full mobilization and its Citywide Tactical Alert.  The Department assessed the situations that arose and adjusted its missions and tactics.



At approximately 10:25 a.m., Governor Gavin Newsom visited Leimert Park in OSB. He walked around, spoke to people, participated in a planned protest, and an interview with the media. He also went to visit the Community Based Organization -Community Build in Leimert Park. He was accompanied by Mark Ridley-Thomas. The OSB Command Staff and officers facilitated this visit to ensure the Governor's safety. The event remained peaceful and no issue arose from the Governor's visit.



The City began to see a slight decrease in criminal activity, but officers remained vigilant. This was rewarded when, for example, officers near 2nd and Spring Streets found a handgun in a planter near a planned protest for the day. Units responded and canvassed the area for additional weapons to maintain the safety of protesters and officers who were in the area that day.

At 12:30 p.m. the Mayor's Curfew Order was revised. The curfew was pushed back to 9:00 p.m. All other details of the Order remained the same.

By the afternoon, the Downtown Area had approximately 8,000 protesters. The protest was largely peaceful.

Nonetheless, officers encountered another new tactic -- drones. Individuals within the crowd were using drones to fly over the protest. This caused safety concerns for the Air Unit because the drones could collide into the Air Unit potentially causing a crash and injury to officers and community members. As a result, the Air Unit was continuously updated on the drones in the area.

Despite the overall tenor of the peaceful protests, there were several isolated incidents of criminal activity, predominantly within the evening hours. As crowds diminished in the evening hours, the protesters that remained started to become hostile. At about 8:05 p.m., a crowd of approximately 500 began to surround the National Guard Downtown. Officers were called to assist and as they arrived, the crowd started throwing rocks, bottles, and other harmful items at the officers.

In OWB, individuals reported looting in various locations (e.g., Shiekh Shoes, Walgreens, a Fed Ex Truck with packages) including, but not limited to, Hollywood Area. Officers continued to use the curfew order as a useful tool to make arrests, thereby deterring more significant criminal activity.



500 protesters surround the National Guard.
8:05 PM

Curfew begins.
9:00 PM

7:35 PM
Over 13,000 protesters in the
Downtown Area.

8:51 PM
Suspect involved in shooting on
May 30th arrested.

**SAFE LA AFTER ACTION REPORT**

*Crimes and Arrests*

By the fifth day of Department mobilization, a significant decline in criminal activity and arrests occurred.  There were 55 arrests related to the Civil Unrest.  Most were for Curfew Violations.

*Analysis*

Although the violence and criminal behavior were still declining, the Department maintained a high deployment level because George Floyd's memorial was scheduled to take place on June 4, 2020.

As had been seen in previous days, new tactics continued to be deployed by individuals within the crowd and the Department had to adjust quickly.  On June 3, 2020, the protestors used drones to oversee police tactics and deter Air Units from flying overhead.  Personnel remained in contact with the Air Units for flight safety and attempted to locate and arrest drone operators with little success.  Anti-drone technology, used by the Los Angeles Port Police, would have been beneficial during the civil unrest.  *(See Chapter 8 – Critique No. 19.)*

**Thursday, June 4, 2020**

*Outside Los Angeles – George Floyd's Memorial Service was Held.  Officers in Other Cities Were Suspended for Aggressive Acts.*

George Floyd's memorial service was held in Minneapolis.

Officers in Buffalo, New York, were suspended after they are captured on video, shoving a 75-year-old man to the ground causing the man to sustain an injury to his head.

*Inside Los Angeles – Demonstrations and Violence Diminished.  The Curfew was Lifted.*

The City continued to see a decline in activity – both in terms of demonstrations and incidents of criminal activity.  The demonstrations were predominately peaceful in nature.  The Department continued with its low-profile approach and began to look at deployment needs to determine when to conclude the Department's mobilization.



Protests were scheduled predominately in OCB.  All were scheduled in the early afternoon hours.  The crowds began forming at Newton Station at approximately 10:53 a.m., at City Hall at approximately 11:39 a.m., and at Hollenbeck Station at 1:24 p.m.  The Newton Protest had minimal turnout with approximately 15-20 protesters all of who were peaceful throughout the day.  The Hollenbeck protest began as scheduled and ended by about 3:10 p.m.



At 4:40 p.m. the Mayor rescinded all curfews within the City.

As the evening hours approached, the Downtown Area was the main hub of demonstration activity.  By 8:04 p.m. a crowd estimated at 4,000 was maneuvering throughout the Downtown Area.  There were a handful of incidents where protesters threw objects at officers, but overall, there was a significant decrease in violence.

### Crimes and Arrests

On June 4, 2020, there were 20 arrests related to the Civil Unrest, predominately Curfew Violations that occurred in the early morning hours of June 4, 2020, while the curfew was still in place.  There was only one felony arrest.  It was for Assault with a Deadly Weapon.

### Analysis

The Department stayed mobilized and alert throughout the day due to George Floyd's Memorial service held in the early afternoon hours.  Several protests were scheduled throughout the City and all remained peaceful.  The Curfew Order was rescinded as violence and criminal behavior had significantly declined.



Hollenbeck Protest ends with no issues.
3:10 PM

1:35 PM
800 peaceful protesters in OWB.

4:40 PM
All Curfew Orders end.

### Friday June 5, 2020 – Sunday June 7, 2020

*Outside Los Angeles – Global Rallies Continued*

Global rallies continued outside the United States from Sydney to London.

*Inside Los Angeles –   Demonstrations and Criminal Actively Decreased*

Communications Division continued to disseminate safety alerts to personnel.  For example, Communications Division received an emergency text stating, "We are the peace rally, and we are going to kill you."  Similarly, RHD received information of an individual planning to bring an assault rifle to Los Angeles, and another individual setting a mannequin dressed up as a police officer on fire.

On June 6, 2020, the Department received information that another large protest would be occurring at Pan Pacific Park.  The Department was particularly cautious in its approach to this event due to the level of violence that had previously accompanied the protest at Pan Pacific Park.  The Department planned accordingly and had resources on hand in case officers were met with violence.



At approximately 2:55 p.m., a crowd of 1,500 protesters overtook the street as they marched westbound on Beverly Boulevard towards West Hollywood.  The crowd maintained a vocal but largely lawful demeanor.  This peaceful demeanor was in stark contrast to the protest at Pan Pacific Park the week before.  The Department planned to have a hands-off approach if the event remained peaceful.  It did.  There were no injuries, damage, or arrests as a result of the protest that took place on June 6, 2020.

In the Valley, National Guard soldiers found pallets of rocks and bricks surrounding the Westfield Fashion Square's perimeter.  The OVB quickly assigned officers to assess if there was any criminal intent in placing the pallets in this area.  The OVB also had a few demonstrations throughout the Valley, the largest being a crowd of approximately 400-500 who were protesting at Nordhoff



Boulevard and Reseda.  All demonstrations were peaceful and did not require police intervention.  There was minimal other activity reported in the Valley Area.

On June 7, 2020, in Hollywood, there was a protest of approximately 15,000 participants.  This event was pre-planned and hosted by entertainer YG and Black Lives Matter.  It was one of the largest events during the Civil Unrest.

During this event, the Department deployed officers to the exterior perimeter, out of sight of attendees.



The Air Unit monitored the event and crowd from a high altitude as to not bring attention to themselves.  Officers were instructed to engage with the crowd only if the Air Unit observed any escalation and criminal activity occurring.  This tactic, along with the Department's relationship with event organizers who successfully managed the crowd, led to minimal issues.  The LAPD personnel were able to facilitate the protesters' First Amendment rights.

As the City was on a steady decline of criminal activity involving the Civil Unrest, Mayor Garcetti, Chief Moore and the EOC determined that the City no longer needed the National Guard.  The National Guard returned to staging and stood down from deployment on Saturday, June 6, 2020.

On Sunday, June 7, 2020, the National Guard was demobilized from the incident and returned to home bases.

### Crimes and Arrests

From June 5, 2020 through June 7, 2020, there were approximately 12 arrests related to the Civil Unrest.  All of them were misdemeanors.



**SAFE LA AFTER ACTION REPORT**

*Analysis*

Media outlets and social media postings went viral with images of police and protesters. The Department began to be scrutinized for its use of less-lethal force during the Civil Unrest. The Department explained that the level of force used by the LAPD escalated in response to the violence and intensifying destruction. Similarly, the Department rapidly de-escalated force as the protests returned to a peaceful posture. The Department reiterated that it encouraged peaceful protesting and condoned the violence that occurred during the prior days.

Despite media outlets depicting violence at the hands of police, on June 7, 2020, the Department facilitated the largest demonstration during the Civil Unrest. There were no significant issues. By limiting the number of visible resources, contacting the protest organizer, and providing appropriate traffic control, the demonstration in Hollywood Area remained peaceful allowing individuals to express their First Amendment rights. This success, as well as the context of other actions remains largely untold, and the Department's media section must continue to provide media outlets, traditional and non-traditional, with information even during unusual occurrences. (*See Chapter 8 – Critique No. 26.*)



**(THIS PAGE WAS LEFT INTENTIONALLY BLANK)**



Source: Axel Koester



# Chapter 2:

## Costs – Injuries, Property Damage & Other Costs

# INJURIES

*Department Personnel:*

Multiple officers sustained injuries because of the Civil Unrest.  On-duty officers reported approximately 106 demonstration-related injuries during the period of May 27, 2020 through June 7, 2020.  This number does not account for minor injuries that were not reported by officers while working the Civil Unrest.  Injuries varied from minor to serious and included strains, contusions, lacerations, bone fractures, and a gunshot wound.  There were approximately 97 assaults or batteries on police officers.  Five of the assaults included the attempted murder of a police officer.



There were additional assaults with a deadly weapon on a police officer which included assaults from rocks, bottles, bricks, concrete, bottles of urine, dry ice bombs, fireworks, lasers, and gunfire.  The officers that were injured as a direct result of the Civil Unrest, including those that were hospitalized, are expected to recover from their injuries.

Following the Civil Unrest, the Department also saw an increase in LAPD personnel with COVID-19.

*Other Agencies:*

At this time, none of the agencies who rendered mutual aid to the LAPD have reported any injuries while assisting the Department during the Civil Unrest.

*Angelenos:*

Approximately 55 people reported to the Department that they sustained injuries from law enforcement officers as a result of the Civil Unrest.  Of the 55 injuries, 17 were described as serious bodily injury.

There have been no reported deaths.

Each citizen complaint against the Department and its personnel, including those involving injuries, is investigated by Internal Affairs Group.  Moreover, Force Investigation Division is investigating all categorical uses of force and complained of injuries related to uses of force.  The details of each citizen complaint and use of force investigation are not included in this Report due to ongoing investigations and litigation.

SAFE LA AFTER ACTION REPORT

# PROPERTY DAMAGE

### Private Property

During the Civil Unrest, there were approximately 279 reported cases of looting and 911 reports of burglary documented throughout the City.  In an effort to obtain an accurate assessment of the damage that was incurred by the City and citizens of Los Angeles, Department personnel contacted several private, local, and federal entities.  These entities included the Insurance Information Institute, the National Association of Insurance Commissioners, Los Angeles Department of Building and Safety (LADBS), the California Department of Insurance, and the Federal Emergency Management Agency (FEMA).

The Insurance Information Institute, the National Association of Insurance Commissioners, the California Department of Insurance, and FEMA, all advised that they did not have any data related specifically to the damages that were incurred during civil unrest in Los Angeles.

At the time of this report the LADBS had inspected approximately 121 privately owned locations that were damaged.  The following information was provided by the LADBS and reflects a summary of statistics for buildings damaged during the Civil Unrest.  The cost estimates provided are for structure damage only and do not include the value of the contents in the structure.

| Type of Building | Inspected | Number Damaged | Estimated Cost |
|---|---|---|---|
| Residential | 2 | 2 | $80,000.00 |
| Commercial | 90 | 90 | $2,487,500.00 |
| Un-Specified | 32 | 29 | Unknown |
| **TOTAL** | **124** | **121** | **$2,567,500.00** |

NOTE: Extensive property damage (including the loss of structures) occurred primarily in Central, Hollywood, Wilshire, and Van Nuys Areas.

In a continued effort to provide an accurate estimate of damage, Department personnel reviewed all crime reports generated due to the Civil Unrest.  Although some reports are still pending estimates from the victims, an estimate of the private property damaged based off these reports is approximately $16,561,666.  For purposes of this document, damaged property can mean broken/tampered doors, smashed windows, damages to building infrastructures, interior walls, or equipment for interior of businesses.

In addition to the property damage, many protesters removed property from the locations.  An initial assessment based on victim's estimates is that $150,397,571 worth of property was stolen by looters.

The information, broken down by bureau can be seen in the following chart:



| | Central Bureau | West Bureau | South Bureau | Valley Bureau |
|---|---|---|---|---|
| ■ Property Damaged | $2,283,276.00 | $13,950,125.00 | $95,970.00 | $232,295.00 |
| ■ Property Taken | $11,824,708.00 | $135,827,588.00 | $1,910,396.00 | $834,879.00 |
| Total Amount | $14,107,984.00 | $149,777,713.00 | $2,006,366.00 | $1,067,174.00 |

Thus, based on reports to the Department, the amount of private property loss due to the Civil Unrest is close to $167,000,000.[20]



Among the property taken by looters was pharmaceutical medications. According to the Drug Enforcement Administration (DEA), 52 pharmacies in the City of LA were looted during the Civil Unrest. Out of those 52 locations, approximately 568,781 doses of controlled substances were stolen or unaccounted for (including oxycodone, Xanax, amphetamines, and clonazepam). The DEA estimated that street value of these drugs to be approximately $1,267,175.

*City Property*

In addition, to private property damage, there was significant damage to City property. A total of 142 police vehicles were damaged during the Civil Unrest. Eight police vehicles were damaged beyond repair. The replacement cost for these eight police vehicles is $640,000. The cost to repair the remaining damaged vehicles was approximately $158,593. Including additional expenses, the

---

[20] Neighboring cities of Beverly Hills and Santa Monica reported extensive damage and property loss. Beverly Hills estimated $281,970 in damage/loss and Santa Monica had approximately $5 million in loss/damage. The information about damage and loss was provided to the Department by the cities themselves.

Department's total repair costs was $836,589.  The Motor Transport Division was able to reduce the actual cost by about 10 percent because they were able to repair vehicles with used parts from unsalvageable vehicles.  Additionally, the Department used approximately $30,000 more in fuel than in a usual 10-day period.

In addition to City vehicles being damaged, several City-owned properties were impacted as well, predominately by graffiti and broken windows.  Below is an estimate of those damages.

| *City Building Location* | *Description of Damage* | *Estimated Cost* |
|---|---|---|
| Highland Park | Derogatory graffiti towards police officers | $472 |
| Pershing Square | Windows broken at administration building, Olive Street community room, and North window. Graffiti throughout. | $7,325 |
| Pan Pacific Park | Graffiti and damage to basketball court | $1,244 |
| Paxton/Ritchie Valens Park | Graffiti | $472 |
| LAPD Headquarters | Broken pane window | $14,770 |
| Metropolitan Detention Center | Vandalism to exterior camera | $435 |
| LA Convention Center | Graffiti & facility cleaning | $421,920 |
| Library | Graffiti & Vandalism | $1,960 |
| Public Works Board | Vandalism & Graffiti | $24,929 |
| **TOTAL** | **9 Buildings** | **$473,527** |

The overall cost of damage to City property, both vehicles and buildings, was approximately $1,310,116.

For comparison purposes, in the 1992 Los Angeles Civil Unrest the damage to City property was approximately $362,946 or the equivalent of about $676,344 in 2020 dollars.  In 1992, approximately 21 City-owned/leased buildings were damaged.  In 2020, there were nine City-owned/leased buildings damaged.  In 1992, four police vehicles were unrepairable, in the 2020 Civil Unrest eight police vehicles were beyond repair.

During the Civil Unrest, the Department brought in all available personnel and canceled all scheduled days off and vacations.  In doing so, the City spent a large amount of money in keeping Department personnel for long periods of time to protect and serve the City.  The Department used approximately 516,236 hours in overtime related to the Civil Unrest.  The total overtime cost for all employees during this period was $50,169,029.

### *Clean Up and Removal of Debris*

Due to the multiple days of Civil Unrest, the City faced a massive amount of destruction and debris left behind by protesters.  Each night, the Los Angeles Bureau of Street Services and the Los Angeles Sanitation Department were both tasked with clearing all the debris that was left behind on City property (roadways, sidewalks, parks, etc.).  At the end of the Civil Unrest, the LA Bureau of Street Services estimated that they had cleared over 626 cubic yards of debris (approximately 15.65 tons), which is equivalent to approximately 53 dump trucks.  Los Angeles Sanitation estimated that its Department had cleared approximately 1,150 tons of debris from City property during the Civil Unrest period.  In total, over 130 dump trucks worth of debris was removed from City streets.  It is unknown what the costs to the City was for the cleanup.

### *Vehicle Impounds*

Approximately 320 vehicles were impounded related to the Civil Unrest between May 27, 2020 through June 7, 2020.  The highest number of vehicle impounds occurred between May 31, 2020 through June 2, 2020.  Vehicle impounds proved effective as it decreased the number of car caravans used to loot businesses and helped quell the violence throughout the City.

On June 9, 2020, the City Council voted and required the Department to release all vehicles impounded during the Civil Unrest without requiring payments from vehicle owners.  In addition, the City Council required the Department to pay any costs regarding the impounds. The Department reimbursed the registered owners approximately $28,807 for vehicles that were impounded due to curfew violations.

The below chart depicts the total estimated costs that the City of Los Angeles incurred due to the Civil Unrest.

| Civil Unrest by the Numbers | |
|---|---|
| Private Property Damage | $19,129,166.00 |
| Public Property Damage | $1,310,116.00 |
| Property Value Stolen by Looters | $150,397,571.00 |
| Street Value of Stolen Pharmaceuticals | $1,267,175.00 |
| Overtime Expenses | $50,335,320.53 |
| Debris Removal (Approximate in tons) | 1165.65 tons / unknown cost |
| Fuel Used | $30,000 |
| Tow Reimbursements | $28,807.15 |



Source: Axel Koester



# Chapter 3:

## Crimes, Arrests & Field Jails

# CRIMES

Between May 27, 2020 and June 7, 2020, the City of Los Angeles experienced approximately 6,911 crimes overall throughout the City.  Out of those 6,911 Crime Reports, approximately 1,855 arrests were made overall.[21]

Daily violent crime peaked on Saturday, May 30, 2020.  After June 1, 2020, violent crime substantially decreased.  The below Common Crime Trends is a chart that identifies three common crimes related to the Civil Unrest by date.



Comparing May 27 through June 7, 2019 with May 27, through June 7, 2020, there was a significant increase in criminal activity in 2020, specifically in Burglaries, Vandalisms, and Assaults on Police Officers.  The below chart shows overall total number of crimes in particular categories within the City and not specifically Civil Unrest crimes.

| Common Civil Unrest Crimes | 2020 | 2019 | Percent Change |
|---|---|---|---|
| 459 PC (Burglary) | 911 | 396 | 130% |
| 594 PC (Vandalism) | 822 | 633 | 30% |
| 231 PC (Assaults on Police Officers) | 176 | 5 | 3420% |

---

[21] This report does not focus on crime unrelated to the Civil Unrest.  The reader should be aware that the Department continued to respond to other crime during this period with a minimum operating force.  As other crimes are still being investigated and prosecuted, this Report does not comment on those crimes.  This is an overall statistic and does not differentiate between Safe LA arrests/crimes and regular crime/arrests.

# ARRESTS

On May 29, 2020, Command Staff sought the advice of the City Attorney's Office on what arrest sections to use during the civil unrest. This conversation focused on California Penal Code (CPC) Sections 409 (failure to disperse) and 415 (disturbing the peace). Individuals were arrested for the misdemeanor violation of 409 CPC based on probable cause to believe that arrested individuals failed to disperse after orders were given.[22] The same individuals were then transported and cited for a violation of Los Angeles Municipal Code Section 80.02. Section 80.02 is an infraction and citation issued to individuals is completed on a Traffic Notice to Appear. Such a citation allowed officers to process large amounts of people through field jails. The field jails were not set up to book mass arrestees and detain them for long periods of time. Additionally, citing an individual for an infraction meant that they would not have a misdemeanor arrest on their record. Later, the City Attorney's Office dismissed the individuals cited with the infractions.

Daily Civil Unrest arrests surged to a high on June 1, 2020, but then declined thereafter. The substantial decline in arrests demonstrated a strong shift to lawful protesting from the riotous conduct observed early in the demonstrations.



| | 5/28/20 | 5/29/20 | 5/30/20 | 5/31/20 | 6/1/20 | 6/2/20 | 6/3/20 | 6/4/20 | 6/5/20 | 6/6/20 | 6/7/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Felony | 0 | 3 | 72 | 134 | 112 | 34 | 4 | 1 | 0 | 7 | 0 |
| Misd. | 3 | 261 | 783 | 585 | 1266 | 935 | 51 | 19 | 3 | 1 | 1 |
| Totals | 3 | 264 | 855 | 719 | 1378 | 969 | 55 | 20 | 3 | 8 | 1 |

---

[22] The Department dispersal order is read verbatim in both English and Spanish over an amplified speaker. The dispersal order specifically states, "Section 409 of the Penal Code prohibits remaining present at an unlawful assembly. If you remain in the area which was just described, regardless of your purpose in remaining, you will be in violation of Section 409." Routes for dispersal and reasonable time frame are also given to the crowd. See Emergency Operations Guide, Volume 5 – Guidelines for Crowd Management and Crowd Control, 2009, p. 43.

As stated earlier in the narrative section, the Civil Unrest developed into a pattern.  There was little criminal activity in the morning.  Peaceful marches, facilitated by the LAPD, would take place in the afternoon.  Then, as the day progressed, and the sun began to set, criminal elements would join the marches and protests would devolve into demonstrations mixed with violence and disorder until the early hours of the next day.   The chart below depicts the timing of the arrests.



Felony Arrests

From May 28, 2020 through June 7, 2020, the Department reported a total of approximately 391 felony reports.  The RHD investigated and reviewed all 391 felony reports and determined only 367 of those were related to the Civil Unrest.

Robbery Homicide Division evaluated each report on seven categories:
- Arrest charge;
- Unusual Occurrence box utilized;
- Filing status;
- Probable cause;
- Body worn video available;
- Body worn video activated; and,
- Presence of surveillance cameras was noted.

Detectives identified reports as related to the Civil Unrest if the arrest charge and activity which lead to the arrest were in direct response to the Civil Unrest.  As an example, detectives determined it was connected to the Civil Unrest if a suspect was located within a business that was broken into and was

in possession of property belonging to the business or the suspect was arrested for looting in direct correlation to the Civil Unrest.

On May 28, 2020, there were no felony arrests made in conjunction with the Civil Unrest.

On May 29, 2020, the Department made only three felony arrests. One arrest was for Looting, another for Criminal Threats, and the last for Assault with a Deadly Weapon on a Police Officer.

On May 30, 2020, along with an increase in the Civil Unrest activity, the number of felony arrests made by the Department increased to 72. These arrests were primarily for Looting. There were also several other felony arrests due to Civil Unrest activity, including three for Weapons Violations, five for Burglary, one for Assault with a Deadly Weapon, one for Robbery, and one for Attempt Murder.

On May 31, 2020, the Department experienced its largest increase in felony arrests associated with the Civil Unrest. The Department made 134 felony arrests, and as on the previous night, most of the arrests were for Looting. The Department also made several other felony arrests including two Weapons Violations, three Burglary, two Robbery, five felony Vandalism, and nine Receiving Stolen Property.

On June 1, 2020, the Department saw a slight decrease in the number of felony arrests due to the Civil Unrest. The Department made 112 felony arrests. The primary felony charge again was Looting; however, there were seven arrests for Weapons Violation, six arrests for Burglary, and three arrests for Assault with a Deadly Weapon on Police Officers. Other felony bookings included one for Narcotics Violation, one for Assault with a Deadly Weapon, one for Receiving Stolen Property, and one for Arson.

On June 2, 2020, the Department experienced a significant decrease in the number of felony arrests, as the total for this day was 34. Looting remained the primary booking offense, with other felony arrests including one for Weapons Violation, one for Assault with a Deadly Weapon, one felony Vandalism, and one for Assault with a Deadly Weapon on a Police Officer.

On June 3, 2020, the Department continued to see a decrease in the number of felony arrests due to the Civil Unrest. This day's total of four felony arrests included one for Looting, one for Assault with a Deadly Weapon, and two for Attempted Burglary.

On June 4, 2020, the Department made only one felony arrest for Assault with a Deadly Weapon with a Firearm.

On June 5, 2020, there were no felony arrests made in conjunction with the Civil Unrest.

On June 6, 2020, the Department made a total of seven felony arrests, all for Looting.

On June 7, 2020, there were no felony arrests made in conjunction with the Civil Unrest.

<u>Misdemeanor/Infraction Arrests</u>



From May 28, 2020, through June 7, 2020, approximately 3,908 misdemeanor and infraction arrests were made related to the Civil Unrest.  Between May 29, 2020 and May 30, 2020, the Department used Los Angeles Municipal Code Section 80.02 when citing and releasing individuals from custody.

On May 28, 2020, there were three misdemeanor and infractions arrests made in conjunction with the Civil Unrest.

On May 29, 2020, the Department made 261 misdemeanor and infraction arrests.  The majority of the arrests were for Failure to Disperse.  In addition to those arrests, there was one arrest for Resisting Arrest, one for Obstructing, one for Vandalism, and one for Battery on a Police Officer.

On May 30, 2020, the Department saw a large increase in the number of misdemeanor and infraction arrests in conjunction with the Civil Unrest.  The primary charge for the 783 misdemeanor and infraction arrests was for Curfew Violations.  Additionally, there were several arrests for Failure to Disperse, two for Trespass, one for Probation Violation, one for Mischief, and one for Vandalism.

On May 31, 2020, the number of misdemeanor and infraction arrests, totaled 585.  Curfew Violations were the paramount arresting charge due to the Civil Unrest.  In addition, there were several other arrests, including one for Mischief, one for a warrant, one for Interfering with a Police Officer, and one for Operating an Unmanned Aerial Vehicle.

On June 1, 2020, the Department saw the largest increase in misdemeanor and infraction arrests related to the Civil Unrest.  The Department made a total of 1,266 misdemeanor and infraction arrests, mostly for Curfew Violations.

On June 2, 2020, the Department made total of 935 misdemeanor and infraction arrests.  The primary arrest charges were Curfew Violations.  There were also three arrests for Vandalism, one arrest for a misdemeanor warrant, two arrests for Speed Contest, and one arrest for Driving without a License.



On June 3, 2020, the Department experienced its largest decline in the number of misdemeanor and infraction arrests, falling from 935 to 51 arrests.  Of the 51, most were for Curfew Violations, notwithstanding one arrest for Vandalism, one arrest for Narcotics Violation, and one arrest for Failure to Stop.

On June 4, 2020, the Department continued to see a decrease in the number of misdemeanor and infraction arrests.  Of the 19 total arrests, 18 were for Curfew Violations, one was for a Narcotics Violation.

On June 5, 2020, there were three misdemeanor arrests; two for Possession of an Imitation Firearm and one for Loitering.

On June 6, 2020, the Department made one misdemeanor arrest for Brandishing a Firearm.

On June 7, 2020, there was one misdemeanor infraction arrest made in conjunction with the Civil Unrest.

From May 28, 2020, to June 7, 2020, the total number of arrests made by the Department, including Infractions, due to the Civil Unrest was 4,275.

# FIELD JAILS

During the Civil Unrest, field jails were established beginning May 28, 2020.  Most field jails were set up at existing Department detention facilities.  As protesters were arrested, they were transported to designated booking locations.  Each respective Bureau had the following booking locations:

- **Operations-Central Bureau**
  - Metropolitan Detention Center (MDC) used May 28, 2020 through June 10, 2020
    - 180 North Los Angeles Street Los Angeles, CA 90012
      - Services Available at the Location:
        - Bathrooms
        - Water
        - Medical Staff

- **Operations-South Bureau**
  - 77th Street Community Police Station used May 28, 2020 through June 10, 2020
    - 7600 South Broadway Los Angeles, CA 90003
      - Services Available at the Location:
        - Bathrooms
        - Water
        - Medical Staff

- **Operations-West Bureau**
  - Hollywood Community Police Station used May 30, 2020 through May 31, 2020
    - 1358 North Wilcox Avenue Los Angeles, CA 90028
      - Services Available at the Location:
        - Bathrooms
        - Water
  - UCLA - Jackie Robinson Stadium was used June 1, 2020 at 1:00 p.m. through

June 2, 2020 at 7:00 a.m.
- ▪ 100 Davis Avenue Los Angeles, CA 90049
  - Services Available at Location:
    - o Bathrooms (2 portable toilets)
    - o Water

- **Operations-Valley Bureau**
  - o Grace Community Church used June 2, 2020 through June 4, 2020
    - ▪ 13248 Roscoe Boulevard Sun Valley, CA 91352
      - Services Available at the Location:
        - o Bathrooms
        - o Water
        - o Medical Staff

  - o Van Nuys Community Police Station used May 28, 2020 through June 10, 2020
    - ▪ 6240 Sylmar Avenue Van Nuys, CA 91401
      - Services Available at the Location:
        - o Bathrooms
        - o Water
        - o Medical Staff

During the Civil Unrest over 4,000 arrestees went through these designated field jails. The field jails were staffed with sworn personnel and Custody Service Division (CSD) personnel who booked, processed, and transported arrestees throughout the City. [23]  During the several days of protests, a larger than expected number of people were arrested for a variety of charges. The transportation of the arrestees was quickly overwhelmed which caused delays in processing the arrestees. At times personnel and arrestees had to wait for extended periods of time for transportation. This caused significant deployment and tracking issues.

---

[23] CSD is predominantly a civilian division that oversaw processing all Department arrests.





# Chapter 4:

## Use of Force and Less-Lethal Options for Crowd Control

# USE OF FORCE

Due to on-going litigation and internal investigations, this Section does not discuss specific details or outcomes of any incidents relating to the use of force.

The Department's guiding principle when using force is reverence for human life.  Officers are taught to attempt to control an incident by using time, distance, communication, and available resources to de-escalate the situation whenever it is safe, feasible and reasonable to do so.[24]  During the Civil Unrest, officers did their best to de-escalate each situation they encountered.  There were, however, instances when force was used.

Departmental policy characterizes the use of force in two forms: deadly force and non-deadly force.

### *Deadly Force*

Deadly force shall only use force upon another person when the officer reasonably believes, based on the totality of circumstances, that such force is *necessary* for either of the following reasons:

- To defend against an imminent threat of death or serious bodily injury to the officer or to another person; or,
- To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.

Incidents of deadly force are investigated as a Categorical Use of Force (CUOF).  The Force Investigation Division investigates all CUOF incidents.  The categories for CUOF include, but are not limited to:

- An incident involving the use of deadly force (e.g. discharge of a firearm) by a Department employee;
- A use of force incident resulting in an injury requiring hospitalization commonly referred to as a law enforcement related injury (LERI);
- All intentional head strikes with an impact weapon or device (e.g. baton, flashlight, etc.) and all unintentional head strikes that result in serious bodily injury, hospitalization or death. [25]

During the Civil Unrest, there was no loss of life.  Between May 27 and June 6, 2020, there were five CUOFs reported.

---

[24] See Los Angeles Police Department Manual, Section 1/556. 10, Policy on Use of Force.
[25] See Los Angeles Police Department Manual, Section 3/792.05, Definitions- Categorical Use of Force.

### *Non-Deadly Force*

Non-Deadly Force is defined as only that force which is "objectively reasonable" to:

- Defend themselves;
- Defend others;
- Effect an arrest or detention;
- Prevent escape; or;
- Overcome resistance.

Non-Deadly Force is investigated as a Non-Categorical Use of Force (NCUOF) and is investigated by an uninvolved supervisor. All NCUOFs are adjudicated through an employee's chain of command with review and oversight of Critical Incident Review Division.

In a crowd control situation, an individual NCUOF report is not required when officer(s) become involved in an incident where force is used to push, move, or strike individuals who exhibit unlawful or hostile behavior and who do not respond to verbal directions by the police.[26] In these instances, LAPD policy dictates that supervisors document the force used on the Incident Command System, Form 211/214, or as directed by the IC. A NCUOF report is only required when an officer(s) becomes involved in an isolated incident with an individual during a crowd control situation, which goes beyond the mission of the skirmish line.

Thus far, approximately 36 situations are being investigated as NCUOFs. Because the Department continues to strive for transparency and investigate each complaint that was associated with the Civil Unrest, this number may increase.

During the Civil Unrest, there were accounts of force being used in crowd control situations which were documented in the appropriate manner. Documented uses of force ranged from, but were not limited to, forward push; takedown; baton; beanbag shotgun to 40mm less-launcher; and, deadly force.

Less-Lethal munitions were a common tool used during crowd control situations against protesters during the Civil Unrest.

# Less-Lethal Munitions

## Types of Less-lethal Munitions Used

The Department used less-lethal munitions as officers were met with increasing levels of violence from protesters. These munitions included: the 37mm less-lethal foam rubber baton; the 40mm Less-Lethal Launcher; the Beanbag Shotgun; and, the Stinger Grenade .60 cal.

---

[26] See Los Angeles Police Department Manual, Section 245.05, Categories and Investigative Responsibilities for Use of Force.

### 37mm Launcher, Deploying the 37mm Foam Baton Round



The foam baton round consists of five foam rubber projectiles that are discharged at once.  The 37mm launcher has a smooth bore barrel with standard iron sights which must be manually unloaded and reloaded after each firing.  The foam baton rounds are skip fired in front of the crowd and are not fired directly at an individual.

The recommended range is from five to 10 feet with a maximum effective range of 50 feet.

### 40mm Less-Lethal Launcher, Deploying the 40mm Exact Impact Sponge Round

 

The 40mm launcher has a rifled barrel and is equipped with a holographical sighting system that uses a single foam projectile, which must be manually unloaded and reloaded after each firing.  Specifically, after each foam projectile is expelled: the barrel must be manually opened; the used portion of the rubber projectile must be removed; the new rubber projectile must be inserted; and the barrel must then be re-closed.  This means that the 40mm launcher cannot shoot twice without being reloaded manually.  The barrel is green to signify its less-lethal status.  The 40mm launcher can only carry three additional foam projectiles, pictured below.  The 40mm launcher may be used in crowd control situations against a single subject as a target-specific less-lethal option.

The optimal range is five to 110 feet.

### Beanbag Shotgun, Deploying the Beanbag Super-Sock Round



The beanbag shotgun has a rifled barrel, and side saddle ammunition holder.  The beanbag shotgun uses a beanbag super-sock round with a 12-gauge cartridge containing a shot-filled fabric bag as its ammunition.  It has a green slide handle and stock to signify that it is less-lethal.

The optimal range is five to 30 feet.



The Stinger Grenade, Deploying .60 cal. Rubber Balls

The Stinger is a tool used by SWAT only and only with approval of a Commander or above.  The Stinger is a Sting Grenade .60 cal. rubber ball diversionary device that produces approximately 130 decibels (dB) at five feet.  In addition to the light and sound the stinger grenade is designed to disperse approximately 25 .60 caliber rubber balls in a 360-degree pattern.

The Department continues to explore new technologies and less-lethal options for use in both patrol and during crowd control situations.  At the present time, the Department has yet to discover or invent any more accurate and effective less-lethal options.

## Distribution and Use of Less-Lethal Rounds During the Civil Unrest

Beginning May 29, 2020, personnel increased their use of less-lethal munitions to address the increase in violence.  As a result, the CP requested the remaining stock of less-lethal rounds from In-Service Training Division to be distributed among personnel.  The CP received a total of 28,169 rounds of less-lethal munitions broken down as follows:

- 8,127 - 37mm rounds;
- 7,142 - 40mm rounds; and,
- 12,900 - beanbag rounds.

Beginning on May 29, 2020, the CP distributed those rounds to both OWB and OCB personnel specifically for the Civil Unrest.

On June 18, 2020, Personnel and Training Bureau conducted a review and learned that approximately 11,305 rounds of less-lethal munitions were used during the period of Civil unrest broken down as follows:

- 4,377 - 37mm rounds;
- 2,621 - 40mm rounds; and,
- 4,307 - Beanbag Shotgun rounds.

**(THIS PAGE WAS LEFT INTENTIONALLY BLANK)**





# Chapter 5:

## LAPD Reforms

# SUMMARY OF RELEVANT LAPD REFORMS

The LAPD is committed to seeking solutions for emerging problems and challenges that involve law enforcement.  The Department remains dedicated to building trust within the community by enhancing community engagement and transparency.  In these goals, the Department has made significant strides in diversity and inclusion within and outside the Department, addressing officer accountability, confronting issues of implicit bias, and providing officers with the training needed to de-escalate hostile and novel incidents.  These reform efforts, strategies, and improvements are described in detail below.

I.   ***Reform Efforts During and Post 2020 Civil Unrest***

- **Board of Police Commissioners Reforms (BOPC) -** On June 3, 2020, the Board of Police Commissioners announced an aggressive reform agenda. These reforms included the following:

  - Reviewing and revising the Police Department budget;
  - Enhancing community neighborhood-based policing;
  - Modifying enforcement strategies;
  - Suggesting meaningful reformative legislation;
  - Enhancing police training;
  - Broadening risk management assessments;
  - Expanding transparency and accountability efforts; and,
  - Implementing Senate Bill 230 requirements (See Appendix Form L for detailed release).

- **Mental Health Intervention Training (MHIT)** – Historically, the Department has made mental health training part of its overall curriculum.  During and after the Civil Unrest, the Department redoubled its efforts including:

  - On June 3, 2020, the Mayor's Office announced that the Department would enhance police training, expanding MHIT to train 900 officers in 2020, from 700 in 2019.  As of December 31, 2020, 820 officers were MHIT-trained (91 percent to the Department's 900-officer goal).  From January 1, 2020 through February 2021, 82 percent of crisis calls were being handled by an MHIT-trained officer.

  - On December 9, 2020, the Department revised its policy on Contacts with Persons Suffering from a Mental Illness.[27]

---

[27] "Contact with Persons Suffering From Mental Illness," Special Order No. 30, December 9, 2020.

- On January 14, 2021, the LAPD published a notice on the implementation of the Mental Evaluation Unit (MEU) Systemwide Mental Assessment Response Team (SMART) co-response model. This notice advised that SMART units will be dispatched to mental illness calls meeting specific criteria at the same time as the patrol unit assigned the call.[28]

- In February 2021, the MEU's co-response model was launched.

- In February 2021, a 9-1-1 Call Diversion Program was launched to have some suicide calls diverted to Didi Hirsch's Suicide Prevention Hotline. A new Roll Call Training video to explain MHIT procedures and the new Didi Hirsch call diversion is in production and should be introduced by Spring of 2021.

- **Community Safety Partnership (CSP) Bureau** - On June 7, 2020, the Los Angeles Police Department created CSP Bureau. Previously the LAPD had engaged in community safety partnership as part of the Office of Operations. The mission of the CSP Bureau is to use community relationship strategies to strengthen trust between law enforcement and the community. Thus far, this Bureau has created a community safety advisory council at each of the 10 CSP sites. These councils include residents, institutional partners, and community-based organizations. These advisory councils address community concerns in shared partnership.  The CSP Bureau will be responsible for training officers on all aspects of effective relationship-building, including forging connections with individual residents and community-based organizations. The CSP Bureau works in collaboration with a multi-disciplinary Steering Committee with community and City stakeholders. A comprehensive manual is being written to codify all CSP procedures with input from the Steering Committee. The CSP Bureau is also working to establish a four-day, California Peace Officer Standards and Training (POST) certified course for all CSP officers.

---

[28] "Implementation of the Mental Evaluation Unit's Systemwide Mental Assessment Response Team Co-response Model" Chief of Police Office Notice 8.2, January 14, 2021.

- **Diversity, Equity, and Inclusion Officer (DEIO) -** On June 19, 2020, Mayor Garcetti issued Executive Directive No. 27, 2020 to develop and execute a Racial Equity Action Plan and appoint a DEIO.  The DEIO is responsible for examining internal and external policing practices.  These examinations include focused inquiries to remedy structural and systemic barriers to create an appropriate ecosystem throughout the Department and the community.  The DEIO has worked in collaboration with community advisory groups to refine a Department-wide DEI Mission Statement.  In addition, the DEIO has worked with Training Division and is revising and creating new Training Bulletins. 

- **Body-Worn Video (BWV) Updates** – The Department began using Digital In-Car Video in 2009 and BWV in 2015.  The Department continues to expand its use of and reliance on BWV.  Updates in 2020 included:

  - On July 2, 2020, the DOC published a notice to advise officers of the importance to narrate when the violent actions of a crowd result in the use of force, including less-lethal force.  This notice includes instruction that officers should identify, by narrating on their BWV, why they are using less-lethal force.[29]

  - In October 2020, the Department acquired BWV cameras to use in academy training.

- **Community Stakeholders in Training -** Community collaboration was initiated in July 2020 for assistance with community perspectives and insight into training.  This group, Community Stakeholders in Training (CSIT) have met monthly with the Director, Police Training and Education to review training materials, attend the Days of Dialogue, and generate ideas and solutions for training.  One solution has included community members being interviewed on video for inclusion of community voices in Department training while adhering to the health guidelines due to the pandemic.

- **Divisional History Project and Orientation Days -** The Department is in the process of creating Divisional History Books at Geographic Areas.  The Department will incorporate new Electronic History Books online for Department and Community Reference and implement the content into a Divisional Training Day for new employees starting at their division.  The goal is to also incorporate or enhance Community Panels into Divisional Orientation days and expand or enhance community members who are willing to come in and participate for community panels on Divisional Orientation Days.

---

[29] "Narrating on Body Worn Video When Using Less-Lethal," Office of the Chief of Police Notice, November 2, 2020.

- **Use of Force** – The Department, in collaboration with the Board of Police Commissioners took progressive steps in modifying use of force policies and training significantly ahead and beyond the scope of California legislation requirements.  In 2020, policies included:

  o On August 26, 2020, the Department published its revised Use of Force Policy ahead of requirements of California Senate Bill 230, which became effective January 1, 2021.[30] The Use of Force Policy included a duty to intercede and report excessive use of force, fair and unbiased policing, as well as ensuring the level of force is proportional to the seriousness of the suspected offense.  Additionally, the policy went further and requires officers to report the intentional pointing of a firearm at a person.  Thereafter, Campaign Zero published #8cantwait, a campaign to alter police departments' use of force policies.  In its publication, Campaign Zero shows LAPD in compliance with its eight areas of use of force reform.[31]

  o In September 2020, the LAPD published an updated Use of Force Directive on the Beanbag Shotgun.  This directive clarified that a*n officer may use the beanbag shotgun as a reasonable force option to control a suspect when the suspect poses an immediate threat to the safety of the officer or others.  "*Less-lethal force options, including the beanbag shotgun, shall not be used for a suspect or subject who is passively resisting or merely failing to comply with commands.  Verbal threats of violence or mere non-compliance do not along justify the use of less-lethal force*."[32]

  o On September 4, 2020, the LAPD posted a Notice on the use of force related to the use of lasers against officers.  The notice clarifies that *"the use of a laser itself shall not presumptively constitute a threat that justifies an officer's use of deadly force.  An officer that is having a laser used against them should adjust their vision away from the laser.  Should your vision be disrupted one should communicate, re-deploy and seek medical attention if necessary."*[33]

  o On September 15, 2020, the LAPD published a Notice as a reminder for all Department personnel that the concept of the "Twenty-One Foot Rule" is not taught in theory or practice by the Department.[34]  Therefore, relying solely on the "Twenty-One Foot Rule" is not consistent with Department training or sanctioned by the Department as it pertains to suspects or subject armed with weapons other than firearms.[35]

---

[30] "Use of Force Policy – Revised," Special Order No. 23, August 26, 2020.

[31] https://8cantwait.org

[32] "Beanbag Shotgun," Use of Force Tactics Directive No. 6.4, September 2020.

[33] "Use of Force Related to the Use of a Laser" Personnel and Training Bureau Notice, September 4, 2020.

[34] The "21-Foot Rule" was a measure of distance that related to the time it would take an officer to recognize a threat, draw a sidearm, and fire two rounds center mass against an attacker charging with a knife or other stabbing weapon.

[35] "Weapons Other than Firearms – Twenty-One-Foot Rule" Office of the Chief of Police Notice, September 15, 2020.

o   On December 9, 2020, the Department revised its policy related to CUOF investigations, reviews, and adjudications.  Additionally, the Department banned the use of carotid restraint control hold by its personnel.[36]

- **Mobile Field Force Training –**After assessing various challenges after the protests in June 2020, the Department updated its MFF training for sworn personnel.

    o   On September 14, 2020, Metropolitan Division began teaching an updated MFF training for sworn personnel.  This eight-hour course was revised with updated tactics and coordinated unit response.  This daylong hands-on training allowed personnel from the same geographic Area to train together at the same time.  The training focused on coordinated responses and the tactics to use when handling multiple crowds of protesters in several locations.  By the end of 2020, at least 4,153 personnel had attended.  The course was certified by the POST on November 10, 2020.

    o   In October 2020, the Department created an MFF Roll Call Training video that was viewed by all sworn personnel.

- **Less-Lethal Munitions Training –** In September 2020, Metropolitan Division began training additional personnel in the use of the 37mm Launcher.  Enhancement training on the use of the Beanbag Shotgun and the 40mm Less-Lethal Launcher was also included.  This course was previously included in the MFF training; however, it was separated to ensure understanding and proficiency in less-lethal munitions.  The Department will include the 40mm Less-Lethal Launcher in its yearly firearm qualification schedule.

- **Leadership Enhancement and Development Sessions (LEADS) for Command Staff**- On October 1, 2020, and October 2, 2020, the Emergency Services Division personnel provided eight hours of LEADS training for all command staff officers.  The training included:

    o   Unified Command and Resource Coordination – Emergency Services Division focused on coordinating resources when handling multiple incidents of Civil Unrest.  Table top exercises were used to concentrate on key objectives.

    o   Policing History, Culture, Race, and Policy – Drs. Demczuk and Jacobs-Thompson presented a four-hour course on how understanding the Department's history can lead to understanding the implicit biases and distrust of police in the Black community.

- **Preparation for Subsequent Protests** – In October 2020, Metropolitan Division in collaboration with training staff updated the following source documents and videos:

---

[36] "Officer-Involved Shootings or In-Custody Deaths or Injury; Definitions-Categorical Use of Force; and Miscellaneous Department Manual Sections Pertaining to the Procedures for Investigating, Reviewing, and Adjudicating Categorical Use of Force Incidents – Renamed, Revised, or Deleted," Special Order No. 29, December 9, 2020.

- o   Training Bulletin - Rendering Aid;
- o   Training Bulletin - Tactical Hand and Arm Signals;
- o   Training Bulletin - Mobile Field Force Part 1: Organization and Assembly;
- o   Training Bulletin - Mobile Field Force Part 2: Mobile Tactics;
- o   Tactical Directive - Crowd Management, Intervention, and Control; and,
- o   Training Video - Squad Formations.

- **Racial and Identity Profiling Act** – On October 6, 2020, the Office of the Inspector General (OIG) presented its independent review of the Department's stops in 2019 which outlined recommendations to the Department's current policies and procedures. The Department is currently working to address each of the OIG's recommendations.

- **Laser Protective Eyewear** – In October 2020, the Department issued laser protective eyewear to all sworn personnel to prevent injuries from green lasers used by protestors.

- **Consent to Search Advisement –** On November 20, 2020, the Department established requirements for officers obtaining consent to search a premise, person, personal property or vehicle during consensual encounters.[37]  One of the purposes of this new policy was to increase transparency.

- **Crowd Control Shield Training -** Recognizing the challenge of potential violence toward officers during protests, the Department acquired new protective shields for crowd control purposes. In November 2020, Metropolitan Division started providing crowd control shield training for sworn personnel. The training provided personnel with the criteria for the use of the shield, deployment, and documentation. In addition to the training that was completed, the Department created two crowd control shield training videos that were viewed by personnel.

- **Reporting Hate Crimes** – On December 17, 2020, the Department revised policy pertaining to reporting, investigating, and coding incidents motivated by hatred or prejudice.[38]

## II.    *Previous Innovations in Training and Reforms*

- **Board of Police Commissioners (BOPC)** – The BOPC was originally created in the 1920s and is comprised of five civilian professionals appointed by the Los Angeles Mayor and confirmed by the City Council. The BOPC may serve a maximum of two, five-year terms and their priorities include, but are not limited to:

- o   Adjudicating all CUOFs;
- o   Recommending and implementing reforms;
- o   Approving Department policies and procedures; and,

---

[37] "Consent to Search Verbal Advisement, Form 15.05.00 – Activated," Administrative Order No. 22, November 20, 2020.
[38] "Reporting Incidents Motivated by Hatred or Prejudice – Revised," Special Order No. 22, December 17, 2020.

    o   Initiating and supporting community policing programs.

- **Mental Evaluation Unit (MEU)** – In 1985, the Department developed the MEU to assist police officers with mental health calls for service.  In 1993, the LAPD in collaboration with the Department of Mental Health (DMH) developed the SMART to engage and link individuals with mental illness to appropriate services.  The SMART units are comprised of one LAPD officer and one DMH clinician who assist officers in the field with mental illness related calls for service.  Since its inception, MEU introduced innovative training to expand an officer's knowledge of mental illnesses and develop long-term solutions for individuals in need of services.  Below are strategies, training, and programs specifically designed to assist individuals suffering from mental illness:



    o   **Case Assessment and Management Program (CAMP)** – In 2005, CAMP was developed to identify, monitor, and engage individuals while constructing a case management approach that links them to appropriate services.

    o   **SMART Unit Expansion** – In June 2016, 17 SMART units were deployed 24 hours a day, seven days a week.

    o   **Triage Desk** - In 2011, the Department staffed 20-hour, seven-day a week Triage Desk whose primary function was to triage all LAPD contacts with individuals suffering from mental illness.  In 2015, the Triage Desk was expanded to 24-hours, seven days a week.

    o   **Tactical Disengagement** – In July 2019, the LAPD published a Training Bulletin on Tactical Disengagement which affords officers to leave, delay contact, delay custody or plan to make contact at different time and under different circumstances to de-escalate incidents and reduce the likelihood of uses of force.[39]

- **Office of the Inspector General (OIG)** – The OIG was created through a 1995 voter-approved amendment to the Los Angeles City Charter and supports the BOPC through independent audits and reviews of LAPD conduct and performance.

- **Tactical De-escalation** - The Department is guided by the principle of Reverence for Human Life in all investigative enforcement and other contacts between officers and members of the public.  The LAPD has ensured that all sworn officers have attended tactical de-escalation training.  This training involves the use of multiple techniques to reduce the intensity of an encounter with an individual or group.  The LAPD has integrated de-escalation concepts into all training related to critical decision-making and potential uses of force.  The directive on De-

---

[39] "Tactical Disengagement," Training Bulletin, Volume XLVIII, Issue 5, July 2019.

escalation is incorporated into scenario debriefs, MHIT, and all Department promotional exams and schools.

- **Procedural Justice/ Implicit Bias and Community Policing -** In 2017, all LAPD officers were trained by an outside expert on Implicit Bias and Community Policing.  Given current research findings, the Department is looking at existing training to ensure that evidence-based practices are being incorporated along with classroom learning to build on the progress of the 2017 Implicit Bias training.  The goal for the Department's training plan is to promote further discussion and planning in the Department's shared responsibility to ensure we are providing the best possible service to the communities we serve.  As such, procedural justice is not only a key concept from The President's Task Force on 21st Century Policing but is also, a proactive method for addressing habits or practices related to mitigating the potential impact of implicit bias and increasing community trust.

  - The concepts of Procedural Justice, Implicit Bias and Community Policing have been enhanced in academy training through added blocks of instruction entitled, "Principled Policing" and have been fundamental to the curriculum of Police Sciences and Leadership since the inception.  In support of ongoing training development, a training bulletin on Procedural Justice was completed in April 2020, and is used as a source document for Department courses and promotional examinations.  Within in-service training, the concepts of procedural justice are taught in the classroom and are used as a critical part of scenario debrief.   In 2021, the Department will provide all employees, sworn and civilian, with online Implicit Bias Training through a City-provided vendor by April 2021.

  - From the Inside Out **-** Given the feedback from employee organizations and specific direction from the Chief of Police to address racial tension within the Department in March 2020, "Procedural Justice: From the Inside Out" was designed to cover topics that included internal procedural justice, the stress of the protests, discussions on race relations, conflict resolution, and building resiliency.  These facilitated workshops were provided twice in each Bureau and responses were collected to provide front line feedback to Department leadership on current climate within the Department.

- **Historical Integration Project –** In September 2020, the Academy began assessing the curriculum for new officers and looked at ways to infuse historical content and community perspectives into the State-mandated Learning Domains.  There are now 12 new lessons added to Recruit Basic Course curriculum that cover historical events within more than 25 hours of instruction. The new or revised curriculum has been sequenced to flow with the other training that is required by the State or has been identified as important to the Department on the development of new officers.  The culminating event is when community participants engage with new officers in a virtual "Days of Dialogue" with community members. Trained facilitators guide small groups of recruits and community members through discussions on "Racism, Policing, the Pandemic and Beyond."
Community history is being expanded into in-service training for existing officers to compliment discussions on procedural justice, community policing, truth and reconciliation. Historical case studies will be used in each promotional school from FTO through Command

Officer training.  The following courses have reviewed their content and identified and requested curriculum updates to incorporate community history:

- o   Police Sciences and Leadership (PSL)- Historical Training over 2 Blocks
- o   Field Training Officer (FTO) School- Historical Training over 2 Blocks
- o   Field Training Officer (FTO) Update- Historical Training over 3 Blocks
- o   Supervisor School- Historical training over 28 Blocks

- **Critical Incident Video Review Release** – In 2018, the Department began releasing video evidence related to officer-involved shootings, uses of force, in-custody deaths, and any other incident that the BOPC or Chief of Police determines is in the public's interest.  It is the Department's intention to increase transparency and foster greater public trust while maintaining the integrity of related investigations.  All Critical Incident Video can be found on the Department's website.[40]

- **Department Body-Worn Video** – In 2018, BWV deployment expanded to all field personnel including Metropolitan Division and Security Services Division.  Department policy requires officers to activate BWV prior to initiating any investigative or enforcement activity including searches, uses of force, and crowd management and control enforcement and investigative contacts.[41]

  - On December 20, 2018, the Department increased the pre-activation buffer recording of all BWV from 30 seconds to two minutes.  While this buffer does not capture audio recording, it does record video images which documents officers' actions, highlights attempts at de-escalation, and ultimately plays a crucial role in the final adjudication of an incident.[42]

- **Incident Command System Training** – The Department has interwoven ICS training into a variety of courses attended by officers, supervisors, and Command Staff.  The following documents and courses outline aspects of the ICS systems, preparedness, and command and control:

  - **Emergency Operations Guide (EOG)** - The EOG details organizational structure and procedural response to large-scale emergencies throughout its seven volumes.

  - **Standing Plans and Continuity of Operations Plans** – The Department requires each entity to update its mobilization plan each year.  The mobilization plan provides guidance and information for officers and supervisors when a Department mobilization occurs.

---

[40] "Critical Incident Video Release Policy – Established," Administrative Order No. 6, April 13, 2018.
[41] "Body-Worn Video Procedures – Established," Special Order No. 12, April 28, 2015.
[42] "Powering Off Body-Worn Camera Devices While in Department Facilities," Office of Constitutional Policing and Policy Notice, December 20, 2018.

- **Command Post Cadre Training** - The Command Post Cadre course was created to reinforce the Department personnel's knowledge of the ICS, Command Post operations, duties of the Staging Area Manager, and the Planning Section's key principles and applications. Between 2018 and 2020, the Major Incident Response Team instructed this course six times for Department personnel.

- **Command Officer Development** - Command Officer Development provides instruction to personnel soon-to-be promoted to the ranks of command staff on Critical Incident Management; Command, Control and Coordination techniques; Incident Command System; and, Department References and Policies used to successfully respond and manage a major incident or event. This course was presented twice between 2018 and 2020.

- **Incident Action Plan/Event Action Plan** – This course was developed to reinforce the student's knowledge of the ICS Form 201; EAP/IAP process, key principles and applications; "SMART" objectives; the planning process prior to or during an incident; and, the Department's guidelines regarding After Action Reports. The last iteration of this course was held in 2013.

- **Basic Supervisor and Watch Commander Schools** – These courses are mandatory for Department supervisors and watch commanders. The curriculum includes instruction on Critical Incident Management using learning activities, facilitated discussion, directed questions, group dialogue and practical applications. Both schools also review use of force and de-escalation techniques. Twelve iterations of Basic Supervisor School and 13 iterations of the Watch Commander School were held between 2018 and 2020.

- **Exercises** – The Department has participated in a multitude of exercises to apply ICS functions, tools and resources; test and evaluate the operational capability; gain a better understanding of strengths during a major incident or event; and to identify areas for improvement. Between 2018 and 2020, the Department participated in over 80 different types of preparedness exercise scenarios that involved a multitude of different types of equipment and specialized trained personnel.

### III. *Previous Settlement Agreements Concerning Crowd Management and Control*

After the Democratic National Convention (2000) and the May 1, 2007 demonstrations (May Day), the Department entered into settlement agreements agreeing to enact and/or modify crowd management and control policies, procedures, and training.[43]  Because of both settlement agreements, the Department has implemented the following policies, procedures, and training:

- Guidelines for Crowd Management and Crowd Control[44] address various areas associated with demonstrations, marches, protests, and rallies that include, but are not limited to:

  - Basic Principles of First Amendment protected activities;
  - Use of helicopters;
  - Pedestrian movement in public spaces;
  - Use of police motorcycles, bicycles, and vehicles for observation, visible deterrence, traffic control, transportation, and crowd control;
  - Use of forces;
  - Definition, purpose, deployment requirements, and use of less-lethal munitions;
  - Use of batons;
  - Declaration of an unlawful assembly; and,
  - Crowd management and crowd control training.

- Mobile Field Force Training – The Department must undergo training on Crowd Control and use of force policies at minimum intervals of two years.  Since 2007, the Department has incorporated these concepts into the following courses:

  - **Crowd Management and Control for Patrol** – Between 2007 and 2015, sworn personnel attended this 10-hour course which reviewed laws, policy, skirmish lines, arrest team procedures, driving, and mass arrest procedures.

  - **Crowd Management and Control for Management** – Between 2007 and 2013, this eight-hour course designed specifically for Command Staff reviewed lawful assemblies, group dynamics, use of force, media relations, and lessons learned from the Democratic National Convention, parades, and sporting event celebrations.

  - **Crowd Management and Control for Patrol Update (2012)** – This three-hour training course provided an update to field personnel related to First Amendment protected activities, objectives and strategies of crowd management and control, MFF concepts, and baton techniques.

---

[43] Settlement Agreements resulting from *National Lawyers Guild, et.al v. City of Los Angeles, et al* (January 26, 2005) and *Multi-Ethnic Immigrant Workers Organizing Network, et al. v. City of Los Angeles, et al.* (June 22, 2009).
[44] Volume 5 - Guidelines for Crowd Management and Crowd Control, Emergency Operations Guide (2009)

o **Learning Management System Training (2013)** – The Department developed two web-based MFF trainings for its personnel:

- Crowd Management Intervention and Control – a two-hour DVD-based program.
- Crowd Management Update – a two-hour crowd management update for sworn personnel.

o **Integrating Communications, De-escalation, Crowd Control (2017-2018)** – This course included a history of protests within Los Angeles and the Department's response to these incidents.  The ICDC course included a live scenario and a four-hour 40mm Less-Lethal Launcher training.

o **Advanced Concepts in Command and Control (2019-2020)** – This 10-hour course incorporated tactical de-escalation, review of less-lethal devices, and establishing command and control and managing incidents.

**(THIS PAGE WAS LEFT INTENTIONALLY BLANK)**





# Chapter 6:

## Department Personnel & Mutual Aid

# PERSONNEL

Personnel assignments were documented on ICS 211/214 forms.  Officers assigned to the incident were instructed to check-in and out with Staging located at a Dodgers Stadium Parking Lot.  When a person went end of watch (EOW), supervisors were instructed to complete and turn in their ICS 211/214 forms to the Demobilization Unit within Staging.  The Planning Section then stored the forms for each date.

Prior to the Civil Unrest the Department was tasked with several unconventional roles and assignments due to the COVID-19 pandemic.  These assignments diminished the availability of personnel and made it difficult to deploy the appropriate amount of resources to Civil Unrest duties.  Those unconventional COVID-19 related functions included: transportation of people experiencing homelessness to and from shelter locations and hotels, round-the-clock security at those shelter/hotel locations, manning COVID-19 testing sites within the City of Los Angeles and providing high visibility for medical staff, picking up test kits from the testing sites and transporting them to the labs and extra patrol security at schools where lunches were being distributed.  In addition, to the extra duties asked of the sworn personnel other Department employees were tasked with COVID-19 administration including tracking cases for each Area and Bureau and reporting numbers to the City government daily.  During the Civil Unrest the Department also ensured that each Area maintained its Minimum Operating Force (MOF), the minimum number of uniform officers assigned to a Area to maintain area patrol functions and respond to calls for service.  Finally, a segment of the Department was teleworking due to COVID-19 cautionary measures.

The following table depicts sworn personnel numbers assigned to the Civil Unrest for each day based solely on the ICS 211/214 forms that were completed and returned to the Demobilization Unit, those assigned to COVID-19, and MOF.  Between May 27, 2020 and May 30, 2020 there were 76 sworn and 403 civilian personnel teleworking.  Between May 31, 2020 and June 7, 2020 there were 48 sworn and 300 civilian personnel teleworking.  Poor record keeping was an issue that occurred throughout the Safe LA Civil Unrest.  This issue is addressed in the critique section.

**SAFE LA AFTER ACTION REPORT**



| Sworn Overall Personnel Numbers | 5/27/20 | 5/28/20 | 5/29/20 | 5/30/20 | 5/31/20 | 6/1/20 | 6/2/20 | 6/3/20 | 6/4/20 | 6/5/20 | 6/6/20 | 6/7/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Civil Unrest | 120 | 201 | 1141 | 1255 | 2520 | 3395 | 2918 | 2648 | 2836 | 2593 | 2574 | 1908 |
| MOF | 1834 | 1845 | 1719 | 728 | 720 | 1695 | 1778 | 1921 | 2803 | 2097 | 1576 | 1913 |
| COVID | 427 | 397 | 390 | 318 | 318 | 318 | 300 | 298 | 291 | 301 | 264 | 255 |

In the tables below personnel have been broken down into three categories (Command Staff, Supervisory Roles, and Sworn Personnel) that were solely related to the Civil Unrest. Again, the counting of personnel was solely based on ICS 211/214 forms that were submitted to the Demobilization Unit. Personnel have been broken up into an "A" and "B" Watch configuration starting with May 30, 2020 for all personnel below the rank of Captain. In addition, the graph of Captains and above starts "A" and "B" Watch configuration on May 28, 2020. The prior day's deployment for each rank as noted were not in an "A" and "B" Watch configuration, therefore all personnel will be labeled in the "A" Watch section.

**SAFE LA AFTER ACTION REPORT**



| | 5/27/20 | 5/28/20 | 5/29/20 | 5/30/20 | 5/31/20 | 6/1/20 | 6/2/20 | 6/3/20 | 6/4/20 | 6/5/20 | 6/6/20 | 6/7/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ A Watch | 7 | 12 | 14 | 21 | 31 | 28 | 29 | 25 | 29 | 29 | 29 | 25 |
| ■ B Watch | 0 | 7 | 9 | 24 | 26 | 26 | 24 | 24 | 22 | 24 | 22 | 20 |
| Totals | 7 | 19 | 23 | 45 | 57 | 54 | 53 | 49 | 51 | 53 | 51 | 45 |



| | 5/27/20 | 5/28/20 | 5/29/20 | 5/30/20 | 5/31/20 | 6/1/20 | 6/2/20 | 6/3/20 | 6/4/20 | 6/5/20 | 6/6/20 | 6/7/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ A Watch | 28 | 0 | 154 | 45 | 121 | 447 | 365 | 364 | 363 | 352 | 289 | 261 |
| ■ B Watch | 0 | 0 | 0 | 297 | 439 | 388 | 378 | 272 | 354 | 284 | 288 | 169 |
| Totals | 28 | 0 | 154 | 342 | 560 | 835 | 743 | 636 | 717 | 636 | 577 | 430 |

**SAFE LA AFTER ACTION REPORT**



## Officer Personnel Numbers
### (Detectives and Officers)

| | 5/27/20 | 5/28/20 | 5/29/20 | 5/30/20 | 5/31/20 | 6/1/20 | 6/2/20 | 6/3/20 | 6/4/20 | 6/5/20 | 6/6/20 | 6/7/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A Watch | 85 | 182 | 964 | 102 | 523 | 1239 | 998 | 1042 | 978 | 1020 | 890 | 916 |
| B Watch | 0 | 0 | 0 | 766 | 1380 | 1267 | 1124 | 921 | 1090 | 884 | 1056 | 517 |
| Totals | 85 | 182 | 964 | 868 | 1903 | 2506 | 2122 | 1963 | 2068 | 1904 | 1946 | 1433 |



## Civilian Personnel Numbers

| | 5/27/20 | 5/28/20 | 5/29/20 | 5/30/20 | 5/31/20 | 6/1/20 | 6/2/20 | 6/3/20 | 6/4/20 | 6/5/20 | 6/6/20 | 6/7/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A Watch | 2 | 0 | 1 | 7 | 6 | 22 | 13 | 20 | 28 | 20 | 20 | 19 |
| B Watch | 0 | 0 | 0 | 7 | 11 | 15 | 1 | 7 | 8 | 8 | 3 | 6 |
| COVID | 13 | 13 | 13 | 15 | 15 | 15 | 17 | 16 | 13 | 10 | 9 | 9 |
| Teleworking | 403 | 403 | 403 | 403 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Totals | 418 | 416 | 417 | 432 | 332 | 352 | 331 | 343 | 349 | 338 | 332 | 334 |

The following chart shows the Department deployment response to the Civil Unrest, while operating at minimum force throughout the City.

| Date | # of Personnel Assigned to Civil Unrest | # of Sworn Assigned to COVID-19 | # of Civilians Assigned to COVID-19 | MOF | TOTALS |
|---|---|---|---|---|---|
| May 27, 2020 | 122 | 414 | 13 | 1,834 | 2,383 |
| May 28, 2020 | 201 | 384 | 13 | 1,845 | 2,443 |
| May 29, 2020 | 1,142 | 377 | 13 | 1,719 | 3,251 |
| May 30, 2020 | 1,269 | 303 | 15 | 728 | 2,315 |
| May 31, 2020 | 2,537 | 303 | 15 | 720 | 3,575 |
| June 1, 2020 | 3,432 | 303 | 15 | 1,695 | 5,445 |
| June 2, 2020 | 2,932 | 283 | 17 | 1,778 | 5,010 |
| June 3, 2020 | 2,675 | 282 | 16 | 1,921 | 4,894 |
| June 4, 2020 | 2,872 | 278 | 13 | 2,803 | 5,966 |
| June 5, 2020 | 2,621 | 291 | 10 | 2,097 | 5,019 |
| June 6, 2020 | 2,597 | 255 | 9 | 1,576 | 4,437 |
| June 7, 2020 | 1,933 | 246 | 9 | 1,913 | 4,101 |

<u>Mutual Aid Received</u>

On May 30, 2020, a request for mutual aid was sent to the California Office of Emergency Services (Cal OES).  The Cal OES mobilized and deployed the following personnel to Los Angeles from Region I-A, Region V and the California National Guard. [45]  The resources that the Los Angeles Sheriff's Department sent to the City of Los Angeles were not recorded.

**<u>Region IA</u>**

<u>Santa Barbara County</u>:
· Santa Barbara Sheriff - 30
· Santa Barbara PD - 8
· Santa Maria PD - 8
· Lompoc PD - 6
· Guadalupe PD – 2

<u>San Luis Obispo County</u>:
· San Luis Obispo Sheriff – 30

<u>Ventura County</u>:
· Ventura Sheriff - 40

---

[45] Cal OES Region I-A includes: San Luis Obispo, Ventura, and Santa Barbara Counties. Region V includes: Kern, Kings, Tulare, Fresno, Madera, Merced, and Mariposa Counties.

· Ventura DA - 10
· Santa Paula PD – 10

**Region V**

Kings County:
· Kings Sheriff - 6

California National Guard:
· National Guard - 1,250

**(THIS PAGE WAS LEFT INTENTIONALLY BLANK)**





# Chapter 7:

## Logistics

SAFE LA AFTER ACTION REPORT

# INCIDENT COMMAND POST INFORMATION

*Command Post Locations*

May 27, 2020
- <u>Operations Central Bureau</u> - Los Angeles Fire Station 4 - 450 E. Temple Street, Los Angeles, CA 90012
  - o Command Post Equipment used: Major Incident Response Team-Tahoe

May 28, 2020
- <u>Operations Central Bureau</u> – Police Administration Building (PAB) Courtyard- 100 West 1st Street, Los Angeles, CA 90012
  - o Command Post Equipment used: Major Incident Response Team-Tahoe

- <u>Operations West Bureau</u> – (transitioned from a COVID-19 CP to a Safe LA CP) – OWB Administrative Office, 4861 Venice Boulevard, Los Angeles, CA 90019.

- <u>Operations Valley Bureau</u> – (transitioned from a COVID-19 CP to a Safe LA CP) – OVB Administrative Office, 7870 Nolan Place, Panorama City, CA 91402.

- <u>Operations South Bureau</u> – (transitioned from a COVID-19 CP to a Safe LA CP) – OSB Administrative Office, 7600 South Broadway, Los Angeles, CA 90003.

May 29, 2020 to June 10, 2020
- <u>Operations Central Bureau</u> – OCB CP moved to a parking lot, 815 E. 1st Street, Los Angeles, CA 90012
  - o Command Post Equipment used:
    - Mobile 3 CP vehicle
    - Plans Trailer
    - Pegasus CP Vehicle
    - Fire Department CP vehicle
    - National Guard CP vehicle
    - California Highway Patrol CP vehicle

May 30, 2020
- <u>Operations West Bureau</u> – OWB CP moved to the CBS Studios, 7800 Beverly Boulevard, Los Angeles, CA 90036
  - o Command Post Equipment used:
    - Mobile Divisional Command Post Vehicle

# LOGISTICS

On May 29, 2020, the CP was established at 815 E. 1st Street, Los Angeles, CA 90012.  The below-listed equipment was staged and used while the CP was in operation:

- Mobile 3 Command Tractor and Trailer
- Plans Trailer
- 100kw Generator (CP Power)
- Logistics Truck (Ford F450 Cargo Truck)
- 2-Stall Restroom
- Laptops (6)
- EZ Up Canopies (4)
- Tables
- Chairs

In addition to the CP, a Staging Area was set up at a Dodgers Stadium Parking Lot.  The Staging Area was the official Check-in and Demobilization for all resources responding to Safe-LA Civil Unrest.  Below is the equipment that was staged and used at the Staging Area:

- Alternate Department Operations Center Trailer
- Tractor with attached 25kw Generator (CP power)
- Light Trailer
- 4-Stall Restroom
- Laptops (4)
- EZ Up Canopies (3)
- Tables
- Chairs
- Portable Satellite System (WIFI for CP)

The following vehicles were used to logistically support the incident with the movement of supplies and equipment to the CP, the Staging Area, and various field locations:

- Stake Bed Truck with lift gate (2)
- Box Truck with lift gate
- Pickup Trucks (4)

Air Support Division provided situational awareness and information necessary for key decision-making regarding resource deployment.  The Air Unit provided downlink or tactical operational services.  Below is a break down, by day, of video downlink and tactical Air Units that were deployed:

**SAFE LA AFTER ACTION REPORT**

| Date | Downlink | Tactical |
|---|---|---|
| May 27th | 23LA, 28LA | 26LA |
| May 28th | 23LA, 21LA, WB | 67LA, 3PF, 62PD |
| May 29th | 21LA, WB, 23LA, 26LA | 62PD, 3PF, 28LA,72LA |
| May 30th | WB, 21LA, 25LA, 26LA | 3PF, 61PD, 72LA |
| May 31st | WB, 21LA, 26LA, 25LA | 28LA, 3PF, 72PD |
| June 1st | WB, 21LA, 23LA, 26LA | 61PD, 62PD, 28LA |
| June 2nd | 23LA | 62PD, 65PD, 28LA, 3PF, 61PD |
| June 3rd | WB, 21LA, 23LA | 62PD, 3PF, 65PD, 61PD |
| June 4th | WB, 21LA, 23LA, 25LA | 68PD, 62PD, 3PF |
| June 5th | WB, 23LA, 21LA, 26LA, 25LA | 3PF, 68PD |
| June 6th | 23LA, 25LA, WB, 21LA, 26LA | 3PF, 68PD, 61PD |





# Chapter 8:

## Critique and Recommendations

# CRITIQUE

The critique portion of this After Action Report is based on information provided by a variety of sources, including the Department's General Staff assigned to the management of this incident, chronological information logs, videos, body-worn video, social media, media outlets, pictures, communication recordings, and subject matter experts.

The critique will focus on recommendations for areas of improvement and are organized to correspond to the narrative section when possible.  As with the other sections of this Report, the critique should be viewed in context of the larger event – a high impact, low frequency occurrence.  Department personnel responded to this chaotic multi-day, multi-location incident in a manner far beyond the call of duty.  And they did so during a pandemic.  The purpose of this Section is to focus on the future by learning from the past, and to do so by discussing the events and response transparently and respectfully, not to cast aspersions.

Although only parts of the City experienced looting and widespread damage, other parts of the City were impacted by the cascading effects of the Civil Unrest.  Resources from all over the City were redeployed and Department personnel worked long hours to meet the needs of the City.  Some areas impacted by the Civil Unrest were controlled by existing strategies and tactics, including the mere presence of uniformed officers.  In other areas of the City, officers were met with violence and tactics that were constantly evaluated and altered in an effort to obtain and maintain control of the area.

*Lessons Learned*

1.  Following the Principles of the ICS and the Role of the CP

When an event is declared an unusual occurrence, the Department assumes an Incident Command System.  That System provides for one IC who may not be the highest-ranking Department member at the scene.  Regardless of rank, the IC is, and needs to remain, in charge of the event.  The IC must assume this responsibility.  To obtain and maintain situational awareness, regardless of where other command staff are going, the IC must respond to the CP and direct the operation from there.  Doing so allows the IC to oversee the entire operation, have maximum access to intelligence, enhance the communication between the IC and the Operations Chief, and effectively track and deploy resources. It also allows Command Staff to step back and look at the overall picture of what was occurring, prioritize missions, and focus on economy of force by deploying officers more efficiently.

Not only does the IC have to defer to the ICS, other Command Staff must be aware of it as well.  As the level of violence of the protests increased some Command Staff left the CP and responded to the location of the protests.  Once on scene, they began to direct strike teams and task forces without going through the establish unity of command.  This caused uncertainty as to who was in charge and what directions to follow.

<u>Recommendations Regarding Following the Principles of the ICS and the Role of the CP</u>

The Civil Unrest showed that the Department needs additional training on ICS.

First, Command Staff needs training on the duties of each job within ICS and where those duties should be carried out. This training should also include position specific instruction. The roles and responsibilities of all ICS positions including needed support personnel, equipment, and other necessary tools to manage the incident must be incorporated into Command Staff's training on a regular basis. Training needs to include tabletop exercises, practical applications, and exercises to emphasize unity of command and current changes in crowd dynamics and strategies to ensure performance objectives are met. This must include training that requests for additional personnel or equipment as soon as an issue is identified.

In addition, the Department should consider a robust Major Incident Response Team (MIRT). The MIRT would ensure compliance with ICS and provide on scene recommendations to Command Staff. A cadre of Command Staff trained in specific ICS positions should be maintained and used for the fulfillment of resource needs. This cadre of Command Staff should be separated into different teams such as Team A, B and C. This would allow one team to run A-watch and another team to run B-watch. However, multiple Command Staff would be trained for each position.

2. <u>Establishing a Set CP</u>

The IC also needs an established CP. An established CP aids an IC with the necessary oversight to manage an event effectively. A CP also provides a central location to coordinate resources with assisting agencies; operationally track and deploy resources assigned to the incident; monitor the location of protest groups; improve situational awareness; and, make decisions. The IC can then continually evaluate the effectiveness of the objectives for the incident and update or modify them as necessary.

To enhance the CP, certain supplies are optimal. For example, during the first couple nights of protests the CP did not have large maps for operations. The maps would have assisted in situational awareness and the ability to track resources and crowd movement.

When possible, the CP should stay in one place. The OWB was negatively impacted in its attempt to obtain and maintain situational awareness and resources by relocating to a different venue during the event.

For this Citywide event, the OCB CP was located in a parking lot near the DOC. This provided adequate space for command post operations and allowed for good ventilation and lessened possible exposure during a pandemic. The location, however, had a single point-of-entry, which could have posed a problem for ingress/egress during emergency evacuation procedures. Although no evacuation was ever needed it is something to consider.

While the CP provided ventilation during a pandemic and had a large footprint to allow for some spacing, it also required numerous canopies to help with the heat and sun. Canopies required extensive work and time. The Department did not have enough canopies to support the outdoor CP. Canopies

had to be acquired through various sources outside of the Department, which took a few days to complete.

<u>Recommendations Regarding Establishing a CP</u>

Knowledge of how to establish a CP needs to be incorporated into training, including the need to communicate where the CP is located.

Each geographic Bureau should obtain and maintain large current maps of its Bureau to provide to a CP during incidents and events. The maps should be large enough to include street names and be laminated, if possible, for multiple use.

While there were unique considerations for this event and CP, in non-pandemic times, the Department should consider an existing facility for the CP during extended operational incidents. For example, the in-service training facility at the Elysian Park Academy has adequate facilities for such an operation. Should an extended outdoor CP be necessary, a venue that has numerous ingress and egress routes should be sought. An outside vendor that could provide a large tent should be considered.

While some change to the CP's venue may, at times, be inevitable, it is preferable to have the CP remain in one place.

The MIRT would aid in establishing CPs as well.

3. <u>Communications and Unity of Command while in ICS</u>

During the period of Civil Unrest, especially at the beginning, there were issues collaterally associated with the lack of understanding of ICS and the need for updated technology. One such issue was communications. Early on, the commander's intent was not well publicized, and Command Staff gave conflicting directions. In addition, multiple forms of communications were used. This caused confusion.

Adding to the confusion was the fact that over the radio, not all the Command Staff used their proper or complete designations (*i.e.* Commander 1A). Thus, it was hard to assess which units were where, and which could be re-deployed elsewhere.

<u>Recommendations Regarding Communications and Unity of Command while in ICS</u>

During an unusual occurrence, the IC must make sure that the commander's intent is understood and communicated to all personnel at the event. It should also be videotaped with the time and date narrated before or after it is given. The Department should use radios as its primary formal communication method. Although this is the best method of communication it raises two issues.

First, because radio broadcasts are not secure, and are followed by others within a demonstrating or violent crowd, the Department needs to invest in encrypted radios or some other form of communication that is private at the time.

Second, only one tactical frequency was used for this incident although there were multiple protest groups spread throughout the Downtown Area.  This proved to be problematic, as too many officers tried to use it simultaneously.  The Department needs to make sure that it has sufficient tactical encrypted frequencies and that the CP uses them.

Relatedly, when using the radio, Command Staff and assigned personnel need to know and use their proper and full designations so the IC and others at the CP can most efficiently track resources and personnel.

### 4. A Citywide Event needs a Department Operations Center

Civil Unrest in Los Angeles began on May 27, 2020, in the OCB area.  Understandably, the OCB established a CP that night.  A Citywide Tactical Alert was declared the next day and by the second night of protests, the main challenge was obtaining resources in a timely manner.  Since OCB established its CP first, despite events throughout the City, the OCB assumed and maintained control of coordinating resources throughout the City.  This caused at least perceived problems as, in many instances, the OCB CP made the determination on whether resources were going to remain at OCB or be allocated to other Bureaus in the City.  For example, OWB requested additional personnel and resources for the May 30, 2020 Pan Pacific Park Event.  The OCB CP denied resource requests from OWB because it believed that OCB would require more significant resources that day.  While this may have been the right decision at the time given the intelligence and resources, the Department needs to have a more objective view of resource deployment when Citywide events occur.

#### Recommendations Regarding A Citywide Event and the Need for a Department Operations Center

When a Citywide event occurs that will affect multiple Bureaus, the DOC should be activated.  The purpose of a fully activated DOC is to manage large-scale and complex unusual occurrences.

Each Bureau should establish a CP to maintain operational oversight of events within its area of command and request resources through the DOC.  This will ensure proper request and approval processes are followed.  This will also limit the span of control of any one Bureau.

### 5. Span of Control

The IC in OCB coordinated Citywide resources.  Captains were also often placed in control of a specific area with only one MFF, one lieutenant MFF leader, assigned to them.  As the nights wore on this caused fatigue and made it more difficult to locate other captains to provide relief for the multiple day operation.

On a Bureau level, in the afternoon of May 30, 2020, OWB mapped the area into four sectors.  The OWB IC then assigned a captain to oversee each sector.  This had mixed results.  On the one hand, it allowed for a better span of control.  On the other hand, it taxed captain resources leaving limited Captain resource to both oversee each sector and perform other captain designated duties in OWB and the City in general.

Recommendations Regarding Span of Control

During Citywide incidents, the Department should consider establishing multiple incident commands with appropriate span of control.  The DOC should then operate at a Level 2, to coordinate Citywide resource deployment.

Careful consideration must be given to allow lieutenants and other supervisors to fill the roles and responsibilities.  This will enhance the Department's ability to foster an environment that focuses on succession training.  For example, if an area is to be broken up into four geographic divisions during an incident, rather than assigning a captain to be in charge of each division, a lieutenant could assume the division supervisor role and a captain would then serve as the branch director to oversee the divisions.  The command officer span of control would be decreased allowing for sustainment of the incident over multiple operational periods.

6.  Staging and Unity of Command

The first few nights the Staging Area was located on Judge John Aiso Street, between 1st Street and East Temple Street.  The communication between the Staging Area and the Operations Section Chief or CP was not optimal.  There was confusion about the missions for the officers who were being deployed from Staging.  Multiple points of contact at the CP were giving inconsistent missions to officers.

After the first few nights the Staging Area was moved to the Dodger Stadium parking lot.  The Staging Area was large and minimal direction was provided to resources arriving at the location.  Food was brought in and personnel often took time to eat rather than checking in and getting prepared to deploy.  This caused a delay in switching out resources.  The pre-established MFF unit designations were not used which caused confusion as to the resources deployed.

Some of the personnel that responded to the Staging Area did not bring or have access to vehicles that possessed emergency equipment.  This became an issue when trying to establish MFFs.  Further, the Staging Area did not have enough vehicles equipped with emergency lights and sirens to deploy the personnel.

Recommendations Regarding Staging and Unity of Command

Unity of command should be established to prevent multiple sources providing conflicting missions.  All personnel should receive a briefing that includes the commander's intent, which should be video recorded.  If multiple Staging Areas are used, the information needs to be sent to the DOC, Area Command or Planning Section for continuity of operations.

At the Staging Area, signage and public address systems should be used to delineate between MFFs, plain clothes officers, check-in, and other necessary assignments.  In order to quickly identify resources, one option would be to have the resources grouped by Bureau.  The supervisor would gather 15 officers for the strike team and check-in.  Once four strike teams for that Bureau checked in, they would be formed into an MFF and deployed.  If it is taking a considerable amount of time for the entire

MFF to be established the Staging Area Manager could brief the Operations Section Chief as to the number of Strike Teams available within the Staging Area.  The Operations Section Chief could deploy the resources as needed during an escalating situation.

The food provided should be something that personnel can grab quickly and take with them.

Vehicles with the required emergency lights and sirens should be identified and staged for use by detectives or other personnel who do not have emergency equipped vehicles assigned to them.  The MTD should be used as a resource to identify those vehicles needed and assist Staging with coordination of these vehicles.

   7.   Videographers and Photographers

The Department only has two trained videographers.  This caused, in part, civilian photographers and officers from other assignments to be deployed as videographers without proper training.  As a result, details such as the commander's intent, briefings, crowd size, crowd demeanor, actions taken by officers, uses of force, dispersal orders, arrests, and additional evidence were not documented.  The videographers were unclear on their role and did not execute it as intended.  Many of the pictures and videos do not have narrations as to the significance of the information that was recorded.  Additionally, photographs and videos were not properly processed and stored at Technical Investigation Division.

   Recommendations Regarding Videographers and Photographers

The Department should develop a course on proper videography for all videographers and camera operators to ensure proper video and photographic documentation of the commander's intent, briefings, crowd size, crowd demeanor, actions taken by officers, uses of force, dispersal orders, arrests, and additional evidence are recorded.  Also, videographers should be trained on how to properly narrate the events that they are observing.  For example, they should at least describe where they are (with words and visual evidence if possible) as well as the actions of individuals in the crowd (i.e., throwing frozen water bottles at officers).  Furthermore, proper documentation and storage with Technical Investigation Division should be reviewed.  Videos need to be downloaded, labeled, and stored each day.

The Department should develop a guide for videographers to ensure all pertinent information is captured in photographs and videos.  This guide can be reviewed with videographers prior to deployment.

Each geographic Bureau should identify personnel as videographers and ensure they receive the proper training prior to deployment as a videographer.  This position would be an ancillary duty.

Videographers should be requested prior to an incident, preferably during the planning phase.

   8.   Mutual Aid

The Department has good working relationships with other local law enforcement agencies in the County and State.  During the Civil Unrest, the Department needed those agencies to assist it in quelling the violence that was erupting all over the City, and other agencies needed the LAPD's

assistance.  While the agencies' ability to work together should be commended, there was a lack of
unity and a lack of understanding about different protocols and less-lethal options for crowd control
among the agencies.  For example, other agencies used tear gas.  The LAPD does not.  The use of tear
gas by other agencies meant that the LAPD could not effectively assist without compromising their
own safety.

The Department has other less-lethal options that it used during the Civil Unrest.  Other departments
and agencies may not be familiar with those.

Finally, the Department did not keep good records on those who provided mutual aid.

> Recommendation Regarding Mutual Aid

The region must continue to work together to develop coordinated responses to manage significant
incidents.

As to record keeping, which is a significant issue spanning multiple critiques, the Department did not
keep good records on the agencies that assisted it during the Civil Unrest.  This makes it more difficult
to develop future coordinated responses.

9.   Deploying the National Guard

Related to mutual aid from local law enforcement agencies, is the deployment of the National Guard.

The National Guard assisted in many ways, but there were also challenges, mostly related to confusion
and communication on their first days of deployment.  First, Operations was asked to create
assignments for them, which was a challenge on the first two days as the deployment levels were not
firm and there was confusion as to their capabilities other than force protection.  Several Command
Staff were confused regarding the deployment of the National Guard.  Additionally, it was difficult to
maintain communication with them.  Although the LAPD hired a former member of the Department to
oversee the National Guard's integration into the event, upon the arrival of the National Guard in the
City, they could not be immediately deployed because they had not been briefed on the rules of
engagement (including the fact that they would be limited to fixed post positions).  Similarly, the
National Guard was not made aware of the Department's demonstration posture and its use of force
policy.  There was also a last-minute change to their transportation protocols requiring uniformed
pathfinders to be assigned as escorts.  All of this caused delay in their deployment but not in the need
to have them deployed.

Finally, coordinating the deployment of a fully mobilized Department, the mutual aid responders, and
the National Guard required robust Staging Areas.  Due to the Department's paper-based check in
system, a significant amount of personnel were used at the CPs to track resources assigned to the
incident.

Recommendations Regarding Deployment of the National Guard

The Department needs to have procedures in place for working with the National Guard.

The Department should consider appointing and developing command level officer(s) to serve as the National Guard liaisons as an ancillary Department duty.  These should be attached to Department positions that will likely not be assigned to other, critical field duties in the event of an unusual occurrence, which means outside of the Office of Operations.  These liaison officers can meet regularly with National Guard management, keep up on changes to their policies and capabilities, conduct tabletop exercises and complete regular reports back to the Department.  This should help ensure that the National Guard is familiar with the City and its policies.  It should also allow an IC to assign them tasks more seamlessly.

The Department also needs to work towards a less antiquated way to track and deploy resources – especially as they grow larger and larger.  The Department's investment in technology needs to include an investment in a more efficient system for using its own and additional resources.

10. Personnel and Equipment Delays

The Department suffered delays in getting personnel and equipment to locations where unlawful assemblies occurred, dispersal orders given, and arrest made.  Personnel are needed for blocking forces, arrest teams, transportation, and other investigative purposes.  Moreover, sound equipment for amplified dispersal orders, transportation vehicles, and other tools necessary to carry out mass arrests. The delay in personnel and equipment resources caused unruly crowds to become further agitated and escalated confrontations with officers.  Additionally, early delays (May 27-28, 2020) appeared to embolden protesters as threats of arrest were not taken seriously.  Protestors saw that their actions had little to no consequences and they defied orders to disperse which would continue into the following days.

Recommendations Regarding Personnel and Equipment Delays

In general, all personnel and equipment needed to manage crowds, declare unlawful assemblies, and make arrests should be deployed at the location prior to giving any dispersal order.  However, when there is an absence of equipment, but enough personnel, a dispersal may be given when a crowd is made up of protestors and those inciting violence to make arrests of those violent instigators. Experienced personnel at the scene need to be able to make and communicate that decision through the chain of command.

This topic and various options should be incorporated into Command Staff training and exercises.

11. Unlawful Assembly

During this period of Civil Unrest, the demonstrators used a variety of new or at least uncommon techniques.  One of them was to march together in large groups, separate into smaller groups and then rejoin together into a larger group.  This happened repeatedly in the Downtown Area on multiple days

and at Pan Pacific Park on May 30, 2020 when the large crowds divided, blocking roadways, and
preventing law enforcement response to calls of looting and violence.

When an unlawful assembly is declared, and the dispersal order is given, issues arise when the group
disbands and then regroups. The Department's current dispersal order requires that the group at a
defined location, such as an intersection, is provided with information on how much time they have to
disperse and the direction in which to disperse. However, the group that is unlawfully assembled can
separate, move two blocks away, and re-assemble. This process continues repeatedly as the group
disbands and then assembles back into a group.

### Recommendation Regarding Unlawful Assembly

The Department and City Attorney's Office should review the Department's Dispersal Order to
determine if it is reasonable to add a sentence to the end of the dispersal stating that if, once dispersed
from a defined location and the assemblage regroups within another larger defined area within a
specific time frame, they will be subject to this dispersal order and in violation of Section 409 of the
California Penal Code.

The Department and City Attorney's Office will then have to determine what documentation of those
assembled would be necessary to show that they were from the group initially provided with the
dispersal order. The Department may wish to look at whether, in exceptional circumstances, there is
video equipment that could be used to determine whether the group is the same. New municipal codes,
polices, and technology may obviate the need to continually repeat the dispersal order to the same
group at each location where they assemble without unduly restricting the rights of those who are
demonstrating.

### 12. Mobilization and A/B Rosters

The Department has mobilized twice in the last 28 years: 1992 and 2020. It is therefore perhaps
understandable that in 2020, it did not go smoothly. First, mobilization caused a change of watch at
6:00 p.m. when most of the violence and vandalism was causing disruptions in resource allocation.
This was further compounded by the use of Nixel. While Nixel was a good resource to notify all
Department personnel of the mobilization, it also was used too often creating an influx to information
all at once.

Second, not all personnel, including Command Staff, especially those serving in non-operational
capacities at the time of the Civil Unrest, understood mobilization and what it meant to them. While
the Department is fortunate in that more than half of its Command Staff experienced the 1992
mobilization, they were in different functions at that time.

Third, not all personnel were mobilized. Specifically, the civilian side (which is the majority) of CSD
was not mobilized at the time the rest of the Department was mobilized and that decision was not
revisited by CSD's Command.

Fourth, not all Mobilization Rosters were up to date. Department entities are required to update their
Mobilization Rosters (A/B Rosters) each year in Standing Plans as well as provide updated rosters
each deployment period to the DOC. Some Areas did not have updated A/B rosters during the Civil

Unrest.  This caused an issue when the Department mobilized, and employees did not know which watch they were assigned and where they should respond.

Finally, A/B watch has traditional times, but was not customized for the Civil Unrest.  This is true even though, by May 31, 2020, the pattern for the protests was clear.  There was little criminal activity in the morning.  Peaceful marches, facilitated by the LAPD, would take place in the afternoon.  Then, as the day progressed and the sun began to set, criminal elements would join the marches and protests would devolve into demonstrations mixed with violence and disorder until the early hours of the next day.

Recommendations Regarding Mobilization Rosters

To avoid confusion over mobilization, the Department should engage in virtual mobilization efforts.  This would allow personnel to know what they were supposed to do and where to respond.  While mobilization happens infrequently, the stakes of policing are high during mobilization and the need to have an organized police department is paramount.  In a virtual or test mobilization, Nixel should be used to determine if unnecessary redundancies exist.

Should the Department need to mobilize for an emergency that may involve mass arrests, the civilian side of CSD should also be mobilized.  This should be done in any virtual mobilization scenario.

All Department entities should have their A/B rosters reviewed for accuracy every deployment period and submit them to the DOC.  The DOC should ensure they are in receipt of each entity's A/B rosters each DP.

The Department should consider modifying its A/B-watch schedule during a mobilization to include a mid-shift or adjust the start times of each watch to maximize the number of resources available during the hours of heightened activity.

13. Arrests

During a Citywide incident, resource allocation becomes an integral part of the incident.  Assigning personnel to positions or tasks that are within the scope of their expertise aides in the operation.  The processing of arrestees and completing follow-up investigations were cumbersome due to the inability in identifying the arresting officer to obtain a statement or locate evidence.  As a result, some cases were not filed.

Recommendations Regarding Arrests

A robust Investigative Section staffed by detectives is a necessity.  A detective should be assigned as the arresting and investigating officer at each incident where a dispersal order is given to ensure the dispersal order and crowd behavior are documented on video, the elements of the crime are met, necessary follow up information is obtained, and evidence (i.e., objects thrown at officers) is collected and/or photographed.  Deploying specialized detectives to these assignments and the field jail would maximize the deployment of Bureau resources to manage the incident.  Officers should use their BWV to memorialize the detention and ensure that the field jail is provided with the information.

14. <u>Transportation of Arrestees</u>

Several days of protests involved criminal activity and violence.  On these days a larger than expected number of people were arrested for a variety of charges.  The transportation resources were quickly overwhelmed which caused delays in processing the arrestees. The jail vans could not accommodate all the requests to transport those taken into custody.  This left several officers and arrestees waiting for significant periods of time for transport.  To help alleviate the transportation issues and lower the response time for jail transport vans, the Department received assistance from LASD in the form of jail buses.  The Department also used MTA buses to transport arrestees.

<u>Recommendations Regarding Transportation of Arrestees</u>

A transportation plan is required when there is potential of mass arrests.  This plan should be developed in advance to assist in mitigating delays and should include exploring contracts with the LASD and the MTA, among others.  The Department should also explore the ability to expand their fleet of vehicles designated to transport arrestees.  The Department should also maintain an accurate list of Department employees that have commercial driver's licenses with passenger endorsements.

In situations where the processing of arrestees is delayed, the Department should consider issuing a Release from Custody on-site as an alternative to transporting individuals to field jails for booking and release.

15. <u>Mobilization of Custody Services</u>

The Field Jail Manual provided information on antiquated techniques for the field jail.  Some of the personnel assigned to the field jails were unfamiliar with the process and procedures.  Custody Services Division was not mobilized during Safe LA.

<u>Recommendations Regarding Mobilization of Custody Services</u>

The Field Jail Manual should be reviewed and updated to include current techniques on how to operate a field jail including proper processing and retention of original booking paperwork (i.e., Release from Custody form, etc.).  During events or incidents where the potential for mass arrests are likely, the ICS structure should be evaluated to determine if it is more efficient to move Investigative Group to a Branch or Section.  This could improve efficiency by reducing the span of control that the Operations Section must maintain.  Investigative Branch could include groups and divisions necessary for the transport and processing of arrestees as well as other investigations related to the incident.  When mass arrests are likely, a CSD representative should be at each field jail.  If there are insufficient personnel working CSD to staff each location, then a representative from CSD should be assigned to Investigative Branch to provide guidance and direction.

16. <u>Field Jail Locations</u>

Locations identified for field jails must be vetted, and locations used previously for other unusual occurrences, like a wildfire cannot be automatically used for a field jail.

Recommendations Regarding Field Jail Locations

The Department should pre-identify locations throughout the City that can be used for field jails.  The list of locations should be maintained and verified on an annual basis and made available to Investigative Branch and CSD when needed.

The Department should consider having a pre-loaded trailer, or at least a check list and the ability to load a trailer with the needed supplies and a trained cadre of detention personnel to establish field jails in future mobilizations or unusual occurrences.

17.  Air Unit Downlink

The Air Unit downlink is instrumental in obtaining and maintaining situational awareness for the Operations Section Chief and Branch Directors who are deployed in the field.  During most of the Safe LA protests the Department's downlink was not operating properly.  Command Staff were forced to use their personal devices to stream news broadcasts to obtain an overview of crowd size and demeanor.  Further, the CP had to rely on mainstream media and social media posts to try and maintain some of the visual situational awareness.

Recommendations Regarding Air Unit Downlink

The Department should establish a routine testing schedule for the Air Unit downlinks.  Downlink systems that are not working properly should be fixed and retested to ensure an adequate number are operational and able to send live video downlink to multiple receivers.  Additionally, a command officer in an Air Unit can complement the downlink deployment and provide guidance and information to Operations Section Chief and Incident Commander.

On October 21, 2020, the BOPC approved the Los Angeles Police Foundation donation of new recording equipment for the video downlink feed in Air Units.  The old equipment which only allowed viewing of real-time feeds was supplemented with standalone recorders to allow Command Staff to download and replay recorded video captured by the Air Unit.

18.  New Tactics by Protesters Require New Responses

The demonstrators and those that would opportunistically use them employed new or novel tactics including: scanning police radios and moving to thwart law enforcement's efforts; assaulting officers by throwing projectiles from within the crowd as well as from buildings above; using vehicle caravans to conduct mass looting, and sometimes covering license plates to avoid detection; splitting into small groups and moving in different directions only to rejoin again at a different location; using social media to communicate; having leaderless groups that did not respond favorably to officers' attempts to talk to someone, and at times led to the officer being assaulted by another group; setting fire to debris in the middle of the street or otherwise blocking officers' ability to respond to situations and calls for help; surrounding officers and, at times taking the high ground on freeway overpasses; and burning police vehicles.  Both officers and protesters were injured, and it was difficult for LAFD to get to the injured – even with force protection from LAPD.

The Department relied on MFF to handle large crowds, but the MFFs were trained to handle a large crowd in a single location.  The Civil Unrest was a series of spontaneous and wide-spread protests throughout various locations.  The protests involved large crowds who often split into smaller groups causing gridlock and law enforcement response to criminal activity.  The Department had trouble responding effectively to multiple locations, large crowds, and criminal activity.  Moreover, given the violence and destruction that was coming from within the groups and elsewhere, the Department deployed a significant amount of less-lethal munitions.

Given the enormity of the situation and the new techniques, the Department had to adjust on the fly.

Recommendations Regarding New Tactics by Protesters Require New Responses

During the Civil Unrest, the Department learned that MFFs worked best when deployed with specific missions to address criminal activity.  The MFF Leader should remain in contact with the Branch Director for an updated deployment mission.  During this incident the need to move resources around quickly once they became available was imperative.  Based on the demonstrators' practice of splitting up, the Department decided to make changes including splitting up MFFs.  The splitting of MFFs helped in apprehending many looters, making arrests, and using resources more effectively throughout the City.  The Department also employed the Air Unit in conjunction with MFFs.  The Air Unit guided the MFF into hot spots of criminal activity such as looting.

In October 2020, Metropolitan Division began training personnel on updated crowd management and crowd control which included lessons learned during the Civil Unrest.  Some of the training focused on new techniques, use of MFF during crowd control, splitting MFFs into squads to address isolated incidents, vehicle movement, and less-lethal munitions.  The Department should continue to revise its MFF training to address new tactics employed by demonstrators while meeting the requirements of previous settlement agreements.

The Operations Section Chief should provide clear communication and direction to the Branch Directors and MFF leaders as to the commander's intent and the expectation that resources be tracked and redeployed to evolving situations as quickly as possible.

The Department has considered expanding the EMT cadre to assist both injured officers and community members during demonstrations and other major incidents.  This, however, would not have been an effective option for this event as officers were frequently assaulted as they tried to facilitate protests or extract a lawless individual from within a previously peaceful crowd.  Therefore, while it is something to consider for other events, the Department is cognizant of the additional training and equipment that would be required.

The Department used a significant amount of less-lethal munitions to protect the City and restore order.  The Department should continue to research and seek best practices related to the deployment of less-lethal munitions.  This should include an examination of the Department's current less-lethal capabilities and new available technologies.  A clear understanding regarding when to deploy less-lethal and the level of approval necessary should be reiterated and clarified to avoid confusion.  When less-lethal is deployed, when available it should be used in conjunction with BWV to capture the

activity leading up to the decision to use less-lethal.  Officers trained in less-lethal should attend annual weapons manipulation training.

### 19.  New Equipment – Lasers and Drones

The protesters used green lasers as a weapon to shine into the eyes of the officers on the street and in the Air Unit.  The use of lasers caused injury and prevented further Air Unit deployment.  Additionally, protesters used the drones to stream live video of the officers' deployment and search for plain clothes officers.

Drones were also seen over demonstrations causing dangerous conditions for the Air Units flying in the same air space.

#### Recommendations Regarding New Equipment – Lasers and Drones

As of this writing, the Department has issued protective eyewear to its officers.  This eye wear protects officers from the use of lasers.  Additionally, the Department should investigate acquiring counter drone technology such as that used by the Los Angeles Port Police.

### 20. Protesters on Freeways

On multiple days during the Civil Unrest protestors marched onto freeways causing traffic congestion.  For example, on May 29, 2020, at approximately 7:30 p.m., roughly 150 protesters went on to the northbound lanes of the 110 Freeway blocking all lanes of traffic.  When the officers moved the protesters back onto City streets they caused damage to the City and had a violent confrontation with officers.

#### Recommendations Regarding Protestors on Freeways

A clear and concise commander's intent should be provided to supervisors and officers at the beginning of any large incident or event.  Part of the intent should include groups entering the freeway and arrest posture.  A crowd can be detained and arrested for entering the freeway and blocking traffic.  These themes should be included in all crowd management and control training.

### 21. Information Technology Bureau (ITB)

The Logistics Section was tasked with a multitude of requests including technological support.  The ITB was not embedded with the Logistics Section and their expertise was not used.

The ability to track squad leaders electronically on a map could aid in the deployment of resources during a dynamic incident.

Finally, as has been mentioned in sections above, much of the tracking of Department personnel was done on paper by individuals.

Recommendations Regarding Information Technology Bureau

The ITB needs to play a larger role in an unusual occurrence operation to coordinate and assist with technological equipment and coordinate with the City's Information Technology Agency.  Having a representative from ITB embedded with Logistics Section would have assisted with the coordination of many of those requests.

On October 21, 2020, the Department published a Notice[46] detailing the enhanced capabilities of the Department-issued smartphones including populating officers' location onto Computer Aided Dispatch system mapping functions.  This function will allow the Department to improve situational awareness as well as track and deploy resources.

The Department must continue to try and harness technology.  Moving away from paper tracking of personnel is necessary in the current technology-rich environment.  It would save time, allow personnel to be devoted to other work and allow for a more efficient recap after any event.

22. Record-Keeping

Maintaining good records during an emergency is critical.  During a period of civil unrest, each Bureau maintained its incident chronological log and situational status reports differently.  This caused a delay in recreating activities and time lines.

The Finance/Administration Section, Planning Section, and Logistics Section did not work together causing an inability to accurately capture resources (personnel, equipment, supplies) deployed to the incident.  During the week-long incident, many resources were acquired and dispersed to sustain the operation.  However, the system used for the tracking of resources proved to be inadequate.  At the end of the incident it was difficult to locate supplies, resources, and personnel.

Further, all personnel did not accurately document unit designations, personnel assigned, resource requests, missions, uses of force, injuries, etc.

Recommendation Regarding Record Keeping

Personnel should be assigned to the Finance/Administrative Section as soon as practicable when a large incident occurs.  As a result of the COVID-19 pandemic, several civilian employees in our Department have been trained in cost recovery.  This training should be expanded to additional civilian employees.  In doing so, sworn employees can be redeployed to the tactical incident.

The Department should create a standardized approach towards compiling timeline activities, maintaining accurate documentation of incidents and preplanned events, and tracking equipment using ICS Form 213.  In doing so, should an event cross Bureau borders, reporting will be uniform.  Training

---

[46] See "Enhanced Department Smartphone Capability; Required Mobile Device Security Protocols," Office of the Chief of Police Notice, October 21, 2020.

on reporting and tracking should be supplied to the Planning Section personnel and Logistics Section Chief in each Bureau.

Further, Finance/Administration Section, Planning Section, and Logistics Section should work together at the CP. This will allow for the quick acquisition and accurate documentation of supplies necessary for the operation. This will also ensure better accountability and assist with potential financial reimbursement.

All personnel, including Command Staff, should accurately complete the ICS Form 214 to ensure personnel, equipment, and actions taken are documented. The Demobilization Unit should ensure all information is accurately captured on the ICS Form 214 prior to releasing personnel from the incident.

23. <u>Communications with Plain Clothes Officers</u>

The Department needs to ensure that good lines of communication are established with plain clothes officers deployed in the field. In some cases, the plain clothes officers reported information through their chain of command, however, that information was not relayed to the Operations Section Chief in a timely manner. As a result, the Operations Section Chief did not have the information to make timely decisions and deploy needed resources.

<u>Recommendations Regarding Communications with Plain Clothes Officers</u>

Department-issued smartphones should be given to plain clothes officers during demonstrations to immediately provide the Operations Section Chief with photographs and briefs on the incidents occurring in the crowd. Any changes to reporting procedures should be shared with plain clothes officers so that they may provide the CP with information in a timely manner.

Also, consideration should be given to the use of Observation Posts, location in which officers can observe activity and report back to the CP, to assist with establishing good situational awareness and the coordination of resources.

Finally, those who receive communications from plain clothes officers must relay those communications to the appropriate section and person at the CP so that the Department can make the most out of the information provided by plain clothes officers.

24. <u>Communication Between Watches</u>

Differences in opinions arose when resources were requested for the next watch. For example, B-watch would request the resources for the next day's A-watch, including deployment missions. However, A-watch personnel would disagree with the requests and missions.

<u>Recommendations Regarding Communication Between Watches</u>

As stated above in the mobilization critique, but for different reasons, the current A/B watch may not be the best for long term events such as the Civil Unrest. The Department should consider writing IAPs for a 24-hour operational period rather than a 12-hour operational period. The Department would

have two shifts within one 24-hour operational period.  If the Department continues to use 12-hour operational periods, then the communication between the A-watch and B-watch personnel will have to be improved to meet the expectations of each watch.

25. Personnel Deployment

During the hyperdynamic phase of this incident, situations arose where personnel deployed did not meet the needs of the Department.  For example, once the Department mobilized the number of personnel allocated to this incident improved, but on certain occasions did not fully meet the needs of the Department.  It was noted that, some PAB personnel could have been deployed to satisfy incident needs.

Recommendations Regarding Personnel Deployment

The command and control of all Department personnel during a major incident has a direct correlation to the success of meeting the incident objectives.  The following incident priorities should be the basis for managing the incident and personnel:

- Life Safety;
- Incident Stabilization;
- Evidence/Property Preservation;
- Continuity of Operations;
- Economy of Force; and,
- The overall wellbeing of the Community/Feedback.

Department personnel should be reminded of the priorities during a major incident and all available resources should be deployed to the incident unless an exception is given by Command Staff and that deviation should then be relayed to the DOC, who has the overall authority on resource allocation and distribution.  Non-OO entities should be provided clear direction on assignment during a major incident.

26. Public Information Officer

The Public Information Officer (PIO) had difficulty in relaying information to the public and news outlets due to the large number of protesters combined with the numerous protest locations; media utilizing Live View; and, the inability to set up press conferences due to the movement of the Chief of Police and other high-ranking Command Staff as they dealt with the dynamics of the protest.  In the days following the protests, the PIOs used social media to distribute information.  However, the PIOs paused information sharing on social media due to the inability to keep the information from continually being buried.

Recommendations Regarding Public Information Officer

The PIOs should continue to meet with media in the field when able.  The PIO should continue to seek locations to conduct interviews with the Chief of Police and other high-ranking members of the Department during dynamic incidents to provide the public with incident and safety information.

Although information provided to the public via social media can be buried, the PIO should continue to push out factual information.  The establishment of a Joint Information Center during an evolving incident may enhance the ability to efficiently provide a unified message.

27. Information Receipt

The DOC was not given accurate information regarding the number of personnel assigned to the incident.  Information from the Staging Area did not match the personnel that showed available to respond to the incident.  For example, a command officer was already assigned to the DOC, as the Director of Emergency Operations, due to it previously being activated for COVID-19.

Recommendations Regarding Information Receipt

The DOC needs to receive accurate and timely information from Staging to coordinate multi-Bureau and multi-location incidents within the City.  As an example, each Bureau would establish an Incident Command and then the DOC, activated to Level 2, would take on the role similar to Area Command.  As such, the DOC would coordinate Citywide personnel and resources to the areas with the highest priority.

28. Information and Intelligence

On May 25 and 26, 2020, members of the LAPD Major Crimes Division (MCD) reviewed the landscape that was unfolding in Minneapolis and as early as May 26, 2020, MCD anticipated public demonstrations in Los Angeles.  Throughout the Civil Unrest, MCD continued intelligence gathering related to the Civil Unrest and put out safety bulletins advising that protesters were arming themselves with bottles of acid, so officers should be diligent and aware of their surroundings.  The MCD sent out daily intelligence briefs to Command Staff informing them of potential protests and threats of violence.

Despite gathering some intelligence, the Department did not have all the intelligence it would have liked to properly deploy and deter the violence that resulted from the Civil Unrest.  For example, on May 28, 2020, the Department knew of two protests that were going to take place in the City – one in OCB and one in OWB.  There was no verified estimate of the crowd size.  An unverified source indicated about 100 people would be attending the Pan Pacific Park protest and the Department also received information that pallets of rocks and cinderblocks had been located in the Downtown Area, possibly staged by protesters or those who wanted to blend in with protesters and engage in violence.

Imperfect intelligence can lead to imperfect responses.  However, there are limits on what the Department can and should do to gain intelligence.  While information may have been posted on some "publicly available" social media, one has to know where to look and the Department and City have always been mindful of casting too broad a net and balancing individual privacy and freedom of assembly with police intelligence.

Recommendation Regarding Information and Intelligence

The Department should continue to seek new technologies and capabilities to gather and analyze open source information and intelligence that can be quickly shared with the Operations Section Chief.

*Best Practices*

1.  Fire Extinguishers

    Some protesters set fire to garbage cans and other debris and then pushed them into the street
    causing delays in LAPD response to calls for service and violent demonstrations.  The
    Department issued fire extinguishers to officers in the field to address small fires in the field.
    This reduced the need for LAFD to enter volatile scenes.

2.  Connectivity with Other Agencies

    Having other agency representatives at the CP was extremely important for the coordination of
    resources.  Not only did this allow for timely information sharing but it allowed decision
    makers from those agencies to maintain an adequate level of situational awareness.

3.  ESD Assigned to DOC

    Emergency Services Division (ESD) personnel were assigned to the Logistics Section at the
    DOC for COVID-19.  Having personnel at the DOC to assist with resource requests and to
    purchase needed items utilizing the Department credit cards proved beneficial.





# Chapter 9:

## Detailed Chronology

SAFE LA AFTER ACTION REPORT

# DETAILED CHRONOLOGY

The following timeline was compiled from several Department sources.  This includes the lists of events from the Planning Section at the CP, each Bureau CP, firsthand accounts from Department personnel, videographers/photographers, and radio frequency broadcasts.

## WEDNESDAY, MAY 27, 2020

### Operations-Central Bureau (OCB)

| | |
|---|---|
| 1700 hours | Approximately 100 demonstrators congregated near the civic center. |
| 1730 hours | The group started to march in the streets around City Hall.  As additional people joined the protest, the group started to overflow into the street.  More people joined the march as it progressed along the streets of the Downtown Area.  The demonstrators continued to the intersection of North Alameda Street and East Aliso Street, blocking traffic.  At the intersection, a brief rally was held, which remained peaceful.  At the end of the rally, the group marched north on Alameda Street and entered the off-ramp to the northbound 101 Freeway at Alameda Street.  Commander 1B requested additional units to assist the bicycle unit. |
| 1800 hours | The demonstrators entered the 101 Freeway and blocked the north and southbound lanes of traffic.  Two CHP units arrived in the southbound lanes of the 101 Freeway to clear a lane of traffic for the vehicles that were trapped by the sudden demonstration on the freeway.  A demonstrator immediately vandalized one of the CHP cruisers by smashing its back window with a skateboard.  Another demonstrator, who had jumped on the front of the vandalized CHP vehicle, was injured when he fell off as the CHP officers attempted to drive away.  The demonstrators eventually left the freeway and most of them gathered on Aliso Street. |
| 1825 hours | The group of roughly 200 people made their way to Hope Street and Hope Place.  Other protesters continued to arrive in the downtown Civic Center area.  The new protesters joined in with other groups and began blocking multiple intersections.

The demonstrators used an aerosol spray and flame to burn a United States Flag at Los Angeles Street and Aliso Street. |
| 1900 hours | The command post was established on the driveway of Fire Station 4, located at 450 East Temple Street.  Staging was located at Judge John Aiso and Los Angeles Street.  This caused some confusion as people kept referring to the Staging Area as the command post. |

| | |
|---|---|
| 1955 hours | Commander 1 requested a sound truck and jail bus to be deployed to the intersection of Aliso and Los Angeles Streets in preparation for a dispersal order.  The Department Operations Center (DOC) advised that the jail bus request could not be filled.  The DOC was unable to locate a certified bus driver.  The DOC began actively searching for other available options to fulfill this request. |
| 2010 hours | Two main groups of protesters were established: one at the intersection of East Temple and Los Angeles Streets and one at the junction of Aliso and Los Angeles Streets.  The group at the corner of East Temple and Los Angeles Streets blocked a LASD jail bus from traversing the intersection.  The Operations Section Chief dispatched bicycle officers and officers on foot to assist in clearing the intersection. |
| 2015 hours | The protesters in the middle of the intersection at East Temple and Los Angeles Streets were given a dispersal order and provided five minutes to clear the intersection and disperse west on Temple Street.  The group dispersed without incident. |
| 2025 Hours | A protest group was established at 1st and Main Streets, in front of the Police Administration Building (PAB).  The DOC located two jail transport vans, and both responded to staging at Judge John Aiso and Los Angeles Street. |
| 2045Hours | The Air Unit gave a crowd estimate in front of PAB of approximately 50 to 75 people.  The command post at Fire Station 4 continued to request additional resources and have them respond to staging for deployment. |
| 2050 hours | The Air Unit requested officers to block traffic at 1st and Main Streets for protesters in the intersection. |
| 2055 hours | Officers assigned to PAB advised the CP that vandalism was taking place at PAB.  Spray paint was used to vandalize the front of PAB with unknown graffiti.  While officers were deployed to PAB, protesters started to throw rocks and bottles.  Officers requested additional resources to provide defense to the PAB structure. |
| 2110 hours | The crowd started moving into the intersection of 1st and Spring Streets.  The crowd trapped several motorists in the streets. |
| 2120 hours | The B-Watch IC advised officers over radio transmission, if they observe criminal activity, they should effect arrests.  As additional police resources arrived on scene, the protesters started moving south on Hill Street towards 2nd Street. |
| 2135 Hours | A crowd of approximately 50 protesters walking in the streets was now contained in the intersection of 2nd and Hill Streets. |
| 2145 hours | Videographers were requested to respond to the intersection of 2nd Street and Hill Street.  A short time later, jail vans and OCB PM-watch detectives were requested to the same intersection. |

SAFE LA AFTER ACTION REPORT

2220 hours      Officers on scene gave a dispersal order to the protesters occupying the intersection at
                2nd and Hill Streets.  They were given five minutes to leave the intersection and area by
                moving West on 2nd Street away from Hill Street.  The crowd dispersed, and the night
                watch detectives responded to staging at Judge John Aiso and Los Angeles Street.

2250 hours      The Department instituted a modified tactical alert for OCB only and released the CHP
                from the incident.  The IC continued to have units respond to staging.

2311 hours      The modified tactical alert was canceled, and resources continued to demobilize.

2345 hours       The CP was demobilized for the night.


# THURSDAY, MAY 28, 2020


### Operations-Central Bureau (OCB)


1800 hours      Police resources started to arrive at staging (located on Judge John Aiso Street between
                East Temple and 1st Streets).

1920 hours      Unit P120 requested plain clothes officers to Main and 2nd Streets to monitor the
                vandalism occurring to police vehicles at the location.

1930 hours      A protest group started to gather and march towards 2nd Street and the 110 Freeway on-
                ramp.  As the group continued to walk around several streets in the Downtown Area,
                the bicycle unit assisted in facilitating the march by intermittently blocking vehicle
                traffic so that marchers could peacefully demonstrate.  Bicycle units are commonly used
                by the Department to facilitate the movement of large crowds, parades and
                demonstrations due to their ability to move quickly through densely populated crowds
                where officers in police vehicle would be inhibited by pedestrians and traffic.

1950 hours      Plain clothes officers reported multiple acts of vandalism and vandalism suspects in the
                group as they moved south on Spring towards 5th Street.

1953 hours      Unit P160 reported that some of the protesters were gathering rocks and bottles as they
                walked in the direction of Central Community Police Station (251 East 6th Street).  The
                group then changed directions and went to 6th Street and Broadway.  The plain clothes
                officers reported the group were vandalizing businesses as they walked westbound on
                6th Street.

2000 hours      The OCB declared a Tactical Alert for OCB.  A protest group gathered in the
                intersection of 2nd Street and Grand Avenue.  The LAPD established skirmish lines in
                the intersection and were confronted by protesters who pushed officers.

| | |
|---|---|
| 2030 hours | The sound truck gave a dispersal order at Grand Avenue and 2nd Street.  The group was given five minutes to disperse south on Grand Avenue from 2nd Street.  Some of the protesters left the location.  However, other protesters arrived on the scene.  Commander 1A requested all night watch detectives respond to staging at Judge John Aiso.  Officers at the scene requested additional resources to assist with the group on Grand Avenue. |
| 2055 hours | A Citywide Tactical Alert was declared. |
| 2100 hours | The CP was moved to PAB and Commander 1A requested two jail transport vans at Grand Avenue and 3rd Street.  The Air Unit assisted with the tactical movement and repositioning of resources.  As the crowds were beginning to disperse, some protesters moved over to Hope and 3rd Street.  Protesters started throwing rocks and bottles at the officers. |
| 2135 hours | A second dispersal order was given to the new group gathered at the intersection. |
| 2200 hours | A bottle of bleach was thrown from a window of a multi-story building, spraying a motor officer at Hope and 3rd Street.  The Air Unit arrived at the location, the rest of the groups dispersed, and the Air Unit broadcast no additional groups of protesters. |
| 2250 hours | A large group of protesters began moving north on Flower Street at Olympic Boulevard.  Officers saw some of the protesters attempting to break into a business.  At 12th Street and Grand Avenue, the group began throwing rocks at the windows of a Starbucks (1251 S Grand Ave).  The crowd then dispersed, and additional units responded to the intersection at 7th and Hope Streets. |
| 2313 hours | A group of protesters started moving west on 5th Street towards the 110 Freeway on-ramp.  A CHP blocking force stopped the group before they could gain access to the freeway. |
| 2325 hours | An LAPD sound truck gave a dispersal order to the group of protesters that had gathered in the middle of the intersection of 5th and Figueroa Streets.  The group was given five minutes to disperse northbound on Figueroa.  The group dispersed north on Figueroa Street. |
| 2345 hours | A small group remained in front of PAB, and the Citywide Tactical Alert was canceled. |
| 2358 hours | The OCB IC responded to the command post. |
| 0015 hours | The CP was demobilized. |

# FRIDAY, MAY 29, 2020

### Department Operations Center (DOC)

0940 hours    Chief Moore provided all senior command staff with his commander's intent during the direct report meeting.  Chief Moore identified objectives and strategies that included the following:

- Facilitate demonstrations.
- Do not allow violence or property damage.
- Recognize that if officers are unable to accomplish targeted enforcement, officers are to shift to declaring unlawful assemblies.
- Outreach to community groups needs to be a focus to petition for peace.  The groups are to be made aware that violence and property damage will not be tolerated.
- Metropolitan platoons are to be put into TSEs to support operations.
- Obtain a list of prohibited items during protests.
- Use of tactical Air Unit.
- All divisions were to have plans in place for station security.  Chief Moore advised that officers were not to post on station roofs with rifles.
- Cancelling of days off and use of overtime.
- DOC was to have a command officer on B watch.
- Custody Services Division was to augment staffing.
- GSD was placed on standby.  Command were to make requests for needed supplies as soon as possible.

1300 hours    The CP advised OSB CP that its virtual MFF units were activated and requested additional resources.  Responding units advised to stage at 142 W 75th Street, 75th Elementary School by 1400 hours.

1315 hours    An email from the DOC was sent to Department personnel regarding the *Al Crespo v City of Los Angeles* decision defining the freedom of press during demonstrations.

1415 hours    A Citywide Tactical Alert was declared.

### Operations-Central Bureau (OCB)

1245 hours    Hollenbeck requested additional resources, including 20 k-rail and 20 bicycle racks at Hollenbeck Community Police Station in preparation for a protest that was scheduled to take place there the next day, May 30, 2020.

1654 hours    A small group that gathered and peacefully protested on the sidewalk in front of Los Angeles City Hall moved to occupy Spring Street north of 1st Street and maintained their presence in front of City Hall.

1718 hours    As the Air Unit arrived overhead, they observed the crowd marching westbound Olympic Boulevard and requested that motor officers assist with traffic blocks at Olympic Boulevard and Hope Street.  They also broadcast that vehicles had joined the crowd's tail end and requested officers trail to deter this.

1730 hours    While protesters marched on Figueroa Street, the CP requested two MFFs to the Staging Area.  Officers assigned to force protection details met with the LAFD.  They were briefed on their assignment as uniform protection for LAFD.  At the same time, LAFD responded to fire and medical incidents in hostile crowds.  Commander 1A requested CHP block the 110 Freeway on-ramp at Olympic.

1736 hours    Bicycle 20 broadcasted that some protesters appeared to be heading to the Target, located at 735 South Figueroa Street.  MQ30 advised that Target had anticipated possible looting crime due to the protests.  The store had closed and barricaded the entrance doors.

1830 hours    Several groups of protesters had formed in the Downtown Area and marched, including a crowd of 60 protesters that occupied 1st Street between Spring Street and Main Street on the northside of PAB.

1900 hours    Several community members reported that the Starbucks on the corner of 6th and Spring Streets had been looted.

1904 hours    The large crowd that had continued southbound away from 5th and Olive Streets at Pershing Square marched to 8th Street then turned westbound towards Figueroa Street.

1904 hours    Mobile Field Force units requested 37mm approval.  The OCB IC approved the use of 37mm less-lethal rounds.

1924 hours    As the majority of the crowd entered the freeway.  Staff 2A directed the Air Unit, who estimated the crowd at 150, to coordinate containment of the crowd with MFF units and arrest protesters on the freeway.

1955 hours    The IC advised that the freeway would be handled by the CHP.  There were, however, two major groups in the area.  One group was near Figueroa Street and Olympic Boulevard.  The other group had exited the freeway and was contained by blocking forces at 7th and Figueroa Streets.  Staff 2A then advised they intended to make a large-scale arrest of 100 protesters at 7th Street and Figueroa Streets and requested additional units to facilitate the arrest.

2000 hours    As additional MFF units responded to 7th and Figueroa Streets, protesters used electric scooters to block and delay their response.  Officers parked their vehicles on 7th Street and responded on foot, leaving five officers to protect approximately 100 vehicles.  As this delay occurred, the crowd contained at Figueroa Street and 7th Street broke through a chain-link fence used to contain one side of the group.  Containment was lost as the crowd entered the multi-level Target store parking structure near 945 W 8th Street.

Protesters then entered the Target, and as reported by citizen radio calls, looted and vandalized the store.

The Air Unit made ongoing attempts to coordinate the crowd's containment by giving direction and assignments to MFFs responding to 7th and Figueroa Streets.  However, confusion occurred when an unknown supervisor attempted to track unit deployment over the radio while the Air Unit was assigning resources.  To avoid additional confusion the Air Unit advised all MFF to use their complete call signs when identifying themselves on the radio.

2008 hours    Bicycle 20 requested additional units for a crowd of 50 at 5th and Olive Streets.  The crowd size continued to increase in numbers and violence as protesters began throwing fireworks towards the officers.  Officers protecting the police vehicles on 7th Street advised they needed additional units to protect vehicles from damage due to large groups forming at the location.

2015 hours    The larger crowd that had broken through containment and looted the Target store marched southbound Figueroa Street and eastbound Olympic Boulevard to northbound Hope Street.  The crowd continued marching through city streets occupied by vehicle traffic, causing gridlock.  As the Air Unit monitored protester activity in Downtown Area, they contacted the CP requesting a plan of action.  The CP advised the Air Unit to stay with the larger group and keep them from the parking structures

A separate group of 300 protesters formed near 7th and Figueroa Streets, where police vehicles were parked.  The group quickly became hostile and threw bottles and launched fireworks at officers.

2016 hours    Protesters continued to interfere with the response efforts of MFFs by leaving items such as electric scooters as roadblocks in the street.

2020 hours    Two notable crowds continued to march downtown: one crowd near the western side of Downtown Area at 7th Street and Figueroa Street and the other towards the central area of Downtown Area near Hope Street and Grand Avenue.  Protesters in both areas began to increase the level of violence and destruction.

The crowd marching on Hope Street made its way to Grand Avenue.  It began vandalizing businesses on Grand Avenue between 7th and 8th Streets.  As this widespread vandalism occurred, a MFF supervisor set a blocking force across Grand Avenue between 7th and 8th Streets to block the crowd from moving northbound.  The blocking force was quickly surrounded by violent protesters who attacked officers with items, including rocks and bottles.  The squad requested assistance multiple times and eventually broadcasted they had officers down at that location as they were surrounded. The Air Unit attempted to guide responding MFFs to the officers who were surrounded and needing help.  However, MFFs were delayed due to traffic gridlock.

| | |
|---|---|
| 2026 hours | Protesters at 7th Street and Grand Avenue damaged police vehicles, vandalized businesses, ignited trash cans, broke windows, and assaulted officers with rocks, bottles, and fireworks.  As the violence and damage escalated, a small group split from the larger crowd.  The smaller group re-entered and barricaded the 110 Freeway near 4th Street. |
| | Transit Service Bureau (TSB) and MTA were advised by an unknown individual not to allow buses into the Downtown Area. |
| 2039 hours | Several "officer needs help" calls were broadcasted at Hope and 7th Streets as officers were overwhelmed by hostile protesters.  The Air Unit advised the CP that multiple crowds estimated at 250 protesters were moving towards PAB, and the CP needed a plan to address that crowd. |
| 2051 hours | Chief Moore organized resources and gave the Air Unit his priorities to coordinate.  The Air Unit identified a crowd occupying the intersection of 7th and Figueroa Streets.  Chief Moore directed the Air Unit to coordinate the containment and arrest of the protesters at that location.  Chief Moore advised multiple times throughout the night that containing and arresting violent protesters was a priority. |
| 2056 hours | The crowds marched towards PAB merged and surrounded officers in a police vehicle at Broadway and 1st Street as they marched towards PAB.  Unable to move and pinned in, officers broadcasted an "officer needs help" call.  As units responded, the crowd quickly dispersed and ran towards PAB and onto the property at PAB.  The Air Unit requested all available MFF units to PAB and coordinated skirmish lines.  As blocking forces were set to protect PAB, the crowd moved to the north side of the building on 1st Street and then ran northbound on Spring Street from 1st Street to the front steps of City Hall.  Multiple units were broadcasting while the Air Unit secured PAB, making it difficult for officers to hear assignments. |
| 2121 hours | As the crowd at City Hall was contained, Chief Moore directed any supervisor at City Hall to advise the crowd that they were under arrest, to sit down and submit to arrest.  Chief Moore also directed officers to arrest protesters who attempted to evade arrest and break through the blocking forces.  The CP then requested an arrestee transport van and the sound truck to respond to the location. |
| 2125 hours | The Air Unit reported that a green laser was being directed at them while they were in the area of Spring Street and 1st Street. |
| | Lasers and green lasers, specifically, are known to cause temporary blindness and, in some instances, permanent visual impairment when directed into a person's eye.  Law enforcement officers have been subject to attacks from lasers.  Lasers directed at aircrafts in flight bring additional safety concern as they can brightly illuminate aircraft's cockpit temporarily blinding the pilot.  This leads to the visual loss of the pilot's aircraft controls and the flightpath of the aircraft.  The LAPD's common practice while monitoring events such as protests is to orbit overhead at a distance that allows a |

clear visual of the event and the surrounding area.  This keeps the Air Unit near the general public since many events in the City occur in densely populated urban areas.  Directing a laser at an aircraft in flight is also a violation of State and Federal Law.

2127 hours    A crowd of 150 formed near the intersection of 1st and Spring Streets.  They broke windows and entered the police vehicles parked near PAB.  The crowd grew to 500 and continued to throw bottles, rocks, and harmful items at officers set as blocking forces near the intersection.  Two officers were injured, and an RA was requested to transport the officers to the hospital.

2151 hours    Citizens reported that trash can fires were set and strategically placed by protesters at the intersection of 7th and Hope Streets to delay officers in MFF configuration from responding.  Officers near 2nd and Spring Streets advised they were taking rocks, bottles, and fireworks.  Those officers requested additional resources.  Shortly after that, protesters surrounded officers at Broadway and 1st Street.  Officers at that location broadcasted "officer needs help" and that they were being assaulted with rocks and bottles.

While officers contained the arrestees at City Hall, separate groups of protesters started approaching the officers from the rear on Spring Street.

2215 hours    The Air Unit made multiple attempts to contain violent groups by directing MFFs to block intersections and streets.  Officers at Broadway and 1st Street were surrounded and broadcasted "officer needs help."  However, protesters used the alleyways and side streets in downtown to double back and evade containment.  Covering these alleys and side streets with blocking forces to support crowds' containment on City streets proved difficult due to various items used as roadblocks interfering officers' response.

2225 hours    Chief Moore directed the Air Unit and ground units to keep moving protesters through the streets to keep the protesters off balance.  Protesters broke the windows of the Starbucks and began looting the store as well.

2230 hours    A Harbor unit assigned to a MFF broadcasted, on Harbor frequency, they needed an RA at 213 S. Spring Street for two officers with injured or broken arms.

2233 hours    The Air Unit advised the CP of a problem crowd forming at Spring Street and 6th Street that spread onto Spring Street between 6th Street and 4th Street.  They added that there was also a radio call of arson suspects at that same location.  As this occurred an unknown unit requested a back-up response nearby at 4th and Spring Streets advising they had suspects in custody but were being surrounded by a large crowd.  The crowd grew in hostility and began throwing rocks and bottles at officers at 4th and Spring Streets.

Violence and destruction increased in the area of Grand Avenue and 6th Street as Staff E1B observed suspects inside the "California Bear Bank" breaking windows and

vandalizing the bank from inside.  Protesters set fire to objects placed in the street as roadblocks.

Suspects entered the multi-story apartment buildings in the area.  Individuals from the top floors of those apartment buildings and protesters who had gained roof access began throwing bricks, bottles, and unknown liquids at officers on the street below.  During this time, suspects also jumped onto parked cars and vandalized the area

2243 hours     A crowd of 300 protesters stopped and surrounded an MTA bus at 6th and S. Spring Streets.  Four of the protesters armed with scooters assaulted the bus operator.  No central units were available to respond.

2252 hours     Chief Moore advised the Air Unit that the tactics he wanted to employ were to use blocking forces to contain the crowd and make arrests.  The Air Unit set blocking forces and contained a group on 8th Street between Broadway and Main Street.  The contained protesters responded by looting the businesses along 8th Street between South Main Street and South Broadway while officers held the crowd's perimeter as containment.  Portions of the crowd used midblock alleys to move away from the crowd and evade containment.  Around this time multiple jewelry stores nearby at Olive Street and 6th Street reported being vandalized and looted.

2305 hours     A MFF supervisor (Q710) at Broadway and 4th Street requested approval to use 37mm less-lethal.  The OCB IC had approved its use and the CP broadcasted its approval.

2330 hours     Twenty protesters near 7th and Figueroa Streets vandalized a police vehicle left unattended, then broke into and looted the Target store for a second time.

2344hours      Protesters near 6th Street and Broadway threw bricks at officers in a vehicle who were responding to an unknown emergency radio call.  Officers broadcasted a help call and were able to drive away to prevent further damage and injury before being completely blocked in.  MFF units responded, deployed, and set blocking forces around the violent crowd at 6th Street and Broadway.  Protesters vandalized and looted the jewelry stores in the same area.  These groups continued to occupy the streets surrounding Pershing Square Park and continued to ignite and use rubbish and dumpster fires as roadblocks against responding units.

2357 hours     The crowd at 7th and Figueroa Streets looted businesses.  At this time the crowd began burning businesses as well.  Approximately 100 people were protesting in the intersection of East 4th and South Main Street.  Some of the protesters started to break windows of the Barclay Hotel and windows of parked vehicles in the area.  Large scale destruction and lawlessness occurred in multiple areas of downtown Los Angeles.  Limited resources, gridlocked traffic, and various make-shift barricades made it difficult to effectively deploy officers and prevent property destruction.  The Air Unit, again, advised the CP that the crowds were moving too fast to set blocking forces and contain them.

### Operations-South Bureau (OSB)

1345 hours    The OSB notified all South Bureau Areas that A and B-Watch MFFs are to be activated and stand down in their respective areas.

1525 hours    The OSB MFF formed up at the rally point and were directed to the Staging Area on Judge John Aiso, between 1st Street and East Temple Street.

1930 hours    The OSB received a request from the DOC to establish a list of personnel volunteering to work on May 30, 2020, on their regular day off.

2200 hours    The OSB CP received a DOC request that all unused less-lethal rounds (Beanbag, 37mm and 40mm) be brought to the CP.  The OSB collected all unused less-lethal rounds and delivered them to the CP.

### Operations-West Bureau (OWB)

1335 hours    The OWB CP put a request in for a sound truck for Saturday which was denied due to both sound trucks already being deployed elsewhere in OCB.

# SATURDAY, MAY 30, 2020

### Department Operations Center (DOC)

0030hrs    Department Operations Center requested nine detectives from OSB to respond to the CP to complete a damage assessment of all City and private property.

0600 hours    The OCB Operations Chief canceled the Citywide Tactical Alert and demobilized the Mobile Field Force.

0700 hours    Briefing with the Chief.

### Operations-Central Bureau (OCB)

0001 hours    The Air Unit set blocking forces to contain the crowd as they marched from the intersection of East 4th and South Main Streets to the intersection of Spring and 6th Streets.  Chief Moore advised that there were ample resources at 6th Street and Broadway to redeploy at the Air Unit's direction.  Thirty protesters moved southbound Spring Street to the intersection of Spring and 6th Streets and were contained.  Chief Moore directed officers containing the small group to repeatedly advise protesters that they were under arrest and to sit on the street.  Some protesters from the smaller splinter groups broke through the containment and moved southbound Spring Street.  A small

group of protesters looted businesses at 5th Street and Spring Street.  The Air Unit then coordinated a blocking force on Spring Street and 7th Street with a Motor Strike team as reinforcement.  Officers in the area of 5th Street and Main Street advised that they were taking rocks and bottles from protesters.

Motor units requested resources to 7th Street and Broadway because protesters were vandalizing police vehicles.  Shortly after that, officers advised they heard shots fired in the area.  Officers reported that a police vehicle was on fire at Figueroa and 7th Streets.

0015 hours    Officers at Main and 5th Streets broadcasted a man with a gun, "shots fired." According to the officers, the suspect wore a red long-sleeved shirt and a mask.  The Air Unit responded and observed two possible suspects at Winston and Main Streets.  Ground units located one suspect and took him into custody at 4th and Los Angeles Streets.  The other suspect was located near the 5th and Los Angeles Streets, and a foot pursuit ensued.  The foot pursuit ended at 5th and Wall Streets where the suspect was taken into custody.

While officers were handling the man with a gun call, an additional radio call was broadcasted for shots fired at 7th and Figueroa Streets.  Officers in the area observed protesters ignited a police vehicle at the location.

Protesters at 5th and Main Streets threw bricks, bottles, and harmful items at officers.  Protesters also gained roof access to the multi-level apartment building on each side of the officers near 5th and Main Streets.  The officers who were just shot at also had items thrown at them including, bricks and rocks, from an elevated position.  An ambulance was requested for an injured officer at Main and 5th Streets.  The officer was not transported and instead was released to the CP.

0035hours     Officers reported that beer bottles were being thrown at them by an unknown suspect from on top of the roof of a Whole Food Store located at 788 South Grand Avenue.

0043hours     Communications Division received information of a group of approximately 80 protesters looting jewelry stores in the area of 7th and Hill Streets.

0045 hours    Two officers were reported injured at 7th Street and Broadway.

0103 hours    Communications Division received information that an unknown male suspect was throwing glass bottles from the roof of 215 6th Street.  (Incident No. 0223)

0125 hours    The Air Unit reported that approximately 50-60 protesters appeared to have liquid detergent or gasoline bottles congregating at Pershing Square.

0127 hours    The Air Unit reported that approximately 60 protesters were attempting to enter the Jewelry District at 6th and Hill Streets.

| | |
|---|---|
| 0132 hours | Undercover officers requested LAFD to respond to 4th and Winston Streets for a vehicle fire. |
| 0134 hours | Communications Division received several reports of looting throughout the jewelry district in the Downtown Area. |
| 0135 hours | Officers reported that they were being assaulted by protesters using fireworks and rocks at Pershing Square. |
| 0143 hours | Officers reported looting at various businesses on Spring Street between 5th and 7th Streets. |
| 0150 hours | Uniformed officers were assigned to crowd control at 6th Street and South Broadway. As officers were positioned in a skirmish line blocking the intersection, a suspect drove his vehicle eastbound on 6th Street towards the officers.  Officers yelled for the vehicle driver to stop.  An officer fired a 40mm less-lethal munition at the suspect driving the vehicle which broke through the side window and struck the driver in abdomen. However, the vehicle continued traveling in the direction of officers on the skirmish line which resulted in an officer-involved shooting.  The vehicle continued in the direction of officers for a short distance then stopped.  After the vehicle stopped the Suspect was taken into custody.  It was determined that the suspect was struck by the 40mm less-lethal munition but not struck by gunfire.  The suspect was arrested and received medical treatment. |
| 0216 hours | Officers reported that a group of approximately 30-40 protesters were setting trash on fire at the intersection of 5th and Hill Streets. |
| 0322 hours | Chief Moore requested MFF Leaders to respond to Spring and 8th Streets to stop a large amount of looting. |
| 0405 hours | Unit 19L120 advised that a protester was shooting fireworks at officers. |
| 0410 hours | Chief Moore requested to have Watch Commanders call Watch 2 personnel and encourage them to voluntarily come into work (the Department did not mobilize yet). |
| 0930 hours | Twelve investigative reports for vandalism were taken at 5th Street and Grand Avenue. |
| 1250 hours | A Citywide Tactical Alert was called (Incident No. 2129). |
| 1400 hours | Approximately 100 protesters gathered for the National Day of Protest at Mariachi Plaza (1831 East 1st Street, Incident No. 2032). |
| 1420 hours | A small group of protesters gathered at PAB.  Approximately 150 vehicles were gathered in Chinatown.  The vehicles were expected to drive to PAB. |
| 1530 hours | The number of protesters gathered at Mariachi Plaza increased to 200. |

| | |
|---|---|
| 1600 hours | The Mariachi Plaza crowd began marching from the plaza to Hollenbeck Station (2111 East 1st Street) then to East Los Angeles LASD's Station (5019 East 3rd Street). |
| 1620 hours | Between 50 and 100 protesters entered the 101 Freeway at East Temple Street.  Staging for the downtown incident was located at 1st Street and Judge John Aiso. |
| 1645 hours | The CHP reported that the protesters had moved off the freeway and onto Virgil and East Temple Streets. |
| 1700 hours | Approximately 400-500 protesters from the Mariachi Plaza were now walking westbound 1st Street to northbound Spring Street.  The CHP requested its resources to shut down the 101 Freeway. |
| 1750 hours | Protesters from the Mariachi Plaza continued west on Cesar Chavez Avenue and then south on Grand Avenue.  The protesters then entered the freeway and vandalized police vehicles.  The LAPD formed skirmish lines at Temple Street and Grand Avenue. |
| 1800 hours | Protesters continued east on East Temple Street from Grand Avenue and assaulted officers with rocks and bottles.  Officers requested permission to use less-lethal 37mm.  Staff 2 requested a dispersal order to be given. |
| 1805 hours | The 200 protesting vehicles arrived at East Temple Street and Grand Avenue.  The Protesters continued marching through Grand Park and south on Hill Street. |
| 1915 hours | Officers were assaulted with rocks and bottles at Olympic Boulevard and Figueroa Street.  Officers requested approval to use 37mm less-lethal.  Officers were given authorization to use the 37mm by the IC.  The CHP requested help at Figueroa Street and 5th Street.  The CHP reported that they were being assaulted with rocks and bottles. |
| 1920 hours | Commander 15 requested a dispersal order at Figueroa Street and Olympic Boulevard.  The dispersal order was given. |
| 1930 hours | Approximately 500-600 protesters were on Figueroa Street between 3rd and 5th Streets, vandalizing and looting businesses as they continued to assault officers with rocks and bottles. |
| 2000 hours | Air 10 advised that a protester in the group currently at Figueroa and 4th Streets was moving east toward PAB and was armed with a machete.  Dispersal orders were given five times, and protesters did not disperse.  Officers at Olympic Boulevard east of Flower Street were being assaulted with rocks and bottles. |
| 2015 hours | The OCB Operations Chief requested a tow truck for a vehicle filled with fireworks at 4th and Hill Streets. |
| 2030 hours | Approximately 200-300 protesters were looting jewelry stores and other businesses in the Downtown Area. |

**SAFE LA AFTER ACTION REPORT**

| | |
|---|---|
| 2045 hours | Officers requested a rescue ambulance for two officers who had sustained injuries from protesters throwing items at 7th Street and Broadway. |
| 2120 hours | Groups of protesters continued to loot businesses in the Downtown Area as officers made multiple arrests. |
| 2145 hours | Officers reported that multiple vehicles were driving around dropping off looters then picking them up throughout the Downtown Area.  Staff 7 advised to impound vehicles and make arrests for curfew violations. |
| 2235 hours | The CP was informed by Communications Division that approximately 1,000 National Guard were scheduled to arrive in the next hour. |
| 2300 hours | Commander 21 advised of 120 arrests, and 55 vehicle impounds at 8th Street and Broadway.  Transport buses and tow trucks were requested. |
| 2300-0000 | Officers made numerous arrests for curfew violations throughout the Downtown Area. |

## Operations-South Bureau (OSB)

| | |
|---|---|
| 0030 hours | The DOC requested that OSB CP have nine detectives to respond to the CP by 0600 hours to conduct a damage assessment.  All OSB detective commanding officers were contacted and directed to provide two detectives each for the mission. |
| 0340 hours | An Assistant Chief requested OSB CP provide the same number of resources as they did on May 29, 2020, four MFFs. |
| 0410 hours | Chief Moore requested that all Watch Commanders contact off-duty Watch-2 personnel and encourage them to voluntarily come into work. |

## Operations-West Bureau (OWB)

| | |
|---|---|
| 0900 hours | The OWB CP was operational, and resources were checking in at the OWB staging location. Protesters arrived at Pan Pacific Park at 7600 Beverly Boulevard for the Breonna Taylor Rally.  A small group formed but was peaceful at that time. |
| 1100 hours | The OWB Staging location reported that resources assigned to OWB were delayed and unable to be deployed to the field.  Resources were not fully organized into strike teams, still checking in, or had not arrived at the staging location.  Many of the officers assigned to the OWB event were held over due to the civil unrest that occurred in Downtown Area the day prior.<br>Some officers assigned to the OWB CP had worked May 29, 2020 (the day prior) and were released on May 30, 2020 at 0700 hours causing delays in resource availability. |

1130 hours The groups of protesters at Pan Pacific Park had quickly grown to approximately 150 participants.  The OWB CP notified the staging area that resources checking in were requesting less-lethal munitions (beanbag, 37mm and 40mm) and flex cuffs.

1200 hours The OWB IC left the OWB CP to brief resources at 4801 Venice Boulevard and the Staging Location (7800 Beverly Boulevard).

1230 hours The OWB IC requested an Air Unit to respond to Pan Pacific Park and provide a crowd estimate.   Air 18 responded and estimated the group to be approximately 1,500 and growing rapidly.  A group of 300 protesters was forming at Beverly Boulevard and Gardner Street.  This group planned to march in the area, but it was unclear what path they would take.

1250 hours A Tactical Alert was called (see Incident No. 2129).

1300 hours The group in Pan Pacific Park continued to gather and had grown to approximately 2,500 participants.  The IC did not return to the OWB CP.  Instead, due to crowd size and her belief that she could not afford to take the time to travel back to OWB from the staging location, she decided to remain at the Staging Area and assumed IC responsibilities from there.

1315 hours A large portion of the group began moving southbound through the park towards 3rd Street.  At the same time, a smaller group began moving northbound through the park and onto Beverly Boulevard.  The staging location advised the OWB CP that seven Strike Teams and two Metro TSEs were available at staging.  The OWB CP advised staging that two additional Strike Teams arrived at the OWB CP and were standing by for deployment.  Both the IC and the Operations Chief were deployed in the field.

     When the large group of protesters moved south through Pan Pacific Park, the Operations Chief facilitated their movement by deploying a Strike Team to stop westbound traffic at 3rd Street and Gardner.  The group of approximately 2,500 took to the street and began moving westbound 3rd Street from Gardner.  As the group continued westbound on 3rd Street, vehicle traffic was unable to flow due to the protesters in the streets.  At 3rd Street and Fairfax Avenue an MTA bus was unable to move.

1330 hours The protesters continued to surround the bus and climbed onto the roof.  While this was happening the driver and passengers remained in the bus.  Local news networks were broadcasting this incident live, which allowed the OWB CP and the Staging Area to observe the group's behavior.

1345 hours Air 18 was over the incident and reported the group's size and behavior.  The group of approximately 200 protesters on Beverly Boulevard north of Pan Pacific Park were confrontational and actively blocking police vehicles.

The larger group of approximately 2,500 protesters on 3rd Street south of Pan Pacific Park moved westbound toward La Cienega.  Smaller groups were remaining at 3rd Street and Fairfax Avenue and inside Pan Pacific Park.

1350 hours    Staff 6 and Commander 7 arrived at the Staging location and had a briefing with the IC.

1400 hours    The 3rd Street Group of protesters continued to vandalize the MTA bus endangering passengers still inside.

The majority of the protesters continued moving westbound towards La Cienega Boulevard.  A Strike Team was deployed from the Staging location to the MTA bus location to rescue the driver and passengers.  The Air Unit directed the Strike Team from staging to 3rd Street west of the bus to avoid the group of protesters in the intersection at 3rd and Fairfax Avenue.

The larger portion of the group continued moving west on 3rd Street towards La Cienega Boulevard.

When the Strike Team arrived at the bus, the protesters moving westbound observed the police vehicles on 3rd Street and began moving eastbound on 3rd Street back towards Fairfax Avenue, in the direction of the police vehicles.  This group of protesters then surrounded the Strike Team and their vehicles.  As this was occurring, the group of protesters at 3rd Street and Fairfax Avenue observed the officers and approached from the east.  The Strike Team was then surrounded and unable to move.

The Air Unit requested resources to respond Code 3 to assist the Strike Team, which was surrounded and being assaulted by protesters who were throwing items at the officers.

1420 hours    The IC broadcasted that a Metropolitan TSE was launching from Staging to the bus and Strike Teams location.

1430 hours    The TSE arrived and requested less-lethal approval before they began moving the crowd.  The IC gave approval for less-lethal munitions.

1435 hours    Officers reported protesters were surrounding them at 3rd Street and Edinburgh Avenue.  Officers were assaulted with thrown objects and numerous police vehicles were being vandalized.  Furthermore, officers reported that protesters were attempting to break into buildings and set them on fire.

1440 hours    Protestors at Beverly Boulevard surrounded officers conducting traffic control at Beverly Boulevard and Fairfax Avenue.  Officers broadcasted that they were being assaulted by protesters who were throwing objects at them and vandalizing their police vehicles.  Officers requested additional units to respond and bring less-lethal weapons to Beverly Boulevard and Crescent Heights Boulevard.  During this encounter, an officer's radio was taken by the protesters.

Protesters were scattered all over and lining the sides of the street. Officers had difficulties pushing the crowds of protesters because additional groups would flank the officers and come from behind the Strike Teams. Groups of protesters moved from the east and the west towards the Staging location at Genesee and Beverly Boulevards. Both groups of protesters were throwing items at the police and looting stores as they moved towards the Staging Area entrance.

1535 hours    Four MFFs and two jail transport buses from LASD were requested to respond to OWB staging.

1700 hours    Chief Moore directed a TSE unit to Beverly and Fairfax Boulevards in order to hold the southern edge of the intersection. He then directed the Air Unit to coordinate available resources and establish blocking forces at Beverly Boulevard and Fairfax Avenue on the east and westside of the intersection. Chief Moore advised that the TSE unit hold the northside of the intersection to contain the crowd as an MFF moved the crowd northbound on Fairfax Avenue from 3rd Street. Once the crowd was contained, a dispersal order would be given, ordering the crowd to disperse northbound Beverly from the intersection of Beverly and Fairfax Boulevards. The crowd would be allowed to disperse northbound only. If they did not disperse as required he directed that they be contained, ordered to sit and be placed under arrest. Chief Moore requested a sound truck to Fairfax Avenue and Beverly Boulevard in anticipation of a dispersal order.

The Air Unit advised blocking forces on the east side of the intersection at Fairfax Avenue and Beverly Boulevard of a crowd approaching them from the rear, east of Fairfax Avenue on Beverly Boulevard. The Air Unit requested they redeploy and allow the crowd to move into the intersection, then reestablish containment.

Unit 7P150 advised the OWB CP that police vehicles were being vandalized near 3rd Street and Fairfax Avenue.

1705 hours    Staff 8 advised the OWB CP that, per Chief Moore, they would be declaring the entire area closed. He directed the OWB CP to designate the area to be closed and advise him of the boundaries, so that the boundaries could be stated in the dispersal order.

The OWB CP established the following boundaries: La Cienega Boulevard to the West, Melrose Avenue to the North, 6th Street to the South, La Brea Avenue to the East.

1709 hours    Chief Moore requested LAFD to Fairfax Avenue south of Beverly Boulevard for a vehicle fire.

1710 hours    An LASD unit advised they were at Spaulding and Beverly Boulevard holding that location.

| | |
|---|---|
| 1712 hours | Chief Moore advised Staff 8, and blocking forces, on the eastside of the intersection of Fairfax Avenue and Beverly Boulevard that a crowd had approached them from the rear and that they were surrounded. |
| 1718 hours | Large scale unrest had occurred in the Fairfax area as LAPD Command Staff, the Air Unit as well as MFF supervisors attempted to coordinate containment of multiple hostile crowds.  At this time, numerous police vehicles parked in the area without protection from officers were vandalized or burned.  The vandalism included, but was not limited to, broken windshields and windows, slashed tires, and spray-painted vandalism.  Officers advised the Air Unit and OWB CP that individuals in the crowd had used Molotov Cocktails to burn police vehicles from the inside.  Most of the spray-painted vandalism consisted of anti-police phrases and threats directed towards officers and law enforcement as a whole.  Multiple businesses in the Fairfax area were looted and vandalized.  Arson was committed as well as reports from officers stating that individuals in the crowd were in possession of Molotov Cocktails.  Crowds split into small groups and were running through alleyways, uncontained streets, private property, and parking lots to avoid containment. |
| 1720 hours | Additional less-lethal munitions were delivered to the OWB Staging.  Supervisors in the field were notified and sent officers back to OWB Staging to retrieve less-lethal munitions. |
| 1730 hours | Multiple protesters continued large scale violence that included, but was not limited to, throwing harmful items at uniform officers such as bricks, concrete and water bottles containing unknown substance; large scale looting; and, arson throughout the area. Some Strike Teams were instructed to be a blocking force as others attempted to move the crowds away from the area.  Chief Moore requested all resources not assigned to OCB to respond Code 3 to OWB Staging.  Numerous calls of armed (guns, crowbars and bats) suspects looting, and setting fire to multiple businesses in the area were broadcasted. |
| | The Air Unit advised that a crowd of 200 at Blackburn and Edinburgh Avenues moved eastbound Blackburn Avenue towards officers on Fairfax and Blackburn Avenues. Officers and the Air Unit advised that the crowd was using parking lots in the area to circle around officers at 3rd Street and Fairfax Avenue, approaching them from the rear. |
| | At the same time, the Air Unit requested three squads respond to 3rd Street and Fairfax Avenue for the crowd that had dispersed but was now reforming and becoming more violent.  The Air Unit addressed the squads just east of Fairfax Avenue on 3rd Street, adding that officers just south of 3rd Street on Fairfax Avenue needed assistance immediately.  The hostile crowd approaching officers from the east on Blackburn Avenue was too large for the small number of officers in the area.  The two large crowds moved towards each other in an attempt to form one group. |

| | |
|---|---|
| 1732 hours | Staff 6 advised all units that a dispersal order was given to the large crowd contained at Fairfax Avenue and Beverly Boulevard, ordering the crowd to disperse northbound on Fairfax Avenue. |
| | This occurred while officers near 3rd Street and Fairfax Avenue requested assistance. |
| | Two large hostile crowds occupied areas in close proximity to each other near 3rd Street and Fairfax Avenue.  One crowd was at 3rd Street and Edinburgh Avenue and the other was at 3rd Street east of Fairfax Avenue.  Both crowds assaulted officers and vandalized the areas they occupied.  The size and hostile demeanor of these two crowds proved difficult for the small number of officers in the area to manage.   Officers in both areas continued to be assaulted by harmful items such as rocks, broken concrete, and water bottles containing an unknown substance.  Officers in the area also advised that individuals in the crowd were in possession of prohibited items that could be used as weapons, such as golf clubs. |
| | At this time, resources were limited.  Units had difficulty responding to assistance requests due to gridlocked traffic and protesters blocking the street. |
| 1743 hours | The two crowds near 3rd Street and Fairfax Avenue continued their violence.  Separate smaller crowds occupied Beverly Boulevard and Orange Grove Avenue, Ogden Drive and Genesee Avenues.  Officers on these streets attempted to move the crowds northbound away from Beverly Boulevard. |
| | The Air Unit repeated that officers at 3rd Street and Fairfax Avenue and officers at Edinburgh Avenue needed assistance.  Officers near Fairfax Avenue and Blackburn Avenue (just south of 3rd Street) advised that individuals in the crowd were committing arson in the area and throwing Molotov Cocktails. |
| 1746 hours | Units at 3rd Street and Fairfax Avenue asked the Air Unit if a dispersal order was given to the crowd at 3rd Street and Fairfax Avenue.  Chief Moore directed the CP to order all supervisors to advise protesters that the area was closed and to leave the area.  Chief Moore added that this was to be an ongoing advisement, prior to arrest and prior to containing the crowd.  He then requested a sound truck to 3rd Street and Fairfax Avenue to give a dispersal order to the crowd at that location.  Staff 6 re-advised the parameters of the area closed by radio broadcast as a reminder for supervisors who were advising the crowd. |
| | As hostile crowds marched in multiple areas, the news media broadcasted that looting was occurring on Melrose Ave. |
| 1747 hours | The OWB CP advised that approximately 180 protesters occupied the intersection of Norton Avenue and Beverly Boulevard in Olympic area.  Protesters were sitting in the intersection, causing traffic gridlock and refusing to leave. |

| | |
|---|---|
| 1748 hours | Additional units arrived to assist with the hostile crowd at 3rd Street and Edinburgh Avenue. As units arrived the crowd mobilized and moved northbound Edinburgh Avenue from 3rd Street. |
| | Units on Fairfax Avenue just south of 3rd Street advised they did not receive assistance, stating they had only 13 officers to manage a violent crowd of 150 protesters. |
| 1753 hours | An LASD unit advised that a violent crowd at Grove Drive and Beverly Boulevard were throwing rocks and bottles at them. |
| 1755 hours | The Air Unit repeated that officers at Hayworth Avenue and Beverly Boulevard needed assistance with a large hostile crowd that continued to grow. |
| | As command staff and supervisors broadcasted multiple requests, the Air Unit advised that units at 3rd Street and Fairfax Boulevard did not have enough resources and needed assistance. |
| 1756 hours | Staff 6 advised the Air Unit that all available units were to respond to 3rd Street and Fairfax Avenue, contain protesters at that location, give a dispersal order directing them to disperse northbound, facilitate a safe dispersal, and if needed, effect a large-scale arrest. |
| 1759 hours | Units on Fairfax Avenue south of 3rd advised that they needed assistance with a violent crowd and were deploying less-lethal munitions on the crowd. |
| 1810 hours | As the Air Unit identified available resources, they coordinated responses to Hayworth Avenue and Beverly Boulevard as well as 3rd Street and Fairfax Avenue. Response to each area was delayed due to traffic gridlock and protesters occupying the street. |
| 1813 hours | An officer was injured near Fairfax Avenue and 1st Street. Unit P460 requested an RA for the injured officer. |
| 1820 hours | Officers at 3rd Street and Fairfax broadcasted that individuals in the crowd gained roof access on the buildings surrounding 3rd Street and Fairfax Avenue, where officers were attempting to contain a large crowd. This officer safety issue required squads to break from containment assignments in order to enter the building and attempt to clear the roof. |
| | Individuals in the crowd continued to gain access to buildings overlooking areas where officers were set as blocking forces on the ground. This occurred at various locations along Fairfax Avenue between 4th Street and Beverly Boulevard. |
| | Units at Hayworth Avenue and Beverly Boulevard advised they were taking rocks and bottles from an extremely hostile crowd. |

| | |
|---|---|
| 1822 hours | Unit 7P430, located at Beverly Boulevard and Spaulding Avenue along with LASD units, advised that some type of tear gas was used against officers by protesters. |
| 1824 hours | Units in the area of Beverly Boulevard and Fairfax Avenue advised that individuals in the crowd were lighting police vehicles on fire parked on Beverly Boulevard and Fairfax Avenue.  Due to limited LAPD resources, LASD units responded to address arson attempts. |
| 1826 hours | Staff 1 directed the OWB CP to have the staging manger and/or assistant, drive the perimeter area to identify units not actively tasked with an assignment and reassign them to the Beverly Boulevard and Hayward Avenue.  His direction identified that the request for additional units at Beverly Boulevard and Hayworth Avenue was a priority. |
| 1827 hours | A large number of looting incidents occurred at "The Grove" outside the shopping mall. |
| 1830 hours | Officers advised that individuals in the crowd at Beverly Boulevard and Stanley Avenue were throwing harmful items at them such as rocks, bottles and "M80" explosives.  They added that individuals were also igniting dumpster fires in the area. |
| 1838 hours | The Air Unit advised the OWB CP that large groups were looting numerous stores at The Grove. |
| 1839 hours | An LASD unit requested LAFD respond to Grove Drive (which continues as Stanley Avenue) north of Beverly Boulevard.  The LASD units broadcasted that individuals in the crowd had ignited dumpster fires and pushed them into officers on skirmish lines. |
| 1841 hours | Unit P280 requested an ambulance for an officer with a knee injury at Ogden Drive and 3rd Street. |
| | The Air Unit advised that there were three dumpsters on fire and a crowd of 200 near Stanley Avenue and Beverly Boulevard, one block east of the entrance to the OWB CP. |
| 1846 hours | As looting continued at The Grove outdoor shopping center a small but hostile crowd approached the gated entrance to the OWB CP at Genesee Avenue and Beverly Boulevard.  Commander 14D observed the safety issue while at the OWB CP and immediately directed a squad to the south side of Beverly Boulevard at Genesee Avenue.  He then added that the OWB CP was completely open from the north and to get officers from the CP to respond to the entrance immediately. |
| | The Air Unit advised an additional crowd of 200, two blocks east of Genesee Avenue at Stanley Avenue and Beverly Boulevard.  Unit P370 advised the crowd at Stanley Avenue and Beverly Boulevard were throwing "Molotov Cocktails" at officers and LASD units. |
| | Unit 25P460 requested eastbound traffic blocked at Fairfax Avenue and Beverly Boulevard to prevent vehicles from approaching the OWB CP. |

| | |
|---|---|
| 1849 hours | The Air Unit advised the OWB CP to send additional MFFs to Stanley Avenue and Beverly Boulevard for a growing crowd. |
| | Officers at two locations 3rd Street and The Grove Drive and Stanley Avenue and Beverly Boulevard needed a resupply of less-lethal munitions and to have the request respond Code 3.  The OWB CP confirmed they received each munitions request and organized resupply. |
| | While the Air Unit was overhead at the Grove he observed a structure fire near the Nordstrom Store.  The Air Unit broadcasted to units on the ground and to the OWB CP for situational awareness.  The structure fire was the substation for officers at the Grove. |
| 1854 hours | The Air Unit requested units to Stanley Avenue and Beverly Boulevard to assist officers with a large hostile crowd of 450 who were assaulting officers at that location.  Multiple units at that location advised that individuals in the crowd were throwing rocks, bottles and fireworks at officers.  Unit P430 advised the Air Unit, that officers at Stanley Avenue and Beverly Boulevard were unable to hold the crowd without additional resources. |
| 1903 hours | The Air Unit advised that the LAFD force protection detail (MQ20), who were blocked at Stanley Avenue north of Beverly Boulevard were being assaulted by rocks and bottles. |
| | Unit MQ20 and LAFD were able to leave the area before any officers were significantly injured and advised the Air Unit that Stanley Avenue and Beverly Boulevard was a problem location. |
| | The force protection detail and LAFD attempted different routes of travel as they responded to structure fires in the area, but the crowds blocked traffic and assaulted LAFD and officers. |
| | Officers at Beverly Boulevard and Stanley Avenue advised the OWB CP that they needed a less-lethal munitions resupply.  The OWB CP advised they received the request and coordinated a response. |
| | Units TSE 1, TSE 2 and TSE 3 advised they were responding to Stanley Avenue and Beverly Boulevard to assist. |
| 1905 hours | Unit P810 advised they were assaulted with rocks and bottles at Beverly Boulevard and Edinburgh Avenue. |
| 1906 hours | Unit 7P210 advised that officers were taking rocks and bottles at Beverly Boulevard and Edinburgh Avenue.  Minutes later, they re-broadcasted a request for additional resources to Edinburgh Avenue and Beverly Boulevard, adding they were assaulted by fireworks as well. |

| | |
|---|---|
| 1907 hours | Unit Commander 14D arrived at Beverly Boulevard and Stanley Avenue and coordinated a response to address the violent crowd at that location.  The Air Unit advised Commander 14D to move the crowd at Stanley Avenue and Beverly Boulevard eastbound from the location. |
| 1918 hours | Unit P628, had one arrestee in custody and requested assistance to Ogden Drive and 3rd Street, stating they were being surrounded by a crowd. |
| 1921 hours | At this time, there were three main hostile crowds that occupied the Fairfax area.  The crowds on Beverly Boulevard at Genesee Avenue and Stanley Avenue were moved by skirmish lines eastbound on Beverly Boulevard to Gardner Street.  The Air Unit and Commander 14D had coordinated separate squads to move the crowds eastbound on Beverly Boulevard while simultaneously moving a squad eastbound through the parallel alley just north of Beverly Boulevard.  Both squads moved simultaneously.  This proved effective in moving the crowd and at the same time blocking the crowd's tactic of splitting into smaller groups then doubling back around MFFs causing safety issues for officers. |
| | The crowd near 3rd Street and Fairfax Boulevard continued its violence as they were moved by MFFs to 3rd and Gardner Streets.  The MFF addressing this crowd advised multiple times that they were low on less-lethal munitions and needed resupply. |
| | The crowd near Edinburgh Avenue and Beverly Boulevard maintained a violent and aggressive demeanor towards officers in the area.  Supervisors at that location had requested additional resources multiple times. |
| | The crowds at all three of these locations were extremely hostile and assaulted officers on skirmish lines.  Individuals in the crowd used dumpsters lit on fire as barricades and deterrents against MFF movements.  Individuals in the crowd also, threw harmful items at the officers, some of the items were rocks and concrete and water bottles with an unknown substance. |
| | Individuals continued looting multiple businesses in the greater Fairfax area.  The Air Unit requested and coordinated the response of additional units to each of the three locations. |
| 1930 hours | Unit P530 advised the OWB CP that they arrived to 3rd Street and Ogden Drive but could not find the officers who requested an RA for an arrestee. |
| 1935 hours | As Commander 14D continued to move the crowd at Beverly Boulevard and Gardner Street eastbound on Beverly Boulevard the crowd size decreased to approximately 150.  The crowd largely dispersed after reaching La Brea Avenue. |
| 1937 hours | The crowd at Edinburgh Avenue and Beverly Boulevard moved northbound to Oakwood Avenue and then to Rosewood Avenue.  The Air Unit requested units to Fairfax Avenue near Oakwood Avenue for individuals looting businesses.  The Air Unit |

also advised that a violent crowd was forming at Rosewood Avenue near Hayworth Avenue.

The IC requested the locations of the fires from the Air Unit.  The Air Unit advised that the major fires were located at Rosewood Avenue and Fairfax Avenue, LAFD was responding.

1944 hours    The OWB CP directed the Air Unit to assess the area (Fairfax area) and reassign units to locations that required assistance.  The Air Unit conducted their assessment and requested TSE 1 and TSE 2, located at Beverly and La Brea Boulevards, to Oakwood Avenue and Fairfax Avenue.

Individuals in the crowds near Oakwood and Fairfax Avenues continued to ignite fires in the area and loot businesses.

1958 hours    Units at 4th Street and Fairfax Boulevard advised they were taking rocks, bottles and fireworks, and additional units responded to assist.  Due to multiple dumpster fires in the roadways, the Air Unit guided additional units, attempting to provide an unblocked route of travel.

Unit MQ20 requested additional units respond to the area of Melrose and Spaulding Avenues.  He advised there were multiple structure fires and looting in the area.

2000 hours    The Air Unit and ground units attempted to contain the crowd and numerous looting suspects on Fairfax Avenue near Rosewood and Oakwood Avenues.  This was done by positioning units set in the alleys directectly east and west of Fairfax Avenue to prevent looting suspects from fleeing to the rear of businesses on either side of Fairfax Avenue. As looting occurred, hostile crowds continued to march in multiple areas.  Units at 4th Street and Fairfax Avenue advised that individuals in the crowd near that location were removing items from dumpsters that could be harmful if thrown at officers.  Officers advised that those individuals were attempting to gain access to the roof tops of the buildings surrounding them possibly positioning themselves to throw items at officers from an elevated position.

2010 hours    A TSE unit arrived at Melrose and Genesee Avenues then moved eastbound on Melrose Avenue toward Spaulding.  The Air Unit advised that looting crimes were occurring in area of Spaulding and Melrose Avenues but that the more significant crowd was further east on Melrose Avenue near Poinsettia Place.

A unit at Beverly Boulevard and Gardner Street advised that a hostile crowd was forming in the area and they had only a small number of officers at that location.

2011 hours    Unit TSE 4 advised the OWB CP to have a LASD jail transport bus respond to Fairfax Avenue and Oakwood Avenue.  They advised a large crowd of 100 was about to be contained and taken into custody at Fairfax Avenue and Rosewood Avenue.

| | |
|---|---|
| 2017 hours | The Air Unit advised the OWB CP that a squad moving eastbound Melrose Avenue on Gardner Street was alone and needed an additional squad to protect its backside.  The Air Unit further stated that the squad's backs were currently exposed to vehicle traffic and hostile crowds. |
| 2019 hours | The Air Unit advised that numerous looting crimes were occurring around Melrose and Formosa Avenues.  In order to contain those suspects the Air Unit requested officers respond to the alleys just north and south of Melrose Avenue.  The Air Unit directed those units to move eastbound in at the same time as officers on Melrose Avenue moved eastbound. |
| | The IC directed the Air Unit to address the looting crimes at Melrose and Formosa Avenues.  However, coordinating officers into an organized response proved difficult.  There were numerous escape routes, included alleyways, for looting suspect to use.  The Air Unit would advise throughout the night that suspects would flee each looting location, often to the rear, as they observed officers responding. |
| | Unit TSE 1 requested a jail transport van to Melrose and Fuller Avenues for looting suspects in custody. |
| | As looting occurred on Melrose Avenue, the crowd at 4th Street and Fairfax Avenue continued its violence and hostility.  Units at Colgate Avenue and Fairfax Avenue, just south of 4th Street and Fairfax Avenue requested additional 37mm less-lethal munitions. |
| 2024 hours | Chief Moore advised he was reassigning units from Fairfax Avenue and Rosewood Avenue and requested the Air Unit advise where they were needed.  The Air Unit advised that those units should respond to Rosewood and Fuller Avenues. |
| | The Air Unit advised that a crowd of 100 had formed at Melrose Avenue and Alta Vista Boulevard and barricaded the street with items including dumpster fires. |
| 2028 hours | Units at 3rd Street and Edinburgh Avenue advised that a vehicle drove through a skirmish line, then collided with a light pole in the area. |
| 2034 hours | The Air Unit advised that numerous looting crimes continued on Melrose Avenue near Fuller Avenue.  Three TSE units were in the area but unable to address the ongoing crimes due to those units having had multiple suspects contained and in custody. |
| 2036 hours | Multiple fires continued in the greater Fairfax area.  The Air Unit advised that four LAFD fire engines, attempting to travel westbound, on Melrose Avenue were blocked by a barricade of dumpster fires at Alta Vista Boulevard.  The LAFD engines were able to turn southbound Alta Vista Boulevard and responding units assigned to force protection cleared Alta Vista Boulevard allowing the LAFD engines a clear path out of the area. |

| | |
|---|---|
| 2044 hours | Throughout the remainder of night, there were numerous looting and burglary radio calls generated for OWB.  As a result of the enforcement taken by officers during these incidents, the jail vans could not handle all of the requests from patrol.  This left several officers and arrestees waiting for significant periods of time for transport.  Moreover, officers who had arrestees in their custody were unable to respond to the looting radio calls that were occurring around them. |
| 2055 hours | The Air Unit advised that individuals in the crowd near Melrose and La Brea Avenues were throwing rocks, bottles, and fireworks at officers. |
| 2105 hours | The LAFD force protection units at Melrose and Stanley Avenues advised that a large crowd had formed and was looting businesses in the area.  Units also advised that an additional fire had started on the southwest corner of the location in the Urban Outfitters. |
| 2120 hours | The Air Unit organized containment of the Target store on La Brea Avenue between San Vicente and Pico Boulevards for additional looting suspects contained in the store. |
| | Chief Moore gave direction to transport arrestees at La Brea and Pico Boulevards by available patrol vehicles in the area.  Arrestees were to be transported a short distance to Wilshire station and not wait for MTA buses for transport.  However, 7L10 advised that Wilshire Station did not have the ability to process the arrestees and that they were to be transported to Van Nuys Station. |
| 2126 hours | The OWB CP requested an area assessment from the Air Unit. |
| 2128 hours | Commander 14D advised the OWB CP that widespread looting was occurring at multiple businesses in the Beverly Center Shopping Mall. |
| 2131 hours | Commander 6 requested additional units to the scene of multiple structure fires at Melrose and Spaulding Avenues.  The force protection units, assigned to LAFD at same location, advised that the fires had been put out and that LAFD was leaving.  Due to their assignment as force protection for LAFD they would be leaving the location as well. |
| 2137 hours | Commander 6 requested additional units to Melrose and Spaulding Avenues.  Unit TSE 5 and an LASD squad advised they would respond to Melrose and Spaulding Avenue to assist officers at that location. |
| 2140 hours | The OWB CP requested the Air Unit respond to Fairfax and Rosewood Avenues to assess activity in the area.  As the Air Unit arrived they advised of suspects looting numerous businesses on Fairfax Avenue between Rosewood and Melrose Avenues. |
| 2142 hours | The Air Unit advised an agitated group was launching fireworks at Melrose and Spaulding.  Additionally, at the same location, there was a fire with no fire personnel at |

|  | scene.  The Air Unit advised fire personnel were at Stanley Avenue and Melrose Avenue handling the fire at that location. |
|---|---|
| 2144 hours | The Air Unit advised units at Melrose and Spaulding requested a backup response due to assaults with fireworks at location.  Multiple units responded to assist. |
| 2145 hours | The DOC log indicated that 105 officers from mutual aid were being deployed to OWB (43 from Santa Barbara and 62 from Ventura County). |
| 2146 hours | The OWB CP advised they have approximately 60 Orange County Sheriffs ready to be deployed.  The Air Unit suggested that they respond to Melrose Avenue and Gardner Street. |
| 2147 hours | The Air Unit advised of a fire at Genesee Avenue and Melrose Avenue.  The LAFD was advised and the Air Unit requested the LASD to assist fire with the force protection at the location.  The Orange County Sheriff's responded to the location to assist with force protection and blocking forces. |
| 2153 hours | The OWB CP requested situational awareness from the Air Unit, Air Unit advised of a vehicle fire at Melrose Avenue and Formosa Avenue, there was a group forming at the location.  The Air Unit advised LAFD was at the location but left, possibly due to do with the crowd around the vehicle fire. |
| 2157 hours | Commander 14D requested additional units at La Cienega Boulevard and 3rd Street for several looting calls and active looting in the area. |
| 2158 hours | The OWB CP requested an update of the Grove, they received intelligence that the Grove was possibly being looted.  The Air Unit went overhead and reported nothing abnormal.  The Air Unit observed looting at the CVS located at Beverly Boulevard and La Cienega Boulevard.  No LAPD personnel were in the area.  The Air Unit advised they had to go downtown for another request and would return as soon as they could. |
| 2214 hours | The Air Unit advised of a dumpster fire at Fairfax Avenue and Waring Avenue. |
| 2220 hours | Units at Fairfax Avenue and Rosewood Avenue requested additional units for officers taking fireworks at the location.  Additional units responded to the location for assistance. |
| 2222 hours | The OWB CP advised jail transport will be departing staging and to update locations of arrestee pickups. |
| 2230 hours | Officers requested bomb squad to Rosewood and Fairfax Avenues for an unexploded item.  The OWB CP acknowledged and handled. |
| 2244 hours | The OWB CP advised officers of the commander's intent to arrest as many looters as possible. |

2249 hours     Officers broadcasted there were two vehicle fires at Beverly Boulevard and La Cienega Boulevard.  The OWB CP acknowledged and would advise LAFD.

2251 hours     The Air Unit advised the OWB CP of a vehicle fire at Alfred Street and Beverly Boulevard.  The OWB CP advised LAFD.

2255 hours     The Air Unit broadcasted possible looters at 3rd Street and Kings Road; there were five vehicles at the location involved with the looting.

2256 hours     Commander 7B requested units to respond to The Grove for possible looting at the location.

2306 hours     Officers advised looting occurred at a 7-11 business at Gardner and 3rd Streets.  Officers requested the Air Unit to canvass the area for the looters that possibly entered a white Honda that was parked in the alley.

2325 hours     Officers requested LAFD to Genesee and Beverly Boulevard for a dumpster fire.

2330 hours     The OWB CP advised all personnel there are no jail transport vans available, only jail buses.  If personnel are waiting for jail transport and have only a couple arrestees, move the arrestees to another location with a bigger group detained.

2334 hours     The Air Unit informed personnel, the looting in the area of Poinsettia Place and Melrose Avenue have vehicles involved and are moving from store to store.

2337 hours     Commander 6 advised personnel to begin vehicle enforcement and stop all vehicles in the area and arrest on curfew violations if not a looting investigation.

               Officers asked Commander 6 what to do with the vehicles of those arrested for curfew. Commander 6 advised to park the vehicles.

2348 hours     Officers requested a jail transport van at La Brea Boulevard and San Vincente Boulevard.  The Target continued to be looted and the pharmacy at the location as well.

2354 hours     Officers at Beverly Boulevard and Crescent Heights requested the status of the jail transport van as they waited for over an hour with six arrestees.  The OWB CP acknowledged and stated they were working on the request.

2358 hours     Plain clothes officers reported looters inside starting fires at the Off-Broadway Shoe Store near Mansfield Avenue and Sunset Boulevard.  They requested LAFD response.

# <u>SUNDAY, MAY 31, 2020</u>

### Operations-Central Bureau (OCB)

0004 hours    From midnight to 0100 hours, OCB had multiple requests for jail transport vehicles in the greater downtown Los Angeles area.

0030 hours    Unit M30 requested Bomb Squad to respond to 1100 South Broadway for a container of nitrous oxide located inside a Cadillac Escalade.  The Bomb Squad was not available, so the DOC contacted Los Angeles County Hazmat to respond.

0142 hours    The OCB IC assigned a dedicated Air Unit to the CP for situational awareness.

0220 hours    The OCB IC directed all units to handle their arrests and transports due to having no jail transport vehicles available to respond.

0300 hours    A person reported looting at the jewelry store located at 624 South Broadway.

0825 hours    All National Guard units deployed in OCB and OWB were directed to respond to Dodgers Stadium Parking Lot, Staging Area.

0850 hours    An unknown motor unit requested back-up for an irate man with a gun in his right hand.  The suspect was traveling East 5th Street from San Julian Street.  Squad P130 units responded (Incident No. 1267).  Although the incident was not related to the civil unrest, the situation needed resources, furthering depleting more resources for the City.

1014 hours    Unit P740A advised there was a pallet of rocks located on Main Street, under the freeway, that could be used as projectiles.

1035 hours    Unit P760A advised there were three to five pallets of cinder blocks located on the southeast corner of Flower Street and Pico Boulevard.  The CP notified Street Services to remove the items from both locations

1400 hours    The Santa Monica Police Department (SMPD) requested mutual aid from the Department.  Two MFF packages were directed to the City of Santa Monica for mutual aid.

The SMPD also advised of approximately 150-200 protesters were traveling south on Colorado Street in the City of Santa Monica possibly enroute to Pacific Area.

1415 hours    An officer completed a burglary report at the Cathay Pharmacy, 711 West College Street, Suite 100.  Approximately $400,000 in damage and property taken was reported.

1443 hours    Over the following two hours, crowds at the different locations in the Downtown Area began marching and taking over the streets.  Additional resources were called in to

assist in keeping the crowds from taking additional streets and blocking access to the freeways.  The combined crowd size reached over 500 protesters.

Chief Moore advised that if the protesters were peaceful and not committing any acts of vandalism or burglary, to allow them to walk and peacefully protest.  The crowds did not stay together; new groups formed, groups combined and split, and continued to move throughout the Downtown Area.

1510 hours     Unit Q130 advised the crowd at 5th and Hill Streets was throwing rocks and bottles at the officers.

1515 hours     Commander 27 authorized the arrest of the suspects throwing rocks and bottles.  At the same time, Staff 230 reported seeing a white sedan in the same area passing out fireworks to protesters in the crowd and a traffic stop was conducted within 15 minutes.  The traffic stop was initiated at 4th and Hill Streets.  Investigative Branch was notified and sent two detectives to assist with the traffic stop.

1530 hours     The Air Unit advised 300-400 protesters were peacefully walking south on Flower Street, passing Wilshire Boulevard.

Unit P750B responded and observed a male Black, with chains, in the group throwing objects.  Upon their arrival, unit Q110A also observed the same suspect still with the group.  The Air Unit requested an arrest team to the location.  Unit TC1 (possibly TSE1) responded to the location to assist with extracting the suspect who was throwing objects.

1550 hours     The Air Unit advised another group of 200-300 protesters in the intersection of Figueroa Street at 12th Street.  The group was stopping a bus from moving and requested two MFFs to respond to assist the bus.

A resource request was placed for four videographers.

1615 hours     Commander 27 advised one of the protest groups traveling north on Flower Street had protesters that were carrying hammers and M80 explosives.  The Air Unit advised that an additional group was traveling eastbound on 5th Street towards Pershing Square had protesters that were carrying military style back packs.

1618 hours     An additional group of 600 protesters formed and was moving northbound on Grand Avenue towards 3rd Street.

1630 hours     An unknown unit advised the protest group located at 1st and Grand Streets had hammers and M80s and were walking towards City Hall.

The Air Unit advised the group of 600 protesters on Grand Street were moving east through Grand Park and were approaching the west side of City Hall.

| | |
|---|---|
| 1645 hours | An unknown unit reported an additional group of 200 protesters walking north on Main from 2nd Streets and were going to join the group at City Hall on Spring Street. |
| 1652 hours | Additional resources were deployed to the area of City Hall. |
| 1713 hours | An unknown unit requested an additional MFF to the south side of PAB for protesters armed with hammers and M80 explosives. |
| 1715 hours | Motor Strike Team MX180 reported they observed two suspects with backpacks loaded with weapons, possible knives, M80 explosives, and hammers.  Units P310 and P350 contacted the two suspects and detained them without incident. |
| | An unknown unit advised a group of 100-200 protesters were armed with metal bats and rods were on Hill Street between 3rd and 4th Streets. |
| 1750 hours | Air Unit, Idaho 30, made a public announcement over City Hall with its loudspeaker mounted on the Air Unit.  The announcement advised of the curfew that was in place for the evening. |
| 1914 hours | Chief Moore advised 100 National Guard Troops were deployed to the City of Santa Monica. |
| 2051 hours | Unknown unit advised 100 protesters heading towards the LAFD Fire Station located at 6th and San Julian Streets.  The LAFD advised they had closed and locked all the doors and the personnel inside had barricaded themselves in.  The protesters moved past the LAFD station and ultimately went east on 5th Street from Wall Street. |
| 2130 hours | An unknown unit advised a group of 15-20 males were on Broadway between 6th and 7th Streets.  They attempted to break wooden barricades at the Jordan Store (622 S. Broadway). |
| 2140 hours | An unknown plain clothes unit, driving a grey Honda Pilot, requested back up for an irate group of approximately 50 protesters walking south on Broadway from 6th Street. They reported some of the members of the group had bats and were breaking windows of the building as they walked past. |
| 2304 hours | An unknown unit advised they observed persons throwing fireworks onto the street from the building located at the southwest corner of Olympic Boulevard and Main Street. |

## Operations-South Bureau (OSB)

0715 hours     Southwest Area officers were sent to pick up less-lethal munitions.

1225 hours     The OSB areas reported on the number of damaged Department vehicles related to the protests:

> Southwest Area – five vehicles
> Harbor Area – two vehicles
> 77th Area – three vehicles
> Southeast Area – six vehicles

## Operations-West Bureau (OWB)

National Guard resources were mission tasked to locations within West Los Angeles Area. Their mission was to conduct high visibility security to deter looting.

0005 hours     There were multiple outstanding requests for the transport of suspects in custody from multiple locations. There was a large delay in the response of transport vehicles due to the level of looting, arson activity, and transport requests in the field. The multiple requests were due to looters returning to locations that were already looted.

               The Target located at 1302 South La Brea Avenue, was looted late in the evening on May 30, 2020. Metropolitan Division Lieutenant 10A advised his TSE had to return to the location due to continual looting each time they left the location. They advised they were clearing the Target again and had an additional four looting suspects in custody and needed transportation. They also requested board-up services to respond to secure the location. Per the OWB Command Post, there were no private board-up services available at the time. Lieutenant 10A was able to contact personnel from Target directly to secure the building so they could clear the scene.

0115 hours     Unit 25P230 requested an Air Unit for an Assault with a Deadly Weapon on a Police Officer at Melrose and West Knoll. The Air Unit responded to the request. The suspects were last seen in a silver 4-door Hyundai Sonata with damage to the vehicle. Unit V20 advised he had the possible suspects detained at Detroit Street and Clinton Street and requested the primary officers respond.

0125 hours     The DOC, Logistics Section, approved (400) Beanbag rounds and (240) 40mm rounds to be delivered to the OWB CP.

1221 hours     A Pacific Area sergeant advised that a group of approximately 300 were enroute to Councilman Bonin's residence for a protest and OWB dispatched personnel for security.

               A sergeant requested one lieutenant, one supervisor, and three officers for security at Councilman Bonin's residence.

| | |
|---|---|
| 1230 hours | The OWB CP issued all available less-lethal munitions to the OWB geographic Areas. |
| 1250 hours | Commander 6A advised the OWB CP they had deployed one MFF at Venice Beach for the protesters that SMPD advised could be moving to the City of Los Angeles. |
| 1345 hours | A SMPD Lieutenant contacted an OWB sergeant and requested mutual aid from LAPD to respond to Santa Monica. |
| 1415 hours | Commander 8B advised he was enroute with two MFFs of LAPD resources, to the City of Santa Monica for the mutual aid request. |
| | Commander 8B responded to the 3rd Street Promenade Mall (1415 3rd Street Promenade) and met with an unidentified SMPD Captain.  Commander 8B was tasked to assist SMPD with clearing the mall.  After completing this mission with no issues, the SMPD requested Commander 8B to respond to the Santa Monica Pier and assist with crowd control. |
| 1417 hours | Two police officers returned to the OWB CP with the less-lethal munitions from the DOC. |
| 1430 hours | Commander 13B advised, per 14N10, there was approximately 200 protesters traveling southbound Pacific Street approaching Navy Street, and they were headed into LAPD's Pacific Area from the City of Santa Monica. |
| 1515 hours | Commander 8B advised that he was being asked to push the crowd in coordination with the SMPD.  He then asked if Santa Monica would give a dispersal order before any LAPD action was taken. |
| 1518 hours | Unit Q530 advised they observed "gas" being used by SMPD at Colorado Street and Main Street to disperse a large crowd.  Air-10 discussed if the LAPD units near the location of the gas dispersal had gas masks.  If not, he would direct them to areas that were not impacted by the gas.  The units did not have gas masks and the Air Unit coordinated with SMPD to have the LAPD units avoid situations near gas dispersal areas. |
| 1545 hours | Air-10 advised the crowd size in Santa Monica was approximately 100 protesters. |
| 1548 hours | Unit 14N10 advised they were in the City of Santa Monica and the Walgreens located at Lincoln Avenue and Pico Street was being looted and requested units to respond. |
| | Unit 14N10 then advised that another group of people were confronting the looters and were armed with golf clubs. |
| 1610 hours | Commander 14A advised an officer was shot in the foot by a suspect in a car in Pacific Area.  The injured officer was transported to Santa Monica Hospital. |

1810 hours    The DOC ordered personnel from Metropolitan Division to respond to the City of Santa Monica, in the area of Ocean Front Walk and Park Street, to support other LAPD resources and the use of less-lethal force was approved.

1832 hours    Unit 6P100 advised there were looters at the CVS store located at Main Street and Rose Street in Santa Monica and requested additional units to respond to assist.

An unidentified unit advised she was sending an entire MFF to the Abbot Kinney location to assist.  They were responding from Riviera and Windward, in the City of Santa Monica.

1857 hours    Air 8 and Commander 13B discussed helping the City of Santa Monica with the tactical plan to detain the curfew violators while at the same time not pushing the crowd into the City of Los Angeles.  Commander 13B advised he would meet with SMPD at Ocean Boulevard to assist.

1900 hours    After discussions with the Chief Moore, Commander 13B advised that LAPD resources would respond to Ocean Boulevard, make arrests for curfew violations, and transport the suspects to the intersection 11th Street and Santa Monica Boulevard.  At this location, the SMPD would then take custody of the suspects and handle the processing of the mass arrests.

1920 hours    Air-8 directed the Metropolitan TSE to the area of 4th and Main Streets, in the City of Santa Monica, to affect a mass arrest of curfew violators.

1928 hours    Unit Q630 requested help for officers down due to having a hard time breathing at Civic Center and 4th Street, in the City of Santa Monica.  An unknown unit advised it was "CS" gas.

Commander 13B advised he had numerous people in custody and was coordinating with Santa Monica for transport.


Operations-Valley Bureau (OVB)

1000 hours    The OVB IC requested Tactical Channel 41 to be reserved for OVB and two MFFs to respond to OVB.  One MFF was to respond to the Topanga Mall and one MFF was to respond to the Northridge Mall for high visibility patrol.

1556 hours    Communications Division broadcasted a call of an ADW on a Police Officer.  The ADW occurred at Victory Boulevard and Owensmouth Street (Incident No. 2396).

2150 hours    North Hollywood officers advised there was a group of looters at the intersection of Whitsett Street and Ventura Boulevard.  No arrests were made from the crowd.

2305 hours   An unidentified 9P unit reported the CVS store at Reseda and Ventura Boulevards (18441 Ventura Boulevard, Tarzana) was being looted.  They also advised there were multiple groups of protesters on Ventura Boulevard between Reseda Boulevard and Louise Streets.

2320 hours   One MFF was tasked to respond to the protesters on Ventura Boulevard between Louise Street and Reseda Boulevard.

# MONDAY, JUNE 1, 2020

## Department Operations Center (DOC)

0630 hours   The Investigative Branch began setting up a field jail for a planned incident in Hollywood.

0659 hours   A notice was sent advising that a copy of all completed and approved arrest reports related to "Safe LA" shall be forwarded to their respective Bureaus' CPs.

The DOC received a call from the OVB CP advising that they were out of less-lethal munitions.

0715 hours   A lieutenant requested two additional LASD buses to transport any arrestees and two (LAPD) lieutenants to staff the buses.

0800 hours   A briefing was conducted with a lieutenant from Custody Services Division regarding organization of the field jails.

0910 hours   The Investigative Branch requested that each bureau provide an update of all felony arrests since Friday, May 30, 2020.

1050 hours   The DOC sent a notice to all officers advising that any investigative run-up requests or social media analysis related to the civil unrest or VIP security, be directed to RHD.

1110 hours   Investigative Branch made a request for an Internal Affairs Group team to respond to the MDC regarding complaints of missing property for arrestees.

1119 hours   The DOC sent a notice advising that any investigative run-up requests or social media analysis related to the Civil Unrest or VIP security, should contact the Citywide CP.

1221 hours   The DOC published a notice to all officers advising of Amendment Order No. 1 to a Los Angeles County Executive Order regarding the civil unrest.  The curfew would be in place from 6:00 p.m. to 6:00 a.m., daily for everyone except the list of exemptions in

Amendment Order No. 1.  The Department would use LACC Section 2.68.320 when processing violators.

1256 hours     The DOC sent a notice rescinding the 12:21 p.m. email on the matter of Amendment Order No. 1.

1354 hours     The DOC sent a notice to all officers advising of an Officer Safety Bulletin from RHD. The bulletin advised of organized rioters staging pallets of bricks on City streets for demonstrations.  Officers were to notify the DOC if they observed any pallets.

1445 hours     An Investigative Branch detective began to contact all arresting officers by cellular telephone so that they could provide a better narrative for arrest reports.  The detective also began assisting in recovering evidence for the investigations, including video evidence.

1615 hours     The DOC advised that all Areas had met their minimum patrol requirements with the exception of Hollywood and Pacific Areas.  Command advised that moving forward all Areas shall meet their Office of Operations patrol requirements.

1630 hours     The DOC sent two LASD buses to Hollywood station and two LASD buses to Devonshire Station.  There were buses on standby for deployment should mass arrests be made and transport needed.

1648 hours     The DOC sent a notice to all officers advising that the Mayor had amended his curfew order to reflect a curfew period of 6:00 p.m. to 6:00 a.m.  Officers could enforce this order using Los Angeles Administrative Code 8.78 and need not rely on the county ordinance.

                This order shall not apply to persons experiencing homelessness who are without access to a viable shelter.  The DOC attached the amended order signed June 1, 2020, 2:45 p.m.

1831 hours     The DOC sent a notice to all officers advising that board up material was transferred from Evidence and Property Management Division to the Department CP and directed all personnel to the DOC.

1835 hours     The DOC sent a notice to all officers advising that effective immediately and until further notice, booked evidence in need of Forensic Science Division analysis or Technical Investigation Division latent fingerprint processing be transported and booked to Central Property or Valley Property Section.


Operations-Central Bureau (OCB)


0010-0200 hours
                Multiple radio calls were generated for looting and burglaries.

0018 hours    Officers broadcasted that they were in a foot pursuit of a man with gun northbound on Main from 7th Streets.  The suspect was located and taken into custody without incident.

0055 hours    A lieutenant advised of a labor protest on Alameda Street south of 7th Street.  Ten protesters were at the location and were described as peaceful.

0132 hours    The Air Unit advised that was a portable toilet on fire at 6th and San Julian Streets.  The LAFD responded.

0134 hours    Unit 320B advised that there was looting at the shoe store on 1st and Central Streets.  Officers took suspects into custody.

0240 hours    Officers requested a jail van to respond to 218 South Spring Street for a felony arrest.  Shortly thereafter, officers requested a jail van to respond to 8th and Flower Streets for arrestees.  A lieutenant, Investigative Branch, advised that there were no jail vans available and told officer that they would have to transport their arrestees to MDC themselves.

0320 hours    The OCB IC requested that an additional lieutenant, four sergeants, and 40 officers be assigned to do force protection for Fire Station 4 starting the June 2, 2020, at 3:00 p.m.  Due to the depleted Department resources, he requested this assignment be staffed by LAUSD personnel.

1059 hours    Commander 16 advised that there were no protesters at PAB for the anticipated protest at 1100 hours.

1250 hours    Commander 4 advised that there were approximately 15 protesters walking towards City Hall.  Commander 1 deployed one plain clothes team to City Hall to monitor the crowd.  Shortly thereafter, the crowd began to disrupt traffic on the West side of Spring Street and had grown to approximately 50 protesters.

1330 hours    A community member informed Communications Division that seven to eight males were armed with hammers and other weapons preparing to loot the Ross located, at 510 Alvarado Street. (Incident No. 1878)

1418 hours    Plain clothes officers reported that there were vehicles driving on the bus lane, northbound Spring Street.  The vehicles were honking and inciting protesters

1456 hours    Per M20, the protesters at City Hall appeared to be peaceful.  The Air Unit continued to monitor the crowd.

A large portion of the crowd that was in front of City Hall separated into three groups.  One group had walked towards PAB.  The second group walked north towards the 101 freeway.  Both groups were walking in the middle of the street interfering with the flow of traffic.  Commander 1 requested that traffic be shut down on Spring between 1st and

**160**

Temple Streets in an effort to avoid a traffic collision with one of the protesters. Unit 24MQ10 responded to traffic on 1st and Temple Streets to block traffic for the large group of protesters that was marching there. Based on the request from Commander 1, MTA stopped all its bus traffic that went through the intersection at 1st and Temple Streets. The CHP deployed units to shut down all on and off ramps to the 101 Freeway in the area.

Plain clothes officers advised Commander 1 that 350 protesters remained in front of City Hall and that they were developing plans to commit acts of violence. The protesters continued down Spring Street to PAB where they staged, taking up all lanes of traffic. Commander 1 deployed a Motor Strike team to shut down 1st and Main Streets. An MFF was deployed to shut down the intersection at 1st and Spring Streets.

1548 hours   The Air Unit advised that the crowd in front of City Hall had grown to 400 protesters.

Commander 1 directed that a jail van be staged two blocks away from PAB in order to facilitate transport of any arrests if needed.

1630 hours   Motor officers reported a low flying drone being flown by one of the protesters in front City Hall.

1650 hours   Plain clothes officers reported that they observed a male, White, with an axe hidden between his back and backpack. The suspect was also equipped to combat chemical agents.

1700 hours   Protesters began to break up into small groups and march on 1st Street between PAB and City Hall. These groups continuously split and regrouped with other groups without loyalty to the original larger group of protesters staged in front of City Hall. A group of 150-200 protesters marched to the intersection of 1st and Spring Streets. They took over the intersection and refused to let traffic through.

At the same time, a large group of protesters marched southbound on Spring Street towards 5th Street. This group of protesters was led by a small group of bicyclists that overtook intersections ahead of the protesters on foot. This elongated the group of protesters causing the officers that were monitoring the group to be overwhelmed. An additional MFF and plain clothes officers were requested. This request was denied. Officers were advised that there were no available MFF units to respond to their request. The group of protesters continued to march west 8th from Spring Streets. The Air Unit requested a skirmish line for vehicle protection and to not allow the protesters to continue north on Broadway. The protesters continued to Grand Avenue and began to walk south towards 9th Street. The group was monitored by an MFF following in their vehicles towards the rear of those marching. An available plain clothes unit arrived to monitor the crowd of protesters from within the march. The group of protesters continued to disrupt traffic as they made it to 9th Street and Grand Avenue. When the protesters arrived at the intersection of Grand Avenue and Olympic Boulevard they changed direction again and began walking east towards Hill Street.

The group of protesters continued to march until they were walking northbound on Hill Street passed 9th Street. The group eventually returned and reformed with the protesters who remained at City Hall.

As the CP was monitoring the several different groups of protesters, they were advised by the LAFD that a trash fire had been started on Broadway north of 6th Street. The LAFD Liaison also advised of reports of looters at the Rosslyn Hotel located at 451 South Main Street.

1823 hours    Communications Division received information that 200-300 looters were jumping the fence of Joe's Parking Lot and actively vandalizing the vehicles in the lot (Incident No. 2832).

1928 hours    An unknown officer reported that protesters were throwing rocks and bottles at them at 6th and Main Streets. Unit Q110 responded to support the officers and assist with the combative group of protesters.

2044 hours    Commander 16 requested a unit with a fire extinguisher at 6th and Central Streets for a small rubbish fire.


Operations-South Bureau (OSB)

0010 hours    During the hours of 0010-0210, several radio calls were generated for looting.

1400 hours    Southwest Watch Commander was advised of a possible protest at Leimert Park. The OSB CP advised that it would monitor the protest and deploy units if needed.

1420 hours    A Command Staff Officer requested one MFF to respond to the Shoe Warehouse located at 201 Pacific Coast Highway for a protest at Banning Park.

1630 hours    The OSB IC ordered all area Community Relations Officers and Senior Lead Officers to make physical contact with community stakeholders, schools, and places of worship.

2130 hours    A Southwest Narcotics Enforcement Detail saw a man with a gun at the Chevron gas station on Vermont Street and the 10 Freeway. An officer-involved shooting occurred as officers approached the suspects. One suspect sustained a non-life threating gunshot wound. No officers were seriously injured. Two of the suspects were arrested. The third suspect was released.

2308 hours    Communications Division received information that five to six individuals armed with bats were standing in the middle of the intersection of South Western and West Gage Avenues. The suspects were attempting to stop passing vehicles and open their doors.

<u>Operations-West Bureau (OWB)</u>

**0000-0640 hours**
Communications Division received multiple radio calls for burglary and looting suspects all over the West Bureau region.

**0415 hours**
The National Guard reported back to OWB CP staging area at CBS Studios. A Command Staff Officer requested that the National Guard maintain at least a company sized contingent.

**0925 hours**
A detective contacted the DOC and requested two buses for West Los Angeles Area and one for Hollywood Area.

**1135 hours**
The DOC advised that Department of Transportation (DOT) was unable to accommodate the OWB request for DOT units to conduct street closures.

**1350 hours**
Communications Division received information that 50 protesters were at Nordstrom located on West 3rd Street and The Grove Drive. Plain clothes officers deployed to the area and reported that the crowd of protesters were walking towards 3rd Street and Fairfax Avenue. The group was described as peaceful and obeying the law. No additional units were requested as the crowd dispersed to only 25 people.

Communications Division received information of 30 protesters at West Sunset Boulevard and Gardner Street. The protesters were described as peaceful (Incident No. 1970).

**1415 hours**
The OWB CP was advised that 100-150 protesters were gathering at Wilshire Veterans parking lot (345 Sawtelle Boulevard) as a central location.

An officer from the OWB CP contacted the DOC and requested less-lethal 40mm and Beanbag rounds. The DOC advised there was no more less-lethal munitions left. The DOC advised that they would contact each Bureau once there were less-lethal munitions to deploy.

**1445 hours**
The OWB CP was contacted by the LASD – West Hollywood Station. The LASD advised that there were 60-100 protesters walking towards Fairfax Avenue and Willoughby Avenue.

**1538 hours**
Communications Division advised that the Sketchers Shoe Store located at Hollywood Boulevard and Schrader Boulevard was being looted (Incident No. 2259).

**1545 hours**
Commander 14 requested that all "Frank300" MFFs responded to the CVS on Beverly Boulevard and Genesee Avenue to stage.

Commander 20A requested that one MFF be deployed to Ivar Avenue and Sunset Boulevard.

| | |
|---|---|
| 1605 hours | The Air Unit reported that there were 50-85 protesters on the 405 Freeway and Wilshire Boulevard. |
| | A shooting had occurred at Queen Ann Park.  There were no confirmed hits, the suspect was described as a male, Black fleeing the scene in a silver Hyundai. |
| 1915 hours | The OWB CP reported over 100 protesters had been arrested in West Los Angeles Area.  Ten MFFs were deployed to Hollywood Area with one plain clothes team.  There were approximately 300 protesters in Hollywood Area. |
| 2010 hours | The OWB IC requested a less-lethal munitions count for all OWB Areas. |
| 2020 hours | An unknown unit requested a jail transport van for 30 arrestees at Wilcox Avenue and Hollywood Boulevard. |
| | A vehicle pursuit was initiated when a white SUV attempted to run over an officer in Hollywood Area.  The SUV was stopped at Nadeau Street and Antwerp Street.  Four suspects fled from the suspect vehicle.  Three suspects were taken into custody without incident. |
| 2025 hours | The OWB CP was advised that approximately 100 protesters were looting at Sunset Boulevard and Orange Drive. |
| | Another group of 400 protesters were actively looting on Sunset Boulevard between Steward and Hudson Avenues.  The responding MFF used their vehicles to contain the protesters and stop the looting.  Numerous arrests were made. |
| | A request from OWB CP to the DOC was made for 500 flex cuffs. |
| 2055 hours | OWB CP requested jail transport vans at Vine Street and De Longpre Avenue for 200 arrestees and at Jackie Robinson park for 100 arrestees. |
| | The OWB CP dispatched four MFFs to the above locations to handle the looting calls. Units created a perimeter around the looters and shut down all traffic on Hollywood Boulevard.  Mass arrests were made. |
| 2124 hours | Unit 25MX80 requested a jail transport van at Olive and 12th Streets for four arrestees. |
| 2200 hours | A jail van was requested to Hollywood Boulevard and Wilcox Avenue for 200 arrestees. |
| 2230 hours | Four buses were sent to Hollywood Boulevard and Highland Avenue for arrestees that were waiting for transport. |
| | Throughout the remainder of night, there were numerous looting and burglary radio calls generated within OWB.  As a result of the enforcement taken by officers during these incidents, the jail vans could not handle all of the requests from patrol.  This left |

several officers and arrestees waiting for significant periods of time for transport. Moreover, officers who had arrestees in their custody were unable to respond to the looting radio calls that were occurring around them.


Operations-Valley Bureau (OVB)


| | |
|---|---|
| 0019 hours | Per the OVB IC, protesters had staged five pallets of rocks at 14961 Ventura Boulevard in Van Nuys Area. |
| 0145 hours | The DOC requested that the jail vans be returned downtown from the valley. |
| 0800 hours | Commander 21A advised the OVB CP that she had received information that there was a planned protest at Topanga Station for 1400 hours. No resources were requested for the protest. |
| 0900 hours | A sergeant advised that 50 protesters congregated at the Van Nuys Courthouse. Officers requested a squad of officers to respond from the OVB CP. The OVB IC dispatched two Motor Strike Teams to Van Nuys Courthouse to provide security. |
| 1225 hours | The OVB CP was advised that the crowds at the Van Nuys courthouse grew to over 100 protesters. The OVB IC deployed a plain clothes unit to monitor the protest. |
| 1252 hours | A citizen reported that they observed protesters drop off 30-40 cages of bricks and rocks next to the bus stop on Ventura Boulevard and Noble Avenue (Incident No. 1772). |
| 1300 hours | The Commander 21A requested an MFF for security at Topanga Mall. The OVB IC deployed one MFF to Topanga Mall and one to Sylmar and Tyrone. Additionally, the OVB IC deployed one MFF Zelzah Avenue and Chatsworth Avenue.

Communications Division received calls of multiple vehicles with their license plates covered with trash bags. Suspect vehicles had multiple males in them and were driving around the Topanga Mall. |
| 1350 hours | Communications Division received calls of looting at the Sketchers Shoe Store and nearby pharmacy located at 6522 Van Nuys Boulevard. (Incident No. 1946) |
| 1355 hours | Communications Division received information that there were several vigilantes streaming on twitter. The vigilantes were driving around Topanga Area shopping areas, assaulting protesters who were looting in the area. (Incident No. 1968) |
| 1425 hours | The OVB IC deployed one MFF to the Church of Scientology at 11455 Burbank Boulevard. |
| 1533 hours | The LAFD advised that they were responding to Friar Street and Van Nuys Boulevard to reports of rubbish fires. The CHP reported looting in the area as well. |

Communications Division received information that protesters were looting the Allied Health Pharmacy located at 14659 Victory (Incident No. 2308).  Additional information was received advising that looters were smashing windows to businesses in the area (Incident No. 2347).

1700 hours   The OVB CP was advised that four stores in Van Nuys had been looted.  The OVB CP dispatched board up to the looted stores.

1815 hours   The OVB IC deployed two MFFs to Victory Boulevard and Van Nuys Boulevard. Units were directed to arrest any looters in the area.

1930 hours   Communications Division received information of looting occurring at the Fire Stone Auto Care located at 6530 Van Nuys Boulevard.  (Incident No. 3090)

1935 hours   The OVB CP deployed a partially formed MFF to Van Nuys Boulevard and Haynes Street to assist with looting calls.

The CHP Communications received information of possible looting at the Target located at 14876 Keswick Street. (Incident No. 3125)

1942 hours   An officer from the CP reported to the OVB CP that there was a large crowd of protesters at 15130 Ventura Boulevard.  The protesters were reportedly armed with bricks.

2005 hours   The National Guard was deployed to Sherman Oaks Galleria, Fashion Center, Topanga and Northridge Malls.

2010 hours   A lieutenant advised the OVB CP that there was an officer-involved traffic collision at Ventura Boulevard and Whitsett Avenue.  Four officers were involved in the collision and transported to Sherman Oaks Hospital with non-life-threatening injuries.

2035 hours   The OVB CP was notified that a LASD bus was arriving to Van Nuys jail with 45 arrestees from unknown location.


# TUESDAY, JUNE 2, 2020


### Department Operations Center (DOC)

0027 hours   The DOC sent out an Officer Safety Bulletin advising officers to be on the lookout for a Jeep which was seen at two separate incidents of officers being shot at in the Pacific Area that occurred on May 31, 2020.

| | |
|---|---|
| 0030 hours | The National Guard was demobilized.  However, an unknown person from OVB directed 30 National Guard Officers to the Northridge Mall. |
| 0600 hours | The CP conducted a roll call and change of watch briefing for A-Watch personnel during which they discussed the planned protests for the day and incidents that occurred that night. |
| 0800 hours | Communications Division advised there were no officers available to respond to stolen vehicle calls and no detectives to release impounded vehicles.  Thus, Communications Division had to close the calls without being handled despite the numerous calls for service.  Investigative Branch advised they would handle the issue. |
| 0950 hours | Investigative Branch contacted all the Bureau CPs and reminded all Areas to staff detectives to release vehicle impounds.  All Bureaus staffed detectives to support those needs at each Area. |
| 1130 hours | All Command Staff at the CP had a situational update briefing. |
| 1315 hours | Chief Moore wanted to determine if protestors were coming from outside the City to engage in violent protests and criminal activity.  He requested the area of residence for those that were arrested.  The Director of OCPP was researching the matter and no further inquiries were needed from the Investigative Branch or OSS. |
| 1430 hours | There was a CP briefing with the Command Staff. |
| 1504 hours | The DOC sent second email informing personnel the Mayor amended the Curfew Order at 1240 hours now exempting those community members traveling to and from work and those voting. |
| 1554 hours | A Department-wide message was sent out regarding the "Safe LA LAPD Booking Guide."  Based on recommendations from the Los Angeles County District Attorney's Office, officers should review the booking guidelines/checklist before making arrests for looting or throwing items at a vehicle with intent to cause great bodily harm during the Safe LA protests. |
| 1600 hours | The DOC informed the OSB CP of intel related to pallets of bricks being dropped at 56th and Figueroa Streets. |
| 1650 hours | A Department-wide message was sent out reviewing the MOU 24 for the Safe LA Mobilization. |
| 2120 hours | The DOC notified officers that the Metropolitan Detention Center (MDC) located at 180 North Los Angeles Street MDC was closed, and officers should use the jails at 77th or Van Nuys for bookings. |
| 2200 hours | A Department-wide notice was sent advising officers that Clara Shortridge Foltz Criminal Justice Center and Los Angeles Superior Court would be closed on |

|  |  |
|---|---|
|  | Wednesday, June 3, 2020.  All other courts would remain open and subpoenas shall be honored. |
| 2225 hours | The MDC returned to normal operations and was available for bookings. |

### Operations-Central Bureau (OCB)

|  |  |
|---|---|
| 0012 hours | Officers made several requests for transport vans at 8th and Hill Streets and 4th and Flower Streets.  All transport vans acknowledged the request and picked up arrestees.  Arrestees were transported to MDC. |
| 0051 hours | Officers requested a jail transport van for two juveniles detained at Main Street and Olympic Boulevard.  Thereafter, the request was canceled since, per policy, jail transport vans are unable to transport juveniles. |
| 0158 hours | An unknown unit reported a dumpster fire located at Main Street and Alpine Street.  The LAFD Engine 4 was dispatched. |
| 0211 hours | The CP sent a request for Los Angeles Port Police Department and LAUSD to assemble one MFF at 450 East Temple in front of Fire Station 4 for force protection. |
| 0959 hours | Commander 1 requested a Motor Strike Team respond to PAB for traffic control and street closures.  Additionally, Commander 1 asked units stay ahead of the march on Main Street to block traffic and sent a unit to 1st and Spring Streets to shut down eastbound traffic on Spring Street. |
| 1006 hours | Protesters approached Main and 1st Streets.  Officers at the scene received information that the group intended to head towards PAB and did not plan to go beyond Spring Street. |
| 1015 hours | The CP sent a request asking DOT to relieve officers at Main and 2nd Streets.  The DOT notified the CP they could not fulfill the request and advised they would not respond to any location near the protests. |
| 1147 hours | Commander 1 requested one MFF to stage at Judge John Aiso and Temple Streets.  Staff 2B approved the movement of Commander 13B's MFF from Dodgers Stadium Parking Lot, to Judge John Aiso and Temple Streets. |
| 1158 hours | Protesters continued movement towards Spring Street.  Commander 1 requested a Motor Strike Team to block traffic only at Spring and Temple Streets and allow protesters to walk in the street. |
| 1210 hours | Commander 27 advised there was a peaceful crowd of approximately 200 protesters at Pershing Square. |
| 1220 hours | Metropolitan Division Armory put a request in for 400 flex cuffs. |

Staff 2B at the CP directed Commander 4, Commander 1, and Commander 13B respond Code 3 to Hollywood.

The Air Unit gave a crowd assessment and advised that there were approximately 2,000 protesters at Grand Park. The crowd moved east on 1st Street and stopped in front of PAB.

Commander 4 requested additional units to block traffic at 1st and Hill Streets, Spring and 1st Streets, and 1st Street and Broadway.

1306 hours   The 2,000 protesters moved south on Spring Street to 1st Street. A motor unit advised that the protesters went westbound on 1st Street to Broadway. Commander 4 informed officers that the Department would take a hands-off approach and directed units to the rear of the protesters and to parallel the march. Additionally, Commander 4 requested the Air Unit monitor for criminal activity in the area.

1310 hours   The Air Unit advised a small group had split off from the crowd of 2,000 currently at 2nd and Hill Streets and was lying on the ground. A motor unit requested additional units. The motor unit informed the Air Unit he was by himself at Broadway and 2nd Streets. Additional motor units responded, and the Air Unit kept an eye on him until resources arrived.

1317 hours   Commander 4 directed the CP to notify LASD of a group of 500 protesters gathered at the Family Courthouse (LASD jurisdiction) located at 1st and Hill Streets. The group may go inside the courthouse and attempt to disrupt business inside.

1320 hours   Commander 4 requested additional motor officers. No motor officers were available in the City. Commander 4 advised Commander 27 to have his units move south to Staples Center to block and protect the venue.

1325 hours   Commander 36 advised that approximately 500 protesters were heading towards City Hall from the Red Line Station located near Grand Park.

1336 hours   The Air Unit advised there was a group of an estimated 1,000 protesters on 8th Street approaching Figueroa Street.

1340 hours   Commander 27 advised the CP a group of approximately 1,000 protesters were walking north from 8th Street towards the 110 Freeway and could not be stopped due to limited resources. Commander 27 requested the CP notify CHP and LAPD resources stand down until there was coordination of resources between the departments.

The crowd entered the 110 Freeway at 6th Street. Commander 27 requested one MFF at the northbound 110 Freeway and 6th Street off-ramp. The crowd exited the 110 Freeway and continued marching throughout the Downtown Area.

1407 hours    The crowd went east on 1st Street and approached Broadway.  Commander 36 requested a crowd assessment over Grand Park and the Air Unit estimated the group at 2,000.

1422 hours    The front of the crowd stopped at the front of PAB.  The crowd extended to Hill Street (over two full blocks).

1445 hours    Officers broadcasted a drone was flying over 1st and Spring Streets and the Air Unit was notified.

1507 hours    The National Guard arrived at City Hall to help with security.

1531 hours    The LAFD indicated there was an additional drone over City Hall.

1535 hours    The Air Unit assessed the crowd size around City Hall to be approximately 5,000. There were no other visible groups in the Downtown Area.

1611 hours    A crowd assessment was given and advised that the crowd had diminished significantly to approximately 2,000 protesters.  The crowd appeared to be leaving southbound.

1626 hours    Approximately 1,000 protesters moved from City Hall south on Spring Street to 2nd Street.

1643 hours    The group of 1,000 continued to move throughout the Downtown Area, and at this time, had an updated location of 8th and Spring Streets.

1650 hours    The protesters continued to march throughout the Downtown Area.  The Air Unit estimated the group had grown to approximately 3,000 protesters and were westbound on Olympic Boulevard from Hope Street.  Commander 27 requested a blocking force on Olympic Boulevard and an additional MFF for Olympic Boulevard and Figueroa Street.

1712 hours    P731 advised a brick was thrown at their vehicle from a rooftop located at 8th Street and Grand Avenue.  No injuries were sustained.

1722 hours    Communications Division advised possible looting at Avenue 51 and Figueroa Street, at the Food 4 Less.  When officers arrived at the location, there was no looting at the location, only peaceful protesting.

1730 hours    The large crowd continued moved north on Main Street from 2nd Street.  MQ80 informed the CP a crowd member advised the group intended to conduct a prayer in front of PAB to end the protest for the evening.

1738 hours    The front of the group made it to City Hall and PAB.  The end of the crowd was at 1st and Main Streets.

1752 hours    Commander 1 requested the Air Unit assist with a dispersal order every minute until 1800 hours.  Additionally, Commander 1 requested a videographer.

| | |
|---|---|
| 1800 hours | Unit 36Q40 made dispersal announcements with a bull horn.  Commander 1 requested a sound truck to PAB. |
| 1814 hours | A DOT officer at 5th and Olive Street had an individual report he observed a male, Black, wearing a burgundy shirt with black or gray pants carrying a crow bar and a fuel can.  The suspect was last seen walking westbound on 5th Street from Olive Street.  The DOT officer had a picture of the suspect and waited at the location for police arrival. |
| 1831 hours | The Air Unit and officers on the ground made announcements to disperse the area of the City Hall steps. |
| 1850 hours | The Air Unit advised that the crowd moved south on Spring Street and toward 1st Street.  Additionally, another part of the group was marching westbound 2nd Street from Spring Street.  The Air Unit requested a blocking force at 1st and Spring Streets to stop eastbound traffic. |
| 1857 hours | The Air Unit advised officers should stop the crowd at Broadway and 5th Street and requested an MFF respond Code 3 to Broadway between 4th and 5th Streets.  An unknown MFF supported this request. |
| 1910 hours | The Air Unit advised 50-60 protesters were contained on Broadway between 4th and 5th Streets.  An unknown unit requested a transport van respond to 3rd and Main Streets. |
| 1915 hours | Commander 16 advised the CP that approximately 100 individuals were under arrest on Broadway between 4th and 5th Streets and requested two jail buses be dispatched to that location. |
| 1924 hours | Officers updated the jail bus request to three buses at Broadway and 4th Street.  Additionally, officers requested 15 tow trucks to Broadway between 3rd and 4th Streets. |
| 2000 hours | One jail transport van indicated it was responding to the transport request at Grand Avenue and 17th Street.  The CP received an additional request for a jail transport van for two individuals at Pico and Broadway. |
| 2009 hours | The CP began receiving multiple requests for jail transport buses and vans  Commander 16 made another request for the transportation of 100-120 arrestees at Broadway and 4th Street.  His first request at 1915 hours was unanswered. |
| 2012 hours | A jail transport van responded to 5th and Los Angeles Streets.  An additional jail transport van responded to 8th and Figueroa Streets. |
| 2022 hours | Communications Division broadcasted that there were possible looters at Montana Street and Echo Park Avenue.  Officers arrived at the scene and requested the Air Unit conduct a roof check and search the surrounding area.  Officers detained three suspects. |

Due to no evidence of a burglary, all three individuals were cited for curfew violations and released at scene.

2107 hours     Officers requested numerous jail transport vans throughout the hour.  Detainees were taken to MDC until it reached capacity and could no longer process detainees.

2205 hours     Requests for jail transport vans continued to be made throughout the Downtown Area.

2235 hours     The Watch Commander at MDC broadcasted MDC was now open.  Requests for jail transport vans continued to be made throughout the City.

## Operations-South Bureau (OSB)

1120 hours     Office of Operations notified the OSB CP that every Area will need to compile and review all felony and misdemeanor arrest reports involving "Safe LA" and email the reports to RHD no later than June 4, 2020.

1140 hours     Security Services Division advised of a protest in front of City Hall in Harbor Area located at 7th Street and Beacon Avenue.  It was anticipated that the protest would move to Harbor Community Police Station.

1530 hours     Major Crimes Division advised the OSB CP of social media chatter of protesters arming themselves with bottles of acid.

1950 hours     The OSB CP assigned Southwest officers to the Crenshaw Mall and the Target Store located at Rodeo Road and La Cienega Boulevard.

## Operations-West Bureau (OWB)

0005 hours     All arrestees that were transported to Jackie Robinson Stadium were cited and released. There were no additional bus transportations for the remainder of the night.

0130 hours     The OWB CP contacted the DOC and requested CHP support for the 101 on and off-ramps at Hollywood Boulevard.  The CHP was advised of the request.

Communications Division advised of possible looting by people armed with bats attempting to break into the 7-11 at Wilton Place and Santa Monica Boulevard.  Plain clothes units responded to the area.

0835 hours     A Pacific Area lieutenant advised there were approximately 100 protesters at Abbott Kinney and Venice Boulevards.

0910 hours     The OWB IC requested the DOC provide OWB with three additional MFFs and two additional TSE teams for Hollywood starting at 1100 hours.

1004 hours     A citizen reported the Walgreens located at 4009 Lincoln Boulevard was being looted.
               Officers responded to the location and took the suspect into custody for looting
               (Incident No. 1245).

1205 hours     Officers at scene gave the OWB CP a crowd assessment.  They indicated there were
               150-200 protesters in Hollywood and 100 protesters in Pacific Area at the location of
               Lincoln Boulevard and Rose Avenue.  Both groups were peaceful.

1224 hours     Downtown staging advised OWB CP two MFFs were enroute to Hollywood from
               Central.

1231 hours     The Air Unit gave a crowd assessment of 1,000 protesters at Hollywood and Cahuenga
               Boulevards.

1245 hours     Based on Air Unit estimates, the crowd in Hollywood had doubled in size and was
               approximately 2,000 protesters.  The crowd was moving southbound on Bronson
               Avenue from Hollywood Boulevard.

1250 hours     Communications Division advised the OWB CP they received numerous irate related
               calls on Hollywood Boulevard and Vine Street.  The OWB CP advised
               Communications Division to broadcast on the tactical frequency.

1313 hours     A unit on the perimeter of Hollywood Station requested authorization to use less-lethal
               munitions if rocks and bottles were being thrown at them.  Commander 6 authorized
               less-lethal if they began to take rocks and bottles or if anyone breached the perimeter of
               the station.

1340 hours     There were 90 National Guardsmen deployed on Hollywood Boulevard, Vine Street,
               and Sunset Boulevard.  The crowd assessment in the area was approximately 2,000
               protesters.

1350 hours     The crowd increased in size to approximately 7,000 protesters and was going north on
               Cahuenga Boulevard to Sunset Boulevard.

               Commander 14B directed officers assigned to the Pacific Area protest to respond to
               their designated staging locations for reassignment.
1408 hours     The crowd continued south on Wilcox Avenue from Sunset Boulevard towards the
               Hollywood Station.  Additionally, the crowd in the Pacific Area had grown to
               approximately 300 protesters.  It was still at Abbot Kinney and Venice Boulevard.

1422 hours     The OWB CP requested two MFFs to respond to all looting calls.  Commander 14
               indicated his MFF would monitor Hollywood Base Frequency and respond to looting
               calls.

| | |
|---|---|
| 1430 hours | The DOC contacted OWB CP and directed all MFFs to account for all less-lethal munitions per Chief Moore.  The intent was to locate any less-lethal munitions that could be redistributed based on necessity. |
| 1440 hours | Officers were hit with rocks and bottles on Hollywood Boulevard at Ivar Avenue as they were moving the crowd. |
| 1452 hours | The crowd continued northbound on Cahuenga Boulevard when part of the crowd separated and began marching on Ivar Avenue and Cahuenga Boulevard. |
| 1456 hours | A unit requested additional units to assist with looters in a vehicle located at El Cerrito Place and Hollywood Boulevard. |
| 1508 hours | A unit at Sunset and Highland Boulevards requested additional units for looters.  Still, due to limited resources in the area, no one was able to respond. |
| 1510 hours | Communications Division advised OWB CP of a crowd of 200 protesters at Harold Henry Park (Incident No. 2085).  The OWB CP passed the information to the Wilshire Watch Commander. |
| 1512 hours | At this time, two groups were moving throughout the Hollywood Area.  A group of approximately 1,000 protesters were marching southbound on Cahuenga Boulevard at Fountain Avenue and a larger group was marching southbound Highland Avenue at Franklin Avenue. |
| 1520 hours | The IC reported she was enroute to monitor the crowd at Genesee Park. |
| 1526 hours | The Air Unit conducted a crowd assessment over the Hollywood Area.  It estimated there were approximately 6,000 protesters with 20 vehicles heading northbound La Brea Avenue.  The second group of roughly 500 protesters was at Hollywood Boulevard and Vine Street, and the third group of approximately 1,000 protesters was eastbound Sunset Boulevard at Olive Street. |
| 1530 hours | The Air Unit asked Commander 6 for his stance on the crowds in the Hollywood Area.  Commander 6 advised all personnel to allow everyone to peacefully march and follow the group until curfew went into effect. |
| 1542 hours | The OWB CP were informed 100-200 protesters arrived at the Getty House (Los Angeles Mayor's residence). |
| 1553 hours | The Air Unit assessed the size of the crowd at Hollywood Boulevard and Vine Street to be approximately 5000, and at Abbott Kinney and Venice Boulevard to be about 300.  There were no issues at either location. |

| | |
|---|---|
| 1600 hours | The CP downtown advised OWB CP that two MFFs from the OVB were enroute to OWB CP.  Additionally, the OWB IC requested that two MTA buses be sent to the Getty House. |
| 1608 hours | The Air Unit advised that there were approximately 500 protesters southbound Highland Avenue at Santa Monica Boulevard.  A larger group was eastbound at Sunset Boulevard at Western Avenue. |
| | Commander 6 advised that there were too many groups in the Hollywood Area and would deploy MFFs only to quell criminal activity such as looting or vandalism. |
| 1618 hours | The crowd of 1,000 protesters were at Beverly Boulevard walking eastbound past Poinsettia Place.  The IC monitored the crowd and the demeanor was calm and peaceful.  The Air Unit gave dispersal orders to the crowd at Melrose Avenue and La Brea Avenue and they dispersed. |
| 1636 hours | Units at Lexington and Western Avenues requested a back-up response for an irate group. |
| 1643 hours | A citizen reported that a silver compact car, possibly a Honda was full of rocks and bottles.  An unknown unit requested an Air Unit to conduct a flyover in the area of Cahuenga and Hollywood Boulevards to try and locate the car.  An Air Unit advised that the suspect's vehicle was possibly looters as they were, carrying shoe boxes and clothing.  The Air Unit requested a unit to respond to the possible looters at Cahuenga Boulevard and Selma Avenue.  Officers responded to the location where four suspects were taken into custody without incident. |
| 1655 hours | One TSE Team was enroute to the Getty House. |
| 1700 hours | The Air Unit made a crowd assessment of 2,000 protesters walking eastbound 3rd Street toward the Getty House. |
| 1705 hours | The OWB CP advised that an additional LASD bus was enroute to OWB, and one sergeant and two officers would be required for each bus. |
| | The group of 2,000 protesters were just north of the Getty House on 6th Street. |
| 1714 hours | The Air Unit advised that there approximately 500 protesters at the intersection of Vine Street and Sunset Boulevard.  A larger group had proceeded eastbound on Sunset Boulevard from Vine Street. |
| 1720 hours | A unit requested a squad for individuals in two vehicles looting at Schrader and Hollywood Boulevards.  Vehicles were described as a silver Ford F-150 truck and a white Ford Flex. |

The suspects proceeded south on Ivar Avenue from Hollywood Boulevard. The cars drove in tandem and the unit advised that both vehicles had potentially stolen merchandise inside the vehicle. As the vehicles approached Vine Street they began moving at a high rate of speed and going through traffic lights. An unmarked police vehicle and the Air Unit followed the two vehicles with the last updated location of south on Ivar Avenue.

| | |
|---|---|
| 1722 hours | Communications Division advised the OWB CP of a burglary (Incident No. 2459), related to the incident at Schrader and Hollywood Boulevards, and a unit was handling the call. |
| 1726 hours | The two suspected vehicles involved in looting at Hollywood Boulevard and Ivar Avenue were northbound Vine Street from Hollywood Boulevard. Units stopped a Ford F-150 at Hollywood Boulevard and Gower Street, and requested an updated location on the white Ford Flex. |
| 1730 hours | The OWB CP did a resource assessment at the Getty House and identified one MFF from Olympic Area; one MFF from West Los Angeles Area; two MFFs from OVB; two MFFs from OCB; and, one TSE team. |
| 1810 hours | The Beverly Hills Police Department advised the OWB CP they received reports of shots being fired in the area of Wilshire Boulevard and Curson Avenue, but no gun was seen. |
| 1820 hours | The Air Unit conducted a crowd assessment and estimated 500 protesters were at Cahuenga and Sunset Boulevards. An additional 300 protesters were on Morningside Court and the 300 protesters joined the larger group. |
| 1822 hours | The Air Unit requested a unit to meet with CHP at the termination of the pursuit of the white Ford Flex from a looting incident. The Air Unit requested the unit to respond to 48th Street and Vermont Avenue and 77th Street Station for CHP for the termination. |
| 1835 hours | The OWB CP deployed one sergeant and ten officers from A Watch with the LASD bus located at De Longpre Avenue and Cole Place. |
| 1850 hours | Five additional LASD buses were sent to Gower Street and Carlos Avenue. |
| 1900 hours | At this time there were no transport vans available. |
| 1920 hours | The OWB CP requested seven additional MFFs through the DOC. |
| 1925 hours | Commander 6 asked the Air Unit to estimate how many individuals George10 was trying to arrest. The Air Unit estimated 300 protesters and 150 vehicles in the area of Van Ness and Maplewood Avenues. |

The OWB IC requested the following be sent to Hollywood Station:
- Two MFFs;

- Two Motor Strike Teams; and,
- Two Strike Forces.

| | |
|---|---|
| 1928 hours | The Air Unit and George 10 were able to box in a significant amount of people and vehicles on Van Ness Avenue from Clinton Street to Elmwood Avenue and Maplewood Avenue to Van Ness Avenue and Wilton Place.  George 10 advised everyone within the designated area was arrested for curfew violation and all vehicles would be impounded. |
| 1932 hours | In an effort to escape, some protesters ran through properties.  The Air Unit advised officers who were taking a group into custody at Van Ness and Rosewood Avenues that approximately 40 protesters were on the roof of an apartment building and officers should watch their high ground.  The Air Unit requested an arrest team enter the apartment complex to arrest the protesters stranded on top of the apartment building officers continue with the arrests on the ground. |
| 1940 hours | Communications Division advised officers were requesting a jail transport van to Bronson Avenue and Santa Monica Boulevard, but there were no vans available, so officers requested an LASD bus instead.<br><br>The Air Unit requested jail transport vans to Wilton Place and Maplewood Avenue for approximately 200 detainees.  In addition to the jail transport vans, the Air Unit requested tow trucks for approximately 30 vehicles. |
| 1950 hours | Officers requested an ETA on jail transport vans at Wilton Place and Maplewood Avenue.  Staging advised they had five LASD buses that were enroute to Wilton Place and Maplewood Avenue. |
| 2008 hours | Plain clothes officers informed the Air Unit and officers that approximately 200 protesters and 20 vehicles were headed westbound on Sunset Boulevard at Gower Street. |
| 2017 hours | The LASD buses arrived and were staged at Wilton Place and Rosewood Avenue.  The LASD buses asked officers to walk individuals to the buses where they could then be transported to field jails. |
| 2020 hours | A sergeant advised OWB CP there was one LAPD bus standing by in the OVB, and they are attempting to locate the driver. |
| 2030 hours | Based on the request of the MFFs, the DOC conducted an assessment and confirmed that two of the seven MFFs sent to Hollywood Station checked-in at Staging. |
| 2048 hours | Approximately 40 protesters were on the roof of the apartment building at Van Ness and Rosewood Avenues.  Officers entered the apartment complex to detain the protesters from the roof. |

2050 hours        An OWB CP officer contacted the LASD for buses.  They advised the buses were still available until 2200 hours and to call back for an extension.  Approximately 150 people were arrested at the Getty House for violation of the curfew order.

2059 hours        A unit requested a jail transport van for nine arrestees and one juvenile.  In addition, the unit requested, a tow truck for two vehicles located at Santa Monica Boulevard and Western Avenue.

2116 hours        The TSE team requested Valley Traffic Division Motors to respond to 8th Street and Crenshaw Boulevard to support them in 20 vehicle impounds.

2200 hours        Officers who were with the LASD buses requested two police vehicles and one supervisor to provide escorts for the buses located at Fountain and Cole Avenues.

2210 hours        Commander 6 inquired if there were any A Watch personnel in the field.  Several units responded that they were still deployed awaiting jail transport vans, some for more than one hour.

2240 hours        A jail transport van responded to Santa Monica Boulevard and Western Avenue to transport the arrestees to the field jail.


## Operations-Valley Bureau (OVB)

0032 hours        Several radio calls were generated, indicating pallets of rocks and bricks were placed across the way from 14961 Ventura Boulevard.  When officers arrived at the scene, no evidence of these items could be located.

0150 hours        An MFF, 22P810, advised they were in pursuit of a possible stolen U-Haul Truck (Arizona License Plate No. AJ61290).  While in pursuit, the suspect hit officers with the U-Haul vehicle.  Officers advised they were now in pursuit of an ADW on a Police Officer suspect.  Communications Division advised, "officer needs help."  Unit 22P810 was still in pursuit of the suspect, although they were involved in a traffic collision with the suspect.  The IC for the pursuit was LP120.
The IC, LP120, advised the Air Unit will not go into tracking mode[47] due to the crime being an ADW on a Police Officer.

0215 hours        The pursuit continued throughout the area and onto the 210 Freeway, eastbound at La Tuna Canyon. The IC notified the CHP.

_____

[47] In tracking mode, ground units continue their code 3 operation; however, officers reduce their speed and allow sufficient distance behind the suspect's vehicle to remain out of sight.  The Air Unit will monitor the distance between the vehicle and units and advise for situational awareness.

| 0219 hours | Officers initiated a spike strip at Foothill and Lowell Avenue. The suspect vehicle ran over the spike strip causing the loss of three tires and continued to drive.

An additional spike strip was deployed at Foothill and Wheatland. The suspect continued driving and started losing control of the vehicle. |
|---|---|

0232 hours    The IC authorized the Pursuit Intervention Technique (PIT); the first attempt was unsuccessful. A second attempt was authorized and was initiated with success. Still, the suspect made a U-turn and continued driving until he stopped at De Haven Avenue and Garber Street where he was taken into custody without incident.

0600 hours    The Investigative Branch advised OVB CP that a field jail location was needed by 0800 hours.

0605 hours    Department of Water and Power employees requested armed escorts while completing repairs throughout OVB.

0810 hours    The CP advised OVB CP that the National Guard was sending 70 guardsmen to Topanga; 23 to Northridge Fashion Center; 15 to Sherman Oaks; and 25 to Westfield Fashion Square Mall. With an overall total of 133 National Guardsmen in the Valley Area.

0920 hours    A lieutenant advised the field jail was operational at Grace Community Church (13248 Roscoe Boulevard) with 80 jail personnel assigned.

1015 hours    A decontamination center was established at Northridge Hospital (13248 Roscoe Boulevard) and was given an individual as the point of contact for the center.

1045 hours    The OVB CP assigned two MFFs and one plain clothes team to the Devonshire Area for the California State University, Northridge (CSUN) demonstration that was expected to take place that afternoon. Additionally, one MFF was assigned to the North Hollywood Area for the anticipated protest at North Hollywood Park.

1230 hours    An initial crowd assessment for the OVB protests were as follows: 250 in North Hollywood Park and 600 at CSUN.

1300 hours    The crowd assessment update included the following: 600 protesters at CSUN began to move off campus to Nordhoff Street and Reseda Boulevard; 50 protesters were at Warner Park; and, the North Hollywood Park Protest began to disband.

1730 hours    The crowd assessment in the Valley was 100 protesters at Warner Center Park and 200 protesters at North Hollywood Park.

1930 hours    A sergeant advised the MFF which they contemplated sending to replace A Watch field jail personnel was not needed and OVB would fulfill the needs of the field jail.

SAFE LA AFTER ACTION REPORT

2035 hours       One MFF was deployed to Devonshire Street and Sepulveda Boulevard for looting at
                 the Vons.


# <u>WEDNESDAY, JUNE 3, 2020</u>


## <u>Department Operations Center (DOC)</u>

0340 hours       Major Crimes Division was notified that addresses for the primary residences of Chief
                 Moore and Mayor Garcetti had been posted on social media sites frequented by
                 individuals organizing protests.

0620 hours       Investigative Branch noted that all 8.78 LAAC (Curfew) citations must be completed on
                 an RFC form with a short narrative attached per the City Attorney's Office.  This
                 information was relayed to all Department personnel by Director Office of
                 Constitutional Policing and Policy.

                 The DOC confirmed with all Bureau CPs of the planned protests for the day.  The
                 Department continued to monitor social media platforms and forums.  The Department
                 CP was notified of any impromptu protests or protests that were not made public.

                 The major planned public protests included:
                 • 0800 hours - Hall of Justice (211 Temple Street);
                 • 0900 hours - Venice Pier to Santa Monica Pier;
                 • 1200 hours - The Laugh Factory (Sunset and Laurel Boulevard);
                 • 1200 hours - Los Angeles City Hall;
                 • 1200 hours - Northridge Recreation Center; and,
                 • 1400 hours -Tujunga & W. Magnolia.

1406 hours       Director of OCPP informed all personnel of the necessary documentation to include on
                 citations and/or arrest paperwork when enforcing the Citywide curfew on juveniles,
                 adults, and all violators.

1430 hours       Officer safety information was broadcasted to advise units that a handgun was staged
                 near 1st Street and Broadway.  Officers were advised to be on the lookout for makeshift
                 tools staged in the area.

1530 hours       Communications Division advised that the Department's jail transport vans were now
                 being handled by Logistics Section.

1553 hours       The DOC distributed an email to all personnel on behalf of Director OCPP, informing
                 of the amended City of Los Angeles Curfew Order.  The "new curfew hours were from

9:00 p.m. to 5:00 a.m.  Officers are to use discretion when enforcing, especially before 10:00 p.m.  All other details of the Order remain the same."

The DOC distributed an email notifying all personnel the Citywide curfew had limitations related to people temporarily experiencing homelessness.

| | |
|---|---|
| 1643 hours | The DOC distributed an email informing all personnel to review California Vehicle Code Sections 22651(b) and 22651(h) authorizing vehicle impounds.  The purpose was to clarify when to use each impound section. |
| 1911 hours | The DOC distributed an email on behalf of a sergeant working the CP informing personnel all courts would be open on June 4, 2020.  Officers with subpoenas for court were required to honor the summons. |
| 1915 hours | The Investigative Branch conducted its change of watch briefing.  Multiple follow-ups were conducted by detectives assigned to the Investigative Branch.  They completed follow-up investigations on looting, theft, burglary, and vandalism crimes related to the civil unrest. |

## Operations-Central Bureau (OCB)

| | |
|---|---|
| 0005 - 1059 hours | Several radio calls were generated for vandalism and looting related crimes within OCB. |
| 0800 hours | The CP conducted its morning staff briefing, including an update on arrests, crimes, crime locations, evidence seized, curfew citations, and vehicle impounds. |
| 0929 hours | Commander 13B advised an MFF was ready for deployment to Judge John Aiso Street.  Commander 2 requested plain clothes officers respond to Judge John Aiso Street and Temple Street to monitor a crowd. |
| 1023 hours | A peaceful crowd of 30 formed at 1st and Spring Streets between PAB and City Hall.  No units were assigned to monitor the crowd. |
| 1114 hours | The National Guardsmen advised Communications Division they had posted at the Los Angeles Convention Center at Pico Boulevard and Figueroa Street. |
| 1125 hours | The CP requested a crowd estimate of the group at Pershing Square.  The Air Unit advised a crowd of approximately 20 was marching near 6th and Olive Streets.  An hour later, plain clothes officers advised the crowd appeared to be leaving the location. |
| 1329 hours | The Air Unit advised the crowd near PAB and City Hall were joined by vehicles and increased to 300 protesters.  Plain clothes units monitored the crowd and traffic control was established to reroute north and southbound traffic on Spring Street north of 1st Street at City Hall. |

| | |
|---|---|
| 1338 hours | Commander 36 contacted the LASD liaison for the Jackie Lacey Protest scheduled for 1500 hours. |
| 1357 hours | While monitoring the area of Broadway and Spring Street, officers located a handgun that appeared to be staged in a planter near a planned protest.  Commander 2 requested an investigative unit to respond for canvassing and further follow up. |
| 1400 hours | Information was received that the crowd in front of City Hall East planned to stay at the location until 1500 hours. |
| 1439 hours | The crowd in front of City Hall grew to 400 and advanced onto the steps of City Hall.  Commander 36 made requests for two MFFs to respond to the City Hall's Main Street entrance.  Unit 1P510A requested units to block traffic at the intersections of Main and Temple Streets; North Broadway and Temple Street; Judge John Aiso and Spring Street; and, North Broadway and Main Street. |
| 1457 hours | The Air Unit advised the crowd on the steps of City Hall was growing rapidly and reached approximately 5,000.  Commander 2A and Commander 4 coordinated resources for traffic control and public safety considerations.  The MTA bus routes were re-routed away from streets near City Hall.  Additionally, MFFs and Motor Strike Teams controlled traffic on Temple Street.  Additional Motor Strike Teams responded to Judge John Aiso Street north of 1st Street as plain clothes officers monitored the crowd. |
| | The Air Unit directed responding units to control traffic at North Broadway and Temple Street and stop all traffic northbound on Broadway and 1st Street as well as eastbound on Temple Street from Broadway.  In addition, the Air Unit advised to stop all traffic eastbound on Temple and Hill Streets. |
| 1546 hours | Unit N50 advised the CP that the MTA Redline train was operational and was dropping off large crowds at Union Station every 10-15 minutes. |
| 1553 hours | The Air Unit estimated the crowd at 8,000 protestors.  They also advised they observed privately owned drones monitoring the activity. |
| 1641 hours | National Guard Units broadcasted they saw a truck with broken concrete in its bed driving in the area of Broadway and 1st Street near the protest at City Hall.  Prior to this day, officers had recovered staged weapons and items used to harm officers.  Units investigated and determined the driver used the concrete for work.  The truck then left the Downtown Area. |
| 1720 hours | Commander 2 advised 200 protesters mobilized and were marching southbound on Spring Street from Temple Street.  Commander 2 and the Air Unit requested units block eastbound and westbound traffic at 1st and Spring Streets for protester safety. |

1745 hours     As the protest continued, smaller groups broke away from the larger stationary crowd of 8,000 at Spring and Temple Streets.  They occupied the entire street and began to circle the area around City Hall and PAB.  The crowd maintained its practice of breaking from the larger group and joining other groups with no loyalty to any certain group or location.  This continued throughout the night.

Multiple drones were identified observing crowd movement from the air.  When officers located one drone operator, they advised the operator to bring the drone down due to public safety.  Additional drones in the area continued to launch and monitor the event randomly.

The large crowd of 8,000 mobilized and spread over four City blocks and encompassed both streets and sidewalks, as it marched southbound Spring Street from 1st Street.  As the crowd marched, the Air Unit and MFF supervisors noted the crowd appeared to be positioning itself to enter the freeway.  To deter this action, the Air Unit and an unknown Commander in the area moved an MFF to 8th Street and the 110 Freeway then staged an additional MFF at 5th and Figueroa Streets to block access to the freeway on-ramps.  The crowd continued northbound Hill Street and turned eastbound on 1st Street returning to City Hall.  The crowd maintained its presence around City Hall and PAB as they circled the area and congregated on the steps of City Hall.

The Air Unit identified four privately-owned drones monitoring the crowd from the air and advised plain clothes officers in the area.

Plain clothes units monitoring the crowd identified a possible crowd agitator suspiciously carrying three backpacks near 1st and Main Streets.  Uniform officers detained the individual, but he refused a consent search of his backpack and was released.

1845 hours     Vehicles joined the crowd at City Hall and PAB when officers identified two pickup trucks, one covered by a camper shell, that were circling the area.  The truck with the camper shell parked in front of PAB and began unloading white boxes with green lettering from the truck bed.  Protesters began opening the boxes, removed items, and placed them into backpacks before rejoining the crowd.  As plain clothes units and motor strike teams responded to investigate, the truck moved to Los Angeles Street south of 1st Street.  Items continued to be dispersed from the bed of the truck.  The truck then left the area.  The second truck eventually parked on Spring Street near 1st Street where the driver parked and left it unattended.  Plain clothes officers investigated the abandoned truck and determined there was no suspicious activity to be reported.

1935 hours     The Air Unit conducted a crowd assessment over the Downtown Area.  A crowd of 7,000 at Spring and 1st Streets was joined by 10 vehicles.  It maintained its position near City Hall.  An additional crowd of approximately 100 was in front of PAB.  The Air Unit requested units respond to 2nd and Main Streets as well as Broadway and 1st Streets to hold northbound and eastbound traffic, respectively, and address the vehicles that had joined the crowd.

The larger crowd of approximately 5,000 maintained its presence in front of City Hall on Spring Street just south of Temple Street.  One group at City Hall grew to approximately 1,500 and marched southbound on Spring Street from 1st Street.  Another group broke off and marched eastbound on Temple Street towards Los Angeles Street.  As smaller groups marched in the area, they joined and held stationary positions near Temple and Judge John Aiso Streets as well as at City Hall on Spring and Temple Streets.  The groups continued to split, rejoin each other, and march in the same general area, which made coordinating containment of the unlawful groups difficult.

As protesters stayed in front of City Hall, plain clothes units identified a man with what looked like a machete on the steps of City Hall.  As plain clothes officers obtained a better view of the man, they observed that the machete was only a wooden sword and not an edged weapon.  Plain clothes units continued to monitor the crowd in the area.

2000 hours     Commander 21 broadcasted the Department would be responsible for facilitating the crowd's movement.

2005 hours     The large crowd's size diminished to 2,500 but continued to march, eventually occupying Spring Street between 2nd and 6th Streets.  An additional sizeable crowd of approximately 500 circled the area before returning to City Hall at Spring Street between 1st and Temple Streets.  This smaller crowd became hostile and began throwing rocks, bottles, and harmful items at the MFFs.  The crowd then broke through blocking forces set at Spring and Temple Streets.  Additional MFFs were requested to the area to assist.

Simultaneously, the larger group surrounded the National Guard Units near Spring and 7th Streets.  The National Guard requested assistance. As officers arrived, they were met by a hostile crowd who threw bottles, rocks, and other harmful items at the officers while a skirmish line was deployed.  Additional MFFs were requested to assist with the skirmish line and provide protection to LAPD vehicles parked in the area.

2024 hours     While officers attempted to contain the irate crowd at 6th and Spring Streets, another crowd of 1,500 joined together and formed near 11th and Main Streets.
Officers suspected that the hostile crowd occupying a large area of Spring Street between 2nd and 6th Streets were looting businesses on Spring Street.  An unknown Commander attempted to curb possible looting crimes by directing a motor strike team to follow the tail end of the crowd.

Commander 15 staged two squads on Broadway and advised they would attempt to contact the protest leader at Grand Avenue and 1st Street.

2051 hours     As the crowds marched throughout the Downtown Area, they were accompanied by protester vehicles that would break from and join different crowds marching in the area.  Officers in the Downtown Area observed that one of the vehicles was a Jeep that matched the detailed description of a vehicle used in a May 30, 2020 crime against a police officer that occurred in Pacific Area.  On that date, unknown suspects driving a

Jeep fired multiple rounds at officers conducting patrol duties.  After the Air Unit was advised and located the Jeep, they coordinated a plan to separate the Jeep from the crowds and conduct a traffic stop.  Additional units responded to the area as the Jeep traveled northbound Main Street approaching 6th Street.  The Air Unit coordinated traffic blocks that directed the Jeep away from the pedestrian crowds.  Units conducted a traffic stop, safely detaining the driver of the vehicle without incident.

The nearby crowd observed the traffic stop of the Jeep and became aggressive towards the officers involved.  As the hostility of the crowd grew, units requested additional resources.  Units that staged in the area responded and set a skirmish line of three squads to assist and prevent disruption of the investigation.  Over time the crowd dispersed.  The RHD responded to handle the investigation and determined that the vehicle was used in the ADW on a Police Officer (shooting).  The driver was taken into custody and the vehicle was taken into custody for evidence.

2102 hours     The crowd in front of City Hall occupied Spring and Temple Streets and grew in hostility as smaller crowds near 7th and Main Streets dispersed.  The Air Unit directed resources to contain the City Hall crowd to the north at Spring and Temple Streets and to the south at Spring and 1st Streets.  The Air Unit also assisted in staging the area for additional assistance.

As the night continued, the IC directed units to enforce the Citywide curfew and detain or move protesters out of the area.

The Air Unit requested to stage units at Main and Temple Streets as well as Temple and Judge John Aiso Streets.  The Air Unit also requested that the sound truck respond to assist with crowd dispersal.  An unknown Commander requested that the Air Unit use its loudspeaker to advise, "Protesters have 30 minutes to vacate the area."  The Air Unit attempted to coordinate the crowd's movement by advising ground units to push northbound on Spring Street, eastbound on Temple Street, then north on Alameda Street into Olvera Street.  Protesters observed the ground unit's response and broke away from larger crowd, fleeing the area.  As the MFF responded, the crowd split, marched in different directions, and rejoined in other areas making containment difficult.

2149 hours     Ground units set blocking forces but containing the crowds continued to prove problematic as they moved through the Downtown Area.  The Air Unit was unable to coordinate with ground units to execute a mass arrest or detention for curfew.

After the crowd marched throughout the Downtown Area, they orchestrated a stationary protest by sitting down in Grand Park where MFFs eventually contained them.

2234 hours     Staff 7 requested the Air Unit broadcast, "The curfew is up, and they need to vacate the area."  After this broadcast, protesters slowly left the area.  The group slowly decreased in size to an estimated 120 protesters.  The Air Unit advised the CP that skirmish lines were established, and the crowd was contained.  Jail transport buses were staged at scene, available for transport.

## Operations-South Bureau (OSB)

0020 hours      A citizen generated a radio call of shots fired in the area of Broadway and 86th Place. When uniformed officers arrived, one officer observed an unknown male shooting in the officers' direction which resulted in an officer-involved shooting. Additional officers, responding to the shooting, observed the vehicle fleeing the location and initiated a vehicle pursuit. The pursuit ended in a traffic collision with the driver taken into custody. The driver was later transported to a local hospital due to a gunshot wound he sustained to his face. Two additional suspects, who fled from the vehicle before the termination of the pursuit, were taken into custody with the assistance of various LAPD units. One vehicle, which contained a firearm and high capacity magazine, was detained at scene. Both the driver and passenger of that vehicle were taken into custody without incident.

0046 hours      An MFF was requested to assist with a hostile crowd that formed at the scene of the Officer-involved Shooting (OIS) near Manchester Avenue and Broadway. An MFF responded to assist.

0208 hours      A community member reported that they saw a crowd of approximately 30 people in the area of South Patton Ave and 22nd Street and heard the breaking of glass windows possibly from vehicles parked on the street.

1025 hours      The CP notified the OSB CP Governor Gavin Newsom would be attending a planned protest at Leimert Park at Crenshaw Boulevard and West Vernon Avenue. The OSB IC attended the event and staged a Motor Strike Team in the area. Governor Gavin Newsom was interviewed by media at Leimert Park and later visited 2107 West Adams with no audience in attendance before leaving OSB.

## Operations-West Bureau (OWB)

0001-1005 hours     Vandalism and looting related crimes continued to occur in OWB area.

0900 hours      The OWB CP conducted a conference call with all OWB Command Staff regarding updated protests and locations, possible looting locations, National Guard assistance, concerns, and issues surrounding field jails.

1010 hours      The OWB CP received a radio call of a suspicious package on the MTA's Hollywood/Highland platform. Specialized bomb technicians responded, investigated the package, and determined that the package was not a bomb but possibly abandoned property.

1215 hours      A crowd assessment conducted in Hollywood Area reported there were 1,000 protesters on Santa Monica Boulevard; 60 at Sunset Avenue and Gower Boulevard; and, 250 at Hollywood Boulevard and Vine Avenue.

| | |
|---|---|
| 1450 hours | A crowd assessment for OWB was given: |

- Approximately 2,500 protesters were occupying the intersection at Hollywood and Highland Boulevards; and,
- Approximately 250 protesters, along with 60 vehicles, were marching towards the Getty House.

| | |
|---|---|
| 1515 hours | The CP requested additional MFF squads to the OWB CP to assist with the protest marching towards the Getty House.  Two additional OVB MFFs responded.  The crowd was monitored until it began to disperse and reduce its hostility.  A smaller group of peaceful protesters stayed until approximately 2045 hours. |
| 1800 hours | At the change of watch, there were multiple MFFs in OWB: four in Hollywood; one in Wilshire and one in West Los Angeles.  Additionally, 173 National Guard were assigned to OWB.  The Hollywood Area had approximately 1,000 protesters. |
| 1845 hours | An unknown unit requested a blocking force at Cole Avenue and La Mirada Boulevard in Hollywood Area and another unit advised that protesters were attempting to commit looting crimes at 8211 Melrose Avenue. |
| 1930 hours | A crowd of 1,000 protesters occupied the street at Hollywood and La Brea Boulevards. An LASD blocking force was set at Fairfax and Sunset Avenues as well as Fairfax Avenue and Hollywood Boulevard near the border of the City of West Hollywood, (LASD jurisdiction).  The crowd moved into the area of Hollywood and Highland Boulevards, still occupying the public street. |
| | Between 1930 and 2040 hours, the crowd estimate fell from 1000 to approximately 80 until it dispersed. |
| 1940 hours | An individual reported that possible looting suspects were seen near his/her apartment, unloading possible looted shoes from their vehicles' trunk near 1738 4th Avenue. |
| 2100 hours | The Citywide Curfew was announced to the protesters still marching near Hollywood Boulevard and Vine Street.  Protesters ignored the order and refused to disperse. |
| 2200 hours | Units were directed to Ivar Avenue and Hollywood Boulevard and then to Yucca Street and Vine Street direct vehicles that had joined the crowd out of the area.  The OWB CP advised units were deployed and staged, ready to effect curfew arrests.  Commander 7 advised the CP they did not intend to make any arrests in Hollywood as long as the entire crowd remained peaceful. |

<u>Operations-Valley Bureau (OVB)</u>

0200-1021 hours   In the early morning hours, OVB responded to multiple vandalism and looting locations.

0145 hours   The OVB mobile jail was closed per Commander 19A and squads were deployed to specific areas for crime control.

0945 hours   A commander deployed one MFF and one plain clothes squad to the Sherman Oaks Galleria to support National Guard resources.

1634 hours   An individual reported that there were 300 protesters near Mulholland Drive and Calabasas.  The crowd marched, occupied city streets, and was accompanied by multiple vehicles.

# <u>THURSDAY, JUNE 4, 2020</u>

### <u>Department Operations Center (DOC)</u>

0045 hours   The OCB IC authorized the field jail to demobilize.

1205 hours   The Investigative Branch received intel that looted property from the previous nights was being sold online via TikTok and handled the investigation.

1351 hours   The IC sent a notification advising that the National Guard would only be used as fixed post assignments.

1430 hours   Command Staff at the CP conducted a briefing for situational awareness on current and planned events in the City.

1721 hours   The DOC sent out a notice advising that the June 4, 2020, Mayor's Directive for the necessity of a curfew in the City of Los Angeles no longer existed.  All previous curfew orders were rescinded.

1757 hours   Chief Moore invited personnel to a candlelight vigil to reaffirm community solidarity on Friday, June 5, 2020.

Operations-Central Bureau (OCB)

| | |
|---|---|
| 0317 hours | Officers stood by with detained protesters at Grand Park.  Protesters were sitting on the grass in a group waiting for transportation of the arrestees. |
| 0715 hours | An MTA driver advised there was a group throwing fireworks at passing busses (Incident No. 0578).  When officers arrived at the location, they spoke with security in the area, but the suspect(s) and the MTA driver were gone. |
| 1053 hours | Approximately 50 protesters assembled at Slauson Avenue and Crenshaw Boulevard for the Newton March. |
| 1111 hours | The Newton March continued from Central Avenue and Jefferson Boulevard south of Newton Station with approximately 40 protesters.  All protesters were peaceful.  Officers previously positioned bike rail across Central Avenue south of 35th Street to prevent protesters from coming to Newton Station. |
| 1115 hours | The Newton March moved south on Central Avenue with approximately 15-20 protesters and one vehicle followed behind the crowd.  All protesters remained peaceful. |
| 1139 hours | Approximately 40-50 protesters began to form at City Hall. |
| 1205 hours | The group at City Hall increased in size to approximately 75-100 protesters.  It began to move from City Hall to Grand Park. |
| 1209 hours | The National Guard advised there was an irate man with a machete walking towards PAB.  The suspect was described as a male, with an American Flag bandana, walking towards 1st Street from Spring Street.  The suspect with the machete was seen getting into a white Honda, driving northbound on Los Angeles Street near 2nd Street.  Commander 2 requested the vehicle's license plate number be given to the Investigative Branch. |
| 1305 hours | Grand Park (LASD jurisdiction) had approximately 200 more protesters, and LASD was notified of this observation.  During this assessment, there were no protesters at the City Hall steps. |
| 1324 hours | The Hollenbeck protest began forming with approximately 300 protesters.  Commander 4 advised no additional resources were needed.  They had one squad and one Motor Strike Team assigned to the event. |
| 1326 hours | A group of 35-40 protesters began to form on the City Hall steps. |
| 1355 hours | The Hollenbeck protest had an estimated 400 protesters on Huntington Drive and Portola Avenue. |

**189**

| | |
|---|---|
| 1418 hours | The CP was advised the Hollenbeck protest crowd was estimated at 650 protesters at Huntington Drive and Eastern Avenue. |
| 1437 hours | Commander 1 requested a traffic break at Spring Street and Cesar Chavez Avenue for a group of 700 protesters.  Additionally, Commander 2 requested the CHP respond to Spring Street and Aliso Street for 101 Freeway ramp security.  An officer from CHP was notified. |
| 1440 hours | The Motor Strike Team responded to Main and 2nd Streets at the request of Commander 1.  The Air Unit estimated the crowd at Main and 2nd Streets to be approximate 500 protesters. |
| 1453 hours | A crowd assessment was given to the CP of 500 protesters at the Hollenbeck protest. |
| 1455 hours | Information was broadcasted that a male, Caucasian, bald, wearing a white shirt and blue pants was flying a drone in the area of 1st and Main Streets. |
| 1459 hours | Protesters returned to the front of City Hall. |
| 1507 hours | Information was broadcasted that a group of mothers were blocking traffic on Temple between Main Street and Broadway. |
| 1510 hours | The Hollenbeck protest ended without incident, and assigned officers returned to Staging for reassignment. |
| 1516 hours | Central Area conducted a crowd assessment and estimated approximately 250-300 protesters within the area. |
| 1542 hours | A group of approximately 800 protesters were in front of PAB after marching from Spring Street.  While the crowd was in front of PAB, two drones were flying overhead. |
| 1552 hours | The crowd in front of PAB separated into two groups.  One group began marching south on Spring Street from Temple, and the other remained at City Hall with approximately 400 protesters. |
| 1616 hours | The crowd of approximately 400 protesters moving throughout downtown was now on Spring Street approaching 8th Street. |
| 1627 hours | The Air Unit was monitoring the crowd moving throughout the Downtown Area, which was now on 9th Street and Grand Avenue.  The head of the group was at Hope Street with an estimation of 400-500 protesters. |
| 1636 hours | The Air Unit conducted a crowd assessment over the Downtown Area which included: 75-100 protesters at City Hall, 200 protesters at PAB, and an additional group of 400-500 protesters moving from Figueroa and 5th Streets. |

| | |
|---|---|
| 1710 hours | The crowd at City Hall was estimated at 600-700 protesters. An additional small group of 250 protesters continued southbound Hill Street from 1st Street. |
| 1741 hours | Officers staged on Main Street south of 1st Street encountered an irate protester yelling about racism to the officers who eventually walked away without further incident. |
| 1742 hours | A group of 700 protesters were on Spring Street and continued to 1st Street towards Grand Park. |
| 1750 hours | A small group of 200 protesters were at 8th Street and Santee Avenue. |
| 1802 hours | The crowd of 200 protesters at 8th Street and Santee Avenue was followed by approximately 20 vehicles and headed towards Central Station. Central Station was advised to ensure all gates were secured and manned. |
| 1835 hours | A group of approximately 300 protesters traveling north on Broadway to 1st Street stopped in the middle of the intersection, blocking all directions of traffic. Protesters took a knee at the intersection and started chanting. Officers at 1st Street west of Broadway monitored the crowd. |
| 1847 hours | Protesters at 1st Street and Broadway continued moving east on 1st Street approaching Spring Street using all traffic lanes. |
| 1850 hours | The group that was stationary at City Hall began to march southbound on Spring Street to join with the group from 1st Street and Broadway. The groups rejoined at Main and 1st Streets. Approximately 20 vehicles were with the crowd. |
| 1911 hours | The National Guard advised that four male, Blacks, with a rifle were in a silver Honda Accord. The suspects' vehicle was following a blue convertible lowrider on Broadway from 6th Street. |
| 1927 hours | The crowd continued to move throughout Downtown and was at 7th Street and Grand Avenue approaching Hope Street. Officers advised that the crowd was deploying smoke bombs. The group continued to move throughout Downtown. |
| 1931 hours | The blue convertible was last seen traveling on west 7th Street from Spring Street. The silver Honda Accord was no longer with the blue vehicle. Officers found a silver Honda matching the description of the silver Honda with two male, Hispanics in the front seats and 1 female, Hispanic in the rear seat. |
| 1938 hours | The silver Honda was located at 7th and Olive Streets. The suspects were detained pending an investigation. |
| 1947 hours | The crowd moved northbound on Figueroa Street, passing 3rd Street. Officers were east of Figueroa at 3rd Streets blocking the crowd from going onto the 110 Freeway ramps |

|  | east from Figueroa on 3rd Street.  The crowd continued north on Figueroa Street using all lanes of traffic. |
|---|---|
| 2004 hours | The crowd continued to maneuver throughout the City.  The Air Unit gave an estimate of 4,000 protesters mixed with vehicles.  The updated location of the crowd was 1st and Spring Streets approaching City Hall. |
| 2015 hours | Officers were in a blocking force on Hill Street north of 1st Street.  Additionally, a Motor Strike Team was blocking the east lanes on 1st Street at Hill Street.  No protesters were in the area at this moment. |
| 2034 hours | Motor officers requested additional units for a crowd throwing water bottles at them. |
| 2122 hours | The officers assessed the crowd at City Hall estimated at 300 peaceful protesters.  Officers observed a suspect throw water bottles at officers. |
| 2126 hours | The suspect that threw the water bottles at officers was taken into custody.  However, for an unknown reason, CSD did not accept the individual.  He was released and rejoined the crowd. |
| 2138 hours | The Air Unit conducted a crowd assessment and concluded there were approximately 200-225 protesters at City Hall.  The protesters marched from City Hall onto Spring Street toward 4th Street. |
| 2308 hours | The crowd continued to Figueroa and 5th Streets and blocked all directions of traffic. |
| 2323 hours | The group blocking 5th and Figueroa Streets moved south on Figueroa Street towards 8th Street. |
| 2337 hours | While the crowd approached 8th and Hope Streets, several protesters threw glass bottles at officers. |
| 2355 hours | During this time, the crowd split into two small groups.  One went eastbound on 2nd Street from Hill and the other went northbound on Hill from 1st Street. |

## Operations-South Bureau (OSB)

| 1120 hours | The OSB CP discovered Harbor Area was not sending a sufficient amount of personnel to OSB Staging. |
|---|---|
| 1220 hours | Southwest advised the OSB CP that a peace march had started at Crenshaw High School and moved to Leimert Park with an unknown number of participants.  No issues were reported. |
| 1400 hours | The Southwest peace march concluded with no issues. |

2207 hours    The OSB CP was notified that an unknown number of protesters were at the residence of County Supervisor Mark Ridley Thomas.  Units were sent to that location.


## Operations-West Bureau (OWB)

0815 hours    The OWB received intel of a possible protest in Pacific Area.

1120 hours    Communications Division advised it received information about a potential protest at 5455 Wilshire Boulevard.  The intelligence suggested protesters were bringing bricks and gasoline-filled coke bottles at an unknown time.

1215 hours    Approximately 100 protesters were north of the Santa Monica Pier.  They had walked northbound from Ocean Boulevard with no issues at the location.

1251 hours    There were approximately 15-20 protesters at the intersection of Beverly and Arden Boulevards (Incident No.1561).

1335 hours    A group of 300 protesters were at the Getty House and a group of 500 protesters were at UCLA.  Both groups were peaceful.

1431 hours    Approximately 300 protesters were at Wilshire Boulevard and Western Avenue.

1520 hours    A crowd assessment update included: 200 protesters in Hollywood; 300 protesters at UCLA; and approximately 200 protesters were enroute to Central Area.

1605 hours    The crowd assessment at this time was 300 in Hollywood Area heading westbound on Sunset Boulevard and 500 at UCLA.  All remained calm and peaceful.

1800 hours    While conducting an assessment in the Hollywood Area, the Air Unit observed approximately 100 protesters at Hollywood and Cahuenga Boulevards and another 100 at Sunset Boulevard and Western Avenue.

2009 hours    Communications Division advised that protesters in several vehicles were driving on the wrong side of the street at 6700 Sunset Boulevard (Incident No. 2790 related).

2125 hours    Officers advised they were having bottles thrown at them around Melrose and La Brea Avenues.  The suspects were gone when the Air Unit flew overhead.

2135 hours    The National Guard advised approximately 20 vehicles were blocking traffic at the intersection of Sunset Boulevard and Vine Street.

## Operations-Valley Bureau (OVB)

| | |
|---|---|
| 1000 hours | Information was received of 50 peaceful protesters outside of North Hollywood Station. |
| 1130 hours | The OVB CP received intelligence of a possible protest at Zelzah Avenue and Chatsworth Street.  No further information was received. |
| 1135 hours | Approximately 200-400 protesters were at Notre Dame High School in Van Nuys with no issues at the location.  The OVB CP received intelligence via Crime Stoppers that looters were told to go to the Northridge Mall at 1400-0200 hours to loot the location. |
| 1300 hours | The protest that was at Zelzah Avenue and Chatsworth Street had only six to eight protesters. |
| 1505 hours | Information was received that approximately 10 vehicles were blocking the 170 Freeway off-ramp at Burbank Boulevard.  The CHP responded and handled. Additionally, five people were blocking the entrance to North Hollywood Station. |
| 1520 hours | Despite intelligence reports, the Northridge Mall had no activity. |
| | The crowd at Zelzah Avenue and Chatsworth Street had approximately 100 protesters. The protesters became aggressive and the business owners at the location advised Communications Division that if police did not arrive, they would take matters into their own hands as they were tired of the protesters damaging their businesses.  Officers responded to the location and stood by until the crowd dispersed. |
| 1630 hours | The OVB CP received information that San Fernando Police Department would impose a curfew from 9:00 p.m.-0500 a.m. |
| 1912 hours | The OVB CP received a report of looting occurring at Devonshire Street and Zelzah Avenue; one MFF responded to the scene per Commander 19A (Incident No. 2567). Officers at the scene discovered no evidence of looting at the location.  Additionally, officers met with a Rite Aid employee, who said that an irate man entered the store and took a bag of items without paying.  The employee did not want to file a report. |
| 1916 hours | Approximately 100 protesters were in the street at Riverside Drive and Woodman Avenue (Incident No. 2595).  Protesters stopped traffic and created a disturbance. Intelligence was received from plain clothes officers. |

# FRIDAY, JUNE 5, 2020

### Department Operations Center (DOC)

0830 hours     The Investigative Branch conducted a morning briefing to determine staffing at the Department's jail and Staging locations.  An MCD detective was assigned as the geographic Area liaison.  A Commercial Crimes Division detective was assigned as the RHD task force liaison.

1804 hours     A Department-wide email was sent advising personnel to review the Use of Force – Tactics Directive No. 11 on Crowd Management, Intervention, and Control.

1818 hours     Communications Division received an anonymous tip through the citizen tip application that a protest would occur at Porter Ranch and Rinaldi at the Porter Ranch Town Center.

### Operations-Central Bureau (OCB)

0053 hours     An individual reported that they were assaulted by protesters in the area of 7th and Figueroa Streets.  Patrol officers responded and completed a criminal battery report.  The victim stated he had "live-streamed" the incident on social media (Incident No. 0148).

1139 hours     A plain clothes supervisor advised that a crowd of approximately 100 gathered at the Hall of Justice and was steadily increasing in size.  They added that multiple vehicles were dropping protesters off with signs and flowers.

1142 hours     Commander 2 arrived at the Hall of Justice to monitor the event.  Commander 2 requested DOT to respond and assist with traffic control for public safety, but DOT was unavailable.  Six motor units and one sergeant responded to the area.

1229 hours     Motor units conducted traffic control and asked for southbound traffic to be held at Spring Street between 1st and Temple Streets.  The crowd at the Hall of Justice stayed stationary and grew to approximately 150.

1240 hours     A crowd of approximately 1,000 protesters formed at 5th and Hill Streets near Perishing Square and marched westbound on 6th Street from Perishing Square.

1240 hours     Commander 2 coordinated with motor supervision to re-route traffic as the crowd continued to protest at the Hall of Justice.

1434 hours     Commander 25 advised there were multiple plain clothes officers in the crowd at Perishing Square.  Plain clothes officers monitored the event and advised the CP of crowd agitators and suspected safety issues, including airborne drones.

| | |
|---|---|
| 1524 hours | A protester near 1300 7th Street texted a written statement to 911, "We are the peace rally we are going to kill you." |
| 1536 hours | Commander 2 designated a media area located on 1st Street between Spring and Main Streets. |
| 1557 hours | An individual contacted officers near the crowd at 1st and Spring Streets to report a protester within the crowd in possession of razor blades and possibly knives.  Plain clothes officers identified the protester and directed a strike team into the crowd to detain the protester for possible criminal activity. |
| 1608 hours | The Air Unit and ground units identified and monitored many smaller groups marching near the Hall of Justice.  Approximately 300 protesters broke away from the main crowd and traveled southbound on Spring Street towards 1st Street. |
| | After the stationary crowd at the Hall of Justice grew to approximately 1,500, it marched from 1st Street south on Spring Street.  The crowd occupied approximately three city blocks. |
| 1631 hours | Commander 27 redeployed units to 1st and Spring Streets, at PAB to address a growing crowd at PAB for the vigil for George Floyd. |
| 1631 hours | The larger crowd at Pershing Square traveled south on Spring from 7th Street before arriving at Hill and 8th Streets. |
| 1638 hours | Officers advised Communications Division that a large privately-owned military-grade people carrier was seen near Hill and 1st Streets.  The rear of the vehicle was covered by a large pink tarp and was not associated with the National Guard.  The vehicle circled in the area and then traveled north on 1st Street. |
| 1650 hours | A crowd assessment was conducted.  Approximately 1,000 protesters were continuing to march near Pershing Square. |
| 1712 hours | Unit MQ10 advised all Motor Strike Team units to respond to PAB to secure the perimeter. |
| 1714 hours | Officers notified Communications Division of two individuals located at Grand Park with helmets dressed in white clothing attempting to conceal water bottles containing yellow liquid. |
| 1723 hours | Due to the vigil scheduled to begin at 6:00 p.m. at PAB, Commander 2 requested an additional tactical frequency and Motor Strike Teams to re-route traffic around PAB. The CP assigned Channel 36 as a separate tactical channel for the vigil. |
| 1726 hours | The larger crowd from Pershing Square, traveled west on 5th Street through Grand Avenue towards the 110 Freeway and attempted to gain access to the freeway. |

A large group of bicyclists joined the crowd as it reached 12th Street and South Grand Avenue.

1800 hours    The Community Solidarity Vigil was held at PAB and attended by Chief Moore.

1822 hours    A larger crowd of approximately 2,000 moved northbound through Broadway as it spread out occupying approximately four City blocks.  A smaller crowd near City Hall and PAB occupied 1st Street between Main and Spring Streets.  All groups were reported as peaceful at this time.

1907 hours    Plain clothes officers in the crowd attempted to determine the motivation for the crowd staying stationary in front of City Hall but were unable to do so.  They also advised that airborne drones were monitoring the protest.  Plain clothes officers identified the location of the drone operators as they canvased the area and relayed the information to the CP and strike teams.

1916 hours    A sergeant from Newton Station called the CP and advised there was a small crowd of 15 peaceful protesters in front of the station.  One squad was sent to the area.  The crowd dissipated at approximately 8:12 p.m.

1929 hours    An individual reported that protesters near Hope Street and Wilshire Boulevard threw objects that hit him in the head and caused an injury.  He was treated at scene by LAFD and refused to make a police report.

2008 hours    The crowd in front of City Hall continued to slowly disperse and the vehicles observed entering the crowd were now stationary.

2058 hours    Both vehicle and pedestrian protesters traveled northbound on Spring Street through Temple Street.  The crowd occupied the area of Spring Street near the 101 Freeway off-ramp.  Protesters aimed green lasers at the Air Unit and continually attempted to gain access to the freeway by the on and off-ramps in the area.  The Air Unit relayed these actions to CHP and coordinated a blocking force to on and off-ramps as well as additional access points of the 101 Freeway.

2016 hours    The Air Unit observed a male suspect with a gun blocking traffic near Spring Street and Caesar Chavez Avenue.  The suspect was accompanied by an additional male suspect.  After being reported by the Air Unit, the man discarded the gun, and both suspects quickly fled.  Both the Air Unit and plain clothes units identified the suspects' direction of travel and guided six uniformed officers to safely detain the suspects in the area of Broadway and Caesar Chavez Avenue.  The Air Unit also directed officers to location the guns were discarded by the suspects.  Both suspects were arrested and transported to MDC.

2239 hours    The Air Unit observed vehicles endangering the public's safety by traveling northbound on Spring Street (one-way street with only southbound lanes) towards 1st Street.  The

Air Unit and Motor Strike Teams coordinated a response with marked police vehicles to act as a blocking force at Spring and Temple Streets and detain the vehicles.

2246 hours    The Air Unit advised that the crowd accompanied by vehicles was stationary at Temple and Main Streets.  The crowd circled the area, and eventually ended in front of City Hall on 1st and Spring Streets.  A skirmish line was requested and blocking forces were formed on the street.  The Motor Strike Teams set blocking forces near Spring and 1st Streets deterring vehicles from the area.  Approximately 50 protesters in Grand Park refused to disperse.

2356 hours    The Air Unit advised the crowd of 50 was still stationary at Grand Park.

### Operations-South Bureau (OSB)

1135 hours    The DOC called and informed OSB CP of a citizen who reported the staging of a large number of bricks delivered to the front yard of a residence at 544 W 9th Street.  Patrol officers spoke with the residents who explained the bricks were for a small residential construction project.

1245 hours    A crowd of approximately 100-150 gathered on Western Avenue between Florence Avenue and 77th Street.  Protesters were drinking and listening to loud music.

1610 hours    Southwest Area advised the OSB CP a protest was planned for 6:00 p.m. at Obama Boulevard and Cloverdale Avenue.  The estimated attendance for the event was under 20 people.  No notable occurrences came from the protest.

### Operations-West Bureau (OWB)

1000 hours    The OWB IC conducted a conference call with all OWB Captains and disseminated updates and the status of upcoming planned protests.

1405 hours    Over the next seven hours Communications Division advised of multiple peaceful protests and their locations within OWB.

1555 hours    A community member reported a large crowd located near 3rd Avenue and Hauser Boulevard was throwing items at passing vehicles.  Commander 78 requested the Air Unit to check the area.  As the Air Unit arrived, the vehicles were leaving the area.

2135 hours    The OWB CP received an Event Action Plan for the "Breonna Taylor Rally" scheduled for June 6, 2020 at 9:00 a.m.  The event was to take place at Pan Pacific Park.  The Jewish Federation 6506 Wilshire Boulevard was the planned Staging Area.

On May 30, 2020 a protest had occurred at the same location.  In preparation for the "Breonna Taylor Rally," OWB requested additional resources, established contact with

the event organizers, and changed the locations of its CP and Staging Area. The OWB IC established plans to respond to violence and protect property if needed.

## Operations-Valley Bureau (OVB)

| | |
|---|---|
| 0745 hours | An individual reported that possible looting suspects were at the Walmart located at 19821 Rinaldi Street in Porter Ranch. Communications Division notified the OVB CP. |
| 1010 hours | Communications Division notified the OVB CP a crowd of approximately 100 were at the Chatsworth Courthouse (9425 Penfield Avenue). |
| 1245 hours | Communications Division advised that a crowd of approximately 300 were at 18300 Lamarsh Street. A crowd of approximately 400-500 who were protesting at Nordhoff Boulevard and Reseda Boulevard were now marching towards the Chatsworth Courthouse. Both protests were peaceful. |
| 1325 hours | The Air Unit gave a crowd assessment of 300 protesters arrived at Chatsworth Courthouse with media on scene. |
| 1420 hours | The OVB IC arrived at Chatsworth Court House and monitored the crowd. The crowd was peaceful at the time and no MFF units were deployed for crowd control. |
| 1525 hours | A citizen reported that two male suspects were looting alcohol from a Rite Aid near Saticoy Street and Van Nuys Boulevard. The suspects fled the area, and the employees fled as well in fear additional looting suspects would arrive and loot the store. |
| 1600 hours | An individual reported a large group had formed and was throwing items at passing vehicles in the area of protests. |
| 1615 hours | North Hollywood Area Watch Commander advised the OVB CP that a crowd of 300-350 was protesting at Lankershim Boulevard and Chandler Avenue. Plain clothes units were redirected to monitor the crowd. |
| 1730 hours | Plain clothes units advised the crowd of 300 protesters at Magnolia Avenue and Tujunga Boulevard were peaceful at the time. |
| 2230 hours | Commander 19A advised the OVB CP approximately 200 motorcycles were racing in the area of Devonshire Street and Topanga Canyon Boulevard had. Commander 19A deployed an MFF to monitor that area. |

# <u>SATURDAY, JUNE 6, 2020</u>

### <u>Department Operations Center (DOC)</u>

0845 hours    The DOC was informed that officers were being followed home from their police stations.  The DOC distributed an email to all personnel concerning officer safety when leaving work and travelling home.

1450 hours    The RHD received a TikTok posting of an individual setting fire to a manikin dressed as a police officer.  The individual commented he planned to bring an assault rifle to Los Angeles.  The RHD detectives began an investigation into the threat.

1810 hours    A Command Staff Officer tasked detectives and the military liaison to plan for security at the Convention Center after the National Guard demobilized at 2200 hours.

1851 hours    The DOC sent out a notice to all officers advising that anti-governmental groups across the country were targeting the information technology systems of police departments.

2114 hours    The DOC send out a notice on behalf of RHD advising officers RHD would be investigating all threats against LAPD officers and provided officer safety precautions.

2200 hours.   The DOC was advised the National Guard would not be deployed to any locations unless there were further protest issues.

### <u>Operations-Central Bureau (OCB)</u>

0826 hours    Communications Division received a radio call of a bomb threat at the Hall of Justice.  The LASD responded and handled the situation without incident.

0900 hours    Northeast Station reported a small group of approximately 20 protesters gathered at Northeast Station for a pre-planned protest.  The protest was peaceful, and no additional resources were requested.

0947 hours    It was reported that 100 protesters were gathered at the steps of City Hall.  Commander 1 requested a Motor Strike Team and provided additional security for City Hall.

1000 hours    Chief Moore was briefed on the updated deployment of the National Guard.

1045 hours    A crowd of 200 protesters began marching from Hill Street to the Staples Center.

1100 hours    The National Guard was deployed and staged at its preplanned locations.

1324 hours    Commander 36 advised that the crowd in front of PAB grew to over 3,000 protesters.  Commander 1 reported an additional 3,000 protesters were marching from the Civic

|  | Center and requested Motor Strike Teams.  The Air Unit and Motor Strike Team assisted in facilitating the march. |
|---|---|
| 1335 hours | The CP received reports that two drones were flying over PAB.  The drones' operator was controlling them from the Joe's Parking Lot roof. |
| 1430 hours | Air 10 reported there were 600-650 protesters in front of City Hall.  An additional group of 100 bicyclists was reported traveling north on Broadway approaching 4th Street. |
| 1444 hours | The CP received information that 75-100 protesters were gathered at Figueroa Street and Cesar Chavez Avenue. |
| 1520 hours | The CP received a report that there were several thousand protesters at 3rd and Temple Streets.  Officers advised there was a small group of 40 protesters that entered the 101 Freeway from Temple and Hill Streets.  The CHP responded, and the protesters dispersed from the freeway and joined the main group.

Unit 24MQ10 reported there were 1,000 protesters at the intersection of 3rd and Spring Streets. |
| 1530 hours | Commander 25 requested an additional MFF respond southbound on Grand Avenue from Temple Street for 2,000 protesters. |
| 1536 hours | An "officer help call" was generated at 3rd Street and Central Avenue due to a traffic collision between a motor officer and another vehicle.  The motor officer reported pain to his hip and leg.  The LAFD responded and transported the officer to a nearby hospital (Incident No. 2140). |
| 1541 hours | Plain clothes officers advised 60-75 motorcycles were traveling on the wrong side of the roadway eastbound on 3rd Street from Broadway.  Commander 1 ordered officers not to stop the motorcycles as they were traveling with the protesters. |
| 1622 hours | The Air Unit gave a crowd assessment of two groups merged together marching towards City Hall.  The Air Unit estimated that the crowd was between 5,000-7,000.  A second crowd of 1,000 protesters marched north on Hill Avenue from East 2nd Street.  An additional crowd of protesters was marching from the East 2nd Street tunnel heading towards City Hall. |
| 1650 hours | An unknown unit requested a RA for a 20-25-year-old man who was conscious and breathing with a laceration to the top of his head (Incident No. 2256). |
| 1653 hours | Commander 2 advised there were 50 protesters marching on 6th Street approaching Rampart Area.  Commander 2 requested a Motor Strike Team to assist with protesters. |
| 1728 hours | The CP was notified that officers were escorting the 50 protesters who were traveling east on 6th Street from Rampart Station towards Downtown. |

| | |
|---|---|
| 1802 hours | The National Guard advised a male, Black, armed with a mini bat "acting aggressively" was walking towards them.  The individual refused to leave the area.  Unit 24Q20 responded and handled the incident. |
| 1804 hours | The CP advised there were 100 individuals peacefully protesting at Figueroa and York Streets.  No additional resources were requested. |
| 1815 hours | Commander 36 requested a Central Area unit respond to MDC for a man who was video recording the license plates and shop numbers of police vehicles as they exited the facility from Los Angeles Street. |
| 1956 hours | The CP advised that 1,000-1,500 protesters were surrounding a vehicle on Figueroa Street between 2nd and 3rd Streets. |
| 2046 hours | The Air Unit advised a group of 150 protesters was marching northbound Broadway at 4th Street. |
| 2107 hours | Commander 10 advised that the crowd around City Hall dispersed.  A Motor Strike Team was requested to conduct traffic enforcement in front of PAB. |
| 2336 hours | The CP was advised   that protesters were kneeling in the intersection of 7th Street and Figueroa Streets.  Skirmish lines were deployed north and south of 7th and Figueroa Streets.  The crowd dispersed leaving mainly on the Redline. |

## Operations-South Bureau (OSB)

| | |
|---|---|
| 1020 hours | Approximately 300-400 protesters were marching at USC.  The protest was described as peaceful in nature. |
| 1050 hours | Harbor Area reported 300 protesters were marching to the City Hall in Harbor Area.  The OSB CP deployed one MFF and one plain clothes team to standby.  The protest was peaceful, and no additional resources were requested. |
| 1110 hours | The protest at USC had grown to 600 protesters.  The protest was peaceful, and no additional resources were requested. |
| 1210 hours | The OSB CP was notified that 400 protesters were congregating at Leimert Park.  The protesters were peaceful in nature.  One Motor Strike Team and two MFFs were staged in the area. |
| 1245 hours | Harbor Area advised 60 protesters were gathering at Figueroa Street and Pacific Coast Highway.  The protesters intended on marching to Harbor Regional Park.  The Los Angeles Port Police Department advised they would provide assistance if requested. |

| | |
|---|---|
| 1300 hours | Southwest Area advised OSB CP the protest at USC had grown to 1,000 protesters. The protest remained peaceful. |
| 1420 hours | Harbor Area advised a peaceful protest of approximately 350 protesters were at the Trump National Golf Club. |
| 1440 hours | The OSB CP requested the MFF and Motor Strike Teams staged at Leimert Park respond back to 75th Street Elementary. |
| 1515 hours | The OSB CP was advised the protests at USC, Harbor City Hall, and Harbor Regional Park were finished. All protesters had dispersed from the areas. |
| 1530 hours | The OSB CP received an update the protesters at Leimert Park were dispersing and only 200 remained. The protest was peaceful, and no additional resources were requested. |
| 1600 hours | Southeast Area reported to the OSB CP that they were monitoring 100 protesters at 107th Street and Budlong Avenue. The protesters marched northbound Vermont Avenue from Century Boulevard. The protest was described as peaceful and no additional resources were requested. |
| 1715 hours | The OSB CP was advised that the protest at Leimert Park had finished and the protesters dispersed from the area. |

### Operations-West Bureau (OWB)

| | |
|---|---|
| 0900 hours | Protesters arrived at Pan Pacific Park at 7600 Beverly Boulevard for the Breonna Taylor Rally. Plain clothes units monitored the crowd and observed no harmful items or prohibited items in the crowd as protesters arrived. |
| 1022 hours | Communications Division advised there were 80 peaceful protesters at Jefferson Boulevard and Beethoven Street (Incident No. 1223). |
| 1113 hours | The National Guard requested an additional 30 soldiers from a lieutenant at The Grove from the Bell Armory. |
| 1200 hours | Communications Division advised there were 50 peaceful protesters gathering at Lincoln Avenue and Loyola Marymount University (LMU) (Incident No. 1463). |
| 1350 hours | The protesters at Lincoln and LMU had grown to 250 protesters and were monitored by OWB officers. Officers closed vehicle traffic for the protesters as they approached the various intersections. |
| 1355 hours | The Breonna Taylor Rally at Pan Pacific Park grew to 1,500 protesters. Individuals in the crowd maintained a vocal but lawful demeanor. |

| | |
|---|---|
| 1400 hours | The Breonna Taylor Rally crowd mobilized and marched northbound on Beverly Boulevard towards Hollywood Area. |
| 1440 hours | The OWB CP received a report that the crowd of 1,500 overtook the street as they marched westbound on Beverly Boulevard towards West Hollywood.  As the crowd overtook multiple City streets but maintained a largely peaceful demeanor. |
| 1520 hours | The protest returned to Lincoln and LMU where the crowd decreased to approximately 100 protesters and then dispersed. |
| 1805 hours | The OWB CP advised a crowd of 1,000 protesters was moving east from Santa Monica Boulevard towards Highland Avenue. |
| 1820 hours | The OWB CP received an update that the crowd of protesters continued to march northbound Highland Avenue approaching Hollywood Boulevard. |
| 1835 hours | The OWB CP advised peaceful protesters stopped at Beverly Boulevard and Sierra Bonita Avenue. |
| 1920 hours | The OWB CP advised that 100 protesters were sitting down in the intersection of La Brea and Oakwood Avenues.  A small group of protesters separated and marched northbound on La Brea Avenue. |

### Operations-Valley Bureau (OVB)

| | |
|---|---|
| 0830 hours | One MFF was deployed at the Westfield Fashion Square and another MFF at the Sherman Oaks Galleria for security. |
| 1015 hours | A crowd of approximate 150 peaceful protesters began congregating in front of OVB Fire Headquarters, Station 83. |
| 1025 hours | The OVB CP received information thatthere were planned protests at Chief Moore's residence.  The OVB IC requested one MFF stage at Devonshire Station and one arrest bus be placed on standby at the OVB CP. |
| 1040 hours | The crowd at Fire Station 83 walked southbound on Balboa Boulevard towards Ventura Boulevard and grew to approximately 400 protesters.  One MFF was deployed from West Valley Station and staged at 5353 Balboa Boulevard.  Upon the MFF's arrival, officers reported the protest grew to 600 protesters and remained peaceful.  The Air Unit was at scene and monitored the protest. |
| 1055 hours | The OVB IC requested two MFFs deploy to Chief Moore's residence. |
| 1120 hours | A sergeant advised there were protesters at Chief Moore's residence. The protest was described as peaceful and no additional resources were requested. |

| | |
|---|---|
| 1240 hours | Officers reported the protesters at Ventura Boulevard and Balboa Boulevard, as well as at Chief Moore's residence were dispersing.  Approximately 100 protesters remained in the area. |
| 1315 hours | The Foothill Area Watch Commander received information that there were approximately 150-200 protesters wearing backpacks and masks, gathering at an AutoZone at Laurel Canyon Boulevard and Osborne Street.  Officers were advised the group planned to march to Foothill Station. |
| 1325 hours | Soldiers from the National Guard reported to the OVB CP that they observed pallets of rocks and bricks around the perimeter of the Westfield Fashion Square Mall.  The OVB IC deployed two supervisors to assess the situation. |
| 1345 hours | Commander 16A reported the crowd at Laurel Canyon Boulevard and Osborne Street was preparing to march to Foothill Station. |
| 1445 hours | The OVB IC deployed one MFF to Lankershim and Chandler Boulevards for a crowd of 100 protesters. |
| 1500 hours | A sergeant advised OVB CP the 100 protesters on Lankershim Boulevard and Chandler Boulevard planned to march to Lankershim and Magnolia Boulevards with the intention to block the intersection. |
| 1545 hours | A sergeant advised protesters were blocking the intersection of Lankershim Boulevard and Magnolia Boulevard. |
| 1610 hours | The OVB CP was advised that a crowd of 100 protesters were gathering at Foothill Boulevard and Hubbard Street. |
| 1900 hours | The OVB CP was notified of a 40-person peaceful protest at Magnolia Boulevard and Tujunga Avenue. |

# SUNDAY, JUNE 7, 2020

### Department Operations Center (DOC)

0630 hours     All National Guard soldiers were released from fixed post assignments. Per Commander 6, the National Guard would no longer be deployed.  All National Guard soldiers were to return to their bases throughout the region.

1025 hours     The OWB CP requested the National Guard for fixed post assignments.  There were 896 National Guard soldiers at the Convention Center awaiting additional orders.

1137 hours     Commander 6 advised the National Guard would no longer be deployed.

1224 hours     The IC advised OWB CP their National Guard request was denied due to California State orders.

1500 hours     All escort details previously scheduled for June 8, 2020, were directed to report to their respective Areas.

### Operations-Central Bureau (OCB)

1340 hours     A Motor Strike Team reported there was a caravan of 300-400 vehicles traveling northbound on Manchester Boulevard passing Union Station.  The caravan was peaceful and obeying traffic laws.  The caravan drove around downtown and eventually parked in front PAB.  After a few minutes, several of the vehicles in the protest began to disperse from the area.

1956 hours     A Motor Strike Team advised that only eight to ten vehicles and approximately 50-75 protesters remained in front of PAB.

2100 hours     Officers advised that only 20 protesters remained in front of PAB.

### Operations-South Bureau (OSB)

1150 hours     Southeast Area advised the OSB CP that BLM may possibly be protesting near Imperial Courts in Compton (Willowbrook Avenue and Tameron) at 1:00 p.m.

                Approximately, 3,000 protesters were expected. The LASD would oversee the protest and Southeast Area would monitor the situation.

1330 hours    Southeast Area advised OSB CP the peaceful Community Car Caravan was traveling from the City of Compton to PAB.  There were approximately 200 - 250 cars in the caravan driving through 77th Street Area.

Southeast Area continued to monitor the BLM protest at Imperial Courts estimated at only 40 protesters, far less that than expected 3,000 participants.


### Operations-West Bureau (OWB)

1209 hours    Communications Division received information that a peaceful group of 20-25 protesters congregated at Sunset Boulevard and Kenter Avenue.

1600 hours    The OWB CP reported a crowd of 4,000 protesters gathering at Hollywood Area.

1640 hours    The OWB CP reported the crowd in Hollywood Area grew to 12,000 protesters and was in the area of Ivar Avenue and Sunset Boulevard.  The OWB CP requested a sound truck to respond to the protest.

1746 hours    The protest in Hollywood grew to approximately 15,000 and remained peaceful.

1905 hours    An additional crowd, approximately 500 protesters and 100 vehicles, was forming Hollywood Boulevard and Highland Avenue.

1945 hours    Officers advised that the protest at Hollywood Boulevard and Highland Avenue was dispersing and only 300-400 protesters remained.  The crowd at Hollywood Boulevard and Ivar Avenue was also dispersing and only 100 protesters remained.  A peaceful group of approximately 100-150 protesters was forming in West Hollywood at Santa Monica and La Cienega Boulevards.

2150 hours    A small crowd gathered at Hollywood Boulevard and Highland Avenue for a candlelight vigil.

2305 hours    Approximately 30 protesters were loitering at the intersection of Hollywood Boulevard and Highland Avenue.  The protest remained peaceful and with minimal police deployment.


### Operations-Valley Bureau (OVB)

1103 hours    Communications Division received information of a peaceful group of 10 protesters at Ventura and Sepulveda Boulevards.





# Chapter 10:

## Appendices

SAFE LA AFTER ACTION REPORT

# APPENDIX

Appendix A: Resources Used

**While completing this After Action Report the Department dedicated countless hours to the research and review of approximately 9,935 hours of audio, 50 hours of video, 2,400 digital images and 13,862 pages of documents related to the Civil Unrest.  It is important to note estimated total documents researched and reviewed varied based on format, layout and font size. Therefore, the number of pages totaled is an estimate only.**

**The following list details the source information the after-action task force accumulated to complete this document:**

- Radio broadcast communications from all four Bureaus from May 27, 2020, to June 7, 2020.
  - The task force was provided approximately 9,935 hours of radio broadcasts.  Large portions and segments of the audio were reviewed to gain clarity of the events and occurrences during the Civil Unrest.
- Robbery Homicide Division Felony Arrest Write Up dated July 15, 2020 (17 pages)
- Misdemeanor Arrests Log dated September 11, 2020 (257 pages)
- Numerous Department emails from the DOC (132 pages)
- Chronological narration logs from each of the Bureaus and DOC (262 pages)
- ICS-211/214s logs (1,620 pages)
- Video and camera footage from May 27,2020, to June 7, 2020 (approximately 40 hours of footage and 2,400 photographs)
- Watch Commanders Logs from all 21 geographic Areas (8,000 pages)
- Investigative Reports from May 27, 2020, to June 7, 2020 (530 pages)
- DOC Minimum Operating Force Logs (84 pages)
- Injured on Duty Tracking Logs related to the Civil Unrest (8 pages)
- Office of Support Services Expenditure Log dated August 13, 2020 (3 pages)
- Building and Safety Division Inspection Log (31 pages)
- Fiscal Group Audit (1 page)
- Social Media/Media Outlets (approximately 10 hours)
- Motor Transport Division Audit Log related to the Civil Unrest (5 pages)
- Emergency Operations Center After Action for the 2020 Civil Unrest (37 pages)
- Training Bulletins, Notices, Memorandums, Administrative Order, Directives (130 pages)
- 1992 Los Angeles Civil Unrest After Action Report (142 pages)
- Outside Agencies' George Floyd After Action Reports (500 pages)
- Bureau Projects (5 complete projects)
- Intelligence Reports from RHD and MCD (543 pages)
- Event Action Plans of protests scheduled during the Civil Unrest (1,507 pages)
- Interviews with approximately 75 past and present commanding officers.
- Formal and Informal Interviews with sworn and civilian personnel of all ranks.

- Crime Analysis Detail Reports (40 pages)
- Mayor Garcetti Declarations and Directives (16 pages)
- COVID-19 Personnel Logs (28 pages)

## Appendix B: Proclamation of a State of Emergency

**EXECUTIVE DEPARTMENT
STATE OF CALIFORNIA**

PROCLAMATION OF A STATE OF EMERGENCY

**WHEREAS** on May 25, 2020, George Floyd tragically died in Minneapolis, Minnesota, shortly following his arrest in which an officer of the Minneapolis Police Department kneeled on his neck to detain him during the arrest, and then did not respond to Mr. Floyd's requests for help when he stated that he could not breathe; and

**WHEREAS** Los Angeles County and the City of Los Angeles have requested State assistance including the activation of the California National Guard based on the civil unrest the City and County of Los Angeles report and based on limited local resources; and

**WHEREAS** I find that conditions of Government Code section 8558(b), relating to the proclamation of a State of Emergency, have been met; and

**WHEREAS** under the provisions of Government Code section 8625(c), I find that local authority is inadequate to address the threat posed by the civil unrest within Los Angeles County and the City of Los Angeles.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes, including the California Emergency Services Act, and in particular, Government Code section 8625, **HEREBY PROCLAIM A STATE OF EMERGENCY** to exist in Los Angeles County and the City of Los Angeles.

**IT IS HEREBY ORDERED THAT:**

1. All agencies of the state government use and employ state personnel, equipment, and facilities or perform any and all activities consistent with the direction of the Office of Emergency Services and the State Emergency Plan. Also, all residents are to heed the advice of emergency officials with regard to this emergency in order to protect their safety.

2. The Office of Emergency Services shall provide assistance to Los Angeles County and the City of Los Angeles, if appropriate and necessary, under the authority of the California Disaster Assistance Act, Government Code section 8550 et seq., and California Code of Regulations, Title 19, section 2900 et seq.

3. The California National Guard shall mobilize under Military and Veterans Code sections 143 and 146 to support response efforts in Los Angeles County and the City of Los Angeles.

**I FURTHER DIRECT** that as soon as hereafter possible, this proclamation be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this proclamation.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 30th day of May 2020.

GAVIN NEWSOM
Governor of California

ATTEST:

ALEX PADILLA
Secretary of State

## Appendix C: Declaration of Local Emergency

### DECLARATION OF LOCAL EMERGENCY

By virtue of the authority vested in me as Mayor of the City of Los Angeles, pursuant to the City of Los Angeles Charter and Los Angeles Administrative Code Chapter 3, Section 8.27, I hereby find that:

> *In the days immediately following the death of George Floyd by members of the Minneapolis Police Department, there have been numerous protests occurring throughout the Nation, including the City of Los Angeles.  While many such events have been nonviolent, the activities of some have devolved into acts of lawlessness and violence;*

> *Specifically, numerous acts of violence have been committed against first responders and members of peaceful protests.  Further, the City has suffered millions of dollars in damage to public and private property, looting of businesses, and arson primarily in the Downtown corridor.  The Los Angeles Police Department issued multiple Unlawful Assembly and Dispersal Orders, with over 500 arrests made for the failure to heed such orders and other observed acts of vandalism and unlawful behavior;*

> *In the immediate wake of such unlawful activities, numerous businesses in the Downtown Corridor remain unsecured, and the City is actively engaged in damage assessment;*

> *The impacts to public safety and other Departments and personnel in the City of Los Angeles resulting from the number and magnitude of such unusual occurrences is extensive, and there is reasonable concern that similar unlawful activities will continue over the coming days;*

> *Based upon the above events as well as their likelihood to continue, there exists the potential that said unlawful incidents are likely to become beyond the control of the normal services, personnel, equipment and facilities of the regularly constituted branches and departments of the City Government; and*

NOW, THEREFORE, I hereby declare the existence of a Local Emergency and direct the Emergency Operations Organization (EOO) to be immediately activated to take such steps that are necessary for the protection of life and property.

I FURTHER DIRECT that all City Departments impacted by this event, and its ongoing effects, continue to conduct damage assessments and collect cost estimates for the purpose of seeking State and Federal disaster assistance.

I FURTHER REQUEST that the County Board of Supervisors proclaim a Local Emergency.

I FURTHER REQUEST that the Governor of California, pursuant to the Emergency Services Act, issue a proclamation declaring an emergency in Los Angeles County; that the Governor waive regulations that may hinder response and recovery efforts; that recovery assistance be made available under the California Disaster Assistance Act; and that the State expedite access to State and Federal resources and any other appropriate Federal disaster relief programs.

I FURTHER DIRECT that this Declaration of Local Emergency shall take effect immediately and that widespread publicity and notice shall be given said Declaration through the most feasible and adequate means of disseminating such notice throughout the City.

Dated at Los Angeles, California

Date: _____30 MAY_____, 2020

Time: _____4:45 PM_____

Filed with the City Clerk

Date: _____May 30_____, 2020

Time: _____5:02 PM_____

By _____

ERIC GARCETTI

Mayor

Appendix D: Order and Revised Orders Setting Curfews



ERIC GARCETTI

MAYOR

### ORDER SETTING CURFEW

### DURING EXISTENCE OF A LOCAL EMERGENCY

WHEREAS, on May 30, 2020, I declared a Local Emergency within the City of Los Angeles resulting from the civil unrest following the death of George Floyd in Minneapolis, Minnesota;

WHEREAS, preceding the declaration of this Local Emergency, while the majority of protesters acted lawfully, there has been a significant amount of criminal behavior, including violence against first responders and peaceful protestors, vandalism of public and private property, looting of businesses, and failure to follow the lawful dispersal orders of the Los Angeles Police Department;

NOW THEREFORE, by virtue of the authority vested in me as Mayor of the City of Los Angeles under the City of Los Angeles Charter and provisions of Los Angeles Administrative Code, Chapter 3, Section 8.29 to promulgate, issue and enforce rules, regulations, directives and orders, I hereby declare the following Order necessary for the protection of life and property in the areas of the City specified below:

1. No person, except as set forth below, shall be upon any public street, avenue, boulevard, place, alley, park or other public place or unimproved private realty within the area bounded as follows: South of the 101 Freeway, East of the 110 Freeway, North of the 10 Freeway and West of the 101/5 Freeway Interchange - between 8:00 p.m. and 5:30 a.m. of the following day.

2. This Order shall not apply to peace officers, fire fighters, Emergency Operations Organization (EOO) personnel, the National Guard, any other responding military personnel deployed to the area, individuals traveling to and from work, individuals seeking or providing emergency medical care, or any persons experiencing homelessness who are sheltered in the affected area.



**ERIC GARCETTI**
MAYOR

## ORDER SETTING CURFEW
## DURING EXISTENCE OF A LOCAL EMERGENCY
### (REVISED MAY 30, 2020 6:30 p.m.)

WHEREAS, on May 30, 2020, I declared a Local Emergency within the City of Los Angeles resulting from the civil unrest following the death of George Floyd in Minneapolis, Minnesota;

WHEREAS, preceding the declaration of this Local Emergency, while the majority of protesters acted lawfully, there has been a significant amount of criminal behavior, including violence against first responders and peaceful protestors, vandalism of public and private property, looting of businesses, and failure to follow the lawful dispersal orders of the Los Angeles Police Department;

NOW THEREFORE, by virtue of the authority vested in me as Mayor of the City of Los Angeles under the City of Los Angeles Charter and provisions of Los Angeles Administrative Code, Chapter 3, Section 8.29 to promulgate, issue and enforce rules, regulations, directives and orders, I hereby declare the following Order necessary for the protection of life and property in the areas of the City specified below:

1. No person, except as set forth below, shall be upon any public street, avenue, boulevard, place, alley, park or other public place or unimproved private realty within the City of Los Angeles boundaries - between 8:00 p.m. and 5:30 a.m. of the following day.

2. This Order shall not apply to peace officers, fire fighters, Emergency Operations Organization (EOO) personnel, the National Guard, any other responding military personnel deployed to the area, individuals traveling to and from work, individuals seeking or providing emergency medical care, or any persons experiencing homelessness.

Any violation of this Order shall be subject to enforcement and penalty as provided under Los Angeles Administrative Code, Chapter 3, Section 8.78.

This Order shall remain in effect until such time as the Declaration of Local Emergency is terminated, or sooner at the direction of the Mayor.

ERIC GARCETTI
Mayor

Dated at Los Angeles, California

Date: _____ May 30th _____, 2020

Time: _____ 6:30p.m. _____

Filed with the City Clerk:

Date: _____, 2020

Time: _____

By: _____



ERIC GARCETTI
MAYOR

### ORDER SETTING CURFEW

### DURING EXISTENCE OF A LOCAL EMERGENCY

### (REVISED MAY 31, 2020 12:00 p.m.)

WHEREAS, on May 30, 2020, I declared a Local Emergency within the City of Los Angeles resulting from the civil unrest following the death of George Floyd in Minneapolis, Minnesota;

WHEREAS, preceding the declaration of this Local Emergency, while the majority of protesters acted lawfully, there has been a significant amount of criminal behavior, including violence against first responders and peaceful protestors, vandalism of public and private property, looting of businesses, and failure to follow the lawful dispersal orders of the Los Angeles Police Department;

NOW THEREFORE, by virtue of the authority vested in me as Mayor of the City of Los Angeles under the City of Los Angeles Charter and provisions of Los Angeles Administrative Code, Chapter 3, Section 8.29 to promulgate, issue and enforce rules, regulations, directives and orders, I hereby declare the following Order necessary for the protection of life and property in the areas of the City specified below:

1. No person, except as set forth below, shall be upon any public street, avenue, boulevard, place, alley, park or other public place or unimproved private realty within the City of Los Angeles boundaries - between 8:00 p.m. and 5:30 a.m. of the following day.

2. This Order shall not apply to peace officers, fire fighters, Emergency Operations Organization (EOO) personnel, the National Guard, any other responding military personnel deployed to the area, credentialed media representatives engaged in news gathering, individuals traveling to and from work, or individuals seeking or providing emergency medical care.

3. This Order shall not apply to persons experiencing unsheltered homelessness
   who are sheltering in place.

Any violation of this Order shall be subject to enforcement and penalty as
provided under Los Angeles Administrative Code, Chapter 3, Section 8.78.

This Order shall remain in effect until such time as the Declaration of Local
Emergency is terminated, or sooner at the direction of the Mayor.

ERIC GARCETTI
Mayor

Dated at Los Angeles, California

Date: ___May 31_____, 2020

Time: ___12:00p.m._____

Filed with the City Clerk:

Date: ___May 31_____, 2020

Time: ___1:20p.m._____

By: _____

### AMENDMENT NO. 1 TO EXECUTIVE ORDER OF THE CHAIR OF THE COUNTY OF LOS ANGELES BOARD OF SUPERVISORS FOLLOWING PROCLAMATION OF EXISTENCE OF A LOCAL EMERGENCY DUE TO CIVIL UNREST

**WHEREAS**, on May 30, 2020, the Chair of the Los Angeles County Board of Supervisors ("Board") proclaimed, pursuant to Chapter 2.68 of the Los Angeles County Code ("LACC"), the existence of a local emergency because the County of Los Angeles ("County") is affected or likely to be affected by a public calamity due to conditions of disaster or of extreme peril to the safety of persons and property arising as a result of civil unrest in the County;

**WHEREAS**, Government Code Section 8634 empowers the Board of Supervisors and delegated officials to promulgate orders and regulations necessary to provide for the protection of life or property;

**WHEREAS**, pursuant to Government Code Section 8634 and LACC section 2.68.150, the Chair of the Board is empowered to promulgate orders and regulations for the protection of life and property where necessary to preserve the public order and safety;

**WHEREAS**, there exists imminent danger to life and property during the hours of darkness and approaching darkness, and it is especially difficult to preserve public safety during such hours; and

**WHEREAS**, a curfew is necessary to preserve the public order and safety in the County.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT**:

1. A curfew is imposed Countywide, within the unincorporated and incorporated areas of the County.

2. The hours of curfew are between 6:00 p.m. and 6:00 a.m. of the following day.

3. No person, except as set forth in paragraph No. 4 below, shall be upon a public street, avenue, boulevard, place, walkway, alley, park, or other public area, or any unimproved private realty, within the County between 6:00 p.m. and 6:00 a.m. of the following day.

4. This Order shall not apply to peace officers; fire fighters; National Guard or other military personnel deployed to the area; emergency medical services personnel; individuals traveling to and from work; individuals working on a public work of improvement construction project; credentialed media representatives involved in media gathering; people experiencing homelessness and without access to a viable shelter; and individuals seeking medical treatment.

HOA.102888009.1                                            1

Any violation of this Order is a misdemeanor, punishable by a fine not to exceed $1,000 or by imprisonment for a period not to exceed six months, or both, as provided by LACC section 2.68.320 or any applicable state or municipal law.

To the extent that the terms of the County's curfew Order are more stringent (e.g., that the start time is earlier or the end time is later) than any city's curfew order, the County's curfew Order would apply within such city to that extent.

This Order shall be effective immediately as of June 1, 2020, commencing at 6:00 p.m., and extending until 6:00 a.m. of the following day.  The County may renew, amend, or extend this Order in accordance with California Government Code section 8634 and County Code section 2.68.150.


Dated:   June ___, 2020


_____

Kathryn Barger
Chair, Los Angeles County Board of Supervisors

HOA.102888009.1                                        2



**ERIC GARCETTI**
MAYOR

### ORDER SETTING CURFEW

### DURING EXISTENCE OF A LOCAL EMERGENCY

### (REVISED JUNE 1, 2020 2:45 p.m.)

WHEREAS, on May 30, 2020, I declared a Local Emergency within the City of Los Angeles resulting from the civil unrest following the death of George Floyd in Minneapolis, Minnesota;

WHEREAS, preceding the declaration of this Local Emergency, while the majority of protesters acted lawfully, there has been a significant amount of criminal behavior, including violence against first responders and peaceful protestors, vandalism of public and private property, looting of businesses, and failure to follow the lawful dispersal orders of the Los Angeles Police Department;

On May 31, 2020, I issued an Order establishing a Curfew throughout the City of Los Angeles, from 8:00 p.m. to 5:30 a.m. daily;

Also on May 31, 2020, and subsequent to the issuance of my Curfew Order, Los Angeles County issued a curfew order extending to all unincorporated and incorporated parts of the County, from 6:00 p.m. to 6:00 a.m.;

NOW THEREFORE, by virtue of the authority vested in me as Mayor of the City of Los Angeles under the City of Los Angeles Charter and provisions of Los Angeles Administrative Code, Chapter 3, Section 8.29 to promulgate, issue and enforce rules, regulations, directives and orders, I hereby declare the following Order necessary for the protection of life and property:

1. No person, except as set forth below, shall be upon any public street, avenue, boulevard, place, walkway, alley, park or other public place or unimproved private realty within the City of Los Angeles boundaries between 6:00 p.m. and 6:00 a.m. of the following day.

200 N. SPRING STREET, ROOM 303 LOS ANGELES, CA 90012 (213) 978-0600

MAYOR.LACITY.ORG



2. This Order shall not apply to peace officers, fire fighters, Emergency Operations Organization (EOO) personnel, emergency medical services personnel, the National Guard, any other responding military personnel deployed to the area, individuals working on a public works or improvement construction project, credentialed media representatives engaged in news gathering, individuals traveling to and from work, or individuals seeking medical treatment.

3. This Order shall not apply to persons experiencing homelessness who are without access to a viable shelter.

Any violation of this Order shall be subject to enforcement and penalty as provided under Los Angeles Administrative Code, Chapter 3, Section 8.78.

This Order shall remain in effect until such time as the Declaration of Local Emergency is terminated, or sooner at the direction of the Mayor.

_____
ERIC GARCETTI
Mayor

Dated at Los Angeles, California

Date: ___June 1, 2020___

Time: ___2:45 p.m.___

Filed with the City Clerk:

Date: _____, 2020

Time: _____

By: _____



ERIC GARCETTI
MAYOR

## ORDER SETTING CURFEW
### DURING EXISTENCE OF A LOCAL EMERGENCY
### (REVISED JUNE 2, 2020 12:30 p.m.)

WHEREAS, on May 30, 2020, I declared a Local Emergency within the City of Los Angeles resulting from the civil unrest following the death of George Floyd in Minneapolis, Minnesota;

WHEREAS, preceding the declaration of this Local Emergency, while the majority of protesters acted lawfully, there has been a significant amount of criminal behavior, including violence against first responders and peaceful protestors, vandalism of public and private property, looting of businesses, and failure to follow the lawful dispersal orders of the Los Angeles Police Department;

On May 31, 2020, I issued an Order establishing a Curfew throughout the City of Los Angeles, from 8:00 p.m. to 5:30 a.m. daily;

Also on May 31, 2020, and subsequent to the issuance of my Curfew Order, Los Angeles County issued a curfew order extending to all unincorporated and incorporated parts of the County, from 6:00 p.m. to 6:00 a.m.;

NOW THEREFORE, by virtue of the authority vested in me as Mayor of the City of Los Angeles under the City of Los Angeles Charter and provisions of Los Angeles Administrative Code, Chapter 3, Section 8.29 to promulgate, issue and enforce rules, regulations, directives and orders, I hereby declare the following Order necessary for the protection of life and property:

1. No person, except as set forth below, shall be upon any public street, avenue, boulevard, place, walkway, alley, park or other public place or unimproved private realty within the City of Los Angeles boundaries between 6:00 p.m. and 6:00 a.m. of the following day.

2. This Order shall not apply to peace officers, fire fighters, Emergency
   Operations Organization (EOO) personnel, emergency medical services
   personnel, the National Guard, any other responding military personnel
   deployed to the area, individuals working on a public works or improvement
   construction project, credentialed media representatives engaged in news
   gathering, individuals traveling to and from work, individuals seeking medical
   treatment, or individuals traveling to and from and participating in voting.

3. This Order shall not apply to persons experiencing homelessness who are
   without access to a viable shelter.

Any violation of this Order shall be subject to enforcement and penalty as
provided under Los Angeles Administrative Code, Chapter 3, Section 8.78.

This Order shall remain in effect until such time as the Declaration of Local
Emergency is terminated, or sooner at the direction of the Mayor.

ERIC GARCETTI
Mayor

Dated at Los Angeles, California

Date: _____ June 2, 2020

Time: _____ 12:40 p.m. _____

Filed with the City Clerk:

Date: _____ June 2 _____, 2020

Time: _____ 12:50 p.m. _____

By: _____



**ERIC GARCETTI**
MAYOR

## ORDER SETTING CURFEW

### DURING EXISTENCE OF A LOCAL EMERGENCY

### (REVISED JUNE 3, 2020 12:30 p.m.)

WHEREAS, on May 30, 2020, I declared a Local Emergency within the City of Los Angeles resulting from the civil unrest following the death of George Floyd in Minneapolis, Minnesota;

WHEREAS, preceding the declaration of this Local Emergency, while the majority of protesters acted lawfully, there has been a significant amount of criminal behavior, including violence against first responders and peaceful protestors, vandalism of public and private property, looting of businesses, and failure to follow the lawful dispersal orders of the Los Angeles Police Department;

On May 31, 2020, I issued an Order establishing a Curfew throughout the City of Los Angeles, from 8:00 p.m. to 5:30 a.m. daily;

On June 3, 2020, and subsequent to the issuance of my Curfew Order, Los Angeles County issued a curfew order extending to all unincorporated and incorporated parts of the County, from 9:00 p.m. to 5:00 a.m.;

NOW THEREFORE, by virtue of the authority vested in me as Mayor of the City of Los Angeles under the City of Los Angeles Charter and provisions of Los Angeles Administrative Code, Chapter 3, Section 8.29 to promulgate, issue and enforce rules, regulations, directives and orders, I hereby declare the following Order necessary for the protection of life and property:

1. No person, except as set forth below, shall be upon any public street, avenue, boulevard, place, walkway, alley, park or other public place or unimproved private realty within the City of Los Angeles boundaries between 9:00 p.m. and 5:00 a.m. of the following day.

200 N. SPRING STREET, ROOM 303 LOS ANGELES, CA 90012 (213) 978-0600
MAYOR.LACITY.ORG

2. This Order shall not apply to peace officers, fire fighters, Emergency Operations Organization (EOO) personnel, emergency medical services personnel, the National Guard, any other responding military personnel deployed to the area, individuals working on a public works or improvement construction project, credentialed media representatives engaged in news gathering, individuals traveling to and from work, individuals seeking medical treatment, or individuals traveling to and from and participating in voting.

3. This Order shall not apply to persons experiencing homelessness who are without access to a viable shelter.

Any violation of this Order shall be subject to enforcement and penalty as provided under Los Angeles Administrative Code, Chapter 3, Section 8.78.

This Order, as herein amended or modified, shall remain in effect until such time as the Declaration of Local Emergency is terminated, or sooner at the direction of the Mayor.

_____

ERIC GARCETTI
Mayor

Dated at Los Angeles, California

Date: _____ June 3 , 2020

Time: _____ 1:00 pm._____

Filed with the City Clerk:

Date: _____ June 3 _____ , 2020

Time: _____ 1:40 p.m._____

By: _____

## DIRECTIVE RESCINDING CURFEW ORDER ISSUED
## DURING EXISTENCE OF LOCAL EMERGENCY

The necessity for a curfew no longer exists in the City of Los Angeles. Therefore, all previous Curfew Orders imposed pursuant to Los Angeles Administrative Code, Chapter 3, Section 8.29 are hereby rescinded.

ERIC GARCETTI
MAYOR

Dated at Los Angeles, California:

6 / 4 , 2020

Time: 4:40 pm

Filed with the City Clerk:

Date: June 4 , 2020

Time: 4:47 p.m.

By:

SAFE LA AFTER ACTION REPORT

Appendix E: Board of Commissions News Release

## News Release

*Wednesday, June 3, 2020*



## Demands for Law Enforcement Reform

The demonstrations of the last several days have been transformative for the people of Los Angeles, California, and Nation. The demands for law enforcement reform are being heard. Angelenos have been crying for a path forward, that doesn't repeat the mistakes of the past, and the Los Angeles Board of Police Commissioners is listening.

Today this body, which is charged with the oversight of the Los Angeles Police Department is establishing an aggressive reform agenda, which continues the evolution of our commitment to 21st Century policing.

This Department has made historic strides in our commitment to community engagement, meaningful partnerships and constitutional policing. These are the first steps in a long journey towards greater accountability, increased transparency, and a strengthening of public trust. These reforms include:

**Review and Revision of Police Department Budget**

A commitment to work with the City Administrative Officer, Chief Legislative Analyst and Mayor to identify $100-$150 million of cuts from the Los Angeles Police Department's Budget.

## Enhance Community Neighborhood Based Policing

- Commitment to expansion of Community Safety Partnership Sites
- Work with the community to accurately reflect and candidly describe the history of the department for the public, academy cadets, in-service training and at each community police station.

**Modification of Enforcement Strategies**

- An immediate moratorium on new entries into the CalGang Database until the Board of Police Commissioners has completed a review of the entire gang entry/removal process.
- An expansion of the Juvenile Diversion Program to include all 21 geographic Areas and specialized divisions, to lessen incarceration of juveniles.

**Support Meaningful Reformative Legislation**

- Advocate for a change to the City Charter regarding the discipline of officers.
- Publish new Department Policy that requires officers to intervene when another officer uses excessive force and requires officers to immediately report misconduct.
- Support the establishment of an independent prosecutor outside of the District Attorney's Office, for prosecution of police officers who engage in misconduct.

**SAFE LA AFTER ACTION REPORT**

- Support the legislation that improved juvenile diversion programs to ensure that juvenile diversion programs are widely available for youth.

**Enhancement of Police Training**

- Expand Mental Health Intervention Training to train 900 officers in 2020 from 700 in 2019.
- Complete De-escalation and Crowd Control Training for the entire Department by end of 2020
- Deliver Procedural Justice Training to remainder of Department.
- Deliver Implicit Bias Update Course to Department and complete retraining by end of 2020.

**Broadening of Risk Management Assessments**

- Review the process for Uses of Force to determine if the early warning system for problematic officer behavior is as effective as possible.
- Determine additional ways to enhance greater oversight of officers who have exhibited patterns of high-risk behavior.

**Expansion of Transparency and Accountability Efforts**

- Creation of updated Department homepage for ease of access by the public when seeking information on uses of force, complaints, crime statistics, and Department policies and procedures.
- Continued development of Racial and Identity Profiling Act data analysis.

**Implementation of SB 230 Requirements**

- In July 2020 the Commission will advance the implementation of the requirements of SB 230 which becomes effective January 1, 2021 which requires each law enforcement agency to maintain a policy that provides guidelines on the use of force, utilizing de-escalation techniques and other alternatives to force when feasible, specific guidelines for the application of deadly force, and factors for evaluating and reviewing all use of force incidents.

On Tuesday June 9, 2020, 9:30AM at the next Police Commission meeting we look forward to hearing from the community on these proposed enhancements and look forward to their input. Input can be sent via email to policecommission@lapd.online.

Appendix F: LAPD Organization Chart During Civil Unrest



Appendix G: Incident Command System Organization Chart



Appendix F: Acronyms

| Acronym | Meaning |
|---------|---------|
| AC | Assistant Chief |
| BLM | Black Lives Matter |
| BOPC | Board of Police Commissioners |
| CHP | California Highway Patrol |
| COP | Chief of Police |
| CP | Command Post |
| CSD | Custody Services Division |
| DA | District Attorney |
| DC | Deputy Chief |
| DOC | Department Operations Center |
| DOT | Department of Transportation |
| DTLA | Downtown Los Angeles |
| EOC | Emergency Operations Center |
| EOW | End of Watch |
| ETA | Estimated Time of Arrival |
| FEMA | Federal Emergency Management Agency |
| IAG | Internal Affairs Group |
| IC | Incident Commander |
| ICS | Incident Command System |
| LA | Los Angeles |
| LASAN | Los Angeles Sanitation |
| LADBS | Los Angeles Department of Building and Safety |
| LAFD | Los Angeles Fire Department |
| LAPD | Los Angeles Police Department |
| LAUSD | Los Angeles Unified School District |
| LASD | Los Angeles Sheriff's Departments |
| LMU | Loyola Marymount University |
| MCD | Major Crimes Division |
| MDC | Metropolitan Detention Center |
| MFF | Mobile Field Force |
| MPD | Minneapolis Police Department |
| MTA | Metropolitan Transit Authority |
| OCB | Operations-Central Bureau |
| OSB | Operations-South Bureau |
| OSS | Office of Support Services |

**SAFE LA AFTER ACTION REPORT**

| Acronym | Meaning |
|---------|---------|
| OWB | Operations-West Bureau |
| OVB | Operations-Valley Bureau |
| PAB | Police Administration Building |
| PR | Person Reporting |
| RA | Rescue Ambulance |
| RFC | Release from Field Custody |
| RHD | Robbery Homicide Division |
| SMPD | Santa Monica Police Department |
| TSB | Transit Services Bureau |
| TSE | Tactical Support Element |
| UCLA | University of Los Angeles |
| USC | University of Southern California |
|  |  |
|  |  |

Appendix G: Glossary Terms

- **Assistant Chief (AC):** An Assistant Chief is the second highest rank in the Department.  The AC commands one of the four organizational Offices and holds the title of "Director" of his or her Office.  The AC is a member of the Chief of Police's Direct Reports and Senior Staff.

- **Blocking Force:** Personnel deployed in an organized fashion to prevent access of an advancing crowd.

- **Bureau:** A Bureau is either a functional or geographical major segregation of specific Department activities such as Operations-Central Bureau.  A Deputy Chief is the commanding officer of a Bureau.

- **Captain:** A captain is assigned to a geographic Area, detective division, or specialized division.  There are three paygrade advancements: Captain I, II, and III.  Each higher level assumes a more complex and difficult level of responsibility.  This position is promoted from the rank of lieutenant and is a part of the COP's General Staff.

- **Civil Disobedience:** An unlawful event involving a planned or spontaneous demonstration by a group of people.

- **Commander:** A commander acts as the Assistant Commanding Officer at the four geographic Bureaus or Commanding Officer of a specialized group within the Department.  A commander is promoted from the rank of Captain and is a part of the COP's Senior Staff.

- **Crowd Control:** Law enforcement response to a pre-planned or spontaneous event, activity or occurrence where there is a potential for unlawful activity or the threat of violence.

- **Crowd Management:** Strategies and tactics employed by law enforcement agencies to deal with lawful assemblies in an effort to prevent escalation of events into an unlawful assembly or riot.

- **Deputy Chief (DC):** A deputy chief is the third highest rank in the Department.  The DC is assigned as the commanding officer of a major organizational component such as a geographic operations Bureau, Detective Bureau, or Professional Standards Bureau.  This position may be promoted from a captain or commander and is a part of the COP's Senior Staff.

- **Division:** A division is a functional subdivision within an Office, Bureau, or Group.  There are 21 geographic divisions, four traffic divisions, and 35 specialized divisions in the Department.  A Captain or Police Administrator (civilian equivalent) is the commanding officer of a division.

- **Incident Action Plan (IAP):** Contains objectives reflecting the overall incident strategy and specific tactical actions and supporting information for the next operational period.  The plan may be oral or written.  When written, the Plan may have a number of forms as attachments (e.g. traffic plan, safety plan, communications plan, map, etc.).

- **Incident Command System (ICS):** A standardized on-scene emergency management concept specifically designed to allow its user(s) to adopt an integrated organizational structure equal to the complexity and demands of single or multiple incidents, without being hindered by jurisdictional boundaries.

- **Incident Commander (IC):** The individual responsible for the management of all incident operations at the incident site.

- **Less-Lethal Impact Munitions:** Projectiles launched or otherwise deployed for the purpose of overcoming resistance, effecting arrest or addressing the threat of serious injury to an officer or suspect with less risk of causing death than the use of a firearm.

- **Mobilization:** The process and procedures used by all organizations federal, state, and local for activating, assembling, and transporting all resources that have been requested to respond to or support an incident.

- **Mobile Field Force (MFF):** A fast and effective method to assemble and deploy a platoon-sized, tactical forces from existing on-duty personnel.  The MFF is adaptable to both pre-planned and spontaneous events, which require the rapid assembly of large numbers of officers.

- **Office:** The Department has four functional Offices under the direction of the Chief of Police: Office of Operations, Office of Special Operations, Office of Support Services, and the Office of Constitutional Policing and Policy.  An Assistant Chief is the commanding officer of an Office.

- **Senior Staff:** The COP's Senior Staff is comprised of Assistant Chiefs, Deputy Chiefs, and Commanders and civilian equivalents of the Department.

- **Serious Bodily Injury:** is defined by but not limited to loss of consciousness, concussion, bone fracture, protracted loss or impairment of function of any bodily member organ, a wound requiring extensive suturing, and serious disfigurement (California Penal Code Section 243(f)(4)).

- **Strike Team:** Specified combinations of the same kind and type of resources, with common communications and a leader.

- **Tactical Support Element (TSE):** Is the primary service delivery package for the purposes of addressing preplanned or spontaneous demonstrations.  This element consists of a MFF or Strike team of on-duty Metropolitan Division officers.

