Cynthia Anderson Barker SBN 75764
NATIONAL LAWYERS GUILD
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
t. 213 381-3246  f. 213 381-3246
e. cablaw@hotmail.com

Paul Hoffman, SBN 71244
Michael Seplow SBN 150183
Aidan McGlaze  SBN 277270
John Washington SBN 315991
SCHONBRUN, SEPLOW, HARRIS, HOFFMAN & ZELDES LLP
11543 W. Olympic Blvd.
Los Angeles, California 90064-1508
t. 310 396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. jwashington@sshhlaw.com

Barrett S. Litt, SBN 45527
Lindsay Battles SBN 262862
KAYE, MCLANE, BEDNARSKI & LITT
975 E. Green Street
Pasadena, California 91106
t. 626 844-7660 f. 626 844-7670
e. blitt@kmbllaw.com
e. lbattles@kmbllaw.com

Pedram Esfandiary SBN 312569
e. pesfandiary@baumhedlundlaw.com
Monique Alarcon SBN 311650
e. malarcon@baumhedlundlaw.com
Bijan Esfandiari SBN 223216
e. besfandiari@baumhedlundlaw.com
R. Brent Wisner SBN 276023
e. rbwisner@baumhedlundlaw.com
BAUM, HEDLUND, ARISTEI & GOLDMAN, P.C.
10940 Wilshire Blvd., 17th Floor
Los Angeles, CA 90024
t. 310 207-3233 f. 310 820-7444

Attorneys for Plaintiffs
Additional Counsel on Next Page

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| BLACK LIVES MATTER LOS ANGELES, CANGRESS (DBA LA CAN), STEVEN ROE, NELSON LOPEZ, TINA CRNKO, JONATHAN MAYORCA, ABIGAIL RODAS, KRYSTLE HARTFIELD, NADIA KHAN, CLARA ARANOVICH, ALEXANDER STAMM, MAIA KAZIM, ALICIA BARRERA-TRUJILO, SHANNON LEE MOORE, DEVON YOUNG, LINUS SHENTU, individually and on behalf of a class of similarly situated persons,<br><br>PLAINTIFFS,<br>v.<br><br>CITY OF LOS ANGELES, a municipal entity, CHIEF MICHEL MOORE , and DOES 1-10 inclusive,<br><br>DEFENDANTS. | Case No.: 2:20-cv-05027 CBM-AS<br><br>**DECLARATION OF ROGER CLARK IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCION** |

DECLARATION OF ROGER CLARK

Carol A. Sobel, SBN 84483
Katherine Robinson SBN 323470
Weston Rowland  SBN 327599
LAW OFFICE OF CAROL A. SOBEL
725 Arizona Avenue, Suite 300
Santa Monica, CA 90401
t. 310 393-3055
e. carolsobel@aol.com
e. klrobinsonlaw@gmail.com
e. rowland.weston@gmail.com

Colleen Flynn, SBN 234281
LAW OFFICE OF COLLEEN FLYNN
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
t. 213 252-9444
r. 213 252-0091
e. cflynn@yahoo.com

Matthew Strugar, SBN 232951
LAW OFFICE OF MATTHEW STRUGAR
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90039
t. 323 696-2299
e. matthewstrugar@gmail.com

Jorge Gonzalez SBN 100799
A PROFESSIONAL CORPORATION
2485 Huntington Dr., Ste. 238
SAN MARINO, CA 91108-2622
t. 626 328-3081
e. jgonzalezlawoffice@gmail.com


Olu Orange SBN 213653
Orange Law Offices
3435 Wilshire BLvd., Ste. 2910
LOS ANGELES, CA. 90010-2015
T. 213 736-9900
f. 213 417-8800
e. o.orange@orangelawoffices.com

DECLARATION OF ROGER CLARK

**DECLARATION OF ROGER A. CLARK**

I, Roger A. Clark, declare as follows:

1. I am a police practices expert specializing in the procedures used by the police, proper police tactics. I have appeared as a police practices expert in over 1,000 cases throughout the United States, in both federal and state courts.

2. I have been retained by counsel for Plaintiffs. I am making this declaration in support of Plaintiffs' Application for a Temporary Restraining Order and for a Preliminary Injunction. The facts and opinions set forth in this Declaration are true and of my own personal knowledge or are based on information typically relied upon by experts in this area. If called as a witness, I could and would testify competently under oath as to the facts and opinions set forth herein.

## Background and Qualifications

3. I am a police practices expert specializing in the procedures used by the police, proper police tactics. I have appeared as a police practices expert in over 1,000 cases throughout the United States, in both federal and state courts.

4. My opinions are based in part on my training, professional experience and education. I am a twenty-seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988). The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system). POST was established by the Legislature in 1959 to set minimum selection and training standards for California law enforcement.

5. During my career, I was trained as a line officer regarding crowd and riot tactics and used that training when I was deployed as a line officer during the August 1970 riot in East Los Angeles and subsequent smaller disturbances that followed - both as a Deputy and as a Sergeant. As a Sergeant, I was assigned as one of four Sergeants to staff the newly created Los Angeles County Sheriff's (LASD) Emergency Operations Bureau (EOB). This was a four-year assignment from February 1, 1974 to April 1, 1978. The EOB was tasked by state law to develop and train all necessary procedures regarding natural disasters and civil disorders that might occur in Los Angeles County. Accordingly, I wrote and trained on personnel planning for such events and was tasked with training department personnel (including command staff) on procedures to manage such events. This included the development and staffing of the newly established LASD Emergency Operations Center (EOC) and Field Command Post (FCP). I used this expertise during significant events that included my command responsibilities during the Rose Parades, and as a commander of a platoon during the Rodney King Riots of April and May of 1992. During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations.

6. During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, from 1984 to 1987, I supervised the training of cadets at our Reserve Training Academy. They were taught, *inter alia*, proper apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

7. During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

DECLARATION OF ROGER CLARK
2

8. During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested. Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension. This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

9. As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the entry into a building for the purpose of an arrest and/or seizure of evidence.

10. Additionally, since my retirement, I have provided reports and given testimony regarding a number of alleged civil disturbances, including alleged riots in Los Angeles, Long Beach, San Diego and Davis, California. Some relevant Ninth Circuit cases in which my expert testimony was admitted include *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) (involving pepperball projectiles at a mass gathering); and *Young v. Cty. of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011) (involving baton strikes and pepper spray).

**Materials Reviewed**

11. In forming my opinions in this matter, I have based my opinions on the Report by Independent Counsel, Gerald Chaleff, of the [Los Angeles] Police Department Response to Protests in May/June 2020 (the "Chaleff Report"), declarations concerning recent events at Echo Park I understand will be submitted alongside Plaintiffs' application, the allegations and contents in Plaintiffs' First Amended complaint, and POST and LAPD training and standards documents.

**LAPD's Use of Munitions Against Protestors**

12. Police officers nationwide, including the LAPD, are trained that they may not use force, particularly kinetic projectiles, against protestors unless there was an objectively reasonable basis for the use of force against that particular individual. Indeed, LAPD's own policy states: "There are no exceptions to the Department's Use of Force Policy for crowd control situations. Officers may use only that force which is objectively reasonable." *See* LAPD Use of Force Tactics Directive No.11-June 2011. All persons are not subject to indiscriminate police force by simply being present at the scene, particularly at a scene where First Amendment rights are being exercised. Law enforcement officers are trained that they may only use force against persons pursuant to their lawful authority. However, there have been several reports indicating that LAPD officers deliberately inflicted significant indiscriminate force on the many persons in the crowd, seriously injuring many of them. Such use of indiscriminate force is unlawful and contrary to proper police training and practices.

13. LAPD officers are generally trained and aware that kinetic projectile are serious and potentially lethal uses of force. LAPD officers' use of force directive ostensibly instructs them that the use of such weapons is only permissible when an officer "reasonably believes that a suspect or subject is violently resisting arrest or poses an immediate threat of violence or physical harm." See LAPD Use of Force Tactics Directive No. 17-July 2018.

14. Even where firing kinetic impact projectiles would be appropriate, officers are trained to only use them by aiming for contact below the knee, avoiding striking body organs such as kidneys and spleen, causing a heart arrythmia by chest strikes or causing potential brain injury with shots to the head and neck, and even then to avoid direct contact with persons by first hitting the ground near their feet.

15. An appropriately-trained police officer acting in a reasonable manner would not indiscriminately fire a potentially lethal projectile into a crowd, or toward persons that are not engaged in conduct which could accurately be construed as posing a danger to themselves, the officer or the general public. This runs contrary to police officers' general trainings and relevant caselaw (as taught to all officers).

16. The Chaleff Report underscores this. As it also states "[b]ecause the 40mm round is target specific, it *cannot be used to disperse a crowd*." Chaleff Report at 42.

17. Nonetheless, the Chaleff Report also found that the majority of reported injuries were sustained by persons in crowds, and that officers quickly fired 40 mm rounds at distant targets. Chaleff Report at 61. As the report indicates, the LAPD expended a great deal of less lethal rounds during the protests. *E.g.* Chaleff Report at 43.

18. Even before the appropriate usage of impact projectiles, which these were not for the several reasons addressed above, Officers would be required to provide adequate warning before deploying such force where it would be at all feasible to do so.

19. The deployment of the uses of impact projectiles – even where they are proper – risks escalating situations and enraging crowds. Officers are trained about this. Additionally, Officers are trained under POST Learning Domain # 24, "Handling Disputes/Crowd Control" that "In a crowd management situation, law

enforcement presence is a preventive measure and should remain low profile. The presence of uniformed officers who display a command presence is often an adequate deterrent to unlawful activities. It is preferable for the crowd to remain focused on the event itself rather than on officer actions at the event." Officers are also trained that "[a]n otherwise peaceful group can become enraged by inappropriate officer conduct . . . ." The LAPD's Use of Force – Tactics Directive also holds that even where appropriate, "Crowd dispersal strategies should only be used when immediate action is necessary to stop violence and/or property damage and/or sufficient resources are not present to ensure public safety."

20. The indiscriminate – and targeted – uses of impact projectiles against non-violent protesters as depicted in the complaint, in the declarations concerning the Echo Park incident, and in the declaration of Cristina Astorga, are clearly unlawful and are contrary to state and nationwide standards and training for police officers. Such tactics are dangerous and counterproductive. Reasonable, properly trained officers should and would have known this.

21. The Chaleff Report's findings further underscores that there is an absence of reasonably specific training on the use of "less lethal" munitions. This is a serious concern. That concern is compounded by the fact that there appears to be no or poor direction or coordination of officers, and that even those higher level officers who theoretically could provide direction or co-ordination, though they do not appear to have done so here, have not even been adequately trained themselves.

I declare under penalty of perjury that the foregoing is true and correct. Executed April__, 2021 at Santee, CA

                                                     Roger A. Clark.