MICHAEL N.  FEUER, City Attorney – SBN 111529
KATHLEEN A. KENEALY, Chief Deputy City Attorney – SBN 212289
SCOTT MARCUS, Senior Assistant City Attorney – SBN 184980
CORY M. BRENTE, Senior Assistant City Attorney – SBN 115453
GABRIEL S. DERMER, Assistant City Attorney – SBN 229424
GEOFFREY R. PLOWDEN, Deputy City Attorney – SBN 146602
200 North Main Street, 6th Floor, City Hall East
Los Angeles, CA 90012
Phone No.: (213) 978-7038  Fax No.: (213) 978-8785
Email: geoffrey.plowden@lacity.org

*Attorneys for Defendants* CITY OF LOS ANGELES and CHIEF MICHEL MOORE

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLACK LIVES MATTER LOS ANGELES et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, et al.,<br><br>Defendants. | Case No. 2:20-cv-05027 CBM (ASx)<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING MOTION TO (1) DISSOLVE OR CLARIFY TEMPORARY RESTRAINING ORDER IN PART, (2) IN THE INTERIM, TO STAY TEMPORARY RESTRAINING ORDER IN PART, OR (3) IN THE ALTERNATIVE, TO STAY TEMPORARY RESTRAINING ORDER IN PART PENDING EMERGENCY APPELLATE RELIEF**<br><br>Judge:          Hon. Consuelo B. Marshall<br>Hearing Date: Not later than April 22, 2021<br>               per Fed. R. Civ. P. 65(b)(4) |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................5

STATEMENT.......................................................................................7

LEGAL STANDARD ..........................................................................11

ARGUMENT.......................................................................................12

I.  Issuing an ex parte TRO always risks unintended negative consequences.  The Court's TRO, issued in response to an emergency of Plaintiffs' own making, unfortunately realizes several of those consequences.  To correct them, the Court should dissolve and amend or clarify the TRO. ............................................................................12

    A.  Plaintiffs' delay created the emergency, and the Court should not have issued an ex parte TRO in response. ....................................12

    B.  Without the benefit of the City's response, the Court has ordered the  LAPD to treat a less-lethal weapon that is not used for crowd control as if it is used for crowd control.  The result is that officers are either foreclosed from using the weapon entirely, or must unnecessarily declare unlawful assemblies before using it...........................................................................................15

    C.  The Court has limited the LAPD's use of less-lethal weapons to situations when deadly force would be permissible.  It is wrong to erase the constitutional distinctions between lethal and less-lethal weapons..............................................................................16

    D.  The Court's Order does not account for critical differences between the intended uses of the 37mm and the 40mm less-lethal munitions because Plaintiffs elided those differences entirely in their ex parte application, then misrepresented the evidence in their "supplemental filing."........................................................18

    E.  Existing LAPD policies provide an enforceable framework for the use of 37mm and 40mm less-lethal munitions.  If anything, the Court's Order should hold the City to those policies.  The Order's second, third, and fifth points should be altered accordingly.................................................................................20

II.  The Court should stay the second, third, and fifth points in its Order immediately, and leave the stay in place pending its resolution of this motion seeking to dissolve and amend or clarify those points. ............20

III.  If the Court will not stay the second, third, and fifth points in its Order immediately and proceed expeditiously to rule on this motion, it should stay the Order pending the City's pursuit of emergency relief in the Ninth Circuit..................................................................................21

CONCLUSION....................................................................................21

DEFS.' MEM. OF P. & A. SUPP. MOT. TO DISSOLVE TRO

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Belknap v. Leary,*
  427 F.2d 496 (2d Cir. 1970) ........................................................................ 14

*Caldwell v. Wells Fargo Bank, N.A.,*
  No. 2:12-cv-09373 JAK, 2012 U.S. Dist. LEXIS 196245
  (C.D. Cal. Nov. 13, 2012) ........................................................................... 13

*City of L.A. v. Lyons,*
  461 U.S. 95 (1983) ..................................................................................... 15

*Deorle v. Rutherford,*
  272 F.3d 1272 (9th Cir. 2001) ................................................................... 17

*Elifritz v. Fender,*
  460 F. Supp. 3d 1088 (D. Or. 2020) .......................................................... 17

*Fuentes v. Shevin,*
  407 U.S. 67 (1972) ..................................................................................... 11

*Garcia v. Google, Inc.,*
  786 F.3d 733 (9th Cir. 2015) (en banc) .................................................... 13

*Glenn v. Washington Cnty.,*
  673 F.3d 864 (9th Cir. 2011) ..................................................................... 17

*M.S. v. Brown,*
  902 F.3d 1076 (9th Cir. 2018) ................................................................... 13

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ................................................................................... 19

*Mission Power Eng'g Co. v. Continental Cas. Co.,*
  883 F. Supp. 488 (C.D. Cal. 1995) ............................................................ 12

DEFS.' MEM. OF P. & A. SUPP. MOT. TO DISSOLVE TRO

*Smith v. City of Hemet*,
    394 F.3d 689 (9th Cir. 2005) (en banc) ........................................................... 17

*Tennessee v. Garner*,
    471 U.S. 1 (1985) ........................................................................................ 17

## Other Authorities

Fed. R. Civ. P. 62 ................................................................................................ 21

Fed. R. Civ. P. 65 .......................................................................................... 11, 12

Fed. R. Evid. 201 ................................................................................................... 8

L.A. Charter § 575 .............................................................................................. 13

DEFS.' MEM. OF P. & A. SUPP. MOT. TO DISSOLVE TRO

## INTRODUCTION

The City of Los Angeles and the Chief of the Los Angeles Police Department do not dispute the gravity of the First and Fourth Amendment issues that Plaintiffs have raised in this litigation.  That is why Chief Moore, who is accountable to the people of Los Angeles, relied on the benefit of the Los Angeles Police Department's experience and expertise to promulgate policies governing the use of less-lethal weapons.  Those policies are intended both to satisfy the Constitution's demands and to maintain the safety of the public and the Department's officers.

Plaintiffs, on the other hand, waited until an event predictable for months became an emergency, then pressed a federal court urgently to opine on the constitutionality of the Department's policies—without the benefit even of hearing from Chief Moore, the Defendant who is responsible for those policies.  The resulting Temporary Restraining Order (Doc. No. 71) dangerously and unnecessarily hamstrings the Los Angeles Police Department in its ability to respond to violence occurring in the midst of a planned protest of the verdict in Derek Chauvin's criminal trial—more so now, because the jury in that trial has a short while ago rendered its verdict.  Instead of abating a risk of imminent harm to those protestors, three facets of the Court's Order themselves create a particular risk of imminent harm to LAPD officers, protesters exercising their First Amendment rights, and any nearby Angelenos who are subjected to crimes occurring under the cover of otherwise lawful assemblies:

*First*, the Court has ordered the LAPD to "give a verbal warning to disperse" before an officer may use either a "40mm or 37mm launcher, except when an officer is attacked."  Because the 40mm launcher is not a crowd-control weapon, however, the Court's Order is overinclusive.  Under the Order, if a single person in a crowd engages in behavior that would justify the use of a less-lethal 40mm foam projectile, an officer must either declare an unlawful assembly—thereby interfering with the First Amendment rights of everyone else in the crowd—or use a different, and perhaps less effective, weapon.

DEFS.' MEM. OF P. & A. SUPP. MOT. TO DISSOLVE TRO

*Second*, the Court has declared that two less-lethal weapons, the 40mm and 37mm launchers, may now be used only in circumstances that would otherwise justify the use of deadly weapons:  Those circumstances in which the target poses "a threat of serious bodily harm to others."  But less-lethal weapons exist—and consistently with the Fourth Amendment and Ninth Circuit precedent can be used in response to lesser threats than those justifying firearms—precisely to defuse situations before the need to use deadly force arises.  For that matter, as to the 37mm launcher, Plaintiffs did not even seek this relief from the Court.  And Plaintiffs certainly did not provide evidence that would support the Court granting it.

*Third*, the Court has restricted officers from "aiming the launchers at the upper bodies of demonstrators and within five feet."  A 37mm launcher is not a direct-impact weapon; it isn't effective at its purpose when aimed directly at people, and LAPD policy already directs that it not be aimed directly at a person.  Instead, policy requires that officers who carry 37 mm launchers aim them at the ground in front of a crowd.  The evidence submitted in support of the Temporary Restraining Order doesn't even purport to show that 37mm projectiles have been used otherwise, with every declarant claiming only to have been struck with an unknown less-lethal projectile.  And LAPD policy already prohibits the 40mm launcher from being used within five feet of a target, with officers directed to aim at "the navel area or belt line," or "a leg, arm, or hand."  If officers are violating those policies, then those matters should have been, or should be, addressed on an individual basis.

What a handful of alleged violations should *not* augur is a sweeping, ex parte revision of carefully considered LAPD policies on the eve of an event that threatens to strain the Department and its officers as it is.  The City asks the Court to dissolve, or to clarify and amend, the preceding portions of its Temporary Restraining Order.  The City requests specifically that the Court instead hold the City to compliance with its written use-of-force policies.  In relevant part, those policies require that:

- 40mm less-lethal munitions may be used only when "[a]n officer reasonably believes that a suspect is violently resisting arrest or poses an immediate threat of violence or physical harm," and then should be aimed at "the navel area or belt line" or "a leg, arm, or hand" of a person five feet or further from the officer, with a warning first—if feasible; and

- 37mm less-lethal munitions may be used only when "an officer reasonably believes that suspects or subjects in a crowd are violently resisting a lawful order to disperse or pose an immediate threat of violence or physical harm," and then may only be fired at the ground 5 to 10 feet in front of the crowd, after a warning to disperse—unless "an officer or other person is attacked the officer and must respond to the suspect's actions."

In the interim, the City asks the Court to stay the conflicting portions of its Order pending its resolution of this motion. If the Court will not stay those portions of the Order and rule expeditiously on this motion, the City requests a stay pending emergency relief from the United States Court of Appeals for the Ninth Circuit.

## STATEMENT

On May 25, 2020, Minneapolis Police Department Officer Derek Chauvin knelt on George Floyd's neck for nine minutes and thirty seconds. Floyd died, sparking immediate and sustained worldwide protests over police uses of force against Black people and other people of color. The protests, which occasionally devolved into acts of violence and property destruction, themselves begat lawsuits over police uses of force against people at or near the protests. This action, for example, was filed on June 5, 2020. (Doc. No. 1.)

Plaintiffs subsequently applied to this Court ex parte for a temporary restraining order on June 24, 2020. (Doc. No. 14.) In relevant part, they asked the Court to broadly enjoin the LAPD from "using projectiles, including rubber bullets, to disperse or otherwise control crowds of protestors." (Doc. No 14-2 at 1:5–1:6.) After

allowing the City until June 30 to respond (Doc. No. 21), the Court found—among other things—that Plaintiffs' 19-day delay between filing their lawsuit and seeking a TRO was "a significant period of time" that weighed against the issuance of a TRO.  (Doc. No. 28 at 4:22.)  The Court ultimately denied the TRO application (again, for that reason and others).

Meanwhile, in Minnesota, Derek Chauvin and the other Minneapolis Police Department officers implicated in Floyd's death were arrested on May 29, 2020.  A scant month later—on June 30, 2020—the Hennepin County, Minnesota trial court set the first of the officers' trials for March 8, 2021.  And on January 11, 2021, the Hennepin County trial court ordered that it would be Derek Chauvin's trial that would begin on March 8.[1]

Of course, things didn't stand still in Los Angeles over the tumultuous nine-and-half-months between when Plaintiffs first sought ex parte relief from this Court and today.  There were other protests, and—according to several third-party declarations—a handful of other inappropriate uses of unidentified less-lethal munitions against people at those protests.  (Doc. Nos. 58-2 [August 21, 2020], 58-3 [March 14, 2021], 58-6 [August 26, 2020], 58-7 [March 25, 2021], 58-8 [same], 68-1 [same].)

But it wasn't until April 13, 2021, as the State of Minnesota rested its case against Chauvin, that Plaintiffs again applied to this Court ex parte for a "renewed" temporary restraining order to force the LAPD to significantly rearrange the policies surrounding its use of less-lethal munitions at protests on an immediate basis.  The purported emergency justifying that relief was a protest planned to coincide with the verdict in the *Chauvin* trial—an emergency for which Plaintiffs could have planned for *at least* three months before seeking relief on an ex parte basis.  (*See* Doc. No. 58-1 ¶ 3 [protest planned regardless of the trial's outcome].)  Plaintiffs sought initially to enjoin

---

[1] The Hennepin County court's orders are publicly available at https://www.mncourts.gov/media/StateofMinnesotavDerekChauvin.  Fed. R. Evid. 201(b).

DEFS.' MEM. OF P. & A. SUPP. MOT. TO DISSOLVE TRO

the LAPD entirely from using either its 37mm or 40mm less-lethal weapons "in public demonstrations." (Doc. No. 54-2 at 2:6.) The 37mm less-lethal weapon fires foam rubber projectiles that are intended to bounce off the ground in front of a violent crowd. The 40mm less-lethal weapon fires a foam projectile and is intended for use on an individual subject who poses an immediate threat of violence or physical harm. It is not a tool meant to control crowds.

The Court ordered the parties to appear for a telephonic status conference at 11:00 am on Thursday, April 15, just as Chauvin's defense rested. (Doc. No. 64.) At the April 15 status conference, the Court did not permit the City to offer a substantive opposition to Plaintiffs' ex parte application. The Court instead ordered the City to email it links to video clips of the 40mm and 37mm less-lethal weapons being fired. (Doc. No. 65.) It simultaneously ordered Plaintiffs to file a modified proposed order, and indicated that "[o]nce the Court has reviewed these items an order will issue." (*Id.*)

The City timely provided the requested videos. Plaintiffs filed a proposed order that would have entirely barred the use of both 40mm and 37mm less-lethal weapons "in the context of public demonstrations" with two exceptions. (Doc. No. 66 at 2:14–2:16.) First, LAPD officers could "use the 40mm weapons" if properly trained, but "only when faced with an imminent threat of serious bodily injury from a single subject/suspect" who is not "behind other individuals whose [*sic*] are not engaged in the threatening conduct believed to warrant use of the 40mm weapon." (*Id.* at 2:17–2:24.) Second, LAPD officers could "use 37mm projectile launchers to disperse a crown [*sic*] after an unlawful assembly has been declared and when it is possible to deploy this weapon without hitting demonstrators with 37mm projectiles in their upper bodies." (*Id.* at 2:25–2:28.) Officers would be barred from aiming "at the upper bodies of demonstrators" within five feet. (*Id.*) The City objected to Plaintiffs' proposed order. (Doc. No. 67.) Plaintiffs then made a "supplemental filing," purporting to identify specifically the evidence that would support the conclusions Plaintiffs wished the Court to draw. (Doc. No. 68.)

DEFS.' MEM. OF P. & A. SUPP. MOT. TO DISSOLVE TRO

1    Likely given the volume of Plaintiffs' ex parte filings and the Court's

2  understandable desire to reach the right result, no order was forthcoming until Monday,

3  April 19—just as the *Chauvin* case went to the jury.  Then, with the possibility of a

4  *Chauvin* verdict at any time, along with accompanying protests and the regrettable

5  specter of violence—but without hearing from the City—the Court ordered the LAPD

6  immediately and dramatically to change its use of force policies.  And further still, on

7  pain of contempt, the LAPD must correctly disseminate the Court's newly formulated

8  policies to the thousands of officers who might use either a 40mm less-lethal weapon or

9  a 37mm less-lethal weapon.

10   Before the Court's Order, LAPD policy was that 40mm less-lethal munitions

11  could be used only when "[a]n officer reasonably believes that a suspect is violently

12  resisting arrest or poses an immediate threat of violence or physical harm," and then

13  should be aimed at "the navel area or belt line" or "a leg, arm, or hand" of a person five

14  feet or further from the officer.  An officer using the 40mm less-lethal weapon is

15  supposed to give a warning first, if feasible.  (Decl. of Roger Murphy ¶ 7.)  Importantly,

16  the 40mm less-lethal weapon is not a crowd-control tool.  (*Id.*)  This policy applies

17  uniformly to its use under *any* circumstances.

18   The 37mm less-lethal weapon, on the other hand, *is* for crowd control.  (*Id.*

19  ¶ 5.)  Before the Court's order, LAPD policy forbade its use—absent exigency—until an

20  incident commander approved it and a dispersal order had been given.  (*Id.* ¶ 6.)  At that

21  point, it could be used only when "an officer reasonably believes that suspects or

22  subjects in a crowd are violently resisting a lawful order to disperse or pose an

23  immediate threat of violence or physical harm," and then could only be fired at the

24  ground 5 to 10 feet in front of the crowd—unless "an officer or other person is attacked

25  and must respond to the suspect's actions."  (*Id.*)

26   In contrast to those policies—and even to Plaintiffs' proposed order—the

27  Court's Order mandates, in five related points:  (1) that "LAPD is restricted from using

28  the 40mm and 37mm launchers in public demonstrations except by officers who are

DEFS.' MEM. OF P. & A. SUPP. MOT. TO DISSOLVE TRO

properly trained and certified to use the less-lethal launchers;" (2) that "LAPD must give a verbal warning to disperse consistent with the LAPD use of force directive and a reasonable opportunity to comply before deploying a 40mm or 37mm launcher, except when an officer is attacked;" (3) that an officer cannot use either a 40mm or 37mm launcher except against a person who poses "a threat of seriously bodily harm to others;" (4) that the 40mm less-lethal weapon cannot be used "to target the head, neck, face, eyes, or spine of a person;" and (5) that an officer cannot aim "the launchers at the upper bodies of demonstrators and within five feet."  (Doc. No. 71 at 8:5–8:18.)

## LEGAL STANDARD

When a district court issues an ex parte temporary restraining order, the party against whom it was issued may move to dissolve it on two days' notice—or less, if the district court agrees.  Fed. R. Civ. P. 65(b)(4).  This rule typically applies when a TRO was issued without any notice whatsoever.  Here, the City was given notice, but no meaningful opportunity to respond.  (4/15/21 Tr. at 24:9 – 24:16, 25:18–26:17.)  There is no relevant difference between a TRO issued without notice and a TRO issued without an opportunity to respond substantively.  *See Fuentes v. Shevin*, 407 U.S. 67, 81 (1972) (notice doesn't serve "its full purpose" if it doesn't precede a hearing at which a party can oppose the deprivation of which the notice warns).

DEFS.' MEM. OF P. & A. SUPP. MOT. TO DISSOLVE TRO

**ARGUMENT**

I.    **Issuing an ex parte TRO always risks unintended negative consequences.  The Court's TRO, issued in response to an emergency of Plaintiffs' own making, unfortunately realizes several of those consequences.  To correct them, the Court should dissolve and amend or clarify the TRO.**

A.    **Plaintiffs' delay created the emergency, and the Court should not have issued an ex parte TRO in response.**

Because applications for ex parte relief effectively foreclose opposition, and so prevent a court from receiving "the best possible presentation of the merits and demerits of the case on each side," they're generally disfavored.  *Mission Power Eng'g Co. v. Continental Cas. Co.*, 883 F. Supp. 488, 491 (C.D. Cal. 1995).  There are exceptions to most general rules, though, and temporary restraining orders are probably the principal exception to that one—because by nature TROs exist to stave off the risk of something bad happening before a court can hear from all parties concerned.  Fed. R. Civ. P. 65(b)(1)(A).  But while ex parte applications for TROs are necessary in emergencies, they become much less so where the party seeking ex parte relief created the emergency from which it seeks a court's immediate rescue.  *Mission Power*, 883 F. Supp. at 492.

And that is what happened here.  Plaintiffs' purported emergency—their reason for seeking, and receiving, ex parte relief from this Court—is a protest that Plaintiff BLMLA plans to hold when the *Chauvin* jury imminently renders its verdict.  (While the the City prepared this memorandum, the jury found Chauvin guilty on all counts.)  BLMLA plans to hold that protest regardless of the verdict reached.  (Doc. No. 58-1 ¶ 3.)  The trial of either one or all of the Minneapolis Police Department officers implicated in George Floyd's death had been scheduled for March 2021 since June 30, 2020, which is before this Court ruled on Plaintiffs' *previous* ex parte TRO application.  *See* pp 7–8, *supra*.  On January 11, 2021, the Hennepin County court in which Chauvin is being tried identified him as the specific defendant who would go on

DEFS.' MEM. OF P. & A. SUPP. MOT. TO DISSOLVE TRO

trial this March.  *See* p. 8, *supra*.  If BLMLA intended to protest at *Chauvin*'s conclusion, no matter the result, Plaintiffs could have sought the same relief by a noticed motion filed over three months ago.  Instead, Plaintiffs waited not just for the beginning of Chauvin's trial, but for the close of the prosecution's case.  Then they asked this Court to interfere, in a sweeping and dramatic manner, with the LAPD's use of force policies—without time for the Court even to hear from the LAPD before doing so.  As events have now transpired, the LAPD has had a scant day between when the Court issued its Order and the announcement of the *Chauvin* verdict.  In that time, the LAPD was required to analyze and disseminate the Court's subsequent Order among the officers who must abide by it.  That is a veritable contempt trap.

The Court's acceding to Plaintiffs' three-month-long (or more) strategic delay would be inequitable in any litigation.  Such delay would counsel heavily against issuing a temporary restraining order—and heavily in favor of dissolving one, at least in part.  *See Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc) (no abuse of discretion in denying an injunction after finding that a four-month delay undercut a finding of irreparable harm); *Caldwell v. Wells Fargo Bank, N.A.*, No. 2:12-cv-09373 JAK (FFMx), 2012 U.S. Dist. LEXIS 196245, at *3–*5, *10 (C.D. Cal. Nov. 13, 2012) (dissolving TRO after finding that the plaintiff had months' notice of a foreclosure, but made "a strategic choice" to delay until it became an emergency).  This is particularly true considering that this Court already found that Plaintiffs' previous 19-day delay in seeking emergency relief was excessive.  (Doc. No. 28 at 4:22.)

Moreover, against a municipal government, granting a TRO under such circumstances is not just inequitable.  It also raises federalism concerns.  *M.S. v. Brown*, 902 F.3d 1076, 1089 (9th Cir. 2018).  Well-intentioned as its action surely was, the Court has overridden the detailed policies implemented by Chief Moore, who is accountable to Angelenos.  L.A. Charter § 575(d), (e).  It has replaced those policies with a federal court's Order, necessarily conceived over the course of only a few days and informed by only one side of every issue upon which the Order touches.

DEFS.' MEM. OF P. & A. SUPP. MOT. TO DISSOLVE TRO

The same concerns informed the Second Circuit when it vacated, on an emergency basis, a temporary restraining order issued under similar circumstances against the City of New York.  After the NYPD allegedly failed to protect peaceful anti-war protestors during the May 8, 1970 New York City "Hard Hat Riot," the plaintiffs in *Belknap v. Leary*, 427 F.2d 496, 498 (2d Cir. 1970) sued New York's police commissioner.  On May 27, the plaintiffs sought an ex parte order restraining the commissioner "and his subordinates from failing to accord protection against physical harm at any legally constituted public demonstration over the Memorial Day weekend." *Id.* at 497.  On May 28, the district court issued just such an order.  *Id.* at 497–98.  And on May 29, the Second Circuit vacated it.  *Id.* at 499.  In doing so, it recognized that "[r]esponsibility for protecting the people of the City of New York in the exercise of their First Amendment right" falls, "in the first instance on their elected Mayor and his designee, the Commissioner of Police."  *Id.* at 498.  The Second Circuit continued, "[p]roper discharge of that duty is not likely to be enhanced by a necessarily vague order from a federal judge which the Commissioner is commanded to read or otherwise convey to the men and women on his force, with the attendant threat of contempt proceedings if their conduct falls short of what the judge thinks proper."  *Id.*

Regretfully and respectfully, so too here.

It is no answer in this case to say that the imposition on the City will be short-lived, because the LAPD faces the prospect of violence erupting around otherwise peaceful protests long before the May 3 preliminary injunction hearing in this case. More to the point, the LAPD now faces that prospect with (for example) an unworkable restriction on its 37mm less-lethal munitions, which are the only crowd-dispersal munitions approved for Department use and now may only be used in circumstances where lethal force could also be used.  That is an outcome even Plaintiffs did not request, but barring emergency action from the courts (starting with this one) it is now

DEFS.' MEM. OF P. & A. SUPP. MOT. TO DISSOLVE TRO

an outcome with which the City is stuck.  (*Compare* Doc. No. 71 at 8:12–8:14 *with* Doc. No. 66 at 2:17–2:28.)[2]

Unfortunately, that is not the only problematic result occasioned by the unjustified ex parte proceedings Plaintiffs initiated this case.

**B.     Without the benefit of the City's response, the Court has ordered the  LAPD to treat a less-lethal weapon that is not used for crowd control as if it is used for crowd control.  The result is that officers are either foreclosed from using the weapon entirely, or must unnecessarily declare unlawful assemblies before using it.**

First among problematic results is that the Court's Order requires the LAPD to treat 40mm less-lethal munitions as if they are crowd-control tools whenever officers find themselves "in public demonstrations."  (Doc. No. 71 at 8:5–8:11.)  Specifically, the Order's second point requires officers to "give a verbal warning to disperse" before using 40mm munitions.  (*Id.* at 8:8–8:11.)  But 40mm less-lethal munitions are *not* crowd-control tools—as Plaintiffs themselves have argued.  (*E.g.*, Doc. No. 53 at 12:25–13:3.)  Their use is instead subject to a *particular* warning (absent exigency) before they are used, and then they are used on a *particular* person in response to a *particular* violent behavior.  (Murphy Decl. ¶ 7.)  Even if Plaintiffs have uncovered individual violations of this policy—something that the City isn't in a position to dispute until it finishes investigating the incidents in a handful of declarations—that cannot justify the Court's wholesale reclassification of the tool from one thing to another for the purpose of restricting its use.  *Cf. City of L.A. v. Lyons*, 461 U.S. 95, 108 (1983) ("among the countless encounters between the police and the citizens of a great city such as Los Angeles" there will be instances of illegal or unconstitutional applications of force—and

---

[2] There is also the problem that Plaintiffs provided the Court with no evidence whatsoever about 37mm less-lethal munitions, *see* § I.D, *infra*, making per se improper any restraining order that extends to those munitions.

DEFS.' MEM. OF P. & A. SUPP. MOT. TO DISSOLVE TRO

that would be insufficient to support a wholesale injunction on a particular type of force).

Nevertheless, the Court *has* reclassified 40mm less-lethal munitions as if they were meant for crowd control.  The result of that is detrimentally to limit officers in the use of a tool on the spectrum of force that could ordinarily be applied to someone who is "violently resisting arrest" or who "poses an immediate threat of violence or physical harm."  Whereas that person could previously be subject to the use of 40mm less-lethal munitions, now—if he or she is at a "public demonstration"—an officer cannot use a 40mm less-lethal munition on the subject *at all* without ordering everyone to disperse on pain of arrest.  (Murphy Decl. ¶ 10.)  That doesn't make sense.[3]

> ### C.    The Court has limited the LAPD's use of less-lethal weapons to situations when deadly force would be permissible.  It is wrong to erase the constitutional distinctions between lethal and less-lethal weapons.

The previous problem is only compounded by this one:  Although Plaintiffs themselves did not propose it, the Order's third point imposed a heightened standard on the Department's use of both 40mm less-lethal munitions and 37mm less-lethal munitions.  Department policy allowed the use of the former on someone who violently resists arrest or who poses an immediate threat of violence or physical harm; it allowed the use of the latter when "subjects in a crowd are violently resisting a lawful order to disperse"—e.g., by throwing objects at officers—or when they pose "an immediate threat of violence or physical harm."  Plaintiffs proposed to limit the use of 40mm less-lethal munitions to situations where an officer faces "an imminent serious threat of

---

[3] Nor is it clear from the Order's second point whether an attack on an officer exempts him from having to give a dispersal order at all, or simply from having to wait for a reply before acting.  (Doc. No. 71 at 8:8–8:11.)  Further, under existing LAPD policy, use of 40mm less-lethal munitions already requires that the subject be warned first if feasible.

DEFS.' MEM. OF P. & A. SUPP. MOT. TO DISSOLVE TRO

serious bodily injury from a single subject" and to impose no limits on the use of 37mm less-lethal munitions beyond the declaration of an unlawful assembly and with caveats about where they may be aimed.  The Court, however, limited the use of both 40mm less-lethal projectiles and 37mm less-lethal projectiles to "persons who pose a threat of serious bodily harm to others."  (Doc. No. 71 at 8:12–8:14.)

The standard that the Court applied, of its own accord, is the standard that governs the use of lethal force.  *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc).  The weapons at issue here, as no one seriously disputes, are less lethal than firearms.  (Murphy Decl. ¶¶ 12, 13.)  That doesn't mean they are incapable of causing serious injury or death.  *Cf. Glenn v. Washington Cnty.*, 673 F.3d 864, 871–72 (9th Cir. 2011) (beanbag shotgun—not at issue here—can cause serious injury or death, but isn't considered a deadly weapon).  But it does mean that 40mm and 37mm less-lethal munitions are not substantially likely to cause serious injury or death, which in turn means that they are appropriately used in circumstances when lethal force is not.  *See generally Smith*, 394 F.3d at (a lethal weapon poses a substantial risk of death or serious injury).  The whole point of creating a niche in which the use of less-lethal weapons is appropriate is to avoid escalation to the use of lethal force.  *See, e.g.*, *Elifritz v. Fender*, 460 F. Supp. 3d 1088, 1101 (D. Or. 2020) (City of Portland policy allows officers to use less-lethal weapons to, among other things "avoid using a higher level of force").  By collapsing the distinction between lethal and less-lethal weapons, the Order needlessly eliminates a potential off-ramp between lesser types of force (e.g., pepper spray) and deadly force.  *Cf. Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001) (beanbag shotgun is "force much greater than that applied through the use of pepper spray).

Meanwhile, when combined with the rule in point two of the Court's Order, the rule announced in point three means that on one hand, the use of 40mm less-lethal munitions "in a public demonstration" requires a dispersal order *and* the risk of serious bodily harm, while on the other, the use of a firearm requires only the risk of serious

17

bodily harm.  That, too, does not make sense.  Nor does the Order's treatment of 37mm less-lethal munitions, which are cast as the equivalent of 40mm less-lethal munitions for nearly all purposes.  The two munitions are not the same.

> **D.    The Court's Order does not account for critical differences between the intended uses of the 37mm and the 40mm less-lethal munitions because Plaintiffs elided those differences entirely in their ex parte application, then misrepresented the evidence in their "supplemental filing."**

While the 40mm and 37mm less-lethal munitions aren't equivalent, it is understandable that the Court would treat them that way:  Plaintiffs did.  (*See* Doc. No. 53.)  Again, the 40mm less-lethal munition is meant to be directly fired at a specific person who is violently resisting arrest or presents an immediate risk of violence or physical harm.  The 37mm less-lethal munition is meant to be skipped off the ground to disperse violent crowds.  (Murphy Decl. ¶ 14.)  Why would Plaintiffs collapse the distinction between the two at every possible juncture, even as their proposed order treats them differently?  (Doc. No. 66 at 2:17–2:28.)

Without conceding that any of their evidence is sufficient to support the relief that Plaintiffs sought and obtained, there is indisputably *no* evidence in the record that *anyone* was injured by 37mm less-lethal munitions, never mind by the unconstitutional use of those munitions.  No declarant claims to have been hit by anything other than a generic less-lethal munition or impact projectile.  (Doc. Nos. 58-2 ¶ 4, 58-3 ¶ 4, 58-6 ¶ 4, 58-7 ¶ 2, 58-8 ¶ 2.)  To be sure, Plaintiffs claim that Christina Astorga was hit by a 37mm less-lethal round, but they offer absolutely no evidence in support of that claim.  (Doc. No. 53 at 14:1–14:11.)  Certainly Astorga herself didn't say so.  (Doc. No. 58-2 at ¶ 4.)  And whatever its authors' opinions are worth, the Chaleff Report—on which Plaintiffs also rely heavily—criticizes specifically the LAPD's use of 40mm less-lethal munitions.  It has virtually nothing to say about the use of 37mm less-lethal munitions.

Perhaps that's because the undisputed fact, which the City would have established previously if given an opportunity, is that 37mm less-lethal munitions are never aimed directly at anyone, but are instead skipped off the ground for the purpose of dispersing violent crowds.  (Murphy Decl. ¶ 14.)  Undisputed?  Yes.  The Chaleff Report, which Plaintiffs use in their "supplemental filing" to imply otherwise, contains a quotation from the munitions' manufacturer that they *can* be directly fired at people.  (Doc. No. 68 at 2:20–2:23, citing Doc. No. 56 at 94 [ECF page no. 101].)  But when the Chaleff Report discusses what the LAPD actually does with 37mm less-lethal munitions, it explains accurately the Department's policy that 37mm rounds are bounced off the ground rather than fired at anyone:  "The LAPD uses the 37mm foam baton rounds as a non-target specific impact tool.  The LAPD only allows the foam baton rounds to be skip-fired."  (Doc. No. at 56 at 42 [ECF page no. 49].)

A temporary restraining order, like a preliminary injunction, "is an extraordinary and drastic remedy," which "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation marks and citation omitted).  Whatever one might say about the rest of their evidence, Plaintiffs have *nothing whatsoever* that speaks to the LAPD's use of 37mm less-lethal munitions.  The absence of any evidence of the LAPD's use of 37mm less-lethal munitions, in turn, makes a TRO restricting their use inappropriate.

The void in the evidentiary record means that the Order should be dissolved to the extent it bears on 37mm less-lethal munitions at all, and that the fifth point in the Order requires clarification and limitation to 40mm less-lethal munitions.

DEFS.' MEM. OF P. & A. SUPP. MOT. TO DISSOLVE TRO

**E.      Existing LAPD policies provide an enforceable framework for the use of 37mm and 40mm less-lethal munitions.  If anything, the Court's Order should hold the City to those policies.  The Order's second, third, and fifth points should be altered accordingly.**

Among them, the three preceding sections of this brief call into serious question the second, third, and fifth points in the Court's Order.  Fortunately, the LAPD's policies already provide a workable, constitutional framework for the use of 40mm and 37mm less-lethal munitions.  The Court need not start from a blank slate if it dissolves, and subsequently amends or clarifies those points—or, indeed, the Order in its entirety.  If the Court must issue a temporary restraining order at all, it can simply incorporate the LAPD's policies, *see* p. 10, *supra*, and so hold the LAPD to those policies.

**II.     The Court should stay the second, third, and fifth points in its Order immediately, and leave the stay in place pending its resolution of this motion seeking to dissolve and amend or clarify those points.**

The Court's Order abruptly throws into disarray a Police Department that cannot afford disarray when facing the prospect of mass gatherings, many peaceful but some not, at any moment.  Accordingly, the City requests that the Court in its discretion stay the second, third, and fifth points in its Order, pending the dissolution, amendment or clarification of the Order on those points.

DEFS.' MEM. OF P. & A. SUPP. MOT. TO DISSOLVE TRO

**III.    If the Court will not stay the second, third, and fifth points in its Order immediately and proceed expeditiously to rule on this motion, it should stay the Order pending the City's pursuit of emergency relief in the Ninth Circuit.**

If the Court will not immediately stay the second, third, and fifth points in its Order and rule expeditiously on this motion, the City asks the Court to stay the Order pending its pursuit of emergency relief in the United States Court of Appeals for the Ninth Circuit.  Fed. R. Civ. P. 62(d).

## CONCLUSION

The Court should dissolve the Temporary Restraining Order (Doc. No. 71) in part, and amend or clarify its second, third, and fifth points to conform to the relevant— existing—LAPD policies.  In the interim, it should stay application of the second, third and fifth points.  If the Court will not, then the City requests that it stay its Order pending the City's pursuit of emergency relief in the United States Court of Appeals for the Ninth Circuit.

Respectfully submitted,

Dated:  April 20, 2021

LOS ANGELES CITY ATTORNEY'S OFFICE
Michael N. Feuer
Kathleen A. Kenealy
Scott Marcus
Cory M. Brente
Gabriel S. Dermer
Geoffrey R. Plowden

By:    /s/ Geoffrey R. Plowden
_____
Geoffrey R. Plowden, Deputy City Attorney
*Attorneys for Defendants*
The City of Los Angeles & Chief Michel Moore