MICHAEL N. FEUER, City Attorney
KATHLEEN A. KENEALY, Chief Assistant City Attorney (SBN 212289)
SCOTT MARCUS, Senior Assistant City Attorney (SBN 184980)
CORY M. BRENTE, Senior Assistant City Attorney (SBN 115453)
GABRIEL S. DERMER, Assistant City Attorney (SBN 229424)
GEOFFREY R. PLOWDEN, Deputy City Attorney (SBN 146602)
200 North Main Street, Room 600
Los Angeles, California 90012
Telephone: 213-978-7038
Facsimile: 213-978-8785
geoffrey.plowden@lacity.org

Attorneys for Defendants City of Los Angeles and Chief Michel Moore

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLACK LIVES MATTER LOS ANGELES, CANGRESS (DBA LA CAN), STEVEN ROE, NELSON LOPEZ, TINA ČRNKO, JONATHAN MAYORCA, ABIGAIL RODAS, KRYSTLE HARTFIELD, NADIA KHAN, CLARA ARANOVICH, ALEXANDER STAMM, MAIA KAZIM, ALICIA BARRERA-TRUJILO, SHANNON LEE MOORE, DEVON YOUNG, LINUS SHENTU, individually and on behalf of a class of similarly situated persons; <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF LOS ANGELES, a municipal entity, CHIEF MICHEL MOORE, and DOES 1-10 inclusive, <br><br> Defendants. | Case No.: 2:20-cv-05027 CBM-AS <br><br> **RESPONSE TO OSC RE PRELIMINARY INJUNCTION** <br><br> <u>Hearing</u> <br> Date: May 3, 2021 <br> Time: 10:00 a.m. |

# TABLE OF CONTENTS

I.   INTRODUCTION ...........................................................................................1

II.  RELEVANT FACTS ......................................................................................2

   A.   Echo Park Closure (Declarants Barbadillo, Kanegawa, Kim and Monterrosa).......5

   B.   Hollywood/Breonna Taylor (Declarant Baffa)........................................6

   C.   Third Street Tunnel (Declarant Guerrero) ............................................7

   D.   Tujunga (Declarant Astorga) ...............................................................8

III. LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS .................10

IV.  ARGUMENT...............................................................................................10

   Plaintiffs Have Not Met Their Burden To Obtain Injunctive Relief. ...........10

   A.   Plaintiffs Are Not Likely To Succeed On The Merits.............................11

   B.   Plaintiffs Have Not Demonstrated They Will Suffer Irreparable Harm. .............11

   C.   Balance of Equities and Public Interest..................................................16

V.   CONCLUSION............................................................................................19

# TABLE OF AUTHORITIES

**Cases**

*Abay v. City of Denver*, 445 F. Supp. 3d 1286 (D. Colo. 2020) ........................13

*Activation Products (CAN), Inc. v. Wecker*,
  2017 U.S. Dist. LEXIS 4196 (D. Ore. 2017) ........................................12

*ACT-UP v. Walp*, 755 F. Supp. 1281 (M.D. Pa. 1991) ................................12

*Anti Police-Terror Project v. City of Oakland*,
  2020 U.S. Dist. LEXIS 135607 (N.D. Cal. July 29, 2020) ..........................14

*Arc of California v. Douglas*, 757 F.3d 975 (9th Cir. 2014) ........................17

*Arthur J. Gallagher & Co. v. Edgewood Partners Ins. Ctr.*,
  2008 U.S. Dist. LEXIS 8924 (N.D. Cal.  2008) ....................................12

*Black Lives Matter Seattle-King Cty. v. City of Seattle*,
  466 F. Supp. 3d 1206 (W.D. Wash. 2020) ..........................................13

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ....................18

*Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) ........10, 12

*City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ..........................12, 15

*Detroit Will Breathe v. City of Detroit*, 484 F. Supp. 3d 511 (E.D. Mich. 2020) ..........14

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
  356 F.3d 1256 (10th Cir. 2004) ..................................................11

*Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150 (D. Or. 2020) ..........14

*Downes-Covington v. Las Vegas Metro. Police Dep't*,
  2020 U.S. Dist. LEXIS 240330 (D. Nev. Dec. 17, 2020) ............................10

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) ....................18

*Earth Island Institute v. Carlton*, 626 F3d 462 (9th Cir. 2010) ....................17

*Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862 (9th Cir. 2014) ....12

*Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018) ................................15

*Forrester v. City of San Diego*, 25 F.3d 804 (9th Cir. 1994) ......................15, 18

*Goyette v. City of Minneapolis*, 2020 U.S. Dist. LEXIS 100761 (D. Minn. 2020) ..........12

ii

*Graham v. Connor*, 490 U.S. 386 (1989) ......................................................11, 15

*Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998 (9th Cir. 2004)...............4

*L.A. Mem'l Coliseum Com. v. Nat'l Football League*, 634 F.2d 1197 (9th Cir. 1980)....16

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
   571 F.3d 873 (9th Cir. 2009) ......................................................................11, 16

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ...................................................14

*Nelson v. City of Davis,* 685 F.3d 867 (9th Cir. 2012) .......................................4

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374 (9th Cir. 1985)................11

*Scotts Co. v. United Indus. Corp.*, 315 F3d 264 (4th Cir. 2002) ...........................17

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000) ...........................................11

*Sloman v. Tadlock,* 21 F.3d 1462 (9th Cir. 1994)...........................................4

*Taylor v. Lemus*, 2015 U.S. Dist. LEXIS 186790 (C.D. Cal. June 17, 2015) ...................4

*Terrace v. Thompson*, 263 U.S. 197 (1923).................................................10

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ................................................10, 17

*Young v County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011) ..............................4

**Statutes**

Cal. Pen. Code § 835a.......................................................................17

RESPONSE TO OSC RE PRELIMINARY INJUNCTION

## I.   INTRODUCTION

The City of Los Angeles, including the Los Angeles Police Department, supports all Angelenos in the exercise of their First Amendment rights.  Sometimes, while supporting the right to free speech and assembly, there is a legitimate need to respond to violence or the threat of violence against people, including police officers, as well as looting and destruction of property.  This is why Plaintiffs' application for a temporary restraining order and preliminary injunction is so troubling.  If the facts were as Plaintiffs suggest, then perhaps their requested relief would be warranted.  The facts, however, are not at all as Plaintiffs suggest.  The evidence submitted by Plaintiffs in support of an injunction does not demonstrate the unconstitutional use of either the 37mm or 40mm less lethal munitions (LLMs).  Indeed, Plaintiffs' evidence barely demonstrates *the use* of either munition at all.  Instead, the evidence actually shows mostly the use of beanbag shotguns and batons—neither of which are the subject of Plaintiffs' application.  Nor are they much mentioned in the Chaleff Report, upon which the Plaintiffs so heavily rely, assuming that Report could be considered evidence.  For this reason alone, no injunction can issue.

In fact, rather than demonstrating the unconstitutional use of LLMs, the undisputed evidence demonstrates that Los Angeles police officers judiciously deployed 37mm and 40mm LLMs during the Echo Park protest, as well as during the other recent incidents raised in Plaintiffs' papers.  The evidence demonstrates that, to the extent officers deployed batons or beanbag shotguns—again, not the 37mm or 40mm LLMs that are the subjects of Plaintiffs' motion—it was when protestors attempted to blind (with lasers and strobe lights) or batter the officers themselves.

In summary, Plaintiffs have not demonstrated any entitlement to the injunctive relief they seek.  Furthermore, the evidence demonstrates the City justifiably used the less lethal weapons it did use.  Plaintiffs have not carried their burden and the Court should vacate the TRO, discharge the OSC, and deny their request for a preliminary injunction.

RESPONSE TO OSC RE PRELIMINARY INJUNCTION

## II.   RELEVANT FACTS

Following the death of George Floyd, protests and demonstrations occurred across the country, including in the City of Los Angeles.  Civil unrest broke out in the City, which required the LAPD to take action to protect Angelenos, their property, and police officers themselves.  This Court denied Plaintiffs' previous request for a TRO, made in the wake of those events.  Plaintiffs have returned, claiming there are "new developments" that warrant the relief they seek.

Principally, these new developments are the recent police response relating to the closure of Echo Park on March 25, 2021 and after-action reports relating to last summer's events, including one prepared by Gerald Chaleff.

But Plaintiffs have misstated the facts as to 37mm and 40mm LLMs, the tools they seek to ban.  Plaintiffs seek to rely on the objectionable Chaleff Report and the Safe LA After Action Report, but those merely contain photographs of the various LLMs and a description of how they are used.  *See* Dkt. 56, pp. 101-102 (Chaleff Report); Dkt. 57, p. 102 (Safe LA After Action Report).

The Chaleff Report does not allege any misuse of the 37mm launcher (nor inadequate training), stating "the 37 mm foam rubber baton round is a non-target specific round used for crowd control…Officers deploying the 37mm launcher are limited to firing a "foam baton" round by skipping the round off the ground in front of the intended target to disperse the crowds."  Dkt. 56, pp. 49, 101 (Chaleff Report).  The Safe LA After Action Report, which also found no fault in the use of the 37mm launcher, states "The foam baton rounds are skip fired in front of the crowd and are not fired directly at an individual." Dkt. 57, p. 85 (Safe LA Report).

Yet Plaintiff's Application improperly and repeatedly lumps the 37mm and the 40mm together in relation to the Chaleff Report, then erroneously concludes that all "these" less lethal munitions were faulted in the report.  *See, e.g.,* Dkt. 54-1 at 13:18-19 ("Chaleff Report findings underscore…absence of any adequate or reasonably specific LAPD training concerning the 40mm and 37mm projectiles.").  This is simply not

accurate.

Unlike the 37mm, the 40mm LLM is a target specific munition that is not used to disperse a crowd.  Dkt. 56, pp. 48, 49, 101 (Chaleff Report).  The Chaleff Report states "the 40mm can be an effective tool in a crowd control situation when utilized by officers who are well trained and experienced in its use." *Id.*, p. 52.  And while the Chaleff Report states that it *appears* many of the injuries reported came from the 40mm LLM, "the Review Team did not attempt to investigate the appropriateness of individual uses of less lethal munitions.  Nor could a determination be made about the amount of less lethal munitions other than that a large amount was used."[1]  *Id.*, pp. 50-51.  Similarly, the Safe LA Report, as well as A Crisis in Trust from the National Police Foundation (Dkt. 57), do not fault the use of the 40mm launcher.

Plaintiffs' subsequent TRO filings also erroneously cite A Crisis in Trust for the proposition that the deployment of less lethal munitions was inconsistent.  *See*, *e.g.* Dkt. 76 at 4:11.  A Crisis in Trust found the *documentation* of uses of force by police inconsistent, not the *deployment* of the less lethal munitions.  *See* Dkt. 56, p. 118, finding 1.3.  That report also discussed the state of training last May, not as of today. *Id.,* finding 1.4.  Thus, not only have Plaintiffs misrepresented and conflated the 37mm LLM's use with the 40mm LLM's use, but they misquote their own evidence, including the Chaleff Report, in order to support their otherwise baseless arguments.

Roger Clark's declaration does not provide anything to support a restraining order or preliminary injunction.  His opinions are not based on any declarations, photos or videos; he simply parroted the Plaintiffs' complaint and the (misquoted) Chaleff Report. Dkt. 60-1 (Clark Decl.), ¶ 11.  He offers no personal knowledge of how LAPD officers are trained or whether any use of force at issue in this case was unreasonable.  His legal conclusion is not based on evidence—it is based only on allegations in the unverified

---

[1] Defendants note the Chaleff Report only speculates that the bulk of injuries "appear to be" from 40mm rounds; the injuries could equally be from bean bag rounds, as demonstrated in Defendants' evidence.

RESPONSE TO OSC RE PRELIMINARY INJUNCTION

complaint—and so is inadmissible.  *Hangarter v. Provident Life & Accident Ins. Co*., 373 F.3d 998, 1016 (9th Cir. 2004) ("an expert witness cannot give an opinion as to [his] legal conclusion, which is effectively an opinion on an ultimate issue of law."); *Taylor v. Lemus*, 2015 U.S. Dist. LEXIS 186790, at *22 (C.D. Cal. June 17, 2015) (citing *Sloman v. Tadlock,* 21 F.3d 1462, 1468 (9th Cir. 1994)).

Mr. Clark cites two Ninth Circuit cases, but fails to recognize that neither case relates to 40mm or 37mm LLMs.  In *Nelson*, the officers fired pepper balls at partygoers at an apartment building, injuring plaintiff.  It was not a protest or demonstration case, and it did not involve the 40mm and 37mm LLMs at issue here.  *Nelson v. City of Davis,* 685 F.3d 867 (9th Cir. 2012).  In *Young,* sheriff's deputies used baton blows and pepper spray on an uncooperative motorist.  *Young v County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011).

Mr. Clark suggests that alternative crowd control options and "several other devices" would be available if LAPD is enjoined from using the 40 mm and 37 mm launchers, citing POST Learning Domain 24.  Dkt. 60-1, ¶ 22.  However, he does not say what those options are and fails to mention that POST Learning Domain 24 does not discuss less lethal options at all as crowd control measures, but instead focuses on skirmish line formations and arrest teams. *See,* https://post.ca.gov/portals/0/post_docs/basic_course_resources/workbooks/LD_24_V-3.1.pdf (pages 5-10 - 5-30).  Arrest teams require a squad of officers to go into a hostile crowd and use force to arrest an individual suspect, further inciting the crowd and endangering the officers.  This is the antithesis of "keeping a low profile" that Mr. Clark suggests is appropriate.  Dkt. 60-1, ¶ 19.

The declaration of Dr. Rohini Haar, cited in Plaintiffs' current application but filed with Plaintiffs' unsuccessful first attempt to restrain defendants (Dkt. 15-1), also cannot support the restraining order or preliminary injunction that Plaintiffs now seek.  Dr. Haar has no education, training or experience in crowd control or police practices, so her conclusion that "there is significant doubt that these weapons can be used in a

manner that is simultaneously safe and effective" has no foundation and should be disregarded.  Dkt. 15-1, p. 41, ¶ 13.  She offers no evidence that the specific munitions at issue in this case are unsafe or ineffective.  In fact, she does not mention the 40mm or 37mm LLM at all.

Then there are the declarations recently submitted by Plaintiffs, purportedly to support the notion that peaceful protestors were targeted by 37mm or 40mm LLMs at close range.  None of the declarants testify that they were hit with either a 37mm or 40mm LLM, and none of them testify as to the reasons they were hit with anything, if at all.  But body worn video and other evidence shows what the declarants were hit with, and why.

**A. Echo Park Closure** (Declarants Barbadillo, Kanegawa, Kim and Monterrosa)

A number of declarants claim they were hit by LLMs at close range during protests surrounding the recent closure of Echo Park, but the evidence provided by Plaintiffs is unhelpful, at best, as it does not show what type of LLM, if any, the officer was using, who any officer is firing at and what or who he or she hits, if anything. *See* Declaration of Donald Graham ("Graham Decl."), ¶¶ 17, 18.

On March 25, 2021, at 8:18 p.m., police officers declared an unlawful assembly at Echo Park, but certain people refused to disperse. Graham Decl., ¶ 15.  The dispersal order, which the declarants ignored, specifically warned that if declarants did not disperse, they could be arrested or subjected to other police action, such as the use of LLMs.  Graham Decl., ¶ 23.  Also, despite the numerous declarations filed by Plaintiffs, the relevant events took place at one location, over the course of four minutes. Graham Decl., ¶ 15.

Whatever Ms. Barbadillo's intentions, her videos do not show anyone being shot "directly in the chest, abdomen, back, and ribs with less-lethal projectiles." *See* Dkt. 58-4, 1:8-9.  One video, "Diana Barbadillo 6697," mainly shows an officer carrying a beanbag shotgun—not a 40mm or 37mm LLM.  In that video, Mr. Kanegawa is shown battering an officer by slapping down the muzzle of that beanbag shotgun.  In response

5

to Mr. Kanegawa's battery, a single beanbag round, fired by a different officer, hits the lower part of Mr. Kanegawa's backpack.  No one in the video appears harmed by a beanbag shotgun, let alone one of the LLMs (37mm or 40mm) at issue in Plaintiffs' Application.  Ms. Barbadillo's other video, "Diana Barbadillo 6699," shows officers *holding* 40 mm LLMs, but none are fired.  Ultimately, the video depicts a single beanbag round being fired *near* Mr. Kanegawa and Ms. Kim, but the video does not show where that beanbag round hit.

As the relevant body worn video makes clear, *only* beanbags, and not 37 or 40mm LLMs, were fired at Mr. Kanegawa.[2]  Graham Decl., ¶ 24 and Exhibits E, F, G.  By the same token, the video clearly demonstrates that Ms. Kim was hit with a baton, not any projectile.  *Id.*  Finally, although they were not hit with either a 37mm or 40mm LLM, officers used the reasonable force they did because Mr. Kanegawa and Ms. Kim were battering them by pushing down the muzzle of a beanbag shotgun and slapping an officer's hand.  They were not merely "peacefully protesting," but rather were aggressively defying a dispersal order.  *Id.*

Unfortunately, the video shows Mr. Monterrosa being hit by a 40mm LLM in the crossfire.  An officer was aiming for Mr. Kanegawa and Ms. Kim, but the 40mm struck Mr. Monterrosa because he stepped into the line of fire.  As with the shots from the beanbag shotgun, the shot was not from close range.  Graham Decl., ¶ 25.  It is worth noting that the press must obey the law like anyone else.  LAPD cannot guarantee their safety if they violate orders to disperse.  Declaration of Steven Lurie ("Lurie Decl."), ¶ 10.

**B. Hollywood/Breonna Taylor** (Declarant Baffa)

The video of this incident shows that Mr. Baffa was also hit with a beanbag

---

[2] The video also shows that the officer who fired a beanbag close to Mr. Kanegawa did not aim at, or hit Mr. Kanegawa.  The beanbag was intended for, and struck, a person who was behind Mr. Kanegawa, flashing a strobe light to blind the officers.  Graham Decl., ¶ 24.

RESPONSE TO OSC RE PRELIMINARY INJUNCTION

shotgun and not a 37mm or 40mm LLM.  Lurie Decl., ¶ 8.  During that March 13, 2021 event, protestors sprayed graffiti on walls and lit fires in trash cans.  At least one business was looted, and at least eight others vandalized.  Still, the LAPD fired just three less-lethal munitions that night, all beanbag rounds.  Lurie Decl., ¶¶ 3, 4.  This is a far cry from the indiscriminate use (of different weapons) claimed by Plaintiffs.

The officer who fired a single beanbag round at Mr. Baffa did so because the officer perceived that Mr. Baffa had started the fire in the trashcan or that Mr. Baffa was using the trash can fire to light an incendiary device to be hurled at the officers on the skirmish line—or both.  Lurie Decl., ¶ 8.  Mr. Baffa was hit in the shoulder either because he was moving or because that was the only party of his body part that wasn't shielded by the trashcan.  The officer was at least twenty feet from Mr. Baffa when he fired at him.  Lurie Decl., ¶ 11 and Exhibit B.

Finally, in terms of the claim that Mr. Baffa is a member of the press, it is unlikely that the officer could have seen the word "PRESS" on the front and back of his "safety vest."  Lurie Decl., ¶ 9.  More fundamentally, officers are trained to scan every individual they see for threats, regardless of whether they identify themselves as "PRESS."  If the officer reasonably believed that Mr. Baffa was lighting a fire or an incendiary device, then the use of force was justified regardless of Mr. Baffa's self-identification as a member of the press.  *Id.*  Again, although the media may be allowed to move in and around a skirmish line, they do so at their own risk.  The LAPD cannot guarantee their safety, and they must obey the law like any other member of the public.  Lurie Decl., ¶ 10.

**C. Third Street Tunnel** (Declarant Guerrero)

As with the other declarants, Mr. Guerrero does not testify that he was struck by a 37mm or 40mm LLM; it is quite likely that he also was struck with a beanbag round.  Either way, the overwhelming evidence from the protest on August 26, 2020 shows it was not a "peaceful" event, contrary to any characterization of Mr. Guerrero.  As the declaration of Roger Murphy shows, protestors vandalized a bank with spray paint, and

RESPONSE TO OSC RE PRELIMINARY INJUNCTION

many were armed with illegal weapons. Declaration of Roger Murphy ("Murphy Decl."), ¶ 5 and Exhibit 1.  Once at the Third Street tunnel, protestors blockaded the west end, and vandalized the inside with spray paint and markers. Murphy Decl, ¶ 6.  At that point, officers attempted to peacefully and methodically diffuse the situation by taking appropriate people into custody and releasing others. Murphy Decl., ¶ 7.  Due to violent people in the crowd, several officers used beanbag rounds, as well as the 40mm LLM, in an effort to gain compliance. Murphy Decl., ¶ 13.  Target specific LLMs, not 37mm LLMs, were used during this event.  *Id*.  Officers were required to aim at the legs of the protestors who were holding shields, as the rounds were ineffective against the shields.  In addition to shields, protestors had Tasers, a BB gun, a wrench, a hammer, a baseball bat, a pry bar, brass knuckles, pepper spray, knives, smoke balls, hard hats, helmets, umbrellas and snow sleds.  Murphy Decl., ¶ 13, 15 and Exhibits 5, 6, 7.

Further, Protestors lined up together and began using strobe lights and lasers against police officers.  Murphy Decl., ¶¶ 8, 9 and Exhibit 4.  Specifically, a woman, using a green sled as a shield, attempted to blind officers with lasers. Murphy Decl., ¶ 10 and Exhibits 2, 3.  In response, an officer fired a beanbag round at her abdomen, but it deflected off her shield.  *Id*.  She continued to shine the laser, so officers made an effort to arrest her.  Murphy Decl., ¶ 10.  She resisted arrest and fought to free herself. Lieutenant Murphy tried to try to pull her away from the crowd, but protestors managed to pull her back into the crowd.  Murphy Decl., ¶ 11, 12.

When Lieutenant Murphy again tried to pull her back, a man hit him in the face with a large plastic shield.  Murphy Decl., ¶ 12.  He was severely dazed and nearly fell over, but managed to pull out his baton to strike the man, who was eventually arrested. *Id*. and Exhibit 8. The woman with the laser changed clothes so as to avoid detection and arrest.  Murphy Decl., ¶ 12.

**D. Tujunga** (Declarant Astorga)

As with the other declarants, Ms. Astorga does not testify that she was stuck with the LLMs at issue here.  In fact, Ms. Astorga was also hit with a round from a beanbag

shotgun.  Declaration of German Hurtado ("Hurtado Decl."), ¶ 5.  Pro and anti-President Trump demonstrations took place every Friday afternoon in the Tujunga area from February 2020 until late August 2020.  Hurtado Decl., ¶ 2.  In the beginning, the protests would only draw 20-50 protestors on each side of the street and were relatively peaceful.  *Id.*  By the summer, attendance more than doubled and the scene became more contentious and hostile, with protestors regularly walking into the open street to scream and taunt each other.  *Id.*  Vandalism, battery, and assaults became more prevalent and officers and vehicles were deployed to keep protestors apart and on their respective sides of the street.  *Id.*

This was the scene on August 21, 2020, which drew the largest crowd since the protests began, due to the presence of the "Trump Unity Bridge," a 60-foot float decorated with slogans such as "Make America Great Again" and "Secure America's Borders."   Hurtado Decl., ¶ 3. Though LAPD had a plan to address any lawlessness that could arise that day, the protest devolved into violence and chaos by the late afternoon.  *Id.*  Some of the over 40 officers deployed were pelted with projectiles and smoke bombs and an unlawful assembly was declared.  *Id.*

It was then that Ms. Astorga was hit with a round from a beanbag shotgun.  Hurtado Decl., ¶ 6.  She was standing next to a person wearing all black and holding a white sign with a pole.  *Id.* An officer, who was sprayed in the face with chemical-laced water moments before, used his baton to push back Ms. Astorga and the person in black.  *Id.*  When the latter person turned the sign sideways to use the pole as a weapon against the officers, officers fired two beanbag rounds.  *Id.*  One round hit the sign and the other round appears to have inadvertently struck Ms. Astorga, since she was so close to the person holding the pole.  *Id.* and Exhibit A.

To be clear, at this point the City is not arguing the merits—one way or the other—of any individual Plaintiff's or declarant's claim.  It is, however, pointing out to the Court that the evidence Plaintiffs have mustered is both inaccurate and does not carry their burden to obtain preliminary injunctive relief.

## III.   LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS

A preliminary injunction is an extraordinary remedy that may only be issued upon a clear showing that the plaintiff is entitled to such relief.  *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008).  That showing must be made by the plaintiff as to each of four elements:  (1) the plaintiff must be likely to succeed on the merits of its claim; (2) it must be likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities must tip in its favor; and (4) an injunction must be in the public interest.  *Id.* at 20.

Importantly, a plaintiff must demonstrate an immediately threatened injury as a prerequisite to preliminary injunctive relief.  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  In addition, there must be no adequate remedy at law, such as damages.  *Terrace v. Thompson*, 263 U.S. 197, 214 (1923).  As demonstrated herein, Plaintiffs have not met this standard.

## IV.   ARGUMENT

### Plaintiffs Have Not Met Their Burden To Obtain Injunctive Relief.

Following the conviction of Derek Chauvin, the City has remained calm and there have not been any noteworthy crowds or police responses.  Fundamentally, Plaintiffs have not presented any competent evidence to suggest they will likely suffer irreparable harm *now* without injunctive relief.  "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction … [A] plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief."  *Caribbean Marine Services*, 884 F.2d at 674 (emphasis in original; internal citations omitted); *Downes-Covington v. Las Vegas Metro. Police Dep't*, 2020 U.S. Dist. LEXIS 240330, at *36-37 (D. Nev. Dec. 17, 2020). ("Because demonstrating a mere possibility is insufficient to obtain preliminary relief, the Court finds that Plaintiffs have not met their burden in showing irreparable harm as to their Fourth Amendment claim.").

**A. Plaintiffs Are Not Likely To Succeed On The Merits.**

Plaintiffs are not likely to succeed in barring the use of 37mm or 40mm LLMs in public demonstrations because the use of such devices is justified and appropriate. There are certainly many instances where deadly force is not warranted but lesser force is. Equally important, the evidence submitted by Plaintiffs in support of this injunction does not demonstrate or show *any* unlawful use of *these* LLMs. *See, e.g.,* Graham Decl., ¶¶ 17, 18.

Further, the evidence shows that most of the declarants were violating a lawful dispersal order and were engaged in unlawful activity when they were subjected to an LLM, which in most cases was a beanbag and not a 37mm or 40mm. *See, e.g.,* Graham Decl. ¶¶ 23, 24, 25 and Exhibits E, F, G. Accordingly, the force was reasonable, and based on the evidence presented, Plaintiffs are not likely to succeed on the merits. *See Graham v. Connor*, 490 U.S. 386, 395 (1989).

**B. Plaintiffs Have Not Demonstrated They Will Suffer Irreparable Harm.**

Under the second *Winter* factor, Plaintiffs must "demonstrate that there exists a significant threat of irreparable injury." *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1376 (9th Cir. 1985). To that end, Plaintiffs must establish that "extreme or very serious damage will result" absent an injunction, and, importantly, that their injuries are not "capable of compensation in damages." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quotation marks omitted). Failure to establish irreparable injury, by itself, is grounds for the Court to deny Plaintiffs' application *See, e.g., Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) ("[B]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.") (quotation marks omitted); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("A showing of irreparable injury is the sine qua non of injunctive relief…. Significantly,

even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper.") (citations and quotation marks omitted).

"Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Services*, 844 F.2d at 674 (emphasis in original; internal citations omitted). That a specific plaintiff, or declarant, has allegedly been injured in the past by a police officer is not a sufficient reason to impose injunctive relief because the claim that the police will purportedly violate plaintiffs' constitutional rights or fail to follow the law in the future is speculative. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-106 (1983); *Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 868 (9th Cir. 2014) ("But it is not the presence or absence of a past injury that determines Article III standing to seek injunctive relief; it is the imminent prospect of future injury."); *Activation Products (CAN), Inc. v. Wecker*, 2017 U.S. Dist. LEXIS 4196, *3 (D. Ore. 2017) (court denied motion for temporary restraining order where "there is no allegation that [defendant's] conduct has increased in severity or frequency such that *immediate* relief is necessary.").

In *Goyette v. City of Minneapolis*, 2020 U.S. Dist. LEXIS 100761 (D. Minn. 2020), the District Court denied a journalist's request for a temporary restraining order because there was no showing "the conduct he seeks to enjoin—occurring over a five-day period of unprecedented civil unrest—has occurred since May 31, 2020, or" that the "conduct is likely to recur imminently….As a result [plaintiff] has not established that harm is certain and of such imminence that there is a clear and present need for equitable relief." *Goyette*, 2020 U.S. Dist. LEXIS 100761, *10-11; *see also Arthur J. Gallagher & Co. v. Edgewood Partners Ins. Ctr.*, 2008 U.S. Dist. LEXIS 8924, at *7 n.4 (N.D. Cal. 2008) (finding one incident is insufficient to demonstrate a threat of present or future harm; citing *ACT-UP v. Walp*, 755 F. Supp. 1281, 1285-86 (M.D. Pa. 1991) (denying

12

preliminary injunction based on isolated act of a state police officer blocking protestors from the state capital building when afterwards, the plaintiffs "easily strolled into the Capitol" and "held a press conference at the foot of the grand staircase . . . without molestation.").

The same is indisputably true here. None of the declarants, save for one, was even struck by either of the 37mm or 40mm projectiles that Plaintiffs seek to restrict. *See* Graham Decl., ¶¶ 24, 25; Lurie Decl., ¶ 8; Hurtado Decl., ¶ 6. There is no evidence before this Court of any recent or imminent inappropriate use of these projectiles to support an injunction. Certainly references to the Chaleff Report cannot suffice, as that Report is itself about last summer's events, and it does not discuss the use of the 37mm during those events *at all*.

This is all in stark contrast to the cases upon which Plaintiffs rely, where there was evidence of actual and ongoing police misconduct. In *Abay*, issued on June 5, 2020, "plaintiffs provide video evidence of police conduct at the demonstrations. Those videos show that the officers had ample time for reflection and were not dealing with dangerous conditions. Named plaintiffs were attacked with rubber bullets, tear gas, etc, allegedly solely on the basis of their presence at the demonstrations." *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1291 (D. Colo. 2020).

Similarly, *Black Lives Matter Seattle* was issued on June 12, 2020. In that case, a "video of a June 1, 2020 protest in Capitol Hill suggests that [the Seattle Police Department (SPD)] exerted excessive force without provocation—the protesters were largely peaceful, SPD changed its posture by replacing frontline officers on bicycles with officers donning gas masks, and then SPD deployed a battery of pepper spray, flash-bang grenades, and tear gas….And the protests are live. In fact, a statewide walkout is set to commence moments after this Order is entered." *Black Lives Matter Seattle-King Cty. v. City of Seattle*, 466 F. Supp. 3d 1206, 1214-1215 (W.D. Wash. 2020).

Likewise in *Don't Shoot Portland*, issued June 9, 2020: "There is a real and

13

immediate threat that Plaintiffs will be deprived of these rights as protests continue. The declarations in this case show that [the Portland Police Bureau] has regularly used tear gas to disperse peaceful protestors." *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1156 (D. Or. 2020).

In *Breathe*, which was issued September 4, 2020, the Court was presented with evidence that "in response to their peaceful protest activity during the evening of August 22, 2020, Detroit police officers beat [demonstrators] with batons, sprayed them with pepper spray, fired tear gas and rubber bullets at them, rammed them with a police car, and more." *Detroit Will Breathe v. City of Detroit*, 484 F. Supp. 3d 511, 516-17 (E.D. Mich. 2020).

And in obvious contrast to the parties here, the parties in *Anti Police-Terror Project*, issued July 29, 2020, agreed on some terms of an injunction. "Having considered the arguments and evidence submitted by the parties in connection with the pending motion for a preliminary injunction, the parties' agreement that a preliminary injunction may issue and their agreement as to some of the terms of that injunction, and for the reasons that will be set forth in a written order to follow the issuance of the instant Order, the Court enters the following preliminary injunction." *Anti Police-Terror Project v. City of Oakland*, No. 20-cv-03866-JCS, 2020 U.S. Dist. LEXIS 135607, at *1-2 (N.D. Cal. July 29, 2020).

Here, although Plaintiffs bear the burden of proof and persuasion by "a clear showing," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (italics removed), their evidence at best shows that demonstrators may have recently been struck by *something*, but, barring one incident, not with the 37mm or 40 mm LLM.  (Dkts. 58-2 ¶ 4, 58-3 ¶ 4, 58-6 ¶ 4, 58-7 ¶ 2, 58-8 ¶ 2.)  As to the 37mm, there is indisputably *no* evidence that *anyone* was injured by that munition, let alone by its unconstitutional use.  While Plaintiffs *argue* that Ms. Astorga was hit by a 37mm less-lethal round, they offer absolutely *no evidence* in support of that claim.  (Dkt. 53 at 14:1–14:11.)  Certainly Ms. Astorga herself didn't say so.  (Dkt. 58-2 at ¶ 4.)  And though objectionable as

admissible evidence, the Chaleff Report—on which Plaintiffs rely heavily—criticizes the LAPD's use of the 40mm LLM.  It has virtually nothing to say about the use of the 37mm LLM.  Perhaps that is due to the undisputed fact that 37mm LLMs are not aimed directly at anyone, but are instead skipped off the ground for the purpose of dispersing violent crowds.  (Dkt. 75-2, ¶ 14.)  "The LAPD uses the 37mm foam baton rounds as a non-target specific impact tool.  The LAPD only allows the foam baton rounds to be skip-fired."  (Dkt. 56 at 42 [ECF page no. 49].)

Further, Plaintiffs recognize that LAPD policies provide for less lethal munitions in certain situations. "When the use of force is appropriate in a crowd control situation, only that force reasonable to make an arrest or disperse a crowd should be used." LAPD, Use of Force-Tactics Directive No. 11, Crowd Management, Intervention, and Control. (*See* Dkt. 14-1 at 7:38).  This is consistent with the constitutional directive that force is reasonable based on the totality of the circumstances facing the officer. *Graham,* 490 U.S. at 386.  In addition, the Ninth Circuit has upheld the use of less lethal weapons in such circumstances.  For example, in *Felarca v. Birgeneau*, 891 F.3d 809, 818 (9th Cir. 2018), the Ninth Circuit upheld the University of California Police Department's right to use batons against "Occupy Berkeley" protesters that refused to obey lawful dispersal orders, and shouted at officers and engaged them in verbal and physical altercations.  Similarly, in *Forrester*, the Ninth Circuit affirmed a jury verdict which found that police used reasonable force when they used pain compliance techniques to remove protesters that were part of an effort "to invade private property, obstruct businesses and hinder law enforcement." *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994).

Of course, certain individuals may be entitled to damages for a wrongful use of force, but that yet does not mean they would be entitled to an equitable remedy banning the use of LLMs for all purposes.  *Lyons*, 461 U.S. 95 at 111.

In sum, Plaintiffs have not shown that they will suffer irreparable harm in the absence of an injunction—no evidence suggests any police officer wrongly used a 37

mm or 40 mm LLM since last summer or that the Plaintiffs will be subjected to any alleged wrongdoing in the future—and equally important, Plaintiffs have not shown that they could not be fully compensated by damages. *Marlyn Nutraceuticals*, 571 F.3d 873 at 879.

### C. Balance of Equities and Public Interest.

The final *Winter* factors also do not support an injunction. First, the balance of equities does not tip in Plaintiffs' favor. Again, the issue is not First Amendment rights, which no one disputes, but public safety on a broader scale. In such cases, the Court has a duty "to balance the interests of all parties and weigh the damage to each, mindful of the moving party's burden to show the possibility of irreparable injury to itself and the probability of success on the merits." *L.A. Mem'l Coliseum Com. v. Nat'l Football League*, 634 F.2d 1197, 1204 (9th Cir. 1980).

Less lethal munitions generally, and the LLMs at issue here, play an important role in balancing the interests of the First Amendment rights of people and the safety of the public, including the officers guarding those people while they exercise their rights. When demonstrations are peaceful, law enforcement stays out of the way, and remains in the area to ensure the rights of the demonstrators are not impeded. Dkt. 75-2 (Murphy Decl.) at ¶ 4. When persons intent on violence insert themselves into otherwise peaceful protests, law enforcement officers may use the 40mm LLM to effectively deal with those persons, while allowing the peaceful demonstrators to continue unhindered. *Id.* When demonstrators become violent, or large numbers of people begin looting or setting fire to property, then the 37mm LLM becomes an effective tool, as it moves a large crowd out of an area and enables law enforcement to disperse the crowd, thereby protecting persons and property from further destruction. *Id.*

As explained by the *Hodgers-Durgin* Court, the "proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the States' criminal laws in the absence of irreparable injury which is both great and immediate…In the absence of a likelihood of

injury to the named plaintiffs, there is no basis for granting injunctive relief that would restructure the operations of the Border Patrol and that would require ongoing judicial supervision of an agency normally, and properly, overseen by the executive branch." *Hodgers-Durgin*, 199 F.3d at 1044 (citations omitted).

For this reason also, an injunction is not in the public interest.  The impact of an injunction would reach beyond the parties and may be felt by countless residents (and visitors) of the City.  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quotation marks and citation omitted).  Here, issuing an injunction is not in the public interest because it would prevent LAPD from lawfully using reasonable force to enforce the law, protect people and property, effect arrests, or overcome resistance. Cal. Pen. Code § 835a.

In considering the relief sought by Plaintiffs, the Court must also consider potential harms to the City. "Before a preliminary injunction may issue, the court must identify the harm that a preliminary injunction might cause the defendant and weigh it against plaintiff's threatened injury.  "[T]he real issue in this regard is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly granted or denied." *Scotts Co. v. United Indus. Corp.*, 315 F3d 264, 284 (4th Cir. 2002); see *Winter*, 555 U.S. at 24; *Earth Island Institute v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010).

The requested relief not only denies officers statutory rights to use reasonable force, but also will irreparably impact officers' abilities to keep the community safe during demonstrations where "protesters" engage in criminal behavior. *See, e.g.,* Dkt. 75-2 at ¶ 5 (Without these LLMs "officers are limited to the beanbag shotgun and the baton to deal with persons in crowds who threaten violence or violently resist arrest. The baton requires officers to come in close contact with the crowd to physically engage with the threatening persons. This close contact with the crowd can result in escalated tensions."); A*rc of California v. Douglas*, 757 F.3d 975 (9th Cir. 2014) (substantial

RESPONSE TO OSC RE PRELIMINARY INJUNCTION

likelihood of success on the merits by itself is insufficient for a preliminary injunction, plaintiffs need to demonstrate future harms and there was an insufficient record to determine if there was irreparable harm); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) (affirming the denial of a preliminary injunction challenging the government's decision to let a commercial oyster permit expire and noting that when the government is a party, the government's public interest is not negligible.).

The relief Plaintiffs seek would negatively impact the safety and security of the public at large when a peaceful protest turns into large scale violence, which can certainly happen.  (Dkt. 24-3 (Rimkunas Decl.) at ¶ 19).  It is inappropriate to deprive law enforcement of the tools it needs to protect and preserve the rights of those who wish to lawfully exercise their First Amendment rights, the safety and security of the public at large, and the safety of the officers on the line.  In appropriate circumstances, the City may well have "a legitimate interest in quickly dispersing and removing lawbreakers with the least risk of injury to police and others."  *Forrester*, 25 F.3d at 807. For example, in *Forrester*, the "arrestees were part of a group of more than 100 protesters operating in an organized and concerted effort to invade private property, obstruct business, and hinder law enforcement."  *Id.*  While "many of [those] crimes were misdemeanors, the city's interest in preventing their widespread occurrence was significant: 'The wholesale commission of common state-law crimes creates dangers that are far from ordinary. Even in the context of political protest, persistent, organized, premeditated lawlessness menaces in a unique way the capacity of a State to maintain order and preserve the rights of its citizens.'" *Id.* (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 287 (1993) (Kennedy, J. concurring)).

To that point, a 40mm launcher may be used in a crowd control situation, but it is not a crowd-control tool—despite Plaintiffs' characterizations to the contrary.  (*E.g.*, Doc. No. 54-1 at 9:17–19.)  The 40mm LLM is used against a particular person in response to their particular violent behavior.  (Dkt. 75-2 (Murphy Decl.) ¶ 7.)  Lawful First Amendment activity can continue while the lawbreaker is neutralized.  *Forrester*,

25 F.3d at 807.  An injunction against the 40mm removes that option, putting both the public and their constitutional rights at risk.  In sum, the public interest weighs against any injunction.

## V.    CONCLUSION

For the reasons set forth above, the TRO should be vacated, the Order to Show Cause should be discharged, and Plaintiffs' application for a preliminary injunction should be denied.


DATED: April 26, 2021          MICHAEL N. FEUER, City Attorney
                               KATHLEEN A. KENEALY, Chief Asst. City Attorney
                               SCOTT MARCUS, Senior Assistant City Attorney
                               CORY M. BRENTE, Senior Assistant City Attorney
                               GABRIEL S. DERMER, Assistant City Attorney
                               GEOFFREY R. PLOWDEN, Deputy City Attorney

                               /s/ Geoffrey R. Plowden
                               Attorneys for Defendants City of Los Angeles and Chief
                               Michel Moore

RESPONSE TO OSC RE PRELIMINARY INJUNCTION