**MICHAEL N. FEUER**, City Attorney
**KATHLEEN A. KENEALY**, Chief Assistant City Attorney (SBN 212289)
**SCOTT MARCUS**, Senior Assistant City Attorney (SBN 184980)
**CORY M. BRENTE**, Senior Assistant City Attorney (SBN 115453)
**GABRIEL S. DERMER**, Assistant City Attorney (SBN 229424)
**GEOFFREY R. PLOWDEN**, Deputy City Attorney (SBN 146602)
200 North Main Street, Room 600
Los Angeles, California 90012
Telephone: 213-978-7038
Facsimile: 213-978-8785
geoffrey.plowden@lacity.org

Attorneys for Defendants City of Los Angeles and Chief Michel Moore

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLACK LIVES MATTER LOS ANGELES, CANGRESS (DBA LA CAN), STEVEN ROE, NELSON LOPEZ, TINA ČRNKO, JONATHAN MAYORCA, ABIGAIL RODAS, KRYSTLE HARTFIELD, NADIA KHAN, CLARA ARANOVICH, ALEXANDER STAMM, MAIA KAZIM, ALICIA BARRERA-TRUJILO, SHANNON LEE MOORE, DEVON YOUNG, LINUS SHENTU, individually and on behalf of a class of similarly situated persons;<br><br>        Plaintiffs,<br>vs.<br><br>CITY OF LOS ANGELES, a municipal entity, CHIEF MICHEL MOORE, and DOES 1-10 inclusive,<br>        Defendants. | Case No.: 2:20-cv-05027 CBM-AS<br><br>DECLARATION OF DONALD R. GRAHAM, JR., IN SUPPORT OF THE CITY'S RESPONSE TO THE OSC RE PRELIMINARY INJUNCTION |

I, DONALD R. GRAHAM, JR., declare:

1. I have knowledge of the facts stated below and if called upon as a witness to testify to those facts, I could and would do so.

### *My Background Training and Experience*

2. I am employed by the City of Los Angeles as a Commander with the Los Angeles Police Department ("LAPD"). I have worked for the LAPD since 1995. During my 26-year tenure, I worked in a variety of capacities, including participating in the planning of large events, such as large-scale funerals, the Grammy Awards, the Oscars, and Carmageddon II (the closure of the 405 freeway). I also helped architect several homeless services programs. In 2019, I was sworn into my current position, Commander, and appointed to be the LAPD's Homeless Coordinator under the Office of Operations. I was also an Incident Commander for the LAPD on March 24 and 25, 2021, when the LAPD assisted the Department of Recreation and Parks in its operation to close Echo Park so that it could be cleaned, repaired, and rehabilitated.

3. I submit this declaration in response to the OSC re preliminary injunction (Dkt. 70) that seeks to greatly restrict the LAPD's use of two types of less-lethal munitions ("LLMs"): the 40mm launcher and the 37mm launcher.

4. I am familiar with LLMs because of my training over my two and a half decades with the organization, my experience planning and participating in crowd management events, familiarization training for command officers provided by LAPD's Special Weapons and Tactics Team, and command staff familiarization training in the 40mm including personally manipulating, using the sight, and firing the system.

### *The Echo Park Closure and Rehabilitation Project*

5. Councilmember Mitch O'Farrell recently sought to close Echo Park, which is a 16-acre public park surrounding a large manmade lake under the jurisdiction of the City of Los Angeles Department of Recreation and Parks, so that it could be thoroughly cleaned and rehabilitated. Over the years, more and more individuals experiencing homelessness began living in tents at Echo Park. The Department of Recreation and

Parks struggled to maintain and clean the Park given the increasing presence of tents and homeless individuals, and homeless rights activists and others preventing such efforts. Groups would protest and block weekly cleanups of the Park. At times, these groups violently threatened Department of Recreation and Parks workers.

6. Accordingly, Councilmember O'Farrell requested support from (1) the Department of Recreation and Parks, to conduct the cleaning and refurbishment of the Park; (2) homeless outreach providers to find housing for the homeless people living in the park; and (3) the LAPD to establish a public safety perimeter around the Park to protect the Department of Recreation and Parks workers while they installed a fence around the Park, so that it could be formally closed to the public and all ingress and egress eliminated.

### *The Three Types of LLMs Used by the LAPD.*

**40mm launcher:**

7. The 40mm launcher that the LAPD uses is a tactical, single shot launcher that has a green stock and barrel. It fires 40 mm rounds that have a plastic body and blue sponge nose. It has sights that greatly assist the person using it in increased marksmanship. Attached as **Exhibit A** is a true and correct picture of a 40mm launcher and the rounds. The 40mm launcher may be fired upon a single individual in a crowd when that individual poses an immediate threat of violence or physical harm to the officer or others. LAPD policy prohibits 40mm from being fired at an individual's head, neck, face, eyes, or spine unless deadly force is necessary. The primary targets for a 40mm are an individual's navel area or belt line or, if that proves ineffective at stopping the threat, then the leg, arm, or hand when the individual is anywhere from five to 110 feet away. The firing of the 40mm launcher upon an individual must be documented in a Non-Categorical Use of Force Report in a non-crowd control situation. In a crowd control situation, it is documented in a Sgt. ICS 214. Attached as **Exhibit B** is a true and correct copy of the LAPD's Use of Force Tactics Directive for the 40mm launcher.

**37mm launcher:**

8. Unlike the 40mm launcher (and the beanbag shotgun, which I discuss below), LAPD policy prohibits the 37mm from being fired directly at an individual. This policy is more restrictive than the manufacturer's guidance. Instead, it is skip-fired off the ground five to ten feet in front of a crowd that poses an immediate threat to the safety of the officers or others. Attached as **Exhibit C** is a true and correct picture of a 37 mm launcher and the rounds. The 37mm launcher is the only crowd control munition approved by the LAPD.

**The beanbag shotgun:**

9. The beanbag shotgun is a Remington 870 shotgun with super-sock rounds as ammunition (as opposed to lethal rounds), and has been painted green to differentiate it from a shotgun with lethal munitions. It can be carried across the shoulder using its nylon sling. The beanbag shotgun may be fired upon a single individual in a crowd when that individual poses an immediate threat to the safety of the officer or others. The beanbag shotgun may be aimed at the individual's navel area or belt line (or, in the alternative, the leg, arm, or hand) when he or she is five to thirty feet away. The firing of the beanbag shotgun upon an individual must be documented in a Non-Categorical Use of Force Report if we know the individual's identity; if not, it is documented in a Sgt. ICS 214/211. Attached as **Exhibit D** is a true and correct copy of the LAPD's Use of Force Tactics Directive for the Beanbag Shotgun. **Exhibit D** includes photographs of both the shotgun itself and the super-sock rounds.

*The operation to close Echo Park from March 24 – 27, 2021.*

10. From March 24 to March 25, 2021, I was one of the Unified Commanders during the operation to close Echo Park and I developed police objectives and oversaw the LAPD activities related to that operation. Based on social media posts and other information I received, I understood that several homeless advocacy groups were planning to protest the park closure and encouraging the public to join them. On the morning of March 24, 2021, I saw a rally that involved approximately 300-400 protestors. Part of their message was to prevent any City intervention in the current state

of the Park.  It was my concern that similar numbers, between 300-400, protesters would arrive at Echo Park on the evening of March 24, and I determined that their presence would make it nearly impossible to secure the one-mile-long perimeter of the Park.  Accordingly, I planned to deploy approximately 500 officers to the area on March 24 to secure the perimeter of the Park and its multiple entry points, as well as to protect the Recreation and Parks workers and the fence they were constructing.  I planned to establish a First Amendment area for peaceful protests at Park Avenue and Glendale Boulevard and one was immediately implemented when the operation began.

11. I estimate there were approximately 250-300 protestors on March 24 and 600-700 protestors on March 25, 2021.  Command officers who took over as the Unified Commander for the police role in the Echo Park operation told me that there was negligible protest activity from March 26 through 27, 2021.  Despite widespread lawlessness, such as vandalism and assaults on police officers by protesters during the first two days of the four-day operation, the LAPD only fired a negligible amount of LLMs.  Specifically:

  a. (38) 40mm less lethal launchers were available in the field, <u>but only three rounds were fired</u>.
  b. (15) 37mm less lethal launchers were available in the field, <u>but only six rounds were fired.</u>
  c. (59) bean bag shotguns were available in the field, <u>but only six rounds were fired.</u>

12. During the Echo Park protests, and all non-emergency situations in which a 37mm in used, a field commander, in this case a captain, must call the incident commander, me, to ask permission to fire a 37mm after an unlawful assembly has been declared.  Permission is not automatic.

13. During the Echo Park Protest, I granted permission to use the 37mm only if the actions of the crowd were aggressive, combative, or dangerous toward officers or the community.  The captain had to directly observe this behavior to receive my permission.

If a crowd is largely peaceful yet noncompliant, then I would not grant permission. On March 24, 2021 at approximately 10:44 p.m., the captain in the field called me and said that he had made an unlawful assembly declaration and was seeking permission to use 37mm to disperse the crowd if they did not move. After assessing the fact pattern and judging the crowd's behavior to be resisting movement or dispersal but not posing a threat to the officers or the public, I denied permission.

14.     On March 25, 2021, at approximately 8:18 p.m., the captain in the field called me and said that they had declared the unlawful assembly and given the order to disperse. He also said that, after the order to disperse, officers were met by individuals throwing projectiles from the cover of the crowd as well as persons attempting to use lasers as a blinding attack on officers. Based on those facts, I authorized the release of 37mm munitions to move that crowd due to the imminent threat of harm to officers.

***Response To The Declarations Stating That LLMs Were Improperly Fired During The Protests of The Echo Park Closure.***

15.     I have read the Plaintiffs' Memorandum of Points and Authorities in support of an OSC re preliminary injunction. I have also read the declarations of Diana Barbadillo, Alex Kanegawa, Nara Kim, and Christian Monterrosa, and viewed the exhibits attached to those declarations. All of these declarants testify that they attended a demonstration in the Echo Park area on Thursday, March 25, 2021.[1] None of the declarants provided the time or the particular location of the incidents they refer to in their respective declarations. Nonetheless, it was easy for me to determine when and where these incidents occurred because so few LLMs were deployed during the Echo Park closure. I determined that all of the declarants were in the same parking lot south of Sunset Boulevard in between Logan Street and Lymone Street at the same time. On

---

[1] Mr. Monterrosa testified he was at a demonstration in the Echo Park area on Thursday, March 26, 2021, but as I testify herein, my investigation has revealed that he actually meant Thursday, March 25, 2021.

March 25, 2021, at 8:18 p.m. an unlawful assembly was declared at this location pursuant to Penal Code section 409 and the crowd was ordered to immediately disperse. The events upon which these declarations are based occurred between approximately 8:58 p.m. and 9:02 p.m.

**Diana Barbadillo:**

16.  Ms. Barbadillo declared that while at this demonstration she witnessed LAPD officers shooting individuals "directly in the chest, abdomen, back, and ribs with less-lethal projectiles." (Decl. Barbadillo, Dkt. 58-4, 1:8-9.)  She testified that an officer "pointed a less lethal two feet from [her] chest." (*Id*. at 10.)  She further testified that she saw officers fire LLMs "at less than two feet distance" and "not regularly into the ground that day." (*Id*. at 11-14.)  She also testified that she attached as exhibits 8 and 9, two video clips "of what [she] filmed at that incident." (*Id*. 14-15.)

17.  The exhibit entitled "Diana Barbadillo 6697" is a 59 second video clip that is mainly focused on an officer carrying a beanbag shotgun—not a 40 mm launcher or a 37 mm launcher.[2]  At the 17 second mark, Mr. Kanegawa, who is wearing a yellow jacket and a black backpack, slaps down the muzzle of that officer's beanbag shotgun. At the 20 second mark, a single beanbag round from a different officer hits the lower part of Mr. Kanegawa's backpack.  Other than this single beanbag round, no other LLM rounds are fired in this video clip.

18.  The exhibit entitled "Diana Barbadillo 6699" is a 25 second video clip.  The first eleven seconds of this video show officers holding 40 mm launchers, but not firing them.  At the five through nine second mark, the video shows laser beams being shined on the uniformed bodies of the officers.  At the eleven through twelve second mark, the video shows a strobe light reflecting off of the face shield of an officer wearing a blue mouth covering.  The video then cuts out at the 15 second mark and then resumes with

---

[2] The Plaintiffs provided these video clips to the City via Dropbox link and did not identify each of the video clips by exhibit number.

1  showing the same officer depicted in "Diana Barbadillo 6697," this time firing a single
2  beanbag round.  At the time he fires the single beanbag round, the officer is close to Mr.
3  Kanegawa and Ms. Kim.  Ms. Kim is wearing eyeglasses, a white mouth covering, and a
4  blue jacket.  Given the perspective of the video, however, it is unclear who the officer is
5  firing at and what (or who) he hit, if anything (or anyone).  Other than this single
6  beanbag round, no other LLM rounds are fired in this video clip.

**Alex Kanegawa:**

19.  Mr. Kanegawa testified that that he was "shot with a less lethal projectile into the bottom half of his right arm between [his] elbow and shoulder…while trying to move [his] partner [Nara Kim] away from officers as she was shot in the abdomen at close range."  (Dkt. 58-7, 1:6-8.)  Mr. Kanegawa attached two photographs of injuries to his right arm.  (*Id*. at 9-10.)

**Nara Kim:**

20.  Ms. Kim testified that she was "shot [by] a less lethal projectile at the left side of [her] abdomen at close range" and that her partner, Mr. Kanegawa, was shot at close range while "attempting to get [both of them] out of the line of fire."  (Dkt. 58-8, 1:6-9.)  Ms. Kim attached one photograph of injuries to her torso.  (*Id*. at 1:10.)

**Christian Monterrosa:**

21.  Mr. Monterrosa testified that he was shot "at close range" by a "less lethal projectile into the bottom right portion of [his] chest just below [his] pectoral muscle…while trying to move away from officers."  (Dkt. 68-1, 1:7-9.)  Mr. Monterrosa attached as an exhibit a post from his Instagram page, which shows an officer with a raised beanbag shotgun and Mr. Kanegawa.  (*Id*. at Ex. 16.)  Mr. Monterrosa attached two photographs of injuries to his torso.  (*Id*. at Ex. 17.)

### *Body Worn Video from the Officers Contradicts the Declarations*

22.  Based on their declarations, it appears that all four declarants were at the same place at the same time.  Thus, relevant body worn video captures all of them.  The videos entitled "Diana Barbadillo 6697" and "Diana Barbadillo 6699" were submitted by

the Plaintiffs as ostensible support for their claim that peaceful protestors are being intentionally hit at close range with less lethal weapons. The body worn video, however, objectively proves otherwise.

23.  As an initial matter, all these declarants defied the dispersal order given 40 minutes prior to the events discussed in their declarations. They were specifically warned that if they did not immediately disperse then they could be arrested or subjected to other police action, such as the use of LLMs.

24.  The body worn video shows that only beanbags were fired at Mr. Kanegawa. While there may have been 37mm and 40mm launchers carried by officers at the scene, Mr. Kanegawa was hit by two beanbags (one on his backpack and one on his arm) and Ms. Kim was hit with a baton, not any projectile. The reason that Mr. Kanegawa and Ms. Kim were struck at all was because they were advancing upon and pushing down the muzzle of an officer's beanbag shotgun and slapping his hand. They were not merely "peacefully protesting," rather they were aggressively defying a dispersal order. And neither was hit with any projectile from close range. Furthermore, the body worn video shows that the officer who fired a beanbag close to Mr. Kanegawa did not aim for or hit Mr. Kanegawa. The beanbag was intended for, and struck, a person who was behind them and was flashing a strobe light to temporarily blind officers. Once hit, the individual with the strobe stops shining the light and turns around. There is no evidence of 37mm launchers being used against any of these declarants.

25.  The body worn video does depict Mr. Monterrosa being hit by a 40mm launcher. Unfortunately, the officer was aiming for Ms. Kim, who was observed lunging at an officer, but Mr. Monterrosa stepped into the line of fire and was struck. As with all the less lethal munitions fired during this time, the shot was not from close range.

26.  Attached as **Exhibits E-G** are true and correct copies of body worn video compared to the videos attached to Ms. Barbadillo's declaration.

I declare under penalty of perjury under the laws of the United States and State of California that the foregoing is true and correct. Executed on April 26, 2021, in Los Angeles, California.

_____
Donald R. Graham, Jr., Commander of the LAPD