**MICHAEL N. FEUER**, City Attorney
**KATHLEEN A. KENEALY**, Chief Assistant City Attorney (SBN 212289)
**SCOTT MARCUS**, Senior Assistant City Attorney (SBN 184980)
**CORY M. BRENTE**, Senior Assistant City Attorney (SBN 115453)
**GEOFFREY R. PLOWDEN**, Deputy City Attorney (SBN 146602)
**GABRIEL S. DERMER**, Assistant City Attorney (SBN 229424)
200 North Main Street, Room 675
Los Angeles, California 90012
Telephone: 213-978-7558
Facsimile: 213-978-7011
gabriel.dermer@lacity.org

Attorneys for Defendant City of Los Angeles

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLACK LIVES MATTER LOS ANGELES, CANGRESS (DBA LA CAN), STEVEN ROE, NELSON LOPEZ, TINA ČRNKO, JONATHAN MAYORCA, ABIGAIL RODAS, KRYSTLE HARTFIELD, NADIA KHAN, CLARA ARANOVICH, ALEXANDER STAMM, MAIA KAZIM, ALICIA BARRERA-TRUJILO, SHANNON LEE MOORE, DEVON YOUNG, LINUS SHENTU, individually and on behalf of a class of similarly situated persons;<br><br>      Plaintiffs,<br>  vs.<br><br>CITY OF LOS ANGELES, a municipal entity, CHIEF MICHEL MOORE, and DOES 1-10 inclusive,<br>      Defendants. | Case No.: 2:20-cv-05027 CBM-AS<br><br>DECLARATION OF STEVEN LURIE IN SUPPORT OF THE CITY'S RESPONSE TO THE OSC RE PRELIMINARY INJUNCTION |

1

DECLARATION OF STEVEN LURIE IN SUPPORT OF THE CITY'S RESPONSE TO THE OSC RE PRELIMINARY INJUNCTION

I, STEVEN LURIE, declare:

1. I am employed by the City of Los Angeles as a Captain III with the Los Angeles Police Department ("LAPD") and am the Area Commanding Officer of Hollywood Division. I have worked in law enforcement for 24 years, including 10 years in patrol and four years as a detective investigating homicide and sex crimes. I also have 12 years of supervisory experience, including command of two police patrol divisions, management of street crime intervention, patrol operations, and investigations; and three years as a specialized detective supervisor managing all aspects of the investigations into officer-involved shootings, in-custody deaths, the deployment of less-lethal munitions ("LLMs") and other significant uses of police force -- including application of policy, law, and police best practices. In my time as the commanding officer of Hollywood Division, I have facilitated more than 20 peaceful marches and First Amendment events, including crowds in excess of 50,000 throughout May and June of 2020. As such, I have developed an expertise in evaluating a group's posture and intent, specifically whether they appear intent on peacefully exercising their First Amendment rights or whether they appear intent on engaging in acts of violence and property damage. Most groups that come to Hollywood do so with peaceful intent, and police interaction is rare. I submit this declaration in response to the OSC re preliminary injunction that seeks to greatly restrict the LAPD's use of two types of LLMs: the 40 mm launcher and the 37 mm launcher. If called to testify, I could and would competently do so of my own personal knowledge.

2. The Breonna Taylor solidary protest was held on Saturday, March 13, 2021, which was the one-year anniversary of her death. A flyer for this protest, which the Hollywood Community Police Station obtained a copy of, stated that it would begin at the Hollywood Forever Cemetery at 7:30 p.m. Around the edge of the flyer were the words, "COME IN BLOC. HAVE DEBLOC READY. BRING THE TOYS OF YOUR CHOICE. NO PEACE POLICE. BRING UMBRELLAS. YOUR TOYS YOUR CHOICE." Based on my training and experience, I understand that the phrases "come in

bloc" and "have debloc ready," means that protestors are encouraged to wear all black clothing and be prepared to change into non-black clothing so they can blend in with the crowd and avoid being identified and arrested after committing unlawful acts. I further understand that the word "toys," as used in this context, means that protestors are encouraged to bring any items that obstruct or hinder law enforcement, such as shields, smoke grenades, lasers, or strobe lights. The phrase "no peace police," means that neither the organizer(s) nor the attendees will insist that protestors remain peaceful. The flyer also suggested that attendees "bring umbrellas." In recent demonstrations and protests, I know that umbrellas have been used either as shields against less-lethal munitions or to obstruct what protestors were doing behind them. A true and correct copy of the flyer is attached as **Exhibit A**.

3. I was the Incident Commander during the protest on March 13, 2021. As the Incident Commander, I oversee the entire LAPD operation of the event by managing and deploying law enforcement resources to protect life and property. At approximately 7:55 p.m., a group of individuals wearing all black clothing and masks, helmets, and gloves, walked northbound on Vine Street. Some individuals in this group sprayed graffiti on walls and lit fires in trash cans. At least one business, the Bed Bath & Beyond at 1557 Vine Street, was looted. At least eight other businesses were vandalized, including the Walgreens at 1501 Vine Street and the Verizon Wireless store at 1503 Vine Street. The LAPD arrested individuals that night for assault with a deadly weapon on a police officer, battery on a police officer, and possession of a prohibited item, such as batons, bear deterrent spray, and smoke bombs.

4. The LAPD fired three less-lethal munitions that night. All were beanbag rounds.

5. I have read the declaration of Austin Baffa and reviewed the accompanying photograph and video. (Dkt. 58-3.) I understand that Mr. Baffa declares that he

attended the Breonna Taylor solidary protest on March 13, 2021.[1] (*Id*. at 1:5-6.) Mr. Baffa further declares that as he was filming "in the vicinity of the Breonna Taylor protest" and wearing a "safety vest" that bore the word "PRESS" on the back and front of it, he was struck by an LLM near his shoulder. (*Id*. at 1:6-25.) In his declaration, Mr. Baffa states that he was struck while he was half a block away from, and while his back was to, the LAPD skirmish line. (*Id*. at 1:17-25.) Mr. Baffa attached to his declaration a photograph of an injury to his left shoulder. (*Id*. at Ex. 7.)

6. Mr. Baffa also attached as an exhibit to his declaration a 45 second film, which he testifies is the film that he was taking at the time of the events described in his declaration. (*Id*. at Ex. 6.) The film is apparently taken by Mr. Baffa as he walked northbound on Vine Street and approached La Mirada Avenue in Hollywood. At the six second mark, the film shows an individual also walking northbound on Vine Street, but in the middle of the roadway, and wearing all black and carrying an umbrella. Specifically, the individual is wearing a black helmet, face covering, clothing, gloves, and backpack. As Mr. Baffa approached the southeast corner of the intersection, the film focuses on a green metal trash can that has its side door open and its contents ablaze. Based on the perspective of the film and the shadows cast by Mr. Baffa, it appears that at the 13-15 second mark, Mr. Baffa crouches down next to the trash can to get a closer view of the fire burning in the trash can. Mr. Baffa then rises at the 16 second mark and police vehicles and officers, i.e., a southbound facing skirmish line, come into view. Mr. Baffa is apparently shot by an LLM at the 17 second mark.

7. The view and perspective seen in Mr. Baffa's film is not the view and perspective the responding officers would have had, and the evaluation of an officer's use of force is based on that officer's perspective (i.e. their physical location and

---

[1] Mr. Baffa declares that the protest occurred on March 14, 2021, but it occurred the day before on Saturday, March 13, 2021.

sightline in relation to the suspect's location) and that officer's perception of the suspect's actions.

8. Based on my role as the Incident Commander and my review of the subsequent use-of-force investigation, which included a review the pertinent body worn camera video, it appears that the officer who fired the LLM at Mr. Baffa arrived at the intersection of Vine Street and La Mirada Avenue at approximately 9:30 p.m. A few minutes earlier, officers had arrived in that area to form a skirmish line in response to a group of approximately 50 riotous individuals who walking northbound on Vine Street and approaching La Mirada Avenue. The skirmish line was composed of officers facing southbound on Vine Street and ordering the approaching individuals to leave the area. As shown in the officer's body worn camera video, an excerpt of which is attached, the officer carried a beanbag shotgun—not a 40 mm or 37 mm launcher. I know this because I can see the green slide handle and stock, and rifled barrel. The officer, who was facing southbound Vine Street along with several other officers, fired a single beanbag round at Mr. Baffa because the officer believed that Mr. Baffa had started the fire in the trashcan and/or Mr. Baffa was using the trash can fire to light an incendiary device that could be hurled at the skirmish line. Although the officer can be heard on his body worn camera video saying that he believed that the individual (later identified as Mr. Baffa) was lighting a fire, he later clarified that he believed, based on Mr. Baffa's crouching position, the violent nature of the approaching crowd, the fact that Mr. Baffa was holding an object in both hands, and the proximity of the fire to Mr. Baffa's hands, that Mr. Baffa was preparing an incendiary device to throw at officers that could cause great bodily injury.

9. Based on Mr. Baffa's crouching position behind the trash can, it is unlikely that the officer could have seen the word "PRESS" on the front and back of his "safety vest." But, more fundamentally, officers are trained to scan every individual they see for threats, regardless of whether they identify themselves as "PRESS." If the officer reasonably believed that Mr. Baffa was lighting a fire or an incendiary device, then the

use of force was justified regardless of Mr. Baffa's self-identification as a member of the press. Accordingly, the officer's use of the beanbag shotgun as a force option would be consistent with LAPD policy and my understanding of the appropriate level of force to address such a threat.

10. Although the media may be allowed to move in and around a skirmish line, they do so at their own risk and the LAPD cannot guarantee their safety and they must obey the law like any other member of the public.

11. Based on the location of the injury to Mr. Baffa, it appears that the beanbag round struck Mr. Baffa in the shoulder (rather than in the beltline, navel area, leg, arm, or hand). If so, it would been a result of Mr. Baffa either moving from the crouched position behind the trashcan to an upright position and/or that Mr. Baffa's shoulder was exposed to the officer as Mr. Baffa crouched behind the trash can. The officer was at least twenty feet from Mr. Baffa when he fired at him. The body worn camera video also shows the group of individuals wearing all black walking northbound on Vine Street, approaching the skirmish line, and flashing a high-intensity strobe light in the direction of the skirmish line. Attached as **Exhibit B** is a true and correct 32 second excerpt of the officer's body worn camera.

I declare under penalty of perjury under the laws of the United States and State of California that the foregoing is true and correct. Executed on April ___, 2021, in Los Angeles, California.

_____
Steven Lurie, Captain