1

**MICHAEL N. FEUER**, City Attorney
**KATHLEEN A. KENEALY**, Chief Assistant City Attorney (SBN 212289)
**SCOTT MARCUS**, Senior Assistant City Attorney (SBN 184980)
**CORY M. BRENTE**, Senior Assistant City Attorney (SBN 115453)
**GABRIEL S. DERMER**, Assistant City Attorney (SBN 229424)
**GEOFFREY R. PLOWDEN**, Deputy City Attorney (SBN 146602)
200 North Main Street, Room 600
Los Angeles, California 90012
Telephone: 213-978-7038
Facsimile: 213-978-8785
geoffrey.plowden@lacity.org

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLACK LIVES MATTER LOS ANGELES, CANGRESS (DBA LA CAN), STEVEN ROE, NELSON LOPEZ, TINA ČRNKO, JONATHAN MAYORCA, ABIGAIL RODAS, KRYSTLE HARTFIELD, NADIA KHAN, CLARA ARANOVICH, ALEXANDER STAMM, MAIA KAZIM, ALICIA BARRERA-TRUJILO, SHANNON LEE MOORE, DEVON YOUNG, LINUS SHENTU, individually and on behalf of a class of similarly situated persons;<br><br>Plaintiffs,<br>vs.<br><br>CITY OF LOS ANGELES, a municipal entity, CHIEF MICHEL MOORE, and DOES 1-10 inclusive,<br><br>Defendants. | **Case No.: 2:20-cv-05027 CBM-AS**<br><br>**DECLARATION OF ROGER MURPHY IN SUPPORT OF DEFENDANTS' RESPONSE TO OSC RE PRELIMINARY INJUNCTION**<br><br>Hearing<br>Date: May 3, 2021<br>Time: 10:00 a.m. |

I, ROGER MURPHY, declare:

1. I am employed by the City of Los Angeles as a Lieutenant with the Los Angeles Police Department ("LAPD"). My current assignment is the Lieutenant of the K-9 Unit of the Metropolitan Division and I have held this position for two months. Prior to this assignment, I was assigned to Metropolitan's B Platoon for 14 years. I am one of the Los Angeles Police Department's designated experts with regard to the use of Less Lethal Munitions in crowd control situations.

2. I have over 35 years of experience as a police officer. My career in law enforcement began in 1985 when I joined the Monterey Park Police Department. In 1990, I joined the Los Angeles Police Department ["LAPD"]. I have participated in many major public demonstrations in my career, including the 1992 Rodney King demonstrations, the 2000 DNC demonstration, the 2014 Ferguson demonstration in Los Angeles as well as the George Floyd protests of 2020. I assisted in the planning and organization of the department's response to many of those public demonstrations, and supervised and deployed in the field in those responses throughout the City of Los Angeles. I am readily familiar with the tools and tactics utilized by the LAPD, as well as the training and policies associated with the utilization of those tools and tactics, including Less Lethal Munitions [LLMs]. I participated in the first use of the 37mm launcher and beanbag shotgun in a crowd control situation as a patrol officer in the early 1990s, in which a crowd of over 500 persons was effectively dispersed within five minutes. I have taught an excess of 12,000 law enforcement officers in the proper deployment of Less Lethal Munitions and Mobile Field Force tactics from various law enforcement agencies including the LAPD, Orange County Sheriff's Department, California National Guard and other smaller law enforcement agencies. I went through the original Mobile Field Force ["MFF"] training in 1992 following the Los Angeles demonstrations and assisted in developing the most recent MFF training.

3. I have reviewed the Plaintiffs' *Ex Parte* application for a Temporary

Restraining Order and Preliminary Injunction, as well as the accompanying Points and Authorities and declarations filed in support thereof, including the declaration of Andrew Guerrero, and the Court's Order RE: Court's Ruling on Plaintiffs' Application for Temporary Restraining Order [TRO].

**JACOB BLAKE PROTEST—Downtown Los Angeles, Third Street Tunnel— August 26, 2020**

4.   In his declaration, Mr. Guerrero characterizes the demonstration which culminated in the Third Street tunnel as "peaceful". I was present in west downtown Los Angeles when protestors arrived and marched from Grand Park to the Third Street tunnel. Many of the demonstrators in the crowd demonstrated criminal behavior and acted violently towards officers.

**Criminal Behavior Demonstrated by Protestors**

5.   During their march, protestors vandalized the U.S. Bank Building with spray paint in violation of California Penal Code section 594(a). The vandalism was caught on video by the Channel 7 Eyewitness News helicopter. Many of the protestors were in possession of plastic shields and illegal weapons, in violation of Los Angeles Municipal Code section 55.07, a misdemeanor (Prohibition on carrying or possessing specified items while attending or participating in any public demonstration.) The Incident Commander directed Metropolitan units to detain protestors and arrest anyone found in possession of the illegal items, spray paint cans, etc. A video clip filmed by Channel 7 Eyewitness News entitled KABC--1, which is attached hereto as **Exhibit 1**, accurately depicts the portions of the events which are captured in the video.

6.   The protestors had vehicles in front of their group, leading the march down Flower Street. When the march reached the Third Street tunnel, the vehicles entered the tunnel going eastbound, even though both lanes of the tunnel are westbound lanes. As a

2

result, all traffic in the tunnel became stuck, and some citizens tried to make dangerous U-turns and drive the opposite direction of traffic to try to leave the area. The protestors' vehicles formed a blockade at the west end of the tunnel. Several of the protestors vandalized the inside of the tunnel with spray paint and markers.

**Police Tactics in Response to Protect the Community**

7. Since the protestors had placed themselves inside the tunnel, patrol units were instructed to block the west end of the tunnel at Hill Street, which they did. Then I instructed the Metropolitan Tactical Support Element ["TSE"] unit to block the east end of the tunnel so that we could peacefully and methodically determine which persons possessed the unlawful items, take the appropriate persons into custody, and release the others. There were 24 Metropolitan officers and 3 sergeants on scene at the east end of the tunnel.

**Events Inside the Tunnel**

8. The group of protestors became aggressive and violent. First, they began ordering each other to ignore officers' commands. I noticed that many of the protestors were wearing helmets, baseball catcher's vests, motorcycle vests, chest gear, gloves, etc. Many of the protestors carried shields.

9. The protestors with the shields then lined up together, and other protestors lined up behind them and began using strobe lights and lasers against the police officers. The strobe lights are very dangerous, because they cause spotty vision that inhibits a police officer's ability to see a threat and defend himself/herself for a short time.

10. I then observed a female protestor, who was using a green sled as a shield, shine a laser in the eyes of police officers, in an attempt to blind them. Lasers can burn the retina of the eye and cause permanent blindness. At a minimum, they cause temporary blindness to officers on scene, leaving them vulnerable to attack. One of the

Metropolitan officers fired a bean bag round at the abdomen of the protestor, but the super sock round deflected off of the woman's shield. She continued to shine the laser despite commands to stop.  Due to my observations, I formed a small arrest circle with several officers in an effort to arrest the woman with the laser.  I also ordered officers to take the shields away from the protestors.  Only Metropolitan officers were attempting to arrest some of the protestors. The patrol officers maintained a skirmish line at the west end of the tunnel.  A video clip entitled "Officer Green Laser", which accurately depicts the moments when the woman shined the laser at officers, is attached hereto as **Exhibit 2**.

**Violent Behavior Directed at Police**

11. When the arrest team went to arrest the female, she physically resisted arrest and fought to free herself.  I grabbed her to try to pull her away from the crowd.  At that time, the group of protestors collapsed on the officers, meaning that they moved toward the officers and physically attacked them.

12. The crowd managed to take the female away from me and pulled her back into the crowd.  I reached for her to pull her back, and a man hit me in the face with his large plastic shield.  I was severely dazed and nearly fell to the ground, but was able to regain my composure.  I pulled my baton and stuck the man, and he was eventually arrested.  I suffered injury to my inner lip and mouth.  Moments later, I was able to grab the female who had the laser, and once again she was pulled from me by the group.  I saw persons within the crowd helping the woman change clothes so as to avoid detection and arrest.

**Deployment of LLMs – Beanbag Shotgun and 40mm – Allow Police to Take Control**

13. Due to the violent nature of the crowd, several officers deployed both 40mm foam projectiles as well as bean bag rounds at the protestors in an effort to gain compliance.  No 37mm projectiles were fired during this demonstration.  Officers were

required to aim at the legs of the protestors who were holding shields, as the rounds were ineffective against the shields.  The shields were also used as weapons against other officers.  A video clip entitled "KABC—2", attached hereto as **Exhibit 3**, was filmed by the Channel 7 Eyewitness News helicopter which was overhead at the time that the violence and assault on police was taking place.  It accurately depicts those portions of the event which occurred during the time period in which the video was recorded.

14.  Attached hereto as **Exhibit 4** is a video clip of footage filmed by KTLA News from their helicopter which reflects the crowd in the tunnel shining lasers at officers and at the news helicopter.  The video accurately reflects the events at that portion of the tunnel during the time period depicted.

15.  Officers eventually gained control of the crowd.  Metropolitan officers gave a dispersal order, advising the protestors that they would be released in groups of five persons at a time.  Police patted down each person for weapons before they were released. The protestors left behind the weapons and illegal items of which they had been in possession.  The property report attached as **Exhibit 5** to my declaration accurately reflects the items that I saw on scene the night of the protest.  Those items include but are not limited to the following: 3 tasers, a BB gun, BBs, wrench, hammer, cutters, baseball bat, pry bar, brass knuckles, pepper spray, 5 knives, smoke balls, hard hats, helmets, umbrellas, shields, snow sleds, lighter fluid, and multiple cans of spray paint.

16. Attached hereto as **Exhibit 6** is a photograph taken in the tunnel of some of the items that the protestors left behind.

17. Attached here to as **Exhibit 7** is a photograph of many of the items that the protestors left behind after they were collected and documented by law enforcement.

18. Attached hereto as **Exhibit 8** is a photograph which accurately depicts the injury I suffered to my lip/mouth when I was struck in the face with a plastic shield wielded by a violent protestor.

19.  The 40mm launcher was instrumental in gaining control of the violent protestors in the tunnel that night.

**Plaintiffs' Request for a Preliminary Injunction**

20.  The language contained in the second, third and fifth bullet points of this Court's Temporary Restraining Order, as well as the demands made by Plaintiffs, eliminate the effectiveness of both the 40mm and 37mm launcher. Law enforcement is required to maintain the balance between citizens' rights to exercise their free speech in public demonstrations and the safety of the public.  When demonstrations are peaceful, law enforcement stays out of the way of the demonstration, and remains in the area to ensure the rights of the demonstrators are not impeded.  When persons intent on violence insert themselves into otherwise peaceful protests, law enforcement officers may use the 40mm launcher to effectively deal with those persons, while allowing the peaceful demonstrators to continue unhindered.  When demonstrators become violent, or large numbers of people begin looting or setting fire to property, then the 37mm becomes an effective tool, as it moves a large crowd out of an area and enables law enforcement to disperse the crowd, thereby protecting persons and property from further destruction. Plaintiffs' proposed Preliminary Injunction eliminates the ability of law enforcement to effectively use these tools for these purposes.

**History and Purpose of LLMs**

21.  Following the 1992 Rodney King demonstrations in Los Angeles, which stemmed from the jury verdict in the trial of the officers accused of using excessive force against Rodney King and the Christopher Commission's finding regarding the lack of mid-level use of force options, the Department has invested substantial time and resources in improving its ability to effectively manage public demonstrations and reduce harm to persons and property that may accompany such demonstrations.   Since 1992, LAPD's MFF training has been built around its primary and most effective crowd dispersal tool—the 37mm launcher.  The purpose of the 37mm is to reduce direct contact

between the crowd and officers thus reducing the need for officers to directly physically engage with the crowd.  The 37mm launcher serves as a de-escalation tool, giving both sides time to consider their options and hopefully result in compliance with the lawful orders of law enforcement. When the 37mm launcher is deployed, it sets off a loud "bang" sound along with smoke, which can be very effective in de-escalating the hostility of a crowd.  Without the 37mm, officers are limited to the bean bag shotgun and the baton to deal with crowds containing individuals who threaten violence or violently resist arrest.  The baton requires officers to come in close contact with the crowd to physically engage with the threatening persons.  This close contact with the crowd can result in escalated tensions.  LAPD has spent the past 27 years working to deescalate crowd control encounters and reduce the use of police batons in public demonstrations. The language in Plaintiffs' proposed Preliminary Injunction will necessarily result in an increase in direct contact between officers and the crowd and effectively limits officers' crowd control tools to the use of a baton and increases the likelihood of injuries to officers and members of the crowd.   Conversely, the 37mm effectively allows officers to disperse a violent crowd from a distance thereby minimizing the need for direct physical contact with the crowd.

**37mm Launcher**

22.  Per LAPD training guidelines, 37mm less-lethal munitions may be used only when "[a]n officer reasonably believes that suspects or subjects in a crowd are violently resisting a lawful order to disperse or pose an immediate threat of violence or physical harm," and then may only be skip-fired at the ground 5 to 10 feet in front of the crowd after an order to disperse has been given—unless officers or other persons are attacked and must respond to one or more suspect's actions. The 37mm requires incident commander authorization before it can be deployed. It is important to note that the 37mm is not a target-specific LLM, in other words, it is not aimed at a particular person,

but is aimed at the ground in front of a crowd and the five foam-rubber discs that are discharged bounce up and strike members of the crowd.

**40mm Launcher**

23.  Per LAPD policy and training, 40mm less-lethal munitions may be used only when "[a]n officer reasonably believes that a suspect or subject is violently resisting arrest or poses an immediate threat of violence or physical harm," and then should be aimed at "the navel area or belt line" or "a leg, arm, or hand" of a person five feet to 110 feet from the officer, with a warning first—if feasible.  The advantage of the 40mm is its accuracy. The 40mm launcher is equipped with a site that displays a red dot on its target. This device is effective up to 110 feet.  It is important to note that the 40mm LLM is not a crowd control or crowd dispersal LLM.  It is a target-specific LLM, which means it is specifically aimed at a particular person whose conduct or behavior meets the criteria set forth above.   It is designed and used to address specific identifiable threats to officers and members of the public, and those threatening individuals are often located within the crowd.

24.  Since the civil unrest events of the summer of 2020, many LAPD officers have received additional training in all three LLMS—beanbag shotgun, 40mm launcher, and 37mm launcher and their use specific to crowd control situations.

**No Dispersal Order is Needed Prior to Deployment of a 40mm Launcher**

25.  Plaintiffs have asked this Court to require that a dispersal order be given prior to deployment of both the 37mm and 40mm launchers.  This request suggests a lack of understanding of the purpose of these tools.  The 40mm launcher is a target-specific tool, and is not used to disperse a crowd. Requiring a dispersal order before it is used suggests that it would have a role in dispersing a crowd, which it does not.

26.  A dispersal order requires everyone in the crowd to leave an area.  Before a dispersal order is given, the LAPD must declare an unlawful assembly.  Plaintiffs' request to require a dispersal order would severely limit law enforcement's ability to use

8

the 40mm LLM to effectively deal with violent persons unless an entire demonstration has been declared unlawful.

27. The 40mm is effective at removing the hostile and threatening individuals while leaving peaceful protestors free to continue in their free speech activities. Plaintiffs' request would prohibit the use of the 40mm in a situation where persons in a crowd control situation are being actively assaulted but the Department has not yet declared the assembly to be unlawful and given an order to disperse. This limitation, intentionally or unintentionally, puts officers and members of the public at risk. For example, officers in a crowd control situation see certain individuals in the crowd attacking and physically assaulting another individual in the crowd. Under the Court's order, as written, officers appear to be prohibited from targeting the attackers with 40mm launcher unless the Department had first declared the entire assembly to be unlawful and given an order to disperse. This seems contrary to public safety and effectively eliminates the Department's ability to protect individuals who are being violently assaulted.

**Changing the Legal Standard for Intermediate Force**

28. This Court, in its TRO, restricted use of the 37mm and 40mm launchers to only those persons "who pose a threat of serious bodily harm to others, including law enforcement." Per LAPD policy, police officers can use the 40mm launcher when a suspect or subject is *violently resisting arrest or posing a threat of violence or serious physical harm*. The 40mm LLM is an intermediate force option. The Court's order eliminates the language relating to persons who are violently resisting arrest or posing a threat of violence. The standard used by the Court, restricting use of the 40mm to persons who pose a threat of "serious bodily harm", is vague and can be interpreted as essentially the same as the standard for lethal force, which is lawfully permitted when a person poses a threat of "serious bodily injury or death". It is unclear what the difference is between "serious bodily injury" and "serious bodily harm". If a police

officer observes an imminent threat of serious bodily harm to himself or others, the officer may lawfully and reasonably opt for lethal force to protect human life, rather than a less lethal tool.

29.  LAPD uses the 37mm launcher to disperse large crowds.  It is not a target-specific tool.  By requiring law enforcement personnel to first make a determination that the crowd is threatening serious bodily harm, the Court has restricted law enforcement's ability to use the tool for its intended purpose—to disperse a crowd which contains individuals who are threatening violence or violently resisting arrest.

**Limits on the Target Area for Each Launcher**

*30.* In the TRO, the Court restricted LAPD from aiming the launchers

*"at the upper bodies of demonstrators and within five feet."*

Per LAPD policy, 37mm launchers are never to be aimed at any portion of a person. Rather, they are aimed at the ground, and the five foam-rubber discs that are discharged are skipped off the ground in front of the crowd.  By contrast, the 40mm LLM is a target-specific LLM which is aimed at a particular person. The LAPD trains its officers not to target the head, neck, spine, chest, groin or kidneys. They are permitted to target the belt area and abdomen.  It appears from this order that the Court is restricting an officer's ability to aim the weapon as trained.

**Certification for Use of LLMs**

31. Plaintiffs ask this Court to restrict the use of the 37mm and 40mm launchers to officers who have been "certified" to operate them.  However, the Los Angeles Police Department does not "certify" its officers to carry these tools. LAPD officers are not permitted to deploy the 40mm or 37mm launchers unless and until they have completed the required training associated with those tools.  Once the training has been completed and the officer has demonstrated the ability and understanding necessary to properly deploy the tools, the officer is permitted to carry them.  The Department's ongoing MFF training continues to update officers on the use and deployment of these tools.

I declare under penalty of perjury under the laws of the United States and State of California that the foregoing is true and correct. Executed on April 23, 2021 in Los Angeles, California.

Roger Murphy, Lieutenant

11