# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *Black Lives Matter Los Angeles, et al*, <br> Plaintiffs, <br> vs. <br> *City of Los Angeles, et al*, <br> Defendants. | Case No.: CV 20-5027 CBM(ASx) <br><br> **ORDER RE: PRELIMINARY INJUNCTION** |

The matter before the Court is an Order to Show Cause ("OSC") as to why a preliminary injunction should not issue. Defendants filed an Opposition ("Response") and Plaintiffs filed a Reply. (Dkt. 83, 92.) Having considered the parties' briefs and evidence, the Court issues the following Order.

## I. BACKGROUND

This putative class action concerns the response of the Los Angeles Police Department ("LAPD") to protests and demonstrations which occurred throughout Los Angeles in the wake of the death of George Floyd. The video of Officer Derek Chauvin kneeling on George Floyd's neck for several minutes while he begged for his life circulated nationwide and ignited protest across the country. Though many of the demonstrations have remained peaceful, violence has occurred by citizens and police officers alike.

The "unfortunate history of civil rights violations by LAPD officers," is well documented.[1] On May 8, 2000, the Department of Justice concluded that the LAPD engaged in a pattern or practice of excessive force, false arrests and unreasonable searches and seizures in violation of the United States Constitution.[2] The "May Day"[3] immigration rally in 2007 was held at MacArthur Park, the Police pushed, struck and fired less-lethal munition on individuals in the crowd, including media, without a dispersal order being given.

These incidents, unfortunately, seem to be reported more frequently in recent years. In 2014, members of the Los Angeles community participated in demonstrations in response to a grand jury's decision not to indict Darren Wilson for the shooting death of Michael Brown and to express their horror and outrage at the killings of Black Americans at the hands of police officers.[4] Protestors held a demonstration during a Los Angeles Police Commission meeting on August 11, 2014, on the anniversary of the shooting death of Ezell Ford.[5] On September 8, 2020, the "Justice for Dijon Kizzee" demonstration occurred in South Central Los

---

[1] *Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 628 (C.D. Cal. Dec. 14, 2007),

[2] *United States v. City of Los Angeles*, No. CV 00-11769 GAF, 2001 U.S. Dist. LEXIS 26968, at *5 (C.D. Cal. Jan. 5, 2001).

[3] "The first day of May or 'May Day' has long been associated with demonstrations, protests, and civic unrest." *Jurkowski v. City of Seattle*, C15-1155 TSZ, 2017 U.S. Dist. LEXIS 166292, at *1 (W.D. Wash. Oct. 5, 2017).

[4] *Chua v. City of Los Angeles*, CV16-00237 JAK, 2017 U.S. Dist. LEXIS 224221, at *2 (C.D. Cal. May 25, 2017).

[5] Grad, Shelby (October 20, 2015). "How Black Lives Matter became a thorn in the side of L.A. leaders". *Los Angeles Times*. https://www.latimes.com/local/lanow/la-me-ln-how-black-lives-matter-became-a-thorn-in-the-side-for-l-a-leaders-story-so-far-20151020-htmlstory.html

Angeles and on September 25, 2020, the "Justice for Breonna Taylor" protest took place in West Hollywood.[6]

On June 21, 2020, Plaintiff filed an amended Complaint alleging violations of the First, Fourth and Fourteenth Amendment. The Complaint further alleged LAPD used "unreasonable and unnecessary force" against protestors through "improper use of kinetic impact projectiles." Plaintiffs filed a TRO on April 13, 2021, after participating in a homeless advocate rally at Echo Park on March 25, 2021. Plaintiffs' TRO was based on their Fourth Amendment claim and alleged that LAPD "fired on non-violent protestors with 40 mm and 37 mm [less-lethal] weapons." Plaintiffs also alleged that at the Breonna Taylor solidarity protest on or about March 12, 2021, LAPD struck a member of the press in the back and as a result, he was rendered unconscious and suffered a concussion. Plaintiffs sought to enjoin Defendants from using 40 mm and 37 mm less-lethal launchers in public demonstrations. Subsequently, Plaintiffs revised their request seeking only to enjoin Defendants from aiming and deploying the 37 mm less-lethal launchers within five feet and at the upper bodies of demonstrators, from deploying a 40 mm except when faced with an "imminent serious threat of serious bodily injury" and from deploying a 40 mm at suspects who are not engaged in threatening conduct.

The Court held a telephonic status conference on April 15, 2021, and the parties were given an opportunity to be heard. The Court granted Plaintiffs' request for a TRO and ordered Defendants to show cause as to why a preliminary injunction should not issue. An amended order was issued on April 28, 2021, which included language drafted by both parties after they met and conferred and proposed a modification to the Court's previous Order.

---

[6] *Astorga v. Cnty. of Los Angeles*, No. CV 20-9805-AB, 2021 U.S. Dist. LEXIS 78138, at *10 (C.D. Cal. Mar. 17, 2021).

## II. LEGAL STANDARD

"After a district court has granted a TRO, the burden remains on the plaintiff 'to show that [it is] entitled to a preliminary injunction.'" *U.S. D.I.D. Corp. v. Windstream Communs., Inc.*, 775 F.3d 128, 140 (2d. Cir. 2014) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers, Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 443 (1974). Plaintiffs must establish that they are "likely to succeed on the merits, . . . likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). "As the moving party, it is plaintiff[s] who bears the burden, and the burden does not shift to defendants unless and until plaintiff[s'] burden has been met." *Johnson v. Dovey*, No. 1:08-CV-00640, 2008 U.S. Dist. LEXIS 104357, at *5 (E.D. Cal. Dec. 15, 2008).

## III. DISCUSSION

**A.    Judicial Notice**

Plaintiffs requested the Court to take judicial notice of the "Independent Examination of the Los Angeles Police Department 2020 Protest Response," (also known as the Chaleff Report). A team including Commissioner Gerald Chaleff conducted an examination including LAPD's response to the demonstrations that occurred after the death of George Floyd. Mr. Chaleff was appointed to the Los Angeles Board of Police Commissioners and served as President from 1999 to 2001.

Defendants object to the Court taking judicial notice of the contents of the Chaleff Report. Defendants argue that the report is irrelevant because it does not make findings as to the 37mm less-lethal launcher. Defendants also argue that the contents of the Chaleff Report are subject to reasonable dispute because the "accounts of protestors alleging they were injured by 37mm or 40mm less-lethal launchers are subject to factual dispute."

The Chaleff Report is presumed trustworthy because it is a public report made available on the City of Los Angeles, City Clerk website. See *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010); *see also Montiel v. City of Los Angeles*, 2 F.3d 335, 341 (9th Cir. 1993) (noting that pursuant to Fed. Evid. R. 803(8)(C), the district court should have presumed the Christopher Commission Report was trustworthy). On June 30, 2020, the City Council of Los Angeles moved and adopted a Motion (Council File No. 20-0729) instructing LAPD to include an analysis of LAPD's crowd control tactics and compliance with existing departmental policies and legal mandates during the demonstrations and civil unrest resulting from the death of George Floyd. The Report was issued on March 10, 2021, after the investigation was completed, which included the following findings:

> 24. The LAPD has various settlement agreements (as described elsewhere in this report) that requires the approval of a commander (or higher) to use certain kinds of less lethal munitions. The LASD has a lower approval threshold for the deployment of less lethal munitions that allow an incident commander or watch commander to approve the use of the same munition.
> 26. There were many protests during the evaluation period which the LAPD facilitated peacefully.
> 27. There was a lack of training to properly prepare command officers for managing large crowds with the possibility of civil unrest and many command officers stated they did not feel confident in handling these incidents.
> 35. It appears the majority of reported injuries that were sustained by persons in crowds were the result of less lethal munitions from the 40mm. Many who reported being injured claim that they were not involved in any violent or hostile acts.
> 37. Limited viewing of video indicated that there were instances where officers quickly fired the 40mm rounds at

distant targets which increases the likelihood of hitting the wrong target.

38. The deployment of less lethal munitions was not always done at the direction of a supervisor or officer. In some instances, officers were directed to be in front of a skirmish line and left to deploy less lethal tools, including the 40 mm, with no direction or coordination.

39. Over 7,800 personnel were trained (certified) to deploy the 40mm during a two-hour block of instruction at the ICDC course. However, the Review Team did not find the two hours of training to be sufficient given the skill level needed to deploy the 40mm in a chaotic public order policing environment.

40. Officers are required to be trained one time on the 40mm system. Deploying the 40mm in public order policing situations requires recurring certification and training.

41. The skill level required to deploy the 40mm in chaotic public order policing situations is high. Officers must be extremely competent and possess excellent marksmanship skills. It is unlikely that all officers trained possess the marksmanship skills necessary to competently deploy the 40mm system under those circumstances.

44. The Department's Use of Force Tactics directive authorizing the use of 40mm has no detailed guidance on use in public order policing situations.

45. The 40mm can be an effective tool in a crowd control situation when utilized by officers who are well trained and experienced in its use.

60. Most LAPD command staff have completed the basic incident command system training. However, the events of the summer of 2020 make it clear that additional training and mentoring in crowd control tactics and specific incident command system positions, such as incident commander, operations chief, logistics, etc. are needed and should be conducted on an annual basis.

62. Training on the 40mm system use during crowd control situations was insufficient. . .

Chaleff Report at p. 60-62, 64.

The Report also made the following recommendations:

> 7. Undertake an extensive study of all less lethal munitions, including the 40 mm round, to examine performance, consistent velocity, potential for ricochets, influence of the plastic wrapping or banding around the sponge projectile and other aspects of the round. Included in that study should be any potential new technology for use in public order policing operations.
> 8. Design and implement an inventory system to audit and track the amount of less lethal munitions, including the 37mm and 40mm rounds, expended during any public order policing incidents.
> 9. Update the use of force tactical directives to include more detailed instruction regarding the use of less lethal tools in crowds and the approval level required for the deployment of each [of] the less lethal tools.
> 10. Establish protocols that:
> (a) Only trained (certified) members of Metropolitan Division or officers who receive consistent and periodic instruction and certification in the 40mm system should be allowed to deploy the 40mm during crowd control situations, (b) Retain the use of the 40mm system for all other officers during patrol duties and ensure annual retraining of weapon manipulations during shotgun qualification, and (c) Mandate the use of body worn video (when feasible) to record problem behavior of individuals in the crowd when officers decide to use the target specific 40mm in a crowd control situation.
> 18. Review and assess the current mobilization period start times to determine if an additional start of watch time would be appropriate to prevent the fatigue that occurred during this event. . .

Chaleff Report at p. 68-69, 73.

Defendants' objection is overruled. "[E]ven if evidence 'do[es] not meet the requirements for judicial notice,' the Court may consider the evidence 'in the

7

context of the preliminary injunction motion and give [the evidence] appropriate weight[.]'" *Hope Med. Enters. v. Fagron Compounding Servs.*, LLC, 2:19-cv-07748-CAS, 2020 U.S. Dist. LEXIS 119100, at *12 (C.D. Cal. July 7, 2020) (quoting *Walker v. Woodford*, 454 F. Supp. 2d 1007, 1024 (S.D. Cal. 2006)).

**B.  Additional Evidence and Objection Thereto**

Both parties submitted evidence including videos and declarations. Defendant also provided the Use of Force Tactic Directives for the 40 mm dated July 2018 and 37 mm dated March 2021. Each side filed objections to the other side's declarations.

"Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239, 1250 n. 5 (9th Cir. 2013).

"A preliminary injunction is customarily [determined] on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Flynt Distributing Co. v. Harvey*, 734 F. 2d 1389, 1394 (9th Cir. 1984) (brackets omitted).

The Court has considered all the evidence offered by both sides and therefore will not issue separate orders ruling on specific objections.

**B.  Likelihood of Success on the Merits**

LAPD's less-lethal weapons include batons, 37mm less-lethal launchers, 40mm less-lethal launchers, and bean-bag shotguns. Plaintiffs only requested that the Court enjoin Defendants from using the 37mm and 40mm less-lethal launchers.[7] Defendants argue Plaintiffs are not likely to succeed on their claims because the use of 37mm or 40mm LLMs in public demonstrations were justified

---

[7] During the preliminary injunction hearing, Plaintiffs requested the Court to include the 37 mm, the 40 mm, and the bean-nag shotgun weapons. The Court only restricts the use of weapons within the scope of the TRO, i.e. the 37 mm and 40 mm.

8

and the evidence submitted by Plaintiffs does not demonstrate unlawful use of these LLMs.

Fourth Amendment excessive force claims are analyzed under the framework outlined by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). *Donovan v. Phillips*, 685 Fed. App'x. 611, 612 (9th Cir. 2017). Under *Graham*, all claims of excessive force by law enforcement should be analyzed under the Fourth Amendment's "reasonableness" standard. *Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007). "This analysis requires balancing the nature and quality of the intrusion on a person's liberty with the countervailing governmental interests at stake to determine whether the force used was objectively reasonable under the circumstances." *Id.* (internal quotation marks omitted). "Reasonableness" of a given use of force must be measured from the perspective of a reasonable officer on the scene and must appreciate the "split-second judgments" that officers must often make. *Graham*, 490 U.S. at 396. The Ninth Circuit has held that it was unreasonable to use pepper spray and projectiles against individuals "who were suspected of only minor criminal activity, offered only passive resistance, and posed little to no threat of harm to others." *Nelson v. City of Davis*, 685 F.3d 867, 884-87 (9th Cir. 2012).

In this case, the declarants in support of Plaintiffs' TRO state that they were struck and injured by less-lethal munition. Although none of the declarants identify the specific weapon that struck them, there is evidence that the 40 mms were deployed at a person who was not "violently resisting arrest or poses an immediate threat of violence or physical harm" during the March 25, 2021, Echo Park demonstration. *See* (Decl. Graham at ¶ 25 "The body worn video does depict Mr. [Christian] Monterrosa [(a Journalist)] being hit by a 40mm launcher.") Defendants offer evidence that the shot was inadvertently aimed at Mr. Monterrosa. *See* (Decl. Graham at ¶ 25 "Unfortunately, the officer was aiming for Ms. [Nara] Kim, who was observed lunging at an officer, but Mr. Monterrosa

stepped into the line of fire and was struck.") However, at the time the officer fired at Ms. Kim, she had already begun to retreat away from the officers, and even prior to retreating, may have only been suspected of only minor criminal activity, but certainly posed "little to no threat of harm to others." *See* Use of Force - Tactics Directive No. 17 40 mm Less-Lethal Launcher ("[O]fficers should not deploy the 40mm LLL at a fleeing suspect.") Plaintiffs submitted a Declaration from Mr. Monterrosa and pictures describing his injuries as a result of being hit right below the chest by the 40mm projectile. (Decl. Monterrosa at ¶ 2, Ex. 17.) The firing of the weapon towards Ms. Kim, which "inadvertently" hit Mr. Monterrosa, a reasonable juror could find in light of the circumstances this conduct constitutes a violation of the Fourth Amendment excessive force.

Defendants offer evidence showing protestors failing to comply with instructions given by law enforcement. (Decl. Hurtado, Ex. B; Decl. Graham, Ex. G.) Defendants' exhibits also includes a video with captions stating that prior to deploying a bean-bag shotgun less-lethal weapon, the officers' intended target was a "Black Lives Matter Racist Lives Don't" sign (which protestors are holding up at chest level) and not Christina Astorga, but there does not appear to be a reason as to why the officers deployed the bean-bag shotgun at a sign held by a protestor. *See* (Decl. Graham at ¶ 9 "The beanbag shotgun may be fired upon a single individual in a crowd when that *individual poses an immediate threat to the safety of the officer or others*."). Plaintiffs have demonstrated unreasonable use of force and thus, the Court finds that Plaintiffs are likely to succeed on the merits.

**C.  Irreparable Harm**

"Even where a plaintiff demonstrates a likelihood of success on the merits . . . he 'must also demonstrate that he is likely to suffer irreparable harm in the absence of a preliminary injunction.'" *Cuviello v. City of Vallejo*, 944 F.3d 816, 831 (9th Cir. 2019). When determining irreparable harm, Plaintiffs must establish that "extreme or very serious damage will result" absent an injunction. *Marlyn*

*Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quotation marks omitted). "There must be a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined, and showing that 'the requested injunction would forestall' the irreparable harm qualifies as such a connection." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018).

Here, Plaintiffs also provided evidence of continued use of LLMs, post-Chaleff Report, such as demonstrations occurring on August 21, 2020, and August 26, 2020, that resulted in alleged injuries from less-lethal projectiles. *See* (Decl. Murphy at ¶ 13 "Due to the violent nature of the crowd [on August 26, 2020], several officers deployed both 40mm foam projectiles."); *but see* (Decl. Guerreo at ¶ 13 "I attended the protest on August 26, 2020. . . . I did not engage in any physical altercation with the police officers nor did I throw anything at the police officers. Before being hit with the projectile, I did not see anyone nearby me throw anything at the police officers or use a laser pointer."). Plaintiffs have established that extreme or very serious damage will result absent an injunction and their Fourth Amendment rights will be violated. *E.g. Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 837 (9th Cir. 2020) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'")

D.  **Balance of the Equities and Public Interest**

When the government is a party, these last two factors of the preliminary injunction standard merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). As to public interest, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

There is a strong interest in preserving constitutional rights, including the right of peaceful assembly (First Amendment). On balance, the amended TRO

11

language limits LAPD's use of the launchers in order to ensure that the safety of the protestors and the officers can both be achieved.

Therefore, the Court finds Plaintiffs have demonstrated a likelihood of success and irreparable harm.

## IV. CONCLUSION

Accordingly, the Court **GRANTS** the Preliminary Injunction.

**IT IS SO ORDERED.**

DATED: May 10, 2021

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE