Cynthia Anderson Barker SBN 175764
NATIONAL LAWYERS GUILD
3435 Wilshire Blvd., Suite 2910
Los Angeles, California 90010
t. 213 381-3246  f. 213 381-3246
e. cablaw@hotmail.com

Paul Hoffman, SBN 71244
Michael Seplow 150183
John Washington SBN 315991
SCHONBRUN, SEPLOW, HARRIS,
HOFFMAN & ZELDES LLP
9415 Culver Blvd, #115
Culver City, California 90230
t. 310 396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. jwashington@sshhlaw.com

Attorneys for Plaintiffs
Additional Counsel on Next Page

Barrett S. Litt, SBN 45527
Lindsay Battles SBN 262862
MCLANE, BEDNARSKI & LITT
975 E. Green Street
Pasadena, California 91106
t. 626 844-7660 f. 626 844-7670
e. blitt@mbllaw.com
e. lbattles@mbllaw.com

Pedram Esfandiary SBN 312569
e. pesfandiary@wisnerbaum.com
Monique Alarcon SBN 311650
e. malarcon@wisnerbaum.com
Bijan Esfandiari SBN 223216
e. besfandiari@wisnerbaum.com
R. Brent Wisner SBN 276023
e. rbwisner@winserbaum.com
WISNER BAUM P.C.
3435 Wilshire Blvd., Ste. 2910
t. 310 207-3233 f. 310 820-7444

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

BLACK LIVES MATTER LOS ANGELES, ET AL.,

PLAINTIFFS,

v.

CITY OF LOS ANGELES, ET AL,

DEFENDANTS.

Case No.: 2:20-cv-05027 CBM-AS

**FILED**
CLERK, U.S. DISTRICT COURT

NOV. 7, 2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____YS_____ DEPUTY

THIRD AMENDED COMPLAINT

1   Carol A. Sobel, SBN 84483              Olu Orange SBN SBN 213653
    Weston Rowland  SBN 327599             Orange Law Offices
2   LAW OFFICE OF CAROL A. SOBEL           3435 Wilshire Blvd., Ste. 2910
    2632 Wilshire Blvd., #552              Los Angeles, CA. 90010-2015
3   Santa Monica, CA 90403                 t. 213 736-9900
    t. 310 393-3055                        f, 213 417-8800
4   e. carolsobel@aol.com                  e. o.orange#orangelawoffices.com
    e. rowland.weston@gmail.com
5

6   Colleen Flynn, SBN 234281             James Do Kim, SBN 231038
    LAW OFFICE OF COLLEEN FLYNN           LAW OFFICE OF DO KIM, APLC
7   3435 Wilshire Blvd., Suite 2910       3435 Wilshire Blvd, Suite 2700
    Los Angeles, CA 90010                 Los Angeles, CA 90010
8   t. 213 252-9444                       t. 213 251-5440
    r. 213 252-0091                       f, 213 232 -4919
9   e. cflynn@yahoo.com                   e. dkim@dokimlaw.com

10  Matthew Strugar, SBN 232951           Denisse Gastelum
    LAW OFFICE OF MATTHEW STRUGAR          GASTELUM LAW, APC
11  3435 Wilshire Blvd., Suite 2910       3767 Worsham Ave.
    Los Angeles, CA 90039                 Long Beach, CA 90808-1774
12  t. 323 696-2299                       t. 213 340 6112
    e. matthewstrugar@gmail.com           e. dgastelum@gastelumfirm.com
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT

## I.    INTRODUCTION

1.    This action arises out of protests across the nation following the murder of George Floyd by Minneapolis Police Department officers. The events in Minneapolis, soon after the deaths of Breonna Taylor and Ahmaud Arbery, brought out millions of people around the country at once to condemn the deaths of black and brown men and women by law enforcement and vigilantes condoned by local law enforcement. Some of the larger demonstrations in the country occurred in the Los Angeles area. Over the course of six days, the Los Angeles Police Department arrested approximately 3000 individuals. Defendant Chief Moore told the public that well more than 92 percent of those arrested were engaged in peaceful protest.[1] Nonetheless, the Los Angeles Police Department ended the protests through the use of force (batons and rubber bullets), and imposed unconstitutional conditions of confinement on arrestees by holding them on enclosed buses for up to six hours or longer, tightly handcuffed, without access to bathroom facilities, food or water.

2.    On the buses, arrestees were seated just inches apart, with windows closed and with no ventilation (significantly compounding the potential of exposure to Covid-19). In hundreds of cases, the LAPD made false arrests where the charges filed were solely infractions for which custodial authority does not exist.

3.    The LAPD also used unreasonable and unnecessary force directly against residents of Skid Row, both housed and unhoused, and caught them in the crossfire of attacks on protestors through indiscriminate and improper use of kinetic impact projectiles.  Perhaps no image embodies this more than the photograph of Charf Lloyd, an unhoused man in a wheelchair on Skid Row.  He was shot in the head at close range when police fired large projectiles while chasing a small group of protestors.

_____

[1] https://ktla.com/news/lapd-arrests-more-than-2700-people-amid-protests-chief/

1
THIRD AMENDED COMPLAINT



4.    The Plaintiffs' injuries caused by the use of so-called "rubber bullets" are strong evidence in this instance that the training of the LAPD in the use of these potentially lethal weapons was absent, seriously deficient, or intentionally indifferent to the known serious harm that can result from the use and misuse of kinetic impact projectiles (KIPs). The serious, and even deadly, injuries from the use of such munitions for crowd control has been well documented by Physicians for Human Rights ("PHR"). In a 2017 report, PHR called for limiting the "risk of less than lethal incapacitating weapons," particularly because of the high risk of serious, if not deadly, injury to unintended targets, as happened here repeatedly.[2] The force of KIPS can cause serious organ injuries and death, especially when the

_____

[2] Health Impacts of Crowd Control Weapons: Kinetic Impact Projectiles ("Rubber Bullets"), January 1, 2017 (available at: https://phr.org/our-work/resources/health-impacts-of-crowd-control-weapons-kinetic-impact-projectiles-rubber-bullets/

2
THIRD AMENDED COMPLAINT

1  point of impact is the head, neck, and torso.[3]  The injuries of just the few plaintiffs
2  identified by name in this class action demonstrate this finding.  Many received
3  medical treatment and several required surgery for head and facial wounds.

4      5.     All told, about 4000 LAPD arrests followed by the above- described
5  bus detentions occurred over five nights from May 29 to June 2. On May 29, the
6  protests began at the LAPD headquarters at First and Main Streets. The police fired
7  Kinetic Impact Projectiles ("KIPs") at the protestors, causing many in the group to
8  leave and march through downtown's jewelry district before circling back to the
9  LAPD headquarters. At about 9:30 p.m., an unlawful assembly was declared,
10  resulting in 533 arrests, mostly for failure to disperse, but only after first using
11  chemical irritants against the protestors.  *See* "Arrests During George Floyd
12  Protests Swell to Near 3000 in L.A. County; Many are Locals," Los Angeles Times
13  June 2, 2020: https://www.latimes.com/california/story/2020-06-02-george-floyd-
14  protests-los-angeles-arrests-locals.

15      6.     On May 30, 2020, most of the arrests occurred in the Fairfax area,
16  following a peaceful rally organized by BLM LA. When the rally ended in the early
17  afternoon, many of the participants continued peaceful protests, marching
18  throughout the Fairfax area, along Beverly and other streets. Throughout the area,
19  heavily armed officers, several lines deep at times, used unwarranted and unlawful
20  force to kettle and arrest the protestors. Most of the protestors followed orders
21  yelled at them by the officers but each time they moved in the direction that they
22  were told to move, they soon found no avenue to disperse. They were kettled,
23  targeted with impact projectiles and struck with batons as they were ordered to
24  move back. Surrounded by officers, there was nowhere for them to move.
25  Defendant Chief **MOORE** was on site and spoke to the kettled protestors twice,
26
27
28

_____

[3] Haar RJ, *et al*. *BMJ Open* 2017;7:e018154. doi:10.1136/bmjopen-2017-018154

3

THIRD AMENDED COMPLAINT

1  although his words were inaudible to most of the trapped protestors. Chief Moore
2  authorized, approved, and ratified the unwarranted assault on the protestors with
3  projectiles and batons. Alternatively, he did nothing to stop it as he witnessed it.

4       7.    On Sunday, May 31, nearly 700 individuals were arrested, with many
5  subjected to unlawful force, primarily in downtown Los Angeles. *See* Los Angeles
6  Times June 2, 2020, available at https://www.latimes.com/california/story/2020-
7  06-02-george-floyd-protests-los-angeles-arrests-locals. Approximately 10 percent
8  of that total were for property crimes, primarily looting. Tens of thousands of
9  demonstrators started a march from Pershing Square. While few arrests were made
10 during the day, at approximately 5:45 p.m., the LAPD advised the assembled
11 protestors that a curfew would go into effect at 6 p.m. and they would be arrested.

12      8.    On June 1, nearly 600 individuals were arrested in Hollywood, with
13 only 20 or so charged with property crimes, such as looting. Earlier in the day, the
14 LAPD put out a news release "requesting" residents of the City not to come to
15 Hollywood that evening. Shortly before 4 p.m., the City announced the curfew that
16 night would begin at 5 p.m. instead of at 6 p.m. as on previous nights. Barely an
17 hour later, a mobile alert was sent out, announcing the curfew would, in fact, start
18 at 6 p.m. Despite the correction, the police began arrests at 5 p.m. In addition to
19 Hollywood, about 100 individuals were arrested on June 1 in a protest in Van Nuys.

20      9.    Mass arrests occurred on the evening of June 2, when approximately
21 1000 protestors assembled outside Mayor Garcetti's Hancock Park home,
22 demanding that the Mayor's budget defund the police.   After a few hours,
23 participants in the protest outside the residence split up, with groups marching away
24 peacefully to the north and south. They were followed and soon kettled by the
25 police, then arrested. Approximately 120 individuals were arrested at about 8 p.m.
26 in the vicinity of Crenshaw Avenue and 8th Street on curfew violation charges, only
27 enforceable as an infraction under the Los Angeles Municipal Code.

28      10.   The chart below sets out rough estimates for several large arrest events.

4
THIRD AMENDED COMPLAINT

| DATE | AREA | # ARRESTED |
|---|---|---|
| May 29 | Downtown LA | 533 |
| May 30 | Downtown LA | 398 |
| May 31 | Pan Pacific Park/Fairfax | 700 |
| June 1 | Hollywood | 585 |
| June 2 | Mayor's home | 200 |

11.    On May 29, the third day of protests, protestors blocked the 101 freeway in downtown and engaged LAPD officers who responded. At 9:30 p.m. Defendants declared nearly all of downtown LA an "unlawful assembly" and imposed an immediate curfew for the area from the 10 freeway to the 101 freeway, and from the 110 freeway to Alameda. The curfew was announced on the LAPD and Mayor Garcetti Twitter accounts, and at Mayor Garcetti's press conference.[4]



4

**l.Mayor Eric Garcetti @MayorOfLA**

We will always protect free speech and Angelenos' right to live without fear of violence or vandalism. To increase safety for demonstrators, law enforcement and all citizens of Los Angeles, we are...pscp.tv

https://www.pscp.tv/w/caGHiDExMTkzNjN8MWVhS2JRV21lcEJ4WLAxZ0Dzz2-iobDlWBufDWNeHPcCb-7O-UR_4tQbozv4 …

5

THIRD AMENDED COMPLAINT

On Twitter, the LAPD wrote: "This [curfew order] is being made following repeated acts of violence and property damage. Residents should stay inside. Business should close. Those on the street are to leave the area." This was inadequate notice as it is unlikely that all, most or even many of the 10 million residents of the City follow the LAPD on Twitter.

12.    In a similar vein, the May 31 curfew, preemptively declaring all of downtown to be an "unlawful assembly," was announced in a news release posted on lapdonline.org.  *See*  http://www.lapdonline.org/newsroom/news_view/66585. California Penal Code §407 defines an unlawful assembly as two or more people who come together to do "an unlawful act, or to do a lawful act in a "violent, boisterous or tumultuous" manner. To comply with the First Amendment, the California Supreme Court construed §407 narrowly to apply only to assemblies that are "violent or pose a clear and present danger of imminent violence." *In re Brown*, 9 Cal.3d 612, 623 (1973). Defendants could not preempt all public assemblies in downtown on the actions of a few at other sites and other times.

13.    On June 1, the LAPD posted a news release on the its website, issuing a "request" to the public to stay away from the Hollywood Area. *See* http://www.lapdonline.org/newsroom/news_view/66592.

14.    The curfew in place from the night of June 2 to the morning of June 3 was also announced in a press release posted on the LAPD website. *See* http://www.lapdonline.org/newsroom/news_view/66598.

15.    Although public outcry regarding the LAPD's/City's unlawful protest suppression tactics resulted in the cessation of such conduct in Spring 2020,the LAPD soon resumed the same conduct at subsequent protests over the course of 2020 and early 2021.  That evidence resulted in the entry of a Preliminary Injunction by the Court on May 12, 2021.  [Dkt. 101, 102].  Resumption of this unlawful conduct continues to be a serious risk confirmed by the fact that this was not the first time that the LAPD engaged in these tactics, even after previously

6
THIRD AMENDED COMPLAINT

1  agreeing multiple times  not to do so again.  *See* Los Angeles Times, June 15, 2020
2  ("LAPD Violence Against George Floyd Protests Erodes Decades of Reform").
3  https://www.latimes.com/california/story/2020-06-14/lapd-protest-history-
4  criticism-heavy-tactics.
5      16.    Over the course of the last several decades, the Defendant City has
6  been sued repeatedly for many of the same tactics challenged herein, including
7  kettling (i.e., corralling) protestors before declaring an unlawful assembly and
8  blocking all exit routes, excessive force with batons and rubber bullets, and
9  prolonged handcuffing and improper conditions of confinement for arrestees. The
10  day after George Floyd was killed in Minneapolis, the City of Los Angeles paid a
11  settlement of $750,000 for a lawsuit raising many of the same violations in the
12  protests after the Ferguson Grand Jury decision not to indict the officer who shot
13  and killed Michael Brown. *See Chua v. City of Los Angeles*, 16-cv-00237-JAK-
14  GJS (C.D. Ca.). By kettling the demonstrators, detaining them tightly handcuffed
15  on buses for hours, without access to bathrooms, water or food, and through other
16  conduct detailed below, Defendants violated Plaintiffs' federal and state
17  constitutional rights.
18      17.    At a hearing of the Los Angeles City Council Public Safety
19  Committee to receive the Chaleff Report and testimony from the Report's author,
20  Councilmember Monica Rodriguez, chair of the Public Safety Committee,
21  characterized the LAPD's response to the Floyd protests as representing "one of
22  the worst examples in the history of the department." Council Committee Reviews
23  Report On LAPD Mishandling Of George Floyd Protests – CBS Los Angeles
24  (cbslocal.com)
25      18.    This Court has subject matter jurisdiction over the Plaintiffs' claims
26  pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights
27  jurisdiction). This Court has jurisdiction to issue declaratory or injunctive relief
28  pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

19. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391, as all Defendants and events giving rise to the claims herein occurred in the Central District of California.

## II. PARTIES - PLAINTIFFS

### A. ORGANIZATIONAL PLAINTIFFS:

20. Plaintiff BLACK LIVES MATTER LOS ANGELES ("BLMLA") is part of a nationwide organization with chapters in many major cities, including Los Angeles. The organization originated in Los Angeles with demonstrations on July 13, 2013, the date George Zimmerman was acquitted of killing teenager Trayvon Martin in Florida.

21. BLMLA is one of the largest and most active chapters of the organization, with nearly 500 active members and organized ally groups, including White People for Black Lives. In response to the death of George Floyd, BLMLA sponsored protests in Los Angeles and participated in demonstrations organized by other groups. On average, BLMLA sponsors four actions a week. Defendants' actions interfered with BLMLA's right to assembly and speech.  BLMLA plans to assist, plan, participate in, hold similar events in the future, on its own or in conjunction with others, and is fearful that the same unlawful police actions in response to these and similar protests of institutional racism and police brutality will be repeated absent injunctive relief to prohibit the LAPD's practices, policies, and customs that caused the unlawful action in response to the recent protests.

22.  In response to the murder of George Floyd, BLMLA organized protests in Los Angeles. One such action was held at Pan Pacific Park in Los Angeles on Saturday, May 30, 2020. During the course of this protest and others over the past week, while BLMLA and its members were engaged in lawful First Amendment activity, the LAPD used force to terminate the protests, including the indiscriminate use of so-called "less lethal" weapons that caused injury to its

8
THIRD AMENDED COMPLAINT

members and instilled fear in them that, if they chose to assemble in public spaces to express their opposition to police violence across the nation against black men and women, they would be the subject of such violence and arrest.

23.    Plaintiff **CANGRESS**, dba Los Angeles Community Action Network (LA CAN), is a grassroots non-profit organization in Skid Row for approximately two decades. More than 800 low-income residents of Skid Row are involved with LA CAN, many of whom are unsheltered each night. In addition, individuals such as Plaintiff SHENTU are members and supporters of the organization. The primary purpose of the organization is to organize and empower community residents to work collectively to address systemic poverty and oppression in the community. Since its founding in 1999, LA CAN has been the only member-driven organization in Skid Row whose goal is to protect the rights and prevent the further disenfranchisement of homeless and poor people in Los Angeles. LA CAN brings this action on behalf of its members and associates who have been arrested and/or subjected to the use of less-lethal weapons and other tactics aimed at shutting down public spaces over the past 10 days by City employees and agents pursuant to the enforcement policies, practices and customs of the City. As a result of Defendants' unlawful actions, LA CAN has expended personnel resources to try and prevent at-risk individuals from being subjected to these unlawful policies, assist those who have been physically injured by these unlawful policies, and assist their members and associates to be safe from police actions.

B.    **MAY 29 ARRESTS AND FORCE PLAINTIFFS**

24.    Plaintiff **STEVEN ROE** participated in a peaceful protest in downtown Los Angeles at or about the intersection of Temple and Spring Streets, near City Hall. Around 9:00 that night, **ROE** observed the police form a line and begin pushing the protestors toward City Hall.  Approximately 100-200 people were assembled. The crowd moved in compliance with the police orders, but each time the demonstrators did so, they were met by other lines of police officers that

blocked them.  The demonstrators realized that they were being herded by the police into a confined space as a group and completely surrounded by officers. **ROE** and others asked to leave the demonstration but were refused by the officers at the scene.

25.    **ROE** observed a single bottle thrown at the police from behind him. The police made no effort to isolate that one individual.  Instead, the officers advanced more aggressively toward the demonstrators.  An  officer took aim at **ROE** and shot him in the stomach with kinetic impact projectile.  **ROE** did not present a threat to and was walking backward facing the officers when he was struck.  The KIP struck with such force that it broke the skin and caused a deep and very painful injury.  Two weeks after being hit, **ROE** still has a welt under the skin.

26.    At approximately 9:45 p.m., the LAPD announced that everyone in the group should sit down on the ground.  Before this, **ROE** heard no announcement to disperse and all requests to the LAPD to leave were ignored or denied for 45 minutes.  **ROE** later learned that, at about 9:35 p.m., the LAPD tweeted a declaration of an unlawful assembly order.  **ROE** does not follow the LAPD on Twitter, and besides, he and more than 100 others were already kettled when the "unlawful assembly" was declared on Twitter.  The group was handcuffed behind their backs with tight plastic zip ties, causing severe pain and discomfort. After waiting for transport the group to a jail facility, they were loaded onto buses and held in close contact with each other.  They were driven to a location just a few blocks away and could have walked there faster, shortening the time that they were handcuffed and in congregate conditions on the buses that increased exposure to COVID-19.  During the entire time they were in custody they were not given any water or bathroom access.  **ROE** and others asked for the zip ties to be removed because of the pain but their requests were ignored or refused.  In all, he spent 2 hours and 15 minutes handcuffed.  His fingers were numb, and he had visible injuries from the zip ties.

27.  Plaintiff **NELSON LOPEZ** was arrested twice: the first time when he participated in a peaceful protest in front of Los Angeles City Hall at First and Spring Street in downtown Los Angeles on the evening of May 29, 2020.  LOPEZ was also arrested the following night for violating the curfew.  On May 30, 2020, LOPEZ participated in what he thought at the time was a car caravan protest.  In the first arrest, Lopez arrived at Los Angeles City Hall at approximately 7:30 p.m. on May 29, 2020,. The crowd was very peaceful, with some children holding signs. **LOPEZ** soon observed a line of officers form around the group on all sides, blocking anyone from leaving.

28.  **LOPEZ** never heard a dispersal order on May 29, 2020.  A helicopter flew over the crowd, making it hard to hear.   At some point, the group was told to sit on the ground because they were being arrested. After about 40 minutes, LAPD officers informed them that they would be issued a citation, like a traffic ticket. While seated, **LOPEZ** called his mother, a nurse who worked nearby.  After ending her 12-hour shift, she came to get him on her way home.  She was trapped by the LAPD and arrested.

29.    It took about two to three hours for everyone in the group trapped at City Hall to be handcuffed.  Some homeless people were also swept up in these arrests.  Some detainees were screaming because of the tight handcuffs. Others were upset because, after the officers told the group that they would only be cited and release, they were now handcuffed and taken into custody.

30.    **LOPEZ** estimates that approximately several hundred people were in the group arrested with him.  Once handcuffed, they were loaded onto buses and held in close contact with each other.  They were taken to what appeared to be a police garage just a few blocks from City Hall.  However, **LOPEZ** sat on the bus for approximately 45 minutes, waiting for the bus to enter the garage.   When **LOPEZ** entered the garage, he observed humdreds of people inside being processed.  He also observed more buses with arrestees arriving at the location.

31.    **LOPEZ**'s handcuffs were very tight, bruising his wrists and injuring his shoulder (rotator cuff).  He asked an officer to loosen the handcuffs but was told they could not do so because they did not have sufficient replacement zip ties. **LOPEZ** heard multiple, if not most, of the arrestees complain about tight handcuffs. He did not see anyone's handcuffs loosened in response to these complaints.  He was not released until approximately 3:30 a.m.  He was held in handcuffs for several hours in the garage before being issued a citation for a violation of LAMC 80.02 ("obedience to an officer"), which is only punishable as an infraction.

32.    When he was arrested on May 30, 2020, he was again handcuffed and taken by bus.  On this occasion, because the booking area was at a distant police station, he was held for a much longer period of time in tight handcuffs, which exacerbated the bruising on his wrists from the tight handcuffs on May 29, 2020.



**C.    MAY 30 ARRESTS AND FORCE PLAINTIFFS**

33.    Plaintiff TINA ČRNKO attended the Black Lives Matter Los Angeles rally at Pan Pacific Park on May 30, 2020, arriving at approximately 12:30 p.m. At approximately 1 p.m., some of the participants began marching peacefully toward the Beverly Center. After another two hours without incident, the group split into three groups. One group was protesting near the intersection of 3rd Street and Edinburgh peacefully.  Plaintiff **ČRNKO** was part of that group.

34.    Sometime before 5:30 p.m., Defendant **MOORE** arrived and spoke to the group; however, he could not be heard over the protestors because of inadequate amplification equipment.  At that time, additional officers, wearing riot gear and brandishing more weapons, arrived on the scene.  Eventually, several lines of officers in riot gear kettled the group on all sides, preventing everyone from leaving.

35.    A short time after Moore spoke to the group, **ČRNKO** saw protestors running east on 3rd Street, followed by a line of LAPD officers.  About 30 minutes later, the demonstrators marched south and were able to leave the kettling only when Chief **MOORE** directed officers on the south to allow them to exit.

36. **ČRNKO** then marched to the northeast corner of the intersection of 3rd and Fairfax. She observed ever increasing number of LAPD officers arrive at the intersection attired in riot gear, heavily armed and forming what appeared to be an impenetrable wall of officers at least 10 deep stretching across a wide area.

37. Chief Moore appeared again, this time in riot gear, and spoke to the crowd but, again, could not be heard because of poor the amplification equipment.

38. At about 6:00 p.m., plaintiff observed panicked protestors running east on 3rd Street, followed by a large number of LAPD officers moving behind them and coming toward the area where **ČRNKO** was assembled. She began moving east but soon realized that was not an available option. She saw a line of officers coming toward the group from the west. The officers filled the width of the street, running after the fleeing marchers and shooting at them indiscriminately.

39. At about 6:25 p.m., she heard shots fired. She was hit in the left bicep and ribcage by KIPs. As she moved east, the officers fired again. She was hit above her right eye, causing temporary hearing loss, extreme pain, and profuse bleeding. With officers advancing on the group, she could not get help from a medic. The resulting wound required seven stitches. She still suffers nerve damage.



14
THIRD AMENDED COMPLAINT

40. Plaintiff **JONATHAN MAYORCA** is a journalist for an independent media. On May 30, 2020, along with two crew members, he was filming a peaceful demonstration on Beverly Boulevard in the Fairfax area of Los Angeles. He observed LAPD officers begin to form a line and push back everyone in the area of the protest. Mr. **MAYORCA** soon realized he was trapped by the officers, and they were kettling the group of protestors he was with toward an alley. His press badge was clearly visible, but the LAPD officers ignored his attempts to show his press credentials and continued pushing the entire group toward the alley, surrounding them and refusing all requests to leave. **MAYORCA** did not hear a dispersal order and was not given an opportunity to leave before he was arrested.

41. Once in the alley area, **MAYORCA** was ordered to stop filming and to sit on the ground. The LAPD forced him to the ground, breaking his camera. He was handcuffed tightly with zip ties, causing pain and discomfort. He was then stood up against a wall. After the entire group was handcuffed, they were moved into a van, sitting close together. Others in the same arrest group were protestors, whom **MAYORCA** had filmed engaging in a peaceful protest.

42. After about thirty minutes, the group was driven to the Van Nuys station, a considerable distance away. At the station, Mr. **MAYORCA** was issued a citation for failing to obey lawful orders, LAMC 80.02, which is expressly and only chargeable as an infraction pursuant to the Los Angeles Municipal Code.

43. **MAYORCA** was handcuffed tightly for approximately two hours and 15 minutes. His repeated requests to remove or loosen the handcuffs because of the pain were ignored, as were the group's request for access to a bathroom or water.

44. Plaintiff **ABIGAIL RODAS** participated in a peaceful event organized by BLM LA in the Fairfax area on May 30, 2020 of Los Angeles to protest the murder of George Floyd. She was walking on Beverly Boulevard near LaCienega Boulevard when the protestors were met by a line of LAPD officers,

45. Although there had been no dispersal order, RODAS and a friend decided to leave at that point and began walking toward her car when an officer began shooting projectiles at them. RODAS was in the intersection across from the Naurelle store.  There were skirmish lines of officers armed with less lethal weapons throughout the area, shooting at protestors indiscriminately.  They shot at the backs of protestors who posed no imminent threat  and were moving away after being directed by the officers to "leave the area."  RODAS was one of several individuals shot by less lethal munitions at the intersection.  She was struck in the face by a projectile and momentarily lost consciousness, falling to the ground, bleeding.  She was diagnosed with a severe fracture to her right mandible and underwent surgery. Stitches were required on both the inside and outside of her mouth to close the lacerations and a steel plate was used to repair the fractured jawbone. RODAS spent two days in the hospital on Monday afternoon. She was unable to talk for about 10 days. For one week she could only drink liquids and was on a soft food diet. She had screws in her gums and rubber bands to immobilize her



jaw while the bones rejoin.

47. Plaintiff **KRYSTLE HARTSFIELD** participated in a peaceful protest in the Fairfax area of Los Angeles on the afternoon of May 30, 2020. She is employed in the Artist Management department of a Los Angeles media company. When the protestors were near the Trader Joe's on Third Street and Fairfax Avenue, **HARTSFIELD** observed officers begin to physically direct the movement of the group of protesters. A short time thereafter, at around 3:30 p.m., she heard a dispersal order made by the LAPD. At the point the dispersal order was given, the group was directed to leave through the alleyway next to the Trader Joe's. **HARTSFIELD** complied and began to leave the area and was walking way when she heard an officer say "don't let them leave." An officer then grabbed her and pulled her from behind, and other officers surrounded her in front. As they did this, one of the other female protesters grabbed her hand and repeatedly said, "don't round her up – don't round her up" but the officers pulled her away and pushed **HARTSFIELD** into the parking lot near the alley.

48. **HARTSFIELD** and the others were handcuffed and lined up on Third Street where they remained, tightly handcuffed, for approximately two hours while they waited to be transported. The group was then put in a van, seated closely together, and taken to Van Nuys. Despite repeated requests to loosen their handcuffs, they remained very tightly handcuffed throughout, causing considerable pain. In all, she was handcuffed for approximately six hours before her release. **HARTSFIELD** was not released until approximately 10:30 p.m. She heard LAPD officers warn those released that if they remained in front of the station, they would be rearrested for violating the curfew, which went into effect at 8:30 that night. Fortunately, family members arrived at the station to take her home.

49. Plaintiff **NADIA KHAN** participated in the rally organized by Black Lives Matter Los Angeles at Pan Pacific Park on May 30, 2020, in the Fairfax area. She arrived there at approximately 11 a.m. At around noon, the rally concluded and the protesters left the park and began a march.

50.     When the march neared the intersection of 3rd and Fairfax, **KHAN** observed lines of police in riot gear.  **KHAN** observed the officers shoot projectiles at the group, although she was not hit at this time.

51.     The march continued north on Fairfax to Beverly Boulevard where it met up with a large group of young people.  **KHAN** marched with them to the Beverly Center and back on Beverly Boulevard toward Fairfax.   When the marchers neared Beverly and Fairfax, the police deployed a chemical irritant that made **KHAN**'s eyes burn and tear up.  In addition, the gas got into her lungs, making her cough.  At or about the same time, the police were also shooting small pellet-like impact projectiles at the group.  She was hit in the legs, but because she was not close to the police and was wearing jeans, she did not suffer serious injury.

52.     **KHAN** continued with the peaceful protestors north on Fairfax towards Melrose. The police kettled the group there at about 7:45 p.m.  There were approximately 100 people detained at this location.  All of the demonstrators were handcuffed behind their back with zip ties. KHAN's zip ties were very tight and caused pain.  She asked the officers to loosen the zip ties but was ignored.  The arrestees were loaded on to two crowded buses.  **KHAN** was wearing both a mask and goggles to protect against exposure to COVID-19 contagions but most of the officers and some of the detainees did not have masks.

53.     The group was taken to Wilshire Division on Venice Boulevard and cited for a violation of LAMC 80.02, an infraction. **KHAN** was released about midnight.  She was handcuffed for approximately four hours, leaving her wrists sore and painful for several days.

54.     Plaintiff EVA GRENIER is an attorney in Los Angeles.  On May 30, 2020, she Plaintiff **EVA GRENIER** participated in the protest organized by Plaintiff **BLM LA** at Pan Pacific Park on May 30, 2020.  When the rally ended, the LAPD moved in quickly to break up the assembly, wildly swinging batons at those in the front of the protest, closest to the LAPD skirmish line, with officers behind

18
THIRD AMENDED COMPLAINT

1  them deploying less-lethal projectiles.  At the same time, the LAPD formed
2  skirmish lines behind and around the protestors, kettling them and allowing no
3  ready means of dispersal.  As the officers advanced on the front line of protestors,
4  **GRENIER** was struck with a baton with sufficient force that it left bruises on ther
5  body.  At the same time, as the officers advanced, she was forced back and knocked
6  into a structure that caused her to fall backwards.

7       55.    Plaintiff **DAVID CONTRERAS** is a graduate student in social work
8  in Los Angeles.  At approximately 2 pm on May 30, 2020, he was walking down
9  Fairfax to the area where he observed a peaceful protest.  He continued to walk
10 with the protestors down Fairfax.  At some point, he observed a line of officers split
11 the group in half, forming a skirmish line to divide the protestors.  **CONTRERAS**
12 observed some of the protestors become agitated in response to the police action.
13 **CONTRERAS** observed that the officers had put themselves in a tactically
14 compromised position and soon were surrounded by protestors.  The police started
15 striking protestors with batons.  Plaintiff remained on the side, walking toward the
16 sidewalk while photographing what he saw , when he felt a severe pain in his face.

17      56.    Just prior to the injury to his face, **CONTRERAS** observed an officer
18 with a less-lethal launcher facing in his direction.  **CONTRERAS** realized that he
19 was shot in the face with a projectile shot by the officer.  He observed the officer
20 smile as he started to reload his weapon.  Feeling dizzy and pained and fearing he
21 would be shot again, **CONTRERAS** left the area.  As he walked by some of the
22 protestors, he could see their reaction to his injury and heard them call for a medic.
23 Ultimately, he reached 3rd and Fairfax, where a medic attended to him.

24      57.    **CONTRERAS**' eye swelled shut from the injury and he had severe
25 headaches for more than a week.  At that point, he started to lose vision in his left
26 eye.  He sought medical care at a hospital, where he was told that he had severe
27 hemorrhaging.  He continues to suffer debilitating headaches as a result of the
28 projectile shot in his face.  While his vision has largely returned, it is still restricted.



58.    Plaintiff **NERY MARROQUIN** participated in the protest rally at Pan Pacific Park on May 30, 2020.  After the rally was dispersed from the park by the LAPD, **MARROQUIN** was in the area near the Sheriff's substation and the CBS Building with a small number of protestors.   Without justification, **MARROQUIN** was shot in the head with a less lethal munition and suffered significant head trauma.  The shot to his head caused him to lose consciousness. He fell to the ground, injuring his shoulder.  A fireman in the area was able to quickly wrap a bandage around Plaintiff's head to stop the bleeding from an approximately two-inch gash on his forehead.   At the time, LAPD officers prevented the fireman from providing more medical aid.  As Mr. Marroquin then attempted to leave the area, he was repeatedly struck in the back with a baton by an LAPD officer.  Ultimately, two residents of the area brought Mr. Marroquin to their apartment and then transported him to a hospital emergency room, where he received treatment for his injury.   He suffered a concussion and continues to suffer significant pain from the injuries.

20
THIRD AMENDED COMPLAINT



17/130

59.    Plaintiff **CLARA ARANOVICH** is a filmmaker. On May 30, 2020, she joined a peaceful protest in the Fairfax area after a rally in Pan Pacific Park organized by BLM-LA.  She arrived between 4:00 and 5:00 p.m. and saw a group of protestors at Fairfax Avenue and 3rd Street and a line of police across the street.

60.    Just before 6:00 p.m., **ARANOVICH** observed Defendant Moore address the protestors. Initially, he spoke without amplification, making it nearly impossible to hear what he was saying. Even when he used an amplification device, it was still difficult to hear him over the crowd noise.  **ARANOVICH** did not hear Chief **MOORE** or anyone else announce an unlawful assembly or a dispersal order. About 30 minutes after Chief **MOORE** spoke, a line of police officers began to

21
THIRD AMENDED COMPLAINT

move the protestors back by using aggressive, physical force.  The officers used their batons to jab people with force in the chest and abdomen.  Some officers hit protestors with batons in an overhand swinging motion. **ARANOVICH** was struck in her chest and abdomen multiple times, causing a painful bruise on her breast.

61.  As **ARANOVICH** left the protest, she was struck with a KIP in the calf, causing a painful welt and bruise still visible, almost three weeks later.



**C.  MAY 31 ARRESTS AND FORCE PLAINTIFFS (SKID ROW)**

62.  Plaintiff JEFFREY TROTTER is a 51-year-old African American man and a resident of the Rosslyn Hotel on Skid Row. On Sunday, May 31, at about 5 p.m., TROTTER walked two blocks from the Rosslyn, at 5th and Main Streets, to the RiteAid drug store at 5th and Broadway. The Rite Aid was closed, so he started to walk back to the Rosslyn.When he neared 5th and Spring streets, he saw a line of LAPD officers in riot gear. One officer, a white male, stepped toward him and asked where he was going. Mr. TROTTER responded that he was walking home from the Rite Aid. Without further discussion, the officer took a few steps back and

shot Plaintiff with hard rubber or foam projectiles at close range four times, once
in the chest, twice in the stomach, and once on the left hand.

63.    On information and belief, based on the nature of TROTTER's
injuries and the fact that he was struck with multiple projectiles, all at about the
same time, Plaintiffs allege that TROTTER was struck with a 37mm munition,
which fires multiple rounds at the same time.  The weapon is intended to be skip-
fired but was shot directly at TROTTER in this instance and at close range.
Because of the proximity of the officer who shot TROTTER, the projectile that hit
his chest struck with such force that it tore off skin in the shape of the projectile.
The one that hit his hand also tore off a chunk of skin about an inch long and half

 

nd an inch across.Mr. Trotter collapsed from the impact. As he lay on the ground,
the officers stepped over him and walked away. After a period of time, he was able
to walk the block back to the Rosslyn. When he arrived there, a friend called the
paramedics, who treated him there. He was in intense pain for more than a week
and two weeks later, his stomach, chest and hand are still swollen and bruised.

**D.    June 1 Arrests And Force Plaintiffs**

64.    Plaintiff **ALEXANDER STAMM** participated in a peaceful
demonstration in Hollywood on the afternoon of June 1, 2020.  He arrived at

1   approximately 4 p.m. and was joined by his husband at around 5:30 p.m. While
2   marching, he saw the police block off streets, forcing protestors down side streets.
3   As the protestors moved down side streets in response to the lines of officers
4   blocking their march.

5   65.   **STAMM** observed that the police kettled the protestors in these side
6   streets so they could arrest them.

7   66.   Plaintiff **STAMM** smelled some chemical irritants in the air around
8   the protestors. He also observed someone hit with an impact projectile in the thigh.
9   Terrified by what was happening, **STAMM** and his husband decided to leave and
10  go home to their nearby apartment. At around 8 p.m., they started down Schrader
11  Boulevard because Wilcox was blocked by a police line.   As **STAMM** walked
12  down Schrader, between Selma Avenue and Sunset Boulevard, the police blocked
13  the streets and surrounded the group he was walking with. Although he was only a
14  few blocks from his home, he was not permitted to leave.

15  67.   There were approximately 200 to 300 people in the group.  All were
16  ordered by the police to get on their knees and put their hands behind their backs.
17  There were all handcuffed then.  **STAMM** did not hear a dispersal order before
18  being ordered to get down on his knees.

19  68.   All the arrestees were loaded onto LASD buses, seated two to a
20  bench with no social distancing.  Some people's face masks had fallen down, but
21  they could not reposition the masks because they were handcuffed.

22  69.   The arrestees were driven from Hollywood to Jackie Robinson
23  Stadium, on the Veterans Administration property in West Los Angeles.  The drive
24  from Hollywood took approximately 45 minutes.  Once they arrived at the VA,
25  they were held on the buses for another two hours before their citations were
26  processed and they were released.  They were taken off the closed bus only two at
27  a time and then lined up be processed.  During all this time, he remained tightly

28

24
THIRD AMENDED COMPLAINT

1  handcuffed, causing bruising on his wrists, and in an unventilated bus without
2  social distancing or masks.

3      70.    At about 1:00 a.m., **STAMM**'s handcuffs were finally removed and
4  he was told he was free to leave.  To get home to Hollywood, **STAMM** had to take
5  two buses then walk approximately four miles to his apartment.  He did not arrive
6  home until 2:30 a.m., long after the curfew went into effect.

7      71.    On June 1, 2020, Plaintiff **MAIA KAZIN** participated in a peaceful
8  demonstration on Spring St. near the intersection of 5th Street in downtown Los
9  Angeles.  At about 6:30 p.m., LAPD officers blocked about 300 people from
10  moving north or south on Spring Street, forming a blockade at both ends of Spring
11  Street.   Some people tried to leave through a parking lot on Spring, but police
12  blocked them.

13      72.    **KAZIN** was at the front of the protestor group. Prior to the blockade
14  by the LAPD, she heard no dispersal order, or warning that the group was in
15  violation of a curfew order, or that they would be arrested if they did not leave the
16  area.  In fact, the Incident Commander ("IC") made the deliberate decision to arrest
17  Kazin and the other 749 people without first issuing a dispersal order.  Although
18  the same Incident Commander had noted that the group had been peaceful as they
19  marched throughout the City, the IC decided to arrest the entire group immediately
20  when the curfew took effect without notice and an opportunity to disperse because,
21  in the IC's view, "they would just be a problem later."

22      73.    **KAZIN** was handcuffed with zip ties.  About 15 minutes after that,
23  she was given what she understood was a citation for a curfew violation but she
24  was not released.  On information and belief, the paper issued to Plaintiff was a
25  Field Interview Card.  Instead of releasing the group, the hundreds of people in the
26  group were loaded onto buses. Eventually, the arrestees were taken from downtown
27  Los Angeles to a UCLA parking lot.  Once there, they were kept on the buses from
28  7:30 until about 1:00 a.m., handcuffed behind their backs, with no access to food,

water or bathrooms.  While on the bus, **KAZIN** observed a woman on the bus in physical distress from a dislocated shoulder. Someone on the bus was able to access their cell phone and called 911.  The woman next to **KAZIN** was panicking because she needed to take medication.  Someone on the bus was able to use their cell phone to call 911 for this woman, as well.  Requests to the officers to address these situations were ignored.

74.    When she was finally released, **KAZIN** asked an officer if her boyfriend would be violating the curfew if he picked her up.  The officer responded that it would be a violation of the law, but he should be fine.  Uneasy with this response, **KAZIN** did not want to risk arrest of her boyfriend, so she got a ride from the friend of someone on the bus.  She was handcuffed behind her back with plastic zip-ties for more than seven hours until she was released at 1:00 a.m. The handcuffs were painful and caused minor tenderness on both wrists for 2-3 days.

75.    Plaintiff **ALICIA BARRERA-TRUJILLO** also participated in a peaceful protest in downtown Los Angeles on June 1, 2020.  She arrived with her younger sister and a friend at 5th and Grand, near the main public library, at approximately 2:00 pm with her younger sister and friend.  The crowd was very peaceful and diverse, including families with children holding signs.

76.    At around 4:00 p.m., she started making plans to leave the area.  Soon thereafter, we received a text that the curfew for Los Angeles that night was 5:00 p.m.  **BARRERA-TRUJILLO** was confused because she also received a text informing her that the curfew was at 6:00 p.m.

77.    She attempted to leave the area shortly before 5:00 p.m. and observed that the police had blocked off all exit streets.  Police surrounded them on all sides, making it impossible for anyone to exit the area.  **BARRERA-TRUJILLO** began to panic and observed that everyone around her also appeared to panic as officers surrounded them.  **BARRERA-TRUJILLO** never heard a dispersal order, providing notice and an opportunity to leave before the group was kettled.  A

26
THIRD AMENDED COMPLAINT

helicopter flew over the crowd, making it very hard to hear.  As noted with the arrest of plaintiff Kazin, in fact, the IC deliberately did not give a dispersal order.

78.     Once they were kettled, **BARRERA-TRUJILLO** saw some type of rubber bullets being fired into the protest group.  She also saw a police officer direct an aerosol spray at a woman with a young child.  The child was crying and both the woman and the child appeared to be in pain from the effects of the spray.

79.     Approximately 500 people were in the group before it was split in half to handcuff and process them.     **BARRERA-TRUJILLO** was searched, handcuffed and believed she received her citation while detained on the street.  On information and belief, Plaintiff believes that a Field Interview Card was given to her, not a citation.  After she was handcuffed, Plaintiff was then placed on a bus and waited an hour for the bus to leave downtown.  Ultimately, the arrestees were driven to Westwood, near the National Cemetery.  The arrestees were held on the buses while each person was booked and then issued a citation.  She remained in tight handcuffs for about six hours.

80.     While on the bus, she saw several people who seemed to need medical aide.  There were no officers on the bus and no way to get their attention.  One of the arrestees was able to get out of her handcuffs and call for emergency assistance.  Only when the ambulances arrived did the police check on the arrestees on the bus.  Near plaintiff, one woman asked to use the bathroom but was denied by the officers.  When the woman was later taken off the bus, she urinated on herself.

81.     Once released, **BARRERA-TRUJILLO** and her sister had no way to get home.  Her cell phone was not charged.  Several volunteers with the National Lawyers Guild waited with them until they could arrange a ride home.  **BARRERA-TRUJILLO** was handcuffed from about 6:50 p.m. until 1:00 a.m.  The tight handcuffs cut into her wrists, stripping skin off and causing bleeding.

82.     On June 1, 2020, approximately 750 people were engaged in peaceful protest marches throughout Downtown Los Angeles.  Radio transmissions by the

27
THIRD AMENDED COMPLAINT

Incident Commander for that date and location, as well as other officers monitoring the marchers, repeatedly reported that the group was peaceful. Multiple Activity Logs created by Defendants and documenting the incident involving the June 1 arrest class confirmed that officers were directed to the location starting at about 5 p.m. and kettled the protestors by forming a perimeter preparatory to arresting the hundreds of people in the sub-class. The Internal Affairs investigation of **Class Representative Barrera-Trujillo**'s complaint included the statement by the arresting officer that she arrived at 1800 hours and the protestors were already "contained". The curfew on June 1, 2020 went into effect at 1800 hours (6 pm). At approximately 6:43 p.m., an arrest announcement was made to the kettled protestors. No prior dispersal order was given. The radio transmissions at 6 p.m. confirm the decision not to give a dispersal order. Although the incident commander first states on the radio that the protestors will be given a reasonable amount of time to leave, barely 7 minutes later, in response to a query about giving a dispersal order, the officer in charge directs officers to just start making arrests and prevent the protestors from leaving. The June 1 Arrest Class was held in handcuffs at the arrest site for an hour before being transported across town to a makeshift booking site at Jackie Robinson Stadium in West Los Angeles.

**E.    JUNE 2 ARRESTS AND FORCE PLAINTIFFS**

83.    Protests took place in several areas of the City throughout the day on June 2, 2020.  At Hollywood and Vine, a peaceful protest occurred mid-day with approximately 30 people, most standing on Hollywood Boulevard and a smaller group of about 10 people on Vine Street.  Plaintiff **SHANNON MOORE** arrived with a friend shortly before 3 p.m.  Within about five minutes, she was shot in the



back of the head by a KIP.  A tall male in the group threw a water bottle at the police as she arrived.  Rather than isolate and arrest him, the police shot her.

84.    Because **MOORE** saw the officer take aim at her head, she was able to turn away so that she was struck in the back of the head.  She was able to prevent the projectile(s) from hitting her directly in her face and suffered much more serious injury. She sought medical treatment and suffers intense headaches.

85.    Plaintiff **DEVON YOUNG** is a mental health therapist in Los Angeles. On June 2, 2020, she participated in a large, peaceful demonstration outside Mayor Eric Garcetti's house on the corner of South Irving Blvd. and 6th Street in Windsor

Square. The protest was organized by Black Lives Matter Los Angeles to protest the killings of George Floyd, Breonna Taylor, Ahmaud Arbery, and the countless other victims of police brutality and racism.

86.    **YOUNG** arrived at the protest at approximately 5:00 p.m. and remained in the area until about 8:00 p.m. The group she was with then began marching away from the Mayor's home. While marching, the group was surrounded and kettled by LAPD officers. No one was able to exit the group of about 100 people. The officers pushed the group aggressively and silently toward Crenshaw and 8th Street. Officers ignored the protestors' pleas: "We want to leave. Let us go home!"

87.    Finally, at around 8:45 p.m., near the intersection of Crenshaw and 8th Street, the officers announced that they were all under arrest. There was no dispersal order. The officers did not inform them that they were going to be arrested for a curfew violation before the arrests took place. All were handcuffed with their hands behind their backs using zip-ties. YOUNG was handcuffed at about 9:45 p.m. The officers separated the group into two lines – one for men and one for women. The officers performed pat down searches that were intrusive and uncomfortable for many of the women.  In addition, most of the officers were not wearing masks and came in close proximity to the women during the pat down.

88.    During the pat down searches, a transgender woman in the group was separated from her female partner because she did not have female sex organs. **YOUNG** asked an officer what was happening to her and he replied that she was being placed in a holding area labeled "other" so she could be searched separately for her own safety. She and her partner were frightened and upset by the separation.

89.    While handcuffed, **YOUNG's** skirt was raised up such that her underwear was exposed to the group and she had no ability to pull her skirt down because she was handcuffed. She asked the officers if she could pull her skirt down and they refused to let her do so. Only after she walked through the group with her

30<br>THIRD AMENDED COMPLAINT

1  underwear completely exposed was she allowed to adjust her skirt. She was very

2  uncomfortable and felt humiliated.

3      90.   Approximately two hours after they were first detained and

4  handcuffed, the group was loaded onto a bus. The arrestees were forced to be close

5  together, many without masks. The handcuffs were very tight and uncomfortable.

6  When finally uncuffed, **YOUNG** had bruises and marks on her wrists.

7      91.   The group was taken to a parking lot in Van Nuys where they were

8  processed and released with a citation for a violation of LAMC 80.02, a curfew

9  violation.  Throughout the time they were detained, the arrestees were denied

10  access to bathrooms, water and food. For some of the women, this situation was

11  compounded by the inability to change their tampon.

12      92.   **YOUNG** was released in the middle of the night at 1:30 a.m. with no

13  ability to call for a ride or instruction on how to get home safely. A police officer

14  told them they would be rearrested if they did not go home immediately.

15  Fortunately, some volunteers arrived to give people a ride home.

16      93.   Plaintiff **LINUS SHENTU** is a long-time member of CANGRESS.

17  On the evening of June 2, 2020, he was participating in a peaceful protest in

18  Hollywood, near Sunset and Vine. When the protestors marched and reached Van

19  Ness between Melrose and Santa Monica Boulevards, SHENTU observed police

20  starting to block streets and kettle the protestors. The march was accompanied by

21  a car caravan. From a half a block away, SHENTU observed the police dragging

22  people out of cars. All around him, the marchers started running. SHENTU and his

23  partner were able to locate his partner's sister, who had been in the car caravan,

24  and jumped in her car. Because the police had blocked off all of the streets, they

25  could not leave the area. To avoid arrest and be safe until they could safely drive

26  home, they followed other cars to the parking lot of a nearby apartment building.

27      94.   As they remained in their car, they observed a few officers enter the

28  parking lot and pull people out of their vehicles. The officers ordered **SHENTU**,

31<br>THIRD AMENDED COMPLAINT

his partner and her sister out of their car, opened the rear passenger door where his partner was seated and yanked her harshly by her arm. SHENTU voluntarily exited the rear passenger seat. They were lined up on the side of the building with their hands zip tied behind their backs. In all, approximately 30 individuals were arrested at this one location and held at Elmwood and Van Ness for approximately one hour while officers filled out Field Interview cards with their personal identifiers.

95.    After approximately one hour, Sheriff's buses arrived to transp. rt the arrestees. They were driven to a makeshift processing center in Van Nuys at Roscoe and Woodman. There were multiple buses at the location with arrestees who appeared to SHENTU to be protestors. In all, SHENTU estimates that he was detained, handcuffed tightly behind his back, for about four hours. SHENTU, his partner and his partner's sister experienced numbness, bruising and soreness from the handcuffing and the force used to remove them from their vehicle. His partner was pulled from the vehicle with such force that it caused bruises on her forearm.

96.    Defendants' actions interfered with BLMLA's rights to assembly and speech. BLMLA plans to assist, plan, participate in, hold similar events in the future, on its own or in conjunction with others, and is fearful that police actions in response to these and similar protests of sanctioned executions will be repeated absent injunctive relief to prohibit the practices, policies, and customs of the LAPD that resulted in the unlawful action in response to the Floyd protests in the City.

97.    Defendants' actions also interfered with the work of Plaintiff CANGRESS to advocate for racial and economic justice for the residents of Skid Row, both housed and unhoused. Because Defendants indiscriminately arrested individuals on Skid Row for violations of the curfew and assaulted them with less lethal weapons, Plaintiff CANGRESS has had to shift its resources to protecting its members and other residents of Skid Row from the unlawful conduct of the LAPD. Plaintiff CANGRESS' time in recent months was heavily focused on advocating for and protecting a highly-vulnerable population for COVID-19 from the greater

likelihood of contracting and dying from the virus based on their poverty, underlying medical conditions and race.

98.    The Plaintiff injunctive relief class includes all persons who participated, or intend to exercise their First Amendment rights by participating, in future demonstrations, in particular in protest against police violence and racism.

99.    The Plaintiff damages classes consist of: 1) approximately 3000 individuals who were arrested and subjected to excessively tight and prolonged handcuffing, held on buses and in garages for extended periods of time, without access to bathrooms, water or food when they engaged in the spontaneous protests against a number of recent widely publicized police killings of civilians, the most recent spark being the murder of George Floyd in Minneapolis, Minnesota; 2) several thousand individuals who were struck by so-called "rubber bullets" and/or baton strikes administered without lawful justification and in a manner contrary to proper use and inflicted maximum injury; 3) individuals charged solely with infractions who were arrested and taken into custody rather than being released in the field despite their right to field release.

## II.    PARTIES-DEFENDANTS

100.    Defendant **CITY OF LOS ANGELES** is a municipal corporation duly organized and existing under the Constitution and laws of the State of California. The Los Angeles Police Department ("LAPD") is a local government entity and an agency of Defendant City of Los Angeles, and all actions of the LAPD are the legal responsibility of the City of Los Angeles. The City of Los Angeles is sued in its own right on the basis of its policies, customs, and practices which gave rise to Plaintiffs' federal rights claims.

101.    Defendant **CHIEF MICHEL MOORE**, is and was, at all times relevant to this action, the LAPD police chief and a policymaker for his department. He is sued in both his individual and official capacities.

102. Plaintiffs are informed, believe, and thereupon allege that Does 1 through 10 were the agents, servants, and employees of Defendants City of Los Angeles and/or the LAPD. Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10, inclusive, and therefore sue these Defendant by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. The individual Doe Defendants are sued in both their individual and official capacities.

103. Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto Does 1 through 10, in addition to the named Defendants, are responsible in some manner for the damages and injuries alleged herein.

104. Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto Defendants, and each of them, were the agents, servants and employees of the other Defendants and were acting at all times within the scope of their agency and employment and with the knowledge and consent of their principal and employer. At all times Defendants were acting under color of state law.

105. Plaintiffs are informed, believe, and thereupon allege that the practices, policies, and customs of the City of Los Angeles and/or the LAPD caused the unlawful action taken against Plaintiffs.

III.    **FACTS**

106. On May 25, 2020, Minneapolis Police Officer Derek Chauvin murdered George Floyd, suspected of forgery for attempting to use a purported counterfeit $20 bill. Officer Chauvin, along with two other officers, held Mr. Floyd on the ground, handcuffed behind his back, and ignored pleas to get off his neck, back and legs and let him breathe. Mr. Floyd died on the street in Minneapolis.

107. Because of extensive video by onlookers, security cameras and police body cameras, both the Minneapolis law enforcement and prosecutors, as well as the public, concluded that George Floyd was just the latest person to die at the hands of police because of deliberate and unlawful tactics.

108.   The death of George Floyd sparked an extraordinary wave of protests across the country and the world. In Los Angeles, tens of thousands of people participated in lawful and peaceful protests.  Based on the alleged unlawful conduct of a few, Defendants responded to these mass protests with expansive curfews and mass arrests for curfew violation, failure to disperse, unlawful assembly, failure to follow a "lawful" order of an officer,  similar misdemeanors and infractions, all designed to punish protestors. The routine and undifferentiated use of such widespread arrest and dispersal tactics impinged the protestors' right to engage in protected expressive activity in public spaces without preemption and curtailment based on group guilt.

109.   California Penal Code § 409, which defines an unlawful assembly, has repeatedly been construed to require a showing of imminent violence that so permeates a lawful expressive activity that law enforcement may curtail the rights of all demonstrators.  Facts justifying the declaration of an unlawful assembly order anywhere, let alone throughout the City, or even all of downtown Los Angeles in advance of any expressive activity, did not exist. Instead, Chief **MOORE** and Mayor Garcetti applied a ham-handed approach, announcing an unlawful assembly without adequate notice and unlawfully employing indiscriminate, untargeted use of force, silencing everyone.

110.   Thousands of peaceful protestors, the arrest class of Plaintiffs (defined further on), were transported to LAPD jails and make-shift detention sites around the City. All those arrested were held on buses for extended periods of time before being off-loaded into garages and parking lots to be cited and released. Because there was no plan for processing mass arrests and despite the fact that the City has repeatedly been sued for the same unlawful policy and practice, many arrestees were held on the buses and driven around the City for long periods of time in close contact in unventilated buses - handcuffed and without any bathroom access - in search of a location where they could be processed and released. As a result,

35
THIRD AMENDED COMPLAINT

arrestees for infractions and misdemeanors were driven to far distant locations in the City and, after processing, released in the middle of the night without their property and with no way to get home, all the while being out during a time of curfew and risking rearrest if detained again by the LAPD.

111.    Throughout the time they were arrested and held in LAPD custody, Plaintiffs were handcuffed tightly behind their backs and denied food, water and access to bathroom facilities, resulting in many arrestees urinating on themselves in the closed buses. All arrestees, regardless of the alleged crime, were unnecessarily and unreasonably confined in close, enclosed quarters without any ventilation, increasing the risk of COVID-19 exposure. It is well known and was, or should have been known to Defendants, that being in closed spaces without vigorous air movement significantly increases the risk of COVID-19 exposure. Moreover, both the City and Defendant **MOORE** were well aware of the increased risk of COVID-19 exposure because 1) of the institution of $0 bail for low-level offenses and 2) the City and LAPD's involvement in mitigation efforts for COVID-19 for individuals in congregate spaces, including the temporary placement of unhoused individuals at the City's recreation centers. All members of the arrest class (defined in ¶ 123a) were held in restraint for a minimum of three hours, with some held more than 12 hours in these excruciatingly painful conditions from the time they were first handcuffed. The class members experienced numbness in their hands and requests to loosen the zip ties or remove them went unanswered. Without access to bathrooms, arrestees were forced to urinate on themselves.

112.    The harm caused by this practice is well-established.  The Ninth Circuit has long recognized that tight handcuffs for even relatively short period of time less than an hour can cause significant pain and damage.  For more than a quarter of a century, law enforcement in California has "been on notice that abusive handcuffing can amount to excessive force and no officer could reasonable believe

1   it is proper to fail to assist arrestees who complain that their handcuffs are too tight".

2   *See e.g., Alexander v. County of Los Angeles*, 64 F.3d 1315, 1323 (9th Cir. 1995).[5]

3        113.   Arrestees were uniformly held under these unlawful conditions of

4   confinement despite the fact that, to address the COVID-19 pandemic, California

5   currently has a $0 bail for any misdemeanor where the bail would be less than

6   $50,000. The prolonged detention of the arrest class is even more unjustified in

7   light of the California Penal Code § 853.6, which permits individuals suspected of

8   a misdemeanor violation to be cited and released promptly, in the field or after

9   booking, unless one of a limited number of restrictions apply.

10        114.   Applying § 853.6, in 2013 the Los Angeles Police Commission

11   conducted a research project that demonstrated that it took an officer approximately

12   15 minutes to prepare a cite and release in the field with a Notice to Appear; 45

13   minutes to transport an individual to the station and prepare a "short-form" booking

14   document, cite and release the individual with a Notice to Appear; and two and

15   one-half hours to complete a "long-form" booking document. As a result of this

16   review, a directive was issued to follow the cite-and-release option, while reserving

17   individual discretion to book and release at the station. On information and belief,

18   in this instance the LAPD elected to transport every arrestee, regardless of the

19   offense, to a "station" for booking, even though many, if not nearly all, were

20   processed outside of a building and simply cited and released at that location. This

21   was done to punish demonstrators for their protest activity.

22        115.   A large number of individuals in this instance, as many as 1,000 or

23   more, were arrested on infractions.  They were handcuffed and many had their

24   citations prepared on site and put in their pockets.  Instead of releasing them once

---

27   [5]  JJ Payne-James, "Restraint Techniques, Injuries, and Death: Handcuffs"

28   Encyclopedia of Forensic and Legal Medicine, Volume 4 (December 2016): Lists
studies of neurology injuries caused by handcuffing.

THIRD AMENDED COMPLAINT

1    the citation was completed, all were handcuffed, transported and held on buses and
2    in stations for hours, until they were finally booked and released, in violation of
3    Cal. Penal Code § 853.5, which imposes a mandatory requirement to release
4    infraction arrestees on their own recognizance in the field. (" In all cases, except as
5    specified in Sections 40302, 40303, 40305, and 40305.5 of the Vehicle Code, in
6    which a person is arrested for an infraction, a peace officer shall only require the
7    arrestee to present his or her driver's license or other satisfactory evidence of his
8    or her identity for examination and to sign a written promise to appear contained in
9    a notice to appear…. Only if the arrestee refuses to sign a written promise, has no
10   satisfactory identification, or refuses to provide a thumbprint or fingerprint may the
11   arrestee be taken into custody"). All those arrested and charged with infractions
12   were denied the citation release process guaranteed by § 853.5, which creates a
13   liberty interest for such arrestees to be released in the field so long as they provide
14   sufficient identification and agree to sign a written notice to appear. The infraction
15   arrestees were denied the opportunity for a field release without any individualized
16   determination of whether they met one of the three narrow exceptions allowing a
17   custodial arrest pursuant to § 835.5. Section 835.5 creates a liberty interest in a
18   field arrest for those within the statute's ambit and adherence to it is a mandatory
19   governmental duty within the meaning of Govt. Code § 815.6.

20       116.   The unlawful detention of protestor arrestees pursuant to the City's
21   unlawful policy began on or around November 17. 2011, when Defendant City
22   denied OR release to individuals arrested for engaging in civil disobedience in the
23   Occupy LA protests. According to former LAPD Deputy Chief Perez, who first
24   announced this policy during the 2011 Occupy protests, the decision was made to
25   deny OR release to those engaged in First Amendment activity to "teach people a
26   lesson." Subsequently, small groups of individuals involved in acts of civil
27   disobedience at the Bank of America headquarters on November 17, 2011, were
28   arrested on non-violent misdemeanor offenses arising from protest activity and

38<br>THIRD AMENDED COMPLAINT

1    denied OR release. Again, on November 30, 2011, the City denied OR release to
2    the nearly 300 people arrested in connection with the mass arrests at City Hall made
3    in connection with the Occupy L.A. demonstration.

4    117.    The same unlawful actions occurred in the November 2014 mass
5    arrest of persons protesting the decision of the grand jury in Ferguson Missouri not
6    to indict the police officer who shot and killed Michael Brown. In public statements,
7    then-Chief Beck and other command staff in the LAPD stated that protestors would
8    be held and not granted OR, as required by law, for retaliatory reasons and without
9    the requisite individualized suspicion.  In this instance, while the Defendants did
10   not deny OR release for arrestees for minor misdemeanors, they nonetheless
11   detained them for up to 14 hours in some instances rather than cite and release them
12   in the field as mandated by California Penal Code § 853.6. On information and
13   belief, Plaintiffs allege that, without any individual suspicion that the arrestees
14   would violate the law if released, Defendants opted to arrest and detain all
15   protestors to preempt even lawful expressive activity.

16   118.    Both the Occupy arrests in 2011 and the Ferguson arrests in 2014
17   demonstrate the crucial need for the Defendants to have a plan to respond to similar
18   future protests employing the technology the LAPD regularly uses to run wants and
19   warrants in the field, not seizing, handcuffing and detaining protestors for
20   prolonged periods of time. The failure to implement such a plan indicates a
21   deliberate decision to inflict punitive measures against protestors exercising their
22   First Amendment rights to assemble and speak.

23   119.    In this instance, Defendants' failures were exacerbated because of the
24   decision of the Incident Commander to arrest, handcuff and transport 750 peaceful
25   protestors on the pure speculation that they would be a "problem" later on.
26   LAPD's past history shows Defendants' intent to deny Plaintiffs' basic rights
27   without justification in retaliation for the exercise of their First Amendment rights
28   violated the First, Fourth, and Fourteenth Amendment rights of Plaintiffs and the

39
THIRD AMENDED COMPLAINT

1  class members, and with the specific and deliberate intent to interfere with the
2  exercise of Plaintiffs' rights to assembly and due process.

3      120.  Defendants had ready alternatives to the prolonged detention of the
4  Arrest Class. The LAPD has the technological capability to cite and release in the
5  field using modern technology. In fact, the LAPD routinely cites and releases
6  people in the field for traffic violations.  In the Ferguson protests in 2014, arising
7  from the killing of Michael Brown, the LAPD detained a group of approximately
8  40-50 protestors at Beverly and Alvarado, kettled them, handcuffed them with
9  twist-ties, brought in computers and video recording equipment, collected the same
10  information as would be done in a booking at a station, then released them with
11  orders to disperse and advised the detainees that they would be taken to jail and
12  held if they were found again that night in violation of the dispersal order. In all,
13  people were handcuffed in the Beverly and Alvarado detention no longer than
14  approximately one hour. No one suffered injury as a result of the handcuffing for
15  that time period, no one urinated or defecated on themselves in an enclosed bus
16  after being denied bathroom access, and, significantly, no one was a repeat offender
17  that night or any other night as the demonstrations protesting the death of Michael
18  Brown continued. The officers patted down the demonstrators' clothing and
19  searched their personal belongings, including backpacks, as they would do if they
20  were taking them into custody for booking. LAPD officers ran wants and warrants
21  on each detainee in the field, as they do for any traffic stop and as they do with
22  unhoused individuals in the city routinely and released the detainees with a warning.
23  There is no reason why the protestors in the Plaintiff Arrest Class could not have
24  been processed, without injury or anguish, exactly the same way.

25  **IV.    THE REPORTS EVALUATING THE FLOYD PROTEST TACTICS**

26      121.  In the wake of widespread arrests and use of force, several reports
27  were ordered to review the LAPD's performance.  The Los Angeles City Council
28  passed a motion authorizing a report prepared by former Special Assistant for

1    Constitutional Policing, Gerald Chaleff, and other high-ranking LAPD officials.

2    The 101- page Report, titled "An Independent Investigation of the Los Angeles

3    Police Department 2020 Protest Response," was submitted to the City Council on

4    March 10, 2021 and is identified as Council File (C.F.) 20-0279.

5        122.    The Chaleff Report reached several key conclusions:

6        ● many LAPD command officers lacked expertise in crowd control and had

7        no "meaningful or relevant command-level training[;]"

8        ● the lack of training in crowd control tactics resulted in the inability to,

9        isolate and arrest individuals who were throwing objects at the police, or

10       engaged in violence of looting;

11       ● officers collectively employed more than 10,000 less-lethal instruments

12       against the protestors, including batons, bean bag shotguns, stinger grenades

13       and 37mm and 40mm launchers, and many officers did not have adequate

14       training on the  use of these weapons, deploying them without adequate

15       justification, at improper distances and regardless of the target,  causing

16       serious injuries;

17       ● 4,000 people were arrested between May 29 and June 2; there was no

18       "clearly articulated plan" to transport and process the arrestees and,

19       consequently, people were held for hours, handcuffed and without access to

20       water or bathrooms;

21       ● many charges were for infractions, which do not permit custodial arrests

22   and are punishable only by a maximum fine of $250.

23       121.   On April 9, 2021, approximately one month after the Chaleff Report

24   issued, the report of the Police Foundation, requested by the Los Angeles Police

25   Commission, and the LAPD's After Action Report, "Safe LA 2020: Civil Unrest

26   After Action Report".   The LAPD Report identified four types of less-lethal

27   munitions used against the protestors: 37mm less-lethal foam rubber baton; the

28   40mm Less-Lethal Launcher; the Beanbag Shotgun; and, the Stinger Grenade .60

41
THIRD AMENDED COMPLAINT

caliber.  Safe LA 2020: p. 72.  According to a review conducted on June 18, 2020 by the LAPD's Personnel and Training Bureau, approximately 11,305 rounds of less-lethal munitions were used against the protestors, including 4,377 37mm rounds, 2,621 40mm rounds and 4,307 Beanbag Shotgun rounds. *Id.* at p. 74.  The LAPD After Action Report acknowledged the training deficiencies in both crowd control and use of less lethal launchers, as well as the failure to have a coordinated command approach but then blamed the unlawful practices challenged herein on the protestors.  Nonetheless, the LAPD prepared a report at the request of the Police Commission, setting forth all of the recommendations in the Chaleff Report, the LAPD After Action Report and the Police Foundation Report.

122.  The LAPD engaged in repeated, widespread violations of law, as outlined above, over the course of at least five days and nights, shutting down the exercise of First Amendment activities through the use of indiscriminate and unreasonable force against protestors through the improper and excessive discharge of 40mm, 37mm and beanbag munitions; imposing curfews without accommodating, or attempting to accommodate, the right to peaceable assembly and protest; at times declaring unlawful assemblies without adequate sound amplification and without providing both directions, means and opportunity to disperse before taking aggressive police action; hitting hundreds of protestors with batons and/or a variety of "rubber bullets" through the use of unreasonable and excessive force; arresting and not releasing in the field at least hundreds of persons charged solely with infractions in violation of California law that prohibits custodial arrests for low level offenses; arresting protestors without proper dispersal orders; and unlawfully imposing on arrestees unlawful conditions of confinement for many hours – including but not limited to tight handcuffing, no bathroom access, no access to food or water, and lack of ventilation in small congregate spaces  – while on buses with no air circulation in the midst of COVID-

42

THIRD AMENDED COMPLAINT

19 as previously outlined. In conjunction with Defendants' long history of protest-related constitutional violations (outlined below in sub-sections A and B), Defendants' repeated widespread and unlawful acts over several nights and involving many locations constitute an unlawful custom and policy of violating protest participants' constitutional rights.

123.    Most of the use of less-lethal munitions violated LAPD policy, deployed at distances that were too close, causing more serious injury; or from distances that were outside of the recommended range, resulting in less accuracy and striking individuals who were not the targets.  Most of the munitions were dispersed against individuals who posed no or insufficient threat to justify the use of less-lethal munitions, especially target-specific weapons. The bulk of the projectiles shot at the Plaintiff Class were 40 mm weapons, capable of more serious injuries and intended to incapacitate a subject.  The LAPD policy for the use of 40 mm launchers in effect at the time of the Floyd protests directed that "Less Lethal force options shall not be used for a suspect or subject who is passively resisting or merely failing to comply with commands.  Verbal threats of violence or mere non-compliance do not alone justify the use of Less-Lethal force."  LAPD Directive 17 on use of 40mm Launcher (July 2018). In addition, LAPD policy prohibits officers from targeting an individual's head, neck, spine, chest, groin or kidneys, nor can they shoot at people running away. *Id.*

124.  Nonetheless, officers fired more than 13,000 projectiles at peaceful protestors, the overwhelming majority of which, when they hit someone, struck protestors who were not engaged in conduct that presented any, much less an immediate, threat of violence or physical harm and were not engaged in conduct that would justify striking them.   Many, such as Plaintiff ROE, could not disperse because they had been "kettled" and prevented from leaving by police officers.  Many were shot not for any unlawful conduct on

their part, but because others in the assembly were believed to have engaged in unlawful conduct.

125.   The use of less-lethals on May 30, 2020 in Downtown Los Angeles illustrates the reckless and indiscriminate use of less-lethal munitions against peaceful protestors with no justification and in a manner that violates purported policy, a pattern recurring repeatedly throughout the Floyd protests. On Fourth Street, between Spring and Main, the LAPD deployed 37mm and 40mm munitions against individuals who posed absolutely no threat of harm to anyone and were not "violently" resisting arrest because no arrest was being made.   Officers standing in the intersection first shot 37mm munitions at protestors who were more than 150 feet away.  With buildings on both sides of a narrow street, the use of 37mm munitions at this location created a high risk that ammunition would arc in uncontrollable and unpredictable directions on initial impact with a hard street surface, strike the buildings, and continue in an erratic pattern, striking unintended targets.

126.   Then, moments after the unlawful discharge of the 37mm munitions, an officer deployed a 40mm munition, targeting two individuals standing approximately 160 feet away and posing absolutely no threat.  The two are shown in the bottom left of the photo below.  The 40mm "bullet" struck one of the individuals, causing him to double over on impact.  As the photos below show, there was no one near the two so the shot could not have been an "inadvertent" strike.

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23
24
25



26    127.    On June 7, 2020, the LAPD created the SAFE LA Task Force to
27    respond to personnel complaints resulting from the LAPD's treatment of those
28    involved in the George Floyd protests.    The Task Force was charged with

45
THIRD AMENDED COMPLAINT

determining which complaints might involve allegations of a Categorical Use of Force (CUOF).  For the purposes of the response to the George Floyd Protests, a Categorical Use of Force is defined by the LAPD as a "UOF incident resulting in an injury requiring hospitalization, commonly referred to as a Law Enforcement Related Injury or LERI."  *See LAPD 2020 Year End Review Use of Force,* p. 19 (available on lapdonline.org).

128.  The LAPD did not limit its investigation to personnel complaints, but also searched social media and reviewed all government claims filed and arising from the Floyd protests.    Initially, the LAPD submitted only four CUOF investigations to the Board of Police Commissioners, which found three of the injuries resulted from policy violations and one was within policy. After reviewing all of the complaints arising from the Floyd protests in late May and early June, 2020, the LAPD concluded that only six claims involved a CUOF.    This information was provided to the Police Commission in a communication from Defendant Chief Moore.  *See* Safe LA Task Force Update Report, April 9, 2021 to Board of Police Commissioners.  On information and belief, in the ordinary course of the complaint investigation process in the LAPD, Chief Moore reviews the recommendation regarding the resolution of most UOF complaints and specifically did so with regard to those generated from the Floyd protests. Chief Moore reviewed the content of the document prior to transmitting it to the Police Commission, discussed it with members of the LAPD command staff responsible for preparing the report and, ultimately, ratified the findings in the Task Force Update Report, dismissing all but five UOF reports arising from the Floyd protests.

129. Any injury not requiring hospitalization is analyzed as a noncategorical use of force (NCUOF), or a generic use of force (UOF).  The Task Force determined that there were 73 complaints alleging UOF.  Task Force Update p. 2.  On information and belief, Plaintiffs allege that none of these complaints has been adjudicated as sustained.

46<br>THIRD AMENDED COMPLAINT

130.   This result is all the more remarkable because of the number of individuals who already filed lawsuits against the City raising allegations of unlawful force and serious injuries, as well as the number of incidents reported in the news and on social media.  In this action, five Plaintiffs allege that they were shot in the head with less-lethal munitions, including Abigail Rodas, who underwent surgery for her injuries.  In addition, at least three of the additional lawsuits filed from injuries incurred at the protests involved treatment at hospitals, while still other news reports detailed injuries from projectile injuries and baton strikes that required emergency medical and dental treatment and sutures.  Yet, Chief Moore submitted a report to the Police Commission that found no sustained complaints other than the few CUOF complaints.  If a reason for the LAPD's findings in some instances involved the failure of officers to have their body cameras on, as referenced in the Task Force Update Report, that does not excuse Chief Moore's obligations.  On information and belief, under LAPD policy, the failure to turn on the camera is a potential disciplinary offense to be investigated.

131.   The LAPD has the ability to identify involved officers in these incidents by reviewing Body Warn Video (BWV) in the area where the UOF incidents were alleged to have occurred.  The Safe LA Task Force Update Report claims that the available BWV and social media allowed the LAPD to review the allegations of the claims and determine that they should not be sustained.  But if, as the Safe LA Task Force Update Report asserts, the LAPD scoured social media for evidence, they would have seen the videos posted by, among others, the Los Angeles Times, collecting UOF incidents that are indisputably out of policy.  For example, LAPD Directive 1.1., dated August 2017, is unequivocal that officers may not fire shots from a moving vehicle unless there are "exigent circumstances and in the immediate defense of life."   Despite this, a video posted on the Los Angeles Times website on June 11, 2020 captures an officer firing a 40mm projectile without warning into a non-threatening group of people on Fairfax

47<br>THIRD AMENDED COMPLAINT

1  Avenue, just south of Canter's Deli, then reloading and firing another shot into the
2  same group as the vehicle continues south on Fairfax. *See* video by Andrew
3  Matecki posted at: <u>Was LAPD force appropriate in George Floyd protests? - Los</u>
4  <u>Angeles Times (latimes.com)</u>.

5       132.   In the same Los Angeles Times article, other videos show officers
6  firing 40mm projectiles into a crowd at Pan Pacific Park while still other officers
7  are beating protestors with batons.  According to LAPD policy, all of these uses of
8  force are out of policy.  LAPD Directive 8.2 applies the same limitations on the use
9  of batons as apply to less-lethal munitions: there must be evidence of violently
10 resisting arrest or some imminent threat of violence or harm.  Absent this high
11 threshold, batons may not be used as a force strike against those passively resisting
12 orders. *Id.*  Yet, while the LAPD announced the intention to "hold every officer
13 accountable for their actions," a year later, the LAPD has failed completely.  *See*
14 <u>https://www.lapdonline.org/newsroom/news_view.66668</u>  (June    11,    2020,
15 <u>Response to Use of Force Investigations NR20128jr - Los Angeles Police</u>
16 <u>Department)</u>.

17      133.   LAPD **CHIEF MOORE** was fully knowledgeable and apprised of
18 these actions and was on site on several days and at several locations, including but
19 not limited to the first days of protest in downtown Los Angeles and in and around
20 Pan Pacific Park on May 30, 2020, observing the LAPD's operation and directing
21 protestors, sometimes using a bullhorn, without repudiating or stopping the actions
22 of the LAPD officers, thereby ratifying them.  According to radio transmissions of
23 the events, Chief Moore gave the order to arrest individuals in Downtown LA on
24 May 29th, only ordering a sound truck to give a dispersal order one hour people
25 were told to sit down because they were under arrest.  Chief Moore was also on site
26 on May 30, 2020 in the Fairfax area, where he again gave orders to kettle the
27 protestors, preparatory to arresting them.  Throughout the several days of protests,
28 Chief Moore held contemporaneous press conferences addressing the protests and

1   the police response to them.  Moreover, in his reports to the Police Commission
2   and in press conferences with the Mayor and other public statements, **MOORE**
3   **ratified the conduct of the officers when he repeatedly** stated publicly that the
4   actions of the LAPD were proper.

5        134.   Moreover, the LAPD and **CHIEF MOORE** were well aware of the
6   improper use of the various "less-lethal" munitions and prior significant problems
7   with the various munitions.  Over the course of two decades, the LAPD reported
8   that the beanbag munitions were inaccurate and resulted in "inadvertent" but
9   serious, and even deadly, injuries.

10       135.   In fact, more than two decades ago, then Assistant Chief George
11  Gascon was called before the Los Angeles Police Commission to discuss the use
12  of less lethal munitions agaist persons engaged in a protest at the former Parker
13  Center LAPD Headquarters on October 22, 2000.  At that meeting of the Police
14  Commission on December 19, 2000, then Chief Gascon testified that, while the
15  40mm foam baton is "designed to be target specific,"  the 37mm KIP is not and
16  is "a less accurate weapon.".  According to the testimony of Chief Gascon, at that
17  time the 37mm was only used in skip-fired mode. Gascon noted that, while the
18  manufacturer of the 37mm munition indicated it could be used as a target specific
19  weapon,  the LAPD, "as a policy decision, … with the Commission's approval
20  several years ago, decided that the 37 millimeter, because of inaccuracy of the
21  weapon, that it would not be fired target specific.

22       136.   At the same Police Commission, Chief Gascon testified that the 40mm
23  foam baton was used as a direct impact weapon but that it acted "like a sponge"
24  and that it would cause "bruising, contusions."  The suggestion at the time was that,
25  while the 40mm foam baton would cause "serious" bruising and contusions.  There
26  was no recognition or discussion of the type of injuries that resulted in this instance,
27  including broken bones, piercing head wounds and penetration of the skin.
28

49
THIRD AMENDED COMPLAINT

137.   The 37mm weapon, even when skip-fired, is inherently indiscriminate and inaccurate in the targets the munition strikes.  The 37mm consists of five separate projectiles that disperse in uncontrollable and unpredictable directions when the munition hits the ground.  Necessarily, this results in striking individuals for whom the use of such force is completely unjustified.

138.   The LAPD has also long been aware of the serious injuries caused by beanbag munitions.  In mid-2002, the LAPD stopped using "nonlethal" beanbags because of several incidents in which the target was maimed or killed by the beanbag weapon. *See* Los Angeles Times, June 3, 2002, p. A1 ("Police Dropping 'Nonlethal' Beanbags as Too Dangerous).   The decision was based on a finding that the beanbags "can be dangerously inaccurate and deadlier than manufacturers claimed." *Id.*  The reported incidents involved one in which the LAPD killed a mentally ill male after shooting him with a beanbag *Id.*  According to the story in the Los Angeles Times, the LAPD conducted extensive testing and confirmed the significant problems with the beanbag rounds.  In a study by Los Angeles County USC Hospital, looking at individuals they treated for beanbag injuries caused by the Los Angeles Police Department or the Los Angeles Sheriff's Department, the conclusion was that beanbags "were capable of breaking bones, bruising internal organs and ripping through skin." *LA Times*, *supra*, p. A14.  While some law enforcement agencies changed to a type of "sock" beanbag in light of this evidence, even still the new "less-lethal" beanbag munitions maimed and killed.

139.   More recently, the LAPD issued a document titled "Fact Sheet Beanbag Velocity and Accuracy Testing" dated Nov. 12, 2019.  The document identified Chief Moore's concerns regarding the accuracy of the weapon when fired beyond a certain range.   On information and belief, Chief Moore ordered testing of the beanbag weapons to address these concerns.  The testing revealed that the beanbag is highly inaccurate after the fourth shot – causing a "flyer round," which is a round that follows an unintended trajectory.   The beanbag weapon, like the

50
THIRD AMENDED COMPLAINT

other less-lethal munitions deployed in the Floyd protests, was known  to the LAPD at the time to suffer from decreased accuracy when deployed at greater distances, but also was known to also decreases in accuracy after four shots fired (regardless of distance).   Despite these concerns and the testing results, Chief Moore kept the beanbag weapon in use.

140.   As stated above, the City, through **CHIEF MOORE** and the LAPD, has failed to train its officers in the appropriate constitutional responses to peaceful demonstrations. The City is well aware of its constitutional duties in these circumstances in light of the settlement agreements and consent judgments discussed below in *National Lawyers Guild v. City of Los Angeles* and *MIWON v. City of Los Angeles*, as well as other settlements entered into specifying these constitutional duties over the years. The need for training and discipline to preserve constitutional guarantees in these circumstances is obvious. The City has known of the deficiencies in its training since at least 2000 and entered into settlement agreements in June 2005 and June 2009, each time agreeing to revised policies and training, yet the City has failed to promulgate adequate policies effectuating the terms of the settlement agreement and/or to train its command staff and officers on the revised policies, if any exist. This constitutes a separate Monell violation from those outlined above.

A.    NATIONAL LAWYERS GUILD V. CITY OF LOS ANGELES SETTLEMENT

141.   In June, 2005, the City of Los Angeles entered into a settlement agreement in *National Lawyers Guild, et al. v. City of Los Angeles, et al.*, CV 01-6877 FMC (CWx), an action arising from the disruption of lawful assemblies and use of unlawful force during the Democratic National Convention ("DNC") in Los Angeles in 2000 and a subsequent demonstration on October 22, 2000. The settlement provided for important changes in the policy and practices of the LAPD as applied to demonstrations.

142.    Significantly, the settlement provided that, prior to declaring an unlawful assembly, the LAPD Incident Commander should evaluate the feasibility of isolating and arresting those responsible for any unlawful conduct, and if feasible, take action only against those individuals. The settlement also addressed the use of less-lethal weapons and chemical irritants to disperse peaceful protestors.

B.    THE SETTLEMENT IN *MULTI-ETHNIC WORKER ORGANIZING NETWORK V. CITY OF LOS ANGELES*:

143.    On May 1, 2007 (May Day), the LAPD assaulted a peaceful, permitted immigration march in MacArthur Park. The attack on the demonstrators was without warning. No dispersal order was given until more than three minutes into the police action and, even then, the dispersal order was grossly inadequate, given from helicopters in English to a largely Spanish-speaking assembly. During the course of litigating the *MIWON* action, the LAPD conceded that it had not fully implemented training and policy orders regarding the *NLG* settlement two years earlier. In fact, no policy changes were ever finalized.

144.    On June 24, 2009, the federal district court approved and entered a Structural Relief Order as part of the settlement of a class action lawsuit brought on behalf of all those subjected to the LAPD's May Day action. Through this settlement, the LAPD agreed that it would facilitate demonstrations that may temporarily block traffic. This latter provision is consistent with established law in the Ninth Circuit, recognizing the need for local agencies to accommodate "spontaneous" protests in the streets, particularly in response to allegations of police misconduct.

145.    The *MIWON* order also set out requirements to declare an unlawful assembly: an amplified loudspeaker system with an officer at the far side of the crowd to record the officer; if there is no serious violence occurring, the order shall be made repeatedly over a period of time, including an "objectively reasonable" period of time to disperse and identification of "a clear and safe route" to follow to

THIRD AMENDED COMPLAINT

1    disperse. The order should be given so that it is heard by the entire crowd. These
2    requirements were not met in this instance in most locations.

3         146. The terms of the *MIWON* structural relief agreement were to be
4    included in the LAPD's Crowd Control and Use of Force Manuals and every officer
5    at the rank of Sergeant I and above, as well as the entire Metropolitan Division,
6    were to undergo training every two years. Chief Moore, as well as those members
7    of his command staff to whom he has delegated his responsibility to enact and
8    implement lawful policies for responding to demonstrations, are aware of the
9    unlawful policies, practices, and customs of the City and the LAPD which resulted
10   in the settlement in *National Lawyers Guild v. City of Los Angeles* in June, 2005.
11   Moreover, Chief Moore and his delegated command staff are aware that the use of
12   unlawful dispersal orders, baton strikes and "less-lethal" weapons to break up
13   lawful protests, in particular, is a custom so ingrained in the marrow of the LAPD
14   that it was critical to take all steps necessary to ensure that official policy was
15   implemented in a manner sufficient to address the deeply rooted custom to violate
16   First Amendment rights in the specific ways identified in the *National Lawyers
17   Guild* settlement agreement. The failure to take such steps directly lead to the
18   injuries suffered by the Plaintiffs. This failure amounted to an "acquiescence in the
19   constitutional deprivations of which [the] complaint is made" and deliberate
20   indifference to the rights of persons with whom the police come into contact, and
21   constituted a conscious choice by the City not to properly train its law enforcement
22   personnel on these issues.

23        147. The City, through Chief **MOORE** and command staff to whom he
24   delegated decision-making, also knew from the litigation for the Occupy-protest
25   arrests, *Aichele v. City of Los Angeles* (filed in 2012), and *Chua v. City of Los
26   Angeles* (filed in 2016) that it was violating Plaintiffs' right to due process and
27   depriving them of their liberty interest by unlawfully and unreasonably refusing to
28

1  release arrestees in the field based not on individualized suspicion but, rather, on

2  group guilt based on their perceived association with the George Floyd protests.

3         148.   On information and belief, to the extent he did not make the decision

4  and approve the plan himself, Chief **MOORE** delegated responsibility and

5  authority to persons within his command staff to act as the final policy maker in

6  determining the response to assemblies at various locations where protests of the

7  death of George Floyd occurred. The persons who made these decisions, acted as

8  the delegated policy maker for the City of Los Angeles on these issues. There was

9  no time, opportunity, or procedure for anyone to review or revise the decisions

10  made by these delegated policy makers prior to their final implementation.

11  **V.    CLASS ACTION ALLEGATIONS**

12         **A.    CLASS DEFINITION – 23(B)(2)) (INJUNCTIVE RELIEF CLASS)**

13         149.   The injunctive relief class is defined as all persons who have in the

14  past participated, presently are participating, or may in the future participate in, or

15  be present at, demonstrations within the City of Los Angeles in the exercise of their

16  rights of free speech, assembly and petition in general, and particularly as it relates

17  to protesting police violence and discrimination against people of color, especially

18  African-Americans.

19         **B.    CLASS DEFINITIONS – 23(B)(3) (DAMAGES CLASSES)**

20         150.   One or more of the named Plaintiffs (which are indicated for each

21  class or subclass) bring this action individually and on behalf of a proposed

22  class of all other persons similarly situated pursuant to FRCivP Rule 23(b)(1),

23  (b)(2) and (b)(3). The damages classes are defined as:

24  a.  **Arrest Class:** Beginning May 29, 2020, and continuing through June 2,

25       2020, all persons present at or during the aftermath of protests regarding

26       the killing of George Floyd in the City of Los Angeles, who were arrested

27       by the LAPD on misdemeanor charges of failure to obey a curfew, failure

28       to disperse, failure to follow a lawful order of a police officer and/or

54
THIRD AMENDED COMPLAINT

1  unlawful assembly, and who were held on buses and subjected to
2  prolonged tight hand-cuffing, denied access to bathrooms, water and food,
3  and enclosed spaces without ventilation. The Class Representatives for
4  this class are KRYSTLE HARTSFIELD, DEVON YOUNG, LINUS
5  SHENTU, ALEXANDER STAMM, STEVEN ROE, MAIA KAZIM,
6  NELSON LOPES, ALICIA BARRERA-TRUJILLO and JONATHAN
7  MAYORCA.

8  **b. June 1 Arrest Sub-Class (sub-class to the preceding Arrest Class):**
9  The approximately 750 people arrested **o**n June 1, 2020, in downtown
10  Los Angeles who were engaged in peaceful protest marches throughout
11  downtown, who were kettled by LAPD officers with no opportunity to
12  leave or instructions of how to leave, to whom no dispersal order was
13  given, and who were arrested on failure to disperse charges or curfew
14  violations despite the lack of any dispersal order, and who additionally
15  experienced the general conditions pertaining to the previously defined
16  Arrest Class. The Class Representatives for the June 1 Arrest Sub-Class
17  are **ALICIA BARRERA-TRUJILLO AND MAIA KAZIN.**

18  c. **Infraction Class:** Beginning May 29, 2020, and continuing through June
19  2, 2020, all persons present at or during the aftermath of protests
20  regarding the killing of George Floyd in the City of Los Angeles, who
21  were charged with infractions under the Los Angeles Municipal Code
22  ("LAMC"), arrested and taken into custody and not released in the field,
23  as required by Penal Code § 853.5. The Class Representatives for this
24  class are JONATHAN MAYORCA, NADIA KHAN and NELSON
25  LOPEZ.

26  d. **Direct Force Class:** Beginning May 29, 2020, and through June 2, 2020,
27  all persons present at or during the aftermath of protests regarding the
28  killing of George Floyd in the City of Los Angeles, who were struck by

55
THIRD AMENDED COMPLAINT

either "less-lethal weapons" (including 37mm and 40 mm projectiles, and bean-bag shoguns), batons, or knocked down by LAPD officers, and who were neither violently resisting nor posing an immediate threat of violence or physical harm.  The Class Representatives for this class are SHANNON LEE MOORE, TINA ČRNKO, CLARA ARANOVICH, STEVEN ROE, ABIGAIL RODAS, NERY MARROQUIN and EVA GRENIER.

Commented [A1]: I re-ordered the classes, putting force at the end

**C.    RULE 23 PREREQUISITES**

**i.    Numerosity**

151.    Each class is inclusive of people present to protest and those otherwise present in the vicinity as bystanders. In accordance with F.R.Civ. P. Rule 23(a), the members of the class are so numerous that joinder of all members is impracticable. The Arrest Class is approximately 4,000 people. The Direct Force Class consists of at least several hundred people, likely in excess of 1000. The Infraction Class consists of at least several hundred people.

**ii.    Common Issues Of Fact Or Law**

152.    Although the actions complained of in this Complaint occurred at different times and locations, all were in the City of Los Angeles and all involved the actions of the Los Angeles Police Department enforcing the Department's policies on "crowd control."  Defendants acted uniformly with respect to each class. For example, all arrestees were placed on buses and subjected to the described conditions of confinement; all those charged with infractions were taken into custody and held on buses although they were entitled to field release; and so forth.

153.    Plaintiffs are informed and believe and thereon allege that the LAPD officers acted in accordance with orders given by supervisors from the highest command positions, in accordance with policies and procedures instituted by the LAPD and the City of Los Angeles.

154.    The common questions of fact include, but are not limited to:

a.  Did Defendants impose curfews without accommodating, or attempting to accommodate, the right to peaceable assembly and protest;

b.  Did Defendants declare unlawful assemblies without adequate sound amplification and without providing both directions, means and opportunity to disperse before taking aggressive and injurious – potentially deadly police action;

c.  Did Defendants routinely break up George Floyd protests through the use of force (batons, projectiles and forcing protestors to fall by direct force ) without regard to whether the individuals against whom such force was used were engaged in conduct justifying such force, including whether they were violently resisting arrest or posed an immediate threat of physical harm;

d.  Did Defendants routinely, while breaking up George Floyd protests, hit people with batons and/or rubber bullets although those people were not engaging in conduct justifying such force, including whether they were violently resisting arrest or posed an immediate threat of physical harm;

e.  When arresting people at the George Floyd protests, did Defendants routinely subject arrestees to prolonged detention on buses, while tightly hand-cuffed, denied access to bathrooms, water and food, and where they were kept in enclosed spaces without ventilation, despite knowing that the Defendant did not have the capacity to process mass arrests based on past events and having issued a directive to department personnel just a short time earlier to cite and release in the field because of the inability to process arrestees without prolonged detentions and insufficient facilities;

57
THIRD AMENDED COMPLAINT

f. When arresting people at the George Floyd protests, did Defendants routinely subject arrestees charged solely with infractions to custodial arrest without regard to whether they were entitled to field release as provided in Cal. Penal Code § 853.5?

155. The common questions of law include, but are not limited to:

a. Must Defendants, when imposing a curfew based on some present at a protest that is unlawful, accommodate, or attempt to accommodate, the right to peaceable assembly and protest?

b. Must Defendants when declaring unlawful assemblies, provide adequate sound amplification and provide both directions, means and opportunity to disperse before taking aggressive and injurious – potentially deadly - police action?

c. Did Defendants routinely break up George Floyd protests through the use of force (batons and rubber bullets) without regard to whether the individuals against whom such force was used were engaged in conduct justifying such force violate the First, Fourth or Fourteenth Amendments and their state law analogues?

d. Did the LAPD, while breaking up George Floyd protests and routinely using force although those people were not engaging in conduct justifying such force, violate the First, Fourth or Fourteenth Amendments and their state law analogues?

e. Did the LAPD, after arresting people at the George Floyd protests, and routinely subjecting arrestees to prolonged detention on buses, while tightly hand-cuffed, denied access to bathrooms, water and food, and where they were kept in enclosed spaces without ventilation violate the Fourth or Fourteenth Amendments and their state law analogues?

f. Did the LAPD's custodial arrest of people at the George Floyd protests who were charged solely with infractions, and who qualified

1    under Penal Code § 853.5 for field release, violate their rights under

2    853.5 and/or Govt. Code § 815.6, and their rights under the Fourth and

3    Fourteenth Amendments and their state law analogues.

g.    Did some or all of the conduct described above constitute a policy or
custom of Defendants?

h.    If the answer to the foregoing question is yes, was that policy or
custom a moving force in the violation of Plaintiffs' rights?

i.    Is any individual Defendant sued in his individual capacity entitled to
qualified immunity on the federal claims?

j.    Did any of the conduct alleged herein violate Cal. Civil Code § 52.1
(the Bane Act)?

k.    Are general class-wide damages available to the various classes?

l.    Are statutory damages under § 52.1 available to the various classes?

156.    Defendants detained and/or arrested the putative class and sub-classes
as a group and treated all similarly, acting on grounds applicable to the putative
class. The named Plaintiffs' claims that the First, Fourth, and Fourteenth
Amendment rights—and their analogous state Constitution, statutory, and common
law rights—were violated raise common questions of law and fact. the Defendants
have acted, threaten to act, and will continue to act, on grounds generally applicable
to the class, thereby making appropriate final injunctive relief or declaratory relief
with respect to the class as a whole.

157.    The questions of law and fact common to the classes, which are
outlined above, predominate over any questions affecting only individual members.

### iii.   Typicality

158.    In accordance with F.R. Civ. P. Rule 23(a), the claims of the
representative Plaintiffs are typical of the class. Plaintiffs were all present at Floyd
protests in the City of Los Angeles; were subjected to one or more of the violations

59
THIRD AMENDED COMPLAINT

previously enumerated; and seek redress for the past violations of their rights and protection to bar the repeat of those violations in the future.

159.    Thus, Plaintiffs have the same interests and have suffered the same type of damages as the class members. Plaintiffs' claims are based upon the same or similar legal theories as the claims of the class members of each class. Each class member suffered actual damages as a result of being subjected to one or more of the violations enumerated above. The actual injuries suffered by Plaintiffs are similar in type to the actual damages suffered by each class member although the severity of those injuries may vary among class members.

160.  In accordance with F.R. Civ. P. Rule 23(a), the representative Plaintiffs will fairly and adequately protect the interests of the class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the class.

### iv.  Adequate Representation

161.    The named Plaintiffs will fairly and adequately represent the common class interest. The named Plaintiffs have a strong interest in achieving the relief requested in this Complaint, they have no conflicts with members of the Plaintiff class, and they will fairly and adequately protect the interests of the class.

162.    The named Plaintiffs are represented by counsel who are well-experienced in civil rights and class action litigation and are familiar with the issues in this case. Attorneys Paul Hoffman, Barry Litt, and Carol Sobel have successfully litigated a number of class action cases on behalf of protesters in Los Angeles. They were appointed by the court as class counsel in *Aichele, et al. v. City of Los Angeles, et al.*, No. 2:12-CV-10863-DMG (C.D. Cal. August 26, 2012), challenging, *inter alia*, the conditions of detention similar to those at issue here, as well as the LAPD's denial of OR release to 300 persons arrested during the Occupy action at Los Angeles City Hall. They were appointed by the court as class counsel in *Chua v. City of Los Angeles,* Case No. CV 2:16-cv-00237-JAK-GJS(x) (C.D. Cal. January

12, 2016), which involved protests over the police killing of Michael Brown in Ferguson Mo.). They were also appointed as class counsel in *Multi-Ethnic Immigrant Worker Network v. City of Los Angeles*, 24 F.R.D. 631 (C.D. Cal. 2007), challenging the LAPD's assault on a lawful immigrant-rights rally in MacArthur Park on May 1, 2007. That case resulted in a settle of $12,850,000 -- the largest amount ever paid nationally in a protest case in which there were no arrests of the Plaintiffs.  Attorney Sobel was also involved in revising the LAPD's Crowd Control Manual provisions in 1993, following the protests of the Rodney King beating.  She was also lead counsel in several multiple-plaintiff cases challenging LAPD protest practices arising from the Democratic National Convention in Los Angeles in 2000, which resulted in significant structural relief.  In addition to class action protest litigation, attorneys Hoffman, Litt, and Sobel have served as class counsel in a number of other class actions redressing civil rights violations.

163.  Counsel for the named Plaintiffs know of no conflicts among or between members of the class, the named Plaintiffs, or the attorneys in this action.

### v.    Maintenance and Superiority

164.  In accordance with Fed.R.Civ.P. Rule 23(b)(1)(A), prosecutions of separate actions by individual members of the classes would create a risk that inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for parties opposing the class.

165.  In accordance with Fed.R.Civ.P. Rule 23(b)(1)(B), prosecutions of separate actions by individual members of the classes would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

166.  In accordance with Fed.R.Civ.P. Rule 23(b)(2), Defendants have acted on grounds generally applicable to the class.

167.    In accordance with Fed.R.Civ.P. Rule 23(b)(3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe, and thereon allege, that the interests of class members in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute any action at all. Plaintiffs are informed and believe, and thereon allege, that the amounts at stake for individuals are such that separate suits would be impracticable in that most members of the class will not be able to find counsel to represent them. Plaintiffs are informed and believe, and thereon allege, that it is desirable to have all litigation in one forum because all of the claims arise in the same location, *i.e.,* the County of Los Angeles. It will promote judicial efficiency to resolve the common questions of law and fact in one forum rather than in multiple courts.

168.    Plaintiffs do not know the identities of most class members. Plaintiffs are informed and believe, and thereon allege, that the identities of the class members are ascertainable in significant part from LAPD records, at least as it relates to those class members who were arrested. Plaintiffs are informed and believe, and thereon allege, that a significant number of class members may be reached by the use of outreach efforts by organizations that participated in organizing the affected protests.

169.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Leading members of Plaintiffs' counsel organized The class action is superior to any other available means to resolve the issues managed similar litigation with similarly disparate damages as a result of LAPD conduct in breaking up the May Day 2007 protests that resulted in the *MIWON* litigation described previously, as well as the *Aichele* and *Chua* litigation, all of which was against the City of Los

Angeles and the LAPD. Liability can be determined on a class-wide basis. General
damages can also be determined on a classwide.

170.    In accordance with Fed.R.Civ.P. Rule 23(b)(3), class members must
be furnished with the best notice practicable under the circumstances, including
individual notice to all members who can be identified through reasonable effort.
Plaintiffs are informed and believe that LAPD computer records contain a last
known address for class members who were arrested. Plaintiffs contemplate that
individual notice be given to class members at such last known address by first
class mail, email and cell phone outreach, social media and efforts of organizations
that organized the protests. Plaintiffs contemplate that the notice inform class
members of the following regarding their damages claims:

A.    The pendency of the class action, and the issues common to
the class;

B.    The nature of the action;

C.    Their right to 'opt out' of the action within a given time, in
which event they will not be bound by a decision rendered in
the class action;

D.    Their right, if they do not 'opt out,' to be represented by their
own counsel and enter an appearance in the case; otherwise,
they will be represented by the named Plaintiffs and their
counsel; and

E.    Their right, if they do not 'opt out,' to share in any recovery
in favor of the class, and conversely to be bound by any
judgment on the common issues, adverse to the class.

171.    As a direct and proximate cause of the conduct described herein, the
named individual Plaintiffs and the class members have been denied their
constitutional, statutory, and legal rights as stated herein, and have suffered general

and special damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety and other damages in an amount according to proof.

172.   Defendants' acts were willful, wanton, malicious, and oppressive, and done with conscious or reckless disregard for, and deliberate indifference to, Plaintiffs' rights.

173.   All of the claims for relief are asserted against all Defendants.

174.   Although Plaintiffs' legal theories significantly overlap, they apply differently to different classes. Accordingly, Plaintiffs state their claims by class.

175.   Plaintiffs restate and incorporate by reference each of the foregoing and ensuing paragraphs in each of the following causes of action as if each paragraph was fully set forth therein.

176.   The Defendants' actions as set forth herein interfered with, or attempted to interfere with, the exercise or enjoyment by Plaintiffs and Class Members of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws California, by threat, intimidation, or coercion,

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

177.   Plaintiffs timely filed a claim for damages pursuant to California Government Code §910 *et seq.*  The claim was denied by operation of law.

**VI.    FIRST CLAIM FOR RELIEF – INJUNCTIVE RELIEF**
**(First, Fourth And Fourteenth Amendments To The U.S. Constitution, 42 U.S.C. § 1983; California Constitution Articles 1 §§ 2, 3, 7, 13, Penal Code § 835.5, Civil Code § 52.1, And Civil Code § 815.6 For Injunctive Relief)**

178.   Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

179.   The  Defendants engaged in repeated, widespread violations of law, as outlined above, over the course of at least several nights, shutting down the

64
THIRD AMENDED COMPLAINT

exercise of First Amendment activities through the use of indiscriminate and unreasonable force against thousands of protestors, including physically striking dozens or hundreds of them; imposing curfews without accommodating, or even attempting to accommodate, the right to peaceable assembly and protest; at times declaring unlawful assemblies without adequate sound amplification and without providing both directions, means and opportunity to disperse before taking aggressive police action; arresting hundreds of peaceful protestors without any lawful dispersal orders; hitting at least hundreds of protestors with batons and/or rubber bullets through the use of unreasonable and excessive force; arresting and not releasing in the field at least hundreds of persons charged solely with infractions in violation of California law; unlawfully imposing on arrestees unlawful conditions of confinement for many hours – including but not limited to tight handcuffing, no bathroom access, no access to food or water, and lack of ventilation, placing detainees at great risk of exposure to COVID-19 – while on buses as previously outlined; and booking and collecting information on arrested individuals.

180.    The City, through Chief Moore and the LAPD, has failed to train its officers in the constitutional responses to peaceful protests as revealed by the above allegations despite the long history of such violations in the past, and Defendants' commitment to correct them in the form of both court orders and settlement agreements.  The recurrence of the same violations with respect to these arrests indicates an intentional refusal to preserve the constitutional rights of protestors.

181.    Without intervention by this Court, the Injunctive Relief class members, who participated and wish to participate in protest activities, particularly related to police violence, are at risk of having their rights violated in the future due to the Defendants' demonstrated pattern of constitutional violations and threatened future actions. The Injunctive Relief Class has no adequate remedy at law to protect the future lawful exercise of their constitutional rights, and, without action by this court, will suffer irreparable injury, thereby entitling them to injunctive and

65
THIRD AMENDED COMPLAINT

1   declaratory relief. The injunctive relief class is represented by Black Lives Matter
2   Los Angeles and CANGRESS, as well as each individual class representatives.

3       182.   The Defendants have acted and refused to act on grounds generally
4   applicable to the putative class. Injunctive and declaratory relief for the putative
5   class as a whole is appropriate.

6       183.   Defendant City's polices practices, customs, conduct and acts of the
7   Los Angeles Police Department alleged herein resulted in, and will continue to
8   result in, irreparable injury to the Plaintiffs, including but not limited to violation
9   of their constitutional and statutory rights. Plaintiffs have no plain, adequate, or
10  complete remedy at law to address the wrongs described herein. The Plaintiffs and
11  class members intend in the future to exercise their constitutional rights of freedom
12  of speech and association by engaging in expressive activities in the City of Los
13  Angeles. Defendants' conduct described herein has created uncertainty among
14  Plaintiffs with respect to their exercise now and in the future of these constitutional
15  rights, and has chilled their exercise of these rights.

16      184.   Specifically, Plaintiffs are concerned that, if arrested, whether
17  lawfully or unlawfully, they will again be denied the liberty interest codified at
18  California Penal Code § 853.5, will be subjected to unlawful conditions of
19  confinement exposing them to increased risk of COVID-19, and will be subjected
20  to unreasonable and excessive force by LAPD.

21      185.   Plaintiffs are also concerned that, when engaged in protest activities,
22  Defendants will impose curfews without accommodating or attempting to
23  accommodate First Amendment rights; will not provide adequate notice in the
24  event unlawful assemblies are declared; will not provide adequate means and
25  opportunity to disperse; and will again employ indiscriminate, unreasonable or
26  excessive force, injuring and terrifying protestors.

27
28

THIRD AMENDED COMPLAINT

186.   Plaintiffs therefore seek injunctive relief from this court to ensure that Plaintiffs and persons similarly situated will not suffer violations of their rights from Defendants' illegal and unconstitutional policies, customs, and practices.

187.   Plaintiffs also seek injunctive relief in the form of an order requiring that Defendants seal and destroy and records derived from Plaintiffs' arrests, including fingerprints, photographs, and other identification and descriptive information, and all information, and biological samples and information obtained from such biological samples collected from the Plaintiff class, and identify to the Plaintiff class all entities and agencies to which such information has been disseminated; and that all such disseminated records be collected and destroyed.

## VII.     SECOND CLAIM FOR RELIEF – ARREST CLASS AND JUNE 1 ARREST SUB-CLASS
### (Fourth and Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. § 1983, the California Constitution, Cal. Civil Code § 52.1. for damages)

188.   Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

189.   All Arrest Class members were arrested on charges of failure to obey a curfew, failure to disperse, failure to follow a lawful order of a police officer and/or unlawful assembly during Floyd protests and were placed on buses and driven to a variety of facilities where they were processed and released.  They were on the buses for several hours – both to get to their destination and then held on the bus until they were processed -- some as long as  ten or more hours as they were transported to multiple locations before being offloaded and released. While held on buses or otherwise detained prior to their release, Arrest Class members were subjected to prolonged tight hand-cuffing, causing bruising and nerve injury; denied access to bathrooms, water and food; and held in enclosed spaces on buses without ventilation, which caused anxiety about the significant increased risk of Covid-19 exposure because, even if they had previously been similarly distanced

1  from others during outside protests, the risk of exposure is significantly greater in
2  enclosed, unventilated spaces.

3      190.   A sub-class of the this class consists of approximately 750 individuals
4  arrested in Downtown Los Angeles on June 1, 2020 for violation of the curfew
5  without any dispersal order being given and no opportunity to comply with an order
6  to disperse, lawful or otherwise  The members of this class were kept in handcuffs
7  for prolonged times and held on buses in the unlawful conditions of detention
8  described above, and released in the middle of the night with the threat of arrest for
9  violation of the curfew if they were stopped by police.

10     191.   Defendants' above-described conduct violated Arrest Class members'
11 rights to be free from unreasonable seizures under the Fourth Amendment, the
12 Fourteenth Amendment's due process clause and state constitutional analogues.

13     192.   As a result of Defendants' wrongful conduct, Arrest Class members
14 suffered damages as alleged above.

15     193.   As a result of Defendants' wrongful conduct, and the potential that
16 such conduct will recur, the Injunctive Relief Class is entitled to relief from the
17 potential that such violations will recur.

18 **VIII.    THIRD CLAIM FOR RELIEF – DIRECT FORCE CLASS**
19           **(Fourth and Fourteenth Amendment to the U.S. Constitution 42**
           **U.S.C. § 1983, the California Constitution, Cal. Civil Code § 52.1.  for**
20                              **damages)**

21     194.   Plaintiffs reallege and incorporate herein by reference the preceding
22 and any subsequent paragraphs of this Complaint.

23     195.   All Direct Force Class members were shot with so-called "less-lethal
24 weapons" (including 37 and 40 mm projectiles, and bean bag rounds, struck with
25 batons and/or knocked down by the actions of LAPD officers.

26     196.   Members of the Direct Force Class who were shot with "rubber
27 bullets," bean bag rounds, knocked down and/or struck with batons were injured in
28 a manner that evinced that Defendants applied force unlawfully.  Many class

members were struck in the face, head, shoulder and neck areas. Video footage of various incidents shows officers shooting straight at peaceful protestors who posed no threat. *See*: Instagram video May 30, 2020 in the Fairfax area, near Pan Pacific Park after the BLMLA rally https://www.instagram.com/p/CA3GPPYB7dz/. *See also,* photographs of May 30, 2020 in DTLA at paragraph 126, hereinabove. Similarly, baton strikes were done to injure and punish protestors on site.

197. Defendants used unreasonable and excessive force in indiscriminately engaging in baton strikes, shooting projectiles at protestors and knocking them down, not based on an individualized assessment of conduct justifying such force and, more specifically, where the person was not violently resisting arrest and did not present an immediate threat of violence or physical harm, in violation of the Fourth Amendment and its state law analogues. Further, this conduct was deliberately indifferent to the Direct Force Class members' rights, shocks the conscience, and violates the decencies of civilized conduct, under the Fourteenth Amendment and its state law analogues.

198. As a result of Defendants' wrongful conduct, Direct Force Class members suffered damages as alleged above.

199. As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

IX.    **FOURTH CLAIM FOR RELIEF – INFRACTION CLASS**
       **(Fourteenth Amendment to the U.S. Constitution 42 U.S.C. § 1983, the**
       **California Constitution, (Article 1  §§ 7 and 13), Cal. Civil Code § 52.1, Cal.**
       **Penal Code § 835.5 and Govt. Code §815.6, for damages)**

200. Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

201. All Infraction Class members were charged solely with infractions, arrested and taken into custody and not released in the field, as required by Penal

Code § 853.5.  Section 835.5 created a liberty interest for Infraction Class members
to be cited and released in the field and not subjected to custodial arrests.

202.    The custodial arrests of Infraction Class members violated their rights
under the Fourteenth Amendment's due process clause and its state constitutional
analogue (Article 1 § 7 of the California Constitution) not to be deprived of their
liberty without due process of law, violated Article 1 § 13 of the California
Constitution (unreasonable searches and seizures), violated Cal. Civil Code § 52.1,
and violated their rights under Penal Code § 853.5 and Govt. Code § 815.6.

203.  As a result of Defendants' wrongful conduct, Direct Force Class
members suffered damages as alleged above.

204.  As a result of Defendants' wrongful conduct, and the potential that
such conduct will recur, the Injunctive Relief Class is entitled to relief from the
potential that such violations will recur.

**X.      FIFTH CLAIM FOR RELIEF**
**Violation of the Bane Act (Cal. Civil Code § 52.1)**

205.  Plaintiffs re-allege and incorporate by reference the preceding
paragraphs as though fully set forth herein.  The federal and state constitutions
guarantee the right to assembly and to petition the government for a redress of
grievances, as well as to be free from unnecessary and excessive force by law
enforcement officers, and to "liberty" interests guaranteed by due process of law.
Defendants, by engaging in the wrongful acts and failures to act alleged above,
including but not limited to the conditions of arrest for all class members, the
custodial arrest of all persons charged solely with an infraction,  the arrest without
a dispersal order of the June 1 sub-class, and the use of batons, "less-lethal"
munitions against individuals who posed no immediate threat to officers and others
and who were not "violently" resisting arrest, denied these rights to the Plaintiffs
by threats, intimidation, or coercion, to deter, prevent and in retaliation for the
exercise of Plaintiffs' First Amendment rights, in violation of Cal. Civ. Code § 52.1.

70
THIRD AMENDED COMPLAINT

206.   The use of unreasonable force by Defendants was a substantial factor in causing the violation of rights and attendant harm by Plaintiffs.

207.   Defendant City of Los Angeles is liable for the wrongful conduct of its employees through the doctrine of respondeat superior.

208.   Defendants' actions as set out above and further on in this complaint constituted interference by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of California in violation of Cal. Civil Code §52.1. The violation of § 52.1 includes violations of the rights of the members of the Arrest, Infraction and Force classes as outlined throughout this Complaint.

209.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Plaintiffs sustained damages, including but not limited to general damages, statutory damages and treble statutory damages under Cal. Civ. Code § 52, but no less than $4,000 for each incident, and pain and suffering.

## XI.    SIXTH CLAIM FOR RELIEF
ASSAULT

### (By the Force Class Against Defendants)

210.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

211.   Defendants shot the members of the Excessive Force Class with Less-Lethal Launchers, struck them with batons, and shoved peaceful protestors down.

212.   As a direct and proximate result of the aforementioned acts or omissions of Plaintiffs, members of the Force Class sustained and incurred damages including physical injuries, and pain and suffering.

213.    The City of Los Angeles is liable for the actions of the officers of the Los Angeles Police Department through respondeat superior.

**XII.    SEVENTH CLAIM FOR RELIEF**
**BATTERY BY A POLICE OFFICER**

(The Force Class Against all Defendants)

214.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

215.    Defendants, by the actions of the officers of the Los Angeles Police Department, intentionally touched members of the Force Sub-Class without their consent by shoving, beating with batons, and shooting them with less-lethal projectiles, resulting in significant bodily injury to their person.

216.    As a direct and proximate result of the aforementioned acts or omissions of Defendants, Plaintiffs sustained and incurred damages including physical injury and pain and suffering.

217.    The use of unreasonable force by the LAPD Officers was a substantial factor in causing harm to the Plaintiffs.

218.    The Defendant City is responsible for the actions of its employees through the doctrine of respondeat superior.

**XIII.    EIGHTH CLAIM FOR RELIEF**
**FALSE ARREST/FALSE IMPRISONMENT**

**(By the Arrest Class Against Defendants)**

219.    DEFENDANT CITY'S employees and agents at the LAPD, acting within the course and scope of their duties, intentionally deprived Plaintiffs in the Arrest Class of their freedom of movement by detaining and subjecting them to custodial arrests without individualized reasonable suspicion and probable cause to believe a crime was committed.

220.    The Plaintiffs in the INFRACTION sub-class were subjected to custodial arrests in violation of California Penal Code Sec. 853.5, which mandates a cite and release at the site of the purported infraction violation, and prohibits custodial arrest, transport and booking prior to release.

72
THIRD AMENDED COMPLAINT

221.   Each member of the ARREST Class was imprisoned for hours on buses, without any ventilation or access to bathrooms, food and water.  Many members of the ARREST Class were forced to urinate and defecate on themselves while restrained on the buses despite pleas to be released.  All of the class members were handcuffed for hours and requests to loosen the restraints were ignored.

222.   Each member of the JUNE 1 ARREST SUB-CLASS was imprisoned for failure to disperse without the opportunity to disperse or provision of a dispersal order.

223.   The conduct of Defendants complained of herein was a substantial factor in causing the harm to Plaintiffs in the ARREST Class, the JUNE 1 SUB-CLASS and the INFRACTION CLASS.

224.   Defendant City is liable for acts of its employees and agents pursuant to respondeat superior and California Government Code Code § 815.2(a)

**XIV.   REQUEST FOR RELIEF**

Wherefore, Plaintiffs seek judgment as follows:

1.   An order certifying the classes and each sub-class defined herein pursuant to Federal Rules of Civil Procedure Rule 23(b)(2) and (3);

2.   A preliminary and permanent injunction restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above and retaining Court jurisdiction to enforce the terms of the injunction;

3.   A declaratory judgment that Defendants' conduct detailed herein violated Plaintiffs' rights under the Constitution and laws of the United States and the State of California;

4.   An order directing that all arrest records be removed from all criminal databases, whether operated by the City or County of Los Angeles, or the State of California, and that all arrests without conviction be reduced to a "detention;"

THIRD AMENDED COMPLAINT

5.   General and compensatory damages for Plaintiffs and the class they represent for the violations of their federal constitutional and statutory rights, pain and suffering, all to be determined according to proof;

6.   An award of attorneys' fees pursuant to 42 U.S.C. § 1988 and Cal. Civil Code §§ 52(b) & 52.1(h) and Cal. Code of Civ. Proc. § 1021.5;

7.   Costs of suit;

8.   Pre- and post-judgment interest as permitted by law;

9.   Such other and further relief as the Court may deem just and proper.

Dated: October 15, 2023              Respectfully submitted,

SCHONBRUN SEPLOW HARRIS
    HOFFMAN & ZELDES, LLP
LAW OFFICE OF CAROL A. SOBEL
McLANE BEDNARSKI & LITT


_____/s/ Carol a. Sobel_____.
By: CAROL A. SOBEL
Attorneys for Plaintiffs

74
THIRD AMENDED COMPLAINT