Cynthia Anderson Barker SBN 75764
NATIONAL LAWYERS GUILD
3435 Wilshire Blvd., Suite 2910
Los Angeles, California 90010
t. 213 381-3246  f. 213 381-3246
e. cablaw@hotmail.com

Paul Hoffman, SBN 71244
Michael Seplow SBN 150183
John Washington SBN 315991
SCHONBRUN, SEPLOW, HARRIS,
HOFFMAN & ZELDES LLP
9415 Culver Blvd, #115
Culver City, California 90230
t. 310 396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. jwashington@sshhlaw.com

Attorneys for Plaintiffs
Additional Counsel on Next Page

Barrett S. Litt, SBN 45527
Lindsay Battles SBN 262862
MCLANE, BEDNARSKI & LITT
975 E. Green Street
Pasadena, California 91106
t. 626 844-7660 f. 626 844-7670
e. blitt@mbllaw.com
e. lbattles@mbllaw.com

Pedram Esfandiary SBN 312569
e. pesfandiary@wisnerbaum
Monique Alarcon SBN 311650
e. malarcon@wisnerbaum.com
Bijan Esfandiari SBN 223216
R. Brent Wisner SBN 276023
e. rbwisner@wisnerbaum.com
WISNER BAUM, GOLDMAN, P.C.
10940 Wilshire Blvd., 17th Floor
Los Angeles, California 90024
t. 310 207-3233 f. 310 820-7444

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| BLACK LIVES MATTER LOS ANGELES, ET AL.<br><br>                    PLAINTIFFS,<br><br>v.<br><br>CITY OF LOS ANGELES, ET AL,<br><br>                    DEFENDANTS. | Case No.: 2:20-cv-05027 CBM-AS<br><br>**[PROPOSED]**<br><br>**FOURTH AMENDED COMPLAINT: CLASS ACTION; INJUNCTIVE RELIEF AND DAMAGES**<br><br>**42 U.S.C. § 1983: FIRST, FOURTH &FOURTEENTH AMENDMENT; CALIFORNIA CONSTITUTION, ARTICLE 1, §§ 2, 3, 7 , 13, 19; CALIFORNIA CODE  § 52.1; PENAL CODE §853.5; GOVT. CODE §815; ASSAULT; BATTERY; FALSE ARREST FALSE IMPRISONMENT** |

Carol A. Sobel, SBN 84483
Weston Rowland  SBN 327599
LAW OFFICE OF CAROL A. SOBEL
2632 Wilshire Blvd., #552
Santa Monica, CA 90403
t. 310 393-3055
e. carolsobel@aol.com
e. rowland.weston@gmail.com

Colleen Flynn, SBN 234281
LAW OFFICE OF COLLEEN FLYNN
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
t. 213 252-9444
r. 213 252-0091
e. cflynnlaw@yahoo.com

Matthew Strugar, SBN 232951
LAW OFFICE OF MATTHEW STRUGAR
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
t. 323 696-2299
e. matthewstrugar@gmail.com

Denisse Gastelum
GASTELUM LAW, APC
3767 Worsham Ave.
Long Beach, CA 90808-1774
t. 213 340 6112
e. dgastelum@gastelumfirm.com

Christian Contreras, SBN 330269
LAW OFFICES OF CHRISTIAN CONTRERAS, APC
360 E. 2nd St., 8th Floor
Los Angeles, California 90012
t. (323) 435-8000  f: (323) 597-0101
e: CC@Contreras-Law.com

Olu Orange SBN 213653
Orange Law Offices
3435 Wilshire Blvd., Ste. 2910
Los Angeles, CA. 90010-2015
T. 213 736-9900
f. 213 417-8800
e. o.orange@orangelawoffices.com

James Do Kim  SBN 231038
Law Offices of Do Kim, APLC
3435 Wilshire Blvd., STE. 2700
LOS ANGELES, CA 90010
T. 213 251-5440
F. 213 232-4919
E. dkim@dokimlaw.com

Shakeer Mostafa Rahman
LAW OFFICE OF SHAKEER RAHMAN
838 East 6th Street
Los Angeles, CA 90021-1028
t. 323 546-9236
e. shakeer@loosr.net

FOURTH AMENDED COMPLAINT

# I.    INTRODUCTION

1.    This action arises out of protests across the nation following the murder of George Floyd by Minneapolis Police Department officers. The events in Minneapolis, soon after the deaths of Breonna Taylor and Ahmaud Arbery, brought out millions of people around the country at once to condemn the deaths of black and brown men and women by law enforcement and vigilantes condoned by local law enforcement. Some of the larger demonstrations in the country occurred in the Los Angeles area. Over the course of six days, the Los Angeles Police Department arrested approximately 3000 individuals. Defendant Chief Moore told the public that well more than 92 percent of those arrested were engaged in peaceful protest.[1] Nonetheless, the Los Angeles Police Department ended the protests through the use of force (batons and rubber bullets), and imposed unconstitutional conditions of confinement on arrestees by holding them on enclosed buses for up to six hours or longer, tightly handcuffed, without access to bathroom facilities, food or water in violation of long-standing decisions of the United States Supreme Court and the lower courts and in contravention of the LAPD's written directives, conceding the department's inability to conduct mass arrests without facing the constitutional impediments that arose here.

2.    On the buses, arrestees were seated just inches apart, with windows closed and with no ventilation (compounding the potential of exposure to Covid-19). In hundreds of cases, the LAPD made false arrests where the charges filed were solely infractions for which custodial authority does not exist. In other instances, the LAPD arrested hundreds of individuals for curfew violations without any notice of dispersal and just as the curfew went into effect.  In still other instances, groups of protestors were arrested as they complied with LAPD directives to disperse and

---

[1] https://ktla.com/news/lapd-arrests-more-than-2700-people-amid-protests-chief/

FOURTH AMENDED COMPLAINT

found themselves led into areas where they were kettled and arrested, never having had a chance to disperse.  Finally, in at least one instance on the first night of the protests, Chief Moore personally directed  arrests in Downtown Los Angeles, only to give a dispersal order one hour after the arrestees were handcuffed and sitting on the sidewalk, awaiting transport to booking.

3.    The LAPD also used unreasonable and unnecessary force directly against residents of Skid Row, both housed and unhoused, and caught them in the crossfire of attacks on protestors through indiscriminate and improper use of kinetic impact projectiles.  Perhaps no image embodies this more than the photograph of a homeless man in a wheelchair on Skid Row.  He was shot in the head at close range when police fired large projectiles while chasing a small group of protestors.

4.    The Plaintiffs' injuries caused by so-called "less-lethal munitions" are strong evidence here that the LAPD's training in the use of these potentially lethal weapons was absent, seriously deficient, or intentionally indifferent to the known serious harm that can result from the use and misuse of kinetic impact projectiles (KIPs). The serious, and even deadly, injuries from the use of such munitions for crowd control have been well documented by Physicians for Human Rights ("PHR").  In a 2017 report, PHR called for limiting the "risk of less than lethal incapacitating weapons," because of the high risk of serious, if not deadly, injury to unintended targets, as happened here repeatedly

5.    As discussed herein with respect to Plaintiffs' policy challenges, over two decades, the LAPD repeatedly concluded that some, if not most or all, of the KIPS it used were highly inaccurate. KIPS can cause serious organ injuries and death, especially when striking  the head, neck, and torso.[2]  The injuries of just the

---

[2]    Haar RJ, *et al*. *BMJ Open* 2017;7:e018154. doi:10.1136/bmjopen-2017-018154

few plaintiffs identified by name in this class action demonstrate this finding. Many received medical treatment and several required surgeries for head and facial wounds.

## II.    THE ARRESTS OF PROTESTORS

6.    All told, the LAPD reported arresting approximately 4000 people, most for protesting and a much smaller number for vandalism, looting and similar property crimes. The above-described arrests, prolonged handcuffing and bus detentions occurred in multiple locations throughout the City over five nights from May 29 to June 2, 2020. Each arrest group endured common circumstances and nearly all numbered well in excess of 40 individuals, with several up to 500 or more persons arrested at the same time in the same location and under the same conditions.

7.    Over the course of the five days and across the City, the LAPD only documented 12 dispersal orders and conceded that many of those were not heard by the protestors prior to being arrested because most of the arrests did not occur in a static situation where the protestors were all at the location when the order to disperse was given. In other instances, as described more fully below, the dispersal orders were invalid because they directed protestors they were in violation of a curfew order when, in fact, the LAPD had an incorrect time that the curfew was to go into effect. In still other instances, no attempt was made to give a dispersal order with a lawful opportunity to comply.

8.    On May 29, protests began at the LAPD headquarters at First and Main Streets. The police fired Kinetic Impact Projectiles ("KIPs") at the protestors, causing many in the group to leave and march through Downtown's jewelry district before circling back to the LAPD headquarters. At about 9:30 p.m., an unlawful assembly was declared, resulting in about 533 arrests that night, mostly for failure to disperse, but only after first using chemical irritants against protestors. *See* "Arrests During George Floyd Protests Swell to Near 3000 in L.A. County; Many are Locals," Los Angeles Times June 2, 2020:

1  https://www.latimes.com/california/story/2020-06-02-george-floyd-protests-los-
2  angeles-arrests-locals. The arrests were made in three large groups, all handcuffed
3  for prolonged times waiting for transport and then taken to a jail parking garage
4  where they were kept handcuffed while a makeshift booking process was set up.

5       9.    On May 30, 2020, most of the arrests and use of force occurred in the
6  Fairfax area, following a peaceful rally organized by BLM LA. When the rally
7  ended in the early afternoon, many of the participants continued peaceful protests,
8  marching throughout the Fairfax area, along Beverly and other streets. Throughout
9  the area, heavily armed officers, several lines deep at times, used unwarranted and
10 unlawful force to kettle and arrest the protestors. Most of the protestors followed
11 orders yelled at them by the officers but each time they moved in the direction they
12 were instructed to move by one group of officers they soon found there was no
13 avenue for them to disperse.  Instead, they found themselves facing lines of officers
14 with "less-lethal" munitions blocking their exit. They were kettled, targeted with
15 impact projectiles and struck with batons as they were ordered to move back.
16 Surrounded by officers, there was nowhere for them to move. Defendant **MOORE**
17 was on site and spoke to the kettled protestors twice, although his words were
18 inaudible to most of the  protestors. Chief Moore authorized, approved, and ratified
19 the unwarranted assault on the protestors with projectiles and batons. Alternatively,
20 he did nothing to stop the assault on the protestors as he witnessed it.

21      10.   On Sunday, May 31, nearly 700 individuals were arrested, primarily
22 in downtown Los Angeles. *See* Los Angeles Times June 2, 2020, available at
23 https://www.latimes.com/california/story/2020-06-02-george-floyd-protests-los-
24 angeles-arrests-locals. Approximately 10 percent of that total was for property
25 crimes, primarily suspected looting. Thousands of demonstrators started a march
26 from Pershing Square. While few arrests were made during the day, at
27 approximately 5:45 p.m., the LAPD advised the assembled protestors that a curfew
28 would go into effect at 6 p.m. and they would be arrested.

FOURTH AMENDED COMPLAINT

11.     On June 1, nearly 600 individuals were arrested in Hollywood. Earlier in the day, the LAPD put out a news release  and posted it on its website "requesting" residents of the City not to come to Hollywood that evening. *See* http://www.lapdonline.org/newsroom/news_view/66592.

12.     Shortly before 4 p.m., the City announced the curfew that night would begin at 5 p.m. instead of at 6 p.m. as on previous nights but most protestors were not aware of the change because they do not get texts from the City or 2) they did not see the limited number of mobile signs the City placed on a few streets in Hollywood. Barely an hour later, a mobile alert was sent out, announcing the curfew would, in fact, start at 6 p.m. Despite the correction, the police began arrests at 5 p.m., even though the arrests for violating the curfew were unlawful because there was no curfew order for 5 p.m.

13.     In addition to Hollywood, about 100 individuals were arrested on June 1 in a protest in Van Nuys.

14.     On June 1, between 500 and 740 people were arrested in Downtown Los Angeles, next to City Hall.  The charge for all was a purported curfew violation. As occurred that night in Hollywood, a mobile alert was sent out announcing a 5 p.m. curfew.  However, that turned out to be for the City of Glendale and not the City of Los Angeles, which maintained a 6 p.m. curfew as it had the night before. Once the LAPD realized the error, they allowed the peaceful protest to continue. Although radio transmissions for this event first reported a plan to advise those assembled to disperse at 6 p.m., when that time arrived the Incident Commander ordered everyone present be arrested without a dispersal order.  Earlier in the afternoon, LAPD radio transmissions noted that this group was peaceful and had caused no problems as they marched throughout the afternoon.  Despite all of this, when questioned by officers on the radio about giving a dispersal order, the Incident Commander responded everyone would be arrested without first giving a dispersal order on the unsupported assumption that they would be "trouble" down the line.

FOURTH AMENDED COMPLAINT

15.     Mass arrests occurred on the evening of June 2, when approximately 1000 protestors assembled outside Mayor Garcetti's Hancock Park home, demanding that his budget defund the police.  After a few hours, the protestors split up, with groups marching away peacefully to the north and south. They thought they were complying with an order to disperse, which they reasonably believe applied to the area outside the Mayor's house.  As the groups dispersed, they were followed and many were soon kettled by the police, then arrested. Approximately 120 people were arrested at about 8 p.m. in the vicinity of Crenshaw Avenue and 8th Street on curfew violation charges, only enforceable as an infraction under the Los Angeles Municipal Code and, therefore, not subject to custodial arrests.

16.     On May 29, protestors blocked the 101 freeway downtown and engaged LAPD officers who responded. At 9:30 p.m. Defendants declared an "unlawful assembly" and imposed an immediate curfew for the 10 freeway to the 101 freeway, and from the 110 freeway to Alameda. The curfew was announced on the LAPD and Mayor Garcetti Twitter accounts, and at Mayor Garcetti's press conference.[3]

17.     On Twitter, the LAPD wrote: "This [curfew order] is being made following repeated acts of violence and property damage. Residents should stay



[3] https://www.pscp.tv/w/caGHiDExMTkzNjN8MWVhS2JRV21lcEJ4WLAxZ0Dzz2-iobDlWBufDWNeHPcCb-7O-UR_4tQbozv4 …

inside. Business should close. Those on the street are to leave the area." This was inadequate notice as there is no evidence that all, most or even many of the millions of residents of the City follow the LAPD on Twitter, including those participating in the Floyd protests.

18.    In a similar vein, the May 31 curfew, preemptively declaring all of downtown to be an "unlawful assembly," was announced in a news release posted on lapdonline.org.  *See* http://www.lapdonline.org/newsroom/news_view/66585. Setting aside that there is no evidence the protestors were following the LAPD online, California Penal Code §407 defines an unlawful assembly as two or more people who come together to do "an unlawful act, or to do a lawful act in a "violent, boisterous or tumultuous" manner. To comply with the First Amendment, the California Supreme Court construed this statute narrowly to apply only to assemblies that are "violent or pose a clear and present danger of imminent violence." *In re Brown*, 9 Cal.3d 612, 623 (1973). By their own admissions, there was no violence occurring with some of the larger demonstrations.  Defendants could not preempt all public assemblies in downtown on the actions of a few at other locations and other times.

19.    The curfew in place from the night of June 2 to the morning of June 3 was also announced in a press release posted on the LAPD website. *See* http://www.lapdonline.org/newsroom/news_view/66598.

20.    Although public outcry regarding the LAPD's/City's unlawful protest suppression tactics resulted in the temporary cessation of such conduct in Spring 2020, the LAPD soon resumed the same conduct at subsequent protests over the course of 2020 and early 2021.  That evidence resulted in the entry of a Preliminary Injunction by the Court on May 12, 2021.  [Dkt. 101, 102].

21.    Resumption of this unlawful conduct continues to be a serious risk confirmed by the fact that this was not the first time that the LAPD engaged in these tactics, even after previously agreeing multiple times not to do so again.  *See* Los

FOURTH AMENDED COMPLAINT

Angeles Times, June 15, 2020 ("LAPD Violence Against George Floyd Protests Erodes Decades of Reform"). https://www.latimes.com/california/story/2020-06-14/lapd-protest-history-criticism-heavy-tactics.  And, yet, it is happening again in 2025 in response to the indiscriminate force used against those protesting the ICE raids in Los Angeles.

22.    Over the course of the last several decades, the Defendant City has been sued repeatedly for many of the same tactics challenged herein, including kettling (i.e., corralling) protestors before declaring an unlawful assembly and blocking all exit routes, excessive force with batons and rubber bullets, and prolonged handcuffing and improper conditions of confinement for arrestees. The day after George Floyd was killed in Minneapolis, the City of Los Angeles paid a settlement of $750,000 for a lawsuit raising many of the same violations in the protests after the Ferguson Grand Jury decision not to indict the officer who shot and killed Michael Brown. *See Chua v. City of Los Angeles*, 16-cv-00237-JAK-GJS (C.D. Ca.). By kettling the demonstrators, detaining them tightly handcuffed on buses for hours, without access to bathrooms, water or food, and through other conduct detailed below.

23.    At a hearing of the Los Angeles City Council Public Safety Committee to receive the Chaleff Report and testimony from the Report's author, Councilmember Monica Rodriguez, chair of the Public Safety Committee, characterized the LAPD's response to the Floyd protests as representing "one of the worst examples in the history of the department." Council Committee Reviews Report On LAPD Mishandling Of George Floyd Protests – CBS Los Angeles (cbslocal.com).  Almost exactly five years later, the City is seeing the same violation of First Amendment rights in the demonstrations protesting ICE raids.

24.    Moreover, in recent days, the LAPD has brought out the Mounted Unit of the Metropolitan Police Division.  Multiple videos document the mounted unit charging protestors with the horses and striking people with the large sticks they

carry. In one particular disturbing incident reminiscent of Rodney King's beating more than 30 years ago, several officers on horseback surrounded a single person and took turns striking him in the head and neck as he was defenseless on the ground. The use of horses and strikes to the head were the subject of the settlement of the 2000 litigation following the use of force against peaceful protestors at the Democratic National Convention who were dispersing as ordered by the LAPD.

## III.    JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights jurisdiction). This Court has jurisdiction to issue declaratory or injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

26.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391, as all Defendants and events giving rise to the claims herein occurred in the Central District of California.

## IV.    PARTIES - PLAINTIFFS

### A.    Organizational Plaintiffs

27.    Plaintiff BLACK LIVES MATTER LOS ANGELES ("BLMLA") is part of a nationwide organization with chapters in many major cities, including Los Angeles. BLMLA began in Los Angeles with protests on July 13, 2013, the date George Zimmerman was acquitted of killing teenager Trayvon Martin in Florida.

28.    BLMLA is one of the largest and most active chapters of the organization, with nearly 500 active members and organized ally groups, including White People for Black Lives. In response to the death of George Floyd, BLMLA sponsored protests in Los Angeles and participated in demonstrations organized by other groups. On average, BLMLA sponsors four actions a week. Defendants' actions interfered with BLMLA's right to assembly and speech. BLMLA plans to assist, plan, participate in, hold similar events in the future, on its own or in conjunction with others, and is fearful that the same unlawful police actions in

response to these and similar protests of institutional racism and police brutality will be repeated absent injunctive relief to prohibit the LAPD's practices, policies, and customs that caused the unlawful action in response to the recent protests.

29.    In response to the murder of George Floyd, BLMLA organized protests in Los Angeles. One such action was held at Pan Pacific Park in Los Angeles on Saturday, May 30, 2020. During the course of this protest and others over the past week, while BLMLA and its members were engaged in lawful First Amendment activity, the LAPD used force to terminate the protests, including the indiscriminate use of so-called "less lethal" weapons that caused injury to its members and instilled fear in them that, if they chose to assemble in public spaces to express their opposition to police violence across the nation against black men and women, they would be the subject of such violence and arrest.

30.    Plaintiff **CANGRESS**, dba Los Angeles Community Action Network (LA CAN), is a grassroots non-profit organization in Skid Row for approximately two decades. More than 800 low-income residents of Skid Row are involved with LA CAN, many of whom are unsheltered each night. In addition, individuals such as Plaintiff SHENTU are members and supporters of the organization. The primary purpose of the organization is to organize and empower community residents to work collectively to address systemic poverty and oppression in the community. Since its founding in 1999, LA CAN has been the only member-driven organization in Skid Row whose goal is to protect the rights and prevent the further disenfranchisement of homeless and poor people in Los Angeles. LA CAN brings this action on behalf of its members and associates who have been arrested and/or subjected to the use of less-lethal weapons and other tactics aimed at shutting down public spaces over the past 10 days by City employees and agents pursuant to the enforcement policies, practices and customs of the City. As a result of Defendants' unlawful actions, LA CAN has expended personnel resources to try and prevent at-risk individuals from being subjected to these unlawful policies, assist those who

have been physically injured by these unlawful policies, and assist their members and associates to be safe from police actions.

**B.    Force Plaintiffs**

**5.29 Downtown Los Angeles**

32.    **Jorge Aguirre**

On May 29, 2020, Mr. Aguirre was near the intersection of Spring Street and 3rd Street attending a protest. At approximately 10:00 p.m., Mr. Aguirre was in the front lines between the officers and the other protesters. The officers had their batons out and started pushing the protesters back. Mr. Aguirre was jabbed in the ribs with a baton. Officers fired rubber bullets into the crowd and hit Mr. Aguirre on the right thigh and left bicep. The rubber bullets impacts caused bruising on his right thigh and left bicep that lasted for over half a month. Mr. Aguirre also suffered soreness in his ribs for over a month from being hit with batons.

33.    **Citlalli Aparicio**

On May 29, 2020, Citlalli Aparicio was on 4th and Spring attending a protest. The police surrounded her group, and did not give the protestors any ability to leave the area. When they started arresting protestors, the scene became chaotic. While trying to save a teenage protestor from police, Aparicio was hit in the back of the head with a baton. When she tried running, the police pulled her by her backpack and slammed her to the ground. While she was being detained, the police required the detained protestors to take off their masks without permission and made them all sit in a crowded bus with no distance between anyone. She had pain and migraines directly after the event.

34.    **Bruce Barahona**

On May 29, 2020, Bruce Barahona was in downtown LA attending a protest. He was with a group that disbursed from the City Hall area and then marched towards Staples Center on Spring Street. Between 4th and 6th and Spring Street Mr. Barahona lifted his phone to record the LAPD officer pointing his less lethal

launcher at him. The officer shot him in the hand with a rubber bullet, causing a right third metacarpal shaft fracture. He experienced intense pain for two months. His hand still hurts and he has difficulty closing it all the way shut. Mr. Barahona works with his hands, so this injury impacted his ability to work.

### 35. Samantha Bellamy

On May 29, 2020, Samantha Bellamy was participating in a protest around City Hall. There was no clear dispersal order when the police kettled in the protestors and told them to sit on the ground. Exercising her rights, Bellamy refused to sit on the ground and linked arms with her friends. The police then shot at them with less lethal weapons for their disobedience, and Bellamy was struck in both the hand and the shin by a rubber bullet, which resulted in an immediate welt in her shin. She was also charged by the police officers and knocked to the ground. The bruising and pain from the rubber bullets lasted for about a week. Bellamy was arrested and detained by the LAPD and issued a citation for failure to comply with lawful order.

### 36. Erik Blinderman

On May 29, 2020, Mr. Blinderman was at a protest on his bicycle. No dispersal order was issued before the officers started to arrest protesters. While Mr. Blinderman was on his bike, an officer hit him with a baton on his left shoulder. Due to the blow, Mr. Blinderman fell and tripped. As soon as he was on the ground, two officers attempted to hit him with batons. Two blows grazed him, but the third intense blow hit his left shoulder. He was in serious pain. Mr. Blinderman got up and tried to leave the protest, but he ran into another line of officers. He asked, "Can I disperse?" before they ignored and proceeded to arrest him for failure to disperse. The officer put tight handcuffs on Mr. Blinderman that aggravated his shoulder injury and caused significant pain. Mr. Blinderman was struck at least three times in his left shoulder with batons, which caused him pain and lingering discomfort. Mr. Blinderman's shoulder also occasionally locks up. Mr. Blinderman still

experiences intermittent episodes of severe shoulder pain. In October/November of 2022, Mr. Blinderman was told by orthopedic surgeons that they do not anticipate an end date for his pain and his only option for improving his shoulder injury is physical therapy for an undetermined amount of time.

37. **Austin Carr**

Mr. Carr participated in a protest at Second Street and Spring Street, where he was shot with multiple rubber bullets, some of which hit his hip causing bruises and welts. On June 1, 2020, Mr. Carr attended another protest near the intersection of El Centro and Sunset Boulevard. While he was on his bicycle with his hands up, he was struck by a baton on his left side, he was arrested that night for curfew violation. The bruising on Mr. Carr's right hip lasted for approximately two months, and the scar remained until approximately September 2020. The bruising on Mr. Carr's left side lasted for approximately one week.

38. **Caleb Crowder**

Caleb Crowder and other protestors were gathered near the intersection of 2nd and Spring Street. At around 10 pm Mr. Crowder was at the front line of the protest. For 30 minutes or so he remained in the front line as less lethal munitions were fired into the crowd. The officers were pushing the protesters and Mr. Crowder was hit with a baton on his upper body multiple times. Mr. Crowder decided to leave the protest. However, as he was running away, he was shot with a rubber bullet on his upper middle back under his right shoulder blade. The less lethal shot that hit his back caused contusions and the baton strikes caused temporary difficulty breathing. His injuries lasted for days after the protest.

39. **Linda Daitsman**

Ms. Daitsman joined protestors in downtown Los Angeles near City Hall on May 29, 2020. As protestors neared the LAPD station in downtown Los Angeles, LAPD officers kettled the protestors and refused to let them leave. Ms. Daitsman did not hear a dispersal order. As LAPD officers pushed the crowd back Ms.

Daitsman was hit on her thigh with a baton strike. She suffered bruising from the baton strike. The pain and bruising in her thigh lasted for several days. She was also put in overly tight handcuffs and had pain and bruising in her wrists that lasted for more than a week. The following day Ms. Daitsman joined the protests in Fairfax. On Beverly LAPD shot Ms. Daitsman with a rubber bullet in her wrist. This shot caused her nerve damage and bruising. These injuries last for more than a week. She sought medical treatment for her injuries about a week later.

40. **Halley Georgeson**

On May 29, 2020, Ms. Georgeson was at the Spring St. and 8th St. intersection attending a protest. Without issuing a dispersal order, Los Angeles Police Department officers began to kettle the group she was with, and the protesters were not free to leave. Ms. Georgeson attempted to leave by walking down Spring St. but was turned back by two officers. The officers had blocked streets off and were turning protesters away back towards the kettling. Ms. Georgeson was able to find an alleyway to escape through. At approximately 10:30 p.m., as Ms. Georgeson came around the corner of First St. and Spring St., she found herself in the midst of another group of protesters. A bystander told her to turn around and run. She began to run but tripped. As she stood up, an officer who was less than 10 feet away fired a rubber bullet at close range into the back of her left thigh. Ms. Georgeson sustained a large wound from where she was struck with a rubber bullet in the back of her left thigh. The impact broke the skin and caused bleeding and muscular stiffening and pain that left her unable to sit or use the bathroom. A large welt also formed around the wound. Currently, there is hard tissue around the area.

41. **Darlene Mendoza**

Ms. Mendoza attended the protest in downtown Los Angeles. At approximately 8:00PM she attempted to help a child who had been tackled by LAPD officers. She was then hit with a rubber bullet in her hip. She stopped, held

out her arms and asked, "What was that for?" An LAPD officer then shot her outstretched hand. She was in terrible pain and her hand was covered with blood



with the skin hanging off. She was taken to Good Samaritan where she had 15 stitches in her hand. She continued to be in pain for a prolonged period. She returned to her primary care doctor twice to have the stitches removed. She has scarring on her thumb and index finger and is still unable to fully bend her left thumb.

42. **CHRISTIAN STEVEN ROE**

Christian Roe participated in a peaceful protest in downtown Los Angeles near the intersection of Temple and Spring Streets, near City Hall. Around 9:00 that night, he saw the police form a line and begin pushing the protestors toward City Hall. Approximately 100-200 people were assembled in this group. They followed police orders, but were repeatedly met by other lines of police officers blocking them until they in a confined space and completely surrounded by officers. **ROE** and others asked to leave but were refused by the officers at the scene. **ROE** saw a single bottle thrown at the police from behind him. The police made no effort to isolate that person. An officer took aim at **ROE** and shot him in the stomach with

as he was walking backwards, facing the officers. The impact broke the skin and caused a deep, painful injury.



43.    **Justin Ullman**

Mr. Ullman joined the peaceful protest in downtown Los Angeles on the evening of May 29, 2020. At approximately 9:00 PM Mr. Ullman was at the front of a line of protestors facing a line of LAPD officers. Suddenly, without warning, he was hit in the arm by a 40mm projectile. No dispersal order had been given or any warning. Neither Mr. Ullman nor any protestor near him posed any threat to LAPD officers. Mr. Ullman always acted peacefully before being hit by this projectile at close range. After being struck with the projectile, Mr. Ullman was then hit by an LAPD officer on his knees, arms and legs with a baton causing him considerable pain. He was helped to his feet after this attack by fellow protestors. Notwithstanding these LAPD attacks, Mr. Ullman continued to peacefully demonstrate with other protestors. Shortly after 10:00 PM, he was kettled by the LAPD in front of City Hall and taken into custody. He was eventually taken on to a bus in plastic handcuffs. He complained that his handcuffs were too tight but his requests to loosen the handcuffs were ignored by LAPD officers. He asked for water, but this request was also denied. He was kept on the bus in pain around officers and other protestors without masks and without ventilation for hours.

FOURTH AMENDED COMPLAINT

### 5.30 Fairfax

44.     **Channing Abbot**

Channing Abbot was present at 3rd Street and S. Edinburgh. Mr. Abbot found himself in front of a police line that was erratically firing less lethal munitions. In the course of that use of force, Mr. Abbot was hit by a less lethal munition on his left wrist near the side of his wrist connected to his thumb. The area became badly bruised and the bruising lasted for more than a week after.

45.     **Clara Aranovich**

Plaintiff is a filmmaker in Los Angeles. On May 30, 2020, she participated in a peaceful demonstration in the Fairfax district following a rally in Pan Pacific Park organized by Black Lives Matter Los Angeles.  She arrived in the vicinity between 4:00 p.m. and 5:00 p.m. and observed a group of protestors gathered at the intersection of Fairfax Avenue and 3rd Street.  She also observed a line of police officers across the street. Just before 6:00 p.m., she observed Defendant Moore address the protestors. Initially, he had no amplification device, making it nearly impossible to hear what he was saying. He then used a bullhorn that someone handed to him, but it was still difficult to hear him over the crowd noise. **ARANOVICH** did not hear Chief Moore or anyone else with the LAPD make an unlawful assembly order, or a dispersal order.  About 30 minutes after Chief Moore spoke, the police began to move the protestors back by using aggressive, physical force, jabbing people with considerable force in their upper body. Some officers hit protestors with an overhand strike.  **ARANOVICH** was struck in her chest and abdomen multiple times, causing a painful bruise on her breast. As she left the

protest, she was struck with a KIP in the calf, causing a painful welt and a bruise lasting weeks.



46.    **Niki Armato**

Niki Armato participated in the protest at the intersection of Third and Fairfax on May 30, 2020. At around 2:30PM LAPD officers arrived at the protest and formed a skirmish line facing the protestors. Although the protestors facing the skirmish line did not pose a threat to officers and were not engaging in violent actions, the officers shot less lethal weapons indiscriminately into the crowd of protestors where Armato was standing. Armato was not hit in the first round of projectiles and the crowd signaled to the officers that they were not violent or a threat. Notwithstanding this, the officers again shot indiscriminately into the crowd. Armato was hit by a projectile this time. Armato was hit in the thigh and suffered bruising that was still visible days after the shooting. Armato continued to be in pain from the shooting weeks later.

47.    **Bridget Bailey**

On the afternoon of May 30, 2025, Ms. Bailey was filming police officers during the demonstrations. At approximately 4:30PM LAPD officers were pushing demonstrators, without issuing dispersal orders, to kettle them at the Trader Joe's parking lot. Ms. Bailey was pushed backwards by an LAPD officer after she asked

him what law she was violating. She did nothing to justify the use of force against her and she posed no threat to officers or anyone else. She was pushed hard backwards into a palm tree hitting the back of her head very hard. She felt a hematoma developing in the back of her head. She became dizzy and vomited several times. She walked to Cedar Sinai Hospital where she was diagnosed with a concussion. The hematoma was gone in approximately two weeks. However, she experienced nausea for two weeks and extreme fatigue for nearly two months. In this period, she experienced loss of physical strength and occasional dizziness.

48. **Nicole Benthall**

Around 6:30 pm Ms. Benthall was near Whole Foods on Third and Fairfax. At that time police had formed a skirmish line that was pushing protestors east on Third Street. LAPD fired less lethal munitions indiscriminately at protestors that were 150 to 200 feet away from the police line.  It was at this time that she was shot twice as she was attempting to leave the protest. Ms. Benthall developed bruises from both injuries, which both took approximately three weeks to heal. After the bruises dissipated, scarring and discoloration remained on the back of her thigh.

49. **Tina-Desiree Berg**

At approximately 3:00 to 4:00 p.m., Ms. Berg was a journalist covering a protest at Fairfax and Stanley Avenues. She arrived as the protest started to die down. One officer told her to leave but then allowed her to stay after she showed the officer her press credentials. She was approached by another officer who told her to "get the fuck across the street." She heard no dispersal order before LAPD officers shot KIPs at the protesters. She saw one male shot in the head and two women with broken noses after being struck with KIPs. Ms. Berg was hit with a baton. She got into her car and started to drive away when LAPD officers aimed at the back window of her car and shot "less-lethal" munitions, shattering it.

50. **Athena Bermudez**

On May 30, 2020, at approximately 3:00 p.m., Athena Bermudez was on Sunset Blvd. attending a protest. LAPD officers pointed Ms. Bermudez out from the crowd and shot her from a very close distance with a rubber bullet in her right leg above her knee. She heard no dispersal order before she was shot; the police shot into the crowd without warning. She was chanting "Hands up – don't shoot" when she was shot. The rubber bullet that LAPD shot in her leg caused bruising bleeding, pain, and subsequent scarring on her right leg above her knee. Ms. Bermudez had ongoing pain in her right leg that lasted approximately eight 8 months. Ms. Bermudez had scarring on her right leg where the rubber bullet broke the skin that lasted approximately one year.

51.    **Kacey Bonner**

Kacey Bonner was attacked by the LAPD on Fairfax Blvd near Colgate Ave. A line of officers advanced upon Ms. Bonner. She put her hands up. Soon after a female LAPD officer hit her in her chest with a baton, she was also hit in the face, and in the thigh with a baton. Overall, she was hit six to eight times. She sustained bruising and swelling at the point of impact on her head. She also had significant bruising on her thigh. Her bruising and pain lasted for over half a month.

52.    **Leslie Bray**

At approximately 6:30pm Leslie Bray was at Beverly and Curson holding a small sign above her head, peacefully protesting. She was standing near the Devonshire Lodge Motel. At that intersection a line of police officers formed. They told Ms. Bray to leave, and she complied, turning around to walk away with her back to the police line. After taking several steps, Ms. Bray's hand was struck by a less lethal munition. Moments later she was struck in the lower back near her spine by another less lethal munition. Both occurred as she had her back to the police line with a sign in her hands as she was walking away in compliance with the officers' instructions. Her back took approximately one month to heal, with bruises lasting weeks. Her hand injury lasted for approximately the same duration.

FOURTH AMENDED COMPLAINT

53.     **James Brown**

Mr. James Brown is 70 years old. On May 30, 2020, he was protesting near Pan Pacific Park when LAPD officers surrounded the group. Although the officers issued a dispersal order, they did not give directions or sufficient time to leave.  Mr. Brown was struck with a rubber bullet in the head.

54.     **Jodi Chang**

On May 30, 2020, Ms. Chang was protesting outside the Trader Joe's Parking Lot near the Grove. At approximately 3:30 p.m., Los Angeles Police Department officers surrounded the protesters on all sides. While Ms. Chang was trying to exit the parking lot, a male officer between 5'7 and 5'11 in height hit her in the stomach and hip bone with batons. Her bruising and pain lasted for approximately two weeks.

55.     **Sollie Clark**

On May 30, 2020, Ms. Clark participated in a peaceful protest that started near Rodeo Drive and ended in mid-Wilshire. At around 6:45 she was on Beverly near Edinburgh, standing at the front of the protestors peacefully chanting when a plastic bottle was thrown up in the air, falling well short of the police skirmish line. In response LAPD officers began to shoot less lethal weapons indiscriminately into the crowd. None of the other protesters threatened the officers or threw a bottle. No dispersal or other order was given before the officers fired. Ms. Clark was hit on her left thigh. She was in shock and could not run from the officers, but was pulled to safety by bystanders. She was unable to walk for several days. She suffered bruising, burning and lingering muscle soreness for weeks. There was a dent in her left thigh for years after being shot.

56.     **David Contreras**

David Contreras was a graduate student in social work in Los Angeles in 2020.  At approximately 2 pm, he was walking on Fairfax in a peaceful protest when he observed a line of officers split the group in half, forming a skirmish line to divide the protestors. The officers put themselves in a tactically compromised

21
FOURTH AMENDED COMPLAINT

position and soon were surrounded by protestors. The police started striking protestors with batons. Plaintiff was off to the side, photographing, when he felt a severe pain in his face. Just prior to being hit, he observed an officer with a less-lethal launcher facing him. He saw the officer smile as he started to reload his weapon. Contreras' eye swelled shut from the injury and he had severe headaches for more than a week. He started to lose vision in his left eye. He sought medical care and was told he had severe hemorrhaging. He continues to suffer debilitating headaches. His vision is still restricted.



57.  **Tina Črnko**

Tina Črnko arrived at the Black Lives Matter rally at Pan Pacific Park at approximately 12:30 p.m. At approximately 1 p.m., some people began marching peacefully in the direction of the Beverly Center. They marched for two hours without incident, then split into three groups. Črnko was in the group protesting peacefully near the intersection of 3rd Street and Edinburg. Sometime before 5:30 p.m., Chief Moore arrived and spoke to the group; however, he could not be heard over the protestors as he lacked adequate amplification equipment. Officers wearing riot gear and brandishing weapons then kettled the group on all sides for 30 minutes before allowing them to leave to the south. Črnko then marched to the northeast corner of the intersection of 3rd and Fairfax where a wall of officers at

least 10 deep blocked the street. Chief Moore again appeared and spoke to the protestors, but he could not be heard because he did not have effective amplification equipment.

58.    At about 6:00 p.m., she observed protestors running east on 3rd Street, followed by a large number of LAPD officers coming toward the area where she was.   Officers were running after the fleeing marchers and shooting at them indiscriminately.  Črnko was first hit in the left bicep and ribcage by KIPs.  As she moved east, she was struck on the forehead above her right eye, causing profuse bleeding, temporary hearing loss and extreme pain. The resulting wound required seven stitches. She still suffers nerve damage in the area of impact.



59.    **Ma'ayan Dembo**

Ms. Dembo participated in the protest at Third Street between Edinburgh and Fairfax.  At around 2:30 p.m., she was in a group of protestors facing a skirmish line of LAPD officers. The officers started pushing protestors back, striking them with batons. There was no order to disperse or any warning that less lethal weapons would be used. Given the size of the crowd, it was impossible for individual protestors like Ms. Dembo to move away from the area. On at least two occasions Ms. Dembo was hit by fragments from 37mm rounds fired at a 5–10-foot range. Shortly after 3:00PM an officer again jabbed her with a baton.

60.    **Julia Dupuis**

On May 30, 2020, at around 4:30 pm, Ms. Dupuis was near the intersection of Beverly Blvd and Fairfax heading west on Beverly Blvd. LAPD officers piled into the same intersection. Dupuis was moving away from the area where she was previously standing when a group of officers advanced on her position. Officers continued to approach with less lethal rifles pointed in her direction. One of the officers aiming at Dupuis fired at her, hitting her near the bottom of her rib cage. Ms. Dupuis experienced severe swelling and prolonged contusions in the area where she was shot. Ms. Dupuis experienced pain when she breathed for a week. It took several months for the injury to heal.

61.    **Rami Even-Esh**

On June 1, 2020, Mr. Even-Esh was at Sunset Blvd. and Vine St. attending a protest. At approximately 7:00 p.m., Mr. Even-Esh was attempting to leave the protest and walk back to his car when he was suddenly surrounded and tackled by four LAPD officers. He was detained and arrested for a curfew violation. He was detained until approximately 2:00 a.m. Mr. Even-Esh experienced pain in his knee from being tackled by four LAPD officers. His injury took about four weeks to heal.

62.    **Aranavaz Fatemi**

24

FOURTH AMENDED COMPLAINT

1
2
3
4
5
6
7

Aranavaz Fatemi was at 3rd and Fairfax when officers began using force. Fatemi was in the front of the crowd. Officer Bustamonte was one of the officers advancing on the crowd. Though Ms. Fatemi was not a threat to him or anyone else, Officer Bustamonte hit Ms. Fatemi so hard in her ribs that she felt like she could not breathe and fell to the ground. Once she fell more officers started to shove her adding to her feeling of panic and disorientation. Ms. Fatemi felt significant discomfort immediately after the incident which lasted after the event.

8

63.    **Elle Farmer**

9
10
11
12
13
14
15

On May 30, 2020, at approximately 6 pm Elle Farmer was at Fairfax Avenue and Third Street attending a protest. LAPD officers fired multiple less-lethals. Farmer was shot with a rubber bullet on the left side of their stomach, legs, and a few other rubber bullets grazed their body. Farmer suffered two significant contusions one of the left side of their stomach and one on the top of their foot. For the foot contusion Farmer experienced pain for approximately one week. The bruising and pain on the stomach contusion lasted for nearly four weeks.

16

64.    **Victor Galdamez** On May 30, 2020, at approximately 5:00 p.m.,

17
18
19
20
21
22
23
24
25
26
27



28

Mr. Galdamez was at Beverly Blvd. and Stanley Avenue attending a protest. The LAPD officers surrounded the protestors. Without warning, some officers began

25

FOURTH AMENDED COMPLAINT

shooting rubber bullets at the protestors, so Mr. Galdamez took cover behind a dumpster. One officer shot him in the arm and then a different officer hit him in the left forehead, very close to his eye. His immediate wound and bruising took over a month to heal. He has a scar at the point of impact.

65.    **Peter Gonzalez**

At about 4:30 p.m., Mr. Gonzalez was participating in a protest at Third Street and Edinburgh Avenue when officers opened fire on the groups. Mr. Gonzales was shot by two rubber bullets, one hitting his left elbow and another hitting his left foot. The bruising on his left elbow lasted about one month. The area he was shot on his foot was tender for a few months after the initial injury.

66.    **Eva Grenier**

Eva Grenier is an attorney in Los Angeles. She participated in the protest organized by BLM LA at Pan Pacific Park on May 30, 2020. When the rally ended, the LAPD moved in quickly to break up the assembly, wildly swinging batons at those in the front of the protest, closest to the LAPD skirmish line, with officers behind them deploying less-lethal projectiles. At the same time, the LAPD formed skirmish lines behind and around the protestors, kettling them with no ready means of dispersal. As the officers advanced on the front line of protestors, Grenier**,** who was filming the police**,** was struck with a baton with sufficient force that it left bruises on her body. As the officers advanced, she was forced back and knocked into a structure on the sidewalk that caused her to fall backwards.

67.    **Rachel Griego**

Ms. Griego participated in protests in the Beverly/Fairfax area during the afternoon. She had been roughed up by an LAPD officer during the protests and was walking home going east along Beverly Boulevard. At about 7:30PM, she saw an LAPD officer aiming at her with what appeared to be a gun. The officer was at least 100 feet away. Ms. Griego posed no threat to the officer or anyone else. She saw the officer shoot at her and as she turned her head she was hit by a

rubber bullet under her left eye. The blow knocked off her sunglasses and caused her sharp pain. Another protestor gave her some ice to reduce the swelling from



this injury but she still suffered significant swelling. She experienced at least two weeks of discomfort and bruising from this injury. Her left eyeball turned red during this time. She sought treatment at a nearby Emergency Room.

68.    **Thadd Hall**

Thadd Hall was with a large protest group on Beverly Boulevard in the Fairfax district. After 6 pm, Hall was with that crowd when LAPD officers shot Hall several times with less lethal projectiles in the right thigh, left shoulder, left elbow and left shoulder, causing swelling and bruising which lasted several weeks.

69.    **Folasade Harris**

Folasade Harris was standing on the sidewalk at the corner of N. Fairfax and Oakwood when officers opened fire with rubber bullets without warning.  She was struck in her shin, immediately causing swelling, bruising and difficulty walking. She continued to experience these effects for several weeks.

70.    **Suzanne Jennett**

Ms. Jennett was attending a protest at the intersection of Fairfax and Third Street. At approximately 6:00PM she was struck by an LAPD officer in her left thigh with a baton. She had done nothing to justify the use of force against her and she posed no threat to any officer or anyone else. She suffered a large bruise on her left thigh. She was in pain for three weeks and the bruise remained for two months. She suffered anxiety attacks and other emotional distress from this experience for more than a year.

71. **Nadia Khan**

Ms. Khan participated in the rally organized by Black Lives Matter Los Angeles at Pan Pacific Park on May 30, 2020, in the Fairfax area. She arrived there at approximately 11 a.m.  At around noon, the rally concluded and the protesters left the park and began a march.  When the march neared the intersection of 3rd and Fairfax, Khan observed lines of police in riot gear.  She observed the officers shoot projectiles at the group, although she was not hit at this time. As the march continued north on Fairfax to Beverly Boulevard, it met up with a large group of young people. Khan marched with them to the Beverly Center and back on Beverly Boulevard toward Fairfax. As they neared Beverly and Fairfax, the police deployed a chemical irritant that made Khan's eyes burn and tear up.  In addition, the gas got into her lungs, making her cough.  At or about the same time, the police were also shooting small pellet-like impact projectiles at the group, believed to be 37mm KIPS.  She was hit in the legs but, because she was not close to the police and was wearing jeans, she did not suffer serious injury.

72. **Haley Kinas**

28
FOURTH AMENDED COMPLAINT

Ms. Kinas was attending a protest at the intersection of Beverly Blvd. and Fairfax Avenue and continued marching through Beverly with the crowd. She noticed 40 to 50 police cars behind CBS Studio. She was shot with a KIP, striking her in the top right side of her forehead, causing a tear in her skin and swelling. She suffered a 2cm laceration, requiring stitches to close the wound. She also suffered an injury to her right foot.



73.    **Adrian Kudler**

Adriana Kudler attended the Fairfax protest and sought respite at the northwest corner of a 76 gas station at Beverly and Genessee. At approximately 4:45 pm, she was in this location as LAPD officers blocked off the northern end of Genessee. Without warning, less lethal munitions were filed in her direction. Several rounds hit near her area. Around her, protesters were fleeing or taking cover behind any structure or object. When Kudler stepped out slightly from behind the object in front of her, an LAPD officer and hit her in the stomach. She sustained two large cuts and bruises on her stomach where the projectile hit her, causing her pain and discomfort for several weeks, as well as scarring from the injury.

FOURTH AMENDED COMPLAINT

74. **Aine Lynn-McEvoy**

Lynn-McEvoy was attending a protest at the intersection of Fairfax and Third Street on May 30, 2020, around 3:00 PM. At approximately 3:30, LAPD officers began to blockade the street and herded Ms. Lynn-McEvoy and other nearby protestors into the Trader Joe's parking lot. Once there, they were kettled and prevented from leaving. Ms. Lynn-McEvoy did not hear a dispersal order. When she tried to leave the area, she was struck twice on her forearm by an LAPD officer using a baton. She was also jabbed in the rib cage by a baton when she tried to protect her friend. At approximately the same time she was hit on her right shin with a rubber bullet. She suffered bruising on her forearm, rib cage and shin from these injuries, lasting about four weeks.

75. **Nery Marroquin**

Mr. Marroquin participated in the protest at Pan Pacific Park. After the rally was dispersed by the LAPD, he was in the area near the Sheriff's substation and the CBS Building with a small number of protestors. He was shot in the head with a KIP, causing him to lose consciousness and suffer significant head trauma. He fell



17/130

30
FOURTH AMENDED COMPLAINT

to the ground, injuring his shoulder. As he lay on the ground, barely conscious and bleeding, LAPD officers refused to provide medical assistance despite the obvious need for immediate care and LAPD policy requiring that they do so. One officer was recorded on BWV saying, "We need to dispo this man." Others responded that Marroquin needed to get up and leave the area, pointing to a nearby bicycle. Ultimately, a fireman arrived and was able to quickly wrap a bandage around his head to stop the bleeding from a two-inch gash on his forehead. As Marroquin then attempted to leave the area, he was repeatedly struck in the back with a baton by an LAPD officer. Ultimately, two people brought him to their nearby apartment and then transported him to a hospital emergency room. He suffered a severe concussion and continues to suffer head trauma.

76. **Evelyn Masso**

Ms. Masso was part of the main protest group facing the police line near Third and Edinburgh. The group was tightly packed, and she was pressed against other protestors as LAPD officers advanced upon the crowd. Protestors in the front line could not back up because of the rows of protestors behind them. The LAPD began shooting the group and using baton strikes to try to force them to move back, Ms. Masso was in the very front and was struck with batons multiple times. She struggled to maintain balance as the crowd moved in response to the force. She saw an officer aim at her from a short distance with a 40mm less lethal launcher and put both hands up. The officer still fired at her. She sustained a contusion and broken skin near her right rib cage, the effect of which lasted about four to six weeks.

77. **Katie Melara**

Ms. Melara was on Third Street and Fairfax Avenue, near Trader Joe's, attending a protest. In the late afternoon. An LAPD officer struck her on the right side of her back with a baton. Another LAPD officer shot her with a rubber bullet from close range that hit her right knee. People in the crowd assisted Ms. Melara with first aid. Ms. Melara only heard a dispersal order after the officers had begun

shooting. Ms. Melara suffered bruising on the right side of her back and on her right knee. The bruising on Ms. Melara's back and right knee lasted over a week.

78.  **Colleen Newton**

Ms. Newton participated in the protest at Beverly and Hayworth just before 6:00 PM on May 30, 2020. Officers from Foothill Division joined a skirmish line across from the group. The protestors were yelling at the officers but there was no violence or threat to the officers. For about 18 minutes, the officers and protestors were across from each other without much movement. Then officers on the skirmish line yelled at the protestors to leave the area and a portion of the group moved north of Haywood. As they left, without warning, officers began shooting indiscriminately into the group with beanbag shotguns and 40mm projectiles. Newton was hit twice by less lethal projectiles, breaking her skin and causing bruising from her knee to her pelvis. She had limited mobility in her leg for at least a week. Her wounds became infected and took three weeks to heal.



FOURTH AMENDED COMPLAINT

79.     **David Oei**

At around 7 pm, David Oei was marching with other protestors moving East on Beverly. The protestors were unable to progress farther on Beverly when they encountered a police line at the East side of the Beverly and Edinburgh intersection. The police also prevented movement South on Edinburgh. Protestors were chanting with their hands raised as they slowly tried to move forward. When they were within 15 feet of the police line, officers aimed their weapons at the protestors. Eventually, the officers began firing their Less-Lethal weapons at protestors, still with no warnings or directions to move. Oei was shot in the face, causing a laceration on his left chin that needed six stitches.



80.     **Frankie Orr**

Kathleen Frances "Frankie" Orr was protesting near CBS Studios. They moved in front of a person who was standing in front of the police with his hands up. Seeing that force was imminent, Orr turned around and was struck multiple

times in the spine with a baton, including at the base of the neck. The baton strikes caused bruising and lasted approximately six months. Orr was unable to stand or walk for more than 20 minutes at a time without experiencing pain in the spine.

81. **Catherine Paris**

On May 30th at around 4:30 Catherine Paris was at the intersection of Beverly and Genesee. An LAPD skirmish line at that intersection began to open fire on the crowd. Ms. Paris was at the front of the protest and because of the blanket firing chaos ensued. Ms. Paris sought cover from the volleys behind a plank of wood, but she was not completely covered, and she was struck with a less lethal on the left side of her rib. The point of impact immediately began swelling and bleeding. She experienced intense pain in the area for three weeks and could not move that area without great pain.

82. **Adrelina Perazzo**

Around 7pm Ms. Perazzo was peacefully protesting near Third and Gardner when nearby officers told protestors to "scoot back" or leave the protest. She was about 20 feet away from the officers when she heard this. She immediately turned



to leave the scene. As soon as she turned, she was hit in the back of her head with a less lethal projectile. She was standing a little behind the front line of protestors when she was hit. She was not engaged in any action that threatened the officers

nor was she standing near any other protestor engaged in such threatening activity. She did not receive medical attention at the scene even though police officers were well aware of her injuries and the need for such attention. She received six staples for a gash in the back of her head and suffered a concussion. She suffered headaches from the injury.

83. **Shaheed Qur'an**

Ms. Shaheed was near the intersection of Third Street and Fairfax Avenue attending a protest. She was running backwards away from LAPD officers with her hands up when the officers shot her with "rubber bullets" in her left hip and her upper right arm. Ms. Shaheed experienced bruising, swelling and pain in both areas of her body where she was shot. Her injuries lasted approximately three weeks.

84. **Nathan Ramos**

On May 30, 2020, at approximately 4:00 p.m., near the intersection of Third Street and Fairfax Avenue, LAPD officers were pushing the protestors down the street. Mr. Ramos' hands were up, and he was slowly walking backwards to comply with police commands. Officers shoved a woman in front of Mr. Ramos into him. She fell and he helped her up. He then put his hands back up. An LAPD officer looked him in the eye and shot him in the right arm at very close range. The impact of the KIP made him fall to the ground. For six days following the incident, he could not move his arm. The bruising on Mr. Ramos' arm lasted for two weeks. Mr. Ramos experienced decreased strength and decreased range of movement on his arm as a result of the injury.

85. **Abigail Rodas**

Abigail Rodas was walking on Beverly Boulevard near La Cienega after leaving the peaceful BLM LA rally at Pan Pacific Park. As she neared La Cienega, the group was met a line of LAPD officers who began to push them back. Although there was no dispersal order, Rodas and a friend decided to leave and began walking to her car when an officer began shooting projectiles at them. At the time, Rodas

35
FOURTH AMENDED COMPLAINT

was in the intersection across from the Naurelle store.  There were skirmish lines of officers armed with less lethal weapons throughout the intersection, shooting indiscriminately at protestors, including at their backs.  Rodas was one of several individuals shot by KIPs at the intersection. She was struck in the face by a projectile and momentarily lost consciousness.  She fell to the ground, bleeding. She suffered a severe fracture to her right mandible and underwent surgery. Stitches were required on both the inside and outside of her mouth to close the lacerations and a steel plate was used to repair the fractured jawbone. Rodas was unable to talk for about 10 days. For one week, she could only drink liquids. She was on a soft food diet. She had screws in her gums and rubber bands to immobilize her jaw while the bones rejoin.



86.    **Alexis Saenz**

Ms. Saenz participated in the protest at Beverly and Hayworth on May 30, 2020, at approximately 6:00 PM. At this time, the protestors were yelling but otherwise peaceful and posed no threat to officers or others. For about 18 minutes the officers and protestors were across from each other without much movement. At 6:15 PM officers on the skirmish line yelled for the protestors to leave the area

and soon a portion of the crowd began to move north of Haywood. At 6:18 PM, as the protestors were leaving and without issuing a warning, officers began shooting indiscriminately into the crowd with beanbags and 40mm projectiles.  Ms. Saenz was shot in the spine as she fled this scene. She suffered bruising and pain, with substantial pain for about four days and moderate pain for an additional week.

87. **Henry Hank Scott**

Shortly after 3 pm in the Trader Joes parking lot on Third and Fairfax, Mr. Scott was filming the police as a reporter. He asked an officer why the group was being ordered to leave. In response, the officer pushed him to the ground and kicked him in the chest. Mr. Scott had significant bruising and intense pain in the area where the officer kicked him. It was difficult for him to get out of bed because of the pain any movement of his torso caused him. It took six weeks for the pain to become manageable.

88. **Chelsea Stone**

Ms. Stone participated in the protest at Third and Fairfax. At approximately 2:30 PM in an alleyway near Third and Fairfax, she was hit repeatedly by LAPD Lieutenant Jolin Jenal with a baton.  She was struck in her back and shoulder areas, forcing her to the ground. He also kicked her repeatedly in her arms and side and stepped on her hand while she was on the ground. She heard no dispersal order prior to being assaulted and she had done nothing to pose a threat to Lieutenant Jenal or any other officer before this assault. She suffered bruising, soreness and swelling to her arms, back, side, shoulder, elbow and knee as a result of this beating. These injuries continued for approximately three weeks.

89. **Andrew Tahan**

Andrew Tahan was with a group of protestors at Fairfax and Rosewood at around 8 pm. LAPD had a skirmish line across Rosewood. The officers began to shoot less lethal rounds into the crowd. Mr. Tahan was standing next to his motorcycle. As he got on his motorcycle to leave the area, an LAPD officer shot

him in the stomach with a less lethal round. An officer then shot him in his leg. The impact of the less lethal rounds broke the skin on his leg and on his stomach. His injuries lasted for several months.

90. **Lydia Lopez Wolfe**

Ms. Wolfe was protesting at Third and Fairfax on the afternoon of May 30, 2020. At approximately 4:30PM, she was hit by an LAPD officer striking her right thigh with a baton. Shortly thereafter a different LAPD officer fired a less lethal weapon at her from a distance of about ten feet, hitting her in the shin. She experienced extensive bruising and soreness on her right thigh, left calf, right forearm and right upper arm. In particular, she experienced weakness, pain and sensitivity in her right thigh which made it difficult for her to conduct her normal affairs. She suffered from the injuries to her thigh for more than a year. She was not fully recovered until late 2022. Her other injuries took a few weeks to resolve.

### 5.30 Downtown Los Angeles

91. **Jake Jeffers**

On May 30, 2020, Jake Jeffers attended a protest near 8th St. and Flower. LAPD officers began pushing protestors, firing less lethal rounds and striking the group with batons. Mr. Jeffers had his hands up as he walked backwards. He was struck multiple times with different weapons. The impact bruised and cut his arm, causing it to bleed. His injury lasted several weeks, leaving a permanent scar in the area of impact.

### 5.31 Downtown Los Angeles

92. **Jacob Neuman**

On May 31, 2020, Jacob Neuman and his wife were at the Los Angeles City Hall attending a protest with the understanding that the curfew started at 8PM. However, when they arrived, the LAPD officers issued a dispersal order stating the curfew was moved up to 6 PM. Neuman heard this from helicopter audio. The police stood in a line about 85 feet from Neuman and started shooting towards the

FOURTH AMENDED COMPLAINT

protesters. Neuman had both of his hands on his phone and was filming. Neuman started to run away and was hit in the left buttock by a rubber bullet. The bullet broke skin and Neuman bled through his underwear.

93.    **Jeffrey Trotter**

Jeffrey trotter is a 51-year-old African American man and a resident of the Rosslyn Hotel on Skid Row. On Sunday, May 31, at about 5 p.m., he walked two blocks from the Rosslyn at 5th and Main Streets to the Rite-Aid drug store at 5th and Broadway. The store was closed so he started to walk back to the hotel. When he neared 5th and Spring Streets, he saw a line of LAPD officers in riot gear. One officer stepped toward him and asked where he was going. Mr. TROTTER said he was walking home from the Rite Aid. Without further discussion, the officer took a few steps back and shot Plaintiff with KIPs at close range striking him once in the chest, twice in the stomach, and once on the left hand. Based on the nature of the injuries and the fact that he was struck with multiple projectiles all at about the same time, Plaintiffs allege that he was struck with a 37mm munition as a direct impact weapon. The projectile hit his chest with such force that it tore off skin in the shape of the projectile. A chunk of skin about an inch long and half and an inch across was also torn off his hand.  Mr. Trotter collapsed from the impact. As he lay on the ground, the officers stepped over him and walked away. After a period of time, he was able to walk the block back to the Rosslyn. When he arrived, a friend called the paramedics, who treated him there. He was in intense pain for weeks.

### 6.1 Downtown Los Angeles

94.    **Jermain Welch**

On June 1, 2020, at approximately 10:00 p.m., Mr. Jermaine Welch was at the 5th St. and Hill St. intersection attending a protest. He was standing with a crowd of other protesters when police officers hanging off on the sides of a "paddy wagon" drove by and shot him several times on his left elbow with KIPs. There was no dispersal order issued before the officers began shooting. Mr. Welch suffered

broken skin, bleeding, and bruising on his left arm. He experienced pain in his left arm for about two months.

### 6.2 Hollywood

95.    **Shannon Moore**

Protests took place in several areas of the City throughout the day on June 2, 2020. At Hollywood and Vine, there was a peaceful protest at midday with approximately 30 people, most standing on Hollywood Boulevard and a smaller group of about 10 people on Vine Street.  Plaintiff **SHANNON MOORE** arrived with a friend shortly before 3 p.m.  Within about five minutes, she was shot in the back of the head by a KIP.  A tall male in the group threw a water bottle at the police as she arrived.  Rather than isolate and arrest him, the police shot indiscriminately and hit her. Because she saw the officer take aim, she was able to turn away so that she was struck in the back of the head and prevented the projectile(s) from hitting



her directly in her face, causing a more serious injury. She sought medical treatment and suffered intense headaches for some time.

**C.    Arrest Class Plaintiffs**

**5.29 Class Rep Arrest Plaintiffs**

96.    **Christian Steven Roe** participated in a peaceful protest in downtown Los Angeles at or about the intersection of Temple and Spring Streets, near City Hall. Around 9:00 that night, he saw the police form a line and begin pushing the protestors toward City Hall. Roughly 100-200 people were assembled in this group. They followed police orders but were blocked by other lines of officers. They were herded by the police into a confined space and kettled. At approximately 9:45 p.m., the LAPD told the group to sit on the ground. Before this, **ROE** heard no announcement to disperse and all requests by him and others to leave were ignored or denied. **ROE** later learned that, at about 9:35 p.m., the LAPD "tweeted" a declaration of an unlawful assembly order. The group was already kettled when this occurred. Roe was handcuffed tightly behind his back with plastic zip ties, causing pain and discomfort. Eventually, the group was loaded onto buses in close contact with each other and driven to a jail location just a few blocks away. During the entire time they were in custody they were not provided water or bathroom access. Roe and others asked for the zip ties to be removed because of the pain but were ignored or refused with few exceptions. In all, he spent 2 hours and 15 minutes handcuffed. His fingers were numb, and he had visible injuries from the zip ties. He was previously shot with a KIP.

97.    **Nelson Lopez** participated in a peaceful protest in front of Los Angeles City Hall at First and Spring Street in downtown Los Angeles, arriving there at about 7:30 p.m. The crowd was peaceful, with some children holding signs. He soon saw a line of officers form around the group on all sides, blocking anyone from leaving. He never heard a dispersal order before the group was kettled. At some point, the group was told to sit on the ground because they were being arrested. After about 40 minutes, LAPD officers informed them that they would be issued a citation and released on site. Lopez then called his mother, a nurse who worked

nearby, to meet him on the expectation that he would be cited and released.  Instead, she was trapped by the LAPD and arrested. It took about two to three hours for everyone in the group trapped to be handcuffed. Some detainees were screaming because of the tight handcuffs. Others were upset because, after being told they would be cited and released, they were now tightly handcuffed and arrested.

98.    Several hundred people were in the group arrested with **Lopez**.  Once handcuffed, they sat on the ground and waited for buses to arrive. He was taken to a police garage just a few blocks from City Hall where they sat on the bus for another 45 minutes, waiting to enter the garage.  Lopez observed hundreds of people inside being processed.  He also saw more buses arriving. His handcuffs were very tight, bruising his wrists and injuring his shoulder (rotator cuff).  When he asked an officer to loosen the handcuffs he was told they could not do so because they did not have enough replacement zip ties.  **Lopez** heard most of the arrestees in his vicinity complain about tight handcuffs.  He did not see anyone's handcuffs loosened in response to these complaints.  He was released at approximately 3:30 a.m. after being issued a citation for a violation of LAMC 80.02 ("obedience to an officer"), which is only punishable as an infraction.



99.    Lopez was arrested again on May 30, 2020, when he was in his car. He thought he would be safe from arrest if he was not in the midst of protestors. He was again handcuffed and taken by bus to a distant police station.  The tight handcuffs exacerbated his bruises from the handcuffing the prior day.

**5.30 Class Rep Arrest Plaintiffs**

100.    **JONATHAN MAYORCA** is a journalist for an independent media. On May 30, 2020, along with two crew members, he was filming a peaceful demonstration on Beverly Boulevard in the Fairfax area. He observed LAPD officers forming a line and pushing back everyone in the area of the protest. He soon realized he was trapped, and the officers were kettling the group of protestors he was with toward an alley. His press badge was clearly visible, but the LAPD officers ignored his attempts to show his press credentials and continued pushing the entire group toward the alley surrounding them and refusing all requests to leave. **Mayorca** did not hear a dispersal order. Once in the alley, the group faced a line of officers pointing weapons at them and blocking their exit. **Mayorca** was ordered to stop filming and to sit on the ground. The LAPD forced him to the ground, breaking his camera. He was handcuffed tightly with zip ties, causing pain and discomfort. He was then stood up against a wall. After the entire group was handcuffed, they were moved into a van, sitting close together.  They sat in the van for about thirty minutes before being driven to Van Nuys station, a considerable distance away. At the station, he was issued a citation for failing to obey lawful orders, LAMC 80.02, which is expressly and only an infraction pursuant to the Los Angeles Municipal Code. He was handcuffed tightly for about two hours and 15 minutes. His repeated requests to remove or loosen the handcuffs because of the pain were ignored. During the entire time he was detained, they were denied access to a bathroom or water.

101.    **KRYSTLE HARTSFIELD** participated in a peaceful protest in the Fairfax area of Los Angeles on May 30, 2020. When the protestors were near Trader Joe's on Third Street and Fairfax Avenue, she observed officers begin to physically direct the movement of the group. A short time later, at around 3:30 p.m., she heard a dispersal order by the LAPD. When the order was given, the group was directed to leave through the alleyway next to Trader Joe's.  She complied and began to

43
FOURTH AMENDED COMPLAINT

leave the area when she heard an officer say, "don't let them leave." **Hartsfield** and the others in the alley were handcuffed and lined up on Third Street where they remained tightly handcuffed for two hours while they waited to be transported. The group was then put in a van, seated closely together, and taken to Van Nuys. Despite repeated requests to loosen their handcuffs, they remained very tightly handcuffed throughout, causing considerable pain. In all, she was handcuffed for more than six hours before her release at approximately 10:30 p.m. She heard LAPD officers warn those released that if they remained in front of the station, they would be rearrested for violating the curfew, which went into effect at 8:30 that night. Fortunately, family members arrived at the station to take her home.

102. **NADIA KHAN** participated in the rally organized by Black Lives Matter Los Angeles at Pan Pacific Park on May 30, 2020, in the Fairfax area. She arrived at approximately 11 a.m. At around noon, the rally ended, and the protesters left the park and began a march. When the march neared the intersection of 3rd and Fairfax, Khan saw lines of police in riot gear shooting KIPs at the group. The march continued north on Fairfax to Beverly Boulevard where it met up with a large group of young people. Khan marched with them to the Beverly Center and back on Beverly Boulevard toward Fairfax. She continued with the peaceful protestors north on Fairfax towards Melrose. The police kettled the group there at about 7:45 p.m. There were approximately 100 people detained at this location. All of the demonstrators were handcuffed behind their backs with zip ties. KHAN's zip ties were very tight and caused pain. Her requests to loosen the zip ties was ignored. The arrestees were loaded on to two crowded buses. Khan was wearing a mask and goggles to protect against exposure to COVID-19 contagions but most of the officers and detainees did not have masks. The group was taken to Wilshire Division on Venice Boulevard and cited for a violation of LAMC 80.02, an infraction. Khan was released about midnight. She was handcuffed for approximately four hours, leaving her wrists sore and painful for several days.

**6.1 Class Rep Arrest Plaintiffs**

103.    **ALEXANDER STAMM** participated in a peaceful demonstration in Hollywood on the afternoon of June 1, 2020.  He arrived around 4 p.m. and was joined by his husband at around 5:30 p.m. While marching, he saw the police block off streets, forcing protestors down side streets. As the protestors followed the police officers, they were kettled in these side streets. **STAMM** and his husband decided to leave and go home to their nearby apartment. At around 8 p.m., they started down Schrader Boulevard because Wilcox was blocked by a police line. On Schrader, between Selma Avenue and Sunset Boulevard, the group he was walking with was surrounded by the police. Although close to his home, he could not leave.

104.    There were approximately 200 to 300 people in the group.  All were ordered by the police to get on their knees and put their hands behind their backs. They were all handcuffed then.  **STAMM** did not hear a dispersal order before being ordered to get down on his knees.

105.    The arrestees were loaded on buses and taken crosstown to Jackie Robinson Stadium in West Los Angeles. The drive took approximately 45 minutes. Once they arrived at the VA, they were held on buses for two hours before being processed and released. During all this time, he was tightly handcuffed, causing bruising on his wrists, and in an unventilated bus without social distancing or masks. His handcuffs were finally removed at about 1:00 a.m. and he was released.

106.    On June 1, 2020, Plaintiff **MAIA KAZIN** participated in a peaceful demonstration on Spring St. near 5th Street in downtown Los Angeles.  At about 6:30 p.m., LAPD officers blocked about 300 people from moving north or south on Spring Street, forming a blockade at both ends of Spring Street.   Some people tried to leave through a parking lot on Spring, but police blocked them. She was at the front of the protestor group. Prior to the blockade by the LAPD, she heard no dispersal order, or warning that the group was in violation of a curfew order, or that they would be arrested if they did not leave the area. In fact, the Incident

Commander ("IC") made the deliberate decision to arrest Kazin and the other estimated 700 people without first issuing a dispersal order.  Although the same Incident Commander had noted that the group had been peaceful as they marched throughout the City, the IC decided to arrest the entire group immediately when the curfew took effect without notice and an opportunity to disperse because, in the IC's view, "they would just be a problem later."

107.  **KAZIN** was handcuffed with zip ties. The group was held in handcuffs while they waited for transport buses to arrive.   Eventually, they were taken from downtown Los Angeles to a UCLA parking lot.  Once there, they were kept on the buses for several hours, handcuffed behind their backs, with no access to food, water or bathrooms.  While held on the bus, she saw a woman on the bus in physical distress from a dislocated shoulder. Someone on the bus was able to access their cell phone and called 911.  Another woman was panicking because she needed to take medication.  Someone on the bus was able to use their cell phone to call 911 for this woman, as well.  Requests to officers to respond were ignored.

108.  When she was finally released, Kazin asked an officer whether her boyfriend would be violating the curfew if he picked her up.  The officer responded that it would be a violation of the law, but he should be fine.  Uneasy with this response, Kazin did not want to risk the arrest of her boyfriend, so she got a ride from the friend of someone on the bus.  She was handcuffed behind her back with plastic zip-ties for approximately seven hours. The handcuffs were painful and caused minor tenderness on both wrists for 2-3 days.

109.  Plaintiff **ALICIA BARRERA-TRUJILLO** also participated in a peaceful protest in downtown Los Angeles on June 1, 2020.  She arrived with her younger sister and a friend at 5th and Grand, near the main public library, at approximately 2:00 p.m.  The crowd was very peaceful and diverse, including families with children holding signs.

46
FOURTH AMENDED COMPLAINT

110.    At around 4:00 p.m., she started making plans to leave the area.  Soon thereafter, we received a text that the curfew for Los Angeles that night was 5:00 p.m.  **BARRERA-TRUJILLO** was confused because she also received a text informing her that the curfew was at 6:00 p.m.  She attempted to leave the area shortly before 5:00 p.m. and observed that the police had blocked off all exit streets.  Police surrounded them on all sides, making it impossible for anyone to exit the area. She began to panic and observed that everyone around her also appeared to panic as officers surrounded them. She never heard a dispersal order, providing notice and an opportunity to leave before the group was kettled.  A helicopter flew over the crowd, making it very hard to hear.

111.    Once kettled, **BARRERA-TRUJILLO** saw some type of rubber bullets being fired into the protest group.  She also saw a police officer direct an aerosol spray at a woman with a young child.  The child was crying, and both the woman and the child appeared to be in pain from the effects of the spray.

112.    Between 500 and 750 people were in the group before it was split in half to handcuff and process them. **Barrera-Trujillo** was searched, handcuffed and placed on a bus and then waited an hour for the bus to leave downtown.  Ultimately, they were driven to a makeshift booking area at Jackie Robinson Stadium. The arrestees were held on the buses while each person was booked and then issued a citation. Barrera-Trujillo remained in tight handcuffs for about 6 hours. The tight handcuffs cut into her wrists, stripping skin off and causing bleeding.

113.    While on the bus, she saw several people who seemed to need medical aid.  There were no officers on the bus and no way to get their attention.  One arrestee got out of her handcuffs and called for emergency assistance.  Only when the ambulances arrived did the police check on the arrestees on the bus. Near plaintiff, one woman asked to use the bathroom but was denied by the officers.  When the woman was later taken off the bus, she urinated on herself.

114.    Once released, plaintiff and her sister had no way to get home.  Her cell phone was not charged.  Several volunteers with the National Lawyers Guild waited with them until they could arrange a ride home.  The tight handcuffs cut into her wrists, stripping skin off and causing bleeding.

### 6.2 Class Rep Arrest Plaintiffs

115.    Plaintiff **DEVON YOUNG** is a mental health therapist in Los Angeles. On June 2, 2020, she participated in a large, peaceful demonstration outside Mayor Eric Garcetti's house on the corner of South Irving Blvd. and 6th Street in Windsor Square. The protest was organized by BLM-LA to protest the killings of George Floyd, Breonna Taylor, Ahmaud Arbery, and other victims of police brutality. She arrived at the protest at approximately 5:00 p.m. and remained in the area until about 8:00 p.m. The group of about 100 people she was with then began marching away from the Mayor's home when they were surrounded and kettled by LAPD officers. No one was allowed to leave. The officers pushed the group aggressively toward Crenshaw and 8th Street. Officers ignored the protestors' pleas to leave.

116.    Finally, at around 8:45 p.m., near the intersection of Crenshaw and 8th Street, the officers announced everyone was under arrest. There was no dispersal order. They were handcuffed behind their backs using zip-ties. YOUNG was handcuffed at about 9:45 p.m. The officers separated the group into two lines – one for men and one for women.  The officers performed intrusive and uncomfortable pat down searched for many of the women.  In addition, most officers were not wearing masks and came in close proximity to the women during the pat down.

117.    During the searches, a transgender woman in the group was separated from her female partner because she did not have female sex organs. Young asked an officer what was happening to her, and he replied that she was being placed in a holding area labeled "other" so she could be searched separately for her own safety. She and her partner were frightened and upset by the separation.

118.   While handcuffed, **Young's** skirt was raised up, exposing her underwear to the group, and the handcuffs prevented her from pulling her skirt. She asked officers if she could pull her skirt down and they refused to let her do so. Only after she walked through the group with her underwear completely exposed was she allowed to adjust her skirt. She felt humiliated.

119.   Approximately two hours after they were first detained and handcuffed, the group was loaded onto a bus, forced to be close together, many without masks. When finally uncuffed, **Young** had bruises and marks on her wrists.

120.   The group was taken to a parking lot at a church in Van Nuys where they were processed and released with a citation for a violation of LAMC 80.02, a curfew violation.   Throughout the time they were detained, the arrestees were denied access to bathrooms, water and food. For some of the women, this situation was compounded by the inability to change their tampon.

121.   **Young** was released at 1:30 a.m. with no ability to call for a ride or instruction on how to get home safely. A police officer told them they would be rearrested if they did not go home immediately.   Fortunately, some volunteers arrived to give people a ride home.

122.   Plaintiff **LINUS SHENTU** is a long-time member of CANGRESS. On the evening of June 2, 2020, he was in a peaceful protest in Hollywood, near Sunset and Vine. When the protestors reached Van Ness between Melrose and Santa Monica Boulevards, SHENTU observed police starting to block streets and kettle the protestors. The march was accompanied by a car caravan. From a half a block away, SHENTU observed the police dragging people out of cars. All around him, the marchers started running. SHENTU and his partner were able to locate his partner's sister, who had been in the car caravan, and jumped in her car. Because the police had blocked off all of the streets, they could not leave the area. To avoid arrest and be safe until they could safely drive home, they followed other cars to the parking lot of a nearby apartment building.

FOURTH AMENDED COMPLAINT

123.   As they remained in their car, they observed a few officers enter the parking lot and pull people out of their vehicles. The officers ordered **SHENTU**, his partner and her sister out of their car, opened the rear passenger door where his partner was seated and yanked her harshly by her arm. SHENTU voluntarily exited the rear passenger seat. They were lined up on the side of the building with their hands zip-tied behind their backs. In all, about 30 individuals were arrested at this one location and held at Elmwood and Van Ness for approximately one hour while officers filled out Field Interview cards with their personal identifiers.

124.   After this time, Sheriff's buses arrived to transport the arrestees. They were driven to a makeshift processing center in Van Nuys at Roscoe and Woodman. There were multiple buses at the location with arrestees who appeared to SHENTU to be protestors. In all, he estimates that he was detained, handcuffed tightly behind his back for about four hours. SHENTU, his partner and his partner's sister experienced numbness, bruising and soreness from the handcuffing and the force used to remove them from their vehicle. His partner was pulled from the vehicle with such force that it caused bruises on her forearm.

125.   Defendants' actions interfered with BLMLA's right to assembly and speech. BLMLA plans to assist, plan, participate in, and hold similar events in the future, on its own or in conjunction with others, and is fearful that police actions in response to these and similar protests of sanctioned executions will be repeated absent injunctive relief to prohibit the practices, policies, and customs of the LAPD that resulted in the unlawful action in response to recent protests in the City.

126.   Defendants' actions also interfered with the work of Plaintiff CANGRESS to advocate for racial and economic justice for the residents of Skid Row, both housed and unhoused. Because Defendants indiscriminately arrested individuals on Skid Row for violations of the curfew and assaulted them with less lethal weapons, Plaintiff CANGRESS has had to shift its resources to protecting its members and other residents of Skid Row from the unlawful conduct of the LAPD.

Plaintiff CANGRESS' time in recent months was heavily focused on advocating for and protecting a highly vulnerable population for COVID-19 from the greater likelihood of contracting and dying from the virus based on their poverty, underlying medical conditions and race.

## V. PARTIES-DEFENDANTS

127.    Defendant **CITY OF LOS ANGELES** is a municipal corporation duly organized and existing under the Constitution and laws of the State of California. The Los Angeles Police Department ("LAPD") is a local government entity and an agency of Defendant City of Los Angeles, and all actions of the LAPD are the legal responsibility of the City of Los Angeles. The City of Los Angeles is sued in its own right on the basis of its policies, customs, and practices which gave rise to Plaintiffs' federal rights claims.

128.    Defendant **CHIEF JIM McDONNELL** is the LAPD police chief and a policymaker for his department. He is substituted for retired **CHIEF MOORE** sued in his official capacity.

129.    Plaintiffs are informed, believe, and thereupon allege that Does 1 through 10 were the agents, servants, and employees of Defendants City of Los Angeles and/or the LAPD. Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10, inclusive, and therefore sue these Defendant by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. The individual Doe Defendants are sued in both their individual and official capacities.

130.    Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto Does 1 through 10, in addition to the named Defendants, are responsible in some manner for the damages and injuries alleged herein.

131.    Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto Defendants, and each of them, were the agents, servants and employees of the other Defendants and were acting at all times within the scope of

their agency and employment and with the knowledge and consent of their principal and employer. At all times Defendants were acting under color of state law.

132.   Plaintiffs are informed, believe, and thereupon allege that the practices, policies, and customs of the City of Los Angeles and/or the LAPD caused the unlawful action taken against Plaintiffs.

## VI. FACTS

133.   On May 25, 2020, Minneapolis Police Officer Derek Chauvin murdered George Floyd, suspected of forgery for attempting to use a purported counterfeit $20 bill. Officer Chauvin, along with two other officers, held Mr. Floyd on the ground, handcuffed behind his back, and ignored pleas to get off his neck, back and legs and let him breathe. Mr. Floyd died on the street in Minneapolis.

134.   Because of extensive video by onlookers, security cameras and police body cameras, both the Minneapolis law enforcement and prosecutors, as well as the public, concluded that George Floyd was just the latest person to die at the hands of police because of deliberate and unlawful tactics.

135.   The death of George Floyd sparked an extraordinary wave of protests across the country and the world. In Los Angeles, tens of thousands of people participated in lawful and peaceful protests.  Based on the alleged unlawful conduct of a few, Defendants responded to these mass protests with expansive curfews and mass arrests for curfew violation, failure to disperse, unlawful assembly, failure to follow a "lawful" order of an officer,  similar misdemeanors and infractions, all designed to punish protestors. The routine and undifferentiated use of such widespread arrest and dispersal tactics impinged the protestors' right to engage in protected expressive activity in public spaces without preemption and curtailment based on group guilt.

136.   California Penal Code § 409, which defines an unlawful assembly, has repeatedly been construed to require a showing of imminent violence that so permeates a lawful expressive activity that law enforcement may curtail the rights

of all demonstrators. Facts justifying the declaration of an unlawful assembly order anywhere, let alone throughout the City, or even all of downtown Los Angeles in advance of any expressive activity, did not exist. Instead, Chief **MOORE** and Mayor Garcetti applied a ham-handed approach, announcing an unlawful assembly without adequate notice and unlawfully employing indiscriminate, untargeted use of force, silencing everyone.

137.    Thousands of peaceful protestors, the arrest class of Plaintiffs (defined further on), were transported to LAPD jails and make-shift detention sites around the City. All those arrested were held on buses for extended periods of time before being off-loaded into garages and parking lots to be cited and released. Because there was no plan for processing mass arrests and despite the fact that the City has repeatedly been sued for the same unlawful policy and practice, many arrestees were held on the buses and driven around the City for long periods of time in close contact in unventilated buses - handcuffed and without any bathroom access - in search of a location where they could be processed and released. As a result, arrestees for infractions and misdemeanors were driven to far distant locations in the City and, after processing, released in the middle of the night without their property and with no way to get home, all the while being out during a time of curfew and risking rearrest if detained again by the LAPD.

138.    Throughout the time they were arrested and held in LAPD custody, Plaintiffs were handcuffed tightly behind their backs and denied food, water and access to bathroom facilities, resulting in many arrestees urinating on themselves in the closed buses. All arrestees, regardless of the alleged crime, were unnecessarily and unreasonably confined in close, enclosed quarters without any ventilation, increasing the risk of COVID-19 exposure. It is well known and was, or should have been known to Defendants, that being in closed spaces without vigorous air movement significantly increases the risk of COVID-19 exposure. Moreover, both the City and Chief **MOORE** were well aware of the increased risk of COVID-19

exposure because 1) of the institution of $0 bail for low-level offenses and 2) the City and LAPD's involvement in mitigation efforts for COVID-19 for individuals in congregate spaces, including the temporary placement of unhoused individuals at the City's recreation centers. All members of the arrest class (defined in ¶ 123a) were held in restraint for a minimum of three hours, with some held more than 12 hours in these excruciatingly painful conditions from the time they were first handcuffed. The class members experienced numbness in their hands and requests to loosen the zip ties or remove them went unanswered. Without access to bathrooms, arrestees were forced to urinate on themselves.

139.    The harm caused by this practice is well-established.  The Ninth Circuit has long recognized that tight handcuffs for even relatively short period of time, less than an hour can cause significant pain and damage.  For more than a quarter of a century, law enforcement in California has "been on notice that abusive handcuffing can amount to excessive force and no officer could reasonably believe it is proper to fail to assist arrestees who complain that their handcuffs are too tight". *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1323 (9th Cir. 1995).[4]  *See also Taylor-Ewing v. City of Los Angeles*, No. CV075556GHKJWJX, 2009 WL 10681951, at *3 (C.D. Cal. July 31, 2009) (citing *Alexander*); *Meredith v. Erath*, 342 F.3d 1057, 1061, 1063–64 (9th Cir. 2003); *LaLonde v. County of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000); *Maley v. County of Orange*, 224 Fed. App'x 591, 593 (9th Cir. 2007)); see also *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993) ("Contrary to defendants' assertion, the use of excessive force by officers in effecting an arrest was clearly proscribed by the Fourth Amendment at least as early as 1985.").

--------

[4] JJ Payne-James, "Restraint Techniques, Injuries, and Death: Handcuffs" Encyclopedia of Forensic and Legal Medicine, Volume 4 (December 2016): available at https://www.researchgate.net/publication/301776305.

140.    Arrestees were uniformly held under these unlawful conditions of confinement despite the fact that, to address the COVID-19 pandemic, California currently has a $0 bail for any misdemeanor where the bail would be less than $50,000. The prolonged detention of the arrest class is even more unjustified in light of the California Penal Code § 853.6, which permits individuals suspected of a misdemeanor violation to be cited and released promptly, in the field or after booking, unless one of a limited number of restrictions apply.

141.    Applying § 853.6, in 2013 the Los Angeles Police Commission conducted a research project that demonstrated that it took an officer approximately 15 minutes to prepare a cite and release in the field with a Notice to Appear; 45 minutes to transport an individual to the station and prepare a "short-form" booking document, cite and release the individual with a Notice to Appear; and two and one-half hours to complete a "long-form" booking document. As a result of this review, a directive was issued to follow the cite-and-release option, while reserving individual discretion to book and release at the station. On information and belief, in this instance the LAPD elected to transport every arrestee, regardless of the offense, to a "station" for booking, even though many, if not nearly all, were processed outside of a building and simply cited and released at that location.  This was done to punish demonstrators for their protest activity.

142.    A large number of individuals in this instance, as many as 1,000 or more, were arrested on infractions.  They were handcuffed and many had their citations prepared on site and put in their pockets.  Instead of releasing them once the citation was completed, all were held on buses and booked, in violation of Cal. Penal Code § 853.5, which imposes a mandatory requirement to release infraction arrestees on their own recognizance in the field. (" In all cases, except as specified in Sections 40302, 40303, 40305, and 40305.5 of the Vehicle Code, in which a person is arrested for an infraction, a peace officer shall only require the arrestee to present his or her driver's license or other satisfactory evidence of his or her identity

for examination and to sign a written promise to appear contained in a notice to appear…. Only if the arrestee refuses to sign a written promise, has no satisfactory identification, or refuses to provide a thumbprint or fingerprint may the arrestee be taken into custody"). All those arrested and charged with infractions were denied the citation release process guaranteed by § 853.5, which creates a liberty interest for such arrestees to be released in the field so long as they provide sufficient identification and agree to sign a written notice to appear. The infraction arrestees were denied the opportunity for a field release without any individualized determination of whether they met one of the three narrow exceptions allowing a custodial arrest pursuant to § 835.5. Section 835.5 creates a liberty interest in a field arrest for those within the statute's ambit and adherence to it is a mandatory governmental duty within the meaning of Govt. Code § 815.6.

143.    The unlawful detention of thousands of arrestees pursuant to the City's unlawful policy beginning on or around November 17. 2011 of denying OR release to individuals arrested for engaging in civil disobedience is a policy applied to the Occupy LA protests. According to former LAPD Deputy Chief Perez, who first announced this policy during the 2011 Occupy protests, the decision was made to deny OR release to those engaged in First Amendment activity to "teach people a lesson." Subsequently, small groups of individuals involved in acts of civil disobedience at the Bank of America headquarters on November 17, 2011, were arrested on non-violent misdemeanor offenses arising from protest activity and denied OR release. Again, on November 30, 2011, the City denied OR release to the nearly 300 people arrested in connection with the mass arrests at City Hall made in connection with the Occupy L.A. demonstration.

144.    The same unlawful actions occurred in the November 2014 mass arrest of persons protesting the decision of the grand jury in Ferguson Missouri not to indict the police officer who shot and killed Michael Brown. In public statements, then-Chief Beck and other command staff in the LAPD stated that protestors would

be held and not granted OR, as required by law, for retaliatory reasons and without the requisite individualized suspicion.  In this instance, while the Defendants did not deny OR release for arrestees for minor misdemeanors, they nonetheless detained them for up to 14 hours in some instances rather than cite and release them in the field as mandated by California Penal Code § 853.6. On information and belief, Plaintiffs allege that, without any individual suspicion that the arrestees would violate the law if released, Defendants opted to arrest and detain all protestors to preempt even lawful expressive activity.

145.  Both the Occupy arrests in 2011 and the Ferguson arrests in 2014 demonstrate the crucial need for the Defendants to have a plan to respond to similar future protests employing the technology the LAPD regularly uses to run wants and warrants in the field, not seizing, handcuffing and detaining protestors for prolonged periods of time. The failure to implement such a plan indicates a deliberate decision to inflict punitive measures against protestors exercising their First Amendment rights to assemble and speak.

146.   In this instance, Defendants' failures were exacerbated because the obligation to release those arrested in the field and charged with infractions is mandatory under § 853.5. LAPD's past history shows Defendants' intent to deny Plaintiffs' basic rights without justification in retaliation for the exercise of their First Amendment rights violated the First, Fourth, and Fourteenth Amendment rights of Plaintiffs and the class members, and with the specific and deliberate intent to interfere with the exercise of Plaintiffs' rights to assembly and due process.

147.  Defendants had ready alternatives to the prolonged detention of the Arrest Class. The LAPD has the technological capability to cite and release in the field using modern technology.  In the Ferguson protests in 2014, the LAPD detained a group of approximately 40-50 protestors at Beverly and Alvarado, kettled them, handcuffed them with twist-ties, brought in computers and video recording equipment, collected the same information as would be done in a booking

at a station, then released them with orders to disperse and advised the detainees that they would be taken to jail and held if they were found again that night in violation of the dispersal order. In all, people were handcuffed in the Beverly and Alvarado detention no longer than approximately one hour. No one suffered injury as a result of the prolonged tight handcuffing, no one urinated on themselves in an enclosed bus after being denied bathroom access, and, significantly, no one was a repeat offender that night or any other night as the demonstrations protesting the death of Michael Brown continued. The officers patted down the demonstrators' clothing and searched their personal belongings, including backpacks, as they would do if they were taking them into custody for booking. LAPD officers ran wants and warrants on each detainee in the field, as they do for any traffic stop and as they do with unhoused individuals in the city routinely and released the detainees with a warning. There is no reason why the protestors in the Plaintiff Arrest Class could not have been processed, without injury or anguish, exactly the same way.

## THE REPORTS EVALUATING THE FLOYD PROTEST TACTICS

148.    In the wake of widespread arrests and use of force, several reports were ordered to review the LAPD's performance. The Los Angeles City Council passed a motion authorizing a report prepared by former Special Assistant for Constitutional Policing, Gerald Chaleff, and other high-ranking LAPD officials. The 101- page Report, titled "An Independent Investigation of the Los Angeles Police Department 2020 Protest Response," was submitted to the City Council on March 10, 2021, and is identified as Council File (C.F.) 20-0279.

149.    The Chaleff Report reached several key conclusions:

● many LAPD command officers lacked expertise in crowd control and had no "meaningful or relevant command-level training[;]"

●  the lack of training in crowd control tactics resulted in the inability to isolate and arrest individuals who were throwing objects at the police, or engaged in violence of looting;

- officers collectively employed more than 10,000 less-lethal instruments against the protestors, including batons, bean bag shotguns, stinger grenades and 37mm and 40mm launchers, and many officers did not have adequate training on the  use of these weapons, deploying them without adequate justification, at improper distances and regardless of the target,  causing serious injuries;

- 4,000 people were arrested between May 29 and June 2; there was no "clearly articulated plan" to transport and process the arrestees and, consequently, people were held for hours, handcuffed and without access to water or bathrooms;

- many charges were for infractions, which do not permit custodial arrests.

150.   On April 9, 2021, approximately one month after the Chaleff Report was issued, the report of the Police Foundation, requested by the Los Angeles Police Commission, and the LAPD's After-Action Report, "Safe LA 2020: Civil Unrest After Action Report".  The LAPD Report identified four types of less-lethal munitions used against the protestors: 37mm less-lethal foam rubber baton; the 40mm Less-Lethal Launcher; the Beanbag Shotgun; and the Stinger Grenade .60 caliber.  Safe LA 2020: p. 72.  According to a review conducted on June 18, 2020, by the LAPD's Personnel and Training Bureau, approximately 11,305 rounds of less-lethal munitions were used against the protestors, including 4,377 37mm rounds, 2,621 40mm rounds and 4,307 Beanbag Shotgun rounds. *Id.* at p. 74.

151.  The LAPD After Action Report acknowledged the training deficiencies in both crowd control and use of less lethal launchers, as well as the failure to have a coordinated command approach but then blamed the unlawful practices challenged herein on the protestors.  Nonetheless, the LAPD prepared a report at the request of the Police Commission, setting forth all of the recommendations in the Chaleff Report, the LAPD After Action Report and the Police Foundation Report

152.    The LAPD engaged in repeated, widespread violations of law, as outlined above, over the course of at least five days and nights, shutting down the exercise of First Amendment activities through the use of indiscriminate and unreasonable force against 37mms of protestors; imposing curfews without accommodating, or attempting to accommodate, the right to peaceable assembly and protest; at times declaring unlawful assemblies without adequate sound amplification and without providing both directions, means and opportunity to disperse before taking aggressive police action; hitting hundreds of protestors with batons and/or a variety of "rubber bullets" through the use of unreasonable and excessive force; arresting and not releasing in the field at least hundreds of persons charged solely with infractions in violation of California law that prohibits custodial arrests for low level offenses; and unlawfully imposing on arrestees unlawful conditions of confinement for many hours – including but not limited to tight handcuffing, no bathroom access, no access to food or water, and lack of ventilation in small congregate spaces  – while on buses with no air circulation in the midst of COVID-19 as previously outlined. In conjunction with Defendants' long history of protest-related constitutional violations (outlined below in sub-sections A and B), Defendants' repeated widespread and unlawful acts over several nights and involving many locations constitute an unlawful custom and policy of violating protest participants' constitutional rights.

153.    Most of the use of less-lethal munitions violated LAPD policy, deployed at distances that were too close, causing more serious injury; or from distances that were outside of the recommended range, resulting in less accuracy and striking individuals who were not the targets; or shot at moving targets creating a likelihood of striking an unintended target; or deployed without adequate warning. Most of the munitions were dispersed against individuals who posed no or insufficient threat to justify the use of less-lethal munitions, especially target-specific weapons.

154.   The bulk of the projectiles shot at the Plaintiff Class were 40 mm weapons, capable of more serious injuries and intended to incapacitate, not disperse, a subject.  The LAPD policy for the use of 40 mm launchers in effect at the time of the Floyd protests directed that "Less-Lethal force options shall not be used for a suspect or subject who is passively resisting or merely failing to comply with commands.  Verbal threats of violence or mere non-compliance do not alone justify the use of Less-Lethal force."  LAPD Directive 17 on use of 40mm Launcher (July 2018).  In addition, LAPD policy prohibits officers from targeting an individual's head, neck, spine, chest, groin or kidneys, nor can they shoot at people running away.  *Id.* Nonetheless, officers fired more than 13,000 projectiles at peaceful protestors, the overwhelming majority of which, when they hit someone, struck protestors who were not engaged in conduct that presented any, much less an immediate, threat of violence or physical harm and were not engaged in conduct that would justify striking them.  Many, such as Plaintiff ROE, could not disperse because they had been "kettled" and prevented from leaving by police officers.  Many were shot not for any unlawful conduct on their part, but because some other person in the assembly was believed to have engaged in unlawful conduct by throwing an object in the direction of the police.

155.   On June 7, 2020, the LAPD created the SAFE LA Task Force to respond to personnel complaints resulting from the LAPD's treatment of those involved in the George Floyd protests.   The Task Force was charged with determining which complaints might involve allegations of a Categorical Use of Force (CUOF).  For the purposes of the response to the George Floyd Protests, a Categorical Use of Force is defined by the LAPD as a "UOF incident resulting in an injury requiring hospitalization, commonly referred to as a Law Enforcement Related Injury or LERI."  *See LAPD 2020 Year End Review Use of Force,* p. 19 (available on lapdonline.org).

156.   The LAPD claimed it did not limit its investigation to personnel complaints but also searched social media and reviewed all government claims filed and arising from the Floyd protests.  To total, the LAPD only submitted four CUOF investigations to the Board of Police Commissioners, which found three of the injuries resulted from policy violations and one was within policy. After reviewing all of the complaints arising from the Floyd protests in late May and early June 2020, the LAPD concluded that only six claims involved a CUOF.  This information was provided to the Police Commission in a communication from former Chief Moore. *See* Safe LA Task Force Update Report, April 9, 2021, to Board of Police Commissioners.  On information and belief, in the ordinary course of the complaint investigation process in the LAPD, the Chief of Police reviews the recommendation regarding the resolution of most UOF complaints and specifically did so with regard to those generated from the Floyd protests. In 2020, Chief Moore reviewed the content of the document prior to transmitting it to the Police Commission, discussed it with members of the LAPD command staff responsible for preparing the report and, ultimately, ratified the findings in the Task Force Update Report, dismissing all but five UOF reports from the Floyd protests.

157.   Any injury not requiring hospitalization is analyzed as a noncategorical use of force (NCUOF), or a generic use of force (UOF).  The Task Force determined that there were 73 complaints alleging UOF.  Task Force Update p. 2.  To date, not a single one of these complaints has been adjudicated as sustained.

158.   This result is all the more remarkable because of the number of individuals who already filed lawsuits against the City raising allegations of unlawful force and serious injuries, as well as the number of incidents reported in the news and on social media.  In this action, five Plaintiffs allege that they were shot in the head with less-lethal munitions, including Abigail Rodas, who underwent surgery for her injuries.  In addition, at least three of the additional lawsuits filed from injuries incurred at the protests involved treatment at hospitals,

while still other news reports detailed injuries from projectile injuries and baton strikes that required emergency medical and dental treatment and sutures.  Yet, Chief Moore submitted a report to the Police Commission that found no sustained complaints other than the few CUOF complaints.  If a reason for the LAPD's findings in some instances involved the failure of officers to have their body cameras on, as referenced in the Task Force Update Report, that does not excuse Chief Moore's obligations.  On information and belief, under LAPD policy, the failure to turn on the camera is a potential disciplinary offense to be investigated.

159.  The LAPD has the ability to identify involved officers in these incidents by reviewing Body Warn Video (BWV) in the area where the UOF incidents were alleged to have occurred.  The Safe LA Task Force Update Report claims that the available BWV and social media allowed the LAPD to review the allegations of the claims and determine that they should not be sustained.  But if, as the Safe LA Task Force Update Report asserts, the LAPD scoured social media for evidence, they would have seen the videos posted by, among others, the Los Angeles Times, collecting UOF incidents that are indisputably out of policy.  For example, LAPD Directive 1.1., dated August 2017, is unequivocal that officers may not fire shots from a moving vehicle unless there are "exigent circumstances and in the immediate defense of life."   Despite this, a video posted on the Los Angeles Times website on June 11, 2020 captures an officer firing a 40mm projectile without warning into a non-threatening group of people on Fairfax Avenue, just south of Canter's Deli, then reloading and firing another shot into the same group as the vehicle continues south on Fairfax. *See* video by Andrew Matecki posted at: Was LAPD force appropriate in George Floyd protests? - Los Angeles Times (latimes.com).

160.   In the same Los Angeles Times article, other videos show officers firing 40mm projectiles into a crowd at Pan Pacific Park while still other officers are beating protestors with batons.  According to LAPD policy, all of these uses of

force are out of policy. LAPD Directive 8.2 applies the same limitations on the use of batons as apply to less-lethal munitions: there must be evidence of violently resisting arrest or some imminent threat of violence or harm. Absent this high threshold, batons may not be used as a force strike against those passively resisting orders. *Id.* Yet, while the LAPD announced the intention to "hold every officer accountable for their actions," a year later, the LAPD has failed completely. *See* https://www.lapdonline.org/**newsroom**/news_view.66668 (June 11, 2020, Response to Use of Force Investigations NR20128jr - Los Angeles Police Department).

### THE PASSAGE OF SENATE BILLS 48 AND 98

161. In the wake of the George Floyd protests, the California Legislature enacted two measures codifying First and Fourth Amendment protections for police engagement with protestors and press at public assemblies and other incidents to which police respond. The statutes amended the California Penal Code, adding Penal Code §407.9, making it a crime to preclude a broadly defined press access to police lines and to use any force to prevent press access.

162. The Legislature also enacted California Penal Code Section 13652, setting out strict restrictions on the use of kinetic impact projectiles, chemical irritants and other instruments of force to seize and disperse protestors.

**A.    California Penal Code Section 13652**

163. California Penal Code Section 13652 was enacted in 2021 and took effect January 1, 2022. Penal Code Section 13652 provides in relevant part:

> Except as otherwise provided in subdivision (b), kinetic energy projectiles and chemical agents shall not be used by any law enforcement agency to disperse any assembly, protest, or demonstration.

(b)  Kinetic energy projectiles[5] and chemical agents[6] shall only be deployed by a peace officer that has received training on their proper use by the Commission on Peace Officer Standards and Training for crowd control if the use is objectively reasonable to defend against a threat to life or serious bodily injury to any individual, including any peace officer, or to bring an objectively dangerous and unlawful situation safely and effectively under control, and only in accordance with all of the following requirements:

 (1)  Deescalation techniques or other alternatives to force have been attempted, when objectively reasonable, and have failed.

 (2)  Repeated, audible announcements are made announcing the intent to use kinetic energy projectiles and chemical agents and the type to be used, when objectively reasonable to do so. The announcements shall be made from various locations, if necessary, and delivered in multiple languages, if appropriate.

 (3)  Persons are given an objectively reasonable opportunity to disperse and leave the scene.

 (4)  An objectively reasonable effort has been made to identify persons engaged in violent acts and those who are not, and kinetic energy projectiles or chemical agents are targeted toward those individuals engaged in violent acts. Projectiles shall not be aimed indiscriminately into a crowd or group of persons.

 (5)  Kinetic energy projectiles and chemical agents are used only with the frequency, intensity, and in a manner that is proportional to the threat and objectively reasonable.

---

[5] The law defines "Kinetic energy projectiles" as "any type of device designed as less lethal, to be launched from any device as a projectile that may cause bodily injury through the transfer of kinetic energy and blunt force trauma. For purposes of this section, the term includes, but is not limited to, items commonly referred to as rubber bullets, plastic bullets, beanbag rounds, and foam tipped plastic rounds."  Cal. Penal Code § 13652(d)(1).

[6] The law defines "Chemical agents" as "any chemical that can rapidly produce sensory irritation or disabling physical effects in humans, which disappear within a short time following termination of exposure. For purposes of this section, the term includes, but is not limited to, chloroacetophenone tear gas, commonly known as CN tear gas; 2-chlorobenzalmalononitrile gas, commonly known as CS gas; and items commonly referred to as pepper balls, pepper spray, or oleoresin capsicum."  Cal. Penal Code § 13652(d)(2).

FOURTH AMENDED COMPLAINT

(6)  Officers shall minimize the possible incidental impact of their use of kinetic energy projectiles and chemical agents on bystanders, medical personnel, journalists, or other unintended targets.

(7)  An objectively reasonable effort has been made to extract individuals in distress.

(8)  Medical assistance is promptly provided, if properly trained personnel are present, or procured, for injured persons, when it is reasonable and safe to do so.

(9)  Kinetic energy projectiles shall not be aimed at the head, neck, or any other vital organs.

(  10)  Kinetic energy projectiles or chemical agents shall not be used by any law enforcement agency solely due to any of the following:

(A)  A violation of an imposed curfew.

(B)  A verbal threat.

(C)  Noncompliance with a law enforcement directive.

(11)  If the chemical agent to be deployed is tear gas, only a commanding officer at the scene of the assembly, protest, or demonstration may authorize the use of tear gas.

164.  The Preliminary Injunction issued by this court in *Black Lives Matter v. City of Los Angeles*, 2:20-cv-05027-CBM-AS (C.D. Cal. 2021 May 5, 2021) [Doc. 102] is consistent with the directive of California Penal Code Section 13652 regarding the use of KIPs.

### B.   Senate Bill 98

165.  In 2021, California Governor Newsom also signed into law SB 98, ensuring protections for the press at public protests. The Legislature recognized that, "[w]hile [existing] California law protects members of the press from being stopped when entering closed areas during emergencies and natural disasters to gather information, these protections don't extend to protest events such as demonstrations, marches, protests, or rallies where individuals largely engage their First Amendment right to speech."  Assem. Pub. Safety Comm. Analysis, Calif. Senate Bill No. 98, Calif.  2021-2022 Regular Session (July 13, 2021), available at   https://trackbill.com/s3/bills/CA/2021/SB/98/analyses/assembly-public-safety.pdf.

166.    There can be no doubt about the Legislature's intent in this instance. The bill's author stated that it was enacted following widespread assaults and arrests of reporters covering the protests in response to the killing of George Floyd in 2020. "In California and across the country police have arrested, detained, and have physically assaulted journalists with rubber bullets, pepper spray, tear gas, batons, and fists. In many cases there are strong indications that the officers injuring journalists knew their targets were members of the press. Members of the press risk their personal safety and wellbeing each time they attend protest events to get the public the information they need, but rubber bullets, teargas, and even arrest cannot be the norm for an essential pillar of our democracy." *Id.* The intent of the Legislature in this instance is undebatable.

167.    SB 98 added Section 409.7 to the Penal Code, which reads as follows:

409.7. (a) If peace officers … close the immediate area surrounding any emergency field command post or any other command post, or establish a police line, or rolling closure at a demonstration, march, protest, or rally where individuals are engaged in activity that is protected pursuant to the First Amendment to the United States Constitution or Article I of the California Constitution, the following requirements shall apply:

(1) A duly authorized representative of any news service, online news service, newspaper, or radio or television station or network may enter the closed areas described in this section.

(2) A peace officer or other law enforcement officer shall not intentionally assault, interfere with, or obstruct the duly authorized representative of any news service, online news service, newspaper, or radio or television station or network who is gathering, receiving, or processing information for communication to the public.

168.    In early December 2021, the Los Angeles Police Commission approved a Notice from Chief Moore to all Los Angeles Police Department personnel concerning the right of members of the press, defined broadly (with or without official police-issued credentials), to access incident areas, especially at

protests, without fear of arrest or assault by the police.    Specifically, the Notice stated that it was issued to implement the legislative mandate of SB 98.  The Notice is attached at Exhibit A and was obtained from Defendant City's website at: http://www.lapdpolicecom.lacity.org/121421/BPC_21-233.pdf

169.    More than a year earlier, on October 30, 2020, after multiple complaints concerning the LAPD treatment of members of the press during the George Floyd protests, the LAPD issued a notice to all department personnel from the Chief's office (DOC Communications Division), affirming the right of the press to access and document police activity at protests.  The Notice provided that, while individuals who identify as press may be asked for their credentials, **the lack of press credentials does not bar a person from acting as a member of the media**. The October 30, 2020 memorandum also directed that, when an unlawful assembly order is given and a dispersal order made, the Incident Commander and Public Information Officer (PIO) shall establish an area for the media to remain and observe. A copy of the October 30, 2020 document is attached at Exhibit B. On information and belief, Plaintiff alleges that these provisions were not complied with by the LAPD and its officials and officers.

170.    These statutes provide guarantees that are as broad as, if not broader than, the injunction issued by the Court in this matter in 2021. One of the statutes set out strict reform measures to limit the use of so-called "less-lethal munitions" as an instrument of crowd control.  The second statute set out specific rights of all media to document the response of police to protests and other activity in public places. Defendants' actions violate each of these statutes.

### VIOLATIONS OF THE PRELIMINARY INJUNCTION

171.    In light of the LAPD's indiscriminate firing of Kinetic Impact Projectiles at peaceful protestors, journalists, and bystanders during the George Floyd protests -- resulting in serious bodily injuries, including broken jaws, traumatic brain injury, and ruptured testicles -- on May 10, 2021, this Court entered

a Preliminary Injunction restricting the LAPD's use of 40 mm and 37 mm weapons at public demonstrations. [ECF 102.]

172.    The LAPD has failed to comply with the injunction, most egregiously since June 6, 2025, when U.S. Immigration and Customs Enforcement ( ICE ) agents began a series of large-scale immigration raids in Southern California. These raids included enforcement actions at the parking lot of a Westlake Home Depot, apparel factories in the Fashion District, as well as restaurants, businesses, homes, churches, emergency rooms, domestic violence shelters, and schools in Los Angeles and adjacent neighboring communities—targeting immigrants and their families where they work, live, seek help, worship and attend school.  In response, thousands of people across Los Angeles County came out to exercise their constitutional right to free speech and assembly to protest these actions.

173.    Protests of the federal government's actions continued on June 14, 2025, when many thousands of protesters assembled for the "No Kings" rally in Downtown Los Angeles after the Trump administration sent thousands of personnel from the Department of Homeland Security, federalized California National Guard, and active-duty Marines to Los Angeles.  The City sent LAPD officers to the scenes of these protests where the vast majority of protesters engaged in peaceful expressive activity. The LAPD reverted to the tactics this and other federal courts in this district have repeatedly held to be unconstitutional over more than two decades.  The assault on protestors at the ICE raids violates key provisions of past settlements and consent decrees protecting protestors and journalists.

174.    The LAPD nevertheless has continued to indiscriminately fire KIPs at peaceful protestors, journalists, and bystanders. In addition to the weapons the LAPD fired at protesters in 2020, the LAPD is now also shooting tear gas, trampling and kicking protesters with horses, and beating them with long wooden batons from an elevated position on horseback.

FOURTH AMENDED COMPLAINT

175.   As a result, without lawful justification, the LAPD has injured scores of protesters and press, aiming at and striking protesters and press in the head, face and groin, as specifically prohibited by this Court.

176.   In opposition to Plaintiffs' initial request for a Temporary Restraining Order filed in 2020, Defendants represented to the Court that the Floyd protests were an anomaly and, thus, the Defendants were not going to repeat that conduct so no showing could be made of the need for injunctive relief.   Defendants' representations were unsupported and the events at several anti-Trump and other protests soon after the Floyd protests repeated the unlawful use of force.   Plaintiffs then renewed their application for an injunction and the Court granted it, significantly restricting the use of KIPs as a method of crowd control.

177.   The LAPD has again engaged in conduct that unequivocally violates the Court's order granting injunctive relief and restricting when and how certain KIPs could be used to respond to protest activity.   In fact, the unlawful use of force in the ICE raids responses is even more egregious, indiscriminately shooting peaceful protestors and readily identifiable members of the press.   It stands in direct contravention of this Court's orders, the First and Fourth Amendments and the legislative mandate of SB 48 and 98.

## VII.   MONELL ALLEGATIONS

178.   Defendants are liable under *Monell v. Dep't of,\'oc. Servs.,* 436 U.S. 658, 691, 694 (1978) for Plaintiffs' injuries based on the failure to train on the use of less-lethal munitions generally and specifically in crowd control circumstances.   The failure to train adequately was documented in the multiple investigative reports issued concerning and after the 2020 Floyd protests, including the Safe LA report issued by the LAPD and approved by the Board of Police Commissioners.

179.   Liability pursuant to *Monell* also exists here based on the widespread misuse of less-lethal weapons both before and after the 2020 Floyd protests,

amounting to an entrenched custom. In particular, the Defendant City was party to at least two settlements in cases involving the unlawful use of less-lethal munitions for crowd control at the 2000 Democratic National Convention and the 2007 Mayday march and rally in MacArthur Park. Both cases resulted in settlements and/or structural relief addressing the use of force in crowd control. Those requirements were largely ignored by Defendants during the Floyd protests with the widespread use of less-lethals in a manner known to be likely to cause serious injury.

180. The 40mm launcher, the bean bag and the 37mm KIP used as a direct impact weapon are all chiefly designed, intended, and used for the purpose to incapacitate the target and constitute meaningful interference with the individual's freedom of movement and a seizure under the Fourth Amendment. All of the LAPD's training materials direct that these projectiles have the potential to cause serious injury or death. Many of those shot with KIPs were struck in the head and neck, areas considered to be of especially high risk of serious injury and death. By their very nature, these weapons are intended to incapacitate targets, making it difficult to simply walk away. Even when Plaintiffs struck with KIPs were able to walk away, they were still "seized" because that is the inescapable intent of using such incapacitating weapons.

181. LAPD **CHIEF MOORE** was, at the time of the events giving rise to this action, the policy maker for the Los Angeles Police Department on issues of response to protest activity, whether by delegation or direct assignment. He was fully knowledgeable and apprised of the actions alleged herein and was on site on several days and at several locations, including but not limited to the first days of protest in downtown Los Angeles and in and around Pan Pacific Park on May 30, 2020. He was present and observing the LAPD's operation, directing officers and protestors, using a bullhorn, without repudiating or stopping the unlawful actions of the LAPD officers, including but not limited to the indiscriminate use of less-lethal munitions and wholesale custodial arrests, thereby ratifying them.

FOURTH AMENDED COMPLAINT

182.    According to radio transmissions of the events, Chief **MOORE** gave the order to arrest persons in Downtown LA on May 29th, only ordering a sound truck to give a dispersal order one hour after people were told to sit down because they were under arrest.  Chief **MOORE** was also on site on May 30, 2020, in the Fairfax area, where he again gave orders to kettle the protestors, preparatory to arresting them. Throughout the days of protests, **MOORE** held contemporaneous press conferences, addressing the protests and the police response to them.  In his reports to the Police Commission and in press conferences with the Mayor and other public statements, **MOORE** ratified the conduct of the officers when he repeatedly stated that the actions of the LAPD were proper.

183.    The LAPD and **CHIEF MOORE** were well aware of the improper use of the various "less-lethal" munitions and prior significant problems with the various munitions.  Over the course of two decades, the LAPD reported that the beanbag munitions were inaccurate and resulted in "inadvertent" but serious, and even deadly, injuries.

184.    In fact, more than two decades ago, on December 19, 2000, Assistant Chief George Gascon was called before the Los Angeles Police Commission to discuss the use of less lethal munitions against persons engaged in a protest at the former Parker Center LAPD Headquarters on October 22, 2000.  At that meeting, then Chief Gascon testified that, while the 40mm foam baton is "designed to be target specific,"  the 37mm KIP is not and is "a less accurate weapon.".  According to the testimony of Chief Gascon, the 37mm was only used in skip-fired mode. Gascon noted that, while the manufacturer of the 37mm munition indicated it could be used as a target specific weapon,  the LAPD, "as a policy decision, … with the Commission's approval several years ago, decided that the 37 millimeter, because of inaccuracy of the weapon, that it would not be fired target specific.  In the Floyd protests and in the ICE protests, the 37 millimeter has been widely and wildly used as a direct impact weapon.

185.    At the same Police Commission meeting in 2000, Chief Gascon testified that the 40mm foam baton was used as a direct impact weapon but that it acted "like a sponge" and that it would cause "bruising, contusions." There was no recognition or discussion of the type of injuries that resulted in this instance, including broken bones, piercing head wounds and penetration of the skin.

186.    The LAPD has also long been aware of the serious injuries caused by beanbag munitions. In mid-2002, the LAPD stopped using euphemistically named "nonlethal" beanbags because of several incidents in which the target was maimed or killed by the impact of the beanbag. *See* Los Angeles Times, June 3, 2002, p. A1 ("Police Dropping 'Nonlethal' Beanbags as Too Dangerous). The decision was based on a finding that the beanbags "can be dangerously inaccurate and deadlier than manufacturers claimed." *Id.* The reported incidents involved one in which the LAPD killed a mentally ill male after shooting him with a beanbag *Id.*

187.    According to the story in the Los Angeles Times, the LAPD conducted extensive testing and confirmed the significant problems with the beanbag rounds. In a study by Los Angeles County USC Hospital, looking at individuals they treated for beanbag injuries caused by the Los Angeles Police Department or the Los Angeles Sheriff's Department, the conclusion was that beanbags "were capable of breaking bones, bruising internal organs and ripping through skin." *LA Times*, *supra*, p. A14. While some law enforcement agencies changed to a type of "sock" beanbag in light of this evidence, even still the new "less-lethal" beanbag munitions maimed and killed.

188.    More recently, the LAPD issued a document titled "Fact Sheet Beanbag Velocity and Accuracy Testing" dated Nov. 12, 2019. The document identified Chief Moore's concerns regarding the accuracy of the weapon when fired beyond a certain range. On information and belief, Chief Moore ordered testing of the beanbag weapons to address these concerns. The testing revealed that the beanbag is highly inaccurate after the fourth shot – causing a "flyer round," which

is a round that follows an unintended trajectory. The beanbag weapon, like the other less-lethal munitions deployed in the Floyd protests, was known to the LAPD at the time to suffer from decreased accuracy when deployed at greater distances, but also was known to decrease in accuracy after four shots fired (regardless of distance). Despite these concerns and the testing results, Chief Moore kept the beanbag weapon in use.

189. The LAPD's "Safe LA Civil Unrest 2020 After Action Report noted the department's 37mm foam rubber projectiles, which are recommended only for use as "skip fire" rounds shot into the ground in front of targets for dispersal. According to the manufacturer, the most effective use of these weapons is at a distance of 5 to 10 feet and no more than 30 feet from the target because at greater distances the munition because, at a greater distance, the munition may go "off target." The 37mm foam baton round, which the LAPD characterizes as a "non-target specific round," is "only to be used as a direct-impact weapon with the approval of the incident commander and then only when there is a threat of imminent serious harm or an individual is violently resisting arrest. The Independent Investigation also noted that there was no department use of force tactical directive for the 37mm KIP and the information for the use of 40mm KIPS was not adequate to ensure sufficient policy for use of the 37mm. According to the Independent Investigation, the majority of injuries sustained by LLMs, including injuries to the head, face and neck area, were the result of 40mm ammunition deployment against individuals who were not involved in violent or hostile acts. The Independent Investigation noted that officers "quickly fired the 40mm round at distant targets," increasing the probability of hitting the wrong target.

190. The third type of KIP deployed during the George Floyd 2020 protests was the bean bag. The officers must give a verbal warning prior to using the BB when feasible, and they should direct their BB shots at the navel area or belt line.

FOURTH AMENDED COMPLAINT

Only if that proves ineffective, may officers target suspects' legs, arms, or hands. The LAPD Directive No. 6.3 explicitly states that "[t]he sock round may cause serious or fatal injuries if fired at the head, neck, spine, chest, groin, or kidneys." *Id.* at 5. BBs should not be shot at a fleeing suspect. *Id.* at 3. Finally, officers must document the use or non-use of BBs on Form 1.67.05, The Non-Categorical Use of Force Report, including the name of the officer giving the warning and an explanation and appropriate justification for not using the warning. *Id.*

191.    As stated above, the City, through former **CHIEF MOORE** and the LAPD, failed to train its officers in the appropriate constitutional responses to peaceful demonstrations and the proper use of KIP weapons. The failure to provide adequate training and the improper use of KIPs has continued under **CHIEF McDONNELL.**

192.    The City is well aware of its constitutional duties in these circumstances in light of the settlement agreements and consent judgments discussed below in *National Lawyers Guild v. City of Los Angeles* and *MIWON v. City of Los Angeles*, as well as other settlements entered into specifying these constitutional duties over the years.  In fact, the City has known of the training deficiencies since at least 2000 and entered into settlement agreements in June 2005 and June 2009, each time agreeing to revised policies and training, yet the City has failed to promulgate adequate policies effectuating the terms of the settlement agreement and/or to train its command staff and officers on the required policies.

193.    The City's long-term knowledge is significant as well because, as discussed below, the current Chief was a member of the LAPD Command Staff through much of the time when the LAPD was engaged in litigation and settlement discussions after the 2000 DNC and the 2007 Mayday protest. In fact, Chief **McDonnell** was the First Assistant Chief to former Chief William Bratton

194.    Although the City did send out a notice to all department personnel when SB 48 and SB 98 were first signed into law, in light of the recent LAPD

FOURTH AMENDED COMPLAINT

response to protestors and press at the ICE immigration raids in the City, it is evident that the training on these two statutes is inadequate. This constitutes a separate Monell violation from those outlined above.

**THE SETTLEMENT IN NATIONAL LAWYERS GUILD V. CITY OF LOS ANGELES:**

195.    In June, 2005, the City of Los Angeles entered into a settlement agreement in *National Lawyers Guild, et al. v. City of Los Angeles, et al.*, CV 01-6877 FMC (CWx), an action arising from the disruption of lawful assemblies and use of unlawful force during the Democratic National Convention ("DNC") in Los Angeles in 2000 and a subsequent demonstration on October 22, 2000. The settlement provided for important changes in the policy and practices of the LAPD as applied to demonstrations.

196.    Significantly, the settlement provided that, prior to declaring an unlawful assembly, the LAPD Incident Commander should evaluate the feasibility of isolating and arresting those responsible for any unlawful conduct, and if feasible, take action only against those individuals. The settlement also addressed the use of less-lethal weapons and chemical irritants to disperse peaceful protestors.

**THE SETTLEMENT IN *MULTI-ETHNIC WORKER ORGANIZING NETWORK V. CITY OF LOS ANGELES*:**

197.    On May 1, 2007 (May Day), the LAPD assaulted a peaceful, permitted immigration march in MacArthur Park. The attack on the demonstrators was without warning. No dispersal order  awas given until more than three minutes into the police action and, even then, the dispersal order was grossly inadequate, given from helicopters in English to a largely Spanish-speaking assembly. During the course of litigating the *MIWON* action, the LAPD conceded that it had not fully implemented training and policy orders regarding the *NLG* settlement two years earlier. In fact, no policy changes were ever finalized.

198.    On June 24, 2009, the federal district court approved and entered a Structural Relief Order as part of the settlement of a class action lawsuit brought on

behalf of all those subjected to the LAPD's May Day action. Through this settlement, the LAPD agreed that it would facilitate demonstrations that may temporarily block traffic. This latter provision is consistent with established law in the Ninth Circuit, recognizing the need for local agencies to accommodate "spontaneous" protests in the streets, particularly in response to allegations of police misconduct.

199.    The *MIWON* order also set out requirements to declare an unlawful assembly: an amplified loudspeaker system with an officer at the far side of the crowd to record the officer; if there is no serious violence occurring, the order <u>shall</u> be made repeatedly over a period of time, including an "objectively reasonable" period of time to disperse and identification of "a clear and safe route" to follow to disperse. The order should be given so that it is heard by the entire crowd. These requirements were not met in this instance in most locations.

200.    The terms of the *MIWON* structural relief agreement were to be included in the LAPD's Crowd Control and Use of Force Manuals and every officer at the rank of Sergeant I and above, as well as the entire Metropolitan Division, were to undergo training every two years. Chief Moore, as well as those members of his command staff to whom he has delegated his responsibility to enact and implement lawful policies for responding to demonstrations, are aware of the unlawful policies, practices, and customs of the City and the LAPD which resulted in the settlement in *National Lawyers Guild v. City of Los Angeles* in June 2005.

201.    Moreover, Chief Moore and his delegated command staff were aware that the use of unlawful dispersal orders, baton strikes and "less-lethal" weapons to break up lawful protests, in particular, is a custom so ingrained in the marrow of the LAPD that it was critical to take all steps necessary to ensure that official policy was implemented in a manner sufficient to address the deeply rooted custom to violate First Amendment rights in the specific ways identified in the *National Lawyers Guild* settlement agreement. The failure to take such steps directly led to

the injuries suffered by the Plaintiffs. This failure amounted to an "acquiescence in the constitutional deprivations of which [the] complaint is made" and deliberate indifference to the rights of persons with whom the police come into contact, and constituted a conscious choice by the City not to properly train its law enforcement personnel on these issues.

202.    Chief McDonnell also has knowledge of the training deficiencies that continue to be at issue.  The current Chief has been in a command staff position with the LAPD for nearly 30 years, with some time away as Chief of Long Beach and then as the Los Angeles County Sheriff, both neighboring cities.  In the critical time period of 2000 to 2009, Chief McDonnell held significant positions in the LAPD, including as the First Assistant Chief to former Chief William Bratton.  In the time that he was the First Assistant Chief, the LAPD was involved in the settlement of litigation arising from assaults on protestors at the DNC 2000 and the May Day 2007 assembly in MacArthur Park, as well as several smaller protests. After each of these events, as with the 2020 Floyd protests, after-action reports were issued, identifying deficiencies in policies and training, including inadequate training on the use of KIPS as an instrument of crowd control.

203.    The City, through Chief **MOORE** and command staff to whom he delegated decision-making, also knew from the litigation for the Occupy-protest arrests, *Aichele v. City of Los Angeles* (filed in 2012), and *Chua v. City of Los Angeles* (filed in 2016) that it was violating Plaintiffs' right to due process and depriving them of their liberty interest by unlawfully and unreasonably refusing to release arrestees in the field based not on individualized suspicion but, rather, on group guilt based on their perceived association with the George Floyd protests.

204.    On information and belief, to the extent he did not make the decision and approve the plan himself, Chief **MOORE** delegated responsibility and authority to persons within his command staff to act as the final policy maker in determining the response to assemblies at various locations where protests of the

death of George Floyd occurred. The persons who made these decisions acted as the delegated policy maker for the City of Los Angeles on these issues. There was no time, opportunity, or procedure for anyone to review or revise the decisions made by these delegated policy makers prior to their final implementation.

## IX. CLASS DEFINITIONS

### CLASS DEFINITION – 23(B)(2)) (INJUNCTIVE RELIEF CLASS)

205. The injunctive relief class is defined as all persons who have in the past participated, presently are participating, or may in the future participate in, or be present at, demonstrations within the City of Los Angeles in the exercise of their rights of free speech, assembly and petition in general, and particularly as it relates to protesting police violence and discrimination against people of color, especially African-Americans, and other police actions against communities of color.

206. The Plaintiff damages classes consist of:

1) approximately 3000 individuals who were arrested and subjected to excessively tight and prolonged handcuffing, held on buses and in garages for extended periods of time, without access to bathrooms, water or food when they engaged in the spontaneous protests against a number of recent widely publicized police killings of civilians, the most recent spark being the murder of George Floyd in Minneapolis, Minnesota.

2) approximately 1000 individuals charged solely with infractions were arrested and taken into custody rather than being released in the field despite their right to field release.

3) approximately 750 individuals intentionally arrested without a dispersal order and an opportunity to leave the area.

### CLASS DEFINITIONS – 23(B)(3) (DAMAGES CLASSES)

207. One or more of the named Plaintiffs (which are indicated for each class or subclass) bring this action individually and on behalf of a proposed class of all

other persons similarly situated pursuant to F.R.Civ.P. Rule 23(b)(1), (b)(2) and (b)(3). The damages classes are defined as:

**a. Arrest Class:** Beginning May 29, 2020, and continuing through June 2, 2020, all persons present at or during the aftermath of protests regarding the killing of George Floyd in the City of Los Angeles, who were arrested by the LAPD on misdemeanor charges of failure to obey a curfew, failure to disperse, failure to follow a lawful order of a police officer and/or unlawful assembly, and who were held on the street and then on buses or, in a very few instances, in "Slammer" vans and subjected to prolonged restraint with their hands zip tied behind their backs for a minimum of approximately two hours, denied access to bathrooms, water and food, and enclosed spaces without ventilation. The use of tight zip ties in place of handcuffs for prolonged periods of restraint restricts blood flow, causing pain, numbness, cuts or abrasions from the sharp edges of the zip ties, nerve compression and tissue damage. The Class Representatives for this class are KRYSTLE HARTSFIELD, DEVON YOUNG, LINUS SHENTU, ALEXANDER STAMM, STEVEN ROE, MAIA KAZIM and JONATHAN MAYORCA. Within the Arrest Class are sub-classes of arrestees by day and location.

**b. Infraction Class:** Beginning May 29, 2020, and continuing through June 2, 2020, all persons present at or during the aftermath of protests regarding the killing of George Floyd in the City of Los Angeles, who were charged with infractions, arrested and taken into custody and not released in the field, as required by Penal Code §853.5. The Class Representatives for this class are JONATHAN MAYORCA, NADIA KHAN, NELSON LOPEZ, ALICIA BARRERA-TRUJILLO, MAIA KAZIM, DEVON YOUNG.

**c. June 1 Infraction/No Dispersal Order Arrest Class (the "June 1 Infraction/Arrest Class"):**On June 1, 2020, approximately 750 people were engaged in peaceful protest marches throughout Downtown Los Angeles. Radio

transmissions by the Incident Commander for that date and location, as well as other officers monitoring the marchers, repeatedly reported that the group was peaceful.  Multiple Activity Logs created by Defendants and documenting the incident involving the June 1 arrest class confirmed that officers were directed to the location starting at about 5 p.m. and kettled the protestors by forming a perimeter preparatory to arresting the hundreds of people in the sub-class. The Internal Affairs investigation of Class Representative Barrera-Trujillo's complaint included the statement by the arresting officer that she arrived at 1800 hours and the protestors were already "contained". The curfew on June 1, 2020 went into effect at 1800 hours (6 pm).  At approximately 6:43 p.m., an arrest announcement was made to the kettled protestors.  No prior dispersal order was given.  The radio transmissions at 6 p.m. confirm the decision not to give a dispersal order.  Although the incident commander first states on the radio that the protestors will be given a reasonable amount of time to leave, barely 7 minutes later, in response to a query about giving a dispersal order, the officer in charge directs officers to just start making arrests and prevent the protestors from leaving.  The June 1 Arrest Class was held in zip ties with their hands behind their back at the arrest site for an hour before being transported across town to a makeshift booking site at Jackie Robinson Stadium in West Los Angeles. The group of people described above provides the context for the June 1 Infraction/No Dispersal Order Arrest Class**,** which is defined as "persons kettled and then arrested on infractions in downtown Los Angeles on June 1 beginning approximately 5:00 p.m." The Class Representatives for the June 1 Infraction/Arrest Class are ALICIA BARRERA-TRUJILLO AND MAIA KAZIN.

### CLASS DEFINITION –THE DIRECT FORCE 23(C)(4) FORCE ISSUE CLASS (THE "FORCE CLASS")

208.   Although Plaintiffs are no longer seeking to certify a Rule 23(b)(3) class of persons who were subjected to the use of force at the George Floyd protests, there are now approximately 63 individual force plaintiffs filed as part of this complaint. There is a common question whether LA City policy or custom existed on the following issues and whether that policy or custom was a moving force behind the violations of the individual force plaintiffs' constitutional rights as alleged herein, including:

   i.   Did the LAPD, through Chief Michael Moore, ratify without exception the LAPD's use of force on George Floyd protestors on May 29, 2020?

   ii.   Did the LAPD, through Chief Michael Moore, ratify without exception the LAPD's use of force on George Floyd protestors on May 30, 2020?

   iii.   Did the LAPD, through Chief Michael Moore, ratify without exception the LAPD's use of force on George Floyd protestors on May 31, 2020?

   iv.   Did the LAPD, through Chief Michael Moore, ratify without exception the LAPD's use of force on George Floyd protestors on June 1, 2020?

   v.   Did the LAPD, through Chief Michael Moore, ratify without exception the LAPD's use of force on protestors on June 2, 2020?

   vi.   Did the LAPD fail to adequately train its officers, specifically the officers authorized to use them during the Goerge Floyd protests, in the proper use of 37 mm KIPs during protests?

   vii.   Did the LAPD fail to discipline any officers for their use of force during the George Floyd protests during the class period, and if so, did that constitute a ratification of those uses of force, including Kinetic Impact Projectiles and batons?

   viii.   Did the LAPD fail to adequately train its officers, specifically the officers authorized to use them during the Goerge Floyd protests, in the proper use of 40 mm foam baton during protests?

ix. Did the LAPD's failure to discipline officers any officers for their use of force during the George Floyd protests during the class period constitute a custom or policy of failure to discipline?

209. Although these issues may not predominate for determining liability for each plaintiff asserting an excessive force claim, they are common to the central issue of whether any of the above were policies, practices or customs of the LAPD. the resolution of those issues is both central to the individual force plaintiff's claims and is apt to drive the resolution of the force claims in this case because establishing the existence of a Monell policy or custom (one form of which is ratification) behind the use of force is relevant to each force claim, and that resolution is apt to either result in or significantly expedite the resolution of the case, including by eliminating that as an issue to be established in each individual claim, Thus, at a minimum, certification of these issues will result in greater judicial efficiency.

210. The class definition for the Force Class is all persons struck by a less lethal munition (37 mm KIP, beanbag or 40mm foam baton) at a George Floyd protest in the City of Los Angeles between May 29-June 2, 2020, or by a baton in a manner not permitted by LAPD directives.

211. The class representatives are:

May 29, 2020 Christian Stephen Roe (40mm)  - DTLA

May 30, 2020 Nery Marroquin (37 or 40mm)  - Fairfax

May 30, 2020 David Contreras (37mm)      - Fairfax

May 30, 2020 Tina Crnko (37mm)           - Fairfax

May 30, 2020 Eva Grenier (baton)         - Fairfax

May 30, 2020 Abigail Rodas (37 or 40mm)  - Fairfax

May 30, 2020 Alexis Saenz (beanbag or 40mm)- Fairfax

May 30, 2020 Chelsea Stone (baton)       - Fairfax

May 30, 2020 Jake Jeffers (37 and 40mm)  - DTLA

May 31, 2020 Jacob Neuman (37mm)         - DTLA

|  |  |  |
|---|---|---|
| May 31, 2020 | Jeffrey Trotter (37mm) | - DTLA |
| June 1, 2020 | Jermain Welch (37mm) | - DTLA |
| June 2, 2020 | Shannon Moore (beanbag) | - Hollywood |

212.   Within the foregoing issues, common issues predominate since the question is solely about LAPD policy and customs, thus qualifying them for use for damages claims to which Rule 23 applies. All the elements of Rule 23(a) are satisfied: the number of force plaintiffs well exceeds 40 (numerosity); the class representatives' claims are typical; of the class claims; the class representatives are adequate and have no conflicts with other class members; within each issue, there exist common issues and those issues – which are coextensive with the issue – predominate within the issue).

213.   For the reasons stated above, the class action mechanism to resolve the issue is superior.

## X.   RULE 23 PREREQUISITES

### i.      Numerosity

214.   Each class is inclusive of people present to protest and those otherwise present in the vicinity as bystanders. In accordance with F.R.Civ. P. Rule 23(a), the members of the class are so numerous that joinder of all members is impracticable. The Arrest Class is approximately 4,000 people. Within the Arrest Class, the number of people arrested on each day at each location generally exceeds 100 persons. Cumulatively and individually, the members of the arrest class meet the numerosity requirement whether considered as a whole or by each arrest group.  See Sec. II, and fn.3.  The total number of putative class members in the Infraction Class is approximately 1,000 people.  The total number of putative class members in the Infraction/No Dispersal Order Class is approximately 750 people.

215.   The Direct Force Class consists of approximately 100 people. The Infraction Class consists of approximately 1,000 people.

### ii.        Common Issues of Fact Or Law

216.    Although the actions complained of in this Complaint occurred at different times and locations, all were in the City of Los Angeles and all involved the actions of the Los Angeles Police Department enforcing the Department's policies on "crowd control."  For the arrest class, a total of nearly 4,000 individuals were arrested, almost exclusively in groups of 100 or more. *See* fn.3, *supra.*  Within the overall arrest class, the numbers of persons arrested on each day at each location are factually cohesive sub-classes.  They were all held in garages or on buses in handcuffs without water, food or bathroom access solely because of Defendants' lack of capacity to book each person, rather than cite and release, a directive under LAPD policy for misdemeanors and a mandatory requirement for infractions under the California Penal Code. Each arrest group is sufficient to meet the numerosity requirement), as discussed above, and each group of 40-60 people transported together suffered common violations of their rights.

217.    Defendants acted uniformly with respect to each class. For example, all arrestees were placed on buses and subjected to the described conditions of confinement; all those charged with infractions were taken into custody and placed on buses even though they were entitled to field release; and so forth.  All of the arrestees were held in tight handcuffs for prolonged periods of time.  The named class representatives either complained directly about the tight handcuffs, asked that they be loosened and were ignored by the officers, or they observed others arrested with them complain and ask that the handcuffs be loosened without any response from the officers. Plaintiffs and the putative class members endured damage to their wrists as a consequence of the prolonged, tight handcuffs. See *Meredith v. Erath,* 342 F.3d 1057, 1063 (9th Cir. 2003) (no qualified immunity when plaintiff was held for 30 minutes in overly tight handcuffs resulting in unnecessary pain). See also *Wall v. County of Orange*, 364 F.3d 1107, 1109-10, 1112 (9th Cir. 2004); *Laumde v. County of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000)

218.   Plaintiffs are informed and believe and thereon allege that the LAPD officers acted in accordance with orders given by supervisors from the highest command positions, in accordance with policies and procedures instituted by the LAPD and the City of Los Angeles.

219.   The common questions of fact include, but are not limited to:

a. Did Defendants impose curfews without accommodating, or attempting to accommodate, the right to peaceable assembly and protest;

b. Did Defendants declare unlawful assemblies without adequate sound amplification and without providing both directions, means and opportunity to disperse before taking aggressive and injurious – potentially deadly police action;

c. Did Defendants routinely break up George Floyd protests through the use of force (batons, projectiles and forcing protestors to fall by direct force ) without regard to whether the individuals against whom such force was used were engaged in conduct justifying such force, including whether they were violently resisting arrest or posed an immediate threat of physical harm;

d. Did Defendants routinely, while breaking up George Floyd protests, hit people with batons and/or rubber bullets although those people were not engaging in conduct justifying such force, including whether they were violently resisting arrest or posed an immediate threat of physical harm;

e. When arresting people at the George Floyd protests, did Defendants routinely subject arrestees to one or more of the following conditions: prolonged detention on buses, while tightly hand-cuffed with zip ties, denied access to bathrooms, water and food, and kept in enclosed spaces without ventilation;

FOURTH AMENDED COMPLAINT

f. When arresting people at the George Floyd protests, did Defendants routinely subject arrestees charged solely with infractions to custodial arrest without regard to whether they were entitled to field release as provided in Cal. Penal Code § 853.5?

220. The common questions of law include, but are not limited to:

a. Must Defendants, when imposing a curfew based on the conduct of some persons that is alleged to be unlawful, first accommodate, or attempt to accommodate, the right to peaceable assembly and protest?

b. Have Defendants complied with the applicable California Penal Code provisions for declaring unlawful assemblies, including providing a dispersal order communicated through adequate sound amplification with both directions, means and sufficient opportunity to disperse before taking aggressive and injurious – potentially deadly - police action?

c. Did Defendants routinely break up George Floyd protests through the use of force (batons and rubber bullets) without regard to whether the individuals against whom such force was used were engaged in conduct justifying such force violate the First, Fourth or Fourteenth Amendments and their state law analogues?

d. Did the LAPD, while breaking up George Floyd protests and routinely using force although those people were not engaging in conduct justifying such force, violate the First, Fourth or Fourteenth Amendments and their state law analogues?

e. Did the LAPD, after arresting people at the George Floyd protests, and routinely subjecting arrestees to prolonged detention on buses, while tightly hand-cuffed, denied access to bathrooms, water and food, and where they were kept in enclosed spaces without ventilation violate the Fourth or Fourteenth Amendments and their state law analogues?

f. Did the LAPD's custodial arrest of people at the George Floyd protests who were charged solely with infractions, and who qualified under Penal Code § 853.5 for field release, violate their rights under 853.5 and/or Govt. Code § 815.6, and their rights under the Fourth and Fourteenth Amendments and their state law analogues.

g. Did some or all of the conduct described above constitute a policy or custom of Defendants?

h. If the answer to the foregoing question is yes, was that policy or custom a moving force in the violation of Plaintiffs' rights?

i. Is any individual Defendant sued in his individual capacity entitled to qualified immunity on the federal claims?

j. Did any of the conduct alleged herein violate Cal. Civil Code § 52.1 (the Bane Act)?

k. Are general class-wide damages available to the various classes?

l. Are statutory damages under § 52.1 available to the various classes?

221.    Defendants detained and/or arrested the putative class and sub-classes as a group and treated all similarly, acting on grounds applicable to the putative class. The named Plaintiffs' claims that the First, Fourth, and Fourteenth Amendment rights—and their analogous state Constitution, statutory, and common law rights—were violated raise common questions of law and fact. the Defendants have acted, threaten to act, and will continue to act, on grounds generally applicable to the class, thereby making appropriate final injunctive relief or declaratory relief with respect to the class as a whole.

222.    The questions of law and fact common to the classes, which are outlined above, predominate over any questions affecting only individual members.

### iii.    Typicality

223.    In accordance with F.R. Civ. P. Rule 23(a), the claims of the representative Plaintiffs are typical of the class. Plaintiffs were all present at Floyd

protests in the City of Los Angeles; were subjected to one or more of the violations previously enumerated; and seek redress for the past violations of their rights and protection to bar the repeat of those violations in the future.

224.    Thus, Plaintiffs have the same interests and have suffered the same type of damages as the class members. Plaintiffs' claims are based upon the same or similar legal theories as the claims of the class members of each class. Each class member suffered actual damages as a result of being subjected to one or more of the violations enumerated above. The actual injuries suffered by Plaintiffs are similar in type to the actual damages suffered by each class member although the severity of those injuries may vary among class members.

225.    In accordance with F.R. Civ. P. Rule 23(a), the representative Plaintiffs will fairly and adequately protect the interests of the class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the class.

### iv.    Adequate Representation

226.    The named Plaintiffs will fairly and adequately represent the common class interest. The named Plaintiffs have a strong interest in achieving the relief requested in this Complaint, they have no conflicts with members of the Plaintiff class, and they will fairly and adequately protect the interests of the class.

227.    The named Plaintiffs are represented by counsel who are well-experienced in civil rights and class action litigation and are familiar with the issues in this case. Attorneys Paul Hoffman, Barry Litt, and Carol Sobel have successfully litigated a number of class action cases on behalf of protesters in Los Angeles. They were appointed by the court as class counsel in *Aichele, et al. v. City of Los Angeles, et al.*, No. 2:12-CV-10863-DMG (C.D. Cal. August 26, 2012), challenging, *inter alia*, the conditions of detention similar to those at issue here, as well as the LAPD's denial of OR release to 300 persons arrested during the Occupy action at Los Angeles City Hall. They were appointed by the court as class counsel in *Chua v.*

*City of Los Angeles,* Case No. CV 2:16-cv-00237-JAK-GJS(x) (C.D. Cal. January 12, 2016), which involved protests over the police killing of Michael Brown in Ferguson Mo.). They were also appointed as class counsel in *Multi-Ethnic Immigrant Worker Network v. City of Los Angeles*, 24 F.R.D. 631 (C.D. Cal. 2007), challenging the LAPD's assault on a lawful immigrant-rights rally in MacArthur Park on May 1, 2007. That case resulted in a settlement of $12,850,000 -- the largest amount ever paid nationally in a protest case in which there were no arrests of the Plaintiffs. Attorney Sobel was also involved in revising the LAPD's Crowd Control Manual provisions in 1993, following the protests of the Rodney King beating. She was also lead counsel in several multiple-plaintiff cases challenging LAPD protest practices arising from the Democratic National Convention in Los Angeles in 2000, which resulted in significant structural relief. In addition to class action protest litigation, attorneys Hoffman, Litt, and Sobel have served as class counsel in a number of other class actions redressing civil rights violations.

228. Counsel for the named Plaintiffs know of no conflicts among or between members of the class, the named Plaintiffs, or the attorneys in this action.

### v. Maintenance and Superiority

229. In accordance with Fed.R.Civ.P. Rule 23(b)(1)(A), prosecutions of separate actions by individual members of the classes would create a risk that inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class.

230. In accordance with Fed.R.Civ.P. Rule 23(b)(1)(B), prosecutions of separate actions by individual members of the classes would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

FOURTH AMENDED COMPLAINT

231.   In accordance with Fed.R.Civ.P. Rule 23(b)(2), Defendants have acted on grounds generally applicable to the class.

232.   In accordance with Fed.R.Civ.P. Rule 23(b)(3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe, and thereon allege, that the interests of class members in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute any action at all. Plaintiffs are informed and believe, and thereon allege, that the amounts at stake for individuals are such that separate suits would be impracticable in that most members of the class will not be able to find counsel to represent them. Plaintiffs are informed and believe, and thereon allege, that it is desirable to have all litigation in one forum because all of the claims arise in the same location, *i.e.,* the County of Los Angeles. It will promote judicial efficiency to resolve the common questions of law and fact in one forum rather than in multiple courts.

233.   Plaintiffs do not know the identities of most class members. Plaintiffs are informed and believe, and thereon allege, that the identities of the class members are ascertainable in significant part from LAPD records, at least as it relates to those class members who were arrested. Plaintiffs are informed and believe, and thereon allege, that a significant number of class members may be reached by the use of outreach efforts by organizations that participated in organizing the affected protests.

234.   Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Leading members of Plaintiffs' counsel organized The class action is superior to any other available means to resolve the issues managed similar litigation with similarly disparate damages as a result of LAPD conduct in breaking up the May

Day 2007 protests that resulted in the *MIWON* litigation described previously, as well as the *Aichele* and *Chua* litigation, all of which was against the City of Los Angeles and the LAPD. Liability can be determined on a class-wide basis. General damages can also be determined on a classwide basis.

235.   In accordance with Fed.R.Civ.P. Rule 23(b)(3), class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Plaintiffs are informed and believe that LAPD computer records contain a last known address for class members who were arrested. Plaintiffs contemplate that individual notice be given to class members at such last known address by first class mail, email and cell phone outreach, social media and efforts of organizations that organized the protests. Plaintiffs contemplate that the notice inform class members of the following regarding their damages claims:

A.    The pendency of the class action, and the issues common to the class;

B.    The nature of the action;

C.    Their right to 'opt out' of the action within a given time, in which event they will not be bound by a decision rendered in the class action;

D.    Their right, if they do not 'opt out,' to be represented by their own counsel and enter an appearance in the case; otherwise, they will be represented by the named Plaintiffs and their counsel; and

E.    Their right, if they do not 'opt out,' to share in any recovery in favor of the class, and conversely to be bound by any judgment on the common issues, adverse to the class.

236.   As a direct and proximate cause of the conduct described herein, the named individual Plaintiffs and the class members have been denied their constitutional, statutory, and legal rights as stated herein, and have suffered general

and special damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety and other damages in an amount according to proof.

237.   Defendants' acts were willful, wanton, malicious, and oppressive, and done with conscious or reckless disregard for, and deliberate indifference to, Plaintiffs' rights.

238.   All of the following claims for relief are asserted against all Defendants.

239.   Although Plaintiffs' legal theories significantly overlap, they apply differently to different classes. Accordingly, Plaintiffs state their claims by class.

240.    Plaintiffs restate and incorporate by reference each of the foregoing and ensuing paragraphs in each of the following causes of action as if each paragraph was fully set forth therein.

## XI.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

241.   Plaintiffs timely filed a claim for damages pursuant to California Government Code §910 *et seq.*  The claim was denied by operation of law.

**CLAIMS FOR RELIEF**

## I.   FIRST CLAIM FOR RELIEF – INJUNCTIVE RELIEF
**(First, Fourth And Fourteenth Amendments To The U.S. Constitution, 42 U.S.C. § 1983; California Constitution Articles 1 §§ 2, 3, 7, 13, Penal Code § 835.5, Civil Code § 52.1, And Civil Code § 815.6 For Injunctive Relief)**

242.   Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

243.   The Defendants engaged in repeated, widespread violations of law, as outlined above, over the course of at least several nights, shutting down the exercise of First Amendment activities through the use of indiscriminate and unreasonable force against thousands of protestors, including physically striking dozens or hundreds of them; imposing curfews without accommodating, or even attempting to accommodate, the right to peaceable assembly and protest; at times declaring

93

FOURTH AMENDED COMPLAINT

unlawful assemblies without adequate sound amplification and without providing both directions, means and opportunity to disperse before taking aggressive police action; hitting at least hundreds of protestors with batons and/or rubber bullets through the use of unreasonable and excessive force; arresting and not releasing in the field at least hundreds of persons charged solely with infractions in violation of California law; unlawfully imposing on arrestees unlawful conditions of confinement for many hours – including but not limited to tight handcuffing, no bathroom access, no access to food or water, and lack of ventilation, placing detainees at great risk of exposure to COVID-19 – while on buses as previously outlined; and booking and collecting information on arrested individuals.

244.   The City, through Chief Moore and the LAPD, and now Chief McDonnell, has failed to train its officers in the constitutional responses to peaceful protests as revealed by the above allegations despite the long history of such violations in the past, and Defendants' commitment to correct them in the form of both court orders and settlement agreements.  The recurrence of the same violations with respect to these arrests indicates an intentional refusal to preserve the constitutional rights of protestors. The intentional refusal is underscored by the failure of Defendant City to comply with California Penal Code §13652, passed in the wake of the law enforcement response to the 2020 George Floyd protests.  The response of the LAPD to the 2025 protests against immigration raids by federal agents is even more indiscriminate than it was in 2020.  The LAPD is now shooting wildly at protestors in violation of the injunction issued by the Court nearly five years ago and in clear violation of the even broader restraints on the use of Kinetic Impact Projectiles and chemical irritants imposed by the California Legislature.

245. Without intervention by this Court, the Injunctive Relief class members, who participated and wish to participate in protest activities, particularly related to police violence, are at risk of having their rights violated in the future due to the Defendants' demonstrated pattern of constitutional violations and threatened

future actions. The Injunctive Relief Class has no adequate remedy at law to protect the future lawful exercise of their constitutional rights, and, without action by this court, will suffer irreparable injury, thereby entitling them to injunctive and declaratory relief. The injunctive relief class is represented by Black Lives Matter Los Angeles and CANGRESS, as well as each individual class representatives.

246.   The Defendants have acted and refused to act on grounds generally applicable to the putative class. Injunctive and declaratory relief for the putative class as a whole is appropriate.

247.   Defendant City's polices practices, customs, conduct and acts of the Los Angeles Police Department alleged herein resulted in, and will continue to result in, irreparable injury to the Plaintiffs, including but not limited to violation of their constitutional and statutory rights. Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein. The Plaintiffs and class members intend in the future to exercise their constitutional rights of freedom of speech and association by engaging in expressive activities in the City of Los Angeles. Defendants' conduct described herein has created uncertainty among Plaintiffs with respect to their exercise now and in the future of these constitutional rights, and has chilled their exercise of these rights.

248.   Specifically, Plaintiffs are concerned that, if arrested, whether lawfully or unlawfully, they will again be denied the liberty interest codified at California Penal Code § 853.5, will be subjected to unlawful conditions of confinement exposing them to increased risk of COVID-19, and will be subjected to unreasonable and excessive force by LAPD.

249.   Plaintiffs are also concerned that, when engaged in protest activities, Defendants will impose curfews without accommodating or attempting to accommodate First Amendment rights; will not provide adequate notice in the event unlawful assemblies are declared; will not provide adequate means and opportunity

to disperse; and will again employ indiscriminate, unreasonable or excessive force, injuring and terrifying protestors.

250.   Plaintiffs therefore seek injunctive relief from this court to ensure that Plaintiffs and persons similarly situated will not suffer violations of their rights from Defendants' illegal and unconstitutional policies, customs, and practices.

251.   Plaintiffs also seek injunctive relief in the form of an order requiring that Defendants seal and destroy and records derived from Plaintiffs' arrests, including fingerprints, photographs, and other identification and descriptive information, and all information, and biological samples and information obtained from such biological samples collected from the Plaintiff class, and identify to the Plaintiff class all entities and agencies to which such information has been disseminated; and that all such disseminated records be collected and destroyed.

## II.    SECOND CLAIM FOR RELIEF – ARREST CLASS
### (Fourth and Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. § 1983 for damages)

252.   Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

253.   All Arrest Class members were arrested on misdemeanor charges of failure to obey a curfew, failure to disperse, failure to follow a lawful order of a police officer and/or unlawful assembly during Floyd protests and were placed on buses and driven to a variety of facilities where they were processed and released. They were on the buses for several hours – both to get to their destination and then held on the bus until they were processed --  some as long as  ten to twelve hours as they were transported to multiple locations before being offloaded and released. While held on buses or otherwise detained prior to their release, Arrest Class members were subjected to prolonged tight hand-cuffing, causing bruising and nerve injury; denied access to bathrooms, water and food; and held in enclosed spaces on buses without ventilation, which caused anxiety about the significant increased risk of Covid-19 exposure because, even if they had previously been

similarly distanced from others during outside protests, the risk of exposure is significantly greater in enclosed, unventilated spaces.

254.    Defendants' above-described conduct violated Arrest Class members' rights to be free from unreasonable seizures under the Fourth Amendment, the Fourteenth Amendment's due process clause and state constitutional analogues.

255.    As a result of Defendants' wrongful conduct, Arrest Class members suffered damages as alleged above.

256.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

## III.    THIRD CLAIM FOR RELIEF – DIRECT FORCE
### (Fourth and Fourteenth Amendment to the U.S. Constitution 42 U.S.C. § 1983 for damages)

257.    Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

258.    All Direct Force plaintiffs were shot with so-called "less-lethal weapons" (including 37 and 40 mm projectiles, and bean bag rounds, struck with batons and/or knocked down by the actions of LAPD officers.

259.    Members of the Direct Force group who were shot with "rubber bullets," bean bag rounds, knocked down and/or struck with batons were injured in a manner that evinced that Defendants applied force unlawfully. Many class members were struck in the face, head, shoulder and neck areas. Video footage of various incidents shows officers shooting straight at peaceful protestors who posed no threat. *See*: Instagram video May 30, 2020 in the Fairfax area, near Pan Pacific Park after the BLMLA rally https://www.instagram.com/p/CA3GPPYB7dz/ Similarly, baton strikes were done to injure and punish them on site.

260.    Defendants used unreasonable and excessive force in indiscriminately engaging in baton strikes, shooting projectiles at protestors and knocking them down, not based on an individualized assessment of conduct justifying such force

FOURTH AMENDED COMPLAINT

and, more specifically, where the person was not violently resisting arrest and did not present an immediate threat of violence or physical harm, in violation of the Fourth Amendment and its state law analogues. Further, this conduct was deliberately indifferent to the Direct Force Class members' rights, shocks the conscience, and violates the decencies of civilized conduct, under the Fourteenth Amendment and its state law analogues.

261. As a result of Defendants' wrongful conduct, Direct Force Class members suffered damages as alleged above.

262. As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

## IV. FOURTH CLAIM FOR RELIEF – INFRACTION CLASS
### (Fourth and Fourteenth Amendment to the U.S. Constitution 42 U.S.C. § 1983 for damages)

263. Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

264. All Infraction Class members were charged with infractions, arrested and taken into custody and not released in the field, as required by Penal Code § 853.5. Section 835.5 created a liberty interest for Infraction Class members to be cited and released in the field and not subjected to custodial arrests.

265. The custodial arrests of Infraction Class members violated their rights to be free from unreasonable seizures under the Fourth Amendment and its state constitutional analogue, and their rights under the Fourteenth Amendment's due process clause and its state constitutional analogue not to be deprived of their liberty without due process of law, and violated their rights under Penal Code § 853.5 and Govt. Code § 815.6.

266. As a result of Defendants' wrongful conduct, Infraction Class members suffered damages as alleged above.

267.   As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

## V.    FIFTH CLAIM FOR RELIEF -INFRACTION/NO DISPERSAL ORDER
### (Fourth and Fourteenth Amendment to the U.S. Constitution 42 U.S.C. § 1983 for damages)

268.   Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

269.   All Infraction/No Dispersal Class members were arrested for a curfew violation without first being given a timely dispersal order.  Various sections of the Penal Code make it a crime to remain at a public assembly after it being ordered to disperse.  In this instance, the police intentionally did not give an order to disperse before arresting the members of the Infraction/No Dispersal Order class after noting that they had engaged in peaceful protest prior to their arrest and only after giving a false curfew time.  The members of the sub-class were charged with infractions, arrested and taken into custody and not released in the field, as required by Penal Code § 853.5.  Section 835.5 created a liberty interest for Infraction Class members to be cited and released in the field and not subjected to custodial arrests.

270.   The custodial arrests of Infraction/No Dispersal Order Class members violated their rights to be free from unreasonable seizures under the Fourth Amendment and its state constitutional analogue, and their rights under the Fourteenth Amendment's due process clause and its state constitutional analogue not to be deprived of their liberty without due process of law, and violated their rights under Penal Code § 853.5 and Govt. Code § 815.6.

271.   As a result of Defendants' wrongful conduct, Infraction/No Dispersal Order Class members suffered damages as alleged above.

272.   As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

## VI.    SIXTH CLAIM FOR RELIEF
### Violation of the Bane Act (Cal. Civil Code § 52.1)

273.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as though fully set forth herein.  The federal and state constitutions guarantee the right to assembly and to petition the government for a redress of grievances, as well as to be free from unnecessary and excessive force by law enforcement officers. Defendants, by engaging in the wrongful acts and failures to act alleged above, denied these rights to the Plaintiffs by threats, intimidation, or coercion, to deter, prevent and in retaliation for the exercise of Plaintiffs' First Amendment rights, in violation of Cal. Civ. Code § 52.1.

274.    The use of unreasonable force by Defendants was a substantial factor in causing the violation of rights and attendant harm by Plaintiffs.

275.    Defendant City of Los Angeles is liable for the wrongful conduct of its employees through the doctrine of respondeat superior.

276.    Defendants' actions as set out above and further on in this complaint constituted interference by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of California in violation of Cal. Civil Code §52.1. The violation of § 52.1 includes violations of the rights of the members of the Arrest, Infraction and Force classes as outlined throughout this Complaint.

277.    As a direct and proximate result of the aforementioned acts or omissions of Defendants, Plaintiffs sustained damages, including but not limited to general damages, statutory damages and treble statutory damages under Cal. Civ. Code § 52, but no less than $4,000 for each incident, and pain and suffering.

## VII.    SEVENTH CLAIM FOR RELIEF
### Assault

278.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

279.   Defendants shot the members of the Excessive Force Class with Less-Lethal Launchers, struck them with batons, and shoved peaceful protestors down.

280.   As a direct and proximate result of the aforementioned acts or omissions of Plaintiffs, members of the Force Class sustained and incurred damages including physical injuries, and pain and suffering.

281.   The City of Los Angeles is liable for the actions of the officers of the Los Angeles Police Department through respondeat superior.

## VIII.   EIGHTH CLAIM FOR RELIEF
### Battery by a Police Officer

282.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

283.   Defendants, by the actions of the officers of the Los Angeles Police Department, intentionally touched members of the Force Sub-Class without their consent by shoving, beating with batons, and shooting them with less-lethal projectiles, resulting in significant bodily injury to their person.

284.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Plaintiffs sustained and incurred damages including physical injury and pain and suffering.

285.   The use of unreasonable force by the LAPD Officers was a substantial factor in causing harm to the Plaintiffs.

286.   The Defendant City is responsible for the actions of its employees through the doctrine of respondeat superior.

## IX.   NINTH CLAIM FOR RELIEF- INFRACTION AND "NO DISPERSAL ORDER" SUBCLASSES
### False Arrest/False Imprisonment

287.   The Plaintiffs in the INFRACTION sub-class were subjected to custodial arrests in violation of California Penal Code Sec. 853.5, which mandates a cite and release at the site of the purported infraction violation, and prohibits custodial arrest, transport and booking prior to release.

288.   The Plaintiffs in the NO DISPERSAL ORDER subclass were subjected to custodial arrests in violation of California Penal Code Sec. 409 and 416 in that there was no declaration of an unlawful assembly and no order to disperse prior to the arrests.  The commanding officer lacked probable cause to believe that the purpose of the assembly was unlawful and had stated on radio transmissions that the subclass members were peaceful.

289.   Each member of the INFRACTION Subclass, and each member of the NO DISPERSAL ORDER subclass were held for hours on buses, without any ventilation or access to bathrooms, food and water.  Many members of the overall ARREST Class were forced to urinate and defecate on themselves while restrained on the buses despite pleas to be released. All of the class members were handcuffed for hours and requests to loosen the restraints were ignored.

290.   The conduct of Defendants complained of herein was a substantial factor in causing the harm to Plaintiffs in the ARREST Class and Subclasses.

291.   Defendant City is liable for acts of its employees and agents pursuant to respondeat superior and California Government Code § 815.2(a)

## REQUEST FOR RELIEF

Wherefore, Plaintiffs seek judgment as follows:

1.   An order certifying the arrest class and each arrest sub-class defined herein pursuant to Federal Rules of Civil Procedure Rule 23(b)(2) and (3);

2.   A preliminary and permanent injunction restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above and retaining Court jurisdiction to enforce the terms of the injunction;

3.   A declaratory judgment that Defendants' conduct detailed herein violated Plaintiffs' rights under the Constitution and laws of the United States and the State of California;

4.   An order directing that all arrest records be removed from all criminal databases, whether operated by the City or County of Los Angeles, or the State of

California, and that all arrests be reduced to a "detention" unless the individual arrested is convicted of the charge;

5.     General and compensatory damages for the individual force Plaintiffs.

6.     General and compensatory damages for the arrest class for the violations of their federal constitutional and statutory rights, pain and suffering, all to be determined according to proof;

7.     General and compensatory damages for the "Infraction" arrest subclass and the "No Dispersal Order' subclass;

8.     Statutory damages as provided for pursuant to Cal. Civ. Code § 52 (the Bane Act);

9.     An award of attorneys' fees pursuant to 42 U.S.C. § 1988 and Cal. Civil Code §§ 52(b) & 52.1(h) and Cal. Code of Civ. Proc. § 1021.5;

10.   Costs of suit;

11.   Pre- and post-judgment interest as permitted by law;

12.   Such other and further relief as the Court may deem just and proper.


Dated: June 30, 2025                    Respectfully submitted,


                                        SCHONBRUN SEPLOW HARRIS
                                             HOFFMAN & ZELDES, LLP
                                        LAW OFFICE OF CAROL A. SOBEL
                                        McLANE BEDNARSKI & LITT


                                        ____/s/ Carol a. Sobel_____.
                                        By: CAROL A. SOBEL
                                        Attorneys for Plaintiffs

FOURTH AMENDED COMPLAINT