Cynthia Anderson Barker SBN 175764
NATIONAL LAWYERS GUILD
3435 Wilshire Blvd., Suite 2910
Los Angeles, California 90010
t. 213 381-3246 f. 213 381-3246
e. cablaw@hotmail.com

Paul Hoffman, SBN 71244
Michael Seplow SBN 150183
John Washington SBN 315991
SCHONBRUN, SEPLOW, HARRIS,
HOFFMAN & ZELDES LLP
9415 Culver Blvd, #115
Culver City, California 90230
t. 310 396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. jwashington@sshhlaw.com

Attorneys for Plaintiffs
Additional Counsel on Next Page

Barrett S. Litt, SBN 45527
Lindsay Battles SBN 262862
MCLANE, BEDNARSKI & LITT
975 E. Green Street
Pasadena, California 91106
t. 626 844-7660 f. 626 844-7670
e. blitt@mbllaw.com
e. lbattles@mbllaw.com

Pedram Esfandiary SBN 312569
e. pesfandiary@wisnerbaum.com
Monique Alarcon SBN 311650
e. malarcon@wisnerbaum.com
Bijan Esfandiari SBN 223216
e. besfandiari@wisnerbaum.com
R. Brent Wisner SBN 276023
e. rbwisner@winserbaum.com
WISNER BAUM P.C.
11111 Santa Monica Blvd., Ste 1750,
Los Angeles, CA 90025
t. 310 207-3233 f. 310 820-7444

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| BLACK LIVES MATTER LOS ANGELES, ET AL.,<br><br>PLAINTIFFS,<br><br>v.<br><br>CITY OF LOS ANGELES, ET AL,<br><br>DEFENDANTS. | Case No.: 2:20-cv-05027 CBM-AS<br><br>PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CONTEMPT<br><br>Date:  Sept. 16, 2025<br>Time: 10:00 a.m.<br>Ctrm:  8D Hon. Consuelo Marshall |

i

1

2

3

4

5

Carol A. Sobel, SBN 84483
Weston Rowland  SBN 327599
LAW OFFICE OF CAROL A. SOBEL
2632 Wilshire Blvd., #552
Santa Monica, CA 90403
t. 310 393-3055
e. carolsobel@aol.com
e. rowland.weston@gmail.com

Olu Orange SBN SBN 213653
Orange Law Offices
3435 Wilshire Blvd., Ste. 2910
Los Angeles, CA. 90010-2015
t. 213 736-9900
f, 213 417-8800
e. o.orange#orangelawoffices.com

6

7

8

9

Colleen Flynn, SBN 234281
LAW OFFICE OF COLLEEN FLYNN
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
t. 213 252-9444
r. 213 252-0091
e. cflynn@yahoo.com

James Do Kim, SBN 231038
LAW OFFICE OF DO KIM, APLC
3435 Wilshire Blvd, Suite 2700
Los Angeles, CA 90010
t. 213 251-5440
f, 213 232 -4919
e. dkim@dokimlaw.com

10

11

12

13

Matthew Strugar, SBN 232951
LAW OFFICE OF MATTHEW STRUGAR
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90039
t. 323 696-2299
e. matthewstrugar@gmail.com

Denisse Gastelum
GASTELUM LAW, APC
3767 Worsham Ave.
Long Beach, CA 90808-1774
t. 213 340 6112
e. dgastelum@gastelumfirm.com

14

15

16

Christian Contreras, SBN 330269
LAW OFFICES OF CHRISTIAN CONTRERAS, APC
360 E. 2nd St., 8th Floor
Los Angeles, California 90012
t. (323) 435-8000  f: (323) 597-0101
e: CC@Contreras-Law.com

17

18

19

20

21

Shakeer Rahman  SBN 332888
Law Office of Shakeer Rahman
3435 Wilshire Blvd Ste 2910,
Los Angeles, CA 90010-2015
t. 323-546-9236
e. shakeer@loosr.net

22

23

24

25

26

27

28

ii

Table Of Contents

I.    INTRODUCTION ........................................................................... 1

II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY ........................ 1

A. Shooting the Press in Violation of the Preliminary Injunction ......................... 2

B. Shooting Demonstrators in Violation of the Preliminary Injunction................. 4

III.  LEGAL STANDARD ........................................................ 8

IV. ARGUMENT ................................................................ 9

A. The City Violated This Court's Injunction........................................ 9

B. The City Failed to Take Reasonable Steps to Prevent Violations.................... 9

C. Defendants' Repeated Violations Support A Contempt Finding .....................10

1. Judicial and Legislative Restrictions on the Use of 40mm KIPs ....................11

D. Sanctions are warranted to Prevent the City from Continuing to Violate the Court's Order    ..........................................................12

1. Appointment of a Special Master...............................................13

2. A Ban On 40mm KIPs for Crowd Control.....................................15

3. Reasonable Attorney's Fees....................................................15

V. CONCLUSION ................................................................16

iii

1

2

## Table of Authorities

3

Page(s)

Cases

4

5

*Burlington N. R. Co. v. Dep't of Revenue of State of Wash.*,
  934 F.2d 1064 (9th Cir. 1991) ................................................................. 14

6

*Deorle v. Rutherford*,
  272 F.3d 1272 (9th Cir. 2001) .............................................................12, 15

7

*Fed. Trade Comm'n v. Enforma Nat. Prods., Inc.*,
  362 F.3d 1204 (9th Cir. 2004) ................................................................. 9

8

9

*Gen. Signal Corp. v. Donallco, Inc.*,
  787 F.2d 1376 (9th Cir. 1986) ...........................................................10, 13

10

*Harcourt Brace Jovanovich Legal & Pro. Publications, Inc. v. Multistate Legal
  Stud., Inc.*,

11

  26 F.3d 948 (9th Cir. 1994) .................................................................... 16

12

*Hoptowit v. Ray*,
  682 F.2d 1237 (9th Cir. 1982) ................................................................ 14

13

14

*Hous. Rts. Ctr. v. Sterling*,
  2004 WL 3610228 (C.D. Cal. Dec. 29, 2004) ...................................... 16

15

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
  10 F.3d 693 (9th Cir. 1993) .................................................................... 9

16

*In Re: Crystal Palace Gambling Hall Inc.*,
  817 F.2d 1361 (9th Cir. 1993) ................................................................ 9

17

18

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
  774 F.3d 935 (9th Cir. 2014) .............................................................13, 15

19

*Kelly v. Wengler*,
  822 F.3d 1085 (9th Cir. 2016) ................................................................ 10

20

21

*McComb v. Jacksonville Paper Co.*,
  336 U.S. 187 (1949) ............................................................................... 9

22

*Nat'l Org. For the Reform of Marijuana L. v. Mullen*,
  828 F.2d 536 (9th Cir. 1987) .............................................................14, 15

23

24

*Nelson v. City of Davis*,
  685 F.3d 867 (9th Cir. 2012) .............................................................12, 15

25

*O'Connor v. Midwest Pipe Fabrications, Inc.*,
  972 F.2d 1204 (10th Cir. 1992) .............................................................. 13

26

*Robinson v. Delicious Vinyl Recs. Inc.*,
  2014 WL 1715520 (C.D. Cal. Apr. 30, 2014)........................................ 9

27

*Sanderlin v. Dwyer*,
  116 F.4th 905 (9th Cir. 2024) .............................................................12, 15

28

*Shillitani v. United States*,
   384 U.S. 364 (1966) ................................................................................ 8
*Sloane v. Karma Enters., Inc.*,
   2008 WL 11343430 (C.D. Cal. Nov. 25, 2008) .................................... 8
*Spallone v. United States*,
   493 U.S. 265 (1990) ................................................................................ 8
*Stone v. City of San Francisco*,
   968 F.2d 850 (9th Cir. 1992) ........................................................... 9, 14
*United States v. Suquamish Indian Tribe*,
   901 F.2d 772 (9th Cir. 1990) .............................................................. 14
*United States v. United Mine Workers of Am.*,
   330 U.S. 258 (1947) .............................................................................. 13

Statutes

18 U.S.C. § 401 ............................................................................................. 13
California Penal Code §830.10 ..................................................................... 6
California Penal Code §13652 ....................................................... 1, 8, 11, 12

Rules
Fed. R. Civ. P. 53 ................................................................................... 14, 15
Fed. R. Civ. P. 53(a) .................................................................................... 14

v

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

On May 10, 2021, this Court issued a definite and specific order, enjoining and limiting the conditions under which the City of Los Angeles ("the City"), through the Los Angeles Police Department, could discharge Kinetic Impact Projectiles ("KIPs") at protestors as direct impact weapons for crowd control purposes. [Dkt. 102 ("Injunction")].

As set forth below, Defendants' actions over the past two months evince a blatant disregard for the Court's injunction. Defendants' conduct proves an unwillingness or an inability or both on the part of the City to take steps necessary to ensure compliance with the Injunction. A finding of contempt, issuance of appropriate sanctions and appointment of a Special Master are both justified and necessary to ensure Defendants comply with the Court's order in the future.

### II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

At the recent protests in response to the immigration raids by federal ICE officers and other Department of Homeland Security personnel in Los Angeles, Defendants deployed hundreds of KIPs in direct violation of the Court's Preliminary Injunction and California Penal Code §13652, enacted following the police assaults on demonstrators protesting the 2020 killing of George Floyd.

According to a statement issued by the Los Angeles Police Department on June 16, 2025, on June 8th alone the LAPD shot more than 600 KIPs at those gathered at the ICE-raid demonstrations. See LAPD Releases Information Related to Recent Protests NR25119ma - LAPD Online. A true and correct copy of the LAPD statement is also submitted at Exhibit 158.

Multiple videos posted of these recent ICE protests show LAPD skirmish lines moving toward the protestors and firing KIPs as direct impact weapons at the entire group of protestors and press without any regard for which target they struck. The videos also show entire lines of officers firing repeatedly as they advanced and

1

at approximately the same time, defeating any defense that all – if any – of the
targets presented an imminent threat of serious harm to the officers or others.  See
e.g., Exhibit 160-3 [Nigro video]. As the photograph of the second shot shows, but
for the fact that Nigro was wearing a helmet – as if he was in combat zone – he
would have suffered a serious head injury.  Exhibit 160-1; 160-2.

Set forth below are some of the specific injuries caused by the recent
unlawful discharge of KIPs by the LAPD which supports a finding of contempt.

## A.    Shooting the Press in Violation of the Preliminary Injunction[1]

On June 8, 2025, Sergio Olmos, an investigative reporter for CalMatters, was
struck in the chest by a KIP fired by police officers during an immigration protest
in downtown Los Angeles, California. Olmos was wearing a press pass
and shooting  video of a protest in Downtown Los Angeles when LAPD officers
shot various munitions at the protestors.  Mr. Olmos posted a video on X of his
shooting, dropping his equipment when he is shot.  Exhibit 161.

On June 9, officers shot KIPs at photojournalist Michael Nigro while he
stood practically alone on a pedestrian overpass above the protests. The initial shot
just missed him, striking a pole just inches from his head. Nigro Dec. ¶¶ 5–9, 8 and
Exhibit 160. At the time, Nigro carried two large DSLR cameras and wore  a helmet
with "PRESS" written in large white capital letters against a black background on
both sides of his head and a vest with "PRESS" in large white letters against a black

---

[1] The information on injuries to members of the press was first filed in the Ex
Parte Application for a Temporary Restraining Order in *Los Angeles Press Club v.
City of Los Angeles*, 2:25-cv-05423 HDV  E.  The Court in *Los Angeles Press Club*
issued a Temporary Restraining Order and OSC re Preliminary Injunction on July
10, 2025. [Dkt. 044]. A true and correct copy of the Temporary Restraining Order
is submitted at Exhibit 159.

2

background both on his chest and back, and (3) a press ID with the word "PRESS" in large letters on a lanyard around his neck. *Id.* ¶¶ 14–16. Two hours later, he was at street level when a line of LAPD officers suddenly and without justification yelled "move" and began shoving and shooting indiscriminately at protestors. Nigro Dec. ¶¶ 10–12, 19. An LAPD officer shot and struck Nigro in the head with a KIP, leaving a white mark from its impact visible on his helmet at his temple. *Id.* ¶¶ 10, 14–15 and Exhibit 160; Declaration of Adam Rose ("Rose Dec.") ¶ 37.

On June 11, freelance photographer Montez Harris was documenting protests at Grand Park in Downtown Los Angeles, carrying two large professional cameras and a visible press ID. Montez Harris Dec., ¶ 5, Exhibit 161. When a dispersal order was issued, he turned to leave. A mounted officer tried to grab him and another mounted officer rode up and pinned him between the horses. The officer told Harris he wasn't leaving fast enough, hit him with horses, and shot him in the back of his leg with an LLM. *Id.* ¶¶ 5-7. Video of the incident shows that he posed no threat and was complying with the dispersal order, even though he had a right to remain as press. *Id.*; Rose Dec ¶ 45.

Also on June 11, LAPD shot Sangjin Kim, a staff photographer for Korea Daily, in the back resulting in a bloody welt. When shot, Kim was carrying professional camera equipment and a visible press ID. Rose Dec. ¶ 46, Exh. 162.

On June 14, LAPD officers shot an Agence France-Presse photographer in the face and leg. The photographer told France24, "I was covering the protest … 90 feet away from the police when I received the impact of a rubber bullet in my face and another one in my right arm… I [had] two cameras, a helmet with AFP stickers on it and … a big patch on my chest that said 'Press.'" Rose Dec. ¶ 56; Exhibits 163, 164.

On June 14, photographer Marshal Woodruff was documenting protests near City Hall, when an LAPD officer began firing LLMs in the crowd. One LLM hit

3

Woodruff in the face, fracturing his cheek and slicing open his right eye, requiring five hours of surgery, with no certainty of how much vision he will regain. Exhibit 176; 178. Woodruff was first shot in the arm by a KIP.[2]

On July 14, photojournalist Héctor Adolfo Quintanar Perez was covering the protests in downtown Los Angeles on assignment from Zuma Press, an independent press agency. He carried two professional cameras, a large camera bag, and a large press badge issued by Zuma and worn visibly on a lanyard around his neck. Perez Dec., ¶ 2, 3 Exh. 167 and 168. At about 5 p.m., when he was close to 300 Los Angeles Street, without any apparent provocation, LAPD officers began using firing LLMs. *Id*. ¶¶ 4-6. Perez was taking pictures when he saw an officer aiming an LLM in his direction from "very close," so that the officer must have known he was press given his press ID and cameras. The officer fired an LLM that hit both his knees, opening a wound in his left knee that left Perez walking with a cane and possibly in need of surgery. *Id.* ¶ 7-8, 11; Rose Dec. ¶ 54.

**B.    Shooting Demonstrators in Violation of the Preliminary Injunction**

On Sunday, June 8, 2025, the date that the LAPD discharged over 600 KIPs at the protests, Atlachinolli Tezcacoatl was at Temple and Almeda when a skirmish line of LAPD officers began to move forward, pushing a largely peaceful protest back toward Los Angeles and Temple. Declaration of Tezcacoatl at ¶¶ 2-3. The shooting of Mr. Tezcacoatl is one of two serious KIP assaults that day analyzed

---

[2] See, *Macy Jenkins and Karla Rendon, "*Photographer struck in the eye by LAPD's rubber bullet during LA protest" NBC Los Angeles, (Jun. 17, 2025) available at https://www.nbclosangeles.com/news/local/photographer-struck-in-the-eye-by-lapds-rubber-bullet-during-la-protest/3725912/

frame by frame in a video report released by the New York Times of these events.[3] Exhibit 169. LAPD Officer Orozco shot Mr. Tezcacoatl twice. At the time, Tezcacoatl was in the front line of the protest and had his hands up, filming the police with his phone camera when he was shot in the ribs. A few moments later, that same Officer shot him in the face, shattering his jaw, requiring bolts and wires to hold his face together. Tezcacoatl Dec. ¶¶ 6-7; Exhibit 175.

Exhibit 169 also shows the shooting of Kelsey McMurtry by oncoming LAPD officers on June 8, 2025. She is among a group of protestors who crouched behind folding chairs to protect themselves from the munitions being discharged by the LAPD. Starting at approximately 6:21, the video shows that she was struck in the head with a 40mm, causing her to fall down. She is then struck in the torso with a 40mm deployed by a different officer. As other protestors attempt to help her, she is shot a third time by the second officer, this time in the back with a 40mm, making it impossible for her to "disperse" on her own. The officers shooting KIPs were followed by a line of officers on horseback, who appear to have trampled her as they advanced against the protestors.

At approximately 4:58, Exhibit 169 includes an interview with LAPD Deputy Chief Michael Rimkunus, who states that the LAPD "would never use the 40mm to disperse a crowd. We use that weapon, for instance, on folks who are throwing items – bricks, cinder blocks, bottled water. At this point I have not seen any intent to shoot an innocent person in the face." Rimkunus' assertion is refuted by the video evidence.

---

[3] The New York Times video includes footage recorded by Mr. Tezcacoatl at the time of these assaults. Dec. of Tezcacoatl at ¶ 5.

In the same protest in Downtown Los Angeles on June 8, 2025 where Atlachinolli Tezcacoatl and Kelsey McMurtrey were shot, Kathryn Luksus was also severely injured. Luksus Dec. ¶¶8-10. She was shot in the hand while she was sitting down and holding a sign. She was sitting for about two minutes, holding her sign up, when, without warning, an LAPD officer shot her in the left hand. She posed absolutely no threat of harm to the officer or anyone else.  The KIP caused a fifth metacarpal sustained spiral fracture in addition to a degloving injury in which a substantial portion of her flesh was separated from the bone and tendons, leaving a 3.5-centimeter gash on her hand. Exhibits 156 and 157. Luskus observed the officer shoot her and concluded it was an intentional shot fired as a direct impact strike, not skip-fired.

On the night of June 9, 2025, an LAPD officer shot Jason Reedy with a 40-millimeter kinetic impact munition launcher from a raised platform behind a glass partition at the Los Angeles Police Headquarters building complex at 1st and Main Streets.  Mr. Reedy was on the sidewalk with his hands up in the air. The shot struck him in the groin area. He posed no threat – imminent or otherwise. Exhibit 170 is a video posted on X that shows the incident, including Reedy's hands raised just before the officer shot him with the 40mm in the groin, causing him to double over.

On June 9, 2025, in response to the shooting of Reedy, Shakeer Rahman, counsel of record in this action, asked the officer for his name and serial number. California Penal Code §830.10 provides: "Any uniformed peace officer shall wear a badge, nameplate, or other device which bears clearly on its face the identification number or name of the officer."  Attorney Rahman was only asking for what the law required of the officer. Irritated by his repeated question, the officer shot Rahman twice in the groin because Mr. Rahman was "taking [the officer's] focus." Mr. Rahman was also separated from the officer by a glass partition.  He posed no threat to the officer and "taking the officer's focus" is not a lawful reason to

discharge a 40mm weapon at all, let alone twice at the groin. This event is depicted in Exhibit 171,

On June 14, 2025, Chad Ashby attended the "No Kings" demonstration in front of Los Angeles City Hall. Tens of thousands of people assembled in Downtown Los Angeles as millions assembled across the nation to peacefully demonstrate against policies of the current presidential administration. In the early evening, the LAPD forced protestors to move to Broadway between Third and Fourth Street. Mr. Ashby took video on his cell phone of the LAPD advancing in front of the Bradbury Building. He then turned around to leave and, after taking just a few steps, was struck in the back of the head with a KIP, lacerating his left ear and causing him to collapse on the street. Dec. of Chad Ashby at ¶¶ 1,3,6 and Exhibit 154.

Also on June 14, 2025, Christopher Fernandez, a registered nurse, was present at the "No Kings" demonstration to provide medical aid. He was shot in front of Los Angeles City Hall. He wore a hat with a white cross and a white cross on the cart he brought with medical supplies, clearly identifying as a first aid station. At approximately 4 p.m., he observed LAPD officers form a skirmish line and begin to fire tear gas and projectiles at the demonstrators. Fernandez did not observe any conduct by the protestors up to that point that would have justified such use of force and did not hear a warning before the police started firing their weapons. As Fernandez was treating bloody wounds on protestors, including multiple head injuries from KIPs, he was shot on the outside of his left thigh, slightly above the knee, with a 40mm projectile. A huge piece of flesh was ripped off his leg and the wound began bleeding profusely. Declaration of Fernandez at ¶¶2-6 and Exhibits 152, 153, and 176.

On June 14, 2025, Jack Kearns was shot in the back in the back of his head by an LAPD officer with a 40mm weapon.[4]  The incident was classified as a "LERI," a law enforcement related injury that requires hospitalization. Defendants released the composite video on the LAPD You Tube channel. A true and correct copy of the LAPD YouTube video is submitted at Exhibit 172.  Exhibit Kearns suffered a brain bleed. At the time he was shot, he was on the other side of the multi-lane street, at least 80 feet from the officer who shot him and moving away from the officers when he is shot in the back of the head.  Exhibit 173 is the frame from the LAPD video showing Kearns' position when he is shot.  Although the LAPD alleges Kearns broke the skirmish line, he was not even noticed until a single officer sees him nearly a block past the skirmish line and running away from the area, so he posed no imminent threat of harm to an officer or anyone else. Additionally, no warning is heard on the BWV that the officer will shoot Kearns with a "less lethal," as required by the Court's preliminary injunction and California Penal Code §13652, even though there was adequate opportunity to do so. The inescapable conclusion is that the officer shot Kearns in the head to "incapacitate" him so they could arrest him, not to cause him to disperse.

### III.    LEGAL STANDARD

"Courts have inherent power to enforce their orders through civil contempt." *See Spallone v. United States*, 493 U.S. 265, 276 (1990) (citing *Shillitani v. United States,* 384 U.S. 364, 370 (1966)). "A district court has wide latitude in determining whether there has been a contemptuous defiance of one of its orders." *Sloane v. Karma Enterprises, Inc*., 2008 WL 11343430, at *2 (C.D. Cal., 2008) (citing *Stone*

---

[4] The video is posted on the LAPD's YouTube channel at.
https://www.bing.com/videos/riverview/relatedvideo?q=jACK+kEARNS+SHOT+BY+LAPD&mid=A8EE22E996C7BE80D32EA8EE22E996C7BE80D32E&FORM=VIRE  Bing Videos

*v. City of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992), cert. denied, 506 U.S. 1081 (1993).

In a motion for an order to show cause regarding contempt, "the moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply." *Federal Trade Comm'n v. Enforma Natural Prods., Inc*., 362 F.3d 1204, 1211 (9th Cir. 2004) (citation and quotation marks omitted) "The defendant's conduct 'need not be willful' to violate a consent judgment.'" *Robinson v. Delicious Vinyl Records Inc*., 2014 WL 1715520, at *1 (C.D. Cal., 2014) (citing *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993). As the court in Robinson noted, "there is 'no good faith exception to the requirement of obedience.'" *Id*.

## IV.    ARGUMENT

### A.    The City Violated This Court's Injunction

Plaintiffs' evidence establishes clear and convincing evidence that the City violated this Court's injunction on numerous occasions. Plaintiffs need not show more to support a finding of contempt. Specifically, they need not show that these violations were willful for the Court to find the City in civil contempt. *In Re: Crystal Palace Gambling Hall Inc.,* 817 F.2d 1361, 1365 (9th Cir. 1993); *see also McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) ("it matters not with what intent the defendant did the prohibited act").

### B.    The City Failed to Take Reasonable Steps to Prevent Violations

The City cannot defend against a finding of contempt here by arguing that it has substantially complied with the injunction. While "substantial compliance" is a defense to contempt, it rests not on the extent to which the City has complied with the Court's injunction, but instead, on whether the defendant took "all reasonable

steps" to comply with the order. "If a violating party has taken all reasonable steps to comply with the court order, technical or inadvertent violations of the order will not support a finding of civil contempt." *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986) (internal quotations removed, emphasis added). See also *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016)("A contemnor in violation of a court order may avoid a finding of civil contempt only by showing it took all reasonable steps to comply with the order" (emphasis in original)).  The violations in this instance are by no means "technical or inadvertent."  Defendants repeatedly shot individuals in the face, eye, groin and back.

       **C.**    **Defendants' Repeated Violations Support A Contempt Finding**

       When Plaintiffs first applied for a Temporary Restraining in this action, the Court denied the Ex Parte Application and the OSC re a Preliminary Injunction on Defendants' representation that the 2020 George Floyd protests were an unusual event and not likely to occur, countering Plaintiffs' claim of "irreparable harm." Dkt. 024 Pg. 11-14.  Barely a month later, Defendants used the same unlawful force at several protests, including an anti-Trump event in Tujunga and a protest arising from allegations about a transwoman customer at WiSpa.  Based on these events, Plaintiffs' renewed motion for a Preliminary Injunction was granted. [Dkt. 102]

       On July 10, 2025, in *Los Angeles Press Club v. City of Los Angeles,* Case No. 2:25-cv-05423-HDV-E,  the District Court entered a temporary restraining order restricting, *inter alia*, the use of Kinetic Impact Projectiles against journalists. Specifically, the Court ordered that "(3) the LAPD is further enjoined from using less lethal weapons ("LLMs") and other crowd control weapons, including kinetic impact projectiles ("KIPs"), chemical irritants, and flash bangs against journalists who are not posing a threat of imminent harm to an officer or another person."  Dkt. 044, p. 13 and 2025 U.S. Dist. LEXIS 134820 C.D. Cal. July 10, 2025).

For the temporary restraining order application, Plaintiffs submitted declarations and documentary evidence where journalists were shot in the upper torso and head in circumstances where there was no imminent threat of serious harm to the officers or anyone else. In some instances that were documented in publicly available video, LAPD officers were shown shooting protestors in the head, the upper torso, and the groin with 40mm KIPs, in some instances at very close range. Several of those incidents are detailed in Section II A.

### 1.     Judicial and Legislative Restrictions on the 40mm KIPs

Since the Court issued the preliminary injunction in this action, both the Ninth Circuit and the California Legislature addressed the use of KIPs for crowd control. In 2021, following the George Floyd protests, the Legislature enacted California Penal Code §13652, significantly restricting the use of KIPs against protestors. A true and correct copy of the statute is attached at Exhibit A.[5] Specifically, the statute directs that "9) Kinetic energy projectiles shall not be aimed at the head, neck, or any other vital organs." The statute is more expansive in restricting the use of KIPs to disperse a protest than the Preliminary Injunction issued in this action. So, compliance with the Court's order should not have been a challenge since Defendants were required to comply with the statutory restrictions.

The second important development since the Preliminary Injunction was entered is the decision of the Ninth Circuit in *Sanderlin v. Dwyer*, 116 F.4th 905

---

[5] Doctors at Cedars-Sinai hospital in Los Angeles recently published a study on the harm caused by KIPs as a crowd control tool. The study was based on 14 patients treated at the hospital's ER for KIP injuries during the 2020 George Floyd protest. Some of the 14 patients are named plaintiffs in this action, including Abigail Rodas. See, *Kinetic Projectile Injuries Treated During Civil Protests in Los Angeles: A Case Series*, Exhibit 174, and available at cpcem-5-385.pdf.

(9th Cir. 2024). *Sanderlin* upheld the denial of qualified immunity by the district court for an officer who shot Sanderlin in the groin with a 40mm KIP. "The fact that Panighetti's incapacitation of Sanderlin may have been limited in duration does not alter this conclusion, because a 'meaningful interference' with an individual's freedom of movement, even if brief, constitutes a seizure ." *Id.* at 912.

Significantly, the Circuit held that the 40mm munition is not intended to cause the target to disperse; it is intended to "incapacitate." *Id.* at 912. "[T]he 40mm launcher … is chiefly designed, intended, and used for the purpose of incapacitating its target— … 'incapacitating' an individual by firing a projectile at them is an act that 'meaningful[ly] interfere[es]' with their freedom of movement'. …" *Id.* at 913 (combined edits). Applying Fourth Amendment analysis, the Circuit concluded that the right to be free of such force in a crowd control situation was clearly established by the Circuit's decisions in *Nelson v. City of Davis*, 685 F.3d 867, 873-74 (9th Circuit 2012) and *Deorle v. Rutherford*, 272 F.3d 1272,1285 (9th Cir. 2001). *Sanderlin*, *supra*, at 915. Twenty-five years is sufficient time for the LAPD to bring its crowd control responses into conformity with the law.

In most instances, the LLMs were deployed without the warning required by this Court's order, long-standing settlements with the City and by Penal Code §13652 when the evidence demonstrates there were no circumstances that would justify not giving a legally adequate warning before shooting people.  With both the legislature and the Ninth Circuit stressing the danger of 40mm KIPs and restricting their use for crowd control, Defendants have no possible justification to excuse their contempt for the Court's order.

### D.    Sanctions are warranted to Prevent the City from Continuing to Violate the Court's Order

"Courts have statutory authority to punish both civil and criminal contempt pursuant to 18 U.S.C.S. § 401." *Inst. of Cetacean Research v. Sea Shepherd*

*Conservation Soc'y*, 774 F.3d 935, 955 (9th Cir. 2014). After a finding of contempt, a court may issue sanctions for two purposes: "to compel or coerce obedience to a court order" and "to compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance[.]" *O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992) (citation omitted).

When determining the amount of a monetary sanction like the one requested here, the Court should consider "the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant." *United Mine Workers*, 330 U.S. at 304; see also *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1378 (9th Cir. 1986). The City of Los Angeles has a yearly operating budget of approximately $10.5 billion. RJN, Exh. 9. For the fiscal year 2024-2025, by far the greatest liability payments were for lawsuits against the Los Angeles Police Department, topping $100,000,000. *See* LAist, March 14, 2025: As LA veers toward a financial crisis, $320M in liability payouts play a big role | LAist. Although the City has declared a fiscal emergency, the budget problems are attributable in large part to liability payments for actions against the Los Angeles Police Department. *Id.* Defendants should not be permitted to avoid sanctions because of a monetary crisis caused by their own wrongdoing.

## 1. Appointment of a Special Master

Plaintiffs request that this Court appoint a Special Master at the City's expense to conduct an independent investigation into the LAPD's violation of the preliminary injunction during the June 2025 protests. The violations supporting this motion indicate that the LAPD as an institution has failed utterly to incorporate this Court's clear directives to protect peaceful protestors. A prompt report from an independent investigator about the LAPD's recent conduct along with recommendations for further actions to make this Court's Order more effective would enable this Court to fashion further action to an independent set of facts.

Federal Rules of Civil Procedure Rule 53 authorizes the courts to appoint a Special Master under "exceptional conditions." Fed Rules Civ Proc R 53(a). "Rule 53 contemplates that the master will assist the court with specific tasks and exercise necessary power." *Burlington N. R.R. v. Dep't of Revenue*, 934 F.2d 1064, 1071 (9th Cir. 1991). The "appointment of a special master is generally an interlocutory order and not appealable." *National Org. for Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 540 (9th Cir. 1987).

The Ninth Circuit has interpreted the "exceptional" standard to include cases involving complex litigation, or when there are "**problems associated with compliance with the district court order**." *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 775 (9th Cir. 1990) (emphasis supplied); *see also Hoptowit v. Ray*, 682 F.2d 1237, 1263 (9th Cir. 1982) (upholding Special Master appointment based, in part, on the need to monitor compliance with the district court's order enjoining the State from using "unnecessary physical force against prisoners" and ordered supervision of the penitentiary). *See also Stone v. City & Cty. of S.F.*, No. 91-16927, 1992 U.S. App. LEXIS 14436, at *27 n.18 (9th Cir. June 25, 1992) (approving a Special Master "to investigate, report, and recommend actions that the City could take to ensure compliance with the consent decree.")

"There are no judicial decisions requiring a final determination of constitutional violation before an 'exceptional condition' justifying reference to a master can arise under Rule 53(b)." *Nat'l Org. for Reform of Marijuana Laws*, 828 F.2d at 543. Nor is there any "circuit authority that requires a determination of intentional disregard of court orders before a special master may be appointed under Rule 53(b). *Id.* "[T]he prospect of non-compliance is an 'exceptional condition' that justifies reference to a master." *Id.* at 542. That prospect is real in this instance.

14

Here, both the complexity of the litigation and the obvious need to investigate and monitor Defendants' compliance with the preliminary injunction support the appointment of a Special Master.

### 2.    A Ban On 40mm KIPs for Crowd Control

As the Ninth Circuit recently held, 40mm KIPs are not intended to disperse an individual; they are intended to "incapacitate" a target. *Id.* at 912. "T]he 40mm launcher … is chiefly designed, intended, and used for the purpose of incapacitating its target … 'incapacitating' an individual by firing a projectile at them is an act that 'meaningful[ly] interfere[es]' with their freedom of movement'. …" *Id.* at 913 (combined edits). The Court in *Sanderlin* applied traditional Fourth Amendment analysis and held the Circuit's decisions in *Nelson v. City of Davis*, 685 F.3d 867, 873-74 (9th Circuit 2012) and *Deorle v. Rutherford*, 272 F.3d 1272,1285 (9th Cir. 2001) clearly established the right to be free of such force in a crowd control situation. *Sanderlin*, *supra*, at 915.

Defendants have repeatedly shown the failure to conform their conduct to both statutory and constitutional law. The only way to ensure that peaceful protestors, the press, and bystanders who present no imminent threat of serious harm to the police or anyone else will not be shot in the head, torso, back, groin and vital organs is to remove the weapon from Defendants' crowd control arsenal.

### 3.    Reasonable Attorney's Fees

"If the party bringing and prosecuting contempt proceedings prevails, that party may recover its costs and fees incurred in so doing." *Id.* (citing *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 958 (9th Cir. 2014)).The court has broad discretion to award Plaintiffs' attorney's fees as compensatory damages. *Harcourt Brace Jovanovich Legal & Prof'l Publ'ns v. Multistate Legal Studies*, 26 F.3d 948, 953 (9th Cir. 1994). If Defendants had followed the Court's preliminary injunction, Plaintiffs would have no reason to

15

bring this motion to compel obedience. Therefore, Plaintiffs also request reasonable attorney's fees to compensate Plaintiffs for the time and expenses incurred by bringing this motion. *Housing Rights Center v. Donald Sterling*, 2004 WL 3610228 at *3 (C.D. Cal. Dec 29, 2004). Plaintiffs request the Court allow Plaintiffs to submit a request for fees following the Court's ruling on this motion, to account for the full amount of fees expended to bring this motion.

## V.    CONCLUSION

Plaintiffs have provided clear and convincing evidence that the City has violated this Court's order. The City's response to these violations has shown they will continue to do so, unless and until this Court takes further steps to enforce its order. Plaintiffs request the Court find the City in civil contempt and issue an Order to Show Cause re: Civil Contempt Sanctions. Plaintiffs also request appointment of a Special Master to perform an independent investigation of these events. Finally, Plaintiffs request the Court issue attorney fees and coercive sanctions to prevent further violations and to remedy the harm caused by the City's violations.

Dated: August 5, 2025                    Respectfully submitted,

Law Office of Carol A. Sobel

_____/s/   Carol A. Sobel_____.
By: Carol A. Sobel
Attorneys for Plaintiffs

16