**HYDEE FELDSTEIN SOTO**, City Attorney – SBN 106866
**DENISE C. MILLS,** Chief Deputy City Attorney – SBN 191992
**KATHLEEN KENEALY,** Chief Assistant City Attorney – SBN 212289
**CORY M. BRENTE,** Senior Assistant City Attorney – SBN 115453
**CHRISTIAN BOJORQUEZ**, Assistant City Attorney – SBN 192872
**GABRIEL S. DERMER**, Assistant City Attorney – SBN 229424
**JOSEPH S. PERSOFF**, Deputy City Attorney – SBN 307986
200 No. Main Street, 6th Floor City Hall East
Los Angeles, California 90012
Email: christian.bojorquez@lacity.org
Phone: (213) 978-7023; Fax No: (213) 978-8785

*Attorneys for Defendants*
**CITY OF LOS ANGELES and CHIEF JIM McDONNELL**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLACK LIVES MATTER LOS ANGELES, et al.,<br><br>            PLAINTIFFS,<br><br>v.<br><br>CITY OF LOS ANGELES, et al.,<br><br>            DEFENDANTS. | CASE NO. **CV20-05027 CBM-AS**<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT**<br><br>**Hearing**<br><br>Date: September 16, 2025<br>Time: 10:00 a.m.<br>Courtroom: 8D |

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT**

# I.    INTRODUCTION

Five years after the events giving rise to this lawsuit, another mass protest took place in Los Angeles. Unfortunately, the June 2025 protests did not remain peaceful; instead, they devolved into wanton violence against LAPD officers. Officers repeatedly reported protestors were hurling bottles, commercial-grade fireworks, Molotov cocktails, and other projectiles at them; motorcyclists drove into skirmish lines; protestors erected barricades and hid behind them while hurling debris and incendiary devices at officers. Given these violent assaults on officers, officers used less-lethal munitions ("LLMs").

Plaintiffs assert that officers used LLMs against peaceful members of the crowd, including journalists. That latter assertion is the basis for a separate lawsuit: *L.A. Press Club v. City of Los Angeles*, Case No. 25-05423 ("*L.A. Press Club*"), in which the plaintiffs sought a preliminary injunction. Defendants have thoroughly addressed those allegations in *L.A. Press Club*, demonstrating that those alleged incidents are either false or taken out of context, and that the relevant body worn video establishes the propriety of the use of LLMs. For the remaining incidents, LAPD is taking the allegations seriously and is investigating them, and if LAPD finds any violation of law or policy, the officer will be punished, up to and including termination.

Based on these alleged June 2025 incidents, Plaintiffs are asking the Court to hold the City in contempt for violating the Court's May 10, 2021 Injunction, which generally restricted when and how LAPD officers may lawfully deploy 40mm and 37mm LLMs. Even assuming that Plaintiffs have established by clear and convincing evidence that officers deployed LLMs in violation of this Court's Injunction (which as discussed above, for some incidents Plaintiffs have not met their burden and for others LAPD is still investigating), the question for the Court turns on whether the City has taken all reasonable steps to comply with the Court's Injunction.

The answer to this question is yes. In the past five years, LAPD has established policies and implemented training regarding the lawful use of LLMs that is consistent

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT**

with the Court's Injunction. LAPD has continuously expanded its trainings and updated its policies regarding the use of force during protests. As recently as February 2025, LAPD issued new Use of Force Directives regarding both the 37mm and 40mm LLMs. Then in May, just before these protests, LAPD issued a Training Bulletin on crowd management which addressed issues including uses of force, and specifically kinetic energy projectiles. These Use of Force Directives and Training Bulletin are aligned with the Court's Injunction and establish the City takes its obligations to comply with the Court's Injunction and its obligations to protestors seriously, and that it took all reasonable steps to comply with the Court's Injunction.

## II.    THE COURT'S PRELIMINARY INJUNCTION

On May 10, 2021, the Court issued a Preliminary Injunction containing the following terms:

1. LAPD is restricted from using the 40mm and 37mm launchers in public demonstrations except by officers who successfully completed Department training and meet all annual qualification requirements on the weapons;

2. An officer may use 40mm less-lethal munitions only when the officer reasonably believes that a suspect is violently resisting arrest or poses an immediate threat of violence or physical harm. The use of 40mm less-lethal munitions should be preceded by a warning, if feasible, consistent with the Use of Force Warning set forth in LAPD Use of Force – Tactics Directive No. 17;

3. An officer may use 37mm less-lethal munitions as a crowd control tool only with the prior approval of the incident commander and only when a dispersal order has been issued, unless immediate action is necessary to stop violence, to ensure public safety and restore order. A warning to disperse must be given, consistent with all of the dispersal order requirements set forth in LAPD Use of Force – Tactics Directive No. 11.1, and then the officer may fire the 37 mm at the ground 5 to 10 feet in front of the crowd. The 37 mm may not be used as a target

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT**

specific munition unless absolutely necessary to prevent imminent serious bodily injury to the officer or others;

4. The 40mm launcher must not be used to target the head, neck, face, eyes, kidneys, chest, groin or spine of a person.

5. The 40 mm and 37 mm launchers should only be fired at a distance of five feet or greater from another person, unless an officer or other person is attacked and there is a threat of imminent serious harm. (Dkt. 102.)

## III.   LEGAL ARGUMENT

### A.   Legal Standard

Civil contempt consists of a party's disobedience of a specific and definite court order by failure to take all reasonable steps within the party's power to comply. *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014). A moving party must show (1) violation of the court order; (2) beyond substantial compliance; (3) not based on a good faith and reasonable interpretation of the order; and (4) by clear and convincing evidence. *Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009). "Sanctions for civil contempt may be imposed to coerce obedience to a court order, or to compensate the party pursuing the contempt action for injuries resulting from the contemptuous behavior, or both." *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986). "Unlike civil contempt, criminal contempt requires the procedural safeguards applicable in criminal proceedings, including proof beyond a reasonable doubt." *Kelly v. Wengler*, 822 F.3d 1085, 1097 (9th Cir. 2016). "[A] sanction generally is civil if it coerces compliance with a court order or is a remedial sanction meant to compensate the complainant for actual losses. A criminal sanction, in contrast, generally seeks to punish a 'completed act of disobedience.'" *Id.*

### B.   The Alleged Violations Of The Preliminary Injunction

Plaintiffs support their Motion by relying on a number of incidents during the

3

June 2025 protests in the City. Many of those incidents that Plaintiffs submitted to this Court were also submitted by Plaintiffs' counsel in support of the Motion for Preliminary Injunction in *L.A. Press Club*. Defendants' Opposition to the Motion in *L.A. Press Club* readily demonstrates that Plaintiffs cannot establish those incidents violated this Court's Injunction by clear and convincing evidence. (*See* Opp. to Mot. for Prelim. Inj. at 12-22, *L.A. Press Club, et al. v. City of L.A., et al.*, Case No. 25-CV-05423-HDV-E, ECF No. 69; Declaration of Joseph Persoff, ¶ 2, Ex. 12). As to the other incidents Plaintiffs rely on, LAPD is investigating them, and if any violation of law or policy is found, the officer will be punished, up to and including termination.

## C.    Defendants Took All Reasonable Steps To Comply With The Court's May 2021 Injunction

Regardless of whether Plaintiffs have established a violation of the Court's Injunction by clear and convincing evidence, Defendants took all reasonable steps to comply with the Injunction, precluding a finding of contempt. *See Kelly*, 822 F.3d at 1096 (taking all reasonable steps to comply precludes contempt). Following the 2020 protests and this Court's 2021 Injunction, LAPD reformed its use of force policies and training, not only to comply with this Court's Injunction, but federal and state law.[1]

After the 2020 protests, LAPD updated its Crowd Control and Crowd Management training. (Declaration of Sgt. Robert Quiroz ["Quiroz Decl."], ¶ 1.) While in the Academy, recruits receive 6 hours of Crowd Management/Crowd Control management training. (*Id.*, ¶ 2.). The training covers the Use of Force Policy, de-escalation, squad formations, arrest/rescue circle, and using LLMs to safely and effectively bring a dangerous and unlawful situation under control. (*Id.*). During this training, recruits also get certified in use of the 40mm LLM. (*Id.*).

As of September 2020, LAPD required all officers to go through Crowd

---

[1] Since the Injunction, California enacted Penal Code § 13652, which governs the use of kinetic energy projectiles in assemblies, protests and demonstrations.

4

Management and Control for Patrol training; since then, over 13,000 officers have completed the training; some multiple times. (Quiroz Decl., ¶ 4.) The curriculum of this course was modified in response to the enactment of Cal. Penal Code § 13652 in 2022. (*Id*., ¶ 5.) Additionally, LAPD requires officers to undergo 24 hours of perishable skills training every two years, which includes uses of force. (*Id*., ¶ 3.)

Following the Court's issuance of a TRO on April 19, 2021, LAPD disseminated the content of the TRO to all personnel. (Quiroz Decl., ¶ 7, Ex. 10.) After the Court modified the TRO on April 28, 2021, LAPD disseminated another notice to all personnel on May 3, 2021. (Quiroz Decl., ¶ 7, Ex. 11.) That notice reflects the requirements of the Injunction subsequently issued on May 10, 2021. (*Id*.)

Since the Court's issuance of the Injunction, LAPD issued directives and policies regarding the use of the 40mm LLMs, as well as crowd control issues:

- On September 28, 2021, LAPD issued Notice 1.3, prohibiting the use of the beanbag shotgun in crowd control situations. (Quiroz Decl., ¶ 6(a), Ex. 1.)

- In October 2021, LAPD issued Directive No. 17.1 on the 40mm LLM to replace the July 2018 Use of Force-Tactics Directive No. 17. (*Id*., ¶ 6(b), Ex. 2.)

- On December 14, 2021, LAPD issued Notice 1.14 regarding the newly enacted state laws, now codified as Cal. Penal Code §§ 409.7 and 13652, and their requirements. (*Id*., ¶ 6(c), Ex. 3.)

- On July 29, 2022, LAPD issued Notice 1.12 to all sworn personnel reminding that the minimum deployment range remains at 5 feet. (*Id*., ¶ 6(d), Ex. 4.)

- In September 2023, LAPD issued Use of Force Directive No. 3 regarding the 40mm LLM, superseding the October 2021 Directive No. 17.1. (*Id*., ¶ 6(e), Ex. 5.)

- In November 2024, LAPD issued Use of Force Directive No. 12 regarding the 37mm LLM. (*Id*., ¶ 6(f), Ex. 6.) Consistent with the Court's Injunction, the Directive provides that only Department-certified officers may deploy a 37mm launcher, the 37mm launcher may be deployed only with incident commander's approval, and that the

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT**

minimum approved deployment range for the 37mm launcher is 10 feet. (*Id.*) The
Directive further limits the circumstances when a 37mm launcher may be deployed,
consistent with the Court's Injunction. (*Id.*)

- In February 2025, LAPD issued Use of Force Directive 3.1 regarding the
40mm LLM. (*Id.*, ¶ 6(g), Ex. 7.) Consistent with the Injunction, the Directive provides
that use of the 40mm is appropriate when there is an immediate threat to the safety of the
officers or others or if there is an articulable risk the incident could escalate to the use of
deadly force. Further, the Directive provides that, when feasible, an officer shall give a
verbal warning prior to using the 40mm, that the approved deployment range for the
40mm is five to 75 feet, and that the 40mm should not be used to target the head, face,
eyes, neck, groin, spine, or kidneys unless lethal force is authorized. (*Id.*) This policy
does not expressly prohibit targeting the chest, but it provides that "the primary **target
area** is the navel area or beltline," and if "shots to the navel area or beltline do not
appear to be effective, then a leg, arm, or hand may be a viable alternative target." (*Id.*)

- In February 2025, LAPD issued Use of Force Directive 14 regarding Crowd
Control Kinetic Energy Projectiles and Chemical Agents. (*Id.*, ¶ 6(h), Ex. 8.) This
provides that use of 37mm LLM requires Incident Commander approval, reiterates that
the beanbag shotgun is not authorized for use during crowd control situations, and
reiterates the requirements of Cal. Penal Code § 13652, including that kinetic energy
projectiles "shall not be aimed at the head, neck, or other vital organs." (*Id.*)

- In May 2025, LAPD issued a Training Bulletin on Crowd Management,
Intervention, and Control, which noted "[t]here are no exceptions to the Department's
Use of Force Policy for crowd control situations." Further, the Bulletin reminded that
there are additional protocols for certain force options, including the 40mm LLM, and
directed officers to review the February 2025 Use of Force Directive. (*Id.*, ¶ 6(i), Ex. 9.)

The above summary reflects that LAPD updated its policies and trainings because
of the Court's Injunction, insight gained from the 2020 protests, and changes in state

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT**

law. In just the few months preceding the June 2025 protests, LAPD reminded officers of their obligations when deploying LLMs—obligations aligned with this Court's Injunction. This demonstrates LAPD took all reasonable steps to ensure compliance with this Court's Injunction, precluding a finding of contempt.

Further demonstrating that Defendants took all reasonable steps is contrasting the steps taken here with the steps taken by the City of Portland in *Don't Shoot Portland v. City of Portland*, 503 F.Supp.3d 1022 (D. Or. 2020). In that case, arising out of the George Floyd protests in 2020, the district court issued a temporary restraining order restricting the use of tear gas and LLMs. *Id*. at 1026. Following the issuance of the temporary restraining order, the plaintiffs moved for contempt in light of nine incidents that allegedly violated the order. *Id*. The court found the City of Portland did not take all reasonable steps to comply with the order: "[T]he Court cannot conclude that a single radio transmission and a discussion with [Rapid Response Team] officers and supervisors on June 30, 2020, constitutes 'all reasonable steps' Defendant could have taken to ensure compliance with the Order that evening." *Id*. at 1037.

### D. Plaintiffs Improperly Seek Punitive Sanctions

Plaintiffs seek imposition of three sanctions due to the alleged contempt: (1) appointment of a special master; (2) a ban on use of 40mm LLMs; and (3) an award of attorneys' fees. Mot. at 13-15. These proposed sanctions are inappropriately punitive and lack the coercive or compensatory characteristic required for civil contempt sanctions.

"A court can impose sanctions for civil contempt for two purposes: (1) to coerce the defendant into compliance with a court order or (2) to compensate the plaintiff for losses sustained. United States v. United Mine Workers of Am., 330 U.S. 258, 303 (1947); Shuffler v. Heritage Bank, 720 F.2d 1141, 1147 (9th Cir. 1983); Shell Offshore Inc. v. Greenpeace, Inc., 815 F.3d 623, 630 (9th Cir. 2016). Where the fine is coercive to force a defendant to comply with the court order, the fine is payable to the court. General Signal Corp. v. Donallco, Inc., 787 F.2d 1376, 1380 (9th Cir. 1986). If a complainant is

7

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT**

entitled to compensation, the fine imposed must be based upon evidence of the complainant's 'actual losses' sustained as a result of the contumacy. <u>United Mine Workers of Am.</u>, 330 U.S. at 304." *AK Futures LLC v. Smoke Tokes LLC*, Case No. 8:21-cv-01061-JVS-ADS, 2025 WL 1674380, at *5 (C.D. Cal. May 9, 2025).

"Lastly, the Court may grant attorneys [fees] under its inherent authority, and may instruct[ ] a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side. . . . . Such sanctions against a bad actor are limited to the legal fees the innocent party would not have incurred 'but for' the misconduct." *AK Futures LLC*, 2025 WL 1674380, at *7 (internal quotation marks omitted).

Labeling sanctions civil does not make them so; to determine whether sanctions are civil or criminal, courts examine the character of relief itself. *Coleman v. Newsom*, 131 F.4th 948, 962 (9th Cir. 2025). A sanction generally is civil if it coerces compliance with a court order, while a criminal sanction seeks to punish. *Id*. "The distinction is material because criminal sanctions require greater due process, including a jury trial and proof beyond a reasonable doubt." *Id*. When acting under its inherent authority to impose a sanction, a district court must find either (1) a willful violation of a court order; or (2) bad faith. *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1090 (9th Cir. 2021).

## 1.  Plaintiffs' Requested Sanctions Are Improper

Plaintiffs' requested sanctions should be rejected as they are neither coercive nor compensatory. The "ability to purge is perhaps the most definitive characteristic of coercive civil contempt." *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016). The lack of ability to purge reveals the punitive nature of the requested sanctions, removing those sanctions from the context of civil contempt. Further, in light of the substantial steps LAPD has taken to enact trainings and policies consistent with the terms of the Court's Injunction since the 2020 protests and this Court's issuance of the Injunction, there is no basis for finding a willful violation of the Court's Injunction or bad faith. Defendants address each requested sanction in turn.

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT**

First, appointment of a special master at the City's expense would neither have the effect of coercing compliance with the Injunction, nor would it compensate Plaintiffs for any harm allegedly suffered as a result of the alleged violations of the Injunction. Significantly, the incidents from June 2025 that form the basis for this Motion do not involve Plaintiffs in this case. As a result, Plaintiffs' requested special master would be focusing on incidents that not only are not at issue in this case (which is already over five years old), but incidents that very likely could be at issue in other litigation, as those persons subject to the alleged improper uses of force may bring lawsuits. In fact, a number of those persons have already signaled an intent to do so. As such, the appointment of a special master to investigate these incidents would likely amount to a duplication of resources and potentially inconsistent rulings. Therefore, the appointment of a special master would only result in the City paying substantial funds, with no coercive effect on Defendants or compensatory benefit to Plaintiffs.

Second, Plaintiffs seek a ban on use of 40mm LLMs. (Mot. at 15.) This request has no coercive or compensatory characteristic. Plaintiffs' asserted justifications for a ban also fail. Plaintiffs contend, "[t]wenty-five years is sufficient time for the LAPD to bring its crowd control responses into conformity with the law." (Mot. at 12.) This argument ignores LAPD's trainings and policies (discussed above) that are aligned with the law and this Court's Injunction. Plaintiffs cannot argue otherwise.

Next, Plaintiffs argue that "[i]n most instances, the LLMs were deployed without the warning required by this Court's order, long-standing settlements with the City and by Penal Code §13652 when the evidence demonstrates there were no circumstances that would justify not giving a legally adequate warning before shooting people." (Mot. at 12.) Plaintiffs make this contention without any evidentiary citation, so it appears to be baseless. Unless Plaintiffs' argument is referring to most of the instances referenced in their Motion (which they do not say), Plaintiffs' argument fails to consider the times when less-lethal force was utilized consistent with the Court's Injunction, the law, and

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT**

LAPD policy, or times when an officer declined to use less-lethal force because doing so would be inconsistent with either the Court's Injunction, the law, or Department policy. The answer to that question is likely unknowable at this time, and without such evidence, Plaintiffs cannot justify a blanket ban on 40mm LLMs.

Third, Plaintiffs seek attorneys' fees. Such an award would be neither coercive nor compensatory; the Plaintiffs in this case were not subjected to the uses of force forming the basis for Plaintiffs' Motion, so they could not have been harmed by the alleged violations, and therefore an award of attorneys' fees would not be compensatory. This is a necessary showing in order to demonstrate entitlement to fees or any other monetary award. *See In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 696 (9th Cir. 1993) ("[T]he award to defendants must be limited to their 'actual loss' for 'injuries which result from the noncompliance.'"); *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986) ("There is nothing in the record to indicate that General Signal lost $400,000 as a result of the violation of the consent order.").

In contrast to Plaintiffs' punitive requested sanctions, if the Court finds that sanctions are appropriate, the coercive sanctions ordered by the court in the *Portland* case provide guidance as to the nature of sanctions would be appropriate. There, the sanctions included requiring certain officers to undergo certain trainings and recirculating the court's order and requiring certification that it was read. *Portland*, 2021 WL 982613, at *2. The court declined "to order the additional sanctions proposed by Plaintiffs and discussed with the parties at the hearings. Because the proposed sanctions do not provide Defendant with an opportunity to purge the contempt, the proposed sanctions are not appropriate civil contempt sanctions." *Id*.

## IV.    CONCLUSION

Because the City took all reasonable steps to comply with the Court's Preliminary Injunction, Plaintiffs' Motion for Contempt should be denied.

10

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT**

DATED: August 26, 2025            Respectfully Submitted,

**HYDEE FELDSTEIN SOTO**, City Attorney
**DENISE C. MILLS,** Chief Deputy City Attorney
**KATHLEEN KENEALY**, Chief Asst. City Attorney
**CORY M. BRENTE**, Senior Assistant City Attorney
**CHRISTIAN BOJORQUEZ**, Assistant City Attorney
**GABRIEL S. DERMER**, Assistant City Attorney
**JOSEPH S. PERSOFF**, Deputy City Attorney


By:   /s/ Joseph S. Persoff
      JOSEPH S. PERSOFF
      Deputy City Attorney

Attorneys for Defendants
**CITY OF LOS ANGELES and
CHIEF JIM McDONNELL**

11

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT**